Pages 1 - 52

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE BETH LABSON FREEMAN, JUDGE

ALICE SVENSON, individually and     )
on behalf of all others similarly   )
situated,                           )
                                    )
            Plaintiff,              )
                                    )
    VS.                             ) NO. C 13-4080-BLF
                                    )
GOOGLE INC., a Delaware             )
Corporation, and GOOGLE PAYMENT     )
CORPORATION, a Delaware             )
Corporation,                        )
                                    )  San Jose, California
            Defendants.            )  Thursday
                                    )  June 26, 2014
_____)  9:17 a.m.


TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          PROGRESSIVE LAW GROUP, LLC
                        354 West Main Street
                        Madison, Wisconsin  53703
                    BY: FRANK JABLONSKI, ESQ.


For Defendants:         PERKINS COIE LLP
                        1201 Third Avenue
                        Suite 4900
                        Seattle, Washington  98101-3099
                    BY: SUSAN FAHRINGER, ESQ.
                        CHARLES C. SIPOS, ESQ.



Reported by:            BELLE BALL, CSR #8785, CRR, RDR
                        Official Reporter, U.S. District Court

1    **THURSDAY, JUNE 26, 2014**                           **9:17 A.M.**

2                          P R O C E E D I N G S

3            **THE CLERK:**  Calling Case 13-CV 40820, Svenson versus

4    Google, Inc., et al.  Counsel, please state your appearances.

5            **MS. FAHRINGER:**  Good morning, Your Honor.  Susan

6    Fahringer on behalf of Google, Inc. and Google Payment

7    Corporation.  With me today is my colleague, Charles Sipos.

8            **MR. SIPOS:**  Good morning, Your Honor.

9            **MR. JABLONSKI:**  Good morning, Your Honor.  Frank

10   Jablonski on behalf of Alice Svenson.

11           **THE COURT:**  Good morning.

12      Well, to say I had extensive briefing would be an

13   understatement in this case.  And, I -- certainly many issues

14   have been raised here at this motion to dismiss.  I have a

15   number of questions.

16      But, perhaps I would be best served by hearing from each

17   of you -- first, Ms. Fahringer -- if I can, anything you'd

18   like to add.  I did spend quite a bit of time with your

19   papers, but there was a lot to sink my teeth into.

20           **MS. FAHRINGER:**  Understood, Your Honor.  There is a

21   lot of briefing on this motion, and there are a lot of reasons

22   to dismiss the complaint, in our view.

23      I would start with the SCA claims --

24           **THE COURT:**  Okay.

25           **MS. FAHRINGER:**  -- because we're asking the Court to

1    dismiss those claims with prejudice.

2       Unless -- unless the Court has specific questions on those

3    claims, to begin, the overall view of those claims is:   To

4    adopt the position Plaintiff would have this Court adopt would

5    be to go beyond the SCA's claim language, and beyond cases

6    interpreting the SCA.

7       Essentially, the Plaintiff is asking this Court to go

8    where no court has gone before.  And here's why.  I'll start

9    with Section 2702.  That was the subject of our supplemental

10   briefing.

11          **THE COURT:**  And, 2702 is the harder one.  I thought

12   2701 was a clearer case.  I could maybe be persuaded

13   otherwise.  But, I have reviewed the briefing at some level.

14      And I will say on 2702, it's a little baffling to me to

15   read *Zynga* and the *Pharmatrak* case that our Ninth Circuit has

16   adopted, endorsed and embraced, it is very strong language,

17   saying that they got it right.  But, to also look at the

18   exception in 2702 for name, phone number.

19      And so, you know, you're going right there, but that's

20   where I'm puzzling as well.

21          **MS. FAHRINGER:**  And I'm prepared to discuss that.

22   And the reason, frankly, that I wanted to discuss 2702 first

23   is because I do think 2701 is the much more straightforward

24   argument.

25          **THE COURT:**  Yeah.

1          **MS. FAHRINGER:**  As to 2702, it regards disclosure of

2    electronic communication.  And the Plaintiff here concedes,

3    there's no argument that if information at issue in this case

4    is record information, as opposed to the contents of

5    communications, there's no violation of 2702.

6          **THE COURT:**  So, does "record" equate to

7    "automatically generated"?

8          **MS. FAHRINGER:**  Great question.  And the answer is

9    for Wiretap Act cases -- and it's important to recognize that

10   the automatically-generated test is a court-imposed rule of

11   thumb that is applied in Wiretap Act cases.

12      There is not a single case that applies the

13   automatically-generated test that doesn't also have a Wiretap

14   Act claim --

15         **THE COURT:**  And *Zynga* had a Wiretap Act.

16         **MS. FAHRINGER:**  Exactly.  And *Pharmatrak* was entirely

17   Wiretap Act.  No SCA claim in *Pharmatrak*.

18         **THE COURT:**  I don't think I noticed that in

19   *Pharmatrak*.

20         **MS. FAHRINGER:**  Yes.

21         **THE COURT:**  I was so interested in the content of the

22   communication, compared to what is alleged here, that I -- but

23   I thought that the definition of "content of communication"

24   was borrowed -- was used in both acts.

25         **MS. FAHRINGER:**  That's correct.  They share the

1   definitions in 25 --

2          THE COURT:  But, how could it be sharing a

3   definition, but used differently?

4          MS. FAHRINGER:  Yes.  The -- the sharing of the

5   definition --

6          THE COURT:  Making my head hurt.

7          MS. FAHRINGER:  These are questions courts struggle

8   with all the time.

9          THE COURT:  Uh-huh.

10          MS. FAHRINGER:  And it's difficult, because it's a

11   20-plus-year-old statute, and courts are not a fan of this

12   statute because it is confusing.  But, there are a few points

13   of clarity.

14     The two parts of the ECPA, the SCA and the Wiretap Act,

15   share the definition of "contents of communications."  That

16   means it's a substance, purport or meaning of a communication.

17     Wiretap Act cases deal with -- with a certain kind of

18   data.  It's in-flight communications, things like intercepted

19   phone calls.  And for that reason, it's helpful to have a rule

20   of thumb that separates what is typically the contents of

21   those communications, the conversation on the phone, from

22   transactional information or automatically-generated

23   information.

24     And so that rule of thumb, which is the

25   automatically-generated test, that's a court-developed rule of

```
 1   thumb.  It's not statutory.  And it's applied in Wiretap Act

 2   cases for that reason.

 3       What Zynga did is dealt with -- because it had to contend

 4   both with an SCA claim and a Wiretap Act claim, what Zynga did

 5   was consider the SCA definition of "record information," which

 6   is 2703(c)(2).  Over the past 20 years, courts have uniformly

 7   found that the record information listed in the SCA, Section

 8   2703(c)(2), is -- you know, name, subscriber information,

 9   address, phone number -- that that information, that bare

10   information, is records and not content.

11       And that's not just in re: Zynga.

12           THE COURT:  Regardless of what source it's derived

13   from.

14           MS. FAHRINGER:  That's complicated.  If it's buried

15   in an email, things are a little different.  However --

16           THE COURT:  So I think that's an issue that I had in

17   reading these papers.  And I only have a complaint, of course,

18   is that I'm not actually sure how this information was

19   supplied.

20       And that became more complicated when I looked at

21   Pharmatrak.  Because in that case, it was -- it seemed like

22   this was a form that a customer or user had to fill out that

23   included this medical information which has heightened privacy

24   interests, and a multitude of laws that overlay the privacy

25   interests, concerns and rights.  And so, I didn't want to get
```

1  too distracted by it.  But, our Ninth Circuit wasn't using

2  *Pharmatrak* in its limited capacity as invoking the privacy of

3  medical records.

4      So, do I have enough here in these papers, and in this

5  complaint -- and if it's just an amendment, then that's easy

6  to accomplish -- to know whether this is a record or contents

7  of a communication?

8          **MS. FAHRINGER:**  You do.  And here's why.

9          **THE COURT:**  Okay.

10         **MS. FAHRINGER:**  What's alleged in the complaint is

11  that this information was supplied at creation of the Google

12  account.  That's alleged.  There's no dispute about that.

13         **THE COURT:**  Right.

14         **MS. FAHRINGER:**  And there never will be.  This

15  information, it's not buried in an email.  It's supplied,

16  probably in a form, in connection with account creation.

17      Court after court after court recognize that in the

18  context of the SCA, that is how service providers get this

19  information.  That's *Obodai*, *Beluga Shipping*, *Chevron*.

20      They recognize and acknowledge that the record information

21  listed in 2703(c)(2) -- name, address, and so forth -- that

22  that is, even if supplied in a form to a service provider,

23  necessarily the record information, and not contents.

24      And to go and to -- to decide that suddenly, after 20

25  years of guidance that says this is record information, not

```
 1    contents, would be to -- to contravene that authority.  It
 2    would also be to read 2703(c)(2) out of the statute.  Because
 3    if suddenly that information is contents and not a record,
 4    then government authorities needs a search warrant for that
 5    information, rather than a subpoena.  And, there are case
 6    after case after case confirming that that information must be
 7    supplied in response to a subpoena.
 8        It's simply inconsistent with authority interpreting the
 9    SCA to -- to find that the record information listed in
10    2703(c)(2) is the contents of communications.  It would be
11    very disruptive.
12            THE COURT:  What about the fact that his credit card
13    number is part of this, as well?  That goes beyond the statute
14    in terms of the categories of information it identifies as
15    exempt, doesn't it?
16            MS. FAHRINGER:  No, it doesn't.  Credit card -- well,
17    two things.  One, there's no allegation in this case that
18    credit card number was disclosed.  No allegation in this case
19    that credit card number was disclosed.
20            THE COURT:  Really?  Hmm.
21            MR. JABLONSKI:  Yes, Your Honor.  That's correct.
22            THE COURT:  That's correct?  Thank you.  I'm sorry I
23    missed that.
24            MS. FAHRINGER:  However, credit card information
25    actually is among the listed -- listed information.
```

1          **THE COURT:**  It is.

2          **MS. FAHRINGER:**  Yeah.  But in any case, it's not an

3   issue in this case.

4          **THE COURT:**  Okay.

5          **MS. FAHRINGER:**  But to emphasize this, the SCA is a

6   criminal statute.  The Plaintiff is -- it is a criminal

7   statute with civil remedies.

8          **THE COURT:**  Okay.

9          **MS. FAHRINGER:**  And the Plaintiff is asking this

10  Court to extend the range of the SCA beyond activity that it

11  should -- that it should be extended to cover.  It should be

12  interpreted narrowly to cover just the conduct it prohibits,

13  and nothing more.

14     The automatically-generated test does not apply in the SCA

15  context.  And the fact that the information was supplied in a

16  form, court after court after court has confirmed that is not

17  a problem under the SCA.  And again, that's *Obodai*, *Beluga*

18  *Shipping*, *Chevron*.  And they deal with exactly the same

19  information as is alleged to be at issue in this case.

20     It is complicated, and the ECPA is hardly a model of

21  clarity.  But again, on this point, it is straightforward.

22  The information at issue in this case, supplied as it was,

23  uncontestably supplied in this case, is simply not the

24  contents of communications.  That's the 2702 issue.

25         **THE COURT:**  Okay.

1          **MS. FAHRINGER:**  As to Section 2701, I think again, as

2     the Court has noticed, this is fairly straightforward.  This

3     prohibits unauthorized access or access in excess of

4     authorization to facilities.  The facilities here are Google

5     Zone.  It's clear that that's not a violation.

6          **THE COURT:**  To me, it was sort of like I can't go up

7     into my own attic.

8          **MS. FAHRINGER:**  That's right.

9          **THE COURT:**  And forage around for my own junk.

10         **MS. FAHRINGER:**  Yes.  It's your attic.  You can do

11    what you want with it.

12         **THE COURT:**  Yeah.  Yeah.  Sorry.  You know -- well,

13    I'll hear -- you hear where I'm going on it.  It'll help you

14    with your argument.

15         **MR. JABLONSKI:**  Yes, Your Honor.

16         **THE COURT:**  But I -- yeah.  Okay.

17         **MS. FAHRINGER:**  So, that's our -- I feel we've

18    covered the points that need to be covered with regard to the

19    stored communications action.

20         **THE COURT:**  Okay.

21         **MS. FAHRINGER:**  And again, I covered those first

22    because we are asking that those claims be dismissed with

23    prejudice.  And the reason for that is that the flaws in these

24    claims are not flaws in pleading.  These are flaws,

25    fundamental flaws in the theories that are presented.  There

1    is no amendment that is capable of correcting the flaws that

2    are reflected by the allegations here.

3            **THE COURT:**  All right.

4            **MS. FAHRINGER:**  I would start -- as to the state-law

5    claims, I would start with the contract claim.

6        The flaw in this claim, as alleged, is that based on the

7    facts alleged, the Plaintiff here is in exactly the same

8    economic position before the alleged breach as after the

9    alleged breach.  She hasn't alleged any actual or appreciable

10   damage caused by the alleged breach.  And of course, damage is

11   an essential element in a contract claim.

12       What she has alleged is that the Defendant made -- the

13   Defendants made -- allegedly made privacy promises.  But, she

14   won't even allege she read the promises.  And she won't even

15   directly allege she agreed to them.

16       What she alleges on that is at the complaint, Paragraph 68

17   through 70, quote, "according to Google," she agreed to the

18   promises.  But, she's alleged that.  She's alleged the

19   promises were breached.  And, she's presented a number of

20   theories of damage.

21       First, she's argued that her identity -- she fears that

22   her identity might be stolen as a result of the alleged

23   disclosure of this bare registration information.  And again,

24   to be clear, it's not public disclosure.  This is disclosure

25   to the seller from whom she bought an app.

1          **THE COURT:**  Yes.

2          **MS. FAHRINGER:**  She fears her identity might be

3   stolen.  But cases are clear in California that the mere fear

4   of that is too speculative to support either Article III

5   standing or to constitute actual and appreciable damages.

6          She's also alleged and argued in sort of two different

7   forms, number one, that the app she purchased is worth less

8   after the breach than before.  That is one of her arguments.

9          And the other way she puts this is that she lost the

10  benefit of her bargain, because she argues that she paid more

11  for her app -- or that she paid for the privacy promises, to

12  be clear.  So, she makes those arguments.

13         But to be clear, those are theories.  They're conclusions.

14  They are not facts.  This Plaintiff has not alleged a single

15  fact on which this Court -- that this Court can use to

16  reasonably infer that the -- that the decrease in value of the

17  app or that the amount paid for the privacy promises was

18  anything other than zero.  There is not a single fact alleged

19  that allows this Court to reasonably infer that those amounts

20  are anything other than zero.

21         She hasn't -- for example, she hasn't alleged, this

22  Plaintiff, that the app was available elsewhere for more or

23  less with different privacy promises.  She won't even allege

24  -- she alleges that she paid something for the promise, but

25  she won't even allege that she read the promise.

1    She now argues that part of the payment that she made, the

2    $1.77 she paid, she now argues that part of that was for the

3    service or the privacy -- that included these privacy

4    promises.  But that's not in this complaint.  In this

5    complaint, this Plaintiff alleges that she paid for the app,

6    not for privacy promises.  That's at Paragraph 74.

7        And she doesn't allege that she paid the Defendants.  She

8    is very coy about that.  She knows the service was free.  She

9    argues that, quote, "Money changed hands."  What she alleges

10   is that the Defendants pocketed monies, earned money.  The

11   transaction fees are pocketed by Defendants.  That's at

12   Paragraphs 81, 41, 78.

13       But just because money changed hands in not mean that the

14   Plaintiff has borne her burden to establish injury in fact,

15   her burden to show that this money changed hands was damage

16   caused by the alleged breach.

17       **THE COURT:**  Doesn't she also allege that her private

18   information has less value now?

19       **MS. FAHRINGER:**  That's part of the -- oh, that -- the

20   economic injury?

21       **THE COURT:**  Yeah.

22       **MS. FAHRINGER:**  Well, she sort of alleges that.

23       **THE COURT:**  Well, the reason -- I believe she does

24   argue that.  But, there's a May 8, Ninth Circuit case in the

25   *Facebook* privacy litigation.

1             MS. FAHRINGER:  Uh-huh.

2             THE COURT:  You're probably familiar with this.

3             MS. FAHRINGER:  Uh-huh.

4             THE COURT:  I don't know if your firm was actually on

5    that one, but I'm sure you are.

6         And what was interesting to me is that the Ninth Circuit

7    in looking at a -- you know, this case, it's similar, although

8    in the *Facebook* case I believe nothing was paid for the -- for

9    Facebook, so that issue was not before it.

10        But, they indicate -- the Ninth Circuit says (As read):

11             "Plaintiffs allege that the information disclosed by

12             Facebook can be used to obtain personal information

13             about Plaintiffs, and that they were harmed both by

14             the dissemination of their personal information and

15             by losing the sales value of that information.  In

16             the absence of any applicable contravening state law,

17             these allegations are sufficient to show the element

18             of damages for breach of contract."

19             MS. FAHRINGER:  Yeah.  And that's a different

20    complaint.  It's a different case.

21        What the plaintiffs alleged in that complaint was that

22    there was a market, and that they intended to sell their

23    information.  That they were stymied.  They were unable to --

24    to trade in their information.

25        That's the opposite of what this Plaintiff alleges.  What

```
 1   Svenson --

 2            THE COURT:  I just have the conclusion in this one.

 3            MS. FAHRINGER:  Understood.

 4            THE COURT:  Not fleshed out.  However, that would

 5   then beg the question of:  Should this Plaintiff be given

 6   leave to amend?  And I'll hear on that.  I don't know whether

 7   that -- maybe that's not an argument that Plaintiff wants to

 8   pursue.

 9       So, it's your contention, though -- and I'm trying to

10   understand this from the evidence I can consider.

11            MS. FAHRINGER:  Uh-huh.

12            THE COURT:  I know we're not in the middle of

13   discovery; it's not summary judgment.

14            MS. FAHRINGER:  Uh-huh.

15            THE COURT:  And I want to be careful not to go there.

16   But, I believe you're saying in your papers that when a

17   customer using Google Wallet purchases an app, that the

18   transaction is between the customer and the app seller.  The

19   vendor.

20            MS. FAHRINGER:  Yeah.

21            THE COURT:  Are you saying that Google Wallet

22   facilitates the payment being made directly to the vendor?

23            MS. FAHRINGER:  Yeah.  The payment -- they would be

24   the payment processor.

25            THE COURT:  And the money changed hands, and all of
```

1    that.  Again, I don't -- you're right.  I agree with how you

2    identify what's not said in the allegations.  And so, of

3    course, I'm always looking to see if -- if amendment will cure

4    it, then of course we go another round.

5        But I -- it's -- I'm not sure -- I don't think you're able

6    at this point to provide to the Court evidence of whether or

7    not money -- there's a short stop during the Google Wallet

8    phase where Google extracts some fee, some portion of the

9    purchase.

10       And, it may be too soon.  We're just at a motion to

11   dismiss.  I'm not asking you to give me more information.

12   But, I don't think you actually addressed that in your papers.

13       Did you?

14            **MS. FAHRINGER:**  I think we can't.

15            **THE COURT:**  I don't think you can, either.

16            **MS. FAHRINGER:**  Yeah.

17            **THE COURT:**  And that's fine.  I wanted to make sure I

18   didn't miss it.

19            **MS. FAHRINGER:**  If the complaint survives and we have

20   to contend with that, we look forward to the opportunity to

21   show a few things.  One is that all of the actions taken were

22   completely consistent with the privacy policies.  And there's

23   a lot to be said on all of that.

24            **THE COURT:**  No, I understand.  And the privacy policy

25   has the as-necessary clause.  But, that's not even a

```
 1   summary-judgment issue.  We'll be at trial if we get to that,

 2   if that's what we are fighting about.

 3       All right.  And, I certainly got a little confused as to

 4   which contracts we're dealing with, but I'll deal with that,

 5   too.  That's not your concern.  That's an easy fix on the

 6   pleadings.

 7               MS. FAHRINGER:  Yeah.

 8               THE COURT:  But, it's your contention that under

 9   these contracts, that the -- the relationship is between the

10   app vendor and the customer.  And Google is really just the

11   processor.

12               MS. FAHRINGER:  Google Wallet would be the processor.

13               THE COURT:  Thank you.

14               MS. FAHRINGER:  Yes.  The buyer is the -- is Svenson,

15   would be the buyer.

16               THE COURT:  Right.

17               MS. FAHRINGER:  And the seller would be the vendor of

18   the app.  In this case, it's YC Droid.

19               THE COURT:  Okay.  Yes, right.

20       And then, the question I also have -- and again, from this

21   Facebook case, there's this little bit about the UCL.

22               MS. FAHRINGER:  Uh-huh, yes.

23               THE COURT:  And what is interesting to me is where

24   the Court said, "Well, let's go forward on contract damages,

25   you have enough, you've made enough there, but you haven't
```

```
 1   made enough on UCL," again, that was a service that wasn't
 2   directly paid for in Facebook.
 3            MS. FAHRINGER:  Uh-huh.
 4            THE COURT:  So, losing money or property as a result
 5   of, under Prop 64, would be different there.
 6            MS. FAHRINGER:  Uh-huh.
 7            THE COURT:  But, do you contend that these theories
 8   of benefit of the bargain, or the app having less value would
 9   fall into that, that same analysis of the UCL?
10            MS. FAHRINGER:  Yeah, I think that for -- for the
11   same reason that the Plaintiff can't show damage under breach
12   of contract, the claim fails at the UCL.
13       But in addition to that, an even easier threshold question
14   is that the fatal flaw as to the UCL claim is very -- it's
15   conceded -- well, it's not conceded that it's a fatal flaw,
16   but what is conceded by the Plaintiffs here is that they have
17   not pled reliance.
18       And the issue is, in our view, they must plead reliance on
19   these representations in the privacy promises in order to
20   establish they have standing under the UCL.
21            THE COURT:  I saw that Plaintiff argued that reliance
22   wasn't required, unless you use the fraud prong.  I don't
23   think it was conceded.  I think it was the opposite.
24            MS. FAHRINGER:  Right.  That's correct.
25            THE COURT:  And, they have not proceeded under the
```

1    fraud prong, here.  It's the unfair and the unlawful.

2        So clearly, if the 270- -- if the SCA claim goes, then we

3    may not have an unlawful.  But, we'll see on that.  But on the

4    unfair, you're suggesting reliance.  We certainly need

5    causation.  It has to be losing money or property as a result

6    of.  Which, it's not quite reliance.  I don't think the courts

7    have equated that language with reliance, like fraud reliance.

8        **MS. FAHRINGER:**  Actually, in -- where a UCL claim is

9    based on misrepresentations, as is the case here --

10        **THE COURT:**  Really?

11        **MS. FAHRINGER:**  -- where the -- yes, Complaint,

12   Paragraph 154, in the UCL allegations.  154, 151, 152, 155,

13   all of these are essentially allegations that -- for example,

14   Paragraph 154 (As read):

15            "The practice violates reasonable expectations

16            created by the alleged privacy promises."

17        Complaint Paragraphs 151, 152, 155 are all based on,

18   essentially, allegedly broken privacy promises.  All of these

19   claims are based on what amounts to saying, "You promised to

20   do something that you didn't do."  It's essentially,

21   fundamentally, a misrepresentation claim.

22        And when you have a UCL claim that is fundamentally based

23   in fraud or misrepresentation, California courts -- after

24   *Kwikset*, California courts are clear that that makes it clear

25   that in order to establish UCL standing, you have to show

1   reliance on those misrepresentations.

2            **THE COURT:**  But a misrepresentation is different than

3   a broken promise.

4            **MS. FAHRINGER:**  Right.

5            **THE COURT:**  And I actually think this is -- what they

6   are alleging is a broken promise, here.  Maybe both.

7        You know, again, I didn't read it as misrepresentations,

8   because that requires an intention to say something you don't

9   expect to follow through with.  We're right back into fraud.

10       I -- I think -- I don't actually read these -- as I say, I

11   read them as broken promises, breach, unfair to make promises

12   you're saying that you never intended to keep, as opposed to

13   changed your mind later.

14           **MS. FAHRINGER:**  Uh-huh, yeah.  Well, either way,

15   there's the same causation flaw.  Either it is to be read --

16   as I read it, either the UCL claim is to be read as saying you

17   intended -- you intentionally read your privacy promises

18   differently than you should have, and that -- that borders on

19   misrepresentation.  Either it's that and they have to show

20   reliance, or -- either way.

21       Or, if the core act is that there was a -- in either

22   case -- maybe to put it a different way, in either case,

23   there's a disconnect between the loss of money and property

24   and causation.  They can't show -- and again, it's for the

25   same reasons that the contract claim has these flaws.

1        This Plaintiff can't show that the loss of money and

2   property that she is pointing toward was caused by whatever

3   the offending action was.  If it's deception, she can't show

4   she read the promise.  If it's something else, whatever that

5   might be, causation isn't demonstrable.  That would be the

6   flaw we would identify in the UCL claim.

7        Again, it's a UCL standing issue, that it's -- it's --

8   whatever dot the Plaintiff finds to establish money and

9   property, establishing causation is where their UCL claim

10  falls down.  And again, there might be many interpretations of

11  their UCL claim, but they all fall on that causation

12  requirement.

13            **THE COURT:**  All right.  And you have an argument in

14  your reply brief that I probably read three or four times, and

15  I just didn't understand.  So, I know you can help me with it.

16       At Page 4 of your reply, you indicate that the injury

17  preceded the challenged conduct.

18            **MS. FAHRINGER:**  Ah.

19            **THE COURT:**  I just couldn't wrap my head around that.

20  Tell me what you meant by that.

21            **MS. FAHRINGER:**  Yeah.  And candidly, Your Honor, we

22  patterned that after some decisions that Judge Davila had

23  issued, because it was in language that he had used, and we

24  thought it would -- we thought it appropriate to do that.

25       But what the translation of that is, is essentially a

1  causation argument.  That if you are pointing to -- if the

2  damage that you are pointing to is "I paid money for the

3  app" -- that's the damage that this Plaintiff is pointing to.

4  She's saying that $1.77, that some portion of that is her lost

5  money or property.

6     If that is her damage, then she needs to show that that

7  damage is caused by -- or if that is her harm, her loss of

8  money and property, she needs to show that it's caused by the

9  offending actions.

10     So, the fact that it's before in time is --

11         **THE COURT:**  Payment is always before in time.

12  Always.

13         **MS. FAHRINGER:**  Right.

14         **THE COURT:**  I mean, never -- okay.

15         **MS. FAHRINGER:**  But payment is not -- oh.

16         **THE COURT:**  I guess it's just -- it's just not

17  resonating with me, because if you and I have an agreement for

18  you to provide a service to me, I have to do what the contract

19  requires of me.  That's pay you money.

20         **MS. FAHRINGER:**  Uh-huh.

21         **THE COURT:**  And then, you don't do what you were

22  supposed to do.  So my damage always precedes your failure to

23  do what I'm asking.

24         **MS. FAHRINGER:**  Payment is always preceding in time,

25  but it's not always damage.  Payment is consideration.  But,

1    the payment is not necessarily the damage.  Depending on the

2    breach.

3         **THE COURT:**  But in this case, the Plaintiff is not

4    arguing that the payment -- the act of paying was her damage.

5    It was the increment of the payment that could be attributed

6    to her -- the value of her privacy rights in the contract that

7    wasn't delivered.

8         **MS. FAHRINGER:**  And that brings us full circle.

9         **THE COURT:**  It does.

10        **MS. FAHRINGER:**  Because -- yeah.  So.

11        **THE COURT:**  Okay.  That one just kind of jumped out

12   at me; I didn't really understand it.  But maybe I can move on

13   from that.

14        **MS. FAHRINGER:**  Understood.

15        **THE COURT:**  Okay.

16        **MS. FAHRINGER:**  I think we would rest on the briefing

17   with respect to the implied-covenant claim.

18        **THE COURT:**  Yeah.  I think that's --

19        **MS. FAHRINGER:**  So, in summary, I would just note

20   that this Plaintiff is really struggling to articulate a

21   theory of damage that's viable.  And, that's for good reason.

22   Because there is no damage here.

23        And this Plaintiff is really struggling to find a claim

24   that covers the facts in this case.  And again, that's for

25   good reason.  Because there is none.  So we've asked for the

```
 1   complaint to be dismissed, and again, for the SCA claims to be

 2   dismissed with prejudice.

 3           THE COURT:  All right.  Good.  Thank you very much.

 4       All right.  Let's hear the rebuttal.

 5           MR. JABLONSKI:  Thank Your Honor.

 6           THE COURT:  You have a lot to work with here.

 7           MR. JABLONSKI:  I guess what I would do is I would

 8   start off by directing your attention to Paragraph 31 of the

 9   complaint.

10           THE COURT:  Okay.  I've got a lot of paper here, but

11   I have the complaint right here.  Let me get to that.

12           MR. JABLONSKI:  Ms. Fahringer indicated that the

13   information was provided in connection with creation of a

14   Google account.

15       That's not -- and I think that what the defense option --

16   or, what the defense is trying to do here is to try to put

17   this in kind of the box with LinkedIn, and that interesting --

18   that very interesting phrasing in LinkedIn which I've also

19   puzzled about, which you were just talking about with

20   Ms. Fahringer, that, I think, can be explained.

21       I'll just stop and explain it.

22           THE COURT:  Great.

23           MR. JABLONSKI:  What that is, is that -- that's very

24   fact-specific to LinkedIn.

25           THE COURT:  Okay.
```

1          **MR. JABLONSKI:**  In *LinkedIn*, what happened was the

2    plaintiff signed up for a series of promises.  The whole bag

3    of privacy promises was signed up for.  All right?  Then what

4    they did later was they signed up for a higher level of

5    LinkedIn service (Indicating).

6       And what happened then, there was this problem with

7    LinkedIn got hacked.  There's a problem with the data.  Right?

8          **THE COURT:**  So then we have hacking, which does come

9    under the SCA.  I mean, there we've got a whole different --

10         **MR. JABLONSKI:**  Right.

11         **THE COURT:**  Yeah.

12         **MR. JABLONSKI:**  Right.  There was that situation

13   there.

14         **THE COURT:**  Okay.

15         **MR. JABLONSKI:**  And so what they were trying to do is

16   they were relying on these privacy promises, which didn't

17   change in between --

18         **THE COURT:**  I see.

19         **MR. JABLONSKI:**  -- the beginning, buying, and then

20   the problem (Indicating).

21         **THE COURT:**  Uh-huh.

22         **MR. JABLONSKI:**  All right?  What we're saying here,

23   what is indicated here, partially in Paragraph 31 but

24   throughout the complaint, is that the Plaintiff here purchased

25   additional services by signing up for Google Wallet.  And the

1   Plaintiff here was buying a secure product purchase service.

2       And the only entity that provides a product purchase

3   service is Google.  Or, Google Payment Corporation, a

4   subsidiary.

5           **THE COURT:**  So, this was secure.  You're not arguing

6   it wasn't secure, like in *LinkedIn*.  It wasn't hacked.

7           **MR. JABLONSKI:**  No.  We're not talking about hacking.

8           **THE COURT:**  So "secure" means that it's secure from

9   thieves coming in, as opposed -- and I didn't want to use the

10  word "unauthorized," because beauty is in the eye of the

11  beholder, there.

12      So, okay.  Go ahead.

13          **MR. JABLONSKI:**  Okay.  It's secured -- in connection

14  -- what Google says is they say, "Give us your information."

15  And they make these general promises -- general -- I guess

16  I'll call them remonstrations, that, "We care about your

17  privacy.  We're going to keep your information private."

18          **THE COURT:**  Uh-huh.

19          **MR. JABLONSKI:**  And they provide certain exceptions

20  when they won't provide that privacy for the information, that

21  we provide them, and they say that, "We'll only give away the

22  information that you give us, as necessary."

23          **THE COURT:**  Uh-huh.

24          **MR. JABLONSKI:**  The complaint -- the complaint here

25  is that it wasn't necessary for them to give away that

```
1   information, to provide access to that information to third
2   parties.  And, they did that.
3       And, the Plaintiff bought a service which incorporated a
4   promise.  She didn't get the benefit of that promise.  It
5   doesn't matter whether she could have bought this somewhere
6   else.  She bought it from Google.
7       And, Google pitched it as a -- as a product purchase
8   service that incorporates these promises and these benefits,
9   including Google Wallet -- Google Wallet privacy policy.  So,
10  she's entitled to all of that.
11          THE COURT:  Okay.  But you're saying that that only
12  occurs for customers who actually buy apps.
13          MR. JABLONSKI:  Yes.
14          THE COURT:  Because they paid no money for just
15  having Google Wallet.
16          MR. JABLONSKI:  You use Google Wallet to buy apps.
17          THE COURT:  Well, I understand that.  But, I've
18  signed up for a lot of things I don't use.
19      So, what I'm trying to understand is that this is a --
20  this -- you only can make these allegations because
21  Ms. Swenson purchased a product.
22          MR. JABLONSKI:  Right.
23          THE COURT:  And she paid money.  Everyone
24  acknowledges that.
25          MR. JABLONSKI:  Right.
```

1          **THE COURT:**  That that's what distinguishes this

2    from -- maybe from *LinkedIn* and from *Facebook*, and some of the

3    other cases.

4          **MR. JABLONSKI:**  Yes.  That -- yes.  That's --

5          **THE COURT:**  Okay.  And are you -- now, there are a

6    number of contracts.  And I will -- regardless of how the rest

7    of this turns out, you are going to have to amend to put the

8    right contracts before the Court.  Because that turned out to

9    be a problem.

10      And I don't -- I am not going to allow hyperlinks in a

11   complaint.  So -- and thank you, you know.  Should we have

12   moved on?  Maybe, but I don't want to have to be online to

13   read these things.

14      So I need you to do it the old-fashioned way, and submit

15   them as attachments to the complaint.

16         **MR. JABLONSKI:**  Yes, Your Honor.

17         **THE COURT:**  And it turned out the hyperlink went to

18   the wrong document.  So, that was -- those things happen.

19      But, I do need an amendment on that, so that we, as the

20   case goes forward, that we have it.

21      And, I think that one thing that happened was that this

22   was a scanned submission, and so the hyperlink was not a

23   hyperlink when it came to the Court.  So it was just --

24   anyway, not your concern, but nice to know what happens on

25   that.

1       But, it wasn't just a click, and see the contract.  It was

2   a write it down, close out the document, go online, try to

3   find it, hope you didn't type it wrong.  And so --

4       **MR. JABLONSKI:**  You always think these things are

5   going to be easier.

6       **THE COURT:**  Yeah, and then you get an old judge, and

7   you're really in trouble.

8       **MR. JABLONSKI:**  I apologize, Your Honor.

9       **THE COURT:**  That's not a problem.  I appreciate your

10  trying to make it efficient.  And it didn't -- unfortunately

11  for our technology, didn't work out so well.

12      But, I guess -- I mean, I really do -- I think that there

13  are two really significant issues that I need to be persuaded

14  of here.  And, one of them is allegations of damage that are

15  based on fact.  And, I am concerned about really understanding

16  what your theories of damage are.

17      It seems to me like there may be four theories of damages.

18  The threat to -- increased threat to identity theft, the loss

19  of value of private information, the loss of benefit of the

20  bargain, and actually some loss of money -- I'm not sure if

21  benefit of the bargain is the same as loss of the actual money

22  of the pennies on the dollar or -- that went to Google for

23  brokering this transaction.

24      And so, I don't know whether there are three or four.  You

25  can help me out with what you actually meant by "benefit of

1    the bargain."

2          **MR. JABLONSKI:**  By "benefit of the bargain,"

3    Your Honor, what we mean is that she bought a set of privacy

4    promises.  That's what she was entitled to when she made this

5    contract with Google, to use Google Wallet.

6       Every time that -- at least in this time frame, these

7    things have changed, but -- or appear to.  At least in this

8    time frame, every time that you go and you buy a Google

9    application -- or an application using Google Wallet, through

10   the Google Play Store, you have to essentially reinitiate the

11   contract again.  It's all intertwined at that time.

12         **THE COURT:**  Is it a different set of privacy rights

13   when you actually buy an app, as opposed to just register for

14   Google Wallet?

15         **MR. JABLONSKI:**  Yes.

16         **THE COURT:**  Okay.

17         **MR. JABLONSKI:**  Yes.

18         **THE COURT:**  So you're saying she -- in essence --

19         **MR. JABLONSKI:**  Well, you register for Google Wallet.

20   When you're buying the app, it's part of the process.  It's an

21   intertwined process.

22       So, I don't know if you can even register for Google

23   Wallet, other than -- I know that you can now.  But --

24         **THE COURT:**  I guess what I'm saying is I presume that

25   I register once for Google Wallet, and then every time I buy

1    an app, I use that account that I've already set up.  I don't

2    set up a new account each time.

3        Now, I don't personally use Google Wallet, but I use

4    others, and I have that account.  And it can be never used,

5    but I still have the account.  It could be used occasionally.

6    But the second and third and fourth times, I don't set up a

7    new account.

8        Are you saying that with Google Wallet, you actually set

9    up a new agreement with Google Wallet, each time?  Or are you

10   just --

11           **MR. JABLONSKI:**  That's the way that Google sets it

12   up, is that you create an agreement with Google every time you

13   make the app purchase.  And they may be doing that because --

14           **THE COURT:**  And those privacy rights are different

15   than what you signed up for free, just to have Google Wallet?

16           **MR. JABLONSKI:**  They change, over time.  And that may

17   be why Google does this.

18           **THE COURT:**  That doesn't answer my question.  Of

19   course, everything changes over time.

20       But, is there a different quantum of privacy rights when I

21   purchase my app than what I get for free with having Google

22   Wallet account?

23           **MR. JABLONSKI:**  I don't know, Your Honor.  That was

24   not the situation for Ms. Svenson.  Ms. Svenson signed up, and

25   bought.

1        **THE COURT:**  Well, I think you need to know, because

2   you submitted the two contracts.  I apologize that I haven't

3   read them that closely, and I will need to.

4        But, I think that your -- I thought that was the basis of

5   your allegation, is that there was a different quantum of

6   privacy rights that Ms. Svenson obtained when she purchased an

7   app  than when she simply signed up for the free product.

8        **MR. JABLONSKI:**  That's correct.  Because she has to

9   make the contract.  When she purchases the app, it's all

10  intertwined.

11       Every time -- at least in this time frame, every time that

12  you purchase the app, you purchase the app, they deliver the

13  app, they process the transaction, and they make your -- they

14  make your sensitive identifiable data available all in one

15  intertwined activity.

16       And you have to consent at that time to the Google Wallet

17  terms, which incorporate the Google Wallet privacy.

18       **THE COURT:**  Okay.

19       **MR. JABLONSKI:**  Right there.  With the purchase of

20  the app.

21       **THE COURT:**  I appreciate that.

22       So, let me go back to my question.  I understand that you

23  have to do that.  But I'm trying to determine whether the

24  privacy rights that you agree to at the moment you purchase

25  the app are different and greater than the privacy rights that

1   you got when you just -- when you gave them all your personal

2   information to set up your Google Wallet account.

3       I mean, we just have to read the contracts, don't we?  And

4   they are before me, so I can take a look at that.

5            MS. FAHRINGER:  I can answer.  And, they're not

6   different.

7       The Google Wallet privacy policy -- or "privacy notice,"

8   it's called -- Google Wallet privacy notice is the Google

9   Wallet privacy notice when you create your Google Wallet

10  account.  And that's the same Google Wallet privacy notice

11  that the Plaintiff invokes to argue there are new promises in

12  relation to the purchase of an app.  It's the same privacy

13  notice.

14           THE COURT:  Because then you're not paying for it,

15  are you, if you already have it?

16           MS. FAHRINGER:  Then you're not paying for it.

17           THE COURT:  Okay.  Okay.  I have a concern there.

18           MR. JABLONSKI:  Your Honor, that may be -- that may

19  be a different set of people.  Typically what happens -- what

20  happened with Ms. Svenson is she created the Google Wallet

21  account, and she agreed to the Google Wallet terms, and she

22  did her purchase, all in the same fell swoop.

23      And every time the -- well, the one time that she

24  purchased another Google -- Google Play Store application, she

25  did the same thing.  She had to agree to all the terms again.

1   So, her information may have been saved from the first time,

2   but she had to agree at the second time.

3        And the first time, when she purchased the application,

4   which is, I think, probably typical, is -- is -- I don't know

5   why people would do it, otherwise.  Maybe -- I guess it's a

6   placeholder.

7        But typically what happens is you establish your Google

8   Wallet account in connection with purchasing an application.

9   And, that's the fact pattern that we are talking about here.

10            **THE COURT:**  Well, and if that's the fact pattern, I

11   don't recall that it was drawn out that way, that these were

12   -- this was a simultaneous continuum of events.

13        And I will just tell you, and not that the Court's

14   experience is of much moment, but sometimes we have our kids

15   visiting, and they say, "Mom, let me set up a Google Wallet

16   account for you."

17        And I do that, and I say, "I don't know what I'll ever use

18   it for," but there it is.

19        And then, a month later when my kid comes back home, I

20   say, "I don't remember how to use this, but I want to buy that

21   app."

22        So, I don't buy the "That's what people do" statement.

23            **MR. JABLONSKI:**  All right.

24            **THE COURT:**  And so, if that's the fact with your --

25   with Ms. Svenson, --

1          **MR. JABLONSKI:**  Yes.

2          **THE COURT:**  -- that she did it as one continuous

3     event, that's fine.  I mean, that's her situation.  Whether

4     that makes her typical of the class, I don't know.

5          We're not at class certification.  It doesn't much matter

6     at this point.

7          **MR. JABLONSKI:**  Right.

8          **THE COURT:**  It matters for you, looking down the road

9     strategically.

10          **MR. JABLONSKI:**  Yes, it does.

11          **THE COURT:**  But, I don't believe you actually alleged

12     it that way.

13          And I actually thought what the complaint was telling me

14     was that she created a Google Wallet account with one set of

15     privacy promises, and when she bought the app, it was an added

16     quantum of privacy that she paid for.  And that that was the

17     way you were showing that she paid for the privacy, as opposed

18     to it being free.

19          **MR. JABLONSKI:**  She created the Google -- it's an

20     ascending series of agreements.

21          **THE COURT:**  Sure.

22          **MR. JABLONSKI:**  First there's the Google agreement,

23     which gives you your gmail address and that sort of stuff.

24     Then there's Google Play Store.  And you can go to the Google

25     Play Store and you can download all kinds of free apps.  And

```
 1   you're not entitled -- you're not entitled with that.  And
 2   we're not claiming that you're entitled, because you're not
 3   paying money --
 4            THE COURT:  Right.
 5            MR. JABLONSKI:  -- for, you know, issues related to
 6   that.  Then if you want to buy an application, you have to
 7   create a Google Wallet account.
 8       And in Ms. Svenson's case, at least, what she did is she
 9   created the Google Wallet account in connection with
10   purchasing the app.  It's all one process.  She --
11            THE COURT:  Yeah, but I'm going to -- I'm going to
12   give a bricks-and-mortar example here.
13            MR. JABLONSKI:  Okay.
14            THE COURT:  That -- why I'm concerned that that's not
15   working, logically.
16       If I go into Macy's, and they hand me a perfume sample,
17   and then I buy a pair of jeans, I didn't pay for the perfume
18   sample.  In fact, I'm throwing it away as quickly as I can.
19   But, I didn't pay for it just because I gave money to Macy's
20   for my jeans.
21       And that's what I'm afraid you're telling me here:  That
22   she signed up for Google Wallet, which she paid no money
23   for --
24            MR. JABLONSKI:  No; Google Play.
25            THE COURT:  Well, we start with Google Wallet.  She
```

1   signed up for Google Wallet, and Google Play, all right,

2   Google Play.  And then, she purchases an app.

3       So, she doesn't pay to sign up for Google Play.

4           **MR. JABLONSKI:**  True.

5           **THE COURT:**  And so, whatever rights she has there

6   were free.

7           **MR. JABLONSKI:**  True.

8           **THE COURT:**  And then, she buys an app.

9           **MR. JABLONSKI:**  Yes.

10          **THE COURT:**  But that doesn't mean she's paying money

11  for what she already got with Google Play.

12          **MR. JABLONSKI:**  She's not.  She's paying money for

13  the additional promises that go along with Google Wallet.

14          **THE COURT:**  Okay.

15          **MR. JABLONSKI:**  The Google privacy policy and the

16  Google Wallet terms of service.

17          **THE COURT:**  So in this complaint, you need to allege

18  facts that separate those out.  Because what I'm seeing is

19  you're -- you're trying to use the fact that she paid money to

20  scoop up all of these other free services.  And, I -- that's

21  not going to work.

22      If you -- it sounds like you could amend that, and I would

23  certainly give you that opportunity.  But unless you can show

24  me now where you have clearly delineated what privacy rights

25  she got when she paid money that she would not have received

```
 1   had she, for example, just obtained one of the free apps...
 2           MR. JABLONSKI:  Right.
 3           THE COURT:  That's what I need to know.
 4           MR. JABLONSKI:  Okay, Your Honor.  It's -- I can tell
 5   you that it's in the complaint.  I can't cite chapter and
 6   verse for you, but the complaint, which the Defendant has
 7   taken and pulled -- this is what Defendants do, of course, is
 8   they pull --
 9           THE COURT:  It's their job.
10           MR. JABLONSKI:  They pull items out.  But I don't
11   think that it's a fair reading of the complaint that we have
12   been provided by the Defendant.
13           THE COURT:  Well --
14           MR. JABLONSKI:  But, you're correct.  It's this
15   ascending issue.
16           THE COURT:  Uh-huh.
17           MR. JABLONSKI:  It's this ascending issue.  And our
18   claim is that when Google Wallet -- when you make that Google
19   Wallet purchase, and you provide that information into the
20   form, that you're -- you're buying something there.
21           THE COURT:  Uh-huh.
22           MR. JABLONSKI:  And Google calls it a "product
23   purchase service."  That's what they call it.  It's a service
24   that they provide.  They talk about, you know, buying
25   services.
```

1           THE COURT:  Yeah.

2           MR. JABLONSKI:  It's a reasonable understanding.  And

3    certainly, if the contract is to be interpreted in favor of

4    the consumer who doesn't write any of its components, it's a

5    reasonable understanding that you're buying that service.

6        And, and as part -- as part, when you make the purchase,

7    you're buying the service, which is to protect your

8    information.

9           THE COURT:  Okay.  And yes, it is reasonable.  And

10   certainly, I agree with that.  But, again, I just see this as

11   a multi-step process that you've described to me.

12       Some of the services the consumer receives are free.

13          MR. JABLONSKI:  Yes.

14          THE COURT:  And some may or may not be.  And, I'm

15   glad to spend the time with the complaint to find it.  Of

16   course, it's --

17          MR. JABLONSKI:  We're glad to amend to it make it

18   clearer, Your Honor.  And I apologize if it didn't jump off

19   the page at you.

20          THE COURT:  And, you know, you can't --

21          MR. JABLONSKI:  It should have.

22          THE COURT:  And if it does when I go back and read

23   it, then you'll win on this point.  But, that's where I'm

24   going on it.

25          MR. JABLONSKI:  Okay.

 1              **THE COURT:**  That is a concern of mine.

 2              **MR. JABLONSKI:**  Yeah.

 3              **THE COURT:**  And you're telling me it's a simple

 4     matter of amendment.  So, of course, it's a little bit of

 5     homework for you, but not fatal to your case, of course, if

 6     you can amend.

 7              **MR. JABLONSKI:**  I'm sorry we didn't talk about it as

 8     a stepped process.

 9              **THE COURT:**  Right.  Yeah.

10              **MR. JABLONSKI:**  And --

11              **THE COURT:**  You know, in Superior Court, I always

12     gave tentative rulings, and said you could come in and be

13     ready to set me straight on my ways where I veer off the path.

14     But this way, you have to react when you hear the question,

15     so -- I know that's difficult.

16              **MS. FAHRINGER:**  For clarity, Your Honor, the way it

17     works:  Create a Google account; provide a name.  Doesn't have

18     to be your real name.  Many people do.

19              **THE COURT:**  Uh-huh.

20              **MS. FAHRINGER:**  And get a gmail address; agree to

21     some privacy policies.  Use Play.  Create a Wallet account.

22     No payment, no nothing.

23              **THE COURT:**  And you don't have to use the Wallet

24     account to create it.

25              **MS. FAHRINGER:**  No.  No.  It's just as you described.

1    It's just exactly as you described.

2             **THE COURT:**  Yeah.

3             **MS. FAHRINGER:**  And then at some future date if you

4    want to buy an app or use a free app, if you want to buy an

5    app, then you buy an app.  But, that's a separate process.

6         And the complaint, as the Court noted, just combines them.

7             **THE COURT:**  Okay.  That was my reading of the

8    complaint.

9             **MS. FAHRINGER:**  Uh-huh.

10            **THE COURT:**  And, yeah.  Okay.  So that is a -- that

11   is a concern of mine, to be sure that you're actually paying,

12   because you can't lose money or property as a result of the

13   transaction if you didn't get anything for it.  If there was

14   no additional privacy right that you got.

15        So, just to say "And I really meant it when I gave it to

16   you for free" is not purchasing it.  So, I will have to look

17   at those contracts to see if the privacy rights are any

18   different.

19            **MS. FAHRINGER:**  Uh-huh.

20            **THE COURT:**  And certainly, I will do that.

21            **MS. FAHRINGER:**  And again, for clarity, Your Honor,

22   there is no contract that applies solely to the purchase that

23   don't also apply to the creation of a Wallet account.  So

24   that's the same -- that's the same one.  That's the Wallet

25   privacy notice, and the Wallet terms.

1       Those contracts are creation-of-Wallet-account contracts.

2  There's no different contract that comes into play with

3  respect to purchase.

4          **THE COURT:**  So you would agree with my perfume thrust

5  upon me when I walk into Macy's, and my jeans purchase.

6          **MS. FAHRINGER:**  Yes.  I don't like the perfume

7  either, Your Honor.

8          **THE COURT:**  Yeah.  All right.  Anything else you

9  would like to argue?

10         **MR. JABLONSKI:**  Your Honor, I think that you've --

11 I'm not going to argue 2702, because I think that you -- you

12 understand that very well.

13         **THE COURT:**  I'm -- I'm struggling with it, I will

14 tell you.

15         **MR. JABLONSKI:**  I will go back to 2701, which I think

16 that you had a real issue with.

17         **THE COURT:**  Okay.  I do have a real issue, so I do

18 want to hear from you on that.  Yeah.

19         **MR. JABLONSKI:**  On 2701, Google's theory is that

20 carte blanche, you know, per se, you can never access your

21 stuff that is in your servers, without permission.  That you

22 are always authorized to do it.

23      And apparently built into this is the authorization to

24 alter access, because the 2701 claim, itself, has two

25 different prongs.  The prong is the unauthorized access, and

1    the second prong is the alteration of access.

2        And the claim here, the SCA claim under 2701, is that

3    Google altered access to the information, without necessity,

4    that was stored on its servers by giving it to and making it

5    available to the app developers.

6        It didn't have to do that.  It committed not to do that.

7    It was its own policy not -- to not share information unless

8    it was necessary.  But it did alter, alter access to that

9    information.

10       And in terms of --

11           **THE COURT:**  So, there's a -- I thought it was access

12   to the facility, not to the information.  And this may be --

13           **MR. JABLONSKI:**  It is access to the facility.

14           **THE COURT:**  Okay, because here's my concern.  And

15   maybe I don't understand the technology, and I tend to make it

16   more concrete than it is.  So, please correct me if I'm wrong.

17       But, I don't think you've alleged that the vendor has

18   access to the facility, the server.

19           **MR. JABLONSKI:**  Oh, yes.

20           **THE COURT:**  I think the allegation is that Google,

21   itself, is choosing to remit the information to the vendor,

22   not that the vendor has come into the facility in a virtual

23   sense.

24           **MR. JABLONSKI:**  In a virtual sense, Your Honor,

25   that's exactly how it works, is they do come into the

```
 1   facility.  A vendor has to have the Google -- the vendor side

 2   of a Google Play account.

 3            THE COURT:  Sure.

 4            MR. JABLONSKI:  Or the vendor side of the Google

 5   Wallet account, I guess you'd call it.  And that information

 6   is stored on Google's servers.

 7       And what happens is they have access -- like for a gmail

 8   account, the information's stored on Google servers.  It's not

 9   necessarily on your computer, unless you put it there.

10       This is comparable to that.  And actually, it looks like

11   an email account.  And the information goes into and is made

12   available to the vendor who has this account with Google.

13       And, the dictionary definition of "access" is basically,

14   to provide access to.  If I give you -- if I give you a key to

15   a cottage in northern Wisconsin, Mosquitoville, if I give you

16   a key to that, I've certainly altered access to it.

17            THE COURT:  Yes.

18            MR. JABLONSKI:  Even though I haven't -- you know,

19   even though I -- I haven't given it to you, but I've given you

20   a key, so I've altered the access to it.

21       Alteration of access is a prong under 2701, and it's

22   something that they're prevented from doing.  They're also

23   pre- -- I'll stop, because you have a question.

24            THE COURT:  Well, but, okay.  So, you're talking

25   about access to the cottage by giving the key, and someone
```

1    goes into the facility there.

2        So, what if the issue is you really want to sit in that

3    chair in the cottage?  So I could give you the key, and you

4    could go in and sit.  Or I could put the chair out in the

5    front yard, and you could sit in it.  I haven't given you

6    access to the facility; I've given you the item you want.

7    That's what I'm seeing here.

8        But again, I don't understand the technology, and I don't

9    know whether this is opening the door of the facility for the

10   vendor to go in and access Ms. Svenson's information, or if

11   Google goes into its own facility and sends it out.  That's

12   what -- you haven't alleged -- and, does it matter?

13       And, am I going the wrong -- am I on a tangent here?

14       **MR. JABLONSKI:**  I think that you're on -- well, I --

15   I don't know whether it would matter.  It's access to a

16   facility, though, and it's -- it's access to the information,

17   which is in --

18       **THE COURT:**  It's access to the information.

19       **MR. JABLONSKI:**  Which is in Google's facility.

20       **THE COURT:**  Well, but, the SCA does not equate

21   "facility" with "information."

22       **MR. JABLONSKI:**  That's correct.

23       **THE COURT:**  So, that's why I'm drawing the

24   description.  Because we're presuming, based on your

25   complaint, that the identifying information was -- that the

1    vendor obtained it.

2       And so I'm asking, under 2701, does the method of

3    obtaining it make a difference?

4       We know that Google went into its own facility to access

5    the information.  I was under the impression from the

6    complaint and then Google sent it, caused to be sent to the

7    vendor, as opposed to Google authorizing the vendor to come in

8    and get it.

9       To me, they're different.

10         **MR. JABLONSKI:**  There's -- if you send something to

11   me and it is in my gmail account, then -- and I don't

12   download, you know, I don't put those on the hard drive on

13   this machine here (Indicating), then it's on Google's

14   facility.  But I think you've also sent it to me.

15      So, I'm -- I'm struggling with the distinction.

16         **THE COURT:**  Well, then --

17         **MR. JABLONSKI:**  Because I think that it's on Google's

18   facility.  I have access to it, obviously.  You sent it to me.

19         **THE COURT:**  But I -- yeah.  Hm.  Okay.  I'm -- I'm

20   struggling with that.

21         **MR. JABLONSKI:**  Okay.

22         **THE COURT:**  And, maybe I shouldn't be.

23         **MS. FAHRINGER:**  The -- the 2701 analysis is so clear.

24   Access to facilities is a threshold requirement.

25      The facilities at issue in this case, no -- nothing

1    ambiguous about the complaint, and they can't change this

2    allegation.  The facilities at Complaint Paragraph 119 are

3    Google's own servers.

4        Case after case after case after case, and the SCA,

5    itself, confirm that a service provider does not violate 2701

6    by accessing its own facilities.  The very claim that's made

7    in this case.

8        That's *Crowley, Fraser, Bohach, Buza v. Yahoo!, In Re:*

9    *Google Privacy Policy Litigation.*

10       And in fact, in *In Re: Google Privacy Policy Litigation*,

11   the Court described a claim against Google for accessing its

12   own servers under 2701, it described that claim as bordering

13   on frivolous.

14               **THE COURT:**  Yeah.  That was Judge Grewal's opinion.

15               **MS. FAHRINGER:**  Yes.  There's not one case.

16               **THE COURT:**  And that's why I think 2202 --

17               **MS. FAHRINGER:**  2702.

18               **THE COURT:**  2702 -- is, if anything, is where this

19   case lives, because that is the -- if this is not a record and

20   it is the contents of a communication, that's where the

21   liability might lie.  But, I have to get through that.

22       I guess I'm just not persuaded on this argument on 2701.

23   I'm not seeing it.

24               **MR. JABLONSKI:**  If I could just give you a couple --

25               **THE COURT:**  Please.

1          **MR. JABLONSKI:**  Two or three cases?  There's a case

2     that we looked up recently.  And it's called *Cousineau* -- I'll

3     give your staff -- it's on there, but I will provide the cite

4     to that.

5          And, in *Cousineau*, it was a Microsoft case.  And,

6     Microsoft had brought a motion to dismiss.  And the motion --

7     and it had to do with information that was on cell phones.

8          And the issue -- what the court said is the court said --

9     the cell phone, obviously, that's been dealt with elsewhere.

10    But the court in the *Cousineau* case said, "I don't know that

11    this..." -- this is geolocation information -- "...that that's

12    not also on Microsoft's facilities."

13         And what the Court said is that you can't -- Microsoft was

14    precluded from selling this product to people or getting

15    people to use this service because of its own policy under the

16    promise of confidentiality, and that "We will respect your

17    privacy."  And then they can just violate that, because they

18    could violate it in the absence of that policy.

19         The notion of authorization presumes that there's

20    authorized access and unauthorized access.  And, there are

21    cases -- the *Theofel* case, the *Councilman* case -- in which

22    access to information that was on an electronic services

23    provider's own systems was found to be in violation of related

24    laws.

25         For example, the *Theofel* case was -- I think it was the

1    Computer Fraud Act.  And what the court did there was they

2    talked about this information being like in bailment.  Or, if

3    you gave me something for safekeeping, you give me some of

4    your papers for safekeeping, I can't -- and I'm keeping them

5    in a locked box for you, that doesn't mean that I can go -- I

6    can go into that locked box to move them to another safe

7    place, because that's -- that's the nature of the

8    relationship.

9        And what we have here is we have commitments that are made

10   by Google, that Google articulates in its privacy policies.

11           **THE COURT:**  But you are now merging the contract

12   requirements with 2701.  So, you're just -- you're just

13   talking about a basic 2701, and what conduct is proscribed by

14   2701.

15       The contract language is irrelevant to me when I'm looking

16   at your 2701 claim.

17           **MR. JABLONSKI:**  Well, it --

18           **THE COURT:**  Because -- well, you have a separate

19   claim for civil liability under 2701.  And 2701, the door

20   doesn't open there broader because of the parties' contractual

21   obligations.

22           **MR. JABLONSKI:**  I think -- well, Your Honor, I think

23   that we may have a disagreement about that, because --

24   because -- not necessarily because of the contract

25   obligations, but because of their own policies.  Their own

1    policies.

2              **THE COURT:**  Okay.

3              **MR. JABLONSKI:**  They can't violate their own

4    policies, and either access, or certainly, alter access --

5              **THE COURT:**  So they violate 2701 by violating their

6    own policies?  Or they've just breached a contract?

7              **MR. JABLONSKI:**  They've violated -- they violated

8    2701, we think.  When they violate their own policies that

9    they have put out there, they violate 2701.

10       And with respect to the access issue, I don't even think

11   that we -- we don't need this analysis.  This is separate from

12   the access issue.

13             **THE COURT:**  If you have the citation on the Microsoft

14   case, *Cousineau*, I'd appreciate that.  And you can get that to

15   us.  I don't think that's in your brief.  I don't remember

16   that case.

17             **MS. FAHRINGER:**  No.

18             **MR. JABLONSKI:**  It was not in our brief, Your Honor.

19             **THE COURT:**  Okay.  I'm glad to take a look at that.

20       All right.  We do need to wrap up.  I find the case

21   interesting, and I want to make  sure I understand it.

22       So, anything else?

23             **MS. FAHRINGER:**  No, Your Honor.

24             **THE COURT:**  Okay.  Well, thank you both very much.

25   And, if I may just say, to save you some effort on this, I

```
1    know that Judge Davila graciously granted the motions for

2    extended briefing.  And, please be aware that is not my

3    practice.  That's not my policy.  And it would be highly

4    unusual for me to be as gracious as Judge Davila was.

5         So, I don't want to you write a long brief and then ask

6    for the extended pages.  That would be really unfair to you,

7    to think that you got it once, and so it would merit it.

8         You may not want that, but I just don't want you to put in

9    all that work and then have to scramble to cut it down.

10        All right.  Thank you.

11             MS. FAHRINGER:  Thank Your Honor.

12             MR. JABLONSKI:  Thank you, Your Honor.

13        (Conclusion of Proceedings)
```

**CERTIFICATE OF REPORTER**

      I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


      */s/  Belle Ball*_____

        Wednesday , July 23, 2014

      Belle Ball, CSR 8785, CRR, RDR