1   Kathryn Diemer
    kdiemer@diemerwhitman.com
2   DIEMER, WHITMAN & CARDOSI, LLP
    75 East Santa Clara Street, Suite 290
3   San Jose, California 95113
    Tel: 408.971.6270
4   CA Bar No.: 133977

5   Rafey S. Balabanian (Admitted *Pro Hac Vice*)
    rbalabanian@edelson.com
6   EDELSON PC
    329 Bryant Street, Suite 2C
7   San Francisco, CA 94107
    Tel: 415.234.5342
8   Fax: 415.373.9495

9
    (Additional counsel appear on signature page.)
10
    *Attorneys for Plaintiff and the Putative Classes*
11

12                  **UNITED STATES DISTRICT COURT**
13                 **NORTHERN DISTRICT OF CALIFORNIA**
                         **SAN JOSE DIVISION**
14
15  ALICE SVENSON, individually and on behalf    Case No.: 5:13-cv-04080-BLF
    of all others similarly situated,
16                                               **PLAINTIFF'S MOTION FOR AND**
                *Plaintiff*,                     **MEMORANDUM IN SUPPORT OF**
17                                               **MOTION FOR CLASS**
        *v.*                                     **CERTIFICATION**
18
    GOOGLE, INC., and GOOGLE PAYMENT
    CORP.,                                       Judge: Honorable Beth Labson Freeman
19
20              *Defendants*.

21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION

**PLEASE TAKE NOTICE** that Plaintiff Alice Svenson will appear, through counsel, before the Honorable Beth Labson Freeman, or any judge sitting in her stead, in Courtroom 3, 5th Floor at the United States District Courthouse for the Northern District of California, San Jose Division, located at 280 South 1st Street, San Jose, California 95113, at the hearing on her motion for class certification scheduled for August 24, 2016 at 9:00 a.m. (Dkt. 156.) Then and there, Plaintiff will and hereby does move the Court for an Order certifying the following proposed class and subclass of individuals pursuant to Fed. R. Civ. P. 23(a) and (b)(3):

> **Class**: All individuals in the United States who, between March 1, 2012 and April 30, 2014, (i) purchased an App on the Google Play Store that cost less than $300, (ii) using a Google Wallet account tied to a credit or debit card at the time of purchase, and who (iii) had not previously used Google Wallet or Google Checkout to purchase physical goods.

> **EU Seller Subclass**: All members of the Class who purchased an App from a seller located in a European Union member state at the time of the sale.

Plaintiff's motion is based upon this Notice, the Memorandum of Points and Authorities filed herewith, the exhibits attached thereto, and the record in this matter, along with any oral argument that may be presented to the Court and evidence submitted in connection therewith.

Respectfully submitted,

**ALICE SVENSON**, individually and on behalf of all others similarly situated,

Dated: June 3, 2016

By: /s/ Rafey S. Balabanian
    One of Plaintiff's Attorneys

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
EDELSON PC
329 Bryant Street, Suite 2C
San Francisco, CA 94107
Tel: 415.234.5342
Fax: 415.373.9495

(Additional counsel appear on signature page.)

# TABLE OF CONTENTS

**INTRODUCTION** ........................................................................................................ 1

**BACKGROUND** ......................................................................................................... 2

    *Use of Wallet and Play* ........................................................................................ 2

    *Google Systematically Disclosed Class Members' Personal Information to App Vendors* ............................................................................................................... 4

**ARGUMENT** ............................................................................................................. 6

I.      The Proposed Class and Subclass are Ascertainable ..................................... 7

II.    The Proposed Class and Subclass Meet Rule 23(a)'s Requirements ............ 10

    A.    The proposed Class and Subclass are sufficiently numerous ........... 10

    B.    Members of the Class and Subclass share common issues of law and fact .... 11

        *1.    Whether Plaintiff, the Class and Subclass were entitled to protection of their personal information is a common question* ............................... 12

        *2.    Whether Defendants' disclosures exceeded the scope of the Privacy Policies is a common question* ................................................................. 13

        *3.    Whether Defendants interfered with the benefits to which Plaintiff and the Class members were entitled under the contracts is a common question* ................................................................................... 14

        *4.    Whether Plaintiff and the Class and Subclass Members suffered damages is a common question* ............................................................. 15

    C.    Plaintiff's claims are typical of those of the proposed Class and Subclass ......................................................................................... 17

    D.    Plaintiff and her counsel are more than adequate representatives ............... 18

III.   The Proposed Class and Subclass Meet Rule 23(b)(3)'s Requirements .................... 20

    A.    Common questions of law and fact predominate ............................. 21

    B.    A class action is the superior method for resolving this controversy ............ 25

**CONCLUSION** .......................................................................................................... 26

# **TABLE OF AUTHORITIES**

**United States Supreme Court**:

*Amchem Prods. Inc. v. Windsor,*
    521 U.S. 591 (1997) ..................................................................................... 21

*Erica P. John Fund, Inc. v. Halliburton,*
    563 U.S. 804 (2011) ............................................................................... 7, 21

*Shady Grove Ortho. Assoc., P.A. v. Allstate Ins. Co.,*
    559 U.S. 393 (2010) ....................................................................................... 7

*Tyson Foods, Inc. v. Bouaphakeo,*
    136 S. Ct. 1036 (2016) ................................................................................. 21

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ............................................................................... 11, 12

**United States Circuit Court of Appeals**:

*Ebner v. Fresh, Inc.,*
    No. 13-cv-56644, 2016 WL 1056088 (9th Cir. Mar. 17, 2016) ................... 16

*Ellis v. Costco Wholesale Corp.,*
    657 F.3d 970 (9th Cir. 2011) ....................................................................... 19

*Evon v. Law Offices of Sidney Mickell,*
    688 F.3d 1015 (9th Cir. 2012) ..................................................................... 12

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ............................................................... 17, 18

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,*
    244 F.3d 1152 (9th Cir. 2001) ..................................................................... 25

*Parra v. Bashas', Inc.,*
    536 F.3d 975 (9th Cir. 2008) ....................................................................... 12

*Pulaski & Middleman, LLC v. Google, Inc.,*
    802 F.3d 979 (9th Cir. 2015) ....................................................................... 15

*Sacred Heart Health Sys., Inc. v. Humana Mil. Health.,*
    601 F.3d 1159 (11th Cir. 2010) ............................................................. 21, 22

*Wolin v. Jaguar Land Rover N. Am., LLC,*
    617 F.3d 1168 (9th Cir. 2010) ............................................................... 17, 25

**United States District Court**:

*Aranda v. Caribbean Cruise Line, Inc.,*
    No. 12-cv-4069, 2016 WL 1555576 (N.D. Ill. Apr. 18, 2016) ..................... 20

*Arnold v. United Artists Theatre Circuit, Inc.*,
    158 F.R.D. 439 (N.D. Cal. 1994) ............................................................................... 11

*Ballard v. Equifax Check Services, Inc.*,
    186 F.R.D. 589 (E.D. Cal. 1999) ................................................................................ 22

*Brotherson v. Prof. Basketball Club, L.L.C.*,
    262 F.R.D. 564 (W.D. Wash. 2009) ........................................................................... 16

*Dennis v. Kellogg Co.*,
    No. 09-cv-1786, 2013 WL 1883071 (S.D. Cal. May 3, 2013).................................... 11

*Ehret v. Uber Techs., Inc.*,
    No. 14-cv-113, 2015 WL 7759464 (N.D. Cal. Dec. 2, 2015) .................................. 9–10

*Ellsworth v. U.S. Bank, N.A.*,
    No. 12-cv-2506, 2014 WL 2734953 (N.D. Cal. June 13, 2014) ............................. *passim*

*Ewert v. eBay, Inc.*,
    No. 07-cv-02198 RMW, 2010 WL 4269259 (N.D. Cal. Oct. 25, 2010)...................... 14

*Gaudin v. Saxon Mortgage Servs., Inc.*,
    297 F.R.D. 417 (N.D. Cal. 2013) ............................................................................... 23

*Harris v. comScore, Inc.*,
    292 F.R.D. 579 (N.D. Ill. 2013) ................................................................................. 19

*Harris v. comScore*,
    No. 11-cv-5807 (N.D. Ill.) .......................................................................................... 13

*I.B. by and through Bohannon v. Facebook, Inc.*,
    82 F. Supp. 3d 1115 (N.D. Cal. 2015) .................................................................... 7–8, 9

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
    308 F.R.D. 606 (N.D. Cal. 2015) ............................................................................... 21

*In re Facebook Privacy Litig.*,
    No. 10-cv-2389 (N.D. Cal.) ........................................................................................ 19

*In re LinkedIn User Privacy Litig.*,
    No. 12-cv-3088 (N.D. Cal.) ........................................................................................ 20

*In re Med. Cap. Sec. Litig.*,
    No. 10-cv-2145, 2011 WL 5067208 (C.D. Cal. July 26, 2011) ............................. 13, 21

*In re Nat. W. Life Ins. Deferred Annuities Litig.*,
    268 F.R.D. 652 (S.D. Cal. 2010) ................................................................................ 24

*In re Rubber Chems. Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005) ........................................................................ 10, 11, 16

*Jordan v. Paul Financial, LLC*,
    285 F.R.D. 435 (N.D. Cal. 2012) ............................................................................... 16

*Kleiner v. First Nat'l Bank*,
    97 F.R.D. 683 (N.D. Ga. 1983) ................................................................ 14

*Lymburner v. U.S. Fin. Funds, Inc.*,
    263 F.R.D. 534 (N.D. Cal. 2010) ............................................................. 10

*Menagerie Productions v. Citysearch*,
    No. CV 08-4263 CAS (FMO), 2009 U.S. Dist. LEXIS 108768
    (C.D. Cal. Nov. 9, 2009) ......................................................................... 22

*Resnick v. AvMed, Inc.*,
    No. 10-cv-24513 (S.D. Fla.) ................................................................... 20

*Rodman v. Safeway, Inc.*,
    No. 11-cv-3003, 2014 WL 988992 (N.D. Cal. Mar. 9, 2014) ............. 13, 14

*Sitt v. San Francisco Muni. Transp. Agency*,
    No. 12-cv-3704, 2014 WL 1760623 (N.D. Cal. May 2, 2014) ............... 20

*Trosper v. Styker Corp.*,
    No. 13-cv-607, 2014 WL 4145448 (N.D. Cal. Aug. 21, 2014) ............... 19

*Wolph v. Acer Am. Corp.*,
    No. 09-cv-1314, 2012 WL 993531 (N.D. Cal. Mar. 23, 2012) ............... 10

*Zeisel v. Diamond Foods, Inc.*,
    No. 10-cv-1192, 2011 WL 2221113 (N.D. Cal. June 7, 2011) ................. 8

**Miscellaneous**:

5 Alba Conte & Herbert Newberg, *Newberg on Class Actions* (3d ed. 1992) ............................ 17

Alicia Marie Tan, *Google Play just hit a major milestone*, Mashable (Sept. 29, 2015),
    http://mashable.com/2015/09/29/google-play-1-billion-users/#B4wdQfPzmuqY ........... 11

Artyom Dogtiev, *Mobile App Developer Statistic Roundup*, AppIndex, Jan. 20, 2016,
    http://appindex.com/app-development/mobile-app-developer-statistics-roundup/
    (last visited June 3, 2016) ......................................................................... 11

Brahim Elbouchikhi,
    *LinkedIn Profile Page*, available at https://www.linkedin.com/in/elbouchikhi
    (last visited June 3, 2016) ................................................................... 10–11

Fed. R. Civ. P. 23 .............................................................................. *passim*

*Top Paid in Android Apps*, Google Play,
    https://play.google.com/store/apps/collection/topselling_paid?hl=en
    (last visited June 3, 2016) ......................................................................... 11

**INTRODUCTION**

Defendant Google, Inc. ("Google") is perhaps best known to the public for its online search engine and for being one of the most innovative technology companies in history, responsible for casting a seemingly endless light on Silicon Valley. But there are aspects of Google's business that it would prefer to keep hidden in the shadows: that it is a world leader when it comes to consumer privacy violations and a pioneer at exploiting its users' data for gain. Indeed, Google has come under constant fire in recent years for everything from allegedly skirting European privacy laws to the unauthorized collection and use of student data in educational settings. This case presents similar issues with respect to Google's intentional, systematic, and—until the filing of the suit—unchecked violation of its customers' privacy rights. And it's those uniform and widespread privacy violations which form the basis of the instant motion for class certification.

Specifically, Plaintiff's and the proposed Classes' claims arise out of the use of Google's digital market place known as the Google Play Store, where consumers can purchase and download movies, music and software applications (together, "Apps") for use on their Android mobile devices. To facilitate App purchases, Google and its payment-processing division, Defendant Google Payment Corp. ("GPC"), contracted with millions of users to provide secure, private payment processing through a service known as Google Wallet. Relevant here, under the Wallet terms of use, Defendants uniformly promised to safeguard App buyers' (referred to herein as "Buyers") personal information and to disclose it only in a limited set of circumstances—e.g., as necessary to process the transaction or maintain a Buyer's account. But casting aside the express promises made in their own terms of use, for years, Defendants have routinely and systematically disclosed to third-parties, their Buyers' personal contact and billing information—including names and email addresses—which they now admit was not necessary to complete the transactions or otherwise authorized for disclosure.

Plaintiff looks forward to proving her claims at summary judgment and potentially trial, but at this stage of the proceedings, the focus is class certification and whether Rule 23's requirements are satisfied. Here, the path to certification is clear. That's because, as courts in the Ninth Circuit

and throughout the country have consistently held, cases that present systematic breaches of form consumer contracts are readily certifiable under Rule 23(b)(3). Under that analysis, the question is whether this litigation is able to resolve for the entire Class and Subclass—in a single stroke—if the subject disclosures were permissible under the terms of use. Regardless of how the fact finder ultimately comes down on that, the answer to the questions are invariably the same for everyone in the Class and Subclass, making this case readily amenable to class-wide adjudication.

Accordingly, Plaintiff requests that the Court certify the Class and Subclass defined below under Rule 23(b)(3), appoint her as class representative, and her attorneys as class counsel.

## **BACKGROUND**

Google is one of the world's largest technology companies, offering a wide variety of technology and internet services, including its eponymous search engine, an email service (known as gmail), and a smartphone operating system (Android). Relevant here, Google also offers Wallet, a service that facilitates and processes electronic transactions, and Play, an internet-based store where users can purchase Apps for devices running the Android operating system. (*See* Exhibit ("Ex.") 1-1 at GOOG-00001191; Ex. 1-2 at GOOG-00001179.) Wallet is the only method by which a consumer can pay for an App on the Play Store, meaning that every consumer who purchased an App on the Play Store must have established a valid Google Wallet account prior to or along with that purchase. (*See* Ex. 1-2 at GOOG-00001179 (confirming you need a Google Wallet account to purchase products); Exhibit 1-3 at GOOG-00001449 (████████████████████████████████████████

████████████████████████████████████

### *Use of Wallet and Play*

As a consumer-facing service,[1] Wallet allows users to make purchases on a variety of Google platforms—including Play and YouTube—and on third-party websites that have enabled Wallet (or its predecessor, Google Checkout) for payments. (*See* Ex. 1-4, ████████████ Ex. 1-5, ████████

---

[1] The term "wallet" has a variety of meanings within Google. (*See* Ex. 1-4 at 18:14-20.) But here, "Wallet" is used to describe the public-facing service available to consumers under the brand name Google Wallet. (*See* Ex. 1-5 at 35:18-19.)

1 ███████████████████████████████████████████████████████████

2 ████ *id.* at 27:6-9 (████████████████████████████████████ To use

3 Wallet, a consumer must have an existing Google account and associated gmail address. (*See* Ex. 1-

4 1 at GOOG-00001193–94 (requiring users to provide accurate registration information and keep

5 information current); Exhibit 1-6, ████████████████████ Any such user can then

6 access Wallet through a web browser or the Wallet mobile App. (*See* Ex. 1-1 at GOOG-00001199-

7 1200.) At all relevant times, users of the Wallet App agreed to the Wallet Terms of Service then in

8 effect, which incorporated the Wallet Privacy Policy, as well as the more general Google Privacy

9 Policy. (*See id.* at GOOG-00001193; *id.* at GOOG-00001207; Ex. 1-7 at GOOG-00000997-998.)

10 Additionally, each time a Buyer purchased an App, they agreed to the operative Terms of Service.

11 (*See* Ex. 1-4 at 157:6-20 (████████████████████████████████████

12      At all times relevant, the Wallet Privacy Policy provided that Google would share a user's

13 personal information *only*: (1) as permitted under the Google Privacy Policy; (2) as necessary to

14 process a transaction and maintain a user's account; or (3) to complete a user's registration for a

15 third-party service. (Ex. 1-7 at GOOG-00000998.) The Google Privacy Policy, in turn, allows for

16 disclosure of that same information *only*: (1) ████████████████ (2) ████████████

17 ████████████; (3) ████████████████ and (4) "████████████████████

18 ████████████████████████████████ (*See* Ex. 1-8 at GOOG-00000114.)

19 Thus, between them, the Wallet Privacy Policy and the Google Privacy Policy (collectively "the

20 Privacy Policies") set forth six limited scenarios in which Google could disclose consumers'

21 personal information. Beyond those six scenarios, by their own terms, Defendants had no authority

22 to disclose Buyers' personal information.

23      Google Play, the successor to a platform known as Android Market, is a digital marketplace

24 where users can purchase digital goods and services, including Apps. (*See* Ex. 1-9, ████████

25 ████████████████████████████████████████████████████████████

26 *see generally* Ex. 1-2 at GOOG-00001179.) Play can be accessed by web browser or through the

27 Google Play App, which comes pre-installed on all Android devices. (*See generally* Ex. 1-2 at

28

GOOG-00001179; Ex. 1-10 at GOOG-00006571; Ex 1-3, at GOOG-00001506 at 109:19-20; *id.* at GOOG-00001574 at 177:15-16.) Throughout the Class period, when a Class member purchased an App, he or she would be required to assent to the most recent Google, Google Play, and Google Wallet Terms of Service and Privacy Policies. (*See* Ex. 1-11 at GOOG-00009091 ███████████████ ████████████████████████████████████████████████; Ex. 1-7 at GOOG-00000997; Ex. 1-1 at GOOG-00001191.) In so doing, the Class members created new contracts with Defendants, providing for the execution of specific transactions (i.e., payment in exchange for App), governed by the operative Wallet Terms and Privacy Policy. (*See* Ex. 1-12 at GOOG-00002898 ("████████████████████████████████

***Google Systematically Disclosed Class Members' Personal Information to App Vendors.***

Despite the provisions of the Privacy Policies, every time a Class member purchased an App on the Play Store, Defendants disclosed personal information to the App vendor.[2] (*See* Ex. 1-13 at Ans. to Interrog. No. 1.) They disclosed that information in a variety of ways. The first was known as the ███████████ (originally—i.e., prior to the introduction of Wallet—known as ██████ ███████████, and later as ██████████████, or ████████████). (*See id.*; Ex. 1-14 at GOOG-00001969-1970 (███████████████████████████████████████████████████ ████████████████████████████████████████████████████; Ex. 1-15 at GOOG-00001089 (█████████████████████████████ Ex. 1-16 at GOOG-00001093 (████████████ █████████████████████.) Prior to ████████, the ████████████ automatically disclosed and displayed each Buyer's ████████████████████████████, as well as ████ ████████████████████████████████████████████ using Wallet or Checkout. (Ex. 1-13 at Ans. to Interrog. No. 1.) From ████████ through ████████████, Defendants transitioned ███████████████████████████ to the ████████ ████████████████████████. (*Id.*) Once that was complete, a Buyer's ████████████

---

[2] Despite what users may expect, Google does not conduct any sort of background checks or vetting process for vendors prior to offering their Apps on the Play Store. (*See* Ex. 1-4 at 218:13-17.) Instead, Google generally relies on the Play "community" to distinguish good developers from bad. (*Id.* at 219:12-18.)



1 ████████████████████████████████████████, were disclosed to the App

2 vendors. (Ex. 1-17 at GOOG-00003391 (████████████████████████████

3 ████████████; Ex. 1-18 at GOOG-00008234 (████████████████████████

4 ██████.) After this case was filed in May 2014, Defendants ████████████████

5 ████████████████████████████████████ (*See* Ex. 1-19 at GOOG-00003327

6 ████████████████████████████████████████████ Ex. 1-3 at

7 GOOG-00001478, at 81:13-19 (████████████████████████████████████[3]

8     A second way that Defendants disclosed Buyers' personal information was through a feature

9 known as the ████████████[4] a tool that allowed App vendors to ████████████████

10 ████████████████████, rather than ████████████████████████████████████

11 and ████████████████████ that information. (*See* Ex. 1-14 at Ans. Interrog. No. 1; Ex. 1-20 at

12 GOOG-00005451; Exhibit 1-21, ████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████).) Until

14 ████████████████████████████████████████████████████████████████████

15 ████████████████) provided App vendors with Buyers' ████████████████████

16 ████████████████████████████████████████████████████████████████

17 ██████ (*See* Ex. 1-13 at Ans. Interrog. No. 1; Ex. 1-22, ██████████████████

18 ████████)████████████████████████████████████████████████████████,

19 and continued to ████████████████████████████████████████████████████

20 ████████████████████████████████. (*See* Ex. 1-13 at Ans. to Interrog. No. 1.)

21     Another way Defendants disclosed personal information about Buyers to App vendors was

22

---

[3]     Whether App vendors opened and viewed ████████████████████ (they did) is
beside the point. (*See* Ex. 1-14 at GOOG-00002024-2025 at 118:15-119:16; Ex. 1-23 at GOOG-
00002260-2267 ████████████████████████████████████████████
████████████████████████.) The fact that Defendants made Buyers' personal
information available to App vendors through ████████████ in direct contravention of their
App purchase agreements and without their consent alone rises to the level of an unauthorized
disclosure. Notwithstanding, whether Defendants' conduct constitutes an unlawful disclosure of
Buyers' information is a merits question that (as explained below) can be answered on a classwide
basis and therefore, supports Plaintiff's bid for certification. ████████████████████████
[4] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████, (*See* Ex. 1-21 at 38:18-21.)

1  through █████████████████████, a ███████████████████████████

2  ████████████████████████████. (*See* Ex. 1-24, ███████████████████ at

3  108:11-13; Ex. 1-6 at 42:13-21.) Throughout the class period, the █████████████

4  displayed Buyers' ████████████████████████████████████████████████████

5  (*see* Ex. 1-25, ███████████████████████ at 57:18-58:23), and made available ██████████

6  containing Buyers' █████████████████. (*See* Ex. 1-3 at GOOG-00001470 at 73:2-18.[5])

7       In addition to the scenarios laid out above, █████████████████████████████

8  █████ the disclosure of additional Buyer information. (*See* Ex. 1-13 at Ans. to Interrog. No. 1.) For

9  instance, from █████████████████████████████████████ ██████

10 █████████████████████████████████████████) when Buyers

11 purchased Apps ████████████████████████████. (*See id.*; Ex. 1-26 at GOOG-

12 00008880-8904 (██████████████████████████ From ████████████

13 ██████████████, a ███████████████████, once again causing Buyers'

14 ████████████████████████████████████████████████████████.

15 (*See* Ex. 1-13 at Ans. Interrog. No. 1; Ex. 1-27 at GOOG-00003783; Ex. 1-28 at GOOG-00006728.)

16       In sum, at all times between March 1, 2012 and April 30, 2014, Defendants, in direct

17 contravention of their express contractual obligations, disclosed (at a minimum) each App Buyer's

18 name and email address to third-party vendors without authorization.

19                              **ARGUMENT**

20       Plaintiff seeks certification of the following class and subclass under Rule 23(a) and (b)(3):

21 **Class**: All individuals in the United States who, between March 1, 2012 and April 30,
22 2014, (i) purchased an App on the Google Play Store that cost less than $300, (ii) using a
   Google Wallet account tied to a credit or debit card at the time of purchase, and who (iii)
23 had not previously used Google Wallet or Google Checkout to purchase physical goods.[6]

---

24 [5]    Again, regardless of whether vendors actually downloaded the information through the █████
   █████████████, the fact that Defendants made the information available alone
25 constitutes unlawful disclosure. (*See* Ex. 1-3 at GOOG-00001468-1469 at 71:25-72:12; GOOG-
   00001579 at 182:19-24 (████████████████████████████████████████████████████
26 █████████).) That also raises several common questions, as explained below.
        The Class is limited to those individuals who purchased Apps for less than $300 and had not
27 previously purchased physical goods through either Google Wallet or Checkout to avoid variations
   in the information collected and disclosed. For example, the policies that applied to purchases
28 greater than $300 (as they relate to fraud prevention and taxation) varied as to what information was

**EU Seller Subclass**: All members of the Class who purchased an App from a seller located in a European Union member state at the time of the sale.[7]

Rule 23 provides that a "class action may be maintained if two conditions are met: The suit must satisfy the criteria set forth in subdivision (a) (*i.e.,* numerosity, commonality, typicality, and adequacy of representation), and it also must fit into one of the three categories described in subdivision (b)." *Shady Grove Ortho. Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). Rule 23(b)(3) requires a plaintiff to show that common questions of law or fact predominate over any issues affecting only individual members of the proposed class, and that maintaining the lawsuit as a class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3); *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

Here, the proposed Class and Subclass readily satisfy the requirements of Rule 23. They consist of a group of individuals who made similar purchases, pursuant to uniform contractual terms and information-disclosure policies, and with the same failure to protect the privacy of their personal information. Common issues therefore predominate among their claims, and classwide litigation is clearly superior. In short, the proposed Class and Subclass should be certified, Plaintiff should be appointed as class representative, and her attorneys should be appointed as class counsel.

## II.     The Proposed Class and Subclass are Ascertainable.

First, "[t]hough not one of the explicit requirements of Rule 23(a), courts recognize that 'the class sought to be represented must be adequately defined and clearly ascertainable.'" *I.B. by and through Bohannon v. Facebook, Inc.*, 82 F. Supp. 3d 1115, 1126 (N.D. Cal. 2015) (Labson

---

required and would be disclosed to vendors. (*See* Ex. 1-13 at Ans. Interrog. No. 1; Ex. 1-10 at GOOG-00006617-6618; Ex. 1-29 at GOOG-00005126 ███████.) Likewise with respect to purchases of physical goods, which resulted in the collection of varying forms of information for different purposes. (*See* Ex. 1-13 at Ans. Interrog. No. 1.) By contrast, the Class as defined eliminates such variations in the types of information disclosed and the necessity (or more aptly, lack thereof) for doing so: at a minimum, each Class member had their name and email address disclosed despite that information not being necessary to complete the transaction at issue or the disclosure otherwise being authorized.

[7]     Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, their subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and its current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

Freeman, J.) (quotation omitted)). "A class should be sufficiently definite and 'clearly ascertainable' by reference to objective criteria 'so that it is administratively feasible [for a court] to determine whether a particular person is a class member' and thus 'bound by the judgment.'" *Ellsworth v. U.S. Bank, N.A.*, No. 12-cv-2506, 2014 WL 2734953, at \*12 (N.D. Cal. June 13, 2014) (quoting *Shepard v. Lowe's HIW, Inc.*, No. 12-cv-3893, 2013 WL 4488802, at \*2 (N.D. Cal. Aug. 19, 2013)). "[T]he identity of the class members need not be known at the time of certification" and a definition is sufficiently ascertainable as long as "it includes objective characteristics that would permit a consumer to identify themselves as a member of the proposed class." *Zeisel v. Diamond Foods, Inc.*, No. 10-cv-1192, 2011 WL 2221113, at \*6 (N.D. Cal. June 7, 2011).

Because the proposed Class and Subclass are defined by reference to objective facts reflected in Defendants' records, they are sufficiently ascertainable. Indeed, whether any Buyer is a member of the Class can be determined by answering four objective, yes-or-no questions:

    (1)    Did the individual use Google Wallet to purchase an App on the Google Play store between March 1, 2012 and April 30, 2014?

    (2)    Did the App cost less than $300?

    (3)    Was the individual's Google Wallet account tied to a credit or debit card at the time of the purchase?

    (4)    Before purchasing the App, had the individual used Google Wallet or Google Checkout to purchase physical goods?

Likewise, determining whether an individual is a member of the proposed Subclass only requires the resolution of a single, additional yes-or-no question:

    (5)    Did the individual purchase an App from a seller located in an EU member state?

Further, each of these questions can be answered by referencing digital records maintained by Defendants. (*See* Ex. 1-3 at GOOG-00001460 at 63:17-22; *see also* Ex. 1-30 at GOOG-00001392 (███████████████████████████); Ex. 1-15 at GOOG-00001089 ███████████████████████████; Ex. 1-31 at GOOG-00001090-92 (███████████████████████████); Ex. 1-16 at GOOG-00001093 (███████████████████████████); Ex. 1-32 at GOOG-00001394 (███████████████████████████

Ex. 1-33 at GOOG-00001190 (███████████████████████████ Ex. 1-34 at Resp.

Req. Admit No. 1 ("██████████████████████████████████████████████████████

███████████████████████████████ *id.* at Resp. Req. Admit No. 2 (showing

records identify if a ███████████████████████; Ex. 1-22 at 44:14-15 (██████████

██████████████████████████████████ Ex. 1-21 at 71:14-72:15

(████████████████████████████████████████ No reference to

any outside records or manual record review will be necessary to determine class membership.[8]

In cases (like this) against digital services providers where the proposed class is defined by

reference to information contained within the defendant's records, courts in this District regularly

find the ascertainability requirement satisfied. By way of example, this Court certified a class of

minors who used Facebook during a specific time period and a subclass of those who purchased

"credits" during a specific time period, where the information necessary to evaluate any individual's

membership would be found entirely within the defendant's records. *See Bohannon*, 82 F. Supp. 3d

at 1126 (Labson Freeman, J.) (noting that while the defendant "claim[ed] that it [could] not

determine whether or not [any] minor had consent to make a given purchase" it did not argue "that

it [could not] ascertain, through its records, whether a purchase was made from the minor's account,

or whether an account was registered to a minor at the time the account was made."). Likewise, the

Honorable Edward M. Chen recently certified a class in a case against the ride-sharing service Uber,

where the class was composed of individuals who received a specific email from the defendant and

made a purchase, and found the class to be ascertainable because the class was "objectively

ascertainable from Uber's business records" since Uber had "presumably maintained copies of the

promotional emails that were sent." *Ehret v. Uber Techs., Inc.*, No. 14-cv-113, 2015 WL 7759464,

---

[8]     Additionally—and relevant to providing notice to the proposed Classes—each individual
member can be identified by their name and email address, which were provided as part of the
Wallet setup process. (*See* Ex. 1-1 at GOOG-00001193 (requiring, *inter alia*, provision of name and
contact information, including email); *id.* at GOOG-00001194 (requiring registration information to
be accurate and all elements on registration web pages to be complete to use service); Ex. 1-13 at
Ans. Interrog. No. 1; Ex. 1-3 at GOOG-00001454 at 57:1-10 (███████████████████████████
███████████████████████████████████: Ex. 1-35 at GOOG-
00007584 (████████████████████████████████████ Ex. 1-21 at 23:11-24
(███████████████████████████████████████████

at *3 (N.D. Cal. Dec. 2, 2015); *see also Wolph v. Acer Am. Corp.*, No. 09-cv-1314, 2012 WL 993531, at *2 (N.D. Cal. Mar. 23, 2012) ("An individual is a member of the class if he or she purchased the notebook at issue and did not return it. Acer does not dispute that the identity and contact information for a significant portion of these[] individuals can be obtained from the warranty registration and through Acer's customer service databases.").

Similarly, the proposed Class and Subclass are "readily ascertainable" from Google's own records, which identify ██████████████████████████████████████████████████ ████████████████████████████████. (*See* Ex. 1-3 at GOOG-00001460 at 63:20-21 ███████████████████████████████████████████."); GOOG-00001463 at 66:18-20 (████████████████████████████)); *see also Ellsworth* 2014 WL 2734953, at *13 (finding class "ascertainable from the records, even if it '[would] entail some effort on the part of counsel for both parties' to identify the class members.") (citation omitted)). The ascertainability requirement is thus clearly satisfied.

## III. The Proposed Class and Subclass Meet Rule 23(a)'s Requirements.

The proposed Class and Subclass also easily meet Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy.

### A. The proposed Class and Subclass are sufficiently numerous.

A class is sufficiently numerous when "the joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "There is no magic number that will satisfy the numerosity requirement, but numerosity has been found when a class comprised forty or more members, and not found when the class comprised twenty-one or fewer members." *Lymburner v. U.S. Fin. Funds, Inc.*, 263 F.R.D. 534, 539 (N.D. Cal. 2010) (collecting cases). Further, courts may make common sense assumptions regarding the numerosity of a proposed class. *See In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 350–51 (N.D. Cal. 2005).

Here, the proposed Class numbers in the millions. During the last year of the Class period alone, the Play Store generated more than $5 *billion* in revenue across millions of sales that fall within the scope of the Class definition. *See* Brahim Elbouchikhi, *LinkedIn Profile Page*, available

at https://www.linkedin.com/in/elbouchikhi (last visited June 3, 2016). Given that Google has boasted that it recently topped one *billion* active Google Play users,[9] it should come as no surprise that it will not be contesting numerosity. (*See* Ex. 1-36 at Ans. Interrog. No. 13.) The proposed Subclass likely numbers in the millions as well, given that tens of thousands of App developers operate out of the EU and several of the highest-grossing Apps belong to EU vendors. *See Top Paid in Android Apps*, Google Play, https://play.google.com/store/apps/collection/topselling_paid?hl=en (last visited June 3, 2016) (showing list of top-paid Apps from Google Play website, with two out of the top five including EU App developers Mojang (Sweden) and RobTop games (Sweden)); Artyom Dogtiev, *Mobile App Developer Statistic Roundup*, AppIndex, Jan. 20, 2016, http://appindex.com/app-development/mobile-app-developer-statistics-roundup/ (last visited June 3, 2016) (report from January 2016 showing that nearly 30% of app developers are located in Europe).

Accordingly, both the proposed Class and Subclass far exceed the 40-person threshold necessary for a finding of numerosity. *See In re Rubber Chems.*, 232 F.R.D. at 350–51; *Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 448 (N.D. Cal. 1994) (inferring class size of thousands where nearly 900,000 individuals in state were disabled and defendant operated 70 locations subject to claims); *Dennis v. Kellogg Co.*, No. 09-cv-1786, 2013 WL 1883071, at *2 (S.D. Cal. May 3, 2013) (finding numerosity where "exact class size [was] unknown," but "the putative class potentially cover[ed] hundreds of thousands of purchases . . . nationwide.").

**B.      Members of the Class and Subclass share common issues of law and fact.**

Next, Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). As the Supreme Court explained in *Wal-Mart Stores, Inc. v. Dukes*, "[w]hat matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." 564 U.S. 338, 350 (2011). All issues of fact and law need not be identical, as long as the class representative "retain[s] a common core of factual or legal issues with

---

[9]      *See* Alicia Marie Tan, *Google Play just hit a major milestone*, Mashable (Sept. 29, 2015), http://mashable.com/2015/09/29/google-play-1-billion-users/#B4wdQfPzmuqY (last visited June 2, 2016).

the rest of the class." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978–79 (9th Cir. 2008). The standard is "construed permissively," *id.* at 978, and "[i]t is not necessary that members of the proposed class share every fact in common." *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (internal quotations omitted). Even a single common question of law or fact will do. *See Dukes*, 564 U.S. 338 at 359. Commonality simply requires that the claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Id.* at 350.

Here, the claims of Plaintiff and the proposed Class and Subclass members all arise from a single common contention: Defendants breached their obligations to not disclose Buyers' personal information except as provided in the Wallet and Google Privacy Policies. Thus, Defendants' standardized conduct—i.e., the automatic disclosure of user information upon purchase of an App—raises several common questions, the answers to which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

> 1. *Whether Plaintiff, the Class and Subclass were entitled to protection of their personal information is a common question*.

Google does not dispute that every Buyer during the relevant time period agreed to the Google Terms of Service and Privacy Policy, the Google Wallet Terms of Service, and the Google Play Terms of Service and Privacy Policy. Thus, the first question to be answered when analyzing the claims asserted is whether Buyers' personal information was entitled to protection from disclosure. Given that the operative agreements had materially identical provisions throughout the Class period, such a question is obviously common to all Class and Subclass members. (*Compare* "Information sharing" and "Information we share" sections of Google and Wallet Privacy Policies from Oct. 3, 2010 through May 7, 2014 at Ex. 1-37 at GOOG-00000385-86, Ex. 1-38 at GOOG-00000086, Ex. 1-39 at GOOG-00000100-0101, Ex. 1-8 at GOOG-00000114-0115, Ex. 1-40 at GOOG-00000190-0191, Ex. 1-41 at GOOG-00000225-0226, Ex. 1-42 at GOOG-00000315-0316; Ex. 1-43 at GOOG-00000857-0858, Ex. 1-44 at GOOG-00000993-0994, Ex. 1-7 at GOOG-00000998, Ex. 1-45 at GOOG-00001021-1022.)

As courts throughout this District and others have acknowledged, cases involving the interpretation of form contracts are ripe for certification:

> "California recognizes the objective theory of contracts, under which it is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation . . . [t]he parties' undisclosed intent or understanding is irrelevant to contract interpretation." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 956 (2003) (internal citations and quotation marks omitted). It is for this reason that, "[w]hen viewed in light of Rule 23, claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action, and breach of contract cases are routinely certified as such." *Ewert v. eBay, Inc.*, No. 07-cv-02198 RMW, 2010 WL 426259, at *7 (N.D. Cal. Oct. 25, 2010) (*quoting Kleiner v. First Nat'l Bank*, 97 F.R.D. 683, 691 (N.D. Ga. 1983)).

*Rodman v. Safeway, Inc.*, No. 11-cv-3003, 2014 WL 988992, at *7 (N.D. Cal. Mar. 9, 2014); *see also In re Med. Cap. Sec. Litig.*, No. 10-cv-2145, 2011 WL 5067208, at *3 (C.D. Cal. July 26, 2011) ("Courts routinely certify class actions involving breaches of form contracts.") (collecting cases); *Harris v. comScore, Inc.*, 292 F.R.D. 579, 585 (N.D. Ill. 2013) (finding commonality where "each Class member agreed to a form contract," and noting that "[i]t is well established that 'claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action.") (quoting *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998)).

Thus, the terms of the form contracts agreed to by the Class and Subclass can be determined on a classwide basis, and Rule 23(a)'s commonality requirement is therefore satisfied.

> 2. *Whether Defendants' disclosures exceeded the scope of the Privacy Policies is a common question.*

The next common question that can be resolved for the Class and Subclass is whether Defendants breached the privacy provisions of the contracts by disclosing Buyers' personal information. As the starting point for that analysis, each of the operative Privacy Policies provide that personal information (including that of Buyers') will be disclosed only (1) with user consent, (2) to domain administrators, (3) for external processing, (4) for legal reasons, (5) if necessary to process the transaction, or (6) to complete registration for a service offered by the vendor. (*See* Ex. 1-37 at GOOG-00000385-0386; Ex. 1-38 at GOOG-00000086; Ex. 1-39 at GOOG-00000100-0101; Ex. 1-8 at GOOG-00000114-0115; Ex. 1-40 at GOOG-00000190-0191; Ex. 1-41 at GOOG-00000225-0226; Ex. 1-42 at GOOG-00000315-0316; Ex. 1-43 at GOOG-00000857-0858; Ex. 1-44

at GOOG-00000993-0994; Ex. 1-7 at GOOG-00000998; Ex. 1-45 at GOOG-00001021-1022.)

In addition to the uniformity of the contractual terms at issue and the types of information disclosed, the analysis to determine whether it was necessary to disclose that information will be common to the Class and Subclass as well. First, there is perhaps no better evidence of the lack of necessity in disclosing a Buyer's name and email address to complete a transaction (or lack of other authorization to disclose it) than the fact that after the filing of this lawsuit, Defendants ceased disclosing this information to vendors altogether. Notwithstanding, they have successfully continued selling Apps through the Play Store. (Ex. 1-13 Ans. Interrog. No. 1; Ex. 1-14 at GOOG-00002019-20 at 113:13-17 ████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████); Ex. 1-25 at 59:14-17.)[10] Likewise, while Google contends that the disclosure of a Buyer's zip code was necessary for tax purposes (to determine the applicable tax rate, if any), ████

████████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████. (Ex. 1-46, ████

████ at 27:23-28:3.) Given that ████████████████████████████████████ was no need for App vendors to receive that information for tax purposes.[11]

In sum, because Defendants disclosed the same information, for the same purposes, under the same circumstances throughout the Class period, whether they breached their contractual obligations to the Class and Subclass can be assessed on a classwide basis. *Ewert*, 2010 WL 4269259, at \*7; *Kleiner*, 97 F.R.D. at 692; *Rodman*, 2014 WL 988992, at \*7.

     *3.*    *Whether Defendants interfered with the benefits to which Plaintiff and the Class members were entitled under the contracts is a common issue.*

The same holds true with respect to the Class's and Subclass's claims for breach of the covenant of good faith and fair dealing. Whether Defendants interfered with the benefits to which

---

[10] Of course, the fact that the disclosures at issue occurred *after* the transactions took place—i.e., after the Apps were purchased—adds further clarity to the lack of necessity of these disclosures to *completing* the transactions themselves. *See* Background, *supra.*

[11] As to the Subclass specifically, ████████████████████████████████████████ ████████████████████████████████████ Rather, ████████████ ████████ ██████████████████████████████████ (*See* Ex. 1-46 at 82:18-23.)

Class members were entitled under the Privacy Policies can be assessed on a classwide basis given that (i) the contracts each Class member entered into with Defendants were materially identical, as were the privacy protections to which they were entitled, and (ii) Defendants' disclosures were uniform across all App transactions during the Class period. Thus, a determination as to whether Defendants' uniform conduct interfered with and frustrated the benefits to which each Class and Subclass member was entitled necessarily can be determined by reference to common proof.

The *Ellsworth* case is instructive in this regard. There, the plaintiffs brought claims including breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of the UCL where they alleged that the defendant forced backdated flood insurance on their properties and paid substantial kickbacks to the flood insurance company. *Ellsworth*, 2014 WL 2734953, at *1. The court noted that the plaintiffs' case presented myriad common questions, as a result of the fact that "Plaintiffs had identical form contracts, the policies were applied uniformly" and "Plaintiffs allege[d] a common scheme" causing harm. *Id.* at *14. The court followed several other courts within this District addressing claims arising out of form contracts and systemic corporate practices and "found commonality under Rule 23(a)(2)." *Id.*

The commonality reasoning in *Ellsworth* maps squarely onto the facts of this case. Each Class member agreed to a form Privacy Policy, saw the protections offered by those Privacy Policies frustrated and breached at the moment they undertook the same specific action (i.e., buying an App), and now brings claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of the UCL. As a result, commonality is present here as well.

> **4.** *Whether Plaintiff and the Class and Subclass Members suffered damages is a common question.*

Finally, even though Plaintiff is under no obligation to show that damages can be determined on a classwide basis, *see Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015), whether, and to what extent, Plaintiff and the Class and Subclass members were damaged as a result of Defendants' conduct can be determined by reference to common proof as well. As courts in the Ninth Circuit have recognized, all three of the alleged claims—breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of the UCL—

provide for recovery determined by objective criteria and under a reasonable person standard. *See Ebner v. Fresh, Inc.*, No. 13-cv-56644, 2016 WL 1056088, at *4 (9th Cir. Mar. 17, 2016) (noting California's "consumer protection statutes are governed by the 'reasonable consumer' test."); *see also Brotherson v. Prof. Basketball Club, L.L.C.*, 262 F.R.D. 564, 570–71 (W.D. Wash. 2009) (rejecting argument that "subjective expectations of each [member were] relevant to damages," finding "no support for this novel view of contract law," and noting that "[s]ubjective expectations do not govern the determination of contract damages . . . Objectively reasonable expectations do."). That is especially true in cases such as this, where the plaintiff and the class allege a uniform relationship between themselves and the defendants, and the defendants caused damages through a uniform course of conduct. *See Jordan v. Paul Financial, LLC*, 285 F.R.D. 435, 466 (N.D. Cal. 2012) (noting in case involving uniform, material, omissions that "[w]hile the parties dispute the propriety of the model for calculating damages . . . the Court need not decide the precise method . . . at this stage[,]" because the "calculation of damages [would] be sufficiently mechanical that whatever individualized inquiries need occur do not defeat class certification.")).

   Notwithstanding, Plaintiff's expert, through the use of a survey identifying consumer preferences, and approximating the proverbial "reasonable" consumer, has established a formula for determining damages by reference to (1) the types(s) of Buyer information disclosed and (2) the purchase price of the App at issue. (*See generally* Ex. 1-47, Plaintiff's *Corrected* Rule 26(a)(2) Expert Report of Henry Fishkind, Ph.D in Support of Class Certification.) As such, the Court can determine both Defendants' classwide liability, as well as the damages owed to any particular member, by applying the expert's formula to common evidence (i.e., App purchase records). *See In re Rubber Chems.*, 232 F.R.D. at 354 (finding commonality regarding damages where plaintiffs' expert proffered two accepted methodologies for calculating damages using classwide proof).

   Accordingly, this too is a question common to the Class and Subclass, and Rule 23(a)'s commonality requirement is satisfied.[12]

_____

[12]    Likewise, whether Defendants breached the contracts or their duty of good faith and fair dealing, or violated the UCL, present common questions of law, particularly given the California choice of law provision found in their terms.

**C.      Plaintiff's claims are typical of those of the proposed Class and Subclass.**

Next, Rule 23's typicality prerequisite requires that Plaintiff's claims be typical of those of the other members of the Class and Subclass. Fed. R. Civ. P. 23(a)(3). The focuses of the typicality analysis are "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Like commonality, typicality is viewed "permissive[ly]," and the standard is satisfied if the representative's claims "are reasonably co-extensive with those of the absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998); *see also* 5 Alba Conte & Herbert Newberg, *Newberg on Class Actions*, § 24.25 (3d ed. 1992) (Typicality "does not mean that the claims of the class representative must be identical or substantially identical to those of the absent class members.").

Plaintiff's claims are interchangeable with those of the absent Class and Subclass members. As with the other members, she (i) purchased an App from the Play Store using Google Wallet between March 1, 2012 and April 30, 2014; (ii) the App cost less than $300 (in fact, only $1.77); and (iii) her Google Wallet account was tied to her credit card at the time. (*See* Ex. 1-30 at GOOG-00001392; Ex. 1-15 at GOOG-00001089; Ex. 1-31 at GOOG-00001090-1092; Ex. 1-16 at GOOG-00001093; Ex. 1-32 at GOOG-00001394; Ex. 1-33 at GOOG-00001190; Ex. 1-48, D▮▮▮▮



83:4-10 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 132:14-16 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮).) Moreover, because the vendor from which Plaintiff purchased her App—a company named YCDroid—is a UK-based entity, she, like every Subclass member, purchased an App from a vendor located in the EU. (*See* Ex. 1-49 at GOOG-00001010 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); Ex. 1-50 at GOOG-00001012 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮); Ex. 1-31 at GOOG-00001090 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Just like every other Class and Subclass member, Defendants disclosed her personal information (i.e.,

her name, email address, and zip code) to an App vendor without her consent. (*See* Ex. 1-13 at Ans. Interrog. No. 1.) And as a result, Plaintiff suffered the same damages as the Class and Subclass, and is entitled to like restitution: the loss of the benefit of her bargained-for privacy protections and the diminution in value of her personal information. (*See* Ex. 1-47 at 3-6; dkt. 118 at 7–9.)

Accordingly, Plaintiff's claims "are reasonably co-extensive" with those of the absent Class and Subclass members, and Rule 23(a)'s typicality requirement is satisfied as well.

### D. Plaintiff and her counsel are more than adequate representatives.

Rule 23(a)'s final prerequisite—adequacy—is satisfied where the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy analysis has two components: whether the named plaintiff and her counsel have any conflicts of interest with other class members, and whether plaintiff and her counsel will prosecute the action vigorously on behalf of the class. *Hanlon*, 150 F.3d at 1020.

Here, there are no conflicts of interest between Plaintiff (or her counsel) and the other Class or Subclass members, as they all have been injured in the same manner by Defendants' unlawful disclosures and all seek the same relief—i.e., damages equal to the lost benefit of their bargain and the diminution in the value of their personal information. Moreover, Plaintiff's participation in this case goes above and beyond what courts in this District consider adequate. Her involvement began in August 2013 (*see* Ex. 1-48 at 39:21-22), when she retained Progressive Law Group as her counsel and began assisting them with their pre-suit investigation. (*Id.* at 145:12-24 (███████████ ████████████████████████████).) Following the filing of this action, Plaintiff, herself a lawyer, reviewed and provided input on the amended complaint prepared and filed by her counsel. (*Id.* at 145:19-21.) After the Court denied Defendants' motion to dismiss, in part, Plaintiff assisted in the preparation of her discovery responses, including producing information to aid in drafting interrogatory responses, providing documentation, and reviewing draft responses. (*Id.* at 146:5 (████████████████████████ 146:8-11 ███████████ ████████████).) She also sat for a deposition, where she demonstrated her understanding of the issues in the case and her commitment to honoring her duties to the Class. (*Id.* at 40:18-21 (██

██████████████████████████████████████████████████████ *id.* at

43:12-16 ████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████ Thus, Plaintiff has shown a commitment to

pursuing the Class and Subclass's claims and she more than satisfies Rule 23's adequacy

requirement. *See Trosper v. Styker Corp.*, No. 13-cv-607, 2014 WL 4145448, at *13 (N.D. Cal.

Aug. 21, 2014) (finding class representative adequate where he had "demonstrated his commitment

to the case and ha[d] indicated he [would] vigorously prosecute the action on behalf of the class.").

For their part, proposed Class Counsel are also adequate representatives of the Class and

Subclass and they have and will continue to "prosecute the action vigorously on [their] behalf…."

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). Under Rule 23(g), factors such

as the work counsel have done in identifying or investigating potential claims, their experience in

handling other class actions, their knowledge of the law, and the resources they will commit to the

case are all indicative of adequacy. Fed. R. Civ. P. 23(g). Here, through substantive motion practice,

extensive discovery—including eleven depositions of Google employees (and two experts), service

and review of hundreds of discovery requests, and review of more than 10,000 pages of responsive

documents—and oversight of expert discovery, proposed Class Counsel have committed substantial

resources to investigating and litigating the claims in this case, which have now been pending for

four years. (*See* Declaration of Rafey S. Balabanian ("Balabanian Decl.") ¶ 3.)

In terms of experience, proposed Class Counsel are well-respected members of the legal

community with extensive experience litigating class actions of similar size, scope, and complexity,

particularly relating to consumer privacy issues. Lawyers at Edelson PC have been recognized as

"pioneers in the electronic privacy class action field, having litigated some of the largest consumer

class actions in the country on this issue." *In re Facebook Privacy Litig.*, No. 10-cv-2389, dkt. 69 at

5 (N.D. Cal. Dec. 10, 2010); *see also Harris v. comScore*, No. 11-cv-5807, dkts. 186, 369 (N.D. Ill.)

(securing adversarial certification of largest ever privacy class comprised of 10 million consumers

on claims arising under federal privacy statutes and ultimately achieving a $14 million non-

reversionary settlement with claiming class members receiving approximately $500 each). Indeed, in appointing Edelson PC as interim lead counsel of four consolidated actions relating to a defendant's failure to honor its privacy and security promises, Judge Davila of the Northern District of California noted that the firm is "experienced in class action litigation and, in particular, in class action litigation involving technology and privacy." *In re LinkedIn User Privacy Litig.*, No. 12-cv-3088, dkt. 40 at 3 (N.D. Cal. Aug. 29, 2012); *see also Resnick v. AvMed, Inc.*, No. 10-cv-24513 (S.D. Fla.) (Edelson PC obtaining the first data breach class action settlement to provide a class with cash recovery based on overpayment for data security without requiring evidence of identity theft); *Aranda v. Caribbean Cruise Line, Inc.*, No. 12-cv-4069, 2016 WL 1555576 (N.D. Ill. Apr. 18, 2016) (after obtaining class certification, Edelson PC obtained summary judgment on liability for claims under the Telephone Consumer Protection Act, 47 U.S.C. § 227).

Similarly, Progressive Law Group, including the Madison, Wisconsin and Chicago, Illinois firms, concentrate in class litigation and have litigated and successfully prosecuted numerous class actions. And their committed advocacy in this matter likewise demonstrates their adequacy. (*See* Declaration of Mark Bulgarelli, attached as Exhibit 2.)

For these reasons, Plaintiff and her counsel have been—and will continue to be—adequate representatives of the Class and Subclass, and her attorneys should be appointed as Class Counsel pursuant to Fed. R. Civ. P. 23(g). *See Sitt v. San Francisco Muni. Transp. Agency*, No. 12-cv-3704, 2014 WL 1760623, at *7 (N.D. Cal. May 2, 2014) (adequacy "generally met with members of the bar in good standing typically deemed qualified and competent to represent a class absent evidence to the contrary.").

### IV. The Proposed Class and Subclass Meet Rule 23(b)(3)'s Requirements.

In addition to meeting the prerequisites of Rule 23(a), the Class and Subclass must also meet one of the three requirements of Rule 23(b). Here, Plaintiff seeks certification under Rule 23(b)(3), which requires that common questions of law or fact predominate over individual ones, and that a class action is superior to individual actions. Fed. R. Civ. P. 23(b)(3). Those requirements are satisfied as well.

**A.    Common questions of law and fact predominate.**

Rule 23(b)(3)'s predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997), and is met where the common questions "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance tests the balance between common questions, where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof," and individual ones, which call for "evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (Mar. 22, 2016) (citations and internal quotations omitted). Although determining whether questions of law or fact predominate "begins, of course, with the elements of the underlying cause of action," *Erica P. John Fund, Inc.*, 563 U.S. at 809, "proving predominance does not require plaintiffs to prove that every element of a claim is subject to classwide proof: they need only show that common questions predominate over questions affecting only individual class members." *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 612 (N.D. Cal. 2015) (citing *Amgen Inc. v. Ct. Retire. Plans and Trust Funds*, 133 S. Ct. 1184, 1196 (2013)). Here, each element of Plaintiff's claims can be proven by reference to common evidence.

First, with respect to the breach of contract claim, common issues predominate as to each element: (1) existence of a contract, (2) Class members' performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damages. (*See* dkt. 118 at 5.) As to the first element, each Class and Subclass member was presented with a materially identical Privacy Policy in a similar fashion, and each agreed to it in the same way (i.e., clicking a button). (*See* Ex. 1-4 at 157:6-10; Ex. 1-12 at GOOG-00002898 ███████████████████████ █████); Ex. 1-51 at GOOG-00005015.) As to the second, each member performed their obligations in the same manner by purchasing and paying for an App. *See In re Med. Cap. Sec. Litig.*, No. 10-cv-2145, 2011 WL 5067208, at *3 (C.D. Cal. July 26, 2011) (collecting cases); *see also Sacred Heart Health Sys., Inc. v. Humana Mil. Health.*, 601 F.3d 1159, 1171 (11th Cir. 2010) ("It is the form contract, executed under like conditions by all class members, that best facilitates

class treatment."). The same is true for the third element, as each Class and Subclass member asserts that disclosure of their names and email addresses to the App vendors was unnecessary, that the disclosure of their cities, states, and zip codes was not necessary for tax purposes, and, as to the Subclass, that disclosure of any information beyond their country of residence to the App vendors was also unnecessary for tax purposes. *See In re Med. Cap. Sec. Litig.*, 2011 WL 5067208, at *3. Finally, while the Ninth Circuit has made clear that classwide proof of damages is not required for certification, Plaintiff, through expert testimony, has provided for a common methodology for calculating such damages, and the facts and Defendants' records similarly provide common proofs that may be used to calculate damages.[13]

Second, common issues also predominate as to the claim for breach of the implied covenant of good faith and fair dealing. "'The implied promise [of good faith and fair dealing] requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement.'" (Dkt. 118 at 10 (quoting *Avidity Partners, LLC v. State of Cal.*, 221 Cal. App. 4th 1180, 1204 (2013) (citation omitted).) Where the "duty of good faith and reasonableness is rooted in form contracts and the application of uniform policies to the rights and obligations under those contracts," common issues predominate. *Ellsworth*, 2014 WL 2734953, at *27. "The duty does not require examining each plaintiff's individual expectations because those . . . are reflected in the contract." *Id.* As this Court identified in its order denying, in part, Defendants' motion to dismiss, the claims for breach of that covenant are rooted in Defendants' "blanket, universal disclosure" of Buyers' personal information frustrating the purpose of the Privacy Policies. (Dkt. 118 at 10.) Thus, the question of whether Defendants frustrated the purpose of their contracts with the Class and Subclass is simply a matter of comparing a common course of conduct to common contractual terms. *See Ellsworth*, 2014 WL 2734953, at *27 (finding common

---

[13] Courts have routinely certified breach of contract actions where an express term of a uniformly applicable contract was at issue. *See, e.g., Ballard v. Equifax Check Services, Inc.*, 186 F.R.D. 589, 595 (E.D. Cal. 1999) ("claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action"); *see also Menagerie Productions v. Citysearch*, No. CV 08-4263 CAS (FMO), 2009 U.S. Dist. LEXIS 108768, *36 (C.D. Cal. Nov. 9, 2009) (certifying class under breach of contract claim arising "from a standard form contract prepared by [defendant] to which all advertisers in the class agreed.").

issues to predominate as to good faith and fair dealing claim arising out of form contract).

Finally, common issues also predominate for the UCL claim. That claim is asserted under the UCL's unlawful and unfair prongs, both of which are rooted in Defendants' disclosure of Buyers' information in violation of the Privacy Policies. (Dkt. 118 at 16–17.) To state a claim under the UCL's "unlawful" prong, Class members must only show that Defendants' conduct violated any law. (*Id.* at 16.) As the Court recognized in its order on Defendants' last motion to dismiss, Plaintiff's unlawful-prong claim "relies upon alleged violations of California Business and Professions Code § 22576, which prohibits an operator of a commercial web site or online service from failing to comply with its own privacy policies," (*id.*), and a showing of economic harm. (*Id.* at 15.) Given Defendants' uniform conduct, common issues predominate over individual ones as to the unlawful-prong claims. To start, Defendants are plainly "operators of a commercial web site or online service" as to each Class and Subclass member, as each Privacy Policy specifically governs the use of Defendants' online services. (*See, e.g.,* Ex. 1-37 at GOOG-00000383; Ex. 1-38 at GOOG-00000084; Ex. 1-8 at GOOG-00000110; Ex. 1-40 at GOOG-00000187, Ex. 1-41 at GOOG-00000222; Ex. 1-42 at GOOG-00000310; Ex. 1-43 at GOOG-00000856; Ex. 1-44 at GOOG-00000990; Ex. 1-7 at GOOG-00000997; Ex. 1-45 at GOOG-00001020.) Moreover, Defendants' violation of the Privacy Policies is uniform across the Class and Subclass: each member asserts that Defendants unnecessarily disclosed their personal information. Thus, the issue of whether Defendants' conduct was unlawful can be determined on a classwide basis. *See Gaudin v. Saxon Mortgage Servs., Inc.*, 297 F.R.D. 417, 430 (N.D. Cal. 2013) (finding predominance under UCL claim arising out of form contract and "Defendant's uniform practices as they apply generally to the Proposed Class"). Finally, and as established above, common issues predominate as to damages given Defendants' uniform conduct and Plaintiff's expert's proposal of a common methodology for calculating damages. (*See supra* § II(B)(4).)

The Class's and Subclass's claims under the UCL's "unfair" prong are also predominated by common issues. As the Court also recognized in its order on Defendants' motion to dismiss, while the California Supreme Court has not established a definitive test for evaluating violations of the

unfair prong, three tests have emerged for assessing unfair claims. (Dkt. 118 at 16–17.) The first requires a plaintiff to show the violation of some public policy "tethered to [a] specific constitutional, statutory, or regulatory provision[]." (*Id.* at 17 (quoting *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010)). The second requires a showing that the practice at issue is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." (*Id.* (quoting *Drum*, 182 Cal. App. 4th at 257).) The third requires that the injury be "substantial," that it "not be outweighed by any countervailing benefits to consumers or competition," and that the consumers "could not reasonably have avoided" the injury. *Id.* (quoting *Drum*, 182 Cal. App. 4th at 257).) In its order on Defendants' motion to dismiss, the Court noted that Plaintiff stated a claim because she alleged that Defendants' disclosures of personal information were "oppressive, immoral, unethical, and unscrupulous," and that the disclosures caused substantial consumer injury without any countervailing benefit. (Dkt. 118 at 17.)

Here, the evidence shows that Plaintiff's theory under the unfair prong is predominated by common issues. Because each Class and Subclass member alleges breach of the same Privacy Policies in the same way by Defendants' uniform conduct, whether that conduct was in fact oppressive, immoral, unethical, and unscrupulous can be evaluated commonly. *See In re Nat. W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 669 (S.D. Cal. 2010) ("On the unfair prong, the Court must come to the same conclusion. The evidence to date shows class-wide practices by Defendant. There is no indication that the 'unfairness' of those practices differs from individual to individual."). Likewise for the effects of the injury: because each Class and Subclass member was subject to the same conduct and suffered the same harm as a result, the question of whether Defendants' conduct caused them "substantial" injury can be addressed uniformly. As a result, common issues predominate over the Class's and Subclass's claims under the UCL's unfair prong.

In other words, because each element of the Class's and Subclass's claims can be determined by reference to common evidence, common issues certainly predominate and this requirement is met. *See Ellsworth*, 2014 WL 2734953, at *20 (noting that "courts routinely certify

class actions regarding breaches of form contracts" in cases alleging breach of contract, breach of implied covenant of good faith and fair dealing, and UCL claims) (collecting cases).

**B.  A class action is the superior method for resolving this controversy.**

Lastly, Rule 23(b)(3)'s superiority requirement seeks to assure that a class action is the "most efficient and effective means of resolving the controversy." *Wolin*, 617 F.3d at 1175. "Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Id*. Here, the potential recovery to any member of the proposed Class and Subclass is relatively small—on the order of a few cents per purchase. (Ex. 1-47 at ¶ 20.) Given that, the only alternative to a class action—thousands of individual actions in small claims court—would be both incredibly inefficient (as each consumer would present the same arguments and evidence) and unrealistic (as the costs of litigation would quickly exceed the potential return in each individual case). (Balabanian Decl. ¶ 5.) Indeed, discovery here has gone on for years and has involved the production and review of thousands of pages of responsive documents (using common, but expensive, e-discovery platforms), numerous depositions of Defendants' employees, the retention of a damages expert and depositions of rebuttal experts. (*Id*.) That substantial cost would outweigh the minimal recovery available to any individual. *See, e.g., Wolin*, 617 F.3d at 1176 ("The amount of damages suffered by each class member is not large. Forcing individual [consumers] to litigate their cases, particularly where common issues predominate for the proposed class, is an inferior method of adjudication.") (internal quotations omitted); *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (finding superiority "easily satisfied" where "[i]f plaintiffs cannot proceed as a class, some—perhaps most—will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover.").

# CONCLUSION

For the foregoing reasons, Plaintiff Svenson respectfully requests that this Court enter an order (1) certifying the proposed Class and Subclass; (2) appointing Plaintiff as representative of the Class and Subclass; (3) appointing Jay Edelson, Rafey S. Balabanian, and Benjamin H. Richman of Edelson PC, and Frank Jablonski and Mark Bulgarelli of Progressive Law Group, LLC as class counsel; and (4) granting such other and further relief as the Court deems reasonable and just.

Respectfully submitted,

**ALICE SVENSON**, individually and on behalf of all others similarly situated,

Dated: June 3, 2016

By: /s/ Rafey S. Balabanian
One of Plaintiff's Attorneys

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
EDELSON PC
329 Bryant Street, Suite 2C
San Francisco, CA 94107
Tel: 415.234.5342
Fax: 415.373.9495

Jay Edelson (Admitted *Pro Hac Vice*)
jedelson@edelson.com
Benjamin H. Richman (Admitted *Pro Hac Vice*)
brichman@edelson.com
J. Dominick Larry (Admitted *Pro Hac Vice*)
nlarry@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, IL 60654
Tel: 312.589.6370
Fax: 312.589.6378

Mark Bulgarelli (Admitted *Pro Hac Vice*)
Progressive Law Group LLC
140 S. Dearborn Street, Suite 315
Chicago, IL 60603
Tel: 312-787-2717
Fax: 888-574-9038
markb@progressivelaw.com

Frank Jablonski (Admitted *Pro Hac Vice*)
Progressive Law Group LLC
354 West Main Street
Madison, WI 53703
Phone 608-258-8511
Fax: 608-442-949
frankj@progressivelaw.com

Kathryn Diemer
kdiemer@diemerwhitman.com
Diemer, Whitman & Cardosi, LLP
75 East Santa Clara Street, Suite 290
San Jose, CA 95113
Tel: 408.971.6270
CA Bar No.: 133977

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2016, I electronically filed the above and foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Rafey S. Balabanian