Kathryn Diemer
kdiemer@diemerwhitman.com
DIEMER, WHITMAN & CARDOSI, LLP
75 East Santa Clara Street, Suite 290
San Jose, California 95113
Tel: 408.971.6270
CA Bar No.: 133977

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
EDELSON PC
329 Bryant Street, Suite 2C
San Francisco, CA 94107
Tel: 415.234.5342
Fax: 415.373.9495

*Attorneys for Plaintiff and the Putative Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| ALICE SVENSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE, INC., and GOOGLE PAYMENT CORP.,<br><br>Defendants. | Case No. 5:13-cv-04080-BLF<br><br>**DECLARATION OF RAFEY S. BALABANIAN IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Judge: Honorable Beth Labson Freeman |

Pursuant to 28 U.S.C. § 1746 and L.R. 7-5, I hereby declare and state as follows:

1.      I am an attorney admitted *pro hac vice* in the United States District Court for the Northern District of California. I am entering this declaration in support of Plaintiff's Motion for and Memorandum in Support of Class Certification. This declaration is based upon my personal knowledge, except where expressly noted otherwise. If called upon to testify to the matters stated herein, I could and would competently do so.

2.      I am the Global Managing Partner and General Counsel of the law firm of Edelson PC, which has been retained to represent the named Plaintiff in this matter, Alice Svenson ("Svenson" or "Plaintiff").

3.      To date, proposed Class Counsel from Edelson PC—including myself, Jay Edelson, and Benjamin H. Richman—and the Progressive Law Group, LLC—including Mark Bulgarelli and Frank Jablonski—as well as all other attorneys responsible for the matter, have diligently investigated and prosecuted this case and devoted substantial time, energy, and resources to investigating and developing the theories for Plaintiff's claims, as well as progressing the litigation. Those efforts have included, *inter alia*:

- Drafting and responding to multiple motions;
- Serving and reviewing hundreds of discovery requests;
- Reviewing more than 10,000 pages of responsive documents;
- Preparing for and taking eleven depositions of Google employees and two experts;
- Overseeing expert discovery; and
- Throughout the litigation, analyzing and assessing Plaintiff's and the proposed Class's and Subclass's claims in light of the defenses asserted by Defendants, including with respect to the motion for class certification.

Simply put, we have and will continue to commit the resources necessary to adequately represent the proposed Class and Subclass throughout the pendency of this action.

4.      In addition, proposed Class counsel from Edelson PC and the other attorneys at our firm have extensive experience prosecuting actions of similar size, scope and complexity and have been appointed class counsel in numerous class actions throughout the country.

5.      We believe that a class action is the superior method of adjudicating Plaintiff's and the Class's and Subclass's claims. The potential recovery to any member of the proposed Class and Subclass is relatively small—on the order of a few cents per purchase. Given that, the only alternative to a class action—thousands of individual actions in small claims court—would be both incredibly inefficient (as each consumer would present the same arguments and evidence) and unrealistic (as the costs of litigation would quickly exceed the potential return in each individual case). Indeed, discovery here has gone on for years and has involved the production and review of thousands of pages of responsive documents (using common, but expensive, e-discovery platforms), numerous depositions of Defendants' employees, the retention of a damages expert and depositions of rebuttal experts.

***Attachments***

6.      Attached hereto as Exhibit 1-1 is a true and accurate copy of the Google Wallet Terms of Service, bates labeled GOOG-00001191-1213 and dated October 23, 2012.

7.      Attached hereto as Exhibit 1-2 is a true and accurate copy of the Google Play Terms of Service, bates labeled GOOG-00001179-1189.

8.      Attached hereto as Exhibit 1-3 are true and accurate copies of excerpts from the transcript of the deposition of Google engineering director Ficus Kirkpatrick, taken in the matter of *In re Google, Inc., Privacy Policy Litigation*, No 5:12-cv-01382-PSG (N.D. Cal.). Google has designated this deposition transcript as "Highly Confidential – Attorneys' Eyes Only."

9.      Attached hereto as Exhibit 1-4 are true and accurate copies of excerpts from the transcript of the deposition of Google project manager Ibrahim Elbouchikhi taken in this matter. Google has designated this deposition transcript as "Highly Confidential – Attorneys' Eyes Only."

10.      Attached hereto as Exhibit 1-5 are true and accurate copies of excerpts from the transcript of the deposition of Google project manager Kyrk Justin Lawyer taken in this matter. Google has designated this deposition transcript as "Highly Confidential – Attorneys' Eyes Only."

11.      Attached hereto as Exhibit 1-6 are true and accurate copies of excerpts from the transcript of the deposition of Google engineer director John Affaki taken in this matter. Google has designated this deposition transcript as "Confidential."

12.     Attached hereto as Exhibit 1-7 is a true and accurate copy of the Google Wallet Privacy Notice, bates labeled GOOG-00000997-0999 and dated August 1, 2012.

13.     Attached hereto as Exhibit 1-8 is a true and accurate copy of Google's Privacy Policy, bates labeled GOOG-00000110-0116 and dated July 27, 2012.

14.     Attached hereto as Exhibit 1-9 are true and accurate copies of excerpts from the transcript of the deposition of Google software engineer Sri Raga Velagapudi taken in this matter. Google has designated this deposition transcript as "Highly Confidential – Attorneys' Eyes Only."

15.     Attached hereto as Exhibit 1-10 are true and accurate copies of excerpts from an internal document discussing Google projects, bates labeled GOOG-00006571-6572 and GOOG-00006617-6618. Google has designated these documents as "Confidential."

16.     Attached hereto as Exhibit 1-11 is a true and accurate copy of an excerpt from an internal document discussing Google's redesigned Google Play purchase flow, bates labeled GOOG-00009091. Google has designated this document "Confidential."

17.     Attached hereto as Exhibit 1-12 is a true and accurate copy of an excerpt from an internal document discussing various "buyflows" utilized by Google, bates labeled GOOG-00002898. Google has designated this document "Confidential."

18.     Attached hereto as Exhibit 1-13 is a true and accurate copy of an excerpt from Defendant Google Inc.'s Third Amended Supplemental Answers to Plaintiff's Interrogatories, Set One and dated February 4, 2016. Exhibit 1-13 is filed partially under seal to the extent Google has designated portions of its answers "Confidential."

19.     Attached hereto as Exhibit 1-14 are true and accurate copies of excerpts from the transcript of the deposition of Google product manager Mark Thomas taken in the matter of *In re Google, Inc., Privacy Policy Litigation*, No 5:12-cv-01382-PSG (N.D. Cal.). Google has designated this deposition transcript as "Highly Confidential – Attorneys' Eyes Only."

20.     Attached hereto as Exhibit 1-15 is a true and accurate copy of an image related to Plaintiff Svenson's App purchase, bates labeled GOOG-00001089. The image contains, *inter alia*, Plaintiff Svenson's personal email address and order number. Google has designated this document "Confidential."

21.     Attached hereto as Exhibit 1-16 is a true and accurate copy of an image related to Plaintiff Svenson's App purchase, bates labeled GOOG-00001093. The image contains, *inter alia*, Plaintiff Svenson's personal zip code and order number, as well as information related to the processing merchant. Google has designated this document "Confidential."

22.     Attached hereto as Exhibit 1-17 is a true and accurate copy of internal emails between Google employees discussing Google's Merchant Center, bates labeled GOOG-00003391. Google has designated this document "Confidential."

23.     Attached hereto as Exhibit 1-18 are true and accurate copies of internal emails regarding changes to what information will be displayed to vendors, bates labeled GOOG-00008234-8235. Google has designated these emails as "Confidential."

24.     Attached hereto as Exhibit 1-19 is a true and accurate copy of internal emails between Google employees regarding the disclosure of information to App developers, bates labeled GOOG-00003326–3327. Google has designated this document "Confidential."

25.     Attached hereto as Exhibit 1-20 is a true and accurate copy of an excerpt from internal emails between Google employees discussing the Merchant Center, bates labeled GOOG-00005451. Google has designated this document "Confidential."

26.     Attached hereto as Exhibit 1-21 is a true and accurate copy of excerpts from the transcript of the deposition of Google software engineer Giles Douglas taken in this matter. Google has designated this deposition transcript as "Confidential."

27.     Attached hereto as Exhibit 1-22 is a true and accurate copy of excerpts from the transcript of the Rule 30(b)(6) deposition of Google product manager Mark Thomas taken in this matter. Google has designated this deposition transcript as "Confidential."

28.     Attached hereto as Exhibit 1-23 are true and accurate copies of internal emails between Google employees discussing Google Wallet, bates labeled GOOG-00002260–2267. Google has designated these documents "Confidential."

29.     Attached hereto as Exhibit 1-24 is a true and accurate copy of excerpts from the transcript of the deposition of Google product manager Michael Siliski taken in this matter. Google has designated this deposition transcript as "Confidential."

1    30.    Attached hereto as Exhibit 1-25 is a true and accurate copy of excerpts from the

2    transcript of the deposition of Google software engineer Mekka Okereke taken in this matter.

3    Google has designated this deposition transcript as "Confidential."

4    31.    Attached hereto as Exhibit 1-26 is a true and accurate copy of a series of internal

5    communications between Google employees discussing the Checkout Merchant Center, bates

6    labeled GOOG-00008880–8904. Google has designated this document "Highly Confidential—

7    Attorneys' Eyes Only."

8    32.    Attached hereto as Exhibit 1-27 is a true and accurate copy of an internal email

9    between Google employees discussing Merchant Center, bates labeled GOOG-00003783. Google

10    has designated this document "Confidential."

11    33.    Attached hereto as Exhibit 1-28 is a true and accurate copy of an internal email

12    between Google employees discussing the Merchant Center, bates labeled GOOG-00006728–

13    6729. Google has designated this document "Confidential."

14    34.    Attached hereto as Exhibit 1-29 is a true and accurate copy of an excerpt of an

15    excel spreadsheet that provides, in relevant part, information related to the purchase limit related

16    to certain privacy policies, bates labeled GOOG-00005126. Plaintiff believes that Google intended

17    to designate this document "Confidential."

18    35.    Attached hereto as Exhibit 1-30 is a true and accurate copy of an image related to

19    Plaintiff Svenson's App purchase, bates labeled GOOG-00001392. The image contains, *inter alia*,

20    Plaintiff Svenson's personal email address, zip code, and order number. Google has designated

21    this document "Confidential."

22    36.    Attached hereto as Exhibit 1-31 are true and accurate copies of images related to

23    Plaintiff Svenson's App purchase, bates labeled GOOG-00001090–1092. The images contain,

24    *inter alia*, the name and address of the processing merchant. Google has designated these

25    documents "Confidential."

26    37.    Attached hereto as Exhibit 1-32 is a true and accurate copy of an image related to

27    Plaintiff Svenson's App purchase, bates labeled GOOG-00001394. Google has designated the

28    document "Confidential."

38.     Attached hereto as Exhibit 1-33 is a true and accurate copy of an image related to Plaintiff Svenson's App purchase, bates labeled GOOG-00001190. Google has designated the document "Confidential."

39.     Attached hereto as Exhibit 1-34 is a true and accurate copy of Defendants Google Inc.'s and Google Payment Corporation's Responses to Plaintiff's Second Set of Requests for Admission, dated January 16, 2015.

40.     Attached hereto as Exhibit 1-35 is a true and accurate copy of an excerpt from an internal Google document that relates to the Google Wallet signup process, bates labeled GOOG-00007584. Google has designated this document "Confidential."

41.     Attached hereto as Exhibit 1-36 is a true and accurate copy of an excerpt from Defendant Google Payment Corporation's Amended Supplemental Answers to Plaintiff's Interrogatories, Set One. Exhibit 1-36 is filed partially under seal to the extent Google has designated portions of its answers as "Confidential."

42.     Attached hereto as Exhibit 1-37 is a true and accurate copy of Google's Privacy Policy, bates labeled GOOG-00000383-0387 and dated October 3, 2010.

43.     Attached hereto as Exhibit 1-38 is a true and accurate copy of Google's Privacy Policy, bates labeled GOOG-00000084-0089 and dated October 20, 2011.

44.     Attached hereto as Exhibit 1-39 is a true and accurate copy of Google's Privacy Policy, bates labeled GOOG-0000096-0102 and dated March 1, 2012.

45.     Attached hereto as Exhibit 1-40 is a true and accurate copy of Google's Privacy Policy, bates labeled GOOG-00000187-0193 and dated June 24, 2013.

46.     Attached hereto as Exhibit 1-41 is a true and accurate copy of Google's Privacy Policy, bates labeled GOOG-00000222-0228 and dated December 20, 2013.

47.     Attached hereto as Exhibit 1-42 is a true and accurate copy of Google's Privacy Policy, bates labeled GOOG-00000310-0318 and dated March 31, 2014.

48.     Attached hereto as Exhibit 1-43 is a true and accurate copy of the Google Checkout Privacy Policy, bates labeled GOOG-00000856-0860 and dated December 9, 2009.

49.     Attached hereto as Exhibit 1-44 is a true and accurate copy of the Google Wallet

1   Privacy Policy, bates labeled GOOG-00000990-0996 and dated November 16, 2011.

2       50.     Attached hereto as Exhibit 1-45 is a true and accurate copy of the Google Wallet

3   Privacy Notice, bates labeled GOOG-00001020-1022 and dated May 7, 2014.

4       51.     Attached hereto as Exhibit 1-46 is a true and accurate copy of excerpts from the

5   transcript of the deposition of Google employee Marlene Macek taken in this matter. Google has

6   designated this deposition transcript as "Highly Confidential – Attorneys' Eyes Only."

7       52.     Attached hereto as Exhibit 1-47 is a true and accurate copy of Plaintiff's *Corrected*

8   Rule 26(a)(2) Expert Report of Henry Fishkind, Ph.D in Support of Class Certification, which

9   contains information designated by Google as "Confidential" and "Highly Confidential -

10  Attorneys' Eyes Only." The expert report is also accompanied by exhibits, regarding, *inter alia*,

11  survey instruments and materials relied upon for its drafting that were designated confidential by

12  Svenson. Exhibit 1-47 is filed partially under seal to the extent information within it is designated

13  as "Confidential" or "Confidential – Attorneys' Eyes Only".

14      53.     Attached hereto as Exhibit 1-48 is a true and accurate copy of excerpts from the

15  transcript of the deposition of Plaintiff Alice C. Svenson taken in this matter. Plaintiff has

16  designated this deposition transcript as "Confidential."

17      54.     Attached hereto as Exhibit 1-49 is a true and accurate copy of a checkout account

18  verification email sent to a vendor that sold Plaintiff Svenson an App, bates labeled GOOG-

19  00001010. Google has designated this document "Confidential."

20      55.     Attached hereto as Exhibit 1-50 are true and accurate copies of emails regarding

21  verification of a Google Merchant account for a company that sold Plaintiff Svenson an App,

22  bates labeled GOOG-00001012. Google has designated this document "Confidential."

23      56.     Attached hereto as Exhibit 1-51 is a true and accurate copy of an internal Google

24  document discussing Google Play, bates labeled GOOG-00005010–5028. Google has designated

25  this document "Confidential."

26      57.     Attached hereto as Exhibit 1-52 is a true and accurate copy of the firm resume of

27  Edelson PC.

28              *               *               *

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed this 3rd day of June, 2016 at Denver, Colorado.

3

4                                        /s/ Rafey S. Balabanian

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1-1

**Terms of Service - Buyer (US)**

# Google Wallet – Terms of Service

**October 23, 2012**

These Terms of Service are a legal agreement, between you, Google Inc. and Google Payment Corp., a wholly-owned subsidiary of Google Inc., that governs your access to and use of Google Wallet. The services described below are provided by Google Payment Corp. Please review these Terms of Service before you decide whether to accept them and continue with the registration process.

By agreeing to these Terms of Service, you represent the following:

- You are between 13 to 17 years of age and creating a Google Wallet account for the sole and limited purpose of redeeming Google Play Gift Card value for select items that are eligible for purchase by you on Google Play, subject to applicable laws and upon Google's discretion; or
- You are 18 years old or older; and
- Capable of entering into a legally binding agreement.

If you are a business entity, you also represent that you are:

- duly authorized to do business in the country or countries where you operate; and
- your employees, officers, representatives, and other agents accessing Google Wallet are duly authorized to access Google Wallet and to legally bind you to these Terms of Service and all transactions conducted under your username and password.

To use Google Mobile Wallet for in-store purchases with the Google Wallet Mobile Service and an NFC mobile phone, The Bancorp Bank will issue you a Google Wallet Virtual Card. To use Google Wallet for certain online purchases, The Bancorp Bank will issue you a Google Wallet Virtual OneTime Card.

By agreeing to these Terms of Service, you authorize Google Wallet to charge your selected card when you make online purchases using Google Wallet or in-store purchases using the Google Wallet Mobile Service. Please see Section 4 for more information.

1. **Definitions**
2. **Registration for Google Wallet**
3. **Processing Service**
4. **Google Mobile Wallet**
5. **Google Play Gift Cards**
6. **Limitations on Use of the Services**
7. **Privacy**
8. **Username and Password Information**
9. **Electronic Communications**
10. **Termination of Service**

11. **Responsibility for Taxes**
12. **No Endorsement of Products**
13. **Indemnification**
14. **Disclaimer**
15. **Limitation of Liability; Force Majeure**
16. **Governing Law**
17. **Notice**
18. **Modification of the Terms of Service**
19. **Assignment**
20. **Survival**
21. **Other Provisions**

## 1. Definitions.

The following defined terms appear in these Terms of Service.

- **"Applicable Law":** Any and all federal, state and local laws, rules and regulations applicable to the Services.
- **"Bancorp":** The Bancorp Bank.
- "**Buyer**": A Customer that uses a Service to purchase goods and/or services from Sellers or merchants.
- "**Carrier**": A mobile telephone operator approved by GPC that offers a Carrier Billing Account.
- "**Carrier Billing Service**": The payment process whereby GPC, on behalf of Seller, submits a Payment Transaction to the Carrier for billing to the Buyer's Carrier Billing Account.
- "**Carrier Billing Account**": The monthly or other periodic billing account provided to you by your Carrier that you register with the Processing Service to fund certain Payment Transactions.
- "**Customer**": A person that registers for the Service(s).
- "**Google**" means Google Inc.
- "**Google Account**": The account you create with Google Inc. for the use of Google Services, as defined in the Google Terms of Service.
- "**Google Mobile Wallet**": The Google Wallet features that enable you to (i) make purchases at locations that accept contactless payments using a Google Wallet Virtual Card and (ii) make purchases on participating online merchant websites using a Google Wallet Virtual OneTime Card
- "**Google Wallet Account**": The account that is assigned to you upon your completion of the Google Wallet set-up.
- "**Google Wallet Virtual Card**" The MasterCard-branded prepaid debit virtual payment card product issued by Bancorp downloaded and stored on the near-field communication chip of a mobile phone.
- "**Google Wallet Virtual Card Terms of Use**" The terms and conditions between you and Bancorp which are applicable to use of the Google Wallet Virtual Card.
- "**Google Wallet Virtual OneTime Card**": The MasterCard-branded prepaid debit virtual payment card product issued by Bancorp for one time use in the Google Mobile Wallet Service at certain online merchants.
- "**Google Wallet Virtual OneTime Card Terms of Use**": The terms and conditions between you and Bancorp which are applicable to use of the Google Wallet Virtual OneTime Card.
- "**Google Web Sites**": The web site pages of Google, a Google affiliate or a Google-affiliated or partner

GOOG-00001192

company.

- "**GPC**": Google Payment Corp.
- "**Offer(s)**": Vouchers, coupons, discounts or other valuable content that can be redeemed at a participating merchant.
- "**Online Card Processing Service**": The service by which GPC holds a Buyer's registered Payment Instrument information and, at the time of a Buyer's purchase from a Seller using the Google Wallet, GPC provides such information to the Seller (or the Seller's card processor, including potentially GPC itself) for processing through the applicable card network, which Seller, in turn, provides to the issuer of the Payment Instrument for approval and financial settlement through the card network to the Seller.
- "**Payment Instrument**": A credit card, debit card or Carrier Billing Account that is registered in a Customer's Google Wallet Account for Payment Transactions. A Payment Instrument must be associated with a billing address in a country where the applicable Service is made available.
- "**Payment Transaction**": The processing of a payment that results in the debiting, charging, or other related transaction, of the Purchase Amount to a Buyer's Payment Instrument.
- "**Processing Service**": The Online Card Processing Service and the Carrier Billing Service.
- "**Product**": Any merchandise, good or service that a Buyer may purchase using a Service.
- "**Purchase Amount**": The dollar amount of a Payment Transaction to pay for a Product, and any related fees, taxes or shipping charges, as applicable.
- "**Rewards Program Item(s)**": The Google Mobile Wallet service which enables you to store information on your mobile device or in GPC's servers for reward program points, or other incentives that can be redeemed at a participating merchant for Products.
- "**Seller**": A Customer that uses the Processing Service to process Payment Transactions from Buyers.
- "**Service(s)**": The Google Wallet products and services described in these Terms of Service that are or facilitate (i) the Processing Service, and, (ii) the Google Mobile Wallet.
- "**We**", "**us**": Google Inc. and Google Payment Corp.
- "**You**", "**you**": A person that applies to, or registers to use, or uses, the Services.

## 2. Registration for Google Wallet.

### 2.1 Getting started with Google Wallet.

When you sign up for Google Wallet, you are creating a Google Wallet Account that is associated with your Google Account. Depending on the Services of Google Wallet you use, you may be asked to provide information such as your name, contact information, Payment Instrument information, date of birth, and/or your social security number. We may verify your registration information with a third party verification vendor. In some cases, we may ask you to send us additional information, such as a copy of your driver's license or passport, or to answer additional information to help us verify your identity. Finally, if you register a Carrier Billing Account, we will ask you to provide your mobile telephone number and the name and billing address associated with that number.

The information you provide will be used by us to determine if you are eligible to begin and/or continue to use Google Wallet Services. Provision and use of such data is subject to the Google Wallet Privacy Notice, as described more fully in Section 7 below.

### 2.2 USA PATRIOT ACT NOTICE.

GOOG-00001193

To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each individual or business that opens an account or requests credit.

### 2.3 Accuracy of Registration Information.

You are responsible for providing accurate registration information and for keeping your registration information up to date, or notifying us in the event of changes. Changes to your primary residence address may require you to accept new Google Wallet terms of service for the country to which you have moved. In addition, as certain services are currently offered only in select countries, changes to your primary residence address may result in your becoming ineligible for certain services.

### 2.4 Relation to your Google Account.

In order to use Google Wallet Services, you must have a Google Account which is in good standing with Google, in accordance with the <u>Google Terms of Service</u>. If you or Google closes your Google Account for any reason, your Google Wallet Account will also be closed and you will no longer be able to access the Google Wallet Services.

## 3. The Processing Service.

### 3.1 Getting Started with the Processing Service.

In order to use the Processing Service, you must complete all required information elements on the Processing Service registration web pages. You must register a Payment Instrument to make Payment Transactions and pay fees and other obligations arising from your use of the Processing Service.

You authorize GPC to confirm that your Payment Instrument is in good standing with the issuing financial institution and/or Carrier (as applicable), including, but not limited to, by submitting a request for a payment authorization and/or a low dollar credit and/or debit to the Payment Instrument, in accordance with the relevant card association or Carrier rules as applicable. You also authorize GPC to obtain from time to time a credit report and/or to otherwise make credit or other background inquiries as GPC deems appropriate to evaluate your registration for or continued use of the Processing Service. GPC, in its sole and absolute discretion, may refuse to approve or may terminate existing registrations for the Processing Service with or without cause or notice, other than any notice required by any Applicable Law, and not waived herein.

### 3.2 Online Card Processing Service.

The Online Card Processing Service facilitates a credit or debit card purchase by a Buyer from a Seller that is registered with GPC to receive certain merchant payment processing services. The Online Card Processing Service stores information from Buyers, such as their Payment Instruments and shipping information. GPC processes Payment Transactions on behalf of Sellers, as the agent of the Seller, through the appropriate credit card or debit card network or through a participating Carrier, as applicable. When Buyer chooses to pay for Products with the Processing Service, Buyer authorizes the Seller to submit charges (and, in the case of refunds, credits) to Buyer's registered Payment Instrument. GPC will assist the Seller in accessing the card networks and

GOOG-00001194

processing the Payment Transaction. Purchases made through the Online Card Processing Service are also subject to the terms and conditions governing Buyer's Payment Instrument between Buyer and the issuer of the Payment Instrument. Buyer is responsible for any charges and related fees that may be imposed under the Payment Instrument terms and conditions as a result of Buyer's use of a Payment Instrument.

You acknowledge and agree that your purchases of Products are transactions between you and the Seller, and not with GPC, Google or any of their affiliates. Neither GPC nor Google are a party to your Payment Transaction for the purchase of Products, and GPC, Google, or other GPC affiliates are not a Buyer or a Seller in connection with any Payment Transaction, unless expressly designated as such in the listing of the Product on a Google Web Site.

### 3.3 Carrier Billing Service.

Certain Sellers that use the Processing Service may permit you to have your purchase billed to your Carrier Billing Account. These additional terms apply when you use Carrier Billing through the Processing Service:

- Registering your Carrier Billing Account as a payment option requires your mobile telephone number, name and billing address of the Carrier Billing Account associated with that number. You consent to your Carrier providing this information to GPC, and you will review the information during sign-up for Carrier Billing, and correct any inaccuracies. This information will be used by GPC for the purpose of establishing your Carrier Billing Account as a Payment Instrument in your Google Wallet, and for operating the Processing Service. You also agree that GPC and your Carrier may share information with each other regarding your Carrier Billing activity in order to charge or credit your Carrier Billing Account and otherwise complete payments for purchases, reversals, refunds or adjustments of Payment Transactions, resolve disputes, provide customer support, and for other Carrier Billing-related purposes.
- When you choose to pay for a transaction with Carrier Billing, you authorize the Seller and GPC, as agent of and processor for the Seller, to submit charges and credits to your Carrier, and your Carrier to make such charges and credits to your Carrier Billing Account, as necessary to complete the Payment Transaction, or to complete the reversal, refund, or adjustment of that Payment Transaction.
- You can use Carrier Billing to purchase applications (e.g., downloadable or networked applications, wallpapers, ring-tones, games, and productivity tools) ("Apps") for and with your compatible device from certain merchants on Google Play. These Apps are not sold by your Carrier, Google, GPC, or Google Play. You can identify the Seller of the App at the point of purchase.
- Purchases made through Carrier Billing are also subject to the terms and conditions of your Carrier Billing Account. You are responsible for any charges and related fees that may be imposed under your Carrier Billing Account terms and conditions as a result of your use of Carrier Billing.
- You may contact your Carrier's customer service if you have a question about the charges or fees billed to your Carrier Billing Account. You should direct support questions regarding products, such as Google Play Apps, purchased through Carrier Billing to the Seller from whom you purchased the App.
- None of Carrier, Google, GPC, or Google Play is responsible for any product (including an App) purchased with Carrier Billing, including download, installation, use, transmission failure, interruption, or delay, refunds, third party advertisements you may encounter while using the product or App, alterations any App may make to the functionality of your device, including any changes that may affect your Carrier's plan, service, or billing, or any content or website you may be able to access through the App.

### 3.4 One Time Wallet Account.

GOOG-00001195

Where offered by a Seller, you may use the Processing Service to make a Payment Transaction through a one-time Google Wallet Buyer account, also referred to as a "One Time Account", "Guest Account" or a similar name. If you make a Payment Transaction through a One Time Account, these Terms of Service apply except:

- You will create the One Time Account at the time you make the Payment Transaction and you can use the One Time Account only for that single Payment Transaction.
- You will not create a username or password for the One Time Account.
- Information about a Payment Transaction made through the One Time Account will be accessible at the time of the Payment Transaction and subsequently through a dedicated webpage link provided to you.
- Information about a Payment Transaction made through a One Time Account will not be accessible through any other Google Wallet Account you may have.

### 3.5 Subscriptions/Recurring Transactions Purchases

The subscription services described in this section are not currently available when using the Google Mobile Wallet.

In the event that the Processing Service (other than Google Mobile Wallet) offers you the ability to pay for subscriptions, your subscription will start when you click "Accept & buy" on a subscription purchase. This is a recurring billing transaction. Unless otherwise stated, your subscription and the relevant billing authorization will continue indefinitely until cancelled by you.

By clicking "Accept & buy," you authorize the applicable Seller to bill your chosen Payment Instrument during the subscription at the Purchase Amount. The Purchase Amount will continue to be charged to your Payment Instrument, until you cancel your subscription, unless as otherwise stated in the terms and conditions. The billing rate is subject to change by the Seller during the subscription period.

Your Payment Instrument will be billed each period based on the date of the subscription purchase.

You may cancel a subscription at any time, but the cancellation will not become effective until the end of the current billing period. You will not receive a refund for the current billing period. You will continue to be able to access the relevant subscription for the remainder of the current billing period.

We reserve the right to issue refunds or credits at our sole discretion. If we issue a refund or credit, we are under no obligation to issue the same or similar refund in the future.

### 3.6 Permissible Payment Transactions.

You may only use the Processing Service to process a Payment Transaction for a Product that is purchased from a Seller through a legitimate, bona fide sale of the Product. The Processing Service may not be used to process a Payment Transaction, or otherwise transfer money between a Buyer and Seller, that is unrelated to a purchase of a Product. The Processing Service may not be used to receive cash advances from Sellers or to facilitate the purchase of cash equivalents (travelers checks, prepaid cards, money orders, etc.). You may not use the Processing Service to process Payment Transactions in connection with the sale or exchange of any illegal goods or services or any other underlying illegal transaction.

You agree that you will not use the Processing Service to process Payment Transactions for any Products that violate these Terms of Service, other policies or rules applicable to the Processing Service, or Applicable Law. The current policy that establishes the Products and other transactions that may not be paid for with the Processing Service is provided here. Failure to comply with these limitations may result in suspension or termination of your use of the Processing Service.

Additional terms may apply for the use of the Google Wallet Virtual Card and the Google Wallet Virtual OneTime Card, as described in Section 4.

### 3.7 Purchases Eligible for "Instant Refund"

The Instant Refund option is in addition to the merchant's refund/cancellation policy that is disclosed by the merchant at the time of purchase.

Certain internet content, products and application features ("Content") may be available for purchase from merchants with an Instant Refund option that allows you to cancel the purchase before your Payment Instrument is charged. Content eligible for this Instant refund option will be identified to you by a banner on the "Buy" button which states: "with Instant Refund".

By clicking the "Buy" button on a merchant website where this feature is available, you authorize the merchant, and its service providers, including Google, to bill your Payment Instrument at the stated rate for the Content, plus any applicable tax, without further action by you. Your payment order will be deemed to have been received thirty minutes after you click the "Buy" button. If after clicking the "Buy" button, you determine that you do not wish to retain access to the Content, you may click the "get an Instant Refund" link for up to thirty minutes. Upon clicking the "get an Instant Refund" link, the purchase transaction with the merchant will be canceled, the Content will no longer be visible to you, and your Payment Instrument will not be charged for the purchase. Instant Refund refers only to the cancellation of your purchase transaction within thirty minutes of your clicking the "Buy" button. After thirty minutes have elapsed, any refund or cancellation of your purchase will be subject to the merchant's general refund policies.

Purchased Content will continue to be hosted by the merchant from whom it was purchased, and you must be logged into your Google Account to view your purchased Content. Certain purchased Content may become unavailable to you if you cancel your Google Account, or if the provider of such Content determines to no longer host it.

The Instant Refund option is only available for certain purchases, as described above. In addition, your use of the Instant Refund option may be restricted if, in our discretion, we determine that your use of the Instant Refund option is excessive or as otherwise stated in these Terms of Service. If your use of the Instant Refund option has been restricted for a purchase as to you, the banner on the "Buy" button which states "with Instant Refund" will not be visible to you.

### 3.8 Service Fees.

GPC does not charge a fee to use the Processing Service as a Buyer. The financial institution that issues, or the Carrier that provides, your Payment Instrument may charge a fee in connection with the debiting or charging of the Payment Instrument resulting from the Payment Transaction. You should consult the terms and conditions

GOOG-00001197

governing your Payment Instrument for more information about any such fees.

**3.9 Disputes.**

GPC will provide various tools to assist Customers in communicating with each other to resolve a dispute that may arise between Buyers and Sellers with respect to their transaction.

For transactions other than those involving the Google Wallet Virtual Card or the Google Wallet Virtual OneTime Card, if Customers are unable to resolve a dispute, GPC can mediate disputes between buyers and sellers if either party requests assistance. If this occurs, GPC will review the dispute and propose a non-binding solution, if appropriate. For more detailed information, please see our Frequently Asked Questions.

For disputes applicable to the Google Wallet Virtual Card and the Google Wallet Virtual OneTime Card, please see Section 4.

GPC may offer a feedback or other ranking system on the Processing Service to assist you in evaluating other Customers of the Service. You acknowledge that any such feedback or ranking system represents solely the opinion of other Customers of the Processing Service, and is not an opinion, representation, or warranty by GPC with respect to other Customers of the Processing Service.

You agree to release GPC, Google, and other GPC affiliates, and their agents, contractors, officers and employees, from all claims, demands and damages (actual and consequential) arising out of or in any way connected with a dispute. You agree that you will not involve GPC in any litigation or other dispute arising out of or related to any transaction, agreement, or arrangement with any Seller, other Buyer, advertiser or other third party in connection with the Service. If you attempt to do so, (i) you shall pay all costs and attorneys' fees of GPC, Google, and other GPC affiliates and shall provide indemnification as set forth below, and (ii) the jurisdiction for any such litigation or dispute shall be limited as set forth below. However, nothing in these Terms of Service shall constitute a waiver of any rights, claims or defenses that you may have with respect to a Payment Transaction under the Buyer's card issuer agreement or Carrier Billing Account terms and conditions, the card association rules or applicable state and federal laws, such as the federal Truth in Lending Act or the Electronic Fund Transfer Act.

If you are a California resident, you hereby expressly waive California Civil Code §1542, which states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if not known by him must have materially affected his settlement with the debtor."

**3.10 Refunds.**

(a) If you believe your Google Wallet Account has been opened or used in an unauthorized manner in connection with a Payment Transaction, please see our fraud protection process. Also, please see our Frequently Asked Questions for more information on how GPC protects you from fraud.

(b) Except as set forth in these Terms of Service, all Payment Transactions processed through the Processing Service are non-refundable to Buyer by GPC and are non-reversible by Buyer through the Processing Service. You may have additional refund or charge-back rights under your Payment Instrument issuer agreement or

applicable state and federal laws. You should review your periodic statement received from the issuer of your Payment Instrument which will reflect all purchase transactions through the Processing Service. The refund procedure described in this Section 3.10(b) does not apply to transactions involving the Google Wallet Virtual Card or the Google Wallet Virtual OneTime Card. For refund policies applicable to these products, please see Section 4 below.

### 3.11 Unclaimed Property.

If GPC is holding funds due to you arising from a Payment Transaction processed through the Processing Service or otherwise, and GPC is unable to contact you and has no record of your use of the Processing Service for several years, Applicable Law may require GPC to report these funds as unclaimed property. If this occurs, GPC will try to locate you at the address shown in our records, but if GPC is unable to locate you, it may be required to deliver any such funds to the applicable state as unclaimed property. GPC reserves the right to deduct a dormancy fee or other administrative charges from such unclaimed funds, as permitted by Applicable Law.

### 3.12 GPC Not a Banking Institution.

GPC processes Payment Transactions through the Processing Service as an agent of and on behalf of Sellers. GPC is not a bank or other chartered depository institution. Funds held by GPC or its service providers (including any bank service providers) in connection with the processing of Payment Transactions are not deposit obligations of Buyer and are not insured for the benefit of Buyer by the Federal Deposit Insurance Corporation or any other governmental agency.

## 4. The Google Mobile Wallet.

### 4.1 General Description.

The Google Mobile Wallet may allow you to make Payment Transactions (i) in-store using the Google Wallet application which resides on your smart phone or (ii) online at certain merchants using your Payment Instruments which are stored on Google Wallet servers or hosted by a third party provider designated by GPC (the "**Google Mobile Wallet Service**").

The Google Mobile Wallet Service may enable you to store on GPC's servers and access your Payment Instruments, Offers, Reward Program Items, Payment Instrument transaction history or available balance information and payment credentials. The Google Mobile Wallet Service gives you the ability to make purchases at participating merchant locations using an eligible NFC mobile device or on participating merchant websites online. GPC will charge your Payment Instruments for transactions using the Google Mobile Wallet Service. In those instances where the Google Mobile Wallet Service may be enabled for non-NFC mobile devices, the Google Mobile Wallet Service may have reduced functionality.

### 4.2 Getting Started with Google Mobile Wallet.

(a) In order to use the Google Mobile Wallet, you must (i) be a resident of the United States, (ii) link Google Mobile Wallet to your Google Wallet and (iii) if you are using the Google Mobile Wallet on an NFC enabled

GOOG-00001199

mobile device, set a PIN code. You are responsible for maintaining the confidentiality of your PIN code. You agree to notify Google Wallet immediately of any unauthorized use of Google Mobile Wallet or any other breach of security regarding the Google Mobile Wallet of which you have knowledge.

(b) Your Payment Instruments. In order to store your Payment Instruments in your Google Wallet Account, you will need to provide the information requested by Google Wallet.

(c) GPC does not make any representation or verify that any of your Payment Instruments are in good standing or that the issuer of your Payment Instrument will authorize or approve any purchase of Products from a merchant when you use the Google Mobile Wallet in connection with that purchase.

### 4.3 Using the Google Mobile Wallet Service.

(a) You can use the Google Mobile Wallet Service in two ways:

> (i) In store using the Google Wallet Virtual Card stored on your mobile device by logging in to your Google Wallet Account and waving the NFC mobile device near the merchant's NFC reader; or

> (ii) Online using the Google Wallet Virtual OneTime Card issued to you for such transaction when you log into your Google Wallet Account online through your mobile device, at a computer, or

> other device with online capabilities.

By using your Google Wallet Account using either of the methods described above to make Payment Transactions, you authorize GPC to charge your selected Payment Instrument for such Payment Transaction.

(b) Storing Payment Instruments. Through the Google Mobile Wallet Service, Google Mobile Wallet may enable you to store and access Payment Instruments, Offers, or Reward Program Item information, including balance and transaction information, on Google's servers. You can store a Payment Instrument with the Google Mobile Wallet Service by providing the information requested on the Google Mobile Wallet Service sign-up page, including payment credentials and billing address. If you have already stored a Payment Instrument through the Processing Service, that Payment Instrument may be available for use with the Google Mobile Wallet Service.

### 4.4. Transacting with Google Wallet Mobile Service and Google Wallet Virtual Card.

(a) Issuance of the Google Wallet Virtual Card. To enable your use of the Google Mobile Wallet Service via your NFC mobile device, GPC has arranged for Bancorp to provide you with access to a MasterCard®-branded virtual prepaid debit payment card product, the Google Wallet Virtual Card, which is stored on your mobile device. By using the Google Mobile Wallet Service and the Google Wallet Virtual Card, you also agree to the Google Wallet Virtual Card Terms of Use, which may be updated from time to time. For avoidance of doubt, the Google Wallet Virtual Card Terms of Use are between you and Bancorp, not Google or GPC. In addition, the terms and conditions applicable to your chosen Payment Instrument also apply to all transactions involving the Google Wallet Virtual Card. Please refer to the terms and conditions applicable to your chosen Payment Instrument. By requesting the Google Mobile Wallet Service on your NFC enabled mobile device, you are requesting the issuance of the Google Wallet Virtual Card in order to facilitate your use of the Service.

(b) Using the Google Mobile Wallet Application. In order to use the Google Mobile Wallet Application on an

GOOG-00001200

NFC mobile device, follow the instructions on the Google Mobile Wallet Application to log in and then place your NFC mobile device near the merchant's NFC reader. When you place your mobile device near the merchant's NFC reader, your Google Wallet Virtual Card information will be transferred from your NFC mobile device to the merchant for use in processing the Payment Transaction. The Google Wallet Virtual Card is a prepaid debit card that can be used to make purchases when you use the Google Wallet Mobile Service at a merchant location that accepts contactless payments, even if the issuer of your registered debit or credit card is not a Google Wallet partner for NFC transactions. The Google Wallet Virtual Card is different from your debit or credit card registered in Google Wallet. The merchant will not receive your registered debit or credit card information. Rather, Bancorp will settle the Google Wallet Virtual Card payment to the merchant. Then, GPC will bill your selected Payment Instrument for the total purchase amount of the Payment Transaction.

(c) Payment Transaction Limits. There are maximum dollar limits on purchase payments that you may make using Google Wallet Virtual Card. Maximum purchase payments may not exceed the lesser of $1,000 or any daily purchase transaction limit imposed by your selected credit or debit card. GPC may, at its discretion, increase this maximum upon verification of your identity. In addition, Google Wallet Virtual Card purchase transactions below this amount may be declined if GPC is unable to complete a funding transaction to your selected Payment Instrument. The Google Wallet Virtual Card may not be used for transactions in which you request cash back from the merchant. In addition, you may be subject limitations on the amount or type of transaction or merchant as per the terms and conditions of your selected credit or debit card. Please refer to the terms and conditions of your selected credit or debit card. You are responsible for any charges and related fees that may be imposed under the terms and conditions applicable to the selected Payment Instrument for any Payment Transaction using a Google Wallet Virtual Card. The Google Wallet Virtual Card is not a credit card, and GPC and Bancorp are not extending you credit in connection with your use of the Google Mobile Wallet Service or the Google Wallet Virtual Card. GPC will instruct Bancorp to deny a requested Google Wallet Virtual Card purchase if GPC has reason to believe that it will not be able to initiate a charge to your selected Payment Instrument, or if GPC otherwise believes that GPC will not be able to obtain funds from you to complete the requested purchase payment. We reserve the right to decline any Google Wallet Virtual Card-initiated Payment Transaction.

## 4.5 Transacting with Google Mobile Wallet Service and Google Wallet Virtual OneTime Card.

(a) Issuance of the Google Wallet Virtual OneTime Card. To enable your use of the Google Mobile Wallet Service online using your mobile phone, a computer, or other device, GPC holds a Buyer's registered Payment Instrument information and facilitates payment to participating online merchants using a Google Wallet Virtual OneTime Card, after which GPC will charge the Buyer's selected Payment Instrument for the purchase. When you use the Google Mobile Wallet Service to make a purchase online, The Bankcorp Bank will issue you a Google Wallet Virtual OneTime Card, a MasterCard-branded virtual prepaid debit card product that can only be used for the specific purchase for which it was issued. After issuance of the Google Wallet Virtual OneTime Card, GPC facilitates the payment to a merchant through such card, and then charges your selected Payment Instrument. When you choose to pay for a purchase online using the Google Mobile Wallet Service, you authorize the merchant and GPC to submit charges (and, in the case of refunds, credits) to your Google Wallet Virtual OneTime Card and the applicable registered Payment Instrument. By using a Google Wallet Virtual OneTime Card, you also agree to the Google Wallet Virtual OneTime Card Terms of Use, which may be updated from time to time. For the avoidance of doubt, the Google Wallet Virtual OneTime Card Terms of Use are between you and Bancorp, the issuer of the Google Wallet Virtual OneTime Card, and not Google, GPC, or any of their affiliates.

GOOG-00001201

(b) <u>Using a Google Wallet Virtual OneTime Card To Make Merchant Purchases.</u> The Google Wallet Virtual OneTime Card is a prepaid debit card that can be used to make online purchases at a registered merchant's site that accepts MasterCard-branded prepaid debit cards. The Google Wallet Virtual OneTime Card is different from the debit or credit card registered in a Buyer's Google Wallet Account. The merchant will not receive your full registered debit or credit card information. Rather, Bancorp will settle the Google Wallet Virtual OneTime Card payment to the merchant. Then, GPC will charge the applicable debit or credit card that is registered your Google Wallet Account and selected by the Buyer as the default Payment Instrument for the Purchase Amount.

(c) <u>Payment Transaction Limits.</u> There are maximum dollar limits on purchase payments that you may make using a Google Wallet Virtual OneTime Card. Maximum purchase payments may not exceed the lesser of $2,000 or any daily purchase transaction limit imposed by your selected credit or debit card. GPC may, at its discretion, increase this maximum upon verification of your identity. In addition, Google Wallet Virtual OneTime Card purchase transactions below this amount may be declined if GPC is unable to complete a funding transaction to your selected Payment Instrument. The Google Wallet Virtual OneTime Card may not be used for transactions in which you request cash back from the merchant. In addition, you may be subject limitations on the amount or type of transaction or merchant as per the terms and conditions of your selected credit or debit card. Please refer to the terms and conditions of your selected credit or debit card. You are responsible for any charges and related fees that may be imposed under the terms and conditions applicable to the selected Payment Instrument for any Payment Transaction using a Google Wallet Virtual Card. The Google Wallet Virtual OneTime Card is not a credit card, and GPC and Bancorp are not extending you credit in connection with your use of the Google Mobile Wallet Service or the Google Wallet Virtual OneTime Card. GPC will instruct Bancorp to deny a requested Google Wallet Virtual OneTime Card purchase if GPC has reason to believe that it will not be able to initiate a charge to your selected Payment Instrument, or if GPC otherwise believes that GPC will not be able to obtain funds from you to complete the requested purchase payment. We reserve the right to decline any Google Wallet Virtual OneTime Card-initiated Payment Transaction.

## 4.6. Offers and Reward Program Items.

(a) <u>Saving an Offer to Google Mobile Wallet.</u> Offers may be presented to you on Google websites or mobile applications, participating third party websites or mobile applications, through the Google Mobile Wallet Application, or at a merchant's physical location. If you are logged into your Google Wallet account, you may select an Offer and store the Offer to appear in your Google Wallet account for redemption with a participating merchant.

(b) <u>Storing Reward Program Items.</u> In order to store Reward Program Items in Google Mobile Wallet, you must provide all information required by Google Mobile Wallet.

(c) <u>Redemption of an Offer/Reward Program Item.</u> In order to redeem an Offer and/or Reward Program Item stored in Google Mobile Wallet with a participating merchant, you may, at the request of the merchant, either (i) permit the merchant to read the Offer and/or Reward Program Item off the screen of the mobile device, or (ii) place the mobile device near the NFC reader to transmit the Offer or Rewards Program Item redemption information to merchant, (iii) use the Google Mobile Wallet Service to redeem an Offer or Rewards Program Item in conjunction with a payment transaction, or (iv) provide the promotion code or other code associated with an Offer and/or Rewards Program Item to the participating merchant upon such merchant's request. By taking any of the foregoing actions, you authorize the information regarding the Offer and/or Reward Program Item to be transferred from your mobile device to the merchant for redemption. The redemption is processed by the

GOOG-00001202

merchant at its discretion, in accordance with the merchant's terms and conditions for the Offer and/or Reward Program Item, as applicable. If you have questions regarding redemption of an Offer and/or Reward Program Item, please contact the merchant.

### 4.7 Rewards.

GPC does not guarantee and makes no representations that the issuer or the associated payment network of any Payment Instruments you have registered with the Google Mobile Wallet will honor any usual or promotional rewards or benefits (including any purchase protection or insurance) for your purchases using the Google Mobile Wallet. The issuer and associated network of your Payment Instruments will determine whether or not any rewards or benefits will apply to purchases made using the Google Mobile Wallet. GPC and Google are not providing you with any rewards or benefits (including purchase protection and insurance) for your use of the Google Mobile Wallet.

### 4.8 Communication with Issuers.

By electing to use Google Mobile Wallet, you authorize GPC, directly or through the Google Mobile Wallet to communicate with the issuer of your Payment Instrument, Offer or Reward Program Item to provide or obtain any information required by that issuer. An issuer that provides this information does not endorse and is not responsible for Google Mobile Wallet.

### 4.9 Third Party Providers.

GPC may have arranged for third party providers to provide products or services to you through the Google Mobile Wallet ("Third Party Providers"). In order to use these products or services, you may be required to agree to additional terms and conditions from those Third Party Providers, and may be subject to additional requirements of the Third Party Provider. By agreeing to these Terms of Service or continuing to use the Google Mobile Wallet, you hereby agree to any Third Party Provider terms that apply to your use of such products and services through Google Mobile Wallet which may be updated from time to time. For avoidance of doubt, these Third Party Provider terms are between you and the applicable Third Party Provider, not GPC.

### 4.10 GPC is Not a Banking Institution, Issuer, or Processor.

Google Mobile Wallet provides you with the ability to store Payment Instruments, Offers, and Reward Program Items, and to communicate such information to participating merchants. GPC is not a bank or other chartered depository institution. GPC is not an issuer of any Payment Instrument, Offer, or Reward Program Item. Your purchases of Products and/or redemptions of Offers or Reward Program Items using Google Mobile Wallet are transactions between you as a Buyer and the merchant as the merchant, and not with GPC or any Google affiliates. GPC is not a party to your purchase of Products or redemption of Offers or Reward Program Items. With respect to Google Mobile Wallet transactions, all payment processing is handled solely by the merchant, and GPC is not involved in the merchant's processing of the payment. For the Payment Transaction facilitated with the Google Wallet Virtual Card or the Google Wallet Virtual OneTime Card, GPC handles the payment to the merchant and the charging of your registered credit or debit card to conduct your payment for the purchase.

These Terms of Service do not amend or otherwise modify your agreement with the issuer of your Payment

GOOG-00001203

Instrument, Offer, or Reward Program Item, and you are responsible for ensuring your use of the Google Mobile Wallet complies with such agreements. You also are responsible for all charges and/or debits to your Payment Instrument resulting from purchases of Products or redemptions of Offers or Reward Program Items using the Google Mobile Wallet, in accordance with such agreements. In the event of any inconsistency between these Terms of Service and your agreement with the issuer of your Payment Instrument, Offer, or Reward Program Item, these Terms of Service govern the relationship between you and GPC solely with respect to Google Mobile Wallet, and your agreement with the issuer of your Payment Instrument, Offer, or Reward Program Item governs the relationship between you and the issuer of the Payment Instrument, Offer, or Reward Program Item. You acknowledge and agree that you are solely responsible for the Payment Instrument, Offer, Reward Program Item, and other information you enter or otherwise store in the Google Mobile Wallet. GPC is not responsible for the accuracy or availability of any information you enter or otherwise store in the Google Mobile Wallet, including, without limitation, whether such information is current and up-to-date.

**4.11 Advertising.**

Some of the features of Google Mobile Wallet may be supported by advertising revenue and may display advertisements and promotions. In consideration for GPC granting you access to and use of Google Mobile Wallet, you agree that GPC may place such advertising. In addition, you may have the choice to opt-in to allowing information from Google Mobile Wallet to be used by GPC and Google in order to present you with more relevant advertising, Offers and Reward Program Items.

**4.12 Third Party Fees.**

You are responsible for any fees charged by your telecommunications provider, Payment Instrument, Offer, or Reward Program Item issuer, merchant, or any other third party in connection with your use of Google Mobile Wallet.

**4.13 General Terms relating to the use of the Google Mobile Wallet Service.**

(a) GPC will instruct Bancorp to deny a requested Google Mobile Wallet Service purchase if GPC has reason to believe that it will not be able to initiate a charge to your selected Payment Instrument, or if GPC otherwise believes that GPC will not be able to obtain funds from you to complete the requested purchase payment. We reserve the right to decline any Google Mobile Wallet initiated Payment Transaction. We reserve the right to suspend your use of any Google Mobile Wallet Service for any reason.

(b) You acknowledge and agree that your purchases through the Google Mobile Wallet Service are transactions between you and the merchant and not with GPC, Google or any of their affiliates.

(c) The Google Wallet Mobile Service may only be used for U.S. dollar transactions within the fifty U.S. states and the District of Columbia. The Google Wallet Mobile Service does not support payments in foreign currencies.

(d) You do not have any ownership interest in the prepaid account associated with the Google Wallet Virtual Card or the Google Wallet Virtual OneTime Card, and you may only use these products to make purchase transactions in accordance with these terms.

(e) <u>Your Authorization for Google Mobile Wallet Service Billing.</u> By using the Google Mobile Wallet Services to make a purchase payment, you authorize the use of the Google Wallet Virtual Card or the Google Wallet Virtual OneTime Card to complete a payment to the merchant, and you authorize GPC to charge the applicable credit card or debit card that is registered in Google Wallet and selected by you as the default Payment Instrument for the Purchase Transaction. The charge by GPC to your registered Payment Instrument is a separate payment transaction from the Google Wallet Mobile Service purchase transaction. This funding transaction will identify GPC or Google within the payment transaction identifier on your Payment Instrument statement.

(f) <u>Receipts At Merchant Locations.</u> You may receive a transaction receipt from a merchant when you use the Google Mobile Wallet Service. This merchant receipt will reflect the last four digits of the Google Wallet Virtual Card or the Google Wallet Virtual OneTime and not your credit card or debit card number that will be charged by Google Mobile Wallet Service for the payment. GPC is under no obligation to provide you with a receipt or other written confirmation in connection with the charge made at a merchant location or with an online merchant.

(g) <u>No Extension of Credit.</u> Neither of the Google Wallet Virtual Card or Google Wallet Virtual OneTime Card is a credit card, and GPC and Bancorp are not extending credit in connection with your use of the Google Wallet Virtual Card or the Google Wallet Virtual OneTime Card.

(h) <u>Limits on Merchants and Purchases.</u> We may impose limits on merchants where you can use the Google Mobile Wallet Service. For example, you cannot use the Google Mobile Wallet Service to purchase outbound telemarketing services or direct marketing travel related arrangement services. Please refer to the <u>Google Wallet content policy</u> for additional restrictions on permissible transactions using the Google Mobile Wallet Service. Please also refer to the Google Wallet Virtual Card Terms of Use or the Google Wallet Virtual OneTime Card Terms of Use, as applicable, for further information on additional limitations on permissible payments using the applicable Google Mobile Wallet Service.

(i) <u>Periodic Statements.</u> You agree that we will not provide you with a separate periodic statement for your use of the Google Wallet Virtual Card or the Google Wallet Virtual OneTime Card. An electronic transaction statement showing all transactions with the Google Wallet Virtual Card and the Google Wallet Virtual OneTime Card and your other Google Wallet Account transactions in electronic format will be made available free of charge at www.wallet.google.com/manage. You are responsible for reviewing the Google Wallet Virtual Card and the Google Wallet Virtual OneTime Card transactions reflected on the Google Wallet Account transaction statement.

(j) <u>Customer Service.</u> If you have an inquiry regarding a payment made with the Google Mobile Wallet Service, or you believe there has been an error or unauthorized transaction regarding a payment transaction using Google Wallet and the Google Wallet Virtual Card, or the Google Wallet Virtual OneTime Card, please contact Google Wallet Support at 1-888-249-1855.

(k) <u>Error Resolution.</u> Google Wallet provides you with certain rights and protections in the event of an error or unauthorized transaction arising from your use of Google Wallet in which the Google Wallet Virtual Card or the Google Wallet Virtual OneTime Card has been used to facilitate a payment to a merchant. With respect to Payment Transactions made using the Google Wallet Virtual Card or the Google Wallet Virtual OneTime Card, see the applicable Terms of Use between you and the issuer of these card, Bancorp for more details regarding these protections and a statement of your potential liability for use of the Google Wallet Virtual Card, or the Google Wallet Virtual OneTime Card. You may also have certain rights and protections that are provided to you under your agreement with the issuer of your Payment Instrument or Applicable Law with respect to the charges

GOOG-00001205

for a purchase payment made to your registered credit or debit card. You should consult your agreement with the issuer of your Payment Instrument for details.

(l) No Relationship with Issuer of Payment Instruments. Use of the Google Mobile Wallet Service is not approved by, or offered in conjunction with the issuer of your Payment Instrument. Your Payment Instrument issuer may impose fees, transaction limits, or other limitations on funding transactions the GPC submits to obtain funding for Google Mobile Wallet Service transactions.

## 5. Google Play Gift Cards.

**Eligibility and Redemption.** Google Play Gift Cards ("Gift Cards") are valid only for users who are 13 years of age or older, and who are residents of the USA. Gift cards are issued by Google Payment Corporation ("GPC"). To redeem a Google Play Gift Card, you will need access to the internet, and you will need to create a Google Wallet account. For users between 13-17 years of age, your Wallet enrollment is limited solely to redemption of Gift Cards on Google Play. Google Play Gift Cards must be redeemed toward the purchase of eligible products on http://play.google.com. Purchases are deducted from the Gift Card balance. Any unused Google Play Gift Card balance will be placed in the recipient's Google Play Gift Card account when redeemed. Google may provide Gift Card purchasers with information about the redemption status of Google Play Gift Cards that they purchase. To view Google Play Gift Card balances, visit https://wallet.google.com/viewWallet.

**Limitations.** The Gift Card may be used for purchases of eligible items on Google Play only. Limits may apply to redemption and use. The Gift Card is not redeemable for cash or other cards, is not reloadable or refundable, cannot be combined with other non-Google Play Gift Card balances in your Google Wallet account, and cannot be resold, exchanged or transferred for value, except as required by law. If an order exceeds the Gift Card amount, the transaction will be declined unless more value is added to the Google Play Gift Card balance. Once a Gift Card is purchased, the risk of loss and title for the Gift Card passes to the purchaser. GPC disclaims all express or implied warranties as to the Google Play card and Google Play. Gift Card terms may be subject to change in our sole discretion subject to Applicable Law. To view the most recent Google Play Gift Card terms online, visit play.google.com/about/card-terms.html.

**No Fees or Expiration.** No fees or expiration dates apply to this Gift Card. Any refunded amounts, if applicable, will be credited back to your Google Play Gift Card balance for future use under the same terms, unless otherwise required by law.

**Fraud.** Google is not responsible if a Gift Card is lost, stolen, destroyed or used without your permission. Google will have the right to close customer accounts and bill alternative forms of payment if a fraudulently obtained Gift Card is redeemed and/or used to make purchases on Google.com.

**Online Assistance and Customer Care.** To view your Google Play Gift Card balance, visit https://wallet.google.com/viewWallet. To speak to customer care about a Gift Card issue, call us at 1-855-466-4438.

## 6. Limitations on Use of Services.

Notwithstanding any limitations described elsewhere in this Agreement, we may establish general practices and limits concerning use of the Services, including without limitation individual or aggregate transaction limits on the

dollar amount or number of Payment Transactions during any specified time period(s). We reserve the right to change, suspend or discontinue any aspect of the Services at any time, including hours of operation or availability of the Services or any Service feature, without notice and without liability. We also reserve the right to impose limits on certain Service features or restrict access to some or all of the Services without notice and without liability. We may decline to process any Payment Transaction without prior notice to Buyer or merchant.

GPC may delay payment processing of suspicious transactions or attempted Payment Transactions which may involve fraud or misconduct, or violate Applicable Law, these Terms of Service, or other applicable GPC policies, as determined in GPC's sole and absolute discretion. Buyer authorizes the charge or debit to Buyer's Payment Instrument, by GPC as agent of the Seller, as necessary to complete processing of a Payment Transaction. Buyer also authorizes the crediting or debiting, as applicable, to Buyer's Payment Instrument, by GPC as agent of the Seller, in connection with chargebacks, reversals, refunds, or adjustments through the Service by a Seller.

We may limit or suspend your use of one or more Services at any time, in our sole and absolute discretion. If we suspend your use of a Service, we will attempt to notify you by electronic mail. Suspension of your use of a Service will not affect your rights and obligations pursuant to these Terms of Service arising before or after such suspension or with respect to any non-terminated Services.

The Google Mobile Wallet is intended for use on mobile devices, Android operating systems, or other devices or operating systems approved by Google, as provided to you directly by Google or your mobile carrier. You are strictly prohibited from using the Google Mobile Wallet on a mobile device or Android operating system, or other device or operating system approved by Google, that has been modified or customized in any way. You bear sole responsibility for such unauthorized use of the Google Mobile Wallet on a modified mobile device, Android operating system, or other device or operating system approved by Google.

## 7. Privacy.

You understand and agree that personal information provided to Google or GPC in connection with the Services is subject to the Google Wallet Privacy Policy: http://www.google.com/wallet/privacy.html. By agreeing to these Terms of Service you hereby agree to the Google Wallet Privacy Policy, which may be updated by Google or GPC from time to time. You understand and agree that, to the extent permitted by Applicable Law, any data you provide to GPC in connection with the Services may be shared with Google and, conversely, any data you provide to Google in connection with the Services may be shared with GPC.

You may opt-in to providing location data through your mobile device so that Google Mobile Wallet can provide you with more relevant advertising, payment information, Offers or Reward Program Items based on your location. If you opt-in to providing location data, you consent to the collection, use, sharing, and onward transfer of location data, as further set forth in the Google Wallet Privacy Policy. Google may receive information through your mobile device about your actual location (such as GPS signals sent by your mobile device) or information that can be used to approximate a location (such as a cell ID).

## 8. Username and Password Information.

You are responsible for: 1) maintaining the confidentiality of your username and password, 2) any and all transactions by persons that you give access to or that otherwise use such username or password, and 3) any

GOOG-00001207

and all consequences of use or misuse of your username and password. You agree to notify us immediately of any unauthorized use of your username or password or any other breach of security regarding the Services of which you have knowledge.

If you are a business entity, you agree that all officers, employees, agents, representatives and others having access to the username and/or password shall be vested by you with the authority to use the Services and to legally bind you. You shall be responsible for all actions by current and former officers, employees, agents, representatives and others, regardless of whether authorized by you, that access the Services using the business' user name and password.

## 9. Electronic Communications.

GPC, Google Wallet, and Third Party Providers may be required to provide certain disclosures, notices and communications (collectively "Communications") to you in written form. Pursuant to these Terms of Service, we will deliver such Communications to you in electronic form. Your agreement to the Terms of Service confirms your ability and consent to receive such Communications electronically, rather than in paper form.

**Electronic delivery of communications.**

You agree and consent to receive electronically all Communications provided to you in connection with your Google Wallet account and your use of the Google Wallet Services. Communications include: (a) agreements and policies you must agree to in order to use the Google Wallet Services (e.g., the Google Wallet Terms of Service and Privacy Notice), including updates to those agreements and policies; (b) payment authorizations and transaction receipts or confirmations; (c) account statements and history; and, (d) all other communications or documents related to or about your account and your use of the Google Wallet services.

Electronic Communications shall be deemed to be received by you upon delivery in the following manner: (a) posting them to your Google Wallet account on the Google Wallet website or in the Google Wallet mobile application; (b) posting them on or in Google or Google Wallet websites and mobile applications; (c) sending them via electronic mail to the email address you used to create your Google and Google Wallet account registrations; or, (d) otherwise communicating them to you via the Google Wallet Services.

It is your responsibility to log on to your Google Wallet account and the Google Wallet Services to open and review Communications that we deliver to you through those means. We may, but are not obligated to under these Terms of Service, provide you with notice of the posting of a Communication to your Google Wallet account or the Google Wallet Services.

You should maintain copies of electronic Communications by printing paper copies or saving electronic copies, as applicable.

**Hardware and software requirements**

In order to access and retain electronic Communications, you will need to maintain the following computer hardware and software at your own expense:

1.  a computer or mobile device with internet or mobile connectivity;

GOOG-00001208

2. a current web browser that includes 128-bit encryption (e.g. Internet Explorer version 6.0 and above, Firefox version 2.0 and above, Chrome version 3.0 and above, or Safari 3.0 and above) with cookies enabled;

3. Adobe Acrobat Reader version 8.0 (http://get.adobe.com/reader/) and above to open documents in .pdf format;

4. access to the valid email address you used to create your Google and Google Wallet account registrations; and,

5. sufficient storage space to save past Communications or an installed printer (or access to Google Cloud Print) to print them.

By giving your consent to these Terms of Service, you confirm that you are able to meet the above requirements, and that you can receive, open, and print or save any Communications referenced in these Terms of Services for your records.

**Requesting additional copies and withdrawing consent**

The following additional terms will apply to such electronic Communications: (a) you may contact GPC, Google Wallet or the Third Party Provider, as applicable, to request another electronic copy of the electronic Communication without a fee; (b) you may request a paper copy of such electronic Communication within ninety days of the original Communication issuance date, and GPC, Google Wallet or the Third Party Provider, as applicable, reserves the right to charge a fee to provide such paper copy; (c) you may contact Google to update your registration information used for electronic Communications or to withdraw consent to receive electronic Communications; and (d) GPC, Google Wallet or the Third Party Provider reserves the right to terminate your use of Google Wallet and the associated Third Party Provider products and services if you decline or withdraw consent to receive electronic Communications.

You may contact Google in relation to these Terms of Service by using the Contacting Us page in the Help link in the footer of your Google Wallet account.

## 10. Termination of Service.

We may, in our sole and absolute discretion without liability to you or any third party, terminate your use of one or more Services for any reason, including without limitation inactivity or violation of these Terms of Service or other policies we may establish from time to time.

Upon termination of your use of the Services, you remain liable for all Payment Transactions and any other obligations you have incurred under these Terms of Service. Upon termination, we have the right to prohibit your access to the Services, including without limitation by deactivating your username and password, and to refuse future access to the Services by you or if a business entity, its parent, affiliates or subsidiaries or its or their successors).

## 11. Responsibility for Taxes.

The reporting and payment of any applicable taxes arising from the use of the Services is your responsibility. You hereby agree to comply with any and all applicable tax laws in connection with your use of the Services, including without limitation, the reporting and payment of any taxes arising in connection with Payment Transactions made

through the Services.

## 12. No Endorsement of Products.

GPC and Google do not represent or endorse, and shall not be responsible for: (a) the reliability or performance of any Seller, merchant or Third Party Provider; (b) the safety, quality, accuracy, reliability, integrity or legality of any Product, Offer or Reward Program Item; (c) the truth or accuracy of the description of any Product, Offer, or Reward Program Item, or of any advice, opinion, offer, proposal, statement, data or other information (collectively, "**Content**") displayed or distributed, purchased or paid through the Service, or the Google Web Sites; or (d) your ability to buy or redeem Products, Offers or Reward Program Items using the Services. GPC and Google hereby disclaim any liability or responsibility for errors or omissions in any Content in the Services. GPC and Google reserve the right, but shall have no responsibility, to edit, modify, refuse to post or remove any Content, in whole or in part, that in its sole and absolute discretion is objectionable, erroneous, illegal, fraudulent or otherwise in violation of these Terms of Service.

## 13. Indemnification.

You agree to indemnify, defend and hold harmless GPC, Google, and their subsidiaries and other affiliates, and its and their directors, officers, owners, agents, co-branders or other partners, employees, information providers, licensors, licensees, consultants, contractors and other applicable third parties (including without limitation, Bancorp and Paymentech, L.P. and relevant Customers) (collectively "**Indemnified Parties**") from and against any and all claims, demands, causes of action, debt or liability, including reasonable attorneys fees, including without limitation attorneys fees and costs incurred by the Indemnified Parties arising out of, related to, or which may arise from: (i) your use of the Services; (ii) any breach or non-compliance by you of any term of these Terms of Service or any GPC Party policies; (iii) any dispute or litigation caused by your actions or omissions; or (iv) your negligence or violation or alleged violation of any Applicable Law or rights of a third party.

## 14. Disclaimer.

THE SERVICES, INCLUDING ALL CONTENT, SOFTWARE, FUNCTIONS, MATERIALS, AND INFORMATION MADE AVAILABLE ON, PROVIDED IN CONNECTION WITH OR ACCESSIBLE THROUGH THE SERVICES, ARE PROVIDED "AS IS." TO THE FULLEST EXTENT PERMISSIBLE BY LAW, GPC, GOOGLE, AND THEIR SUBSIDIARIES AND OTHER AFFILIATES, AND THEIR AGENTS, CO-BRANDERS OR OTHER PARTNERS, INCLUDING BUT NOT LIMITED TO, DEVICE MANUFACTURERS (COLLECTIVELY, "**GPC PARTIES**"), MAKE NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER FOR THE SERVICES OR THE CONTENT, MATERIALS, INFORMATION AND FUNCTIONS MADE ACCESSIBLE BY THE SOFTWARE USED ON OR ACCESSED THROUGH THE SERVICES, OR FOR ANY BREACH OF SECURITY ASSOCIATED WITH THE TRANSMISSION OF SENSITIVE INFORMATION THROUGH THE SERVICES. EACH GPC PARTY DISCLAIMS WITHOUT LIMITATION, ANY WARRANTY OF ANY KIND WITH RESPECT TO THE SERVICES, NONINFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. THE GPC PARTIES DO NOT WARRANT THAT THE FUNCTIONS CONTAINED IN THE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE. THE GPC PARTIES SHALL NOT BE RESPONSIBLE FOR ANY SERVICE INTERRUPTIONS, INCLUDING, BUT NOT LIMITED TO, SYSTEM FAILURES OR OTHER INTERRUPTIONS THAT

MAY AFFECT THE RECEIPT, PROCESSING, ACCEPTANCE, COMPLETION OR SETTLEMENT OF PAYMENT TRANSACTIONS OR THE SERVICES.

THE GPC PARTIES ARE NOT RESPONSIBLE FOR THE ACCURACY OF ANY PAYMENT INSTRUMENT, OFFER, OR REWARD PROGRAM ITEM INFORMATION, INCLUDING, WITHOUT LIMITATION, WHETHER SUCH INFORMATION IS CURRENT AND UP-TO-DATE. WITHOUT LIMITING THE GENERALITY OF THE PRECEDING SENTENCE, YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT SUCH INFORMATION IS REPORTED BY THE ISSUER AS OF A PARTICULAR TIME ESTABLISHED BY THE ISSUER AND MAY NOT ACCURATELY REFLECT YOUR CURRENT TRANSACTIONS, AVAILABLE BALANCE, OR OTHER ACCOUNT OR PROGRAM DETAILS AT THE TIME THEY ARE DISPLAYED TO YOU THROUGH THE SERVICES OR AT THE TIME YOU MAKE A PURCHASE OR REDEMPTION. YOU MAY INCUR FEES, SUCH AS OVERDRAFT FEES OR OTHER CHARGES AS A RESULT OF SUCH TRANSACTIONS, PER YOUR AGREEMENT WITH YOUR PAYMENT INSTRUMENT, OFFER, OR REWARD PROGRAM ITEM ISSUER, OR YOUR ATTEMPT TO MAKE A PURCHASE OR REDEMPTION MAY NOT BE SUCCESSFUL.

## 15. Limitations of Liability; Force Majeure.

IN NO EVENT SHALL ANY GPC PARTY BE RESPONSIBLE OR LIABLE TO YOU OR ANY THIRD PARTY UNDER ANY CIRCUMSTANCES FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY, DAMAGES OR LOSSES, INCLUDING BUT NOT LIMITED TO DAMAGES FOR LOSS OF PROFITS, GOODWILL, USE, DATA, OR OTHER INTANGIBLE LOSSES WHICH MAY BE INCURRED IN CONNECTION WITH ANY GPC PARTY OR THE SERVICES, OR ANY GOODS, SERVICES, OR INFORMATION PURCHASED, RECEIVED, SOLD, OR PAID FOR BY WAY OF THE SERVICES, REGARDLESS OF THE TYPE OF CLAIM OR THE NATURE OF THE CAUSE OF ACTION, EVEN IF THE GPC PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE OR LOSS. IN NO EVENT SHALL THE GPC PARTIES' TOTAL CUMULATIVE LIABILITY ARISING FROM OR RELATING TO THIS AGREEMENT EXCEED THE NET FEES GPC HAS ACTUALLY RECEIVED AND RETAINED FROM YOUR VALID TRANSACTIONS DURING THE THREE MONTH PERIOD IMMEDIATELY PRECEDING THE DATE OF THE CLAIM. Each party acknowledges that the other party has entered into these Terms of Service relying on the limitations of liability stated herein and that those limitations are an essential basis of the bargain between the parties. In addition to and without limiting any of the foregoing, no GPC Party shall have any liability for any failure or delay resulting from any condition beyond the reasonable control of such party, including but not limited to governmental action or acts of terrorism, earthquake, fire, flood or other acts of God, labor conditions, power failures and Internet disturbances.

## 16. Governing Law.

These Terms of Service shall be governed by the laws of California, except for California's choice of law rules, and applicable federal United States laws. Each party agrees to submit to personal and exclusive jurisdiction of the courts located in Santa Clara County, California. The parties specifically exclude from application to the Terms of Service the United Nations Convention on Contracts for the International Sale of Goods and the Uniform Computer Information Transactions Act.

GOOG-00001211

## 17. Notice.

In addition to the electronic communications authorized under the Section entitled, "Electronic Communications", statements, notices and other communications to you may be made by mail, email, postings on the Google Web Sites or other reasonable means. We may also provide notices of changes to the Terms of Service or other matters by displaying links to notices on the Google Web Sites. Notice to GPC and Google may be made by mail to:

Google Inc.
Attn: Google Wallet
1600 Amphitheatre Parkway
Mountain View, CA 94043

## 18. Modification of Terms of Service.

We have the right, in our sole and absolute discretion, to change, modify, or amend any portion of these Terms of Service at any time by posting notification here or otherwise communicating the notification to you. The changes will become effective, and shall be deemed accepted by you, after the initial posting and shall apply on a going-forward basis with respect to transactions initiated after the posting date. In the event that you do not agree with any such modification, your sole and exclusive remedy is to terminate your use of the Services.

## 19. Assignment.

You may not assign these Terms of Service or any rights or obligations hereunder, by operation of law or otherwise, without our prior written approval and any such attempted assignment shall be void. We reserve the right to freely assign these Terms of Service and the rights and obligations hereunder, to any third party without notice or consent. Subject to the foregoing, these Terms of Service shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns.

## 20. Survival.

Upon termination of your use of the Services or termination of these Terms of Service for any reason, in addition to this section, the following sections shall survive termination: 3.2, 3.8 through 3.11, and 9 through 21.

## 21. Other Provisions.

The failure of GPC or Google to exercise or enforce any right or provision of the Terms of Service shall not constitute a waiver of such right or provision. If any provision of these Terms of Service shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that these Terms of Service shall otherwise remain in full force and effect and remain enforceable between the parties. Headings are for reference purposes only and in no way define, limit, construe or describe the scope or extent of such section. These Terms of Service, including GPC's or Google policies governing the Services referenced herein, constitutes the entire agreement between you and GPC with respect to the use of the Services. These Terms of Service is not intended and shall not be construed to create any rights or remedies in any parties other than you and GPC, Google, and other GPC affiliates which each shall

GOOG-00001212

be a third party beneficiary of these Terms of Service, and no other person shall assert any rights as a third party beneficiary hereunder.

GOOG-00001213

# Exhibit 1-2



# Google Play Terms of Service

## 1. Introduction

**Applicable Terms**. By using digital content on Google Play, you agree to the following terms, in addition to the Google Terms of Service ("Google ToS") and the Google Play Business and Program Policies (found at http://play.google.com/about/android-developer-policies.html), all of which together are the **"Terms"**. If there is any conflict between the following terms and the Google ToS, the following terms shall prevail. Google's provision of Google Play and the services described in these Terms is a **"Service"** as defined in the Google ToS. These Terms apply to the provision of digital content from Google Play. Separate terms here apply to sales of devices from the Google Play store.

**Access to Products.** You may use Google Play to browse, locate, and/or download **Products** (defined as data files, applications, written text, mobile device software, music, audio files or other sounds, photographs, videos or other images) for your mobile, computer or other supported device (**"Device"**). Some of these Products may be offered by Google while others may be made available by third-parties not affiliated with Google. You agree that Google is not responsible for any Product on Google Play that originates from a source other than Google.

**Age Restrictions.** In order to use Google Play you must be 13 years of age or older. If you are between 13 and 18 years of age, you must have your parent or legal guardian's permission to use Google Play. You must not access Google Play or accept these Terms if you are a person who is either barred or otherwise legally prohibited from receiving or using the Service or any Products under the laws of the country in which you are resident or from which you access or use Google Play.

## 2. Google's provision of Google Play

**Payment Processing.** Google may make available to you various payment processing methods to facilitate the purchase of Products from Google Play. You must abide by any relevant terms and conditions or other legal agreement, whether with Google or a third party, that governs your use of a given payment processing method. Google may add or remove payment processing methods at its sole discretion and without notice to you. You agree to pay for any Products that you order and that Google may charge your credit card or other form of payment that you indicate for any Products ordered, along with any additional amounts (including any taxes). You agree that you are solely responsible for all fees associated with purchases you make on Google Play.

**Google Wallet.** You will need a Google Wallet account to purchase Products. If you do not have a Google Wallet Account, you can set one up by going to this link, where you can also find more information about Google Wallet. The Wallet Terms of Service located here also apply whenever you want to purchase a Product using Google Wallet. Please ensure that you read those terms carefully before

GOOG-00001179

making any purchase.

**Pricing.** For sales as both principal or agent, Google displays the pricing for Products on Google Play. Pricing and availability of all Products are subject to change at any time.

**Taxes.** You are responsible for any Taxes, and must pay Google for Products without any reduction for Taxes. If Google is obligated to collect or pay Taxes, the Taxes will be invoiced to you, unless you provide Google with a valid tax exemption certificate authorized by the appropriate taxing authority. If you are required by law to withhold any Taxes from your payments to Google, you must provide Google with an official tax receipt or other appropriate documentation to support such payments. **"Taxes"** means any duties, customs fees, or taxes (other than Google's income tax) associated with the sale of Products, including any related penalties or interest.

# 3. Your Use of Google Play

**Basic Use Requirements.** To use the Service, you will need a Device that meets the system and compatibility requirements for the relevant Product, which may change from time to time, working Internet access, and compatible software. Your ability to use the Service and the performance of the Service may be affected by these factors. Such system requirements are your responsibility.

**Third-Party Fees.** You may incur access or data fees from third parties (such as your Internet provider or mobile carrier) in connection with your use of Products and Google Play. For instance, you may incur such fees if you use services provided through Google Play on or through third-party services or devices. You are responsible for all such fees.

**Updates.** You may need to install updates to Google Play or related Google software that we introduce from time to time to use Google Play and to access or download Products. Products originating from Google may communicate with Google servers from time to time to check for available updates to the Products and to the functionality of Google Play, such as bug fixes, patches, enhanced functions, missing plug-ins and new versions (collectively, **"Updates"**). By using the Google Play store and installing these Products, you agree to such automatically requested and received Updates.

**Information about You.** In order to access certain services in Google Play, you may be required to provide information about yourself such as your name, address, and billing details. Google's privacy policies explain how we treat your personal data and protect your privacy when using Google Play. You agree that any such information you provide to Google will always be accurate, correct and up to date.

**Unauthorised Access to Accounts.** You must keep your user details secure and must not share them with anyone else. You must not collect or harvest any personal data of any user of Google Play, including account names.

**Disabled Accounts.** If Google disables access to your account, you may be prevented from accessing Google Play, your account details or any files or other Products that are stored with your account.

**Eligibility for Carrier Billing.** In order to determine your eligibility to have purchases of Products that you make through your mobile Devices billed to your mobile network provider's account, when you create a Google Play account on a Device we will send identifiers of your Device, subscriber ID and SIM

card serial number to your network provider. To permit this you will need to accept the network provider's terms of service. The network provider may send us your billing address information to help us create your Google Play account. We will hold and use this information in accordance with Google's privacy policies.

# 4. Purchases and Payments.

**Free Products.** Google may allow you to download or use Products free of charge. Any terms and conditions that apply to purchased Products will apply to free Products, except with respect to payment-related matters (for example, the refund-related provisions of these Terms do not apply to such free Products). Google may impose limitations on your access and use of certain free Products.

**Pre-orders of Products.** When you place a pre-order for a Product, your contract for the purchase and use of that item is completed when the Product becomes available in your account, and you are not able to withdraw from the contract after that point.

**Purchase of Products.** When you buy a Product, your contract for the purchase and use of that item is completed once you click the button indicating that your purchase is complete and you are not able to withdraw from the contract after that point.

**Product Purchases are Services.** When you purchase a Product, you are buying a service. Performance of this service begins as soon as the purchase is complete, as the Product will then be available to you through your account.

**Direct, Agency and App Sales.** When you buy Products from Google Play you will buy them either:

(a)   directly from Google (which is referred to as "Google", "we", "our", or "us" in these Terms) (a **"Direct Sale"**);

(b)   from the provider of the Product (the "Provider"), where Google is acting as agent for the Provider (an **"Agency Sale"**); or

(c)   in the case of Android apps, from the Provider of the app (an **"App Sale"**).

Each time that you purchase a Product, you enter into a contract based on these Terms with: Google in relation to the use of Google Play and (in the case of a Direct Sale) the purchase of that Product; and also (in the case of Agency Sales and App Sales) with the Provider of the Product you have purchased.

**All Sales Final.** Except as expressly set forth in these Terms or other Google Play policies, all sales are final, and no returns, replacements or refunds are permitted. If a replacement, return or refund is granted for any transaction, the transaction may be reversed, and you may no longer be able to access the Product that you acquired through that transaction. Your rights to cancel or return purchases and get a refund are set out in the additional terms for the relevant Product type below and related policies.

# 5. Subscriptions.

GOOG-00001181

**Free Trials of Magazines.** If you purchase a subscription for a magazine that includes a free trial, you will receive free access to content for the duration of the free trial period. If you cancel the subscription during the free trial period you will not be billed. You will retain access to the content you receive during the free trial period. If you do not cancel during the free trial period you will be billed at the end of the free trial period for the first period of the subscription that you purchased, which will commence at the end of the free trial period. Free trials are limited to one per user per magazine.

**Free Trials of Apps.** Subscribing to a free trial for an Android app gives you access to the subscription benefits for that app for a duration specified by the application developer. At the end of the trial period, you will be charged the price of the subscription and will continue to be charged until you cancel your subscription. To avoid any charges, you must cancel before the end of the trial period. Once you cancel your trial, you will immediately lose access to any subscription privileges.

**Cancellations.** If you purchase an auto-recurring periodic subscription (whether monthly, annual or another period) to a Product, you may cancel that subscription at any time before the end of the applicable billing cycle, and the cancellation will apply to the next period. For example, if you purchase a monthly subscription, you may cancel that subscription at any time during any month of the subscription, and the subscription will be cancelled as of the following month. You will not receive a refund for the current billing period. You will continue to receive issues and updates of the relevant subscription during the remainder of the current billing period, and your access to these will not be affected by the cancellation. Additional refund policies for magazines are set out in section 10 below.

**Price Changes.** When you purchase a subscription, you will initially be charged at the rate applicable at the time of your agreement to subscribe. If the Provider later increases the price of the subscription, Google will notify you. The increase will apply to the next payment due from you after the notice, provided that you have been given at least 10 days' prior notice before the charge is made. If you are given less than 10 days' prior notice, the price increase will not apply until the payment after the next payment due.

**Declining Price Changes.** If you do not wish to pay the increased price for a subscription, you may cancel the subscription in the manner described in the Google Play help center and you will not be charged further amounts for the subscription, provided you have notified us before the end of the current billing period. In some cases where the Provider increases the price of a subscription Google may cancel your subscription unless you agree to re-subscribe at the new price. If your subscription is cancelled and you later decide to re-subscribe, you will initially be charged at the then current subscription rate.

# 6. Rights and Restrictions

**License to Use Products.** Following payment of the applicable fees for a Product, you will have the non-exclusive right, for the period selected by you in the case of a purchase for a rental period, and in other cases for as long as Google and the applicable copyright holder have rights to provide you that Product, to download or stream, in each case, solely as expressly permitted by Google via the Play user interface and subject to the restrictions set forth in these Terms and associated policies, copies of the applicable Product to your Devices, and to view, use, and display the Product on your Devices or as otherwise authorized by Google as part of the Service for your personal, non-commercial use only. All rights, title and interest in Google Play and Products not expressly granted to you in these Terms are reserved by

GOOG-00001182

Google and its licensors.

**Violation of License Terms.** If you violate any of the terms and conditions of the Terms, your rights under this license will immediately terminate and Google may terminate your access to Google Play, the Products and/or your Google account without notice and without refund to you.

**No Public Performance.** You agree not to display content contained in Products in whole or in part as part of any public performance or display even if no fee is charged (except where such use would not constitute a copyright infringement). Use of a tool or feature provided as an authorized part of Google Play (for example, "Social Recommendations", as defined in the Music terms below) is permitted, provided that as you use the tool or feature as specifically permitted and only in the exact manner specified and enabled by Google.

**Sale, Distribution or Assignment to Third Parties.** You may not sell, rent, lease, redistribute, broadcast, transmit, communicate, modify, sublicense or transfer or assign your rights to Products to any third party without authorization, including with regard to any downloads of Products that you may obtain through Google Play. Use of any tool or feature provided as an authorized part of Google Play (for example, "Social Recommendations") shall not violate this provision so long as you use the tool as specifically permitted and only in the exact manner specified and enabled by Google.

**Capturing of Streams.** You may not use Google Play or any Product in conjunction with any stream-ripping, stream capture or similar software to record or create a copy of any Product that is presented to you in streaming format.

**Sharing.** You may not use Products as part of any service for sharing, lending or multi-person use, or for the purpose of any other institution, except as specifically permitted and only in the exact manner specified and enabled by Google (for example, through "Social Recommendations").

**Security Features.** You may not attempt to, nor assist, authorise or encourage others to circumvent, disable or defeat any of the security features or components, such as digital rights management software or encryption, that protect any Product or Google Play. If you violate any security feature, you may incur civil or criminal liability.

**Proprietary Notices.** You may not remove any watermarks, labels or other legal or proprietary notices included in any Product, and you may not attempt to modify any Products obtained through Google Play, including any modification for the purpose of disguising or changing any indications of the ownership or source of a Product.

**Defective Products.** Once a Product is available to you through your account, you should check the Product as soon as reasonably possible to ensure that it downloads or streams correctly (as applicable) and performs as stated, and notify us as soon as reasonably possible if you find any errors or defect. In the case of Android apps, you should contact the developer concerning any defects or performance issues in the apps, as described in the Google Play help center. In the case of Products other than apps, subject to any limitations in the additional terms for the specific Product below, You may return Products that you purchased from Google Play to Google if Google Play does not perform as stated with respect to that purchased Product, and Google will provide at its option either a replacement Product or a refund of the purchase price. If Google elects to issue you a refund, the refund of your purchase price shall be your

GOOG-00001183

sole remedy. Google reserves the right to issue refunds or credits at its sole discretion. If Google issues a refund or credit, it is under no obligation to issue the same or similar refund in the future.

**Removal or Unavailability of Products.** Subject to these Terms, Products that you purchase will be available to you through Google Play for the period selected by you in the case of a purchase for a rental period, and in other cases as long as Google has the right to make such content available to you. In certain cases (for example, if Google loses the relevant rights, discontinues a service or a Product is discontinued, breaches applicable terms or the law), Google may remove from your Device or cease providing you with access to certain Products that you have purchased. If reasonably practicable, Google will provide you with reasonable prior notice of any such removal or cessation. If you are not able to download a copy of the Product before such removal or cessation, then Google will, at its option and solely as an accommodation to you, offer you either (a) a replacement of the Product if possible or (b) a refund of the price of the Product. If Google chooses to issue you a refund, the refund of your purchase price shall be your sole remedy.

**Effect of Refunds.** If Google chooses to issue you a refund of the purchase price of a Product for any reason, you will no longer have the right to access the relevant Product.

**Select, Copy and Paste.** Select, copy and paste functions may be available for some text-based Products, and you must use these features within the prescribed limits and only for personal non-commercial purposes.

**Multiple Accounts.** If you have multiple Google accounts with different user names, in some cases you may transfer Products out of an account and into another account, provided you are the owner of each such account and provided Google has enabled a feature of the relevant service allowing such transfers.

**Limits on access on Devices.** Google may at any time place limits on the number of Devices and/or software applications you may use to access Products, at Google's discretion. Google may record and store the unique device identifier numbers of your Devices in order to enforce such limits.

**Compliance with Tax Laws.** You must comply with any and all applicable tax laws, including the reporting and payment of any taxes arising in connection with your use of Google Play or the purchase of Products through Google Play. The reporting and payment of any such applicable taxes are your responsibility.

**Dangerous Activities.** NONE OF THE PRODUCTS ARE INTENDED FOR USE IN THE OPERATION OF NUCLEAR FACILITIES, LIFE SUPPORT SYSTEMS, EMERGENCY COMMUNICATIONS, AIRCRAFT NAVIGATION OR COMMUNICATION SYSTEMS, AIR TRAFFIC CONTROL SYSTEMS, OR ANY OTHER SUCH ACTIVITIES IN WHICH CASE THE FAILURE OF THE PRODUCTS COULD LEAD TO DEATH, PERSONAL INJURY, OR SEVERE PHYSICAL OR ENVIRONMENTAL DAMAGE.

**Changes to these Terms.**

If these Terms change, you will be asked to accept new terms before you next purchase Products. Once you have accepted the new terms, they will apply to your use of all Products (including Products you have purchased in the past) and all subsequent purchases, until we notify you of further changes.

GOOG-00001184

If you refuse to accept the updated terms then you will not be able to buy any further Products through Google Play, and the latest version of these Terms that you accepted will continue to apply to your use of Products. In this case we will, if we are able to do so, give you a reasonable period of time in which to download a copy of any Product you have previously bought from Google Play to your Device, and you may continue to view that copy of the Product on your Devices in accordance with the last version of these Terms that you accepted.

After that time has expired, you will not be given a further opportunity to download the Products you have previously bought and it is possible that you will no longer be able to use Google Play to access or use the Products you have already bought or related support services. To do so you may also need to create a new account.

## 7. Music on Google Play

**Introduction.** Google Play includes certain music-related services, which are described in greater detail below and defined as the "Music Services."

**Music Products.** The Google Play store allows you to browse, preview, stream, purchase, download, recommend and use a variety of digital music and music-related content (such as music files, music video files, previews, clips, artist information, user reviews, professional third-party music reviews and other digital content) (**"Music Products"**). Music Products may be owned by Google or its third-party partners and licensors and may contain watermarks or other embedded data.

**Stored Content.** You can also use Google Play to store digital content (such as music files, related metadata and album art) in Music Storage through the Music Software, as each is defined below (**"Stored Content"**). For the avoidance of doubt, "Music Products" do not include Stored Content. Stored Content may include both files that you upload directly to Music Storage and/or files that Google "scans and matches" to files stored locally on your Device.

**Music Services.** Google Play may provide you with access to (a) server space that you can use to store music and associated data files, including Music Products and Stored Content (**"Music Storage"**) and/or (b) software applications (including web, desktop and mobile applications) and related services that allow you to upload, manage, access and play music through Music Storage (**"Music Software"**). Music Storage and Music Software are collectively referred to in these Terms as the "Music Services".

**Use of Music Services.** By storing Music Products and Stored Content in Music Storage, you are storing a unique copy of such content and requesting Google to retain it on your behalf and to make it accessible to you through your Google account. By using the Music Services, you are requesting that Google make all of the necessary functions and features of the Music Services available to you in order to facilitate your use of Music Products and Stored Content. Additionally, by accessing or using Music Products and Stored Content through the Music Software, you are initiating and performing the corresponding functions on Google's servers, together with any related steps necessary to achieve them, through the Music Services. You understand that Google, in performing the required technical steps at your direction to provide you with the Music Services, may (a) transmit Music Products and Stored Content over various networks and in various media and (b) make such changes to Music Products and Stored Content as are necessary to conform and adapt it to the technical requirements of connecting networks, devices,

GOOG-00001185

services or media. You confirm and warrant to Google that you have the necessary rights to store in Music Storage any Stored Content that you direct Google to upload or store in Music Storage, and to instruct Google to perform the actions described in this section.

**Cancelling a Music Purchase; Refunds.** You have the right to cancel each purchase of a Music Product from Google for a refund within 7 working days of the day after that Music Product becomes available for you to download or stream. Once you download or stream any Music Product that you purchase, you no longer have the right to cancel your purchase of that Music Product (unless the Music Product is defective).

**Social Recommendations.** When you purchase Music Products, you may be given the opportunity to share all or a portion of the Music Products to your profile on Google+ or other Google-approved social networks or online destinations, as determined by Google in its sole discretion (**"Social Recommendation"**). Your use of Social Recommendations shall be subject to the Terms and any other terms and conditions applicable to the social networks or online destinations to which you share such Social Recommendations. Google may impose limitations on your Social Recommendations. For example, Google may render the Music Product associated with any Social Recommendation as a limited-length preview rather than a full-length play.

**Rights to Stored Content.** You retain any rights that you already hold in Stored Content. For the avoidance of doubt, Stored Content is not subject to the license grant to Google in the section of the Google Terms of Service titled "Your Content in our Services."

**Geographic Restrictions.** The Music Services and Music Products are currently available only in some countries. You agree that you will not present any false, inaccurate or misleading information in an effort to misrepresent yourself as a resident of a supported country, and you will not attempt to circumvent any restrictions on access to or availability of the Music Services or Music Products.

**Compliance With Settings.** You must observe and comply with any settings or parameters set by Google or a copyright holder in connection with Music Products. For example, Google or the copyright holders may correct errors in Music Products, add additional features or change the security features or regional availability of the Music Products. Where these changes are made, the Music Products may automatically update.

**Third-Party Provisions.** Notwithstanding anything to the contrary in these Terms, the third parties who license their musical or other content to Google as Music Products or for other use in connection with the Google Play store (including Providers in the case of Agency Sales) are intended third party beneficiaries under these Terms solely with respect to the specific provisions of these Terms that directly concern their content (**"Third-Party Provisions"**), and solely for the purpose of enabling such third parties to enforce their rights in such content. For the avoidance of doubt, nothing in these Terms confers a third-party beneficiary right upon any party, with respect to any provision that falls outside the Third Party Provisions, which includes but is not limited to any provisions or agreements incorporated by reference, or that may be referenced without incorporation, in these Terms.

**Third-Party Software and Data.** Information regarding third-party software (including open source) and data in the Music Services can be obtained at the following location: http://music.google.com/about/thirdparty.html.

GOOG-00001186

**Licensing Partners.** If you are interested in learning more about some of the partners we work with to bring you music on Google Play, please visit this underline page.

# 8. Books on Google Play

**Privacy Policy for Books.** The Google Play Privacy Policy for Books http://books.google.com/googlebooks/privacy.html describes how we treat personal and certain other information generated by your use of Products that are books (**"Books Products"**).

**Device Requirements.** For information on the system requirements including what Devices are compatible with the Service and the purchase of and access to Books Products, please look at http://support.google.com/mobile/?p=books_devices.

**Updates to Books Content.** Google or the copyright holders of Books Products may update such Books Products and change digital rights settings for such Books Products from time to time. For example Google or the copyright holders may correct errors in the Books Products or may add additional features, or may change the security features for the Books Products. Where these changes are made the Books Products that you see will automatically update, except where you have downloaded a copy of the Books Products to a Device.

**Pricing.** Prices and availability of any Books Products are subject to change at any time. We try very hard to make sure there are no pricing mistakes. However, we (and, in the case of Agency and App Sales, the Provider) will not be bound by mistakes in the price of the Books Products (unless you have already purchased Books Products at the incorrect price).

**Cancellation.** You have the right to cancel the contract for each purchase of a Book Product from Google for a refund within a period of 7 days beginning with the day after that Book Products becomes available for you to read. Following Google's provision of a refund to you, the transaction will be reversed, and you will no longer have the right to access the applicable Book Product.

**Pre-Ordering.**

(a)    When you pre-order Books Products, the Books Content will automatically be available in your account once it becomes available to read, and you will be charged for the purchase at that time.

(b)    You can cancel your pre-order at any time up to the point at which the Books Product becomes available to read (if you want to cancel the pre-order you will be able to do so by visiting the "My Orders" page and following the instructions there). Once the Books Product is available for you to read, your cancellation and return rights are the same as for other Books Products that you purchase through Google Play. Please see the terms above for more information.

(c)    In some cases, we will need to cancel a pre-order you have placed (for example, we will cancel the pre-order if: the price of the Books Product changes between the time of your pre-order and the time at which the Books Product becomes available in your account; the Publisher of the Books Product requires us to withdraw the Books Content from sale; we have not been able to process your payment for the Books Product; or where we are required to do so by law). In this situation, your pre-order will be cancelled.

# 9. Movies and TV Shows on Google Play

**Introduction.** Google Play includes certain video services, which are defined as the **"Video Services"**. In these Terms Products made available for purchase through the Video Services are **"Video Products"**.

**Cancellation.** You can cancel your purchase of a Video Product and get a refund for an unwatched rental as long as it's within 7 working days of your order. Requests for refunds for any other reason must be directed through the form in the Google Play help center. Google reserves the right to approve or deny refund requests after 7 working days at its sole discretion.

**Purchase Options.** When you order a Video Product through the Service, you may either (i) rent the Video Product for viewing an unlimited number of times during the period of time specified on the transaction page displayed at the time of your payment (**"Viewing Period"**) and noted in your confirmation email (**"Rental Video Product"**) or (ii) purchase the Video Product for storage in a digital locker and for viewing and unlimited number of times as long as the Video Product is available in the digital locker (**"Locker Video Product"**).

**Viewing Periods - Rentals.** Pausing, stopping, or rewinding a Rental Video Product will not extend your applicable Viewing Period for that Rental Video Product. Each item of Rental Video Product may have a different Viewing Period and you agree to review the Viewing Period before you order it.

**Viewing Periods - Purchases.** Each Locker Video Product will be available for unlimited viewing for as long as Google is able to maintain the rights to continue providing you that Locker Video Product (**"Locker Period"**). Pausing, stopping, or rewinding an item of Locker Video Product will not extend the Locker Period. Each item of Locker Pay Content may have a different Locker Period.

**Viewing requirements.** You agree to watch each Video Product only within territories within which Google makes the relevant Video Product available for viewing. You may view Video Products when (1) online, with an internet connection and logged onto your Google account or (2) offline and viewing from a previously authorized device. You must be online to authorize a device for viewing Video Products.

**Device Limits - Rentals.** For each purchased Rental Video Product, you may watch such Rental Video Product on only one Device at a time (either online or on an authorized offline Device).

**Viewing Limits - Purchases.** For Locker Video Products, (1) you may view only one stream of each Locker Video Product at a time, (2) you may view up to 3 streams of Locker Video Products from your locker at a time, (3) you may authorize up to 5 Devices for offline playback of Locker Video Products at a time and to authorize additional devices, you must de-authorize one of those 5 Devices, (4) you may only authorize the same Device three times in any 12 month period and de-authorize the same Device twice in any 12 month period, (5) you may only de-authorize a total of 2 Devices for offline playback every 90 days, and (6) you may authorize no more than 3 Google accounts on the same Device.

# 10. Magazines on Google Play

**Reductions for Print Subscribers.** Some Providers of magazines may allow you to purchase a subscription of magazine Products on Google Play at a reduced rate if you are already a print subscriber.

GOOG-00001188

If you cancel your print subscription of that magazine or your print subscription expires and you do not renew it, your reduced rate subscription of that Product on Google Play will be cancelled automatically.

**Refunds.** Where you are granted a refund, Google may issue a refund for the entire term or grant a partial refund (if available) for the remaining term of a subscription. Following Google's provision of a refund to you, you will no longer have the right to access the applicable issues of the relevant magazine Product delivered during the refunded period, or if a partial refund is given, any issues of the relevant magazine Product not yet received. If a Product is no longer available on Magazines on Google Play (for example, if a title goes out of business or is sold to another publisher that does not provide Products to Magazines on Google Play), Google will give you a refund (which may be a full refund for the current period of the subscription or a partial refund for issues not yet received in the current period).

**Information Google Shares with Magazine Publishers.** If you purchase a subscription of any length on Magazines on Google Play, Google will share your name, email address, mailing address and a unique identifier with the magazine's publisher. The magazine publisher will use this information in accordance with its privacy policy. You will be provided the opportunity to opt out of any communications from the publisher that do not relate to the subscription you are purchasing, and to opt out of marketing communications from third parties, at the time you purchase your subscription. If you purchase a single issue on Magazines on Google Play, Google may provide your postal code to the magazine's publisher. We also provide magazine publishers with sales information on magazine purchases.

**Verifying Print Subscriptions.** If you are accessing a subscription on Magazines on Google Play through an existing print subscription from that magazine's publisher, we may ask a third party service provider to verify your print subscription with the magazine publisher, and we may ask you for certain information relating to your print subscription in order to do so. Google will use this information in accordance with the Google Privacy Policy (located at https://www.google.com/policies/privacy/).

- © Google
- Privacy & Terms
- Help

English ▼

# Exhibit 1-3
## Conditionally Filed Under Seal

# Exhibit 1-4
## Conditionally Filed Under Seal

# Exhibit 1-5
## Conditionally Filed Under Seal

# Exhibit 1-6
## Conditionally Filed Under Seal

# Exhibit 1-7

**Privacy Notice**

> An updated Google Wallet Privacy Notice will take
> effect on May 7th, 2014. Please click here to review the
> updated notice.

# Google Wallet Privacy Notice

Last modified August 1, 2012

The Google Privacy Policy describes how we treat personal information when you use Google's products and services. "Google Wallet" is a product offered to Google Account holders. Your use of Google Wallet is therefore subject to the Google Privacy Policy. In addition, the following notice describes our privacy practices that are specific to Google Wallet.

Google Wallet refers to Google payment services that are provided by both Google Inc. and its wholly owned subsidiaries. For US users, that subsidiary is Google Payment Corporation ("GPC"), and for users in the European Economic Area (EEA), it is Google Payment Limited ("GPL") (based in the United Kingdom). For countries outside of the United States and the EEA, please consult the Google Wallet Terms of Service made available to you within the service to learn more about the subsidiary offering the service.

Your use of Google Wallet is governed by the Google Wallet Terms of Service. Please consult the Terms of Service for detailed information about the specific services of Google Wallet. Capitalized terms not defined in this Google Wallet Privacy Notice shall have the meaning ascribed to them in the Terms of Service.

## Information we collect

In addition to the information listed in the Google Privacy Policy, we may also collect the following:

- **Registration information** - When you sign up for Google Wallet, you are creating a Wallet account that is associated with your Google Account. Depending on the services of Google Wallet you use, in addition to the information listed in the Google Privacy Policy, you may be asked to provide the following information: Credit or debit card number and card expiration date, bank account number and expiration date, address, date of birth, last four digits of your social security number, and for sellers or businesses specifically, your business category and certain information about your sales or transaction volume. In addition, for services requiring additional customer or seller identification, you may also be asked to provide your full social security or taxpayer identification number (or some other government-issued identification number). In some cases, we may also ask you to send us additional information or to answer additional questions to help verify your information. Finally, if you register a Carrier Billing Account, we will ask you to provide your mobile telephone number and the name and billing address associated with that number.
- **Information obtained from third parties** - We may obtain information about you from third party verification services, information arising from Google Wallet transactions at merchant locations,

GOOG-00000997

information regarding your use of payment methods issued by third parties that are linked to the Google Wallet service, information regarding access to balances held in your Google Wallet account, and information from a Carrier in connection with Carrier Billing.

Also, for sellers, we may obtain information about you and your business from a credit bureau or a business information service.

- **Transaction information** - When you use Google Wallet to conduct a transaction, we may collect information about the transaction, including: Date, time and amount of the transaction, a description provided by the seller of the goods or services purchased, any photo you choose to associate with the transaction, the names and email addresses of the seller and buyer (or sender and recipient), the type of payment method used, your description of the reason for the transaction, and the offer associated with the transaction, if any.

# How we use the information we collect

In addition to the uses listed in the Google Privacy Policy, we use the information you provide us, as well as information about you from third parties, in order to provide you with Google Wallet services, and to protect you from fraud, phishing or other misconduct. Such information may also be used to assist third parties in the provision of products or services that you request from them.

Your registration information is stored in association with your Google Account and your registration of a payment method will be stored on Google's servers. In addition, certain data elements may also be stored on your mobile device in encrypted form.

# Use of Google Wallet with third parties

We are not responsible for which merchants or other third parties you choose to share information with from Google Wallet. These include third party provider Wallet services that you register for directly and access through Google Wallet. The third party's receipt of, use of, and disclosure of your personal information from Google Wallet is subject to the third party's privacy policy, data security policy and terms and conditions. This Google Wallet Privacy Notice does not apply to your use of Google Wallet with third parties and any resulting data uses or disclosures by such third parties.

# Information we share

We will only share your personal information with other companies or individuals outside of Google in the following circumstances:

- As permitted under the Google Privacy Policy.
- As necessary to process your transaction and maintain your account.
- To complete your registration for a service provided by a third party.

# Information security

GOOG-00000998

For more information about our security practices, please see the main Google Privacy Policy.

The security of your Google Wallet account depends on you keeping your account password confidential. If you share your account information with a third party, he or she will have access to your account and your personal information.

It is your responsibility to control access to your mobile device and the Google Wallet application on your device, including keeping your PIN confidential and not sharing it with anyone. It is also your responsibility to alert Google or the relevant partner if you believe that the security of the information in the Google Wallet application has been compromised.

# Sharing between affiliates

The information that we collect, including information obtained from third parties, is shared between GPC and its affiliates, including Google Inc., to operate the service. Neither GPC nor its affiliates will share your information with others except as described in this Privacy Notice.

We provide you with the right to opt out of certain sharing between GPC and its affiliates. Specifically, you may choose to opt out of:

- The sharing between GPC and its affiliates of personal information about your creditworthiness; and,
- The sharing of information between GPC and its affiliates for those affiliates to market to you.

We will not share your personal information with anyone outside of GPC or its affiliates except as described in this Privacy Notice. As explained above, Google Wallet is a product offered to Google Account holders. Data you provide to Google Inc. for the purpose of signing up for a Google Account is not affected by the opt-out provisions in this notice.

If you don't want us to share personal information about your creditworthiness between GPC and its affiliates, please click here.

If you don't want us to use any information shared between GPC and its affiliates for those affiliates to market to you, please click here.

©2011 Google - Google Home   Google Terms of Service   Previous Privacy Notices

GOOG-00000999

# Exhibit 1-8

Google

## **Policies & Principles**

- Overview
- Privacy
  - Privacy Policy
  - Advertising
  - Principles
  - Tools
  - Blogs
  - Videos
  - FAQ
- Terms of Service

- Current version
- Past versions
- Self Regulatory Frameworks
- Key terms

# Privacy Policy

Last modified: July 27, 2012 (view archived versions)

There are many different ways you can use our services – to search for and share information, to communicate with other people or to create new content. When you share information with us, for example by creating a Google Account, we can make those services even better – to show you more relevant search results and ads, to help you connect with people or to make sharing with others quicker and easier. As you use our services, we want you to be clear how we're using information and the ways in which you can protect your privacy.

Our Privacy Policy explains:

- What information we collect and why we collect it.
- How we use that information.
- The choices we offer, including how to access and update information.

We've tried to keep it as simple as possible, but if you're not familiar with terms like cookies, IP addresses, pixel tags and browsers, then read about these key terms first. Your privacy matters to Google so whether you are new to Google or a long-time user, please do take the time to get to know our practices – and if you have any questions contact us.

GOOG-00000110

## Information we collect

We collect information to provide better services to all of our users – from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful or the people who matter most to you online.

We collect information in two ways:

- **Information you give us.** For example, many of our services require you to sign up for a Google Account. When you do, we'll ask for personal information, like your name, email address, telephone number or credit card. If you want to take full advantage of the sharing features we offer, we might also ask you to create a publicly visible Google Profile, which may include your name and photo.

- **Information we get from your use of our services.** We may collect information about the services that you use and how you use them, like when you visit a website that uses our advertising services or you view and interact with our ads and content. This information includes:

  - **Device information**

    We may collect device-specific information (such as your hardware model, operating system version, unique device identifiers, and mobile network information including phone number). Google may associate your device identifiers or phone number with your Google Account.

  - **Log information**

    When you use our services or view content provided by Google, we may automatically collect and store certain information in server logs. This may include:

    - details of how you used our service, such as your search queries.
    - telephony log information like your phone number, calling-party number, forwarding numbers, time and date of calls, duration of calls, SMS routing information and types of calls.
    - Internet protocol address.
    - device event information such as crashes, system activity, hardware settings, browser type, browser language, the date and time of your request and referral URL.
    - cookies that may uniquely identify your browser or your Google Account.

  - **Location information**

    When you use a location-enabled Google service, we may collect and process information about your actual location, like GPS signals sent by a mobile device. We may also use various technologies to determine location, such as sensor data from your device that may, for example, provide information on nearby Wi-Fi access points and cell towers.

  - **Unique application numbers**

GOOG-00000111

Certain services include a unique application number. This number and information about your installation (for example, the operating system type and application version number) may be sent to Google when you install or uninstall that service or when that service periodically contacts our servers, such as for automatic updates.

○ **Local storage**

We may collect and store information (including personal information) locally on your device using mechanisms such as browser web storage (including HTML 5) and application data caches.

○ **Cookies and anonymous identifiers**

We use various technologies to collect and store information when you visit a Google service, and this may include sending one or more cookies or anonymous identifiers to your device. We also use cookies and anonymous identifiers when you interact with services we offer to our partners, such as advertising services or Google features that may appear on other sites.

## How we use information we collect

We use the information we collect from all of our services to provide, maintain, protect and improve them, to develop new ones, and to protect Google and our users. We also use this information to offer you tailored content – like giving you more relevant search results and ads.

We may use the name you provide for your Google Profile across all of the services we offer that require a Google Account. In addition, we may replace past names associated with your Google Account so that you are represented consistently across all our services. If other users already have your email, or other information that identifies you, we may show them your publicly visible Google Profile information, such as your name and photo.

When you contact Google, we may keep a record of your communication to help solve any issues you might be facing. We may use your email address to inform you about our services, such as letting you know about upcoming changes or improvements.

We use information collected from cookies and other technologies, like pixel tags, to improve your user experience and the overall quality of our services. For example, by saving your language preferences, we'll be able to have our services appear in the language you prefer. When showing you tailored ads, we will not associate a cookie or anonymous identifier with sensitive categories, such as those based on race, religion, sexual orientation or health.

We may combine personal information from one service with information, including personal information, from other Google services – for example to make it easier to share things with people you know. We will not combine DoubleClick cookie information with personally identifiable information unless we have your opt-in consent.

We will ask for your consent before using information for a purpose other than those that are set out in

GOOG-00000112

this Privacy Policy.

Google processes personal information on our servers in many countries around the world. We may process your personal information on a server located outside the country where you live.

## Transparency and choice

People have different privacy concerns. Our goal is to be clear about what information we collect, so that you can make meaningful choices about how it is used. For example, you can:

- Review and control certain types of information tied to your Google Account by using Google Dashboard.
- View and edit your ads preferences, such as which categories might interest you, using the Ads Preferences Manager. You can also opt out of certain Google advertising services here.
- Use our editor to see and adjust how your Google Profile appears to particular individuals.
- Control who you share information with.
- Take information out of many of our services.

You may also set your browser to block all cookies, including cookies associated with our services, or to indicate when a cookie is being set by us. However, it's important to remember that many of our services may not function properly if your cookies are disabled. For example, we may not remember your language preferences.

## Information you share

Many of our services let you share information with others. Remember that when you share information publicly, it may be indexable by search engines, including Google. Our services provide you with different options on sharing and removing your content.

## Accessing and updating your personal information

Whenever you use our services, we aim to provide you with access to your personal information. If that information is wrong, we strive to give you ways to update it quickly or to delete it – unless we have to keep that information for legitimate business or legal purposes. When updating your personal information, we may ask you to verify your identity before we can act on your request.

We may reject requests that are unreasonably repetitive, require disproportionate technical effort (for example, developing a new system or fundamentally changing an existing practice), risk the privacy of others, or would be extremely impractical (for instance, requests concerning information residing on backup tapes).

Where we can provide information access and correction, we will do so for free, except where it would require a disproportionate effort. We aim to maintain our services in a manner that protects information from accidental or malicious destruction. Because of this, after you delete information from our services, we may not immediately delete residual copies from our active servers and may not remove information from our backup systems.

GOOG-00000113

## Information we share

We do not share personal information with companies, organizations and individuals outside of Google unless one of the following circumstances apply:

- **With your consent**

  We will share personal information with companies, organizations or individuals outside of Google when we have your consent to do so. We require opt-in consent for the sharing of any <u>sensitive personal information</u>.

- **With domain administrators**

  If your Google Account is managed for you by a <u>domain administrator</u> (for example, for Google Apps users) then your domain administrator and resellers who provide user support to your organization will have access to your Google Account information (including your email and other data). Your domain administrator may be able to:

  - view statistics regarding your account, like statistics regarding applications you install.
  - change your account password.
  - suspend or terminate your account access.
  - access or retain information stored as part of your account.
  - receive your account information in order to satisfy applicable law, regulation, legal process or enforceable governmental request.
  - restrict your ability to delete or edit information or privacy settings.

  Please refer to your domain administrator's privacy policy for more information.

- **For external processing**

  We provide personal information to our affiliates or other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures.

- **For legal reasons**

  We will share personal information with companies, organizations or individuals outside of Google if we have a good-faith belief that access, use, preservation or disclosure of the information is reasonably necessary to:

  - meet any applicable law, regulation, legal process or enforceable governmental request.
  - enforce applicable Terms of Service, including investigation of potential violations.
  - detect, prevent, or otherwise address fraud, security or technical issues.
  - protect against harm to the rights, property or safety of Google, our users or the public as required or permitted by law.

We may share aggregated, <u>non-personally identifiable information</u> publicly and with our partners – like publishers, advertisers or connected sites. For example, we may share information publicly to show

GOOG-00000114

trends about the general use of our services.

If Google is involved in a merger, acquisition or asset sale, we will continue to ensure the confidentiality of any personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.

## Information security

We work hard to protect Google and our users from unauthorized access to or unauthorized alteration, disclosure or destruction of information we hold. In particular:

- We encrypt many of our services using SSL.
- We offer you two step verification when you access your Google Account, and a Safe Browsing feature in Google Chrome.
- We review our information collection, storage and processing practices, including physical security measures, to guard against unauthorized access to systems.
- We restrict access to personal information to Google employees, contractors and agents who need to know that information in order to process it for us, and who are subject to strict contractual confidentiality obligations and may be disciplined or terminated if they fail to meet these obligations.

## Application

Our Privacy Policy applies to all of the services offered by Google Inc. and its affiliates, including services offered on other sites (such as our advertising services), but excludes services that have separate privacy policies that do not incorporate this Privacy Policy.

Our Privacy Policy does not apply to services offered by other companies or individuals, including products or sites that may be displayed to you in search results, sites that may include Google services, or other sites linked from our services. Our Privacy Policy does not cover the information practices of other companies and organizations who advertise our services, and who may use cookies, pixel tags and other technologies to serve and offer relevant ads.

## Enforcement

We regularly review our compliance with our Privacy Policy. We also adhere to several self regulatory frameworks. When we receive formal written complaints, we will contact the person who made the complaint to follow up. We work with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of personal data that we cannot resolve with our users directly.

## Changes

Our Privacy Policy may change from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We will post any privacy policy changes on this page and, if the changes are significant, we will provide a more prominent notice (including, for certain services, email

GOOG-00000115

notification of privacy policy changes). We will also keep prior versions of this Privacy Policy in an archive for your review.

## Specific product practices

The following notices explain specific privacy practices with respect to certain Google products and services that you may use:

- Chrome and Chrome OS
- Books
- Wallet
- Fiber



- Google
- Privacy & Terms

GOOG-00000116

# Exhibit 1-9
## Conditionally Filed Under Seal

# Exhibit 1-10
## Conditionally Filed Under Seal

# Exhibit 1-11
## Conditionally Filed Under Seal

# Exhibit 1-12
## Conditionally Filed Under Seal

# Exhibit 1-13
## Conditionally Filed Under Partial Seal

1

2      Susan D. Fahringer, Bar No. 21567
       SFahringer@perkinscoie.com
3      Charles C. Sipos (*Pro Hac Vice*)
       CSipos@perkinscoie.com
4      Breena M. Roos (*Pro Hac Vice*)
       BRoos@perkinscoie.com
5      Ryan T. Mrazik (*Pro Hac Vice*)
       RMrazik@perkinscoie.com
6      PERKINS COIE LLP
       1201 Third Avenue, Suite 4900
7      Seattle, WA  98101-3099
       Telephone:  206.359.8000
8      Facsimile:  206.359.9000

9      Sunita Bali, Bar No. 274108
       SBali@perkinscoie.com
10     PERKINS COIE LLP
       505 Howard Street, Suite 1000
11     San Francisco, CA  94105
       Telephone:  415.344.7000
12     Facsimile:  415.344.7050

13     Attorneys for Defendants
       Google, Inc. and Google Payment Corporation

14

15                       UNITED STATES DISTRICT COURT

16                      NORTHERN DISTRICT OF CALIFORNIA

17                            SAN JOSE DIVISION

18

19     Alice Svenson, individually and on behalf       Case No. 5:13-cv-04080-BLF
       of all others similarly situated,
20                                                      CLASS ACTION
                            Plaintiff,
21                                                      DEFENDANT GOOGLE INC.'S THIRD
              v.                                        AMENDED SUPPLEMENTAL ANSWERS
22                                                      TO PLAINTIFF'S INTERROGATORIES,
       Google Inc. and Google Payment                  SET ONE
23     Corporation,

24                          Defendants.

25                                                      CONTAINS INFORMATION DESIGNATED
                                                        "CONFIDENTIAL" PURSUANT TO THE
26                                                      PARTIES' PROTECTIVE ORDER ENTERED
                                                        AUGUST 6, 2014

27

28

                                           -1-

11.    Each of these general objections is hereby specifically incorporated into each of the specific answers set forth below.

## GOOGLE'S RESPONSES AND OBJECTIONS
## TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify and describe, in detail, what types of BUYERS' Sensitive Identifiable Data ("SID"), including without limitation credit or charge card information (credit or charge card number or portion thereof, expiration date, security code), any billing information (first and last name and street address), phone number, and/or email address, and/or other BUYER information, that you PROVIDE to VENDORS and when, including any purposes, reasons, or other explanations for providing SID to VENDORS.

**ANSWER:**

This Interrogatory is compound and, coupled with Plaintiff's many other compound interrogatories, far exceeds the limit on interrogatories imposed by the Federal Rules of Civil Procedure.  Google objects to this Interrogatory on that basis.  In addition, this Interrogatory seeks information that is subject to a highly individualized inquiry regarding each purchase of an App on Google Play using Google Wallet.  It is impossible to provide a general answer applicable to all purchases of Apps, and Google objects to this Interrogatory on that basis.  Google also incorporates its general objections, above, particularly with regard to the definitions of the terms "SID," "Identify," "BUYERS," and "VENDORS," as well as the time period at issue.  Google further objects to this Interrogatory as unreasonably broad and unduly burdensome.

Notwithstanding and without waiving these objections, Google answers as follows:

Google and GPC may share a Buyer's Contact Information as set forth in the applicable privacy policies, including the Google Privacy Policy and the Wallet Privacy Notice.  Copies of the privacy policies and privacy notice applicable during the Class Period have been produced, and Defendants direct Plaintiff to those policies pursuant to Rule 33(d) in answer to this Interrogatory.  Defendants complied with the applicable policies throughout the Class Period.

*CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER*

**Information provided by a Buyer**

The information that a Buyer provides to Google or GPC is a highly individualized question, and may vary depending upon the choices made by the Buyer.  For example, as of the date of these responses, a person creates a Google account by creating a Gmail address (which also serves as the person's user name), designating a password, and supplying a name (which need not be the person's actual name), day and year of birth, mobile phone number and current email address.  A person also may choose to provide his or her month of birth and gender.  A person may or may not provide additional information to Google in connection with creating a Google profile, including, for example, the person's street address.

A person cannot use Google Wallet unless he or she has a Google account.  When registering to use Google Wallet, a person located in the U.S. provides his or her name, country and zip code to GPC.  The person also may provide her credit card number, expiration date, and security code (the security code is not permanently stored).  Once the person decides to purchase an App via Play using Wallet (and become a Buyer), additional information might be required or supplied in connection with the purchase, depending on the nature of the purchase.  For example, a Buyer who had not provided credit card or other payment information at registration would do so at purchase.  As another example, a Buyer purchasing physical goods provides his or her city and/or state of residence and their street address for shipping purposes.  In addition, if a Buyer purchases goods (even if only digital goods) over $300, the Buyer provides her city and state of residence, as well as country and zip code.

No separate registration beyond creation of a Google account is required for Google Play.

Current representative screenshots of the steps one takes to create a Google account and to register for Google Wallet ("registration flows") will be produced.  Google directs Plaintiff to those documents pursuant to 33(d) in further answer to this Interrogatory.

**Circumstances of disclosing Buyer Contact Information to Seller**

The circumstances under which GPC or Google might share any particular item of Contact Information that a Buyer provided are highly individualized.  They will depend first on

GOOGLE'S 3rd AM. SUPP. ANSWERS TO PL.'S INTERROGATORIES (5:13-cv-04080-BLF)
***CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER***

LEGAL129728237.1

what information a particular Buyer supplied, which varies as discussed above.  Additional variables that will affect whether any item of Contact Information that a buyer provided is shared, when, and under what circumstances include the following:

1.  Whether the Buyer consented to the disclosure.  For example, some Buyers might choose to make any or all of their Contact Information publicly available on their Google Profiles.  Buyers also might disclose their name or other information to the Seller (or publicly) in connection with their review of a product they purchased; if the Seller's App requires a secondary login the Seller controls, which may require the Buyer to enter buyer information; when contacting the Seller for customer service purposes; for in-App purchases, which some Apps allow; in connection with subscription services; or through other means.

2.  If Google or GPC has a good-faith belief that access, use, preservation or disclosure of the information is reasonably necessary to meet any applicable law, regulation, legal process or enforceable governmental request.  This would include, for example, Google's good-faith belief that disclosure or access to certain information is necessary to comply with tax regulations.  The Seller is responsible for paying appropriate tax on sales of products.  A Seller's tax obligation typically will vary depending upon the Buyer's location (city, state, country of residence).  Accordingly, these items of Contact Information might be reasonably necessary to Sellers to verify a Seller's tax obligations.

3.  If Google or GPC has a good-faith belief that access, use, preservation or disclosure of the information is reasonably necessary to detect, prevent, or otherwise address fraud, security or technical issues.  During the Class Period, fraud and security issues may include, for example, the need for Sellers to ensure proper refunds or payment adjustments, for which the Seller is responsible under the Seller Terms of Service, which might require any item of a Buyer's Contact Information.

GOOGLE'S 3rd AM. SUPP. ANSWERS TO PL.'S INTERROGATORIES (5:13-cv-04080-BLF)
*CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER*
LEGAL129728237.1

4.  For purchases using Google Wallet, items of Contact Information might be shared as necessary to process a Buyer's transaction and maintain his or her account, including to process refunds, provide product updates, and address issues if an App does not work properly or requires an update.

5.  For purchases using Google Wallet, items of Contact Information also might be shared to complete a person's registration for a service provided by a third party.

**How a Buyer's Contact Information may be displayed to a Seller**

How a Buyer's Contact Information may be displayed (and what specific items are displayed) by Google or GPC to a Seller is highly individualized and varies with the date of and circumstances surrounding a particular transaction.  Certain Buyer Contact Information has been displayed to Sellers via both Play and Wallet (and their predecessors) in different ways.

As to Wallet, certain items of Buyer Contact Information (described in more detail below) are and historically have been available for review by a Seller in two ways.  First, certain Buyer Contact Information might be available via a secure user interface associated with Google Wallet (and its predecessor, Google Checkout), which the Seller might access only after logging in.  For the vast majority of Sellers, that user interface is currently referred to as the "Wallet Merchant Center" or "MC 3.0."  Its predecessor was referred to as the "Checkout Merchant Center."  While logged in to the Wallet Merchant Center or Checkout Merchant Center, a Seller could request essentially the same items of Buyer Contact Information as were available in the user interface through a query for an order export report.

Second, previously, Sellers located in the United States and the United Kingdom who signed up for a Google Checkout account, and who also obtained a Merchant Key from Google, might have access to certain items of Buyer Contact Information through the Checkout API, which allowed merchants to directly access similar buyer Contact Information.  The Checkout API was retired on November 20, 2013, and a comparable product no longer exists.

*The following sentence is designated CONFIDENTIAL pursuant to the parties' Protective Order:* ███████████████████████████████

-10-

GOOGLE'S 3rd AM. SUPP. ANSWERS TO PL.'S INTERROGATORIES (5:13-cv-04080-BLF)
*CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER*

LEGAL129728237.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In further response to this Interrogatory, Google has produced the following documents, and directs Plaintiff to those documents pursuant to Rule 33(d): GOOG-00001392 and GOOG-00001394 are screenshots of Plaintiff's App purchase from YCDroid, viewed through the Checkout Merchant Center.  GOOG-00001089 and GOOG-00001093 (produced on October 14, 2014) are screenshots of Plaintiff's App purchase from YCDroid, viewed through the Wallet Merchant Center on or about June 3, 2014.  GOOG-00001395, GOOG-00001396, and GOOG-00001397 are screenshots of Plaintiff's App purchase from YCDroid, viewed through the Wallet Merchant Center on or about October 14, 2014.

A particular Seller might not ever actually access the Wallet Merchant Center or the Play Developer Console to access or review any Buyer Contact Information available through those services.  Further, even if a Seller did log in to the services, it might not query for an order export report in the Wallet Merchant Center or sales report or payout report in the Play Development Console, or review the Buyer Contact Information for any particular Buyer or transaction.  A Seller could view Buyer Contact Information only for those Buyers to whom the Seller had sold an App.

*The remaining answer to this Interrogatory is designated CONFIDENTIAL pursuant to the parties' Protective Order:*

GOOGLE'S 3rd AM. SUPP. ANSWERS TO PL.'S INTERROGATORIES (5:13-cv-04080-BLF)
*CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER*
LEGAL129728237.1



GOOGLE'S 3rd AM. SUPP. ANSWERS TO PL.'S INTERROGATORIES (5:13-cv-04080-BLF)
*CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER*

LEGAL129728237.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23 **INTERROGATORY NO. 2:**

24        Identify and describe, in detail, what SID you PROVIDE to VENDORS to process

25 BUYER transactions and maintain BUYER accounts, complete registration for third-party

26 services, for external processing, to domain administrators, with the BUYER's consent, and/or for

27 legal reasons, respectively, including any categories of VENDORS who are PROVIDED such

28

GOOGLE'S 3rd AM. SUPP. ANSWERS TO PL.'S INTERROGATORIES (5:13-cv-04080-BLF)
*CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER*
LEGAL129728237.1

incorporates by reference GPC's response to Plaintiff's Interrogatories, Set One, Interrogatory No. 16.

Dated: February 4, 2016

**PERKINS COIE** LLP

By: *Susan D. Fahringer*
Susan D. Fahringer, Bar No. 21567
SFahringer@perkinscoie.com

Attorneys for Defendants
Google Inc. and Google Payment Corporation

GOOGLE'S 3rd AM. SUPP. ANSWERS TO PL.'S INTERROGATORIES (5:13-cv-04080-BLF)
*CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER*

LEGAL129728237.1

# Exhibit 1-14
## Conditionally Filed Under Seal

# Exhibit 1-15
## Conditionally Filed Under Seal

# Exhibit 1-16
## Conditionally Filed Under Seal

# Exhibit 1-17
## Conditionally Filed Under Seal

# Exhibit 1-18
## Conditionally Filed Under Seal

# Exhibit 1-19
## Conditionally Filed Under Seal

# Exhibit 1-20
## Conditionally Filed Under Seal

# Exhibit 1-21
## Conditionally Filed Under Seal

# Exhibit 1-22
## Conditionally Filed Under Seal

# Exhibit 1-23
## Conditionally Filed Under Seal

# Exhibit 1-24
## Conditionally Filed Under Seal

# Exhibit 1-25
## Conditionally Filed Under Seal

# Exhibit 1-26
## Conditionally Filed Under Seal

# Exhibit 1-27
## Conditionally Filed Under Seal

# Exhibit 1-28
## Conditionally Filed Under Seal

# Exhibit 1-29
## Conditionally Filed Under Seal

# Exhibit 1-30
## Conditionally Filed Under Seal

# Exhibit 1-31
## Conditionally Filed Under Seal

# Exhibit 1-32
## Conditionally Filed Under Seal

# Exhibit 1-33
## Conditionally Filed Under Seal

# Exhibit 1-34

Susan D. Fahringer, Bar No. 21567
SFahringer@perkinscoie.com
Charles C. Sipos (Pro Hac Vice)
CSipos@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

Sunita Bali, Bar No. 274108
SBali@perkinscoie.com
PERKINS COIE LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA  94111-4131
Telephone:  415.344.7000
Facsimile:  415.344.7050

Attorneys for Defendant
Google, Inc. and Google Payment Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Alice Svenson, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Google Inc. and Google Payment Corporation,<br><br>Defendants. | Case No. 5:13-cv-04080-BLF<br><br>**CLASS ACTION**<br><br>DEFENDANTS GOOGLE INC.'S AND GOOGLE PAYMENT CORPORATION'S RESPONSES TO PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION<br><br>CONTAINS INFORMATION DESIGNATED "CONFIDENTIAL" PURSUANT TO THE PARTIES' PROTECTIVE ORDER ENTERED AUGUST 6, 2014 |

PROPOUNDING PARTY:   PLAINTIFF ALICE SVENSON

RESPONDING PARTY:   DEFENDANT GOOGLE INC.

SET NO:   TWO

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Defendants Google

Inc. ("Google") and Google Payment Corporation ("GPC"), by and through Perkins Coie LLP,

1    9.     Each of these General Objections is hereby specifically incorporated into each of

2  the specific responses set forth below.  To the extent that any specific Request or part of a

3  Request is not expressly admitted, it is denied.

### GOOGLE'S RESPONSES AND OBJECTIONS TO
### PLAINTIFF'S SECOND SET OF REQUESTS FOR ADMISSION

**REQUEST NO. 1:**

Your records can identify if a purchase of an item on Google Play was made via Google
Wallet.

**RESPONSE:**

Defendants object to this request on the grounds that it is vexatious and cumulative.
Defendants further object to this request on the grounds that it is unintelligible and incoherent
because records do not, by their nature, "identify."  Defendants also object to this request on the
grounds that it is beyond the scope of permissible discovery.  Finally, Defendants incorporate
the general objections above, particularly with regard to the definition of the term "Google
Wallet," as well as the time period at issue.

Subject to and without waiving these objections, Defendants respond that, from their
records, one can identify if a purchase of an item on Google Play was made via Google Wallet.
Except as expressly admitted, Defendants DENY this Request for Admission.

**REQUEST NO. 2:**

Your records can identify if a purchase of an item on Google Play was an App.

**RESPONSE:**

Defendants object to this request on the grounds that it is vexatious and cumulative.
Defendants further object to this request on the grounds that it is unintelligible and incoherent
because records do not, by their nature, "identify."  Defendants also object to this request on the
grounds that it is beyond the scope of permissible discovery.  Finally, Defendants incorporate
the general objections above, particularly with regard to the definition of the term "App," as
well as the time period at issue.

-7-

1   Subject to and without waiving these objections, Defendants respond that, from their

2   records, one can identify if an item purchased on Google Play was an App.  Except as expressly

3   admitted, Defendants DENY this Request for Admission.

4   **REQUEST NO. 3:**

5   Your records can identify if a purchase of an item on Google Play was digitally

6   delivered.

7   **RESPONSE:**

8   Defendants object to this request on the grounds that it is vexatious and cumulative.

9   Defendants further object to this request on the grounds that it is unintelligible and incoherent

10  because records do not, by their nature, "identify."  Defendants also object to this request on the

11  grounds that it is beyond the scope of permissible discovery.  Finally, Defendants incorporate

12  the general objections above, including as to the time period at issue.

13  Subject to and without waiving these objections, Defendants respond that, from their

14  records, one can identify if an item purchased on Google Play was digitally delivered.  Except

15  as expressly admitted, Defendants DENY this Request for Admission.

16  **REQUEST NO. 4:**

17  Your records can identify if a VENDOR downloaded SID using download means that

18  you offered.

19  **RESPONSE:**

20  Defendants object to this request on the grounds that it is vexatious and cumulative.

21  Defendants further object to this request on the grounds that it is unintelligible and incoherent

22  because records do not, by their nature, "identify."  Defendants also object to this request on the

23  grounds that it is beyond the scope of permissible discovery.  Finally, Defendants incorporate

24  the general objections above, particularly with regard to the definition of the terms "VENDOR"

25  and "SID," as well as the time period at issue.

26  Subject to and without waiving these objections, Defendants respond as follows:

27  DENIED.

28

1    **RESPONSE:**

2         Defendants object to this request on the grounds that it is both vexatious and cumulative

3    of various others of Plaintiff's Second Requests for Admission.   This request is also

4    disproportional to Plaintiff's legitimate discovery needs in advance of class certification because

5    it seeks an admission related to Contact Information, and the alleged use and disclosure of it,

6    that is wholly unrelated and irrelevant to class certification.  Finally, Defendants incorporate the

7    general objections above, particularly with regard to the definition of the terms "VENDOR" and

8    "App," as well as the time period at issue.

9         Subject to and without waiving these objections, Defendants respond as follows:

10   DENIED.

11   **REQUEST NO. 51:**

12        One or more VENDORS have sold SID.

13        **RESPONSE:**

14        Defendants object to this request on the grounds that it is both vexatious and cumulative

15   of various others of Plaintiff's Second Requests for Admission.   This request is also

16   disproportional to Plaintiff's legitimate discovery needs in advance of class certification because

17   it seeks an admission related to Contact Information, and the alleged use and disclosure of it,

18   that is wholly unrelated and irrelevant to class certification.  Finally, Defendants incorporate the

19   general objections above, particularly with regard to the definition of the terms "VENDOR" and

20   "SID," as well as the time period at issue.

21        Subject to and without waiving these objections, Defendants respond as follows:

22   DENIED.

23   Dated: January 16, 2015                    **PERKINS COIE LLP**

24

25                                    By: *Susan D. Fahringer*

26                                        Susan D. Fahringer, Bar No. 21567
                                         SFahringer@perkinscoie.com

27                                        Attorneys for Defendants
                                         Google Inc. and Google Payment Corporation
28
                                         -37-

# Exhibit 1-35
## Conditionally Filed Under Seal

# Exhibit 1-36
## Conditionally Filed Under Partial Seal

Susan D. Fahringer, Bar No. 21567
SFahringer@perkinscoie.com
Charles C. Sipos (Pro Hac Vice)
CSipos@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

Sunita Bali, Bar No. 274108
SBali@perkinscoie.com
PERKINS COIE LLP
Four Embarcadero Center, Suite 2400
San Francisco, CA  94111-4131
Telephone:  415.344.7000
Facsimile:  415.344.7050

Attorneys for Defendant
Google, Inc. and Google Payment Corporation

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Alice Svenson, individually and on behalf of all others similarly situated,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>Google Inc. and Google Payment Corporation,<br><br>　　　　　　　Defendants. | Case No. 5:13-cv-04080-BLF<br><br>CLASS ACTION<br><br>DEFENDANT GOOGLE INC.'S AMENDED SUPPLEMENTAL ANSWERS TO PLAINTIFF'S INTERROGATORIES, SET ONE<br><br>CONTAINS INFORMATION DESIGNATED "CONFIDENTIAL" PURSUANT TO THE PARTIES' PROTECTIVE ORDER ENTERED AUGUST 6, 2014 |

PROPOUNDING PARTY:   PLAINTIFF ALICE SVENSON

RESPONDING PARTY:   DEFENDANT GOOGLE INC.

SET NO:   ONE

-1-

1   Policy, Wallet Buyer Terms of Service, and Google Wallet Privacy Notice and register for

2   Google Wallet.

3

4   **INTERROGATORY NO. 12:**

5       Identify and describe, in detail, what information relating to named Plaintiff Alice

6   Svenson, including but not limited to SID, is or was PROVIDED to VENDOR YCDroid

7   specifically and to any other third party, including what information is or was PROVIDED as

8   "Shipping Information" associated with her App purchase as set forth in the Complaint and when

9   and by and to whom.

10  **ANSWER:**

11      Google incorporates its general objections, in particular its objections to Plaintiff's

12  definitions of the terms "SID," "PROVIDED," and "VENDOR."  Google also objects to this

13  Interrogatory to the extent it seeks information outside that at issue in this case.  Subject to and

14  without waiving these objections, Google incorporates its answer and objections to Interrogatory

15  No. 1, and will produce pursuant to Rule 33(d) records of Plaintiff's Google Wallet account and

16  the Google Wallet Merchant Center that are sufficient to answer this Interrogatory.

17

18  **INTERROGATORY NO. 13:**

19      Identify the total number of BUYERS whose SID, and data styled as SHIPPING

20  INFORMATION, respectively, was PROVIDED to VENDORS pursuant to a BUYER App

21  purchase, and to YCDroid in connection with BUYER purchases of the YCDroid "SMS MMS to

22  Email" App, respectively, during the Relevant Time Period, with breakdowns by month, year,

23  and location, including state and state and local tax jurisdiction.

24  **ANSWER:**

25      Google incorporates its general objections, in particular its objections to Plaintiff's

26  definitions of "SID," "PROVIDED," and "VENDOR."  Google also objects to this Interrogatory

27  to the extent it seeks information outside that at issue in this case.  Moreover, this Interrogatory

28

-17-

1   seeks information that is beyond the scope of the issues that the parties and court must address in

2   connection with class certification.  In connection with class certification, Google will not contest

3   that the number of United States buyers who purchased Apps on Google Play using Google

4   Wallet is sufficient for purposes of Rule 23(a)(1) numerosity.  Accordingly, this Interrogatory

5   seeks information that is invasive, confidential, and potentially reasonably calculated to lead to

6   the discovery of admissible evidence only with regard to merits issues, and Google objects to

7   producing such information at this stage in the case on these grounds.  Google also objects to this

8   Interrogatory as compound.  Google will supplement this Interrogatory response if and when a

9   class is certified.

10

11  **INTERROGATORY NO.  14:**

12       Identify the top ten VENDORS to whom you PROVIDED SID, and data styled as

13  SHIPPING INFORMATION, respectively, for the greatest number of BUYERS during the

14  Relevant Time Period, with breakdowns by VENDOR, VENDOR location (including each

15  VENDOR's country, state or province, and all other address information you have), month, and

16  year, as well as the total number of BUYERS whose SID and "SHIPPING INFORMATION,"

17  respectively, that you PROVIDED to VENDOR YCDroid.

18  **ANSWER:**

19       Google incorporates its general objections, in particular its objections to Plaintiff's

20  definitions of "SID," "PROVIDED," and "VENDOR."  Google also objects to this Interrogatory

21  to the extent it seeks information outside that at issue in this case.  Moreover, this Interrogatory

22  seeks information that is beyond the scope of the issues that the parties and court must address in

23  connection with class certification.  In connection with class certification, Google will not contest

24  that the number of United States buyers who purchased Apps on Google Play using Google

25  Wallet is sufficient for purposes of Rule 23(a)(1) numerosity.  Accordingly, this Interrogatory

26  seeks information that is invasive, confidential, and potentially reasonably calculated to lead to

27  the discovery of admissible evidence only with regard to merits issues, and Google objects to

28

GOOGLE INC.'S AMENDED SUPPLEMENTAL ANSWERS TO PLAINTIFF'S
INTERROGATORIES – *CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL
PURSUANT TO THE PROTECTIVE ORDER* (5:13-cv-04080-BLF)
41063-0065/LEGAL123327411 2

1  *The following sentence is designated CONFIDENTIAL pursuant to the parties' Protective*

2  *Order:* ███████████████████████████████████████████

3  ███████████████████████████████████████████

4  ███████████████████████████████████████████████

5  ███████████████████████████████████████████████

6  ███████████

7

8  **INTERROGATORY NO. 16:**

9      Identify and describe, in detail, the process by which you receive or keep a portion or

10  amount of each App's purchase price; the process by which you collect said portion or amount

11  and from whom you collect it; and the process by which you remit the remainder of the App

12  purchase price to the VENDOR.

13  **ANSWER:**

14      Google incorporates its general objections, in particular its objections to Plaintiff's

15  definition of the term "Identify."  Notwithstanding and without waiving these objections, Google

16  incorporates by reference GPC's response to Plaintiff's Interrogatories, Set One, Interrogatory

17  No. 16.

18

19  Dated: October 27, 2014                **PERKINS COIE** LLP

20

21                                 By: *Susan D. Fahringer*
                                    Susan D. Fahringer, Bar No. 21567
                                    SFahringer@perkinscoie.com

22

23                                      Attorneys for Defendants
                                    Google Inc. and Google Payment Corporation

24

25

26

27

28

-20-

# Exhibit 1-37



## Privacy & Terms

# Privacy Policy

This is an archived version of our Privacy Policy. View the <u>current version</u> or <u>all past versions</u>.

Last modified: October 3, 2010

This Privacy Policy applies to all of the <u>products, services and websites</u> offered by Google Inc. or its subsidiaries or affiliated companies except Postini (<u>Postini Privacy Policy</u>). Sometimes, we may post product specific privacy notices or Help Center materials to explain our products in more detail.

If you have any questions about this Privacy Policy, please feel free to <u>contact us</u> through our website or write to us at

Privacy Matters
c/o Google Inc.
1600 Amphitheatre Parkway
Mountain View, California, 94043
USA

# Information we collect and how we use it

We may collect the following types of information:

- **Information you provide** – When you sign up for a <u>Google Account</u>, we ask you for <u>personal information</u>. We may combine the information you submit under your account with information from other Google services or third parties in order to provide you with a better experience and to improve the quality of our services. For certain services, we may give you the opportunity to opt out of combining such information. You can use the Google Dashboard to learn more about the information associated with your Account. If you are using Google services in conjunction with your Google Apps Account, Google provides such services in conjunction with or on behalf of <u>your domain administrator</u>. Your administrator will have

GOOG-00000383

access to your account information including your email. Consult your domain administrator's privacy policy for more information.

- **Cookies** – When you visit Google, we send one or more <u>cookies</u> to your computer or other device. We use cookies to improve the quality of our service, including for storing user preferences, improving search results and ad selection, and tracking user trends, such as how people search. Google also uses cookies in its advertising services to help advertisers and publishers serve and manage ads across the web and on Google services.
- **Log information** – When you access Google services via a browser, application or other client our servers automatically record certain information. These <u>server logs</u> may include information such as your web request, your interaction with a service, Internet Protocol address, browser type, browser language, the date and time of your request and one or more cookies that may uniquely identify your browser or your account.
- **User communications** – When you send email or other communications to Google, we may retain those communications in order to process your inquiries, respond to your requests and improve our services. When you send and receive SMS messages to or from one of our services that provides SMS functionality, we may collect and maintain information associated with those messages, such as the phone number, the wireless carrier associated with the phone number, the content of the message, and the date and time of the transaction. We may use your email address to communicate with you about our services.
- **Affiliated Google Services on other sites** – We offer some of our services on or through other web sites. Personal information that you provide to those sites may be sent to Google in order to deliver the service. We process such information under this Privacy Policy.
- **Third Party Applications** – Google may make available third party applications, such as gadgets or extensions, through its services. The information collected by Google when you enable a third party application is processed under this Privacy Policy. Information collected by the third party application provider is governed by their privacy policies.
- **Location data** – Google offers location-enabled services, such as Google Maps and Latitude. If you use those services, Google may receive information about your actual location (such as GPS signals sent by a mobile device) or information that can be used to approximate a location (such as a cell ID).
- **Unique application number** – Certain services, such as Google Toolbar, include a unique application number that is not associated with your account or you. This number and information about your installation (e.g., operating system type, version number) may be sent to Google when you install or uninstall that service or when that service periodically contacts our servers (for example, to request automatic updates to the software).
- **Other sites** – This Privacy Policy applies to Google services only. We do not exercise control over the sites displayed as search results, sites that include Google applications,

GOOG-00000384

products or services, or links from within our various services. These other sites may place their own cookies or other files on your computer, collect data or solicit personal information from you.

In addition to the above, we may use the information we collect to:

- Provide, maintain, protect, and improve our services (including advertising services) and develop new services; and
- Protect the rights or property of Google or our users.

If we use this information in a manner different than the purpose for which it was collected, then we will ask for your consent prior to such use.

Google processes personal information on our servers in the United States of America and in other countries. In some cases, we process personal information outside your own country.

## Choices

You can use the Google Dashboard to review and control the information stored in your Google Account.

Most browsers are initially set up to accept cookies, but you can reset your browser to refuse all cookies or to indicate when a cookie is being sent. However, some Google features and services may not function properly if your cookies are disabled.

Google uses the DoubleClick advertising cookie on AdSense partner sites and certain Google services to help advertisers and publishers serve and manage ads across the web. You can view and manage your ads preferences associated with this cookie by accessing the Ads Preferences Manager. In addition, you may choose to opt out of the DoubleClick cookie at any time by using DoubleClick's opt-out cookie.

## Information sharing

Google only shares personal information with other companies or individuals outside of Google in the following limited circumstances:

- We have your consent. We require opt-in consent for the sharing of any sensitive personal information.
- We provide such information to our subsidiaries, affiliated companies or other trusted businesses or persons for the purpose of processing personal information on our behalf. We

GOOG-00000385

require that these parties agree to process such information based on our instructions and in compliance with this Privacy Policy and any other appropriate confidentiality and security measures.

- We have a good faith belief that access, use, preservation or disclosure of such information is reasonably necessary to (a) satisfy any applicable law, regulation, legal process or enforceable governmental request, (b) enforce applicable Terms of Service, including investigation of potential violations thereof, (c) detect, prevent, or otherwise address fraud, security or technical issues, or (d) protect against harm to the rights, property or safety of Google, its users or the public as required or permitted by law.

If Google becomes involved in a merger, acquisition, or any form of sale of some or all of its assets, we will ensure the confidentiality of any personal information involved in such transactions and provide notice before personal information is transferred and becomes subject to a different privacy policy.

# Information security

We take appropriate security measures to protect against unauthorized access to or unauthorized alteration, disclosure or destruction of data. These include internal reviews of our data collection, storage and processing practices and security measures, including appropriate encryption and physical security measures to guard against unauthorized access to systems where we store personal data.

We restrict access to personal information to Google employees, contractors and agents who need to know that information in order to process it on our behalf. These individuals are bound by confidentiality obligations and may be subject to discipline, including termination and criminal prosecution, if they fail to meet these obligations.

# Accessing and updating personal information

When you use Google services, we make good faith efforts to provide you with access to your personal information and either to correct this data if it is inaccurate or to delete such data at your request if it is not otherwise required to be retained by law or for legitimate business purposes. We ask individual users to identify themselves and the information requested to be accessed, corrected or removed before processing such requests, and we may decline to process requests that are unreasonably repetitive or systematic, require disproportionate technical effort, jeopardize the privacy of others, or would be extremely impractical (for instance, requests concerning information residing on backup tapes), or for which access is not otherwise required. In any case

GOOG-00000386

where we provide information access and correction, we perform this service free of charge, except if doing so would require a disproportionate effort. Because of the way we maintain certain services, after you delete your information, residual copies may take a period of time before they are deleted from our active servers and may remain in our backup systems. Please review the service Help Centers for more information.

## Enforcement

Google adheres to the US Safe Harbor Privacy Principles of Notice, Choice, Onward Transfer, Security, Data Integrity, Access and Enforcement, and is registered with the U.S. Department of Commerce's Safe Harbor Program.

Google regularly reviews its compliance with this Privacy Policy. When we receive formal written complaints, it is Google's policy to contact the complaining user regarding his or her concerns. We will cooperate with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of personal data that cannot be resolved between Google and an individual.

## Changes to this Privacy Policy

Please note that this Privacy Policy may change from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We will post any Privacy Policy changes on this page and, if the changes are significant, we will provide a more prominent notice (including, for certain services, email notification of Privacy Policy changes). We will also keep prior versions of this Privacy Policy in an archive for your review.

GOOG-00000387

# Exhibit 1-38

Google

## **Policies & Principles**

- Overview
- Privacy Policy
  - Current version
  - Preview
  - Past versions
  - FAQ
- Terms of Service
- FAQ

# Privacy Policy

This Privacy Policy will be replaced with our new Privacy Policy, effective March 1, 2012. Please see our overview page for additional details.

Last modified: October 20, 2011 (view archived versions)

This Privacy Policy applies to all of the products, services and websites offered by Google Inc. or its subsidiaries or affiliated companies except Postini (Postini Privacy Policy). Sometimes, we may post product specific privacy notices or Help Center materials to explain our products in more detail.

If you have any questions about this Privacy Policy, please feel free to contact us through our website or write to us at

*Privacy Matters*
*c/o Google Inc.*
*1600 Amphitheatre Parkway*
*Mountain View, California, 94043*
*USA*

## **Information we collect and how we use it**

We may collect the following types of information:

- **Information you provide** – When you sign up for a Google Account, we ask you for personal information. We may combine the information you submit under your account with information from other Google services or third parties in order to provide you with a better experience and to improve the quality of our services. For certain services, we may give you the opportunity to opt out of combining such information. You can use the Google Dashboard to learn more about the

GOOG-00000084

information associated with your Account. If you are using Google services in conjunction with your Google Apps Account, Google provides such services in conjunction with or on behalf of your domain administrator. Your administrator will have access to your account information including your email. Consult your domain administrator's privacy policy for more information.

- **Cookies** – When you visit Google, we send one or more cookies to your computer or other device. We use cookies to improve the quality of our service, including for storing user preferences, improving search results and ad selection, and tracking user trends, such as how people search. Google also uses cookies in its advertising services to help advertisers and publishers serve and manage ads across the web and on Google services.
- **Log information** – When you access Google services via a browser, application or other client our servers automatically record certain information. These server logs may include information such as your web request, your interaction with a service, Internet Protocol address, browser type, browser language, the date and time of your request and one or more cookies that may uniquely identify your browser or your account.
- **User communications** – When you send email or other communications to Google, we may retain those communications in order to process your inquiries, respond to your requests and improve our services. When you send and receive SMS messages to or from one of our services that provides SMS functionality, we may collect and maintain information associated with those messages, such as the phone number, the wireless carrier associated with the phone number, the content of the message, and the date and time of the transaction. We may use your email address to communicate with you about our services.
- **Affiliated Google Services on other sites** – We offer some of our services on or through other web sites. Personal information that you provide to those sites may be sent to Google in order to deliver the service. We process such information under this Privacy Policy.
- **Third Party Applications** – Google may make available third party applications, such as gadgets or extensions, through its services. The information collected by Google when you enable a third party application is processed under this Privacy Policy. Information collected by the third party application provider is governed by their privacy policies.
- **Location data** – Google offers location-enabled services, such as Google Maps and Latitude. If you use those services, Google may receive information about your actual location (such as GPS signals sent by a mobile device) or information that can be used to approximate a location (such as a cell ID).
- **Unique application number** – Certain services, such as Google Toolbar, include a unique application number that is not associated with your account or you. This number and information about your installation (e.g., operating system type, version number) may be sent to Google when you install or uninstall that service or when that service periodically contacts our servers (for example, to request automatic updates to the software).
- **Other sites** – This Privacy Policy applies to Google services only. We do not exercise control over the sites displayed as search results, sites that include Google applications, products or services, or links from within our various services. These other sites may place their own cookies or other files on your computer, collect data or solicit personal information from you.

In addition to the above, we may use the information we collect to:

- Provide, maintain, protect, and improve our services (including advertising services) and develop new services; and

GOOG-00000085

- Protect the rights or property of Google or our users.

If we use this information in a manner different than the purpose for which it was collected, then we will ask for your consent prior to such use.

Google processes personal information on our servers in the United States of America and in other countries. In some cases, we process personal information outside your own country.

## Choices

You can use the Google Dashboard to review and control the information stored in your Google Account.

Most browsers are initially set up to accept cookies, but you can reset your browser to refuse all cookies or to indicate when a cookie is being sent. However, some Google features and services may not function properly if your cookies are disabled.

Google uses the DoubleClick advertising cookie on AdSense partner sites and certain Google services to help advertisers and publishers serve and manage ads across the web. You can view and manage your ads preferences associated with this cookie by accessing the Ads Preferences Manager. In addition, you may choose to opt out of the DoubleClick cookie at any time by using DoubleClick's opt-out cookie.

## Information sharing

Google only shares personal information with other companies or individuals outside of Google in the following limited circumstances:

- We have your consent. We require opt-in consent for the sharing of any sensitive personal information.
- We provide such information to our subsidiaries, affiliated companies or other trusted businesses or persons for the purpose of processing personal information on our behalf. We require that these parties agree to process such information based on our instructions and in compliance with this Privacy Policy and any other appropriate confidentiality and security measures.
- We have a good faith belief that access, use, preservation or disclosure of such information is reasonably necessary to (a) satisfy any applicable law, regulation, legal process or enforceable governmental request, (b) enforce applicable Terms of Service, including investigation of potential violations thereof, (c) detect, prevent, or otherwise address fraud, security or technical issues, or (d) protect against harm to the rights, property or safety of Google, its users or the public as required or permitted by law.

If Google becomes involved in a merger, acquisition, or any form of sale of some or all of its assets, we will ensure the confidentiality of any personal information involved in such transactions and provide notice before personal information is transferred and becomes subject to a different privacy policy.

## Information security

We take appropriate security measures to protect against unauthorized access to or unauthorized

GOOG-00000086

alteration, disclosure or destruction of data. These include internal reviews of our data collection, storage and processing practices and security measures, including appropriate encryption and physical security measures to guard against unauthorized access to systems where we store personal data.

We restrict access to personal information to Google employees, contractors and agents who need to know that information in order to process it on our behalf. These individuals are bound by confidentiality obligations and may be subject to discipline, including termination and criminal prosecution, if they fail to meet these obligations.

## Accessing and updating personal information

When you use Google services, we make good faith efforts to provide you with access to your personal information and either to correct this data if it is inaccurate or to delete such data at your request if it is not otherwise required to be retained by law or for legitimate business purposes. We ask individual users to identify themselves and the information requested to be accessed, corrected or removed before processing such requests, and we may decline to process requests that are unreasonably repetitive or systematic, require disproportionate technical effort, jeopardize the privacy of others, or would be extremely impractical (for instance, requests concerning information residing on backup tapes), or for which access is not otherwise required. In any case where we provide information access and correction, we perform this service free of charge, except if doing so would require a disproportionate effort. Because of the way we maintain certain services, after you delete your information, residual copies may take a period of time before they are deleted from our active servers and may remain in our backup systems. Please review the service Help Centers for more information.

## Enforcement

Google complies with the U.S.-EU Safe Harbor Framework and the U.S.-Swiss Safe Harbor Framework as set forth by the U.S. Department of Commerce regarding the collection, use, and retention of personal information from European Union member countries and Switzerland. Google has certified that it adheres to the Safe Harbor Privacy Principles of notice, choice, onward transfer, security, data integrity, access, and enforcement. To learn more about the Safe Harbor program, and to view Google's certification, please visit the Safe Harbor website.

Google regularly reviews its compliance with this Privacy Policy. When we receive formal written complaints, it is Google's policy to contact the complaining user regarding his or her concerns. We will cooperate with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of personal data that cannot be resolved between Google and an individual.

## Changes to this Privacy Policy

Please note that this Privacy Policy may change from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We will post any Privacy Policy changes on this page and, if the changes are significant, we will provide a more prominent notice (including, for certain services, email notification of Privacy Policy changes). We will also keep prior versions of this Privacy Policy in an archive for your review.

GOOG-00000087

## Privacy resources

- Privacy tools
- Blog posts
- Principles
- Videos

## Product information

- Advertising
- Chrome
- Street View
- Web History

## Product policies

Google's Privacy Policy describes how we treat personal information when you use Google's products and services.

The following statements explain specific privacy practices with respect to certain products and services:

- +1 Button
- Advertising
- Advisor
- Apps
- Blogger
- Books
- Buzz
- Checkout
- Chrome
- Chrome Frame
- Gears
- Google+
- Google Music
- Google Notebook
- Google TV
- Google Web Toolkit
- Groups
- Health
- Knol
- Location Service in Firefox
- Mobile
- Moderator
- Orkut
- Picasa

GOOG-00000088

- Postini
- Safe Browsing
- Sites
- Store
- Toolbar
- Trader
- Translator Toolkit
- Voice
- Web Accelerator
- Web History
- YouTube

English ▼

- © Google
- Privacy Policy
- Terms of Service

GOOG-00000089

# Exhibit 1-39

Google

## **Policies & Principles**

- Overview
- Privacy
    - Privacy Policy
    - Advertising
    - Principles
    - Tools
    - Blogs
    - Videos
    - FAQ
- Terms of Service

- Current version
- Past versions
- Self Regulatory Frameworks
- Key terms

# **Privacy Policy**

Last modified: March 1, 2012 (view archived versions)

There are many different ways you can use our services – to search for and share information, to communicate with other people or to create new content. When you share information with us, for example by creating a Google Account, we can make those services even better – to show you more relevant search results and ads, to help you connect with people or to make sharing with others quicker and easier. As you use our services, we want you to be clear how we're using information and the ways in which you can protect your privacy.

Our Privacy Policy explains:

- What information we collect and why we collect it.
- How we use that information.
- The choices we offer, including how to access and update information.

We've tried to keep it as simple as possible, but if you're not familiar with terms like cookies, IP addresses, pixel tags and browsers, then read about these key terms first. Your privacy matters to Google so whether you are new to Google or a long-time user, please do take the time to get to know our practices – and if you have any questions contact us.

GOOG-00000096

## Information we collect

We collect information to provide better services to all of our users – from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful or the people who matter most to you online.

We collect information in two ways:

- **Information you give us.** For example, many of our services require you to sign up for a Google Account. When you do, we'll ask for <u>personal information</u>, like your name, email address, telephone number or credit card. If you want to take full advantage of the sharing features we offer, we might also ask you to create a publicly visible <u>Google Profile</u>, which may include your name and photo.

- **Information we get from your use of our services.** We may collect information about the services that you use and how you use them, like when you visit a website that uses our advertising services or you view and interact with our ads and content. This information includes:

  - **Device information**

    We may collect device-specific information (such as your hardware model, operating system version, unique device identifiers, and mobile network information including phone number). Google may associate your device identifiers or phone number with your Google Account.

  - **Log information**

    When you use our services or view content provided by Google, we may automatically collect and store certain information in <u>server logs</u>. This may include:

    - details of how you used our service, such as your search queries.
    - telephony log information like your phone number, calling-party number, forwarding numbers, time and date of calls, duration of calls, SMS routing information and types of calls.
    - <u>Internet protocol address</u>.
    - device event information such as crashes, system activity, hardware settings, browser type, browser language, the date and time of your request and referral URL.
    - cookies that may uniquely identify your browser or your Google Account.

  - **Location information**

    When you use a location-enabled Google service, we may collect and process information about your actual location, like GPS signals sent by a mobile device. We may also use various technologies to determine location, such as sensor data from your device that may, for example, provide information on nearby Wi-Fi access points and cell towers.

  - **Unique application numbers**

Certain services include a unique application number. This number and information about your installation (for example, the operating system type and application version number) may be sent to Google when you install or uninstall that service or when that service periodically contacts our servers, such as for automatic updates.

○ **Local storage**

We may collect and store information (including personal information) locally on your device using mechanisms such as browser web storage (including HTML 5) and application data caches.

○ **Cookies and anonymous identifiers**

We use various technologies to collect and store information when you visit a Google service, and this may include sending one or more <u>cookies</u> or <u>anonymous identifiers</u> to your device. We also use cookies and anonymous identifiers when you interact with services we offer to our partners, such as advertising services or Google features that may appear on other sites.

## How we use information we collect

We use the information we collect from all of our services to provide, maintain, protect and improve them, to develop new ones, and to protect Google and our users. We also use this information to offer you tailored content – like giving you more relevant search results and ads.

We may use the name you provide for your Google Profile across all of the services we offer that require a Google Account. In addition, we may replace past names associated with your Google Account so that you are represented consistently across all our services. If other users already have your email, or other information that identifies you, we may show them your publicly visible Google Profile information, such as your name and photo.

When you contact Google, we may keep a record of your communication to help solve any issues you might be facing. We may use your email address to inform you about our services, such as letting you know about upcoming changes or improvements.

We use information collected from cookies and other technologies, like <u>pixel tags</u>, to improve your user experience and the overall quality of our services. For example, by saving your language preferences, we'll be able to have our services appear in the language you prefer. When showing you tailored ads, we will not associate a cookie or anonymous identifier with sensitive categories, such as those based on race, religion, sexual orientation or health.

We may combine personal information from one service with information, including personal information, from other Google services – for example to make it easier to share things with people you know. We will not combine DoubleClick cookie information with personally identifiable information unless we have your opt-in consent.

We will ask for your consent before using information for a purpose other than those that are set out in

GOOG-00000098

this Privacy Policy.

Google processes personal information on our servers in many countries around the world. We may process your personal information on a server located outside the country where you live.

## Transparency and choice

People have different privacy concerns. Our goal is to be clear about what information we collect, so that you can make meaningful choices about how it is used. For example, you can:

- <u>Review and control</u> certain types of information tied to your Google Account by using Google Dashboard.
- <u>View and edit</u> your ads preferences, such as which categories might interest you, using the Ads Preferences Manager. You can also opt out of certain Google advertising services here.
- <u>Use our editor</u> to see and adjust how your Google Profile appears to particular individuals.
- <u>Control</u> who you share information with.
- <u>Take information</u> out of many of our services.

You may also set your browser to block all cookies, including cookies associated with our services, or to indicate when a cookie is being set by us. However, it's important to remember that many of our services may not function properly if your cookies are disabled. For example, we may not remember your language preferences.

## Information you share

Many of our services let you share information with others. Remember that when you share information publicly, it may be indexable by search engines, including Google. Our services provide you with different options on sharing and removing your content.

## Accessing and updating your personal information

Whenever you use our services, we aim to provide you with access to your personal information. If that information is wrong, we strive to give you ways to update it quickly or to delete it – unless we have to keep that information for legitimate business or legal purposes. When updating your personal information, we may ask you to verify your identity before we can act on your request.

We may reject requests that are unreasonably repetitive, require disproportionate technical effort (for example, developing a new system or fundamentally changing an existing practice), risk the privacy of others, or would be extremely impractical (for instance, requests concerning information residing on backup tapes).

Where we can provide information access and correction, we will do so for free, except where it would require a disproportionate effort. We aim to maintain our services in a manner that protects information from accidental or malicious destruction. Because of this, after you delete information from our services, we may not immediately delete residual copies from our active servers and may not remove information from our backup systems.

GOOG-00000099

## Information we share

We do not share personal information with companies, organizations and individuals outside of Google unless one of the following circumstances apply:

- **With your consent**

  We will share personal information with companies, organizations or individuals outside of Google when we have your consent to do so. We require opt-in consent for the sharing of any sensitive personal information.

- **With domain administrators**

  If your Google Account is managed for you by a domain administrator (for example, for Google Apps users) then your domain administrator and resellers who provide user support to your organization will have access to your Google Account information (including your email and other data). Your domain administrator may be able to:

  - view statistics regarding your account, like statistics regarding applications you install.
  - change your account password.
  - suspend or terminate your account access.
  - access or retain information stored as part of your account.
  - receive your account information in order to satisfy applicable law, regulation, legal process or enforceable governmental request.
  - restrict your ability to delete or edit information or privacy settings.

  Please refer to your domain administrator's privacy policy for more information.

- **For external processing**

  We provide personal information to our affiliates or other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures.

- **For legal reasons**

  We will share personal information with companies, organizations or individuals outside of Google if we have a good-faith belief that access, use, preservation or disclosure of the information is reasonably necessary to:

  - meet any applicable law, regulation, legal process or enforceable governmental request.
  - enforce applicable Terms of Service, including investigation of potential violations.
  - detect, prevent, or otherwise address fraud, security or technical issues.
  - protect against harm to the rights, property or safety of Google, our users or the public as required or permitted by law.

We may share aggregated, non-personally identifiable information publicly and with our partners – like publishers, advertisers or connected sites. For example, we may share information publicly to show

GOOG-00000100

trends about the general use of our services.

If Google is involved in a merger, acquisition or asset sale, we will continue to ensure the confidentiality of any personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.

## Information security

We work hard to protect Google and our users from unauthorized access to or unauthorized alteration, disclosure or destruction of information we hold. In particular:

- We encrypt many of our services using SSL.
- We offer you two step verification when you access your Google Account, and a Safe Browsing feature in Google Chrome.
- We review our information collection, storage and processing practices, including physical security measures, to guard against unauthorized access to systems.
- We restrict access to personal information to Google employees, contractors and agents who need to know that information in order to process it for us, and who are subject to strict contractual confidentiality obligations and may be disciplined or terminated if they fail to meet these obligations.

## Application

Our Privacy Policy applies to all of the services offered by Google Inc. and its affiliates, including services offered on other sites (such as our advertising services), but excludes services that have separate privacy policies that do not incorporate this Privacy Policy.

Our Privacy Policy does not apply to services offered by other companies or individuals, including products or sites that may be displayed to you in search results, sites that may include Google services, or other sites linked from our services. Our Privacy Policy does not cover the information practices of other companies and organizations who advertise our services, and who may use cookies, pixel tags and other technologies to serve and offer relevant ads.

## Enforcement

We regularly review our compliance with our Privacy Policy. We also adhere to several self regulatory frameworks. When we receive formal written complaints, we will contact the person who made the complaint to follow up. We work with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of personal data that we cannot resolve with our users directly.

## Changes

Our Privacy Policy may change from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We will post any privacy policy changes on this page and, if the changes are significant, we will provide a more prominent notice (including, for certain services, email

GOOG-00000101

notification of privacy policy changes). We will also keep prior versions of this Privacy Policy in an archive for your review.

## Specific product practices

The following notices explain specific privacy practices with respect to certain Google products and services that you may use:

- Chrome and Chrome OS
- Books
- Wallet



- Google
- Privacy & Terms

GOOG-00000102

# Exhibit 1-40

Google

## Policies & Principles

Skip to content

1. Overview
2. Privacy Policy

- Privacy Policy
- Self Regulatory Frameworks
- Key terms
- Archive

# Privacy Policy

Last modified: June 24, 2013 (view archived versions)

There are many different ways you can use our services – to search for and share information, to communicate with other people or to create new content. When you share information with us, for example by creating a Google Account, we can make those services even better – to show you more relevant search results and ads, to help you connect with people or to make sharing with others quicker and easier. As you use our services, we want you to be clear how we're using information and the ways in which you can protect your privacy.

Our Privacy Policy explains:

- What information we collect and why we collect it.
- How we use that information.
- The choices we offer, including how to access and update information.

We've tried to keep it as simple as possible, but if you're not familiar with terms like cookies, IP addresses, pixel tags and browsers, then read about these key terms first. Your privacy matters to Google so whether you are new to Google or a long-time user, please do take the time to get to know our practices – and if you have any questions contact us.

## Information we collect

We collect information to provide better services to all of our users – from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful or the people who matter most to you online.

We collect information in two ways:

GOOG-00000187

- **Information you give us.** For example, many of our services require you to sign up for a Google Account. When you do, we'll ask for personal information, like your name, email address, telephone number or credit card. If you want to take full advantage of the sharing features we offer, we might also ask you to create a publicly visible Google Profile, which may include your name and photo.

- **Information we get from your use of our services.** We may collect information about the services that you use and how you use them, like when you visit a website that uses our advertising services or you view and interact with our ads and content. This information includes:

  - **Device information**

    We may collect device-specific information (such as your hardware model, operating system version, unique device identifiers, and mobile network information including phone number). Google may associate your device identifiers or phone number with your Google Account.

  - **Log information**

    When you use our services or view content provided by Google, we may automatically collect and store certain information in server logs. This may include:

    - details of how you used our service, such as your search queries.
    - telephony log information like your phone number, calling-party number, forwarding numbers, time and date of calls, duration of calls, SMS routing information and types of calls.
    - Internet protocol address.
    - device event information such as crashes, system activity, hardware settings, browser type, browser language, the date and time of your request and referral URL.
    - cookies that may uniquely identify your browser or your Google Account.

  - **Location information**

    When you use a location-enabled Google service, we may collect and process information about your actual location, like GPS signals sent by a mobile device. We may also use various technologies to determine location, such as sensor data from your device that may, for example, provide information on nearby Wi-Fi access points and cell towers.

  - **Unique application numbers**

    Certain services include a unique application number. This number and information about your installation (for example, the operating system type and application version number) may be sent to Google when you install or uninstall that service or when that service periodically contacts our servers, such as for automatic updates.

  - **Local storage**

    We may collect and store information (including personal information) locally on your

device using mechanisms such as browser web storage (including HTML 5) and application data caches.

- ○ **Cookies and anonymous identifiers**

  We use various technologies to collect and store information when you visit a Google service, and this may include sending one or more cookies or anonymous identifiers to your device. We also use cookies and anonymous identifiers when you interact with services we offer to our partners, such as advertising services or Google features that may appear on other sites.

## How we use information we collect

We use the information we collect from all of our services to provide, maintain, protect and improve them, to develop new ones, and to protect Google and our users. We also use this information to offer you tailored content – like giving you more relevant search results and ads.

We may use the name you provide for your Google Profile across all of the services we offer that require a Google Account. In addition, we may replace past names associated with your Google Account so that you are represented consistently across all our services. If other users already have your email, or other information that identifies you, we may show them your publicly visible Google Profile information, such as your name and photo.

When you contact Google, we may keep a record of your communication to help solve any issues you might be facing. We may use your email address to inform you about our services, such as letting you know about upcoming changes or improvements.

We use information collected from cookies and other technologies, like pixel tags, to improve your user experience and the overall quality of our services. For example, by saving your language preferences, we'll be able to have our services appear in the language you prefer. When showing you tailored ads, we will not associate a cookie or anonymous identifier with sensitive categories, such as those based on race, religion, sexual orientation or health.

We may combine personal information from one service with information, including personal information, from other Google services – for example to make it easier to share things with people you know. We will not combine DoubleClick cookie information with personally identifiable information unless we have your opt-in consent.

We will ask for your consent before using information for a purpose other than those that are set out in this Privacy Policy.

Google processes personal information on our servers in many countries around the world. We may process your personal information on a server located outside the country where you live.

## Transparency and choice

People have different privacy concerns. Our goal is to be clear about what information we collect, so that

GOOG-00000189

you can make meaningful choices about how it is used. For example, you can:

- Review and control certain types of information tied to your Google Account by using Google Dashboard.
- View and edit your ads preferences, such as which categories might interest you, using Ads Settings. You can also opt out of certain Google advertising services here.
- Use our editor to see and adjust how your Google Profile appears to particular individuals.
- Control who you share information with.
- Take information out of many of our services.

You may also set your browser to block all cookies, including cookies associated with our services, or to indicate when a cookie is being set by us. However, it's important to remember that many of our services may not function properly if your cookies are disabled. For example, we may not remember your language preferences.

## Information you share

Many of our services let you share information with others. Remember that when you share information publicly, it may be indexable by search engines, including Google. Our services provide you with different options on sharing and removing your content.

## Accessing and updating your personal information

Whenever you use our services, we aim to provide you with access to your personal information. If that information is wrong, we strive to give you ways to update it quickly or to delete it – unless we have to keep that information for legitimate business or legal purposes. When updating your personal information, we may ask you to verify your identity before we can act on your request.

We may reject requests that are unreasonably repetitive, require disproportionate technical effort (for example, developing a new system or fundamentally changing an existing practice), risk the privacy of others, or would be extremely impractical (for instance, requests concerning information residing on backup tapes).

Where we can provide information access and correction, we will do so for free, except where it would require a disproportionate effort. We aim to maintain our services in a manner that protects information from accidental or malicious destruction. Because of this, after you delete information from our services, we may not immediately delete residual copies from our active servers and may not remove information from our backup systems.

## Information we share

We do not share personal information with companies, organizations and individuals outside of Google unless one of the following circumstances apply:

- **With your consent**

GOOG-00000190

We will share personal information with companies, organizations or individuals outside of Google when we have your consent to do so. We require opt-in consent for the sharing of any sensitive personal information.

- **With domain administrators**

  If your Google Account is managed for you by a domain administrator (for example, for Google Apps users) then your domain administrator and resellers who provide user support to your organization will have access to your Google Account information (including your email and other data). Your domain administrator may be able to:

  - view statistics regarding your account, like statistics regarding applications you install.
  - change your account password.
  - suspend or terminate your account access.
  - access or retain information stored as part of your account.
  - receive your account information in order to satisfy applicable law, regulation, legal process or enforceable governmental request.
  - restrict your ability to delete or edit information or privacy settings.

  Please refer to your domain administrator's privacy policy for more information.

- **For external processing**

  We provide personal information to our affiliates or other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures.

- **For legal reasons**

  We will share personal information with companies, organizations or individuals outside of Google if we have a good-faith belief that access, use, preservation or disclosure of the information is reasonably necessary to:

  - meet any applicable law, regulation, legal process or enforceable governmental request.
  - enforce applicable Terms of Service, including investigation of potential violations.
  - detect, prevent, or otherwise address fraud, security or technical issues.
  - protect against harm to the rights, property or safety of Google, our users or the public as required or permitted by law.

We may share aggregated, non-personally identifiable information publicly and with our partners – like publishers, advertisers or connected sites. For example, we may share information publicly to show trends about the general use of our services.

If Google is involved in a merger, acquisition or asset sale, we will continue to ensure the confidentiality of any personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.

## Information security

We work hard to protect Google and our users from unauthorized access to or unauthorized alteration, disclosure or destruction of information we hold. In particular:

- We encrypt many of our services using SSL.
- We offer you two step verification when you access your Google Account, and a Safe Browsing feature in Google Chrome.
- We review our information collection, storage and processing practices, including physical security measures, to guard against unauthorized access to systems.
- We restrict access to personal information to Google employees, contractors and agents who need to know that information in order to process it for us, and who are subject to strict contractual confidentiality obligations and may be disciplined or terminated if they fail to meet these obligations.

## Application

Our Privacy Policy applies to all of the services offered by Google Inc. and its affiliates, including services offered on other sites (such as our advertising services), but excludes services that have separate privacy policies that do not incorporate this Privacy Policy.

Our Privacy Policy does not apply to services offered by other companies or individuals, including products or sites that may be displayed to you in search results, sites that may include Google services, or other sites linked from our services. Our Privacy Policy does not cover the information practices of other companies and organizations who advertise our services, and who may use cookies, pixel tags and other technologies to serve and offer relevant ads.

## Enforcement

We regularly review our compliance with our Privacy Policy. We also adhere to several self regulatory frameworks. When we receive formal written complaints, we will contact the person who made the complaint to follow up. We work with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of personal data that we cannot resolve with our users directly.

## Changes

Our Privacy Policy may change from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We will post any privacy policy changes on this page and, if the changes are significant, we will provide a more prominent notice (including, for certain services, email notification of privacy policy changes). We will also keep prior versions of this Privacy Policy in an archive for your review.

## Specific product practices

The following notices explain specific privacy practices with respect to certain Google products and services that you may use:

- Chrome and Chrome OS
- Books
- Wallet
- Fiber

## Good to Know

- Our Good to Know site helps you stay safe and protect your family's information online. Visit to learn more

## Our legal policies

- Privacy Policy
- Terms of Service
- FAQ

## Some technical details

- Technologies and Principles
- Advertising
- How Google uses cookies
- How Google uses pattern recognition
- Types of location data used by Google
- How Google Wallet uses credit card numbers
- How Google Voice works

Change language:  English ▼

- Google
- About Google
- Privacy & Terms

GOOG-00000193

# Exhibit 1-41



## <u>Policies & Principles</u>

<u>Skip to content</u>

1. <u>Overview</u>
2. Privacy Policy

- Privacy Policy
- <u>Self Regulatory Frameworks</u>
- <u>Key terms</u>
- <u>Updates</u>

# Privacy Policy

Last modified: December 20, 2013 (<u>view archived versions</u>)

There are many different ways you can use our services – to search for and share information, to communicate with other people or to create new content. When you share information with us, for example by creating a <u>Google Account</u>, we can make those services even better – to show you more relevant search results and ads, to help you connect with people or to make sharing with others quicker and easier. As you use our services, we want you to be clear how we're using information and the ways in which you can protect your privacy.

Our Privacy Policy explains:

- What information we collect and why we collect it.
- How we use that information.
- The choices we offer, including how to access and update information.

We've tried to keep it as simple as possible, but if you're not familiar with terms like cookies, IP addresses, pixel tags and browsers, then read about these <u>key terms</u> first. Your privacy matters to Google so whether you are new to Google or a long-time user, please do take the time to get to know our practices – and if you have any questions <u>consult this page</u>.

## Information we collect

We collect information to provide better services to all of our users – from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful or the people who matter most to you online.

GOOG-00000222

We collect information in two ways:

- **Information you give us.** For example, many of our services require you to sign up for a Google Account. When you do, we'll ask for personal information, like your name, email address, telephone number or credit card. If you want to take full advantage of the sharing features we offer, we might also ask you to create a publicly visible Google Profile, which may include your name and photo.

- **Information we get from your use of our services.** We may collect information about the services that you use and how you use them, like when you visit a website that uses our advertising services or you view and interact with our ads and content. This information includes:

  - **Device information**

    We may collect device-specific information (such as your hardware model, operating system version, unique device identifiers, and mobile network information including phone number). Google may associate your device identifiers or phone number with your Google Account.

  - **Log information**

    When you use our services or view content provided by Google, we may automatically collect and store certain information in server logs. This may include:

    - details of how you used our service, such as your search queries.
    - telephony log information like your phone number, calling-party number, forwarding numbers, time and date of calls, duration of calls, SMS routing information and types of calls.
    - Internet protocol address.
    - device event information such as crashes, system activity, hardware settings, browser type, browser language, the date and time of your request and referral URL.
    - cookies that may uniquely identify your browser or your Google Account.

  - **Location information**

    When you use a location-enabled Google service, we may collect and process information about your actual location, like GPS signals sent by a mobile device. We may also use various technologies to determine location, such as sensor data from your device that may, for example, provide information on nearby Wi-Fi access points and cell towers.

  - **Unique application numbers**

    Certain services include a unique application number. This number and information about your installation (for example, the operating system type and application version number) may be sent to Google when you install or uninstall that service or when that service periodically contacts our servers, such as for automatic updates.

  - **Local storage**

GOOG-00000223

We may collect and store information (including personal information) locally on your device using mechanisms such as browser web storage (including HTML 5) and application data caches.

- ○ **Cookies and anonymous identifiers**

  We use various technologies to collect and store information when you visit a Google service, and this may include sending one or more <u>cookies</u> or <u>anonymous identifiers</u> to your device. We also use cookies and anonymous identifiers when you interact with services we offer to our partners, such as advertising services or Google features that may appear on other sites.

# How we use information we collect

We use the information we collect from all of our services to provide, maintain, protect and improve them, to develop new ones, and to protect Google and our users. We also use this information to offer you tailored content – like giving you more relevant search results and ads.

We may use the name you provide for your Google Profile across all of the services we offer that require a Google Account. In addition, we may replace past names associated with your Google Account so that you are represented consistently across all our services. If other users already have your email, or other information that identifies you, we may show them your publicly visible Google Profile information, such as your name and photo.

When you contact Google, we may keep a record of your communication to help solve any issues you might be facing. We may use your email address to inform you about our services, such as letting you know about upcoming changes or improvements.

We use information collected from cookies and other technologies, like <u>pixel tags</u>, to improve your user experience and the overall quality of our services. For example, by saving your language preferences, we'll be able to have our services appear in the language you prefer. When showing you tailored ads, we will not associate a cookie or anonymous identifier with sensitive categories, such as those based on race, religion, sexual orientation or health.

We may combine personal information from one service with information, including personal information, from other Google services – for example to make it easier to share things with people you know. We will not combine DoubleClick cookie information with personally identifiable information unless we have your opt-in consent.

We will ask for your consent before using information for a purpose other than those that are set out in this Privacy Policy.

Google processes personal information on our servers in many countries around the world. We may process your personal information on a server located outside the country where you live.

# Transparency and choice

People have different privacy concerns. Our goal is to be clear about what information we collect, so that you can make meaningful choices about how it is used. For example, you can:

- Review and control certain types of information tied to your Google Account by using Google Dashboard.
- View and edit your preferences about the ads shown to you on Google and across the web, such as which categories might interest you, using Ads Settings. You can also opt out of certain Google advertising services here.
- Use our editor to see and adjust how your Google Profile appears to particular individuals.
- Control who you share information with.
- Take information out of many of our services.

You may also set your browser to block all cookies, including cookies associated with our services, or to indicate when a cookie is being set by us. However, it's important to remember that many of our services may not function properly if your cookies are disabled. For example, we may not remember your language preferences.

## Information you share

Many of our services let you share information with others. Remember that when you share information publicly, it may be indexable by search engines, including Google. Our services provide you with different options on sharing and removing your content.

## Accessing and updating your personal information

Whenever you use our services, we aim to provide you with access to your personal information. If that information is wrong, we strive to give you ways to update it quickly or to delete it – unless we have to keep that information for legitimate business or legal purposes. When updating your personal information, we may ask you to verify your identity before we can act on your request.

We may reject requests that are unreasonably repetitive, require disproportionate technical effort (for example, developing a new system or fundamentally changing an existing practice), risk the privacy of others, or would be extremely impractical (for instance, requests concerning information residing on backup systems).

Where we can provide information access and correction, we will do so for free, except where it would require a disproportionate effort. We aim to maintain our services in a manner that protects information from accidental or malicious destruction. Because of this, after you delete information from our services, we may not immediately delete residual copies from our active servers and may not remove information from our backup systems.

## Information we share

We do not share personal information with companies, organizations and individuals outside of Google unless one of the following circumstances applies:

- **With your consent**

  We will share personal information with companies, organizations or individuals outside of Google when we have your consent to do so. We require opt-in consent for the sharing of any sensitive personal information.

- **With domain administrators**

  If your Google Account is managed for you by a domain administrator (for example, for Google Apps users) then your domain administrator and resellers who provide user support to your organization will have access to your Google Account information (including your email and other data). Your domain administrator may be able to:

  - view statistics regarding your account, like statistics regarding applications you install.
  - change your account password.
  - suspend or terminate your account access.
  - access or retain information stored as part of your account.
  - receive your account information in order to satisfy applicable law, regulation, legal process or enforceable governmental request.
  - restrict your ability to delete or edit information or privacy settings.

  Please refer to your domain administrator's privacy policy for more information.

- **For external processing**

  We provide personal information to our affiliates or other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures.

- **For legal reasons**

  We will share personal information with companies, organizations or individuals outside of Google if we have a good-faith belief that access, use, preservation or disclosure of the information is reasonably necessary to:

  - meet any applicable law, regulation, legal process or enforceable governmental request.
  - enforce applicable Terms of Service, including investigation of potential violations.
  - detect, prevent, or otherwise address fraud, security or technical issues.
  - protect against harm to the rights, property or safety of Google, our users or the public as required or permitted by law.

We may share aggregated, non-personally identifiable information publicly and with our partners – like publishers, advertisers or connected sites. For example, we may share information publicly to show trends about the general use of our services.

If Google is involved in a merger, acquisition or asset sale, we will continue to ensure the confidentiality of any personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.

GOOG-00000226

# Information security

We work hard to protect Google and our users from unauthorized access to or unauthorized alteration, disclosure or destruction of information we hold. In particular:

- We encrypt many of our services using SSL.
- We offer you two step verification when you access your Google Account, and a Safe Browsing feature in Google Chrome.
- We review our information collection, storage and processing practices, including physical security measures, to guard against unauthorized access to systems.
- We restrict access to personal information to Google employees, contractors and agents who need to know that information in order to process it for us, and who are subject to strict contractual confidentiality obligations and may be disciplined or terminated if they fail to meet these obligations.

# Application

Our Privacy Policy applies to all of the services offered by Google Inc. and its affiliates, including services offered on other sites (such as our advertising services), but excludes services that have separate privacy policies that do not incorporate this Privacy Policy.

Our Privacy Policy does not apply to services offered by other companies or individuals, including products or sites that may be displayed to you in search results, sites that may include Google services, or other sites linked from our services. Our Privacy Policy does not cover the information practices of other companies and organizations who advertise our services, and who may use cookies, pixel tags and other technologies to serve and offer relevant ads.

# Enforcement

We regularly review our compliance with our Privacy Policy. We also adhere to several self regulatory frameworks. When we receive formal written complaints, we will contact the person who made the complaint to follow up. We work with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of personal data that we cannot resolve with our users directly.

# Changes

Our Privacy Policy may change from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We will post any privacy policy changes on this page and, if the changes are significant, we will provide a more prominent notice (including, for certain services, email notification of privacy policy changes). We will also keep prior versions of this Privacy Policy in an archive for your review.

# Specific product practices

The following notices explain specific privacy practices with respect to certain Google products and services that you may use:

- Chrome and Chrome OS
- Books
- Wallet
- Fiber

## Good to Know

- Our Good to Know site helps you stay safe and protect your family's information online. Visit to learn more

## Our legal policies

- Privacy Policy
- Terms of Service
- FAQ

## Some technical details

- Technologies and Principles
- Advertising
- How Google uses cookies
- How Google uses pattern recognition
- Types of location data used by Google
- How Google Wallet uses credit card numbers
- How Google Voice works

Change language: English ▼

- Google
- About Google
- Privacy & Terms

GOOG-00000228

# Exhibit 1-42



**Privacy & Terms**

# Privacy Policy

Information we collect

How we use information we collect

Transparency and choice

Information you share

Accessing and updating your personal information

Information we share

Information security

When this Privacy Policy applies

Compliance and cooperation with regulatory authorities

Changes

Specific product practices

Other useful privacy and security related materials

Last modified: March 31, 2014 (view archived versions)                    Hide examples

There are many different ways you can use our services – to search for and share information, to communicate with other people or to create new content. When you share information with us, for example by creating a Google Account, we can make those services even better – to show you more relevant search results and ads, to help you connect with people or to make sharing with others quicker and easier. As you use our services, we want you to be clear how we're using information and the ways in which you can protect your privacy.

GOOG-00000310

Our Privacy Policy explains:

- What information we collect and why we collect it.
- How we use that information.
- The choices we offer, including how to access and update information.

We've tried to keep it as simple as possible, but if you're not familiar with terms like cookies, IP addresses, pixel tags and browsers, then read about these key terms first. Your privacy matters to Google so whether you are new to Google or a long-time user, please do take the time to get to know our practices – and if you have any questions consult this page.

# Information we collect

We collect information to provide better services to all of our users – from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful or the people who matter most to you online.

We collect information in two ways:

- **Information you give us.** For example, many of our services require you to sign up for a Google Account. When you do, we'll ask for personal information, like your name, email address, telephone number or credit card. If you want to take full advantage of the sharing features we offer, we might also ask you to create a publicly visible Google Profile, which may include your name and photo.

- **Information we get from your use of our services.** We may collect information about the services that you use and how you use them, like when you visit a website that uses our advertising services or you view and interact with our ads and content. This information includes:

  ○ **Device information**

    We may collect device-specific information (such as your hardware model, operating system version, unique device identifiers, and mobile network information including phone number). Google may associate your device identifiers or phone number with your Google Account.

  ○ **Log information**

    When you use our services or view content provided by Google, we may automatically

GOOG-00000311

collect and store certain information in <u>server logs</u>. This may include:

- details of how you used our service, such as your search queries.
- telephony log information like your phone number, calling-party number, forwarding numbers, time and date of calls, duration of calls, SMS routing information and types of calls.
- <u>Internet protocol address</u>.
- device event information such as crashes, system activity, hardware settings, browser type, browser language, the date and time of your request and referral URL.
- cookies that may uniquely identify your browser or your Google Account.

○ **Location information**

When you use a location-enabled Google service, we may collect and process information about your actual location, like GPS signals sent by a mobile device. We may also use various technologies to determine location, such as sensor data from your device that may, for example, provide information on nearby Wi-Fi access points and cell towers.

○ **Unique application numbers**

Certain services include a unique application number. This number and information about your installation (for example, the operating system type and application version number) may be sent to Google when you install or uninstall that service or when that service periodically contacts our servers, such as for automatic updates.

○ **Local storage**

We may collect and store information (including personal information) locally on your device using mechanisms such as <u>browser web storage</u> (including HTML 5) and <u>application data caches</u>.

○ **Cookies and anonymous identifiers**

We and our partners use various technologies to collect and store information when you visit a Google service, and this may include sending one or more <u>cookies</u> or <u>anonymous identifiers</u> to your device. We also use cookies and anonymous identifiers when you interact with services we offer to our partners, such as advertising services or Google features that may appear on other sites.

# How we use information we collect

We use the information we collect from all of our services to provide, maintain, protect and improve them, to develop new ones, and to protect Google and our users. We also use this information to offer you tailored content – like giving you more relevant search results and ads.

We may use the name you provide for your Google Profile across all of the services we offer that require a Google Account. In addition, we may replace past names associated with your Google Account so that you are represented consistently across all our services. If other users already have your email, or other information that identifies you, we may show them your publicly visible Google Profile information, such as your name and photo.

When you contact Google, we may keep a record of your communication to help solve any issues you might be facing. We may use your email address to inform you about our services, such as letting you know about upcoming changes or improvements.

We use information collected from cookies and other technologies, like pixel tags, to improve your user experience and the overall quality of our services. For example, by saving your language preferences, we'll be able to have our services appear in the language you prefer. When showing you tailored ads, we will not associate a cookie or anonymous identifier with sensitive categories, such as those based on race, religion, sexual orientation or health.

We may combine personal information from one service with information, including personal information, from other Google services – for example to make it easier to share things with people you know. We will not combine DoubleClick cookie information with personally identifiable information unless we have your opt-in consent.

We will ask for your consent before using information for a purpose other than those that are set out in this Privacy Policy.

Google processes personal information on our servers in many countries around the world. We may process your personal information on a server located outside the country where you live.

# Transparency and choice

People have different privacy concerns. Our goal is to be clear about what information we collect, so that you can make meaningful choices about how it is used. For example, you can:

- Review and control certain types of information tied to your Google Account by using Google

GOOG-00000313

Dashboard.
- <u>View and edit</u> your preferences about the ads shown to you on Google and across the web, such as which categories might interest you, using Ads Settings. You can also opt out of certain Google advertising services here.
- <u>Use our editor</u> to see and adjust how your Google Profile appears to particular individuals.
- <u>Control</u> who you share information with.
- <u>Take information</u> out of many of our services.

You may also set your browser to block all cookies, including cookies associated with our services, or to indicate when a cookie is being set by us. However, it's important to remember that many of our services may not function properly if your cookies are disabled. For example, we may not remember your language preferences.

# Information you share

Many of our services let you share information with others. Remember that when you share information publicly, it may be indexable by search engines, including Google. Our services provide you with different options on sharing and removing your content.

# Accessing and updating your personal information

Whenever you use our services, we aim to provide you with access to your personal information. If that information is wrong, we strive to give you ways to update it quickly or to delete it – unless we have to keep that information for legitimate business or legal purposes. When updating your personal information, we may ask you to verify your identity before we can act on your request.

We may reject requests that are unreasonably repetitive, require disproportionate technical effort (for example, developing a new system or fundamentally changing an existing practice), risk the privacy of others, or would be extremely impractical (for instance, requests concerning information residing on backup systems).

Where we can provide information access and correction, we will do so for free, except where it would require a disproportionate effort. We aim to maintain our services in a manner that protects information from accidental or malicious destruction. Because of this, after you delete information from our services, we may not immediately delete residual copies from our active servers and may not remove information from our backup systems.

# Information we share

We do not share personal information with companies, organizations and individuals outside of Google unless one of the following circumstances applies:

- **With your consent**

  We will share personal information with companies, organizations or individuals outside of Google when we have your consent to do so. We require opt-in consent for the sharing of any sensitive personal information.

- **With domain administrators**

  If your Google Account is managed for you by a domain administrator (for example, for Google Apps users) then your domain administrator and resellers who provide user support to your organization will have access to your Google Account information (including your email and other data). Your domain administrator may be able to:

  - view statistics regarding your account, like statistics regarding applications you install.
  - change your account password.
  - suspend or terminate your account access.
  - access or retain information stored as part of your account.
  - receive your account information in order to satisfy applicable law, regulation, legal process or enforceable governmental request.
  - restrict your ability to delete or edit information or privacy settings.

  Please refer to your domain administrator's privacy policy for more information.

- **For external processing**

  We provide personal information to our affiliates or other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures.

- **For legal reasons**

  We will share personal information with companies, organizations or individuals outside of Google if we have a good-faith belief that access, use, preservation or disclosure of the information is reasonably necessary to:

  - meet any applicable law, regulation, legal process or enforceable governmental

GOOG-00000315

request.

- ○ enforce applicable Terms of Service, including investigation of potential violations.
- ○ detect, prevent, or otherwise address fraud, security or technical issues.
- ○ protect against harm to the rights, property or safety of Google, our users or the public as required or permitted by law.

We may share aggregated, non-personally identifiable information publicly and with our partners – like publishers, advertisers or connected sites. For example, we may share information publicly to show trends about the general use of our services.

If Google is involved in a merger, acquisition or asset sale, we will continue to ensure the confidentiality of any personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.

# Information security

We work hard to protect Google and our users from unauthorized access to or unauthorized alteration, disclosure or destruction of information we hold. In particular:

- We encrypt many of our services using SSL.
- We offer you two step verification when you access your Google Account, and a Safe Browsing feature in Google Chrome.
- We review our information collection, storage and processing practices, including physical security measures, to guard against unauthorized access to systems.
- We restrict access to personal information to Google employees, contractors and agents who need to know that information in order to process it for us, and who are subject to strict contractual confidentiality obligations and may be disciplined or terminated if they fail to meet these obligations.

# When this Privacy Policy applies

Our Privacy Policy applies to all of the services offered by Google Inc. and its affiliates, including services offered on other sites (such as our advertising services), but excludes services that have separate privacy policies that do not incorporate this Privacy Policy.

Our Privacy Policy does not apply to services offered by other companies or individuals, including products or sites that may be displayed to you in search results, sites that may include Google services, or other sites linked from our services. Our Privacy Policy does not cover the information practices of other companies and organizations who advertise our services, and who may use

GOOG-00000316

cookies, pixel tags and other technologies to serve and offer relevant ads.

# Compliance and cooperation with regulatory authorities

We regularly review our compliance with our Privacy Policy. We also adhere to several self regulatory frameworks. When we receive formal written complaints, we will contact the person who made the complaint to follow up. We work with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of personal data that we cannot resolve with our users directly.

# Changes

Our Privacy Policy may change from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We will post any privacy policy changes on this page and, if the changes are significant, we will provide a more prominent notice (including, for certain services, email notification of privacy policy changes). We will also keep prior versions of this Privacy Policy in an archive for your review.

# Specific product practices

The following notices explain specific privacy practices with respect to certain Google products and services that you may use:

- Chrome and Chrome OS
- Books
- Wallet
- Fiber

# Other useful privacy and security related materials

Further useful privacy and security related materials can be found through Google's policies and principles pages, including:

- Information about our technologies and principles, which includes, among other things, more information on
  - how Google uses cookies.
  - technologies we use for advertising.
  - how we recognize patterns like faces.

- A page that explains what data is shared with Google when you visit websites that use our advertising, analytics and social products.
- Google's safety center, which provides information on how to stay safe and secure online.

GOOG-00000318

# Exhibit 1-43



Google Home

Google Terms of Service

Previous Policies

## Google Checkout Privacy Policy

**December 9, 2009**

(View current privacy policy)

The Google Privacy Policy describes how we treat personal information when you use Google's products and services. In addition, the following describes our privacy practices that are specific to Google Checkout.

### Information we collect and how we use it

- **Registration information** - When you sign up for Google Checkout, we ask for your personal information so that we can provide you with the service. If you register a credit or debit card, the information we require to register for the service includes your name, credit or debit card number, card expiration date, card verification number (CVN), address, phone number, and email address. If you register a Carrier Billing Account, the information that we require to register for the service includes your mobile telephone number, and the name and billing address associated with that number. For sellers, we also require you to provide your bank account number, and in some situations, your personal address, your business category, a government-issued identification number (for example, social security number or taxpayer identification number for U.S. residents), and certain information about your sales or transaction volume. This information allows us to process payments and protect users from fraud. In some cases, we may also ask you to send us additional information or to answer additional questions to help verify your information. The information we collect is stored in association with your Google Account.

- **Information obtained from third parties** - In order to protect you from fraud or other misconduct, we may obtain information about you from third parties to verify the information you provide. For example, we may use card authorization and fraud screening services to verify that your credit or debit card information and address match the information that you provided to us. Also, for sellers, we may obtain information about you and your business from a credit bureau or a business information service such as Dun & Bradstreet. We also may obtain information from third parties in connection with providing Google Checkout to you, such as information from the Carrier in connection with Carrier Billing.

- **Transaction information** - When you use Google Checkout to conduct a transaction, we collect information about each transaction, including the transaction amount, a description provided by the seller of the goods or services being purchased, the names of the seller and buyer, and the type of payment used.

- **Information about your use of the service** - In order to protect you from fraud, phishing, and other misconduct, we may collect information about your interaction with the service to help validate your identity or detect potentially fraudulent conduct. For example, in some circumstances we may try to determine service usage patterns (such as how quickly you type) so that we can try to detect and prevent unauthorized attempts to access your account (such as automated hacking attacks, or the use of stolen usernames or passwords). Any such information we collect will only be used to detect and prevent fraud or other misconduct, unless you explicitly grant us permission to use it in another manner.

- **Google cookies** - When you access a Google Checkout webpage, we send one

GOOG-00000856

or more cookies - a small file containing a string of characters - to your computer that uniquely identifies your browser. We use cookies to improve the quality of our service by storing user preferences and tracking user trends. Most browsers are initially set up to accept cookies, but you can reset your browser to refuse all cookies or to indicate when a cookie is being sent. Please note that you will not be able to access Google Checkout if your cookies are disabled.

- **Log information** - When you use Google Checkout, our servers automatically record information that your browser sends whenever you visit a website. These server logs may include information such as your web request, Internet Protocol address, browser type, browser language, the date and time of your request and one or more cookies that may uniquely identify your browser.

- **User communications** - When you send email or other communication to us, we may retain those communications in order to process your inquiries, respond to your requests and improve our services.

- **Links** - We may present links in a format that enables us to keep track of whether these links have been followed. We use this information to improve the quality of our search technology, customized content and advertising. For more information about links and redirected URLs, please see our FAQs.

In addition to the above, we use the information we collect to:

- Provide our products and services to you, including the display of customized content and advertising;
- Perform auditing, research and analysis in order to maintain, protect and improve our services;
- Ensure the technical functioning of our network; and
- Develop new services.

We process personal information on our servers in the United States of America and in other countries. In some cases, we process personal information on a server outside your own country. We may process personal information to provide our own services. In some cases, we may process personal information on behalf of and according to the instructions of a third party, such as our advertising partners.

### Information sharing

We will not sell or rent your personal information to companies or individuals outside of Google. If you are making a purchase through Google Checkout, we may share portions of your credit card number with the seller to identify the transaction, but we will not share your full credit card number with the seller without your opt-in consent, except in the limited circumstances described below. In addition, we will only share your personal information with other companies or individuals outside of Google in the following circumstances:

- As necessary to process your transaction and maintain your account. As with any credit card payment, if you process a credit card transaction through the service, we need to share some information (for example, your name and credit card number) with the banks and other entities in the financial system that process credit card transactions. For payment transactions processed through your Carrier Billing Account, we will need to share information with the Carrier holding your Carrier Billing Account in order to charge your Carrier Billing Account and for other purposes related to processing Carrier Billing transactions, such as purchases, reversals, refunds, adjustments, disputes and customer support. Some sellers require that their buyers provide a telephone number in order to process a transaction. In those cases, we will share your telephone number with the merchant, and you will be notified of that sharing before you complete your

GOOG-00000857

transaction.

- To detect, prevent, or otherwise address fraud, security or technical issues.
- We have your consent. We require opt-in consent for the sharing of any sensitive personal information.
- We provide such information to our subsidiaries, affiliated companies or other trusted businesses or persons for the purpose of processing personal information on our behalf. We require that these parties agree to process such information based on our instructions and in compliance with this Policy and any other appropriate confidentiality and security measures.
- We have a good faith belief that access, use, preservation or disclosure of such information is reasonably necessary to (a) satisfy any applicable law, regulation, legal process or enforceable governmental request, (b) enforce applicable Terms of Service, including investigation of potential violations thereof, (c) detect, prevent, or otherwise address fraud, security or technical issues, or (d) protect against imminent harm to the rights, property or safety of Google, its users or the public as required or permitted by law.
- If you are using a credit card issued by the merchant you are making a purchase from (a "private label credit card"), that merchant will receive your entire credit card number in association with your purchase.
- We may share aggregated non-personally identifiable information with third parties. For example, we may disclose that a certain percentage of our users have a billing address in a particular geographic area, or that a certain percentage of users use a particular type of credit or debit card. However, if we do share this aggregated information, we do not include personally identifiable information without your explicit opt-in consent or in the limited circumstances described above.

Google Checkout also gives you various choices regarding whether and how your email address is shared, on a seller-by-seller basis:

- When you shop at a seller for the first time and complete an order, you'll be given the option to keep your email address confidential. If you select to keep your email address confidential, Google will not share your email address with the seller, but will forward all communications from the seller to the address listed in your account. Please note, however, that if you decide to keep your email address confidential but have shared it with the seller in the past, that seller may associate the information they receive about you through Google Checkout with the information they've already received from you.
- You will also be given a choice on a seller-by-seller basis whether you'd like to receive promotional emails from the seller. If you decide later that you don't want to receive promotional emails from a seller, you will need to contact the seller directly.

If Google or its subsidiaries become involved in a merger, acquisition, or any form of sale of some or all of their assets, we will provide notice before personal information is transferred and becomes subject to a different privacy policy.

## Information security

We take appropriate security measures to protect against unauthorized access to or unauthorized alteration, disclosure or destruction of data. These include internal reviews of our data collection, storage and processing practices and security measures, as well as physical and technical security measures to guard against unauthorized access to systems where we store personal data. For example, your credit card number will always be stored in an encrypted form (except when you provide it to us in a communication outside of our web page interface).

GOOG-00000858

The security of your account also depends on keeping your account password confidential, and you should not share your account name or password with anyone. If you do share your account information with a third party, they will have access to your account and your personal information.

For more information about our security practices, please see the main Google Privacy Policy.

## Accessing and updating personal information

You can review and update your payment information by logging in to your Google Account and going to the "Purchase History" page, where you can update or remove your address and method of payment. You can also view your previous transaction history on the "Purchase History" page.

You can disable Google Checkout by contacting us. If you do so, your payment information and transaction history will no longer be viewable through Google Checkout. However, in order to meet our reporting and auditing obligations, and to detect, deter, and prevent fraud or other misconduct on our systems, the information will be retained in our systems. If you disable Google Checkout, your personally identifiable information will not be used by Google or shared with third parties except for these purposes. We may delete these records over time if permitted or required by law.

Disabling Google Checkout does not close or cancel your Google Account. For more information about how to manage your Google Account preferences, please click here. This Privacy Policy continues to apply to the personal information we maintain after you disable Google Checkout or close or cancel your Google Account.

### Sharing Between Affiliates

We operate the Google Checkout service through wholly-owned subsidiaries of Google. For U.S. users, that subsidiary is Google Payment Corporation, and for European users that subsidiary is Google Payment Limited (based in the United Kingdom). For countries outside of the United States and Europe, please consult the terms of service made available to you within the service to learn more about the corporate entity offering the service.

The information we collect, including information obtained from third parties, is shared between Google Inc. and its subsidiaries to operate the service. Neither Google nor its subsidiaries will share your information with others except as described in this Privacy Policy.

We provide you with the right to opt out of certain sharing between Google and its subsidiaries. Specifically, you may choose to opt out of:

- The sharing between Google and its subsidiaries of information that does not pertain to your transactions or experiences with Google Checkout (also called "non-transactional information", e.g., information we may obtain from third parties to verify your identity), and
- The use by Google of information shared between Google and its subsidiaries to promote Google products and services.

Please remember, regardless of whether you choose to opt out of this sharing or not, we will never sell or rent your personal information, and we will not share your personal information with anyone outside of Google or its subsidiaries except as described in this Privacy Policy.

If you don't want us to share non-transactional data between Google and its subsidiaries, please click here.

If you don't want us to use any information shared between Google and its subsidiaries to promote Google products and services to you, please click here.

**Web Beacons**

Some of the merchants that accept Google Checkout use "web beacons" for the purposes of analyzing or auditing their website or transactions. A web beacon is an electronic image in a web page, usually consisting of a single-pixel (1 x 1 GIF), that allows the website to analyze user traffic.

At the request of the merchant, we may serve web beacons on the merchant's behalf so that the merchant can analyze or audit their web traffic. We do not provide any personal information to merchants when serving web beacons on their behalf. In addition, we will provide you with a notice when a web beacon is served within Google Checkout. For more information on web beacons, click here.

**Changes to this policy**

Please note that this Privacy Policy may change from time to time. We will not reduce your rights under this Policy without your explicit consent. We will post any Policy changes on this page and, if the changes are significant, we will provide a more prominent notice (including notification in your account interface or email notification). Each version of this Policy will be identified at the top of the page by its effective date, and we will also keep prior versions of this Privacy Policy in an archive for your review.

If you have any questions about this Policy, please feel free to contact us through our website or write to us at Privacy Matters, c/o Google Inc., 1600 Amphitheatre Parkway, Mountain View, California, 94043 USA.

Google and its subsidiaries adhere to the U.S. safe harbor privacy principles of Notice, Choice, Onward Transfer, Security, Data Integrity, Access and Enforcement, and are registered with the U.S. Department of Commerce's safe harbor program.

©2010 Google - Google Home

GOOG-00000860

# Exhibit 1-44



Google Home

Google Terms of Service

Previous Policies

## Google Wallet Privacy Policy

**November 16, 2011**

The Google Privacy Policy describes how we treat personal information when you use Google's products and services. In addition, the following describes our privacy practices that are specific to the Google Wallet services provided by Google Inc. and its wholly-owned subsidiaries. Capitalized terms not defined in this Google Wallet Privacy Policy shall have the meaning ascribed to them in the Google Wallet Terms of Service.

For detailed information about Google Wallet services please refer to the Google Wallet Terms of Service.

"Google Wallet" refers to the following Google payment services:

The Processing Service which allows the storage of payment instruments and processing of online payment transactions with participating merchants; and

Mobile Wallet which allows you to (i) make purchases at participating retail locations using an application on your smartphone with near-field communication ("**NFC**") capabilities (i.e., the Mobile Wallet Application); and (ii) make purchases on participating merchant websites from the mobile browser on your smart phone.

### Information that we collect and how we use it

- **Registration information** - When you sign up for Google Wallet, we ask that you associate your Google Wallet account with a Google Account so that we can provide you with the service. If you register a Carrier Billing Account, the information that we require to register for the service includes your mobile telephone number, and the name and billing address associated with that number. For sellers, we also require you to provide your bank account number and, in some situations, your personal address, your business category, a government-issued identification number (for example, social security number or taxpayer identification number for US residents) and certain information about your sales or transaction volume. This information allows us to process payments and protect users from fraud. In some cases, we may also ask you to send us additional information or to answer additional questions to help verify your information. The information we collect is stored in association with your Google Account.

- **Registration of a Payment Method** - If you store a payment method with Google Wallet, information that may be required includes, as applicable, your name, credit or debit card number, card expiration date, address, phone number, email address, date of birth and last four digits of Social Security number. This information may be stored on Google servers to synchronize your payment methods between the Mobile Wallet Application on your phone and the Processing Service. Data elements regarding card verification number (CVN) may be stored on the mobile device in encrypted form, but not on Google's servers. We may also receive information about the provisioning of the payment method to your device.

- **Information obtained from third parties** - In order to protect you from

GOOG-00000990

fraud or other misconduct, we may obtain information about you from third parties to verify the information you provide. For example, we may use card authorization and fraud screening services to verify that your credit or debit card information and address match the information that you provided to us. Also, for sellers using the Processing Service, we may obtain information about you and your business from a credit bureau or a business information service such as Dun & Bradstreet. We also may obtain information from third parties in connection with providing Google Wallet to you, such as information arising from Google Wallet transactions at merchant locations and information from the Carrier in connection with Carrier Billing.

- **Transaction information** - When you use the Processing Service to conduct a transaction, we collect information about each transaction, including the transaction amount, a description provided by the seller of the goods or services being purchased, the names of the seller and buyer and the type of payment used. We may also collect transaction data from your use of the Mobile Wallet. For example, if you use the Mobile Wallet Application to make a purchase at a merchant or download a merchant coupon, we may obtain information regarding that transaction from the Mobile Wallet Application, from the merchant and/or a partner, as applicable. The information may include the date and time of the purchase, the store location, the amount of the purchase, and the offer associated with the transaction.

- **Information collected to prevent fraud** - In order to protect you from fraud, phishing and other misconduct, we may collect information about your interaction with the service to help validate your identity or detect potentially fraudulent conduct. For example, in some circumstances we may try to determine service usage patterns (such as how quickly you type) so that we can try to detect and prevent unauthorized attempts to access your account (such as automated hacking attacks or the use of stolen usernames or passwords). Any such information that we collect will only be used to detect and prevent fraud or other misconduct, unless you explicitly grant us permission to use it in another manner.

- **Information about your use of Google Wallet** - We may collect information about your interaction with the Mobile Wallet. This may include, for example, data on number of offers saved, payment attempts, and provisioning activity. Using added services may require your opt-in consent for Google Wallet to offer the functionality. For example, you may be offered the opportunity to opt-in to a service whereby Mobile Wallet would present offers to you based on your past transaction activities.

- **Offer information** - If you choose to clip and save an offer, we will collect the offer and provision it to the Mobile Wallet Application on your mobile device.

- **Google cookies** - When you access a Google Wallet through a browser, we send one or more cookies - a small file containing a string of characters - to your computer to uniquely identify your browser. We use cookies to improve the quality of our service by storing user preferences and tracking user trends. Most browsers are initially set up to accept cookies, but you can reset your browser to refuse all cookies or to indicate when a cookie is being sent. Please note that you will not be able to access certain features of Google Wallet if your cookies are disabled.

- **Log information** - When you use Google Wallet through a browser, our

GOOG-00000991

servers automatically record information that your browser sends whenever you visit a website. These server logs may include information such as your web request, Internet Protocol address, browser type, browser language, the date and time of your request and one or more cookies that may uniquely identify your browser.

- **Device information** – When you use Google Wallet through a mobile device, we may collect information about your phone (including device and hardware IDs) for technical support and debugging purposes.

- **User communications** - When you send an email or other communication to us, we may retain those communications in order to process your enquiries, respond to your requests and improve our services.

- **Links** - We may present links in a format that enables us to keep track of whether these links have been followed. We use this information to improve the quality of our search technology, customized content and advertising. For more information about links and redirected URLs, please see our FAQs.

### In addition to the above, we use information that we collect to:

- Provide offers, coupons and other similar products to you for goods or services that may be provided by merchants, partners and other third parties alone or jointly with Google;

- To assist third parties in the provisions of products or services that you request from third parties, such as Third Party Provider Wallet Services described below;

- Provide our products and services to you, including the display of customized content and advertising;

- Perform auditing, research and analysis in order to maintain, protect and improve our services;

- Ensure the technical functioning of our network; and

- Develop new services.

We process personal information on our servers in the United States of America and in other countries. In some cases, we process personal information on a server outside your own country. We may process personal information to provide our own services. In some cases, we may process personal information on behalf of and according to the instructions of a third party, such as our advertising partners.

### Use of Google Wallet At Third Party Providers, Merchants and Other Third Parties

"Third Party Provider Wallet Services" are products or services provided by third party providers ("Third Party Providers") that you access through Google Wallet. These Third Party Provider Wallet Services are subject to the Third Party Provider's terms and conditions and privacy policy. This Google Wallet Privacy Policy does not apply to Third Party Provider Wallet Services. Third Party Providers are not affiliated with Google. The Third Party Provider Wallet Services are identified within the Google Wallet as being offered to you by the specified partner.

When you register with a Third Party Provider for a Third Party Provider Wallet Service and subsequently use the Third Party Provider Wallet Service, Google Wallet will disclose certain information to the Third Party Provider. The Third Party Providers receipt of, use of, and disclosure of your personal information from Google Wallet is subject to the Third Party Provider's privacy policy and data security policy.

GOOG-00000992

If you are making a purchase or undertaking a loyalty item or offer redemption at a merchant retail location or on a merchant website using Mobile Wallet, Mobile Wallet may transmit certain information to the merchant, including for example your card number and other personal information needed to complete the transaction (for example, the fact that you have previously purchased 10 cups of coffee and are redeeming an offer for a free cup of coffee). We are not responsible for which merchants or other third parties you choose to share information with from Mobile Wallet. This Privacy Policy does not apply to your use of Mobile Wallet with third parties and any resulting data uses or disclosures by such third parties.

## Information Sharing

We will not sell or rent your personal information to companies or individuals outside of Google. If you are making a purchase through Google Wallet, we may share portions of your credit card number with the retailer to identify the transaction, but we will not share your full credit card number with the retailer without your opt-in consent, except in the limited circumstances described below. In addition, we will only share your personal information with other companies or individuals outside Google as permitted Google Privacy Policy and in the following circumstances:

- As necessary to process your transaction and maintain your account. As with any credit card payment, if you process a credit card transaction through the Processing Service, we need to share some information (for example, your name and credit card number) with the banks and other entities in the financial system that process credit card transactions. For payment transactions processed through your Carrier Billing Account, we will need to share information with the Carrier holding your Carrier Billing Account in order to charge your Carrier Billing Account and for other purposes related to processing Carrier Billing transactions, such as purchases, reversals, refunds, adjustments, disputes and customer support. Some retailers require that their buyers provide a telephone number in order to process a transaction. In those cases, we will share your telephone number with the merchant and you will be notified before you complete your transaction. At a merchant's request, we may also serve Processing Service transaction data through a web beacon so that the merchant can analyze or audit its web traffic. We will provide you with a notice when a web beacon is served within Google Wallet. For more information on web beacons, click here.

- To a Third Party Provider, to complete your registration for Third Party Provider Wallet Services and to facilitate Third Party Provider Wallet Services you request.

- To detect, prevent or otherwise address fraud, security or technical issues.

- We have your consent. We require opt-in consent for the sharing of any sensitive personal information, except as otherwise described in this section or the Google Privacy Policy.

- We provide such information to our subsidiaries, affiliated companies or other businesses or entities for the purpose of processing personal information on our behalf. We require that these parties agree to process such information based on our instructions and in compliance with this Policy and any other appropriate confidentiality and security measures.

- We have a good faith belief that access, use, preservation or disclosure of such information is reasonably necessary to (a) satisfy any applicable law, regulation, legal process or enforceable governmental request, (b) enforce applicable Terms of Service, including investigation of potential

GOOG-00000993

violations thereof, (c) detect, prevent or otherwise address fraud, security or technical issues or (d) protect against imminent harm to the rights, property or safety of Google, its users or the public as required or permitted by law.

- If you are using a credit card issued by the merchant from whom you are making a purchase through the Processing Service (i.e., a 'private label credit card'), that merchant will receive your entire credit card number in association with your purchase.

- If you make purchases on participating merchant websites from your smartphone using the Mobile Wallet, that merchant will receive your entire card number in association with your purchase.

- We may share aggregated non-personally identifiable information with third parties. For example, we may disclose that overall usage of Google Wallet in a particular geographic area or that a certain percentage of users use a particular type of credit or debit card. However, if we do share this aggregated information, we do not include personally identifiable information without your explicit opt-in consent or in the limited circumstances described above.

When you shop at a seller for the first time and complete an order, you'll be given a choice whether you'd like to receive promotional emails from the seller. If you decide later that you don't want to receive promotional emails from a seller, you will need to contact the seller directly.

If Google or its subsidiaries become involved in a merger, acquisition or any form of sale of some or all of their assets, we will provide notice before personal information is transferred and becomes subject to a different privacy policy.

## Information security

We take appropriate security measures to protect against unauthorized access to or unauthorized alteration, disclosure or destruction of data that is stored at Google in connection with Google Wallet. These include internal reviews of our data collection, storage and processing practices and security measures, as well as physical and technical security measures to guard against unauthorized access to systems where we store personal data. For example, your credit card number will always be stored in an encrypted form (except when you provide it to us in a communication outside our web page interface).

The security of your Google Wallet account also depends on keeping your account password confidential, and you should not share your account name or password with anyone. If you do share your account information with a third party, they will have access to your account and your personal information.

The Google Wallet Service information security program does not apply to any information, such as information arising from a Third Party Provider Wallet Service, that is stored on your Google Wallet Application, as that information is outside of the Google-controlled data centers. It is your responsibility to control access to your mobile device and the Google Wallet Application on your device, including keeping your PIN confidential and not sharing it with anyone. It is your responsibility to alert Google or the relevant partner if you believe that the security of the information in the Google Wallet Application has been compromised. For more information about our security practices, please see the main Google Privacy Policy.

## Accessing and updating personal information

You can review and update your payment information available through the Processing

GOOG-00000994

Service by logging in to your Google Account or the Mobile Wallet Application and going to the 'Purchase History' page, where you can update or remove your address and method of payment. You can also view your previous transaction history on the 'Purchase History' page.

You can disable the Google Wallet Processing Service by contacting us. Mobile Wallet can be disabled through the Mobile Wallet Application. If you do so, your payment information and transaction history will no longer be viewable through Google Wallet. However, in order to meet our reporting and auditing obligations and to detect, deter as well as prevent fraud or other misconduct on our systems, the information will be retained in our systems for so long as there remains a business necessity. If you disable Google Wallet, your personally identifiable information will not be used by Google or shared with third parties except for these purposes. We may delete these records over time if permitted or required by law.

Disabling Google Wallet does not close or cancel your Google Account. For more information about how to manage your Google Account preferences, please click here. This Privacy Policy continues to apply to the personal information that we maintain after you disable Google Wallet or close or cancel your Google Account.

### Sharing Between Affiliates

We operate the Google Wallet Processing Service through wholly owned subsidiaries of Google. For US users, that subsidiary is Google Payment Corporation and for European users that subsidiary is Google Payment Limited (based in the United Kingdom). For countries outside of the United States and Europe, please consult the Terms of Service made available to you within the service to learn more about the corporate entity offering the service. We operate the Mobile Wallet through Google Inc.

The information that we collect, including information obtained from third parties, is shared between Google Inc. and its subsidiaries to operate the service. Neither Google nor its subsidiaries will share your information with others except as described in this Privacy Policy.

We provide you with the right to opt out of certain sharing between Google and its subsidiaries. Specifically, you may choose to opt out of:

- The sharing between Google and its subsidiaries of information that does not pertain to your transactions or experiences with Google Wallet (also called 'non-transactional information', e.g. information we may obtain from third parties to verify your identity) and
- The use by Google of information shared between Google and its subsidiaries to promote Google products and services.

Please remember, regardless of whether you choose to opt out of this sharing or not, we will never sell or rent your personal information, and we will not share your personal information with anyone outside of Google or its subsidiaries except as described in this Privacy Policy.

If you don't want us to share non-transactional data between Google and its subsidiaries, please click here.

If you don't want us to use any information shared between Google and its subsidiaries to promote Google products and services to you, please click here.

### Changes to this policy

Please note that this Privacy Policy may change from time to time. We will not reduce your rights under this Policy without your explicit consent. We will post any Privacy

Policy changes on this page and, if the changes are significant, we will provide a more prominent notice (including notification in your account interface or email notification). Each version of this Privacy Policy will be identified at the top of the page by its effective date and we will also keep prior versions of this Privacy Policy in an archive for your review.

If you have any questions about this Policy, please feel free to contact us through our website or write to us at Privacy Matters, c/o Google Inc., 1600 Amphitheatre Parkway, Mountain View, California, 94043 USA.

Google and its subsidiaries adhere to the US Safe Harbour privacy principles of Notice, Choice, Onward Transfer, Security, Data Integrity, Access and Enforcement and are registered with the US Department of Commerce's Safe Harbour programme.

©2011 Google   Google Home

GOOG-00000996

# Exhibit 1-45

**Privacy Notice**

# Google Wallet Privacy Notice

Last modified May 7, 2014

The Google Privacy Policy describes how we treat personal information when you use Google's products and services. "Google Wallet" is a product offered to Google Account holders. Your use of Google Wallet is therefore subject to the Google Privacy Policy. In addition, the following notice describes our privacy practices that are specific to Google Wallet.

Google Wallet refers to Google payment services that are provided by both Google Inc. and its wholly owned subsidiaries. For US users, that subsidiary is Google Payment Corporation ("GPC"), and for users in the European Economic Area (EEA), it is Google Payment Limited ("GPL") (based in the United Kingdom). For countries outside of the United States and the EEA, please consult the Google Wallet Terms of Service made available to you within the service to learn more about the subsidiary offering the service.

Your use of Google Wallet is governed by the Google Wallet Terms of Service. Please consult the Terms of Service for detailed information about the specific services of Google Wallet. Capitalized terms not defined in this Google Wallet Privacy Notice shall have the meaning ascribed to them in the Terms of Service.

## Information we collect

In addition to the information listed in the Google Privacy Policy we may also collect the following:

- **Registration information** – When you sign up for Google Wallet, you are creating a Wallet account that is associated with your Google Account. Depending on the services of Google Wallet you use, in addition to the information listed in the Google Privacy Policy, you may be asked to provide the following information: Credit or debit card number and card expiration date, bank account number and expiration date, address, date of birth, social security number or taxpayer identification number (or some other government-issued identification number), and for sellers or businesses specifically, your business category and certain information about your sales or transaction volume. In some cases, we may also ask you to send us additional information or to answer additional questions to help verify your information. Finally, if you register a Carrier Billing Account, we will ask you to provide us with certain information about your mobile telephone account.

- **Information obtained from third parties** – We may obtain information about you from third parties, including third party verification services, information arising from Google Wallet transactions at merchant locations, information regarding your use of payment methods issued by third parties that are linked to the Google Wallet service, information regarding access to balances held in your Google Wallet account, and information from a Carrier in connection with Carrier Billing.

  Also, for sellers, we may obtain information about you and your business from a credit bureau or a business information service.

GOOG-00001020

- **Transaction information** – When you use Google Wallet to conduct a transaction, we may collect information about the transaction, including: Date, time and amount of the transaction, the merchant's location, a description provided by the seller of the goods or services purchased, any photo you choose to associate with the transaction, the names and email addresses of the seller and buyer (or sender and recipient), the type of payment method used, your description of the reason for the transaction, and the offer associated with the transaction, if any.

# How we use the information we collect

In addition to the uses listed in the Google Privacy Policy, we use the information you provide us, as well as information about you from third parties, in order to provide you with Google Wallet services, and to protect you from fraud, phishing or other misconduct. Such information may also be used to assist third parties in the provision of products or services that you request from them.

Your registration information is stored in association with your Google Account and your registration of a payment method will be stored on Google's servers. In addition, certain data elements may also be stored on your mobile device.

# Information we share

## Third party sharing

We will only share your personal information with other companies or individuals outside of Google in the following circumstances:

- As permitted under the Google Privacy Policy.
- As necessary to process your transaction and maintain your account.
- To complete your registration for a service provided by a third party.

For example, when you make a purchase or transaction using Google Wallet, we make certain personal information about you available to the company or individual you purchase from or transact with. This includes sharing your personal information with the developer from whom you purchased when you use Google Wallet to make a purchase on Google Play.

Any information you provide directly to a third party merchant, website or application is not covered by this privacy notice. We are not responsible for the privacy or security practices of merchants or other third parties with whom you choose to share your personal information directly. We encourage you to review the privacy policies of any third party to whom you choose to share your personal information directly.

## Affiliate sharing

The information that we collect, including information obtained from third parties, is shared with our affiliates, meaning other companies owned and controlled by Google Inc. Our affiliates can be financial and nonfinancial entities.

We provide you with the right to opt out of certain sharing between GPC and its affiliates. Specifically, you may

GOOG-00001021

choose to opt out of:

- Sharing between GPC and its affiliates of information about your creditworthiness for their everyday business purposes; and/or,
- Our affiliates marketing their products or services to you based on your personal information that we collect and share with them. This information includes your account history with us.

If you choose to opt out, your choice will be effective until you tell us to change your choice.

If you don't want us to share personal information about your creditworthiness between GPC and its affiliates or if you do not want our affiliates to use your personal information collected by us and shared with them to market to you, please indicate your preference by logging into your account, going to the Wallet privacy settings page, and updating your preferences.

We will not share your personal information with anyone outside of GPC or with our affiliates except as described in this privacy notice. As explained above, Google Wallet is a product offered to Google Account holders. Data you provide to Google Inc. for the purpose of signing up for a Google Account is not affected by the opt-out provisions in this notice.

# Information security

For more information about our security practices, please see the main Google Privacy Policy.

The security of your Google Wallet account depends on you keeping your account password confidential. If you share your account information with a third party, he or she will have access to your account and your personal information.

It is your responsibility to control access to your mobile device and the Google Wallet application on your device, including keeping your PIN confidential and not sharing it with anyone. It is also your responsibility to alert Google or the relevant partner if you believe that the security of the information in the Google Wallet application has been compromised.

© 2014 Google – Google Home Google Terms of Service Previous Privacy Notices

GOOG-00001022

# Exhibit 1-46
## Conditionally Filed Under Seal

# Exhibit 1-47
## Conditionally Filed Under Partial Seal

1

2

3

4

5

6

7

8

9

10

11

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

12

13

14 | ALICE SVENSON, individually and on behalf of all others similarly situated,

Case No.: 5:13-cv-04080-BLF

15

*Plaintiff,*

CLASS ACTION

16

v.

17 | GOOGLE, INC., and GOOGLE PAYMENT CORP.,

18

19

*Defendants.*

20

**PLAINTIFF'S *CORRECTED* RULE 26(a)(2) EXPERT REPORT OF HENRY FISHKIND, Ph.D IN SUPPORT OF CLASS CERTIFICATION**

21

22

23

24

25

26

27

28

# I.     Introduction

1.0     Plaintiff Alice Svenson through her counsel retained Fishkind and Associates, Inc. to provide expert economic analysis and litigation support in this matter. Specifically, I was asked among other things to: (a) quantify economic damages (using reliable methodologies and models) based on the plaintiff's theories of liability on a class-wide basis, related to Google's unauthorized disclosure of App Buyers' personal identifying information ("PII") to third-party App Vendors; (b) provide this expert report containing my opinions and the bases and reasons for them, with references to the facts or data considered in forming these opinions, and related exhibits; and (c) testifying at a deposition, hearing, and trial as necessary.

2.0     I conducted the research in this engagement. I drafted this expert report and will offer the testimony. Clerical support was provided by other members of my firm. My resume is attached as Exhibit #1, and my court experience as an expert is provided in Exhibit #2. The materials reviewed, considered, made available, or relied upon in rendering these opinions are listed in Exhibit #3. A list of all publications I have authored in the last 10 years is provided in Exhibit #4.

3.0     Our standard hourly fees apply in this engagement, and our compensation does not depend upon the outcome of any case. Our fees are as follows:

| | |
|---|---|
| Dr. Fishkind: | $450/hour for office work, and $900/hour for testimony at trial, hearing, or deposition. |
| Assistants: | $250/hour for research |

# II.     Summary of My Qualifications to Provide Expert Opinion in this Matter

4.0     I am an economist with over 30 years of experience in economic analysis and econometric modeling. I am currently the President of Fishkind & Associates, Inc. ("FA"), an economic and financial consulting firm with offices in Orlando and Port St. Lucie in Florida. My clients include state and municipal governments, the U.S. Department of Justice, Fortune 500 Companies, and major property developers, as well as both plaintiffs and defendants in litigation.

5.0     My resume, included as Exhibit #1, documents my qualifications. I have a Ph.D. in economics from Indiana University with specialties in Urban and Regional economics and in Econometrics. I received my B.A. in economics from Syracuse University.

6.0     For nine years I was Research Economist with the Bureau of Economic and Business Research at the University of Florida, and from time to time I served as its Acting Director and its Associate Director. During the course of my work at the Bureau I conducted numerous surveys. I designed, launched, and administered the Bureau's monthly economic confidence index which involved sample surveys of Floridians. I also designed and executed the Bureau's economic forecasting program.

7.0     I have also served on the Florida Governor's Council of Economic Advisors under two different administrations.[1] In addition, I was a founding board member of two publicly traded companies, Summit Properties (NYSE) and Engle Homes (NASDAQ) until both companies were sold.

8.0     As the President of FA, I am regularly engaged to provide valuations of goods and services as well as tangible and intangible properties. My experience includes valuation of market traded goods and services and non-market traded goods and services. I have designed and conducted numerous surveys to support our clients' business decision making and to be used in court proceedings. Those surveys are similar to the types of surveys I have identified for use in this matter.

9.0     I have extensive experience with, and my engagements have often involved, conducting contingent valuation ("CV") surveys to determine the value of intangible goods such as privacy and PII. Specifically, on six previous occasions I was engaged to provide expert economic analysis, reports, and testimony in privacy-related court cases involving PII. For example, in *Fresco et al. v. Automotive Directions, Inc., et al.*, Case No. 0:03-cv-61063-JEM (S.D. Fla.), I was engaged to determine the value of privacy and PII.

10.0     Furthermore, I have been qualified as an expert witness to provide economic value testimony on more than 50 occasions by both the federal and state courts in Florida and in

---

[1]     Governor Bob Graham 1979 – 1986 and Jeb Bush 1999 – 2007.

1  federal courts in Tennessee and Washington, D.C. I have also served as a court-appointed expert

2  to provide valuation reports to the U.S. Tax Court. Exhibit #2 lists my court experience over the

3  last five years. I have always qualified as an expert, and have never been rejected as an expert on

4  economic analysis or econometric modeling.

5  **III.    Summary of Expert Opinions**

6       11.0    In this case, the Plaintiff complains that Defendants breached their privacy

7  obligations by sharing the Plaintiff's personal identifying information ("PII") with App Vendors

8  in contravention of the Defendants' stated privacy policies prohibiting such sharing. As a result,

9  the Plaintiff and Class Members (or "Buyers") were damaged.

10       12.0    The Plaintiff and Buyers incurred two types of economic damages:

11            12.1    The Buyers did not receive the benefit of the bargain when Defendants

12       wrongfully shared their PII in violation of Defendants' privacy policies. The Buyers paid,

13       in part, to have their PII protected in accordance with their contracts with Defendants. To

14       the extent Defendants disclosed their PII beyond what was provided in their contracts, the

15       Buyers did not receive the full benefit of the bargain they paid for.[2]

16            12.2    The value of the Buyers' PII was diminished by Defendants' failure to

17       adhere to their own privacy provisions contained in their purchase contract and privacy

18       policies. To the extent Defendants disclosed the Buyers' PII beyond what was permitted

19       under their contracts, it diminished the value of the Buyers' PII and deprived the Buyers

20       of the ability to benefit from their PII themselves.[3]

21  **A.    Benefit-of-the-Bargain Damages**

22       13.0    When the Buyers purchased Apps on Defendants' platforms, they paid not only

23  for the Apps themselves, but also for processing, and the right to have Defendants maintain the

24  privacy of their PII except in certain contractually defined circumstances.[4] To the extent

25  Defendants' disclosures of Buyer PII exceeded those contractual circumstances (an issue beyond

26

27  _____

28  [2]   *See* Dkt. 118 at 8.
    [3]   *Id*. at 8 – 9.
    [4]   *Id*. at 6 – 7.

3

the scope of this Report), the Defendants denied the Buyers the full measure of goods and services paid for.[5]

14.0    I developed a set of three simple algebraic formulae to quantify the benefit-of-the-bargain damages to the Buyers, based upon a large-scale survey that determined the value of the types of PII wrongly disclosed in this case. As discussed in more detail below, there were five different sets of PII disclosed in this case: (1) name and email; (2) state, city, and zip; (3) email, name, city, state and zip; (4) email, name, street, city, and zip; and (5) email, name, street, city, zip, and phone. Each set has a specific value of the PII to the Buyers. For convenience I will identify them as D1 through D5.

15.0    The Plaintiff purchased an App for $1.77. Other Buyers purchased Apps for other prices. For convenience I will term this PRICE for the price of the App purchased by a Buyer.

16.0    To calculate the benefit-of-the-bargain damage to any Buyer, paying any PRICE for their App, that resulted in the wrongful disclosure of any bundle of PII ranging from D1 through D5; the following three simple algebraic formulae are used:

$$DAMAGE = PRICE \times \%DISCOUNT$$

$$\%PRIVACY\ DELIVERED = PRIVACY\ VALUE\ DELIVERED/PRIVACY\ VALUE\ UNDER\ CONTRACT$$

$$\%DISCOUNT = 1 - \%PRIVACY\ DELIVERED^{6}$$

17.0    DAMAGE equals the price paid for the App ($1.77 by the named Plaintiff but any value paid by any Buyer can be used) times the discount caused by the disclosure of any specific bundle of PII (D1 through D5).

18.0    The Buyers paid for the App, processing, and privacy protection ("PP"). However, the Buyers did not actually receive the PP they paid for, and some components of the

---

[5]    *Id* at 8.

[6]    I understand from the Complaint, the Court's order on Defendants' Motion to Dismiss, and the discovery documents I have reviewed that Google only retains 30% of the sales price of each App in exchange for its supposedly private processing service. I do not believe this fact to change the damages analysis, because Plaintiffs were making a single, bundled purchase, and the presence or absence of privacy protections affected their willingness to pay for the entire bundle. That said, should the Court determine that the Buyers' damages can be calculated only by reference to amount paid directly to Defendants, the formulae identified above would still be appropriate, with PRICE potentially redefined to equal the portion of the purchase price retained by Defendants, rather than the actual sales price.

4

PII were wrongfully disclosed (D1 through D5). Using a large-scale, contingent-valuation survey and econometric techniques, I determined the prices that Buyers were willing to pay for PP and for D1 through D5. The %PRIVACY DELIVERED is readily calculated by dividing the prices that Buyers were willing to pay for the privacy provided to them by the contracts (PP) compared to the privacy that was actually delivered (PP1 through PP5). Since Buyers value their privacy, they are willing to pay more for privacy protection than for various bundles of privacy disclosures (PP1 through PP5 in this case). So the ratio of privacy delivered (PP1 through PP5) to privacy contracted for is always less than one.

19.0    The discount is simply one minus the ratio of the price for the privacy actually delivered compared to the price of the contracted-for privacy.

20.0    Given just two pieces of information, the three formulae quantify the benefit-of-the-bargain damage for any Buyer, paying any price for an App, with any one of the five sets of PII wrongfully disclosed. The two pieces of information that are needed are: (1) the value of the set of PII, and (2) the price the Buyer paid for the App (PRICE). Table 1 provides the calculations for the benefit-of-the-bargain damages for the Plaintiff who bought an App for $1.77 in this case. Damages range from $0.24 to $0.55 depending on the type of PII disclosed.

**Table 1. Summary of Plaintiff's Benefit-of-the-Bargain Damages**

| Privacy Disclosure | % Privacy Delivered | Discount | Price | Damage |
|---|---|---|---|---|
| Disclosure of Name and Email | 86% | 14% | $1.77 | **$0.25** |
| Disclosure of State, City, and Zip | 86% | 14% | $1.77 | **$0.24** |
| Disclosure of Email, Name, City, State, and Zip | 85% | 15% | $1.77 | **$0.26** |
| Disclosure of Email, Name, Street, City, and Zip | 83% | 17% | $1.77 | **$0.30** |
| Disclosure of Email, Name, Street, City, Zip, and Phone | 69% | 31% | $1.77 | **$0.55** |

**B.    Damages from the Diminished Value of PII**

21.0    In addition to depriving the Buyers the full benefit of their bargain with Defendants, Defendants' disclosure of Buyers' PII diminished the value of that information.[7] PII

---

[7]    *See* Dkt. 118 at 8 – 9.

1  has value in the marketplace, and its value can be ascertained by reference to the cost to acquire

2  it for standard marketing purposes. In turn, that value depends upon the type of PII and its

3  linkage to specific market transactions. Data that is captured by recording the search activities

4  and/or locations of individuals coupled with their email addresses is more valuable. When the

5  captured data involves actual purchases of goods and services—as is the case here—it is even

6  more valuable. Finally, the value also depends upon the types of goods and services purchased.

7    22.0    Private firms routinely offer certain types of PII for sale to businesses primarily

8  for generating sales leads. The price offered reflects the value of the PII. Moreover, a number of

9  firms now offer to assist consumers in managing the sale of their PII by bundling together many

10  consumers to better enable the sale of their PII in the marketplace.[8]

11    23.0    Table 2 identifies the value of various types of PII as determined by the cost of

12  acquiring the set of PII in bundles of 10,000 from various national vendors of sales lead

13  information. Those PII bundles include a generalized set of PII from several different sources, as

14  well as bundles reflective of PII that were wrongly disclosed in this case (*see* paragraph 14.0).

15  On this basis, the types of PII disclosed by Defendants had values of between $0.080 and $0.170

16  per person, per bundle.

**Table 2. Diminished Value of PII**

| Type/Category of PII | Value |
|---|---|
| General/Average | $0.083 |
| Name and address | $0.080 |
| Name, address, and email | $0.100 |
| Name, address, and phone number | $0.100 |
| Name, address, and email campaign | $0.110 |
| Name, address, email, and phone number | $0.170 |

*Sources: InfoUSA, LeadsPlease.com; The Guardian, Alesco Data, Redidata, and Accurate Leads, Axciom, NAICS Association, LLC, and Nationwide Marketing Services*

24.0    The estimates presented in Table 2 are very conservative because, although the

bundles of PII are similar to those wrongly disclosed in this case, the disclosures in this case not

only included generic PII, but specifically linked the PII to an actual purchase of a specific App.

---

[8]       As discussed below, the firms include Datacoup, Handshake, and Meeco.

6

**IV.    Background**

25.0    The Plaintiff along with other consumers ("Buyers") purchased mobile device software applications ("Apps") from Defendants' online Google Play store (previously known as Android Market) using the Google Wallet online payment service (or its predecessor, Google Checkout).[9] Buyers had to sign up for a Google Wallet account, because Google Wallet was the exclusive payment processing system for purchasing Apps from Google's Play store.[10] Therefore, to make an App purchase, Buyers had to use Google's Wallet service for payment processing. In exchange for providing processing services with privacy protections, Defendants retained 30% of the App purchase price, and provided the remainder to the App Vendors.[11]

26.0    To use Google Wallet and buy an App, Buyers were required to provide PII about themselves to Google, including name, email, address, and other contact information.[12] Moreover, each time a Buyer purchased an App, the Buyer agreed to the Google Wallet Terms of Service, and with it the Google Wallet Privacy Policy,[13] which "describes [Defendants'] privacy practices that are specific to Google Wallet."

27.0    Those contracts represent that Defendants "will only share a Buyer's personal information with other companies or individuals outside of Google: (i) as permitted under the

---

[9]    *See* GOOG-00001093 █████████████████████████████████ .

[10]    *See* GOOG-00001453 █████████████████████████████████████████████████████████████████████████ .

[11]    *See* GOOG-00001444 ██████████████████████████████████████████████████████████████ ; GOOG-00005709 (Merchant Center Help Center page).

[12]    *See* GOOG-00009057 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ .

[13]    *See* GOOG-00000957 (Google Play Terms of Service stating that "When you buy a Product, you contract for the purchase and use of that item is completed once you click the button indicating that your purchase is complete and you are not able to withdraw from the contract after that point . . . When you buy Products from Google Play you will buy them…in the case of Android apps, from the Provider of the app (an 'App Sale') . . . Each time that you purchase a Product, you enter into a contract based on these Terms with: Google in relation to the use of Google Play and (in the case of a Direct Sale) the purchases of that Product; and also (in the case of Agency Sales and App Sales) with the Provider of the Product you have purchased.").

1  Google Privacy Policy ('GPP'); (ii) as necessary to process the Buyer's transaction and maintain

2  the Buyer's account; and (iii) to complete the Buyer's registration for a service provided by a

3  third party." The Google Wallet Privacy Notice did not inform users that Google would share

4  personal information with App Vendors.[14]

5      28.0    Defendants continually assure customers that they protect user privacy.[15] "Users

6  entrust us with their information, their e-mail and name, and we will only give it out to anybody

7  in the case that it's needed to make sure you have a good experience."[16] Google's director of

8  privacy stated that: "I think that users should have opportunities to understand about the

9  information, their personal information and how it is shared."[17]

10     29.0    However, according to Plaintiff's Complaint and as it appears from the discovery,

11 Defendants disclosed to the App Vendors (entirely third parties) Buyers' PII via the Google

12 Wallet portal—the Buyer's identity to include combinations of name, address, city, zip code,

13 email address, or telephone number.[18] Google's decisions to share Buyer PII appear to be largely

14 intentional.[19] For example, when Defendants rebranded Google Checkout as Google Wallet,

15 Defendants additionally told merchants to download Buyer contact information while it was still

16 available.[20] Likewise, Defendants have admitted that PII was disclosed to App Vendors during

17

18

19

---

20  [14]    *See* GOOG-00000998 (Google Wallet Privacy Notice August 1, 2012); *see also* Lawyer Dep. Tr.
    at 152:58 ████████████████████████████████

21  [15]    *See* GOOG-00006988 – 6991 (Google's Privacy Principles); GOOG-00000110113 (Google
22  Privacy Policy stating "Your privacy matters to Google" and "We will ask for your consent before using
    information for a purpose other than those that are set out in this Privacy Policy.").
23  [16]    Elbouchikhi Dep. Tr. at 96:4 – 7.
    [17]    You Dep. Tr. at 52:12 – 13.
24  [18]    *See, e.g.*, GOOG-00001941(name), GOOG-00001948 (email), GOOG-00003715 (email),
    GOOG-00004129 (street address and phone number), GOOG-00003783 (city, state, zip).
25  [19]    *See* Affaki Dep. Tr. at 38:5 – 12 ████████████████████████████████
26  ████████████████████████████████████████
27  [20]    GOOG-00006841 ████████████████████████
28  ████████████████████████████████████████
    ████████████████████; *see also* GOOG-00005613.
8

the relevant period. [21] App Buyers could not opt out of the sharing of their information.[22]

30.0    Based on my review of the discovery to date, Defendants disclosed PII to App Vendors, including name, email address, street address, city, state, zip code, and telephone number, in the following combinations:[23]

- Buyer name and email address;
- Buyer state, city, and zip code;
- Buyer name, email address, city, state, and zip code;
- Buyer name, email address, city, state, and zip code;
- Buyer name, email, street address, city, state, zip code, and telephone number.[24]

31.0    Plaintiff's Complaint alleges that Defendants' disclosures of PII to App Vendors breach its contracts with Buyers. I understand that Defendants dispute that their disclosures of Buyer PII were in any way improper. Those issues are outside the scope of my analysis and report. However, and directly relevant to the issues discussed in this report, I also understand that Defendants dispute whether Buyers suffered *any* damages as a result of the disclosure of their PII.

32.0    This report provides a methodology for quantifying the damages suffered by Buyers for disclosures of each of the groups of PII identified above. Specifically, this report describes methods and models for calculating class-wide damages under the benefit-of-the-bargain theory and the diminution-of-value theory as applied to this case, and also describes the empirical work done in order to quantify damages under both theories. This report confirms that damages may be calculated on a class-wide basis, based on accepted and sound methodological principles.

---

[21]    *See* Defendants' Supp. Interrog. Resp. No. 1 (Feb. 4, 2016).
[22]    *See* GOOG-00001610 ███████████████████████████████████
███████████████████████████████████
[23]    *See* Defendants' Supp. Interrog. Resp. No. 1 (Feb. 4, 2016).
[24]    *See* GOOG-00001941 (name); GOOG-00001948 (email); GOOG-00003715 (email); GOOG-00004129 (street address and phone number); GOOG-00003783 (city, state, zip).

9

**V.      Quantifying the Benefit-of-the-Bargain Damage**

   **A.      Overview of the Methodology**

33.0      In this case, the Plaintiff purchased an App for $1.77 on the Google Play Store.[25] As with other Buyers, that purchase entitled Plaintiff to receive the App, as well as Defendants' processing, services and protection of her PII. Discovery has shown Defendants' disclosure of several categories of Buyer PII to App Vendors, which Plaintiff contends were prohibited by the contracts between Buyers and Defendants. Assuming that to be the case, the Plaintiff and the other Buyers were deprived of the full set of benefits of the bargains between themselves and Defendants.

34.0      As mentioned, I developed three simple algebraic formulae to quantify the benefit-of-the-bargain damages to the App Buyers based upon a large-scale survey that determined the value of the types of PII wrongly disclosed in this case. As noted above, the discovery to date has shown that Defendants made various buyer PII available to App Vendors. These three formulae allow for the robust and methodical class-wide calculation of benefit-of-the-bargain damages, taking into account varying purchase prices of Apps as well as varying disclosures of PII by Defendants.

35.0      Specifically, counsel requested that I assume that there were five different sets of PII disclosed in this case throughout the relevant time period: (1) name and email; (2) state, city, and zip; (3) email, name, city, state, and zip; (4) email, name, street, city, and zip; and (5) email, name, street, city, zip, and phone. Each PII set has a specific value to the Buyers, and for convenience I will call them "D1" through "D5."

36.0      By way of example, the Plaintiff purchased her App for $1.77. Other Buyers purchased Apps for other prices. I will call the price of the App purchased by a Buyer "PRICE."

37.0      To calculate the benefit-of-the-bargain damage to any Buyer, paying any PRICE for their App, that resulted in the wrongful disclosure of any bundle of PII ranging from D1 through D5; the following three simple algebraic formulae can be used.

---

[25]      Dkt. 84, ¶ 88.

10

DAMAGE = PRICE X %DISCOUNT

%PRIVACY DELIVERED = PRIVACY VALUE
DELIVERED/PRIVACY VALUE UNDER CONTRACT

%DISCOUNT = 1 − %PRIVACY DELIVERED

38.0     DAMAGE equals the PRICE paid for the App ($1.77 by the named Plaintiff, but any value paid by any Buyer can be used) multiplied by the DISCOUNT caused by the disclosure of any specific bundle of PII (D1 through D5).

39.0     The Buyers paid for the App, processing, and privacy protection ("PP"). However, the Buyers did not actually receive the PP they paid for, because some components of their PII were wrongfully disclosed (D1 through D5). Using a large-scale, contingent valuation survey and econometric techniques (described below), I determined the prices that Buyers were willing to pay to for PP and for D1 through D5. The "%PRIVACY DELIVERED" is readily calculated by dividing the prices that Buyers were willing to pay for the contracted-for privacy (PP) compared to the privacy that was actually delivered ("PP1" through "PP5"). Since Buyers value their privacy, they are willing to pay more for privacy protection than for various bundles of privacy disclosures (PP1 through PP5 in this case). So the ratio of privacy delivered (PP1 through PP5) to contracted-for privacy is always less than one.

40.0     The DISCOUNT is simply one minus the ratio of the price for the privacy actually delivered compared to the price of the contracted-for privacy.

41.0     As noted above, I quantified the value of the PII to any Buyer using a large scale, contingent-valuation survey methodology ("CV") combined with econometric analysis (described below). The methodology I used to develop the survey information is discussed next.

**B.       Methodology to Quantify Benefit-of-the-Bargain Damage**

      **i.       Introduction to the Methodology**

42.0     As described above, this Report measures the damages resulting from Defendants' failure to provide App Buyers with the privacy protections to which they were entitled as part of their App purchases. While the Buyers' purchases can be viewed as including three components: (i) the Apps themselves, (ii) processing, and (iii) the contracted-for privacy

11

protections; the sales themselves were made in one bundled form—Buyers paid one price for all three components of the transaction. This portion of my Report seeks to establish the value of PII privacy in those transactions.[26]

43.0    While there is a large public market for Apps, the marketplace for privacy or privacy-related promises is not as obvious. Thus, generally speaking (and as explained below), a contingent valuation ("CV") survey as proposed and conducted here is the established and most reliable method for determining benefit-of-the-bargain damages where privacy obligations are breached. [27]

ii.    **Review of the Professional Literature Concerning PII and CV Methodology**

44.0    An established and reliable methodology is necessary to calculate damages resulting from breached privacy obligations on a class-wide basis. Economists have developed CV-survey techniques to estimate the value of typically nontraded goods similar to the privacy protections at issue in this case. CV surveys have become widely used and generally accepted for quantifying the value of nontraded goods.[28] Haab (2002) confirms that CV surveys have now become accepted as accurate as experimental approaches for measuring the prices or values of nontraded goods such as privacy and PII at issue here.[29]

45.0    There is a vast literature concerning the valuation of privacy and techniques for quantifying that value.[30] This is partly because privacy has attracted significant world-wide attention among lawyers, politicians, academics, and members of the business community (see Scott 2016). The result of this broad and deep literature related to privacy and privacy valuations is that concrete and reliable methods and models for calculating damages related to privacy violations such as CV surveys have been developed and tested.

---

[26]    *See* Dkt. 118 at 7 ("Svenson alleged that a portion of the $1.77 App purchase price compensated Google for the service of facilitating the App transaction without disclosing her personal information; and that she was denied the benefit of her bargain when Google facilitated the App transaction but disclosed her personal information to the third-party vendor.").
[27]    *See id.* at 7 – 8.
[28]    Kopp, Raymond et al. (1997), Determining the Value of Non-Marketed Goods, Boston, MA: Kluwer Academic Publishers
[29]    Haab, Timothy C., and McConnell, Kenneth E., Valuing Environmental and Natural Resources, 2002.
[30]    See Appendix #3 for the materials I have reviewed in this matter.

12

46.0    As a backdrop to the studies confirming the validity of CV surveys, and in surveying the privacy literature, it is clear that despite alternative definitions, "privacy" relates to hiding personal information. Posner (1981), for instance, studied market inefficiencies resulting from firms concealing product defects or people concealing flaws such as criminal records, ill health, or prior social misconduct from employers. Over the past 35 years and in light of the growth in importance of the internet and on-line retailing, the term "privacy" has evolved so that, for individuals, it now largely relates to securing PII such as name, email address, credit card details, and physical location. Releasing PII in connection with consumer transactions can result in economic harms (Shapiro and Varian 1997). Firms may use personal information collected for advertising or spam, or to price discriminate based on a person's shopping habits. Firms may also transmit customer information to third parties for deceptive marketing, identity fraud, or other nefarious purposes. For these reasons, among others, consumers place a value on protecting their PII.

47.0    Accordingly, important privacy research attempts to measure the monetary value that people place on their own PII. A common hurdle for doing this is the so-called "privacy paradox"—the disconnect between what people say their privacy is worth and how they act when their privacy is at stake. For example, Acquisti and Grossklags (2005), found that 90% of their experimental subjects stated that they had a high concern for their own privacy, yet 90% of these same respondents then risked disclosure of their full name and home address in exchange for a supermarket loyalty card. Other studies have come to similar conclusions or discussed the privacy paradox. *See* Beresford, Kübler, and Preibusch (2012); Speikermann *et al.* (2001); Norberg *et al.* (2007); Cvrcek *et al.* (2009); and Carrascal *et al.* (2013) and others present further results along these lines. Godel *et al.* (2012) and Kokolakis (2015).

48.0    In explaining the privacy paradox, Acquisti *et al.* (2013) attribute it to cognitive biases featured prominently in the behavioral economics literature. As discussed by Acquisti (2004), cognitive biases cause privacy preferences to be undervalued: A subject may not appreciate the long-term harms of lost privacy when given a chance to trade it away for a short-term, immediate-gratification, benefit. Others, such as Cofone (2015), disagree.

13

49.0    Recent empirical studies have further analyzed the presence of the privacy paradox and found that where privacy protections are communicated clearly, individuals are likely to pay a premium for protection. Tsai *et al.* (2011) found that purchases from websites by experimental subjects were strongly influenced by graphics indicating the extent of privacy protection and the extent to which privacy protection deviates from the subjects' privacy requirements. Likewise (and similar to the results of Beresford *et al.* 2012), they found that subjects simply bought goods from the least expensive websites in a treatment in which privacy information was not prominently displayed.

50.0    The privacy paradox also diminishes where subjects are able to compare privacy promises in connection with the sale of goods side-by-side. In those situations, they are more willing to pay a premium for increased privacy. Egelman *et al.* (2013). Also, Egelman *et al.* (2009) found that subjects were more likely to take privacy concerns into account when privacy information could be viewed *before* visiting a website, rather than *after* arriving at a website—timing also influences whether individuals act to protect their privacy.

51.0    Finally, the privacy paradox also tends to disappear in studies that measure people's economic value of protecting their PII. Economic value is measured either in terms of willingness to pay ("WTP") or willingness to accept ("WTA"). WTP is the maximum amount of money a person would pay voluntarily to avoid releasing (or to maintain secrecy over) their PII.

52.0    Importantly, WTP is not what an individual *actually* pays to protect PII from release; it is the maximum amount (including consumer surplus) that person would pay if "push came to shove.". In other words, when a good is purchased, the actual payment for that good (the price per unit) is usually a fraction of WTP. WTP to protect personal information, therefore, measures the value of the information, because a person would be indifferent between the alternatives of: (a) paying the money and protecting the information and (b) not paying the money and releasing the information.

53.0    By contrast, the related concept of WTA refers to the minimum amount of money a person would demand for the loss of security over their PII. Conceptually, the values of WTP and WTA should be about the same, but when measured empirically, WTA often turns out to be

14

the larger of the two. In the privacy context, for example, Acquisti *et al.* (2013) found WTA estimates about five to six times larger than WTP estimates, depending on context and phrasing of questions. Possible reasons for this outcome include loss aversion (people may see greater harm in losing a small amount of security over their privacy details than they see benefit in a small increase privacy security) and the fact that WTP is budget constrained (subjects have limited funds with which to pay), while WTA is not (subjects are not limited in the amount they can ask for).

54.0    In any event, this discrepancy is another potential hurdle to valuing privacy promises and PII accurately. In addition, this consideration suggests that the more conservative measure, WTP, may be more appropriate in this matter.

55.0    Because PII protection is usually bundled together with the sale of goods and services in commerce (as here), the value of protecting the PII is not directly revealed in these transactions—there is no separate line-item for privacy protection in typical transactions such as the App sales here.[31] As a result, there are no direct measures for the value a consumer is willing to pay to protect their PII. Furthermore, if there was an unauthorized disclosure of PII after a transaction that included PII protection, there is no direct measure of the WTA compensation for the disclosure.

56.0    As a result, empirical valuation studies generally rely on data from stated preference field studies using CV methodology or laboratory experiments. Although some controversy remains, CV methods have been widely used in valuing goods that are not traded in explicit markets (e.g. non-market goods such as fewer health risks, cleaner air, preservation of the last members of an endangered species, and protection of PII). The values for WTP are derived from posing hypothetical questions in a survey.

57.0    The first study to measure the value protection of PII (Hann *et al.* (2002)) applied conjoint analysis to data obtained in a laboratory experiment using undergraduate students. The experiment was concerned with aspects of protecting such information when contacting an

---

[31]        It may be indirectly revealed, but economists have not fully worked out how to do so reliably.

1   internet website. A key finding was that protecting personal data against errors, restricting

2   personal data from secondary use and improper access were worth between $45.61 and $57.01.

3       58.0    A recent laboratory experiment conducted by Benndorf and Normann (2014)

4   examined experimental subjects' (university students) willingness to sell (i.e., WTA) varying

5   bundles of personal information. Five such bundles were studied: (1) preferences (including

6   information about hobbies, political views, shopping behavior, income, age, gender, and

7   occupation); (2) contact data (including name, address, e-mail address, and telephone number);

8   and (3) the subjects' Facebook Timeline and About pages. Values for WTA were established by

9   a reverse second price auction, which is used extensively in laboratory experiments and has been

10  shown to have desirable value revealing properties.

11      59.0    Mean values of willingness to sell the various attribute bundles were as follows:

12  (1) preferences (€8.32), (2) contact data (€14.88), (3) preferences and contact data (€18.90), (4)

13  Facebook About page (€17.67), and (5) Facebook Timeline page (€19.49). In a related study,

14  Bauer *et al.* (2012) obtained estimates of WTP to buy back PII from Facebook. As might be

15  expected (as discussed above, WTP is often smaller than WTA), the WTP was indeed

16  considerably smaller than the corresponding WTA estimated by Benndorf and Normann (2014).

17      60.0    In a more recent study, Savage and Waldman (2015) conducted a choice

18  experiment using CV methods to estimate WTP to grant privacy permissions when purchasing

19  smartphone apps. Savage and Waldman report that in their survey of 1,726 smartphone users the

20  representative consumer was willing to make one-time payments per App purchased of: (1)

21  $2.28 to conceal their browser history, (2) $4.05 to conceal their contacts list, (3) $1.19 to

22  conceal their location, (4) $1.75 to conceal their phone's identification number, and (5) $3.58 to

23  conceal their texts. Split sample estimates also were obtained to show the extent of variation in

24  these values by age, income, education, and gender.

25      61.0    In another study closely related to Savage and Wildman, Butler and Glasgow

26  (2014) estimated the value of different types of personal information in the context of purchasing

27  hypothetical streaming video services. Survey respondents were presented with eleven

28  alternative scenarios that were subject to experimental control. Scenarios consisted of different:

16

1  (1) levels of privacy policy, (2) numbers of videos available, (3) content availability, (4)

2  commercial advertising policy, and (5) prices per month. The following WTP values were found:

3  (1) $3.90 per month for promise that the vendor will not share video usage information with

4  third-parties, and (2) $5.99 per month for a promise that the vendor will not share both video

5  usage information and PII with third parties. These values represent substantial fractions of the

6  highest price that respondents were shown ($12.99).

7     62.0    The most recent studies by Savage and Waldman (2015) and Butler and Glasgow

8  (2014) demonstrate that the value of PII (similar to the PII at issue in this case) can be quantified

9  to a reasonable degree of economic certainty by using CV surveys and the econometric

10  techniques. The study executed for this Report follows the methodologies used in these two

11  studies.

12               **iii.    The Survey**

13     63.0    To quantify the PII value wrongly disclosed in this case, I designed a CV study

14  very similar in structure to the ones used recently by Savage and Waldman (2015) and by Butler

15  and Glasgow (2014). Specifically, I administered a survey to a large sample of qualified

16  respondents to estimate their WTP to grant privacy permissions of various types that are at issue

17  in this case when purchasing a smartphone App.

18     64.0    I recognize that here, the Buyers' PII has already been disclosed and the harm

19  done. One might assume that I should therefore try to measure WTA (a payment in

20  compensation for the disclosure), but this would be wrong in this particular case for two reasons.

21     65.0    First, the economic harm in this case is that the Buyers did not get the benefit of

22  the bargain. The Buyers received the App and the processing services, but not the privacy

23  protection. So really, the issue is determining the value of the privacy protection that the Buyers

24  purchased, but did not receive—this is a WTP question.

25     66.0    Second, as noted above, WTA measures can overstate damages in some

26  circumstances. Again, this is because WTA (how much would you ask for?) is not bounded by

27  the budget of the injured party as WTP is (how much would you pay for?). Also, WTA results

28  may be too speculative because Buyers are not as familiar with novel situations such as payment

1  in compensation for a breach of promised privacy—Buyers lack a baseline for this kind of

2  transaction. So, to be conservative and realistic, the survey was designed to obtain answers for

3  WTP, not the usually much higher WTA.

4      67.0    Counsel requested that I quantify the value of each of the following sets of

5  privacy breaches at issue in this case: (1) privacy with no disclosure of PII; (2) disclosure of

6  name and email; (3) disclosure of state, city, and zip code; (4) disclosure of email, name, city,

7  state, and zip; (5) disclosure of email, name, street, city, and zip; (6) disclosure of email, name,

8  street, city, zip, and phone number.

9      68.0    Alternative 1, privacy with no disclosure of PII, was what the Plaintiff was to

10  receive by contract. This alternative serves as a control or base case. Based on the discovery in

11  this matter, Alternative 2 through Alternative 6 represent sets of PII that were wrongly disclosed.

12     69.0    To quantify a respondent's WTP, each respondent was presented with a

13  hypothetical purchase of an App at a particular price bundled with one of the alternative

14  packages of privacy protection. Each respondent was only presented with one alternative and one

15  price. This referendum-style of question is considered very reliable, because respondents are not

16  offered successive prices or package. The prices ranged from $1 to $5 for each alternative.

17     70.0    Exhibit #5 contains the survey instrument. The survey begins with two qualifying

18  or screening questions. First, respondents were asked whether they own a smart phone. If they

19  did, the survey continued; if not, then the survey ended and they were not included. Second,

20  respondents were asked whether they had ever purchased an App for their smart phone. Only

21  those who had purchased an App were allowed to continue in the survey. The screening

22  questions made sure that respondents would understand the survey question and answer reliably.

23  As noted above, each qualifying respondent was presented with a hypothetical purchase of an

24  App at a particular price bundled with a set of privacy protections. The respondent would either

25  be willing to purchase or not.

26     71.0    The hypothetical purchase was presented in the following way: "We want to

27  know how you feel about new APPs for smart phones. We have just a few questions to ask.

28  Suppose that the APP Store has a new APP available that you are very interested in purchasing.

18

1    Suppose you are a returning customer to the APP Store, so you know that the Store already has

2    your name, email address, billing address, mobile number, and credit card number." This

3    question was designed to mimic the facts of this case whereby Buyers would have already

4    disclosed to Defendants the same PII by the time they were about to purchase an App.

5           72.0    Then the respondent would be presented with an alternative set of privacy

6    protections and a price. For example, following the description of the App, the respondent would

7    be presented with for example Alternative #2 for $2, as follows: "The App Store has a strict

8    policy of not sharing any of your information with the developer or seller of the App you are

9    interested in except for your name and email. Would you be willing to pay $2 for this App that

10   you want?" The yes or no answer would then be recorded.

11          73.0    Finally, the respondent was asked for certain demographic and economic

12   information, including year of birth, income, ethnicity, and education.

13          **C.     Survey Results**

14          74.0    The survey was conducted by Opinion Access Corp. between February 5, 2016

15   and March 2, 2016. Initially, over 200 web based surveys were completed on February 13, 2016

16   as a soft pre-test. These initial results confirmed that respondents understood the survey and that

17   the pricing parameters were appropriate in that all price points received positive and negative

18   responses. At this juncture the full survey moved ahead over the web and with landline and

19   mobile phone subsets added. The results included 5,019 completed web surveys, 46 mobile

20   phone surveys, and 39 landline respondents.

21          75.0    The survey design relies primarily on the web-based survey responses. The

22   mobile phone and landline subsets were designed strictly as controls to assess the reliability of

23   the web-based survey. The limited results from the mobile phone and land line surveys confirm

24   the reliability of the web based survey by demonstrating that: (a) respondents understood the

25   questions; (b) all combinations of privacy alternatives and prices had market relevance; and (c)

26   the demographic and ethnic compositions of the web sample compared to the landline or the

27   mobile phone sample were similar (no statistically significant differences).

28

---

19

1    76.0    The survey sample size of 5,019 completions provides highly reliable and robust

2 results. This large sample size results in over 800 respondents for each of the six alternative

3 bundles of PII at issue in this case. To generate reliable responses for each of the six alternatives

4 at the 99% level of confidence with a margin of error of +/- 5% would require a sample size of

5 525 respondents.[32] The actual sample size of respondents achieved exceeds this threshold.

6    77.0    Table 3 summarizes the survey results. These summary results show that

7 Defendants' privacy-protection obligations represented a valuable portion of what the Buyers

8 paid for. On average, 75% of respondents would have paid for the App with the maximum

9 privacy protection compared to only 64%-to-70% who would purchase the App with lower

10 levels of privacy protection. Furthermore, with only two exceptions at the $5 price point,

11 respondents preferred the highest level of privacy protections.

12                    **Table 3. Summary of Survey Results**

| Alternative #1 – Privacy with No Disclosure | Yes | No | Total | % Yes | % No |
|---|---|---|---|---|---|
| **$1.00** | 148 | 19 | 167 | 89% | 11% |
| **$2.00** | 135 | 31 | 166 | 81% | 19% |
| **$3.00** | 127 | 41 | 168 | 76% | 24% |
| **$4.00** | 118 | 56 | 174 | 68% | 32% |
| **$5.00** | 103 | 62 | 165 | 62% | 38% |
|  | ==== | ==== | ==== |  |  |
| **Total** | 631 | 209 | 840 | **75%** | 25% |
|  |  |  |  |  |  |
| Alternative #2 – Share Name and Email |  |  |  | % Yes | % No |
| **$1.00** | 123 | 44 | 167 | 74% | 26% |
| **$2.00** | 135 | 31 | 166 | 81% | 19% |
| **$3.00** | 110 | 56 | 166 | 66% | 34% |
| **$4.00** | 107 | 63 | 170 | 63% | 37% |
| **$5.00** | 112 | 55 | 167 | 67% | 33% |
|  | ==== | ==== | ==== |  |  |
|  | 587 | 249 | 836 | **70%** | 30% |

---

[32]    Sample size is calculated as a function of: (a) margin of error, (b) confidence level, and (c) sample variation. See Thompson (1992) for further details.

20

| Alternative #3 – Share State, City, and Zip | | | | % Yes | % No |
|---|---|---|---|---|---|
| $1.00 | 137 | 31 | 168 | 82% | 18% |
| $2.00 | 126 | 41 | 167 | 75% | 25% |
| $3.00 | 118 | 47 | 165 | 72% | 28% |
| $4.00 | 103 | 64 | 167 | 62% | 38% |
| $5.00 | 103 | 64 | 167 | 62% | 38% |
| | ==== | ==== | ==== | | |
| | 587 | 247 | 834 | **70%** | 30% |
| | | | | | |
| Alternative #4 – Share Email, Name, City, State, and Zip | | | | % Yes | % No |
| $1.00 | 138 | 28 | 166 | 83% | 17% |
| $2.00 | 116 | 50 | 166 | 70% | 30% |
| $3.00 | 109 | 56 | 165 | 66% | 34% |
| $4.00 | 115 | 55 | 170 | 68% | 32% |
| $5.00 | 107 | 62 | 169 | 63% | 37% |
| | ==== | ==== | ==== | | |
| | 585 | 251 | 836 | **70%** | 30% |
| | | | | | |
| Alternative #5 – Share Email, Name, Street, City, and Zip | | | | % Yes | % No |
| $1.00 | 127 | 38 | 165 | 77% | 23% |
| $2.00 | 127 | 41 | 168 | 76% | 24% |
| $3.00 | 107 | 59 | 166 | 64% | 36% |
| $4.00 | 106 | 61 | 167 | 63% | 37% |
| $5.00 | 110 | 60 | 170 | 65% | 35% |
| | ==== | ==== | ==== | | |
| | 577 | 259 | 836 | **69%** | 31% |
| | | | | | |
| Alternative #6 – Share Email, Name, Street, City, Zip, and Phone # | | | | % Yes | % No |
| $1.00 | 120 | 46 | 166 | 72% | 28% |
| $2.00 | 113 | 52 | 165 | 68% | 32% |
| $3.00 | 111 | 60 | 171 | 65% | 35% |
| $4.00 | 100 | 68 | 168 | 60% | 40% |
| $5.00 | 89 | 78 | 167 | 53% | 47% |
| | ==== | ==== | ==== | | |
| | 533 | 304 | 837 | **64%** | 36% |

78.0    It is no surprise that Buyers value the security of their PII, for the reasons the literature has already pointed out, as discussed above. In this case, too, it appears that Google has

21

1   acknowledged consumers' reluctance to share PII. Both Google and consumers[33] recognize that

2   sharing PII can cause security problems for users.[34] ███████████████████████████████

3   ████████████████████████████████████████████████████████████████

4   ██████████████████████████████████████████ ██ ██████████████████████████

5   ████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████ █

7        79.0 ████████████████████████████████████████████████████████

8   ████████████████ █ ████████████████████████████████████████████

9   ██████ █   Therefore, the survey results whereby respondents prefer the App with greater privacy

10  protection and are willing to pay more for them appears consistent with the evidence in the case.

11

12

13

_____

14  [33]   *See* Elbouchikhi Dep. Tr. 209:18 – 23 ███████████████████████████████████

15  ████████████████████████████████████████████████████████████████

16  ███████████   [34]   GOOG-00005451 – 58 ████████████████████████████████

17  █████████████████████ GOOG-00002087 ████████████████████████████████

18  ████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████

20  ████████████████   [35]   You Dep. Tr. 138:38 ████████████████████████████

21  ████████████████████████████████████████████████████████████████

22  ████████████████████████████████   [36]   *Id.* at 207:19 – 24.

23  [37]   Affaki Dep. Tr. 92:12 – 13, 94 ████████████████████████████████

24  ███████████████████ You Dep. Tr. 132:7 – 14 ████████████████████████

25  ███████████   .   [38]   GOOG-00005154 █████████████████████████████████

26  ████████████████████████████ GOOG-00005156 ██████████████████████

27  ████████████████████████████████████ GOOG-

28  00005169 ███████████████████████████████████████████

                                    22

1

**D.      Econometric Analysis of the Survey Results**

2      80.0     The survey results were summarized in Table 3. In this section, I used

3 econometric analysis to quantify the values for Buyers' WTP for an App along with various

4 levels of privacy protection based on the survey results. Survey respondents were presented with

5 a hypothetical App purchase along with a complement of privacy protection at a specific price.

6 As in the real marketplace, the respondent could either make the purchase or not. Since this was

7 a "take it or leave it" proposition, the Buyer did not have to come up with a price – instead the

8 price was provided ($1, $2, $3, $4, or $5). This methodology is consistent with the referendum

9 style of questions found to be reliable in CV surveys.

10      81.0     However, to estimate the Buyers' WTP the survey data was analyzed using a

11 standard statistical technique called regression analysis. Regression analysis is a statistical

12 technique use to analyze the relationship among variables, in this case among the bundles of PII

13 and price. Essentially, a regression analysis quantifies the relationship between the variable of

14 interest and a set of explanatory variables. In this case, the analysis focuses on whether a Buyer

15 would purchase an App with a particular bundle of privacy protections at a price that varies from

16 $1 to $5.

17      82.0     To determine these figures, I used a standard logit regression model. The

18 technique is a type of regression model widely used to analyze binary dependent variables (that

19 is variables that are either 1 or 0—the yes or no data I collected in the survey).[39] Here, the

20 economic model explains the probability that a Buyer will purchase the App and its complement

21 of privacy protection at a particular price. Some Buyers are willing to make the purchase (scored

22 as 1); others are not (scored as 0).

23      83.0     Table 4 summarizes the regression results for the model using the logit approach.

24 The complete regression output is available in Exhibit #6. The logit model fits the data well in

25 that all of the regression coefficients have their expected signs and each is statistically significant

26 at the 99% level of confidence.

27

28 [39]     Wooldridge, Jeffery (2013), Introductory Econometrics, Southwestern: Mason, Ohio, pages 583 – 589.

23

**Table 4. Logit Analysis of the App Purchase Choices**

| Variable | Coefficient | Std. Error | z-Statistic | Prob. |
|---|---|---|---|---|
| **No Privacy Disclosure** | 1.798939 | 0.107952 | 16.66424 | 0 |
| **Disclosure of Name and Email** | 1.547145 | 0.104293 | 14.83459 | 0 |
| **Disclosure of State, City, and Zip** | 1.553835 | 0.104374 | 14.88719 | 0 |
| **Disclosure of Email, Name, City, State, and Zip** | 1.537149 | 0.104254 | 14.74434 | 0 |
| **Disclosure of Email, Name, Street, City, and Zip** | 1.490771 | 0.103626 | 14.38609 | 0 |
| **Disclosure of Email, Name, Street, City, Zip, and Phone** | 1.244809 | 0.100716 | 12.35962 | 0 |
| **App Price $1-$5** | -0.222837 | 0.022299 | -9.992973 | 0 |

84.0     As expected, the coefficient on price is negative, and as the price increases from $1 to $5 for the purchase, the probability of purchase decreases. The coefficients for the alternative packages are all positive as expected, and they vary depending upon the type of privacy protection provided. The standard errors for the coefficient estimates are very low, so that each is statistically significant with a zero probability of equaling zero. This means that the regression results are reliable for analytical purposes.

85.0     To determine the WTP (in this case, to pay less) for each of the alternatives, two steps are required. First, I take the difference between the coefficient for full privacy protection, and each of the other alternatives with less privacy protection. Second, I divide the result of step 1 by the coefficient on Price. Table 5 shows the calculations.

86.0     Thus, Buyers are willing to pay $2.49 to avoid the significant disclosure of their PII associated with Alt 6 compared to $1.10 to avoid the less amount of PII disclosed under Alt3. The other alternatives vary in general relationship to the amount of PII disclosed.

**Table 5. Calculation of WTP**

| Alternative | Difference from Alt1 | WTP More Privacy |
|---|---|---|
| **Disclosure of Name and Email (Alt 2)** | -$0.25 | $1.13 |
| **Disclosure of State, City, and Zip (Alt 3)** | -$0.25 | $1.10 |
| **Disclosure of Email, Name, City, State, and Zip (Alt 4)** | -$0.26 | $1.17 |
| **Disclosure of Email, Name, Street, City, and Zip (Alt 5)** | -$0.31 | $1.38 |
| **Disclosure of Email, Name, Street, City, Zip, and Phone (Alt 6)** | -$0.55 | $2.49 |

87.0     The results presented in Table 5 are consistent with the results in other recent studies that quantified the WTP for privacy protection by Savage and Waldman (2013) and by

24

1  Butler and Glasgow (2014) discussed above.[40] Although the databases and specific choices

2  offered to consumers were different, the results are reasonably comparable.

3  **E.    Calculating the Benefit-of-the-Bargain Damages Using the Formulae**

4  88.0    As noted above, the benefit-of-the-bargain damages can be estimated for any

5  Buyer, for any price paid for an App, and for any of the sets of PII wrongly disclosed using the

6  three formulae provided above. Table 4 provides the estimates for the WTP for the contracted-

7  for privacy (PP) and for the various bundles of privacy that were wrongfully disclosed ("D1"

8  through "D5"). These data are used along with the price paid for the App to quantify the

9  damages under the benefit-of-the-bargain theory.

10  89.0    Following the formulae, the values for the % privacy delivered are calculated

11  using the coefficient estimates from Table 4. For each alternative disclosure bundle ("D1"

12  through "D5"), the % privacy delivered is the ratio of the coefficient for the disclosure type

13  divided by the coefficient for the contracted-for privacy.

14  90.0    For example, the % privacy delivered when there was disclosure of the name and

15  email is calculated from the values in Table 4 as: 1.547145 / 1.798939 = 0.86. The discount for

16  this bundle of disclosure is then is 1 - 0.86 = 0.14 or 14%.

17  91.0    In this case for example, the Plaintiff purchased the App for $1.77. So, the

18  damage associated with the disclosure of the name and email address is $0.25, calculated as 14%

19  of the Price paid of $1.77. Table 6 repeats these calculations for the other disclosure bundles.

**Table 6. Calculations for the Benefit-of-the-Bargain Damages**

| Privacy Disclosure | % Privacy Delivered | Discount | Price | Damage |
|---|---|---|---|---|
| **Disclosure of Name and Email** | 86% | 14% | $1.77 | **$0.25** |
| **Disclosure of State, City, and Zip** | 86% | 14% | $1.77 | **$0.24** |
| **Disclosure of Email, Name, City, State, and Zip** | 85% | 15% | $1.77 | **$0.26** |
| **Disclosure of Email, Name, Street, City, and Zip** | 83% | 17% | $1.77 | **$0.30** |
| **Disclosure of Email, Name, Street, City, Zip, and Phone** | 69% | 31% | $1.77 | **$0.55** |

92.0    On a $1.77 App purchase, Damages vary from $0.24 to $0.55 depending upon the

type of disclosure. All of this is by way of illustrating how the formulae work. The formulae are

---

40        Similar statistical techniques were used as well to generate the WTP shown in Table 5.

25

applicable to all Buyers regardless of the actual price they paid for their App, and demonstrate that benefit-of-the-bargain damages can indeed be calculated on a class-wide basis.

### F.   Testing the Regression Equation

93.0   I conducted a number of tests on the database which all produced similar results. This indicates that the results presented above in Tables 4 – 6 are robust, meaning that changes in the regression techniques do not result in significant changes in the conclusions.

94.0   For example, I re-estimated the model using a probit regression instead of a logit regression as described above. Either technique is appropriate to use with limited dependent variables of interest in this case. The difference between the two estimators is the statistical assumption concerning the dispersion of the data or the disturbance in the system. The disturbance term in a logit model is assumed to follow a logistic function while in the probit model the disturbance term is assumed to be normally distributed.

95.0   Table 7 provides a summary of the probit estimates for the model. The full regression results are found in Exhibit #6. Again, all of the coefficient estimates have the expected signs and each is highly significant at the 99% confidence level. This means that the coefficient estimates can be reliably used for analytical work.

**Table 7. Probit Analysis of the App Purchase Choices**

| Variable | Coefficient | Std. Error | z-Statistic | Prob. |
|---|---|---|---|---|
| ALT1 | 1.100233 | 0.063745 | 17.26 | 0 |
| ALT2 | 0.944886 | 0.061874 | 15.27119 | 0 |
| ALT3 | 0.951403 | 0.062159 | 15.30596 | 0 |
| ALT4 | 0.940248 | 0.062036 | 15.15661 | 0 |
| ALT5 | 0.911567 | 0.061719 | 14.76973 | 0 |
| ALT6 | 0.762276 | 0.060659 | 12.56658 | 0 |
| PRICE | -0.135155 | 0.013382 | -10.0996 | 0 |

96.0   Of course, the absolute magnitudes of the coefficients estimated by probit are different from those estimated by logit. However, the ultimate results for the damage estimates are very similar. Following the same procedure used to estimate the benefit-of-the-bargain damages using logit, with the probit coefficient estimates, produces the results shown in Table 8.

1    As the results are quite similar to the ones from Table 6, this means that the methodology and the

2    results are reliable and robust.

3    **Table 8. Calculations for the Benefit-of-the-Bargain Damages using Probit**

| Privacy Disclosure | % Privacy Delivered | Discount | Price | Damage |
|---|---|---|---|---|
| **Disclosure of Name and Email** | 86% | 14% | $1.77 | **$0.25** |
| **Disclosure of State, City, and Zip** | 86% | 14% | $1.77 | **$0.24** |
| **Disclosure of Email, Name, City, State, and Zip** | 85% | 15% | $1.77 | **$0.26** |
| **Disclosure of Email, Name, Street, City, and Zip** | 83% | 17% | $1.77 | **$0.30** |
| **Disclosure of Email, Name, Street, City, Zip, and Phone** | 69% | 31% | $1.77 | **$0.54** |

9    97.0    As shown in Table 8, the damage estimates range from $0.24 to $0.54. These are

10   all comparable to the damages estimated using logit in Table 6, which ranged from $0.24 to

11   $0.55. Thus, the choice of regression technique does not affect the damage estimate.

12   98.0    It is therefore my opinion that the methodology and equations identified above

13   can be used to calculate the benefit-of-the-bargain damages for any Buyer who had his or her PII

14   improperly disclosed by Defendants, and that such damages may be calculated in the same

15   matter on a class-wide basis among Buyers similarly situated.

16   **VI.    Quantifying Diminished Value of Buyers' PII**

17   99.0    In addition to Defendants depriving Buyers of the benefit of their bargain,

18   Plaintiff also asserts that Defendants' PII disclosures harmed her and other App Buyers by

19   usurping their ability to sell their own PII. As a result, App buyers lost the sales value of that

20   information.[41] This section of my report quantifies damages attributable to this loss of the sales

21   value of the PII at issue.

22   100.0   There is no doubt that an active PII-purchasing market exists. Consumer data, and

23   the information marketplace supporting the online advertising industry in the United States, is

24   estimated at about $26 billion per year.[42] The Federal Trade Commission has stated that

25   consumer data has inherent monetary value within the information marketplace: "Most

26

---

27   [41]    *See* Dkt. 118 at 8 – 9.

28   [42]    See Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, WSJ.com (Feb. 2 8, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html

27

1  consumers cannot begin to comprehend the types and amount of information collected by

2  businesses, or why their information may be commercially valuable. Data is currency."[43]

3  Additionally, major companies including Acxiom, Tableau Software, and Red Hat, focus on the

4  acquisition and marketing of PII. Other major technology companies are also major players in

5  this field, and include companies such as HP, Oracle, Microsoft, and Accenture.

6      101.0   In addition, the robust market for PII is not restricted to business-to-business

7  sales. Increasingly, individuals are able to sell their PII themselves: Various companies offer

8  individuals the opportunity to sell their PII and PII-related information.[44]

9      102.0   Over the last few years, a number of new companies began offering to manage

10  personal information and sell it under controlled circumstances paying individuals for that

11  purpose. The three most prominent companies in this space are Datacoup,[45] Handshake,[46] and

12  Meeco.[47] While each of them takes a different approach to managing and monetizing PII on

13  behalf of their users, they all demonstrate that consumers are beginning to recognize the value of

14  their PII and are taking steps to exploit that value for their own benefit.

15      103.0   Datacoup provides compensation to its users depending upon how much

16  information the user is willing to share and the value and sensitivity of that information. NPR

17  reported that users can earn about $8 per month for allowing access to their Twitter or

18  Foursquare profiles.[48]

19      104.0   Handshake is an app and a website that allows users to negotiate a price for their

20  personal data directly with the companies that want to buy it. Handshake was designed for

21  people who recognize that their personal data has value. Handshake notes that "Rewards come in

22  many forms and money is only one option. Total rewards can vary hugely depending on how

23

24

---

[43]    Pamela Jones Harbour, Remarks Before FTC Exploring Privacy Roundtable, Federal Trade Commission, 2 (Dec. 7, 2009), available at http://www.ftc.gov/sites/default/files/documents/public_statements/remarksftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[44]    *See* Joshua Brustein, Start-Ups Seek to Help Users Put a Price on Their Personal Data, N.Y. Times (Feb. 12, 2012), http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-ontheir-personal-data.html.

[45]    https://datacoup.com/

[46]    http://handshake.uk.com

[47]    https://meeco.me/

[48]    http://www.npr.org/2014/09/09/346981606/privacy-or-profit-these-firms-want-to-help-you-sell-your-data

28

1  unique your Handshake is, how much data you put in your profile (how visible you are to those

2  brands, basically) and how many brands you want to engage with."[49]

3      105.0   Meeco claims to help clients securely manage and control their digital

4  relationships. By using Meeco's private cloud to store information and share users' brand

5  preferences, clients would expect discounts on their purchases.

6      106.0   The existence of these companies illustrates not only that PII has a market value

7  and can be actively traded on an exchange, but that it is also feasible for individuals to do so.

8      107.0   ████████████████████████████████████

9  ██████████ ███████████████████████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████

12 ███████

13      108.0   ███████████████████████████████

14 ███████████ █ █████████████████████████████

15 ████████████████████

16      109.0   ██████████████████████████████████

17 ██████████████████████████████████████

18 ██████████ █ ████████████████████████████████

19 ██████████ █ ████████████████████████████████

20

21 ────────────────────

[49]  http://handshake.uk.com/hs/faq.html.

22 [50]  GOOG-00001490 ████████████████████████████

23 [51]  *See* Elbouchikhi Dep. Tr. 40:17 – 20 ██████████████████

24 [52]  *See* GOOG-00002260 – 67.

25 [53]  *See, e.g.,* GOOG-00003976 ██████████████████████

26 █████████████████████████████████████████

27 [54]  *See, e.g.,* GOOG-00003976 – 83; Affaki Dep. Tr. 82:17 – 24 ████████████

   ███████████████; *id.* at 130:12 – 19 ████████████████████

28 █████████████████████████████████████████

   ███████████████████████████████

1 ▮▮▮▮▮▮▮▮▮▮

2  110.0  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6  111.0  Because the Defendants furnished App Vendors with this Buyer PII information

7 in violation of its privacy promises with Buyers, the Buyers were denied the opportunity of

8 exploiting their PII's value themselves, thereby causing damage.

9  112.0  To calculate the diminution of Buyer PII resulting from Defendants providing it to

10 third parties—thereby depriving Buyers from profiting from their PII—I surveyed published

11 reports in order to determine prices. Published reports indicate that data marketers sell personal

12 information on average for $0.083 per person when bundled in groups of 1,000 individuals.[58]

13 However, the value of the PII depends upon its specificity and sensitivity. General information

14 about a consumer such as age, gender, or location may be worth only $0.0005 per person, or

15 $0.50 per 1,000 people. However, the value increases significantly if the person is shopping for a

16 car, a financial product, or a vacation. For $0.26 per person, buyers can purchase lists of email

17 addresses for people with specific healthcare conditions.[59]

18  113.0  In this case, the PII that was disclosed may have included at least one or more of

19 the following: Email, Name, Street, City, Zip, and Phone Number. This set of PII falls into the

20 _____

21 [55]  *See, e.g.*, GOOG-00003976 – 3983; Affaki Dep. 92:8 – 23 ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[56]  Elbouchikhi Dep. Tr. 26:4 – 27:1 ▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[57]  Powers Dep. Tr. 37:8 – 16 ▮▮▮▮▮▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27 ▮▮▮▮▮▮▮▮▮▮

[58]  Billy Ehrenberg, *How much is your personal data worth*, The Guardian (Apr. 22, 2014),
http://www.theguardian.com/news/datablog/2014/apr/22/how-much-is-personal-data-worth.

28 [59]  Emily Steel, et al., *How much is your personal data worth?*, Financial Times (June 12, 2013),
http://www.ft.com/cms/s/2/927ca86e-d29b-11e2-88ed-00144feab7de.html#axzz42czqK6Th.

30

general category of PII sold in the marketplace that I found. Published reports indicate such information is marketed at an average price of $0.083 per person.

114.0   A number of companies offer to provide sales leads containing similar bundles of PII. Their pricing for various combinations of PII provides a basis for estimating the value of the PII disclose, and Defendants' disclosures deprived Buyers of the ability to exchange that valuable information with vendors on their own terms. In other words, instead of being provided for free by Google, the PII could have been sold by Class Members for roughly the same amounts depending upon the bundle of PII offered for sale.

115.0   Table 9 provides a summary of the values at which various combinations of PII can be readily purchased in the marketplace in batches of 10,000. Prices vary from $0.080 for names and addresses up to $0.170 for names, addresses, emails, and phone numbers. While there is some value added by the vendors in providing large volumes of PII by location, this value added is offset in this case for two reasons.

**Table 9. Diminished Value of PII**

| Type/Category of PII | Value |
|---|---|
| General/Average | $0.083 |
| Name and address | $0.080 |
| Name, address, and email | $0.100 |
| Name, address, and phone number | $0.100 |
| Name, address, and email campaign | $0.110 |
| Name, address, email, and phone number | $0.170 |

Sources: InfoUSA, LeadsPlease.com; The Guardian, Alesco Data, Redidata, and Accurate Leads, Axciom, NAICS Association, LLC, and Nationwide Marketing Services

116.0   First, the PII in this case was tied to specific App purchases, making the value of the PII disclosed to third parties even more meaningful for marketing purposes. ████████

████████████████████████████████████████████████████████████████

████████████████.[60]

---

[60]   Elbouchikhi Dep. Tr. 39:8 – 10 ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████.

31

1    117.0    Second, the PII in this case—tied to a valid payment method and based on a
2  recent and actual purchase—indicates that the PII is fresh (as opposed to being a cold lead).
3  Again, this helps explain why the PII in this case was valuable and sought after by App
4  Vendors.[61]

5    118.0    Therefore, it is my opinion that the unauthorized disclosure of Buyers' PII in this
6  case diminished the value of the PII disclosed by $0.08 to as much as $0.17 per Buyer. Further,
7  diminution-of-value damages may be calculated in the same matter on a class-wide basis among
8  Buyers similarly situated.

9  **Discovery Developments May Warrant an Update**

10    119.0    Should additional information become available that would materially alter my
11  analysis, I would update this report accordingly.

12    120.0    However, at this time based on the information available to me, my report is
13  complete.

14

15  Date: April 7, 2016

Henry Fishkind, Ph.D
16

17

18

19

20

21

22

23

24

25

26

27

28

---

[61]    *See* GOOG-00002260 – 67.

32

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on April 7, 2016, I served the above and foregoing by transmitting it to

3  the persons shown below by electronic mail.

4  Susan D. Fahringer
   sfahringer@perkinscoie.com
5  Charles C. Sipos
   csipos@perkinsoie.com
6  Breena M. Roos
   broos@perkinscoie.com
7  Mica Simpson
   msimpson@perkinscoie.com
8  Perkins Coie LLP
   1201 Third Avenue, Suite 4900
9  Seattle, Washington 98101
10

11                                   s/ J. Dominick Larry_____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1-48
## Conditionally Filed Under Seal

# Exhibit 1-49
## Conditionally Filed Under Seal

# Exhibit 1-50
## Conditionally Filed Under Seal

# Exhibit 1-51
## Conditionally Filed Under Seal

# Exhibit 1-52

### EDELSON PC FIRM RESUME

EDELSON PC is a plaintiffs' class action and commercial litigation firm with attorneys in Illinois and California.

Our attorneys have been recognized as leaders in these fields by state and federal courts, legislatures, national and international media groups, and our peers. Our reputation has led state and federal courts across the country to appoint us lead counsel in many high-profile cases, including in cutting-edge privacy class actions against comScore, Netflix, Time, Microsoft, and Facebook; Telephone Consumer Protection Act class actions against technology, media, and retail companies such as Google, Twentieth Century Fox, Simon & Schuster, and Steve Madden; data security class actions against LinkedIn, Advocate Hospitals, and AvMed; banking cases against Citibank, Wells Fargo, and JP Morgan Chase related to reductions in home equity lines of credit; fraudulent marketing cases against software companies such as Symantec and Ascentive; mobile content class actions against all major cellular telephone carriers; and product liability cases, including the Thomas the Tank Engine lead paint class actions and the tainted pet food litigation.

We have testified before the United States Senate on class action issues and have repeatedly been asked to work on federal and state legislation involving cellular telephony, privacy, and other consumer issues. Our attorneys have appeared on dozens of national and international television and radio programs to discuss our cases and class action and consumer protection issues more generally. Our attorneys speak regularly at seminars on consumer protection and class action issues, lecture on class actions at law schools, and serve as testifying experts in cases involving class action and consumer issues.

### PLAINTIFFS' CLASS AND MASS ACTION PRACTICE GROUP

EDELSON PC is a leader in plaintiffs' class and mass action litigation, with a focus on consumer technology. Our firm is "known for securing multi-million dollar settlements against tech giants" (Chicago Daily Law Bulletin, September 2013), and has been specifically recognized as "pioneers in the electronic privacy class action field, having litigated some of the largest consumer class actions in the country on this issue." *See In re Facebook Privacy Litig.*, No. C 10-02389 (N.D. Cal. Dec. 10, 2010) (order appointing us interim co-lead of privacy class action); *see also In re Netflix Privacy Litig.*, No. 11-cv-00379 (N.D. Cal. Aug. 12, 2011) (appointing us sole lead counsel due, in part, to our "significant and particularly specialized expertise in electronic privacy litigation and class actions. . . ."). Law360 has called us a "Titan of the Plaintiffs Bar," a "Plaintiffs Class Action powerhouse" and a "Privacy Litigation Heavyweight." We have also been recognized by courts for our uniquely zealous and efficient approach to litigation, which lead the then-Chief Judge of the United States Court for the Northern District of Illinois to praise our work as "consistent with the highest standards of the profession" and "a model of what the profession should be. . . ." *In re Kentucky Fried Chicken Coupon Marketing & Sales Practices Litig.*, No. 09-cv-7670, MDL 2103 (N.D. Ill. Nov. 30, 2011). Likewise, in appointing our firm interim co-lead in one of the most high profile banking cases in the country, a federal court pointed to our ability to be "vigorous advocates, constructive problem-solvers, and civil with their adversaries." *In Re JPMorgan Chase Home Equity Line of Credit Litig.*, No. 10 C 3647 (N.D. Ill. July 16, 2010). After hard fought litigation, that case

settled, resulting in the reinstatement of between $3.2 billion and $4.7 billion in home credit lines. In addition, the firm is uniquely able to try cases, especially those involving sophisticated technology issues. Lead by a deputy chief of the cybercrime unit for the United States Attorney's Office, our trial team has handled both jury and bench trials on issues ranging from general consumer matters to complex cyber crimes (including hacking and cyber intrusions, data breaches, and large-scale identity theft cases) that rested on sophisticated computer forensics.

We have several sub-specialties within our plaintiffs' class action practice:

PRIVACY/DATA LOSS

### Data Loss/Unauthorized Disclosure of Data

We have litigated numerous class actions involving issues of first impression against Facebook, Apple, Netflix, Sony, Redbox, Pandora, Sears, Storm 8, Google, T-Mobile, Microsoft, and others involving failures to protect customers' private information, security breaches, and unauthorized sharing of personal information with third parties. Representative settlements and ongoing cases include:

- *Dunstan v. comScore, Inc.*, No. 11-cv-5807 (N.D. Ill.): Lead counsel in certified class action accusing Internet analytics company of improper data collection practices. The court has finally approved a $14 million settlement.

- *Resnick v. Avmed*, No. 10-cv-24513 (S.D. Fla.): Lead counsel in data breach case filed against health insurance company. Obtained landmark appellate decision endorsing common law unjust enrichment theory, irrespective of whether identity theft occurred. Case also resulted in the first class action settlement in the country to provide data breach victims with monetary payments irrespective of identity theft.

- *In re Netflix Privacy Litigation*, No. 11-cv-00379 (N.D. Cal.): Sole lead counsel in suit alleging that defendant violated the Video Privacy Protection Act by illegally retaining customer viewing information. Case resulted in a $9 million dollar *cy pres* settlement that has been finally approved.

- *Halaburda v. Bauer Publishing Co.*, No. 12-cv-12831 (E.D. Mich.); *Grenke v. Hearst Communications, Inc.*, No. 12-cv-14221 (E.D. Mich.); *Fox v. Time, Inc.*, No. 12-cv-14390 (E.D. Mich.): Consolidated actions brought under Michigan's Preservation of Personal Privacy Act, alleging unlawful disclosure of subscribers' personal information. In a ground-breaking decision, the court denied three motions to dismiss finding that the magazine publishers were covered by the act and that the illegal sale of personal information triggers an automatic $5,000 award to each aggrieved consumer. In January and July of 2015, final approval was

granted to a settlement reached in the *Bauer Publishing* matter and an adversarial class was certified in the *Time* case, respectively.

- *Standiford v. Palm*, No. 09-cv-05719-LHK (N.D. Cal.): Sole lead counsel in data loss class action, resulting in $640,000 settlement.

- *In re Zynga Privacy Litig.*, No. 10-cv-04680 (N.D. Cal.): Appointed co-lead counsel in suit against gaming application designer for the alleged unlawful disclosure of its users' personally identifiable information to advertisers and other third parties.

- *In re Facebook Privacy Litigation*, No. 10-cv-02389 (N.D. Cal.): Appointed co-lead counsel in suit alleging that Facebook unlawfully shared its users' sensitive personally identifiable information with Facebook's advertising partners.

- *In re Sidekick Litigation*, No. C 09-04854-JW (N.D. Cal.): Co-lead counsel in cloud computing data loss case against T-Mobile and Microsoft. Settlement provided the class with potential settlement benefits valued at over $12 million.

- *Desantis v. Sears*, No. 08 CH 00448 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in injunctive settlement alleging national retailer allowed purchase information to be publicly available through the Internet.

### Telephone Consumer Protection Act

EDELSON PC has been at the forefront of TCPA litigation for over six years, having secured the groundbreaking *Satterfield* ruling in the Ninth Circuit applying the TCPA to text messages. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009). In addition to numerous settlements totaling over $100 million in relief to consumers, we have over two dozen putative TCPA class actions pending against companies including Santander Consumer USA, Inc., Walgreen Co., Path, Inc., Nuance Communications, Inc., Stonebridge Life Insurance, Inc., GEICO, DirectBuy, Inc., and RCI, Inc. Representative settlements and ongoing cases include:

- *Kolinek v. Walgreen Co.*, No. 13-cv-4806 (N.D. Ill.): Lead counsel in class action alleging that defendant violated federal law by making unsolicited prescription reminder calls. Won reconsideration of dismissal based upon whether provision of telephone number constituted consent to call. Case settled for $11 million.

- *Hopwood v. Nuance Communications, Inc., et al.*, No. 13-cv-2132 (N.D. Cal.): Lead counsel in class action alleging that defendants violated federal law by making unsolicited marketing calls to consumers

nationwide. $9.245 million settlement provided class members option to claim unprecedented relief based upon total number of calls they received.

- *Rojas v CEC*, No. 10-cv-05260 (N.D. Ill.): Lead counsel in text spam class action that settled for $19,999,400.

- *In re Jiffy Lube Int'l Text Spam Litigation*, No. 11-md-2261, 2012 WL 762888 (S.D. Cal.): Co-lead counsel in $35 million text spam settlement.

- *Ellison v Steve Madden, Ltd.*, No. cv 11-5935 PSG (C.D. Cal.): Lead counsel in $10 million text spam settlement.

- *Kramer v. B2Mobile*, No. 0-cv-02722-CW (N.D. Cal.): Lead counsel in $12.2 million text spam settlement.

- *Pimental v. Google, Inc*., No. 11-cv-02585 (N.D. Cal.): Lead counsel in class action alleging that defendant co-opted group text messaging lists to send unsolicited text messages. $6 million settlement provides class members with an unprecedented $500 recovery.

- *Robles v. Lucky Brand Dungarees, Inc.*, No. 10-cv-04846 (N.D. Cal.): Lead counsel in $10 million text spam settlement.

- *Miller v. Red Bull*, No. 12-CV-04961 (N.D. Ill.): Lead counsel in $6 million text spam settlement.

- *Woodman v. ADP Dealer Services*, No. 2013 CH 10169 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in $7.5 million text spam settlement.

- *Lockett v. Mogreet, Inc.*, No 2013 CH 21352 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in $16 million text spam settlement.

- *Lozano v. 20th Century Fox*, No. 09-cv-05344 (N.D. Ill.): Lead counsel in class action alleging that defendants violated federal law by sending unsolicited text messages to cellular telephones of consumers. Case settled for $16 million.

- *Satterfield v. Simon & Schuster*, No. C 06 2893 CW (N.D. Cal.): Co-lead counsel in in $10 million text spam settlement.

- *Weinstein v. Airit2me, Inc*., No. 06 C 0484 (N.D. Ill): Co-lead counsel in $7 million text spam settlement.

## CONSUMER TECHNOLOGY

### *Fraudulent Software*

In addition to the settlements listed below, EDELSON PC has consumer fraud cases pending in courts nationwide against companies such as McAfee, Inc., Avanquest North America Inc., PC Cleaner, AVG, iolo Technologies, LLC, among others. Representative settlements include:

- *Drymon v. Cyberdefender*, No. 11 CH 16779 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $9.75 million.

- *Gross v. Symantec Corp.*, No. 12-cv-00154-CRB (N.D. Cal.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $11 million.

- *LaGarde v. Support.com, Inc.*, No. 12-cv-00609-JSC (N.D. Cal.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $8.59 million.

- *Ledet v. Ascentive LLC*, No. 11-CV-294-PBT (E.D. Pa.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $9.6 million.

- *Webb v. Cleverbridge, Inc.*, No. 1:11-cv-04141 (N.D. Ill.): Lead counsel in class action alleging that defendant deceptively designed and marketed its computer repair software. Case settled for $5.5 million.

### *Video Games*

EDELSON PC has litigated cases video-game related cases against Activision Blizzard Inc., Electronic Arts, Inc., Google, and Zenimax Media, Inc.

## MORTGAGE & BANKING

EDELSON PC has been at the forefront of class action litigation arising in the aftermath of the federal bailouts of the banks. Our suits include claims that certain banks unlawfully suspended home credit lines based on pre-textual reasons, and that certain banks have failed to honor loan modification programs. We achieved the first federal appellate decision in the country recognizing the right of borrowers to enforce HAMP trial plans under state law. The court noted that "[p]rompt resolution of this matter is necessary not only for the good of the litigants but for the good of the Country." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 586 (7th Cir. 2012) (Ripple, J., concurring). Our settlements have restored billions of dollars in home credit lines to people throughout the country. Representative cases and settlements include:

- *In re JP Morgan Chase Bank Home Equity Line of Credit Litig.*, No. 10-cv-3647 (N.D. Ill.): Court appointed interim co-lead counsel in nationwide putative class action alleging illegal suspensions of home credit lines. Settlement restored between $3.2 billion and $4.7 billion in credit to the class.

- *Hamilton v. Wells Fargo Bank, N.A.*, No. 09-cv-04152-CW (N.D. Cal.): Lead counsel in class actions challenging Wells Fargo's suspensions of home equity lines of credit. Nationwide settlement restores access to over $1 billion in credit and provides industry leading service enhancements and injunctive relief.

- *In re Citibank HELOC Reduction Litig.*, No. 09-cv-0350-MMC (N.D. Cal.): Lead counsel in class actions challenging Citibank's suspensions of home equity lines of credit. The settlement restored up to $653,920,000 worth of credit to affected borrowers.

- *Wigod v. Wells Fargo*, No. 10-cv-2348 (N.D. Ill.): In ongoing putative class action, obtained first appellate decision in the country recognizing the right of private litigants to sue to enforce HAMP trial plans.

## GENERAL CONSUMER PROTECTION CLASS ACTIONS

We have successfully prosecuted countless class actions against computer software companies, technology companies, health clubs, dating agencies, phone companies, debt collectors, and other businesses on behalf of consumers. In addition to the settlements listed below, EDELSON PC have litigated consumer fraud cases in courts nationwide against companies such as Motorola Mobility, Stonebridge Benefit Services, J.C. Penney, Sempris LLC, and Plimus, LLC. Representative settlements include:

### Mobile Content

We have prosecuted over 100 cases involving mobile content, settling numerous nationwide class actions, including against industry leader AT&T Mobility, collectively worth over a hundred million dollars.

- *McFerren v. AT&T Mobility, LLC*, No. 08-CV-151322 (Fulton Cnty. Super. Ct., Ga.): Lead counsel class action settlement involving 16 related cases against largest wireless service provider in the nation. "No cap" settlement provided virtually full refunds to a nationwide class of consumers who alleged that unauthorized charges for mobile content were placed on their cell phone bills.

- *Paluzzi v. Cellco Partnership*, No. 07 CH 37213 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action settlement involving 27 related cases

alleging unauthorized mobile content charges. Case settled for $36 million.

- *Gray v. Mobile Messenger Americas, Inc.*, No. 08-CV-61089 (S.D. Fla.): Lead counsel in case alleging unauthorized charges were placed on cell phone bills. Case settled for $12 million.

- *Parone v. m-Qube, Inc.*, No. 08 CH 15834 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action settlement involving over 2 dozen cases alleging the imposition of unauthorized mobile content charges. Case settled for $12.254 million.

- *Williams v. Motricity, Inc.*, No. 09 CH 19089 (Cir. Ct. Cook Cnty., Ill.): Lead counsel in class action settlement involving 24 cases alleging the imposition of unauthorized mobile content charges. Case settled for $9 million.

- *VanDyke v. Media Breakaway, LLC*, No. 08 CV 22131 (S.D. Fla.): Lead counsel in class action settlement alleging unauthorized mobile content charges. Case settled for $7.6 million.

- *Gresham v. Cellco Partnership*, No. BC 387729 (L.A. Super. Ct., Cal.): Lead counsel in case alleging unauthorized charges were placed on cell phone bills. Settlement provided class members with full refunds.

- *Abrams v. Facebook, Inc.*, No. 07-05378 (N.D. Cal.): Lead counsel in injunctive settlement concerning the transmission of allegedly unauthorized mobile content.

### *Deceptive Marketing*

- *Van Tassell v. UMG*, No. 1:10-cv-2675 (N.D. Ill.): Lead counsel in negative option marketing class action. Case settled for $2.85 million.

- *McK Sales Inc. v. Discover Bank*, No. 10-cv-02964 (N.D. Ill.): Lead counsel in class action alleging deceptive marketing aimed at small businesses. Case settled for $6 million.

- *Farrell v. OpenTable*, No. 11-cv-01785 (N.D. Cal.): Lead counsel in gift certificate expiration case. Settlement netted class over $3 million in benefits.

- *Ducharme v. Lexington Law*, No. 10-cv-2763 (N.D. Cal): Lead counsel in CROA class action. Settlement resulted in over $6 million of benefits to the class.

- *Pulcini v. Bally Total Fitness Corp.*, No. 05 CH 10649 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in four class action lawsuits brought against two health clubs and three debt collection companies. A global settlement provided the class with over $40 million in benefits, including cash payments, debt relief, and free health club services.

- *Kozubik v. Capital Fitness, Inc.*, 04 CH 627 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in state-wide suit against a leading health club chain, which settled in 2004, providing the over 150,000 class members with between $11 million and $14 million in benefits, consisting of cash refunds, full debt relief, and months of free health club membership.

- *Kim v. Riscuity*, No. 06 C 01585 (N.D. Ill.): Co-lead counsel in suit against a debt collection company accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with full debt relief and return of all money collected.

- *Jones v. TrueLogic Financial Corp.*, No. 05 C 5937 (N.D. Ill.): Co-lead counsel in suit against two debt collectors accused of attempting to collect on illegal contracts. The case settled in 2007, providing the class with approximately $2 million in debt relief.

- *Fertelmeyster v. Match.com*, No. 02 CH 11534 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in a state-wide class action suit brought under Illinois consumer protection statutes. The settlement provided the class with a collective award with a face value in excess of $3 million.

- *Cioe v. Yahoo!, Inc.*, No. 02 CH 21458 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in a state-wide class action suit brought under state consumer protection statutes. The settlement provided the class with a collective award with a face value between $1.6 million and $4.8 million.

- *Zurakov v. Register.com*, No. 01-600703 (N.Y. Sup. Ct., N.Y. Cnty.): Co-lead counsel in a class action brought on behalf of an international class of over one million members against Register.com for its allegedly deceptive practices in advertising on "coming soon" pages of newly registered Internet domain names. Settlement required Register.com to fully disclose its practices and provided the class with relief valued in excess of $17 million.

## PRODUCTS LIABILITY CLASS ACTIONS

We have been appointed lead counsel in state and federal products liability class settlements, including a $30 million settlement resolving the "Thomas the Tank Engine" lead paint recall cases and a $32 million settlement involving the largest pet food recall in the history of the United States and Canada. Representative settlements include:

- *Barrett v. RC2 Corp.*, No. 07 CH 20924 (Cir. Ct. Cook Cnty., Ill.): Co-lead counsel in lead paint recall case involving Thomas the Tank toy trains. Settlement is valued at over $30 million and provided class with full cash refunds and reimbursement of certain costs related to blood testing.

- *In re Pet Food Products Liability Litig.*, No. 07-2867 (D.N.J.): Part of mediation team in class action involving largest pet food recall in United States history. Settlement provided $24 million common fund and $8 million in charge backs.

### INSURANCE CLASS ACTIONS

We have prosecuted and settled multi-million dollar suits against J.C. Penney Life Insurance for allegedly illegally denying life insurance benefits under an unenforceable policy exclusion and against a Wisconsin insurance company for terminating the health insurance policies of groups of self-insureds. Representative settlements include:

- *Holloway v. J.C. Penney*, No. 97 C 4555 (N.D. Ill.): One of the primary attorneys in a multi-state class action suit alleging that the defendant illegally denied life insurance benefits to the class. The case settled in or around December 2000, resulting in a multi-million dollar cash award to the class.

- *Ramlow v. Family Health Plan* (Wisc. Cir. Ct., WI): Co-lead counsel in a class action suit challenging defendant's termination of health insurance to groups of self-insureds. The plaintiff won a temporary injunction, which was sustained on appeal, prohibiting such termination and eventually settled the case ensuring that each class member would remain insured.

### MASS/CLASS TORT CASES

Our attorneys were part of a team of lawyers representing a group of public housing residents in a suit based upon contamination related injuries, a group of employees exposed to second-hand smoke on a riverboat casino, and a class of individuals suing a hospital and national association of blood banks for failure to warn of risks related to blood transfusions. Representative settlements include:

- *Aaron v. Chicago Housing Authority*, No. 99 L 11738 (Cir. Ct. Cook Cnty., Ill.): Part of team representing a group of public housing residents bringing suit over contamination-related injuries. Case settled on a mass basis for over $10 million.

- *Januszewski v. Horseshoe Hammond*, No. 2:00CV352JM (N.D. Ind.): Part of team of attorneys in mass suit alleging that defendant riverboat casino

caused injuries to its employees arising from exposure to second-hand smoke.

The firm's cases regularly receive attention from local, national, and international media. Our cases and attorneys have been reported in the Chicago Tribune, USA Today, the Wall Street Journal, the New York Times, the LA Times, by the Reuters and UPI news services, and BBC International. Our attorneys have appeared on numerous national television and radio programs, including ABC World News, CNN, Fox News, NPR, and CBS Radio, as well as television and radio programs outside of the United States. We have also been called upon to give congressional testimony and other assistance in hearings involving our cases.

## GENERAL COMMERCIAL LITIGATION

Our attorneys have handled a wide range of general commercial litigation matters, from partnership and business-to-business disputes to litigation involving corporate takeovers. We have handled cases involving tens of thousands of dollars to "bet the company" cases involving up to hundreds of millions of dollars. Our attorneys have collectively tried hundreds of cases, as well as scores of arbitrations and mediations.

## OUR ATTORNEYS

**JAY EDELSON** is the founder and CEO of EDELSON PC. He has been recognized as one of the nation's leading class action lawyers, especially in the areas of privacy, technology, and consumer advocacy. His notable cases include ones involving the national banks' suspensions of home equity lines of credit in the aftermath of the housing collapse, which resulted in the restoration of billions of dollars of consumer credit lines. He has developed much of the positive law under the Telephone Consumer Protection Act, especially in the area of text message spam, resulting in settlements collectively worth over a hundred millions of dollars and earning him the moniker, "the Spam Slammer." Jay has been recognized as a "pioneer" in the emerging field of electronic privacy, having established key precedent in cases throughout the country and reaching some of the most important settlements in this space. Based primarily on his success in bringing consumer technology class actions, the national press has dubbed Jay and his firm the "most feared" litigators in Silicon Valley and, according to the New York Times, tech's "babyfaced … boogeyman." The international press has called Jay one of the world's "profiliertesten (most prominent)" privacy class action attorneys.

In addition to complex defense-side litigation, which he handles only in select cases, Jay also offers strategic support to start-ups, including several that have become national brands.

Jay is a frequent speaker and writer on class action issues, the practice of law more generally, and training and law firm management — the latter earning him recognition by the ABA as one of "the most creative minds in the legal industry". He is an adjunct professor at Chicago-Kent School of Law, where he has taught seminars on class actions and negotiation. He has written a blog for Thomson Reuters, called Pardon the Disruption, where he focused on ideas necessary to reform and reinvent the legal industry.

**RYAN D. ANDREWS** is a Partner at EDELSON PC. He presently leads the firm's complex case resolution and appellate practice group, which oversees the firm's class settlements, class notice programs, and briefing on issues of first impression.

Ryan has been appointed class counsel in numerous federal and state class actions nationwide that have resulted in over $100 million dollars in refunds to consumers, including: *Satterfield v. Simon & Schuster*, No. C 06 2893 CW (N.D. Cal.): *Ellison v Steve Madden, Ltd.*, No. cv 11-5935 PSG (C.D. Cal.); *Robles v. Lucky Brand Dungarees, Inc.*, No. 10-cv-04846 (N.D. Cal.); *Lozano v. 20th Century Fox*, No. 09-cv-05344 (N.D. Ill.): *Paluzzi v. Cellco Partnership*, No. 07 CH 37213 (Cir. Ct. Cook Cnty., Ill.); and *Lofton v. Bank of America Corp.*, No. 07-5892 (N.D. Cal.).

Representative reported decisions include: *Lozano v. Twentieth Century Fox*, 702 F. Supp. 2d 999 (N.D. Ill. 2010), *Satterfield v. Simon & Schuster, Inc.* 569 F.3d 946 (9th Cir. 2009), *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010); *In re Jiffy Lube Int'l Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012); *Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292 (N.D. Cal. 2013); and *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292 (D. Nev. Mar. 26, 2014).

Ryan graduated from the University of Michigan, earning his B.A., with distinction, in Political Science and Communications. Ryan received his J.D. with High Honors from the Chicago-Kent College of Law and was named Order of the Coif. Ryan has served as an Adjunct Professor of Law at Chicago-Kent, teaching a third-year seminar on class actions. While in law school, Ryan was a Notes & Comments Editor for The Chicago-Kent Law Review, earned CALI awards for the highest grade in five classes, and was a teaching assistant for both Property Law and Legal Writing courses. Ryan externed for the Honorable Joan B. Gottschall in the United State District Court for the Northern District of Illinois.

Ryan is licensed to practice in Illinois state courts, the United States District Court for the Northern District of Illinois, the U.S. Court of Appeals for the Seventh Circuit, and the U.S. Court of Appeals for the Ninth Circuit.

**RAFEY S. BALABANIAN** is the Managing Partner of EDELSON PC. Rafey's practice focuses upon a wide range of complex consumer class action litigation, as well as general business litigation. In the class action context, Rafey has extensive experience both prosecuting and defending class actions.

On the plaintiff's side, Rafey has been appointed lead counsel in numerous class actions, and has achieved landmark settlements involving the telecom industry worth hundreds of millions of dollars, including nationwide settlements in the cases *Pimental, et al. v. Google, Inc.*, No. 11-cv-2585 (N.D. Cal.); *Van Dyke v. Media Breakaway, LLC*, No. 08-cv-22131 (S.D. Fla.); *Williams v. Motricity, Inc., et al.*, No. 09 CH 19089 (Cir. Ct. Cook Cnty., Ill.); and *Walker v. OpenMarket, Inc., et al.*, No. 08 CH 40592 (Cir. Ct. Cook Cnty., Ill.).

Rafey's plaintiff's class action practice also focuses on consumer privacy issues and some of his most notable accomplishments include nationwide settlements reached with companies such as

Netflix (*In re Netflix Privacy Litig.*, No. 11-cv-379 (N.D. Cal.)) and RockYou (*Claridge v. RockYou, Inc.*, No. 09-cv-6030 (N.D. Cal.)). Rafey also led the effort to secure adversarial class certification of what is believed to be the largest privacy class action in the history of U.S. jurisprudence in the case of *Dunstan, et al. v. comScore, Inc.*, No. 11-cv-5807 (N.D. Ill.).

On the business side, Rafey has counseled clients ranging from "emerging technology" companies, real estate developers, hotels, insurance companies, lenders, shareholders and attorneys. He has successfully litigated numerous multi-million dollar cases, including several "bet the company" cases. And, with respect to the defense of class action, Rafey's practice focuses mainly on the defense of corporate clients facing wage and hour lawsuits brought under the Fair Labor Standards Act.

Rafey received his J.D. from the DePaul University College of Law in 2005. While in law school, he received a certificate in international and comparative law. A native of Colorado, Rafey received his B.A. in History, with distinction, from the University of Colorado – Boulder in 2002.

**CHRISTOPHER L. DORE** is a Partner at EDELSON PC where he focuses his practice on emerging consumer technology issues, with his cases relating to online fraud, deceptive marketing, consumer privacy, negative option membership enrollment, and unsolicited text messaging. Chris is also a member of the firm's Incubation and Startup Development Group wherein he consults with emergent businesses.

Chris has been appointed class counsel in multiple class actions, including one of the largest text-spam settlements under the Telephone Consumer Protection Act, groundbreaking issues in the mobile phone industry and fraudulent marketing, as well as consumer privacy. *See Kramer v. Autobytel, Inc.*, No. 10-cv-02722-CW (N.D. Cal.); *Turner v. Storm8, LLC*, No. 09-cv-05234 (N.D. Cal.); *Standiford v Palm, Inc.*, No. 09-cv-05719-LHK (N.D. Cal.); and *Espinal v. Burger King Corp.*, No. 09-cv-20982 (S.D. Fla.). In addition, Chris has achieved groundbreaking court decisions protecting consumer rights. Representative reported decisions include: *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855 (N.D. Cal. 2011); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165 (N.D. Cal. 2010); and *Van Tassell v. United Marketing Group, LLC*, 795 F. Supp. 2d 770 (N.D. Ill. 2011). In total, his suits have resulted in hundreds of millions of dollars to consumers.

Outside of consumer class actions, Chris actively advises technology related startups, including providing compliance and marketing guidance, as well as hands-on concept and business development.

Prior to joining EDELSON PC, Chris worked for two large defense firms in the areas of employment and products liability. Chris graduated *magna cum laude* from The John Marshall Law School, where he served as the Executive Lead Articles for the Law Review, as well as a team member for the D.M. Harish International Moot Court Competition in Mumbai, India. Chris has since returned to his alma mater to lecture on current issues in class action litigation and negations.

Before entering law school, Chris received his Masters degree in Legal Sociology, graduating *magna cum laude* from the International Institute for the Sociology of Law, located in Onati, Spain. Chris received his B.A. in Legal Sociology from the University of California, Santa Barbara.

**ROGER PERLSTADT** is a Partner at EDELSON PC, where he concentrates on appellate and complex litigation advocacy. He has briefed and argued appeals and motions in both federal and state appellate courts.

Prior to joining the firm, Roger was a law clerk to United States District Court Judge Elaine E. Bucklo, an associate at a litigation boutique in Chicago, and a Visiting Assistant Professor at the University of Florida Levin College of Law. He has published articles on the Federal Arbitration Act in various law reviews.

Roger has been named a Rising Star by *Illinois Super Lawyer Magazine* four times since 2010.

Roger graduated from the University of Chicago Law School, where he was a member of the University of Chicago Law Review. After law school, he served as a clerk to the Honorable Elaine E. Bucklo of the United States District Court for the Northern District of Illinois.

**EVE-LYNN J. RAPP** is a Partner at EDELSON PC, where she focuses her practice on consumer technology class actions, with a particular emphasis on cell phone telephony and Telephone Consumer Protection Act ("TCPA") cases and "negative option" enrollment consumer fraud cases. She also regularly handles plaintiff's side employment class actions, including federal Fair Labor Stands Act cases and their state law counterparts. Eve is the hiring partner for the firm's Chicago office.

Eve has helped lead approximately 20 TCPA class actions, including Birchmeier v. Caribbean Cruise Line, Inc. et al., No. 12-cv-04069 (N.D. Ill.), where she secured the largest adversarial TCPA class in this nation's history. She is also lead counsel in one of the few "Do Not Call" TCPA cases to settle, resulting in a multi-million dollar settlement and affording class members with as much as $5,000 individually. Eve has also prosecuted TCPA cases on an individual basis in arbitrations, winning six-figure settlements.

She has led over a half-dozen consumer fraud and "negative option" enrollment cases, against a variety of industries, including e-cigarette sellers, the on-line gaming companies, and electronic and sport products distributors.

Eve is also leading a series of employment class actions involving the cell tower industry, securing a six-figure settlement for the named plaintiff.

In a nationally publicized products liability case, Eve help secure a reversal from the United States Supreme Court, paving the way for hundreds of thousands of people to litigate their claims of deceptive marketing.

In 2015, Eve was selected as an Illinois Emerging Lawyer by Leading Lawyers.

Eve received her J.D. from Loyola University of Chicago-School of Law, graduating cum laude, with a Certificate in Trial Advocacy. During law school, she was an Associate Editor of Loyola's International Law Review and externed as a "711" at both the Cook County State's Attorney's Office and for Cook County Commissioner Larry Suffredin. Eve also clerked for both civil and criminal judges (The Honorable Judge Yvonne Lewis and Plummer Lott) in the Supreme Court of New York. Eve graduated from the University of Colorado, Boulder, with distinction and Phi Beta Kappa honors, receiving a B.A. in Political Science.

Eve is actively involved with the Chicago Lawyers' Committee for Civil Rights Under Law, Inc.'s Settlement Assistance Project where she represents a number of pro bono clients for settlement purposes.

**BENJAMIN H. RICHMAN** is the Managing Partner of the Chicago Office of EDELSON PC. He handles plaintiffs'-side consumer class actions, focusing mainly on technology-related cases, represents corporate defendants in class actions, and handles general commercial litigation matters.

On the plaintiff's side, Ben has brought industry-changing lawsuits involving the marketing practices of the mobile industry, print and online direct advertisers, and Internet companies. He has successfully prosecuted cases involving privacy claims and the negligent storage of consumer data. His suits have also uncovered complex fraudulent methodologies of Web 2.0 companies, including the use of automated bots to distort the value of consumer goods and services. In total, his suits have resulted in hundreds of millions of dollars to consumers.

On the defense side, Ben has represented large institutional lenders in the defense of employment class actions. He also routinely represents technology companies in a wide variety of both class action defense and general commercial litigation matters.

Ben received his J.D. from The John Marshall Law School, where he was an Executive Editor of the Law Review and earned a Certificate in Trial Advocacy. While in law school, Ben served as a judicial extern to the Honorable John W. Darrah of the United States District Court for the Northern District of Illinois, in addition to acting as a teaching assistant for Prof. Rogelio Lasso in several torts courses. Ben has since returned to the classroom as a guest-lecturer on issues related to class actions, complex litigation and negotiation. He also lectures incoming law students on the core first year curriculums. Before entering law school, Ben graduated from Colorado State University with a B.S. in Psychology.

Ben is also the director of EDELSON PC's Summer Associate Program.

**ARI J. SCHARG** is a Partner at EDELSON PC and leads the firm's Privacy and Data Security Litigation Group. He handles technology-related class actions, focusing mainly on cases involving privacy and data security issues, including the illegal collection, storage, and disclosure of personal information and text message spam. Ari has been appointed class counsel by state and federal courts in several nationwide class actions, including *Fox v. Time, Inc.*, No. 12-cv-14390 (E.D. Mich. July 27, 2015); *Halaburda v. Bauer Publishing Co.*, No. 12-cv-12831 (E.D. Mich.); *Resnick v. Avmed*, No. 10-cv-24513 (S.D. Fla.); *In re: LinkedIn User Privacy*

*Litigation*, No. 5:12-cv-03088 (N.D. Cal.); *Coffman v. Glide Talk, Ltd.*, No. 14 CH 08513 (Cir. Ct. Cook Cnty, Ill.); *Webb v. Cleverbridge, et al.*, No. 11-cv-4141 (N.D. Ill.); *Ledet v. Ascentive*, No. 11-cv-294 (E.D. Penn.); and *Grant v. Commonwealth Edison Company*, No. 13-cv-8310 (N.D. Ill.), and was appointed sole-lead class counsel in *Loewy v. Live Nation*, No. 11-cv-4872 (N.D. Ill.), where the court praised his work as "impressive" and noted that he "understand[s] what it means to be on a team that's working toward justice." Ari was selected as an Illinois Rising Star (2013, 2014, 2015) by Super Lawyers.

Prior to joining the firm, Ari worked as a litigation associate at a large Chicago firm, where he represented a wide range of clients including Fortune 500 companies and local municipalities. His work included representing the Cook County Sheriff's Office in several civil rights cases and he was part of the litigation team that forced Craigslist to remove its "Adult Services" section from its website.

Ari received his B.A. in Sociology from the University of Michigan – Ann Arbor and graduated magna cum laude from The John Marshall Law School where he served as a Staff Editor for THE JOHN MARSHALL LAW REVIEW and competed nationally in trial competitions. During law school, he also served as a judicial extern to The Honorable Bruce W. Black of the U.S. Bankruptcy Court for the Northern District of Illinois.

**COURTNEY BOOTH** is an Associate at EDELSON PC where her practice focuses on consumer and tech-related class actions.

Courtney received her J.D., *magna cum laude*, from The John Marshall Law School. While in law school, she was a staff editor of The John Marshall Law Review, a teaching assistant for Legal Writing and Civil Procedure, and a member of the Moot Court Honor Society. Courtney represented John Marshall at the Mercer Legal Ethics and Professionalism Competition where she was a semi-finalist and won Best Respondent's Brief and at the Cardozo/BMI Entertainment and Communications Law Competition where she placed in the top three oralists. Courtney was a 2013 Member of the National Order of Scribes.

Courtney focuses her public service efforts on providing settlement-related assistance to *pro se* plaintiffs. In one of her recent *pro bono* cases, the Court recognized Courtney's efforts and "express[ed] its appreciation" to her, stating that "[t]he work she has done for the plaintiff is of the highest order and the way she has conducted herself in court is to be commended." *See Sroga v. City of Chicago*, No. 12-cv-9288, Dkt. 65 (N.D. Ill. Aug. 6, 2014).

Prior to law school, Courtney attended Saint Louis University where she earned a B.A. in Communication. While there, she was a community relations intern for the St. Louis Blues.

**JONATHAN W. HODGE** is an Associate at EDELSON PC where his practice focuses on complex consumer class actions.

Prior to joining EDELSON PC, Jonathan handled complex commercial litigation at an Am Law 100 defense firm, where he drove successful outcomes in matters with as much as $100,000,000 in controversy. Previously, Jonathan served as a consultant for a tech incubator where he helped

clients form new business based on patent-protected technologies developed at the University of Michigan. He also served in the accounting department of Nucor Steel-Hertford, where his IT skillsets helped him largely automate the monitoring of the largest cost at a multibillion-dollar division of America's largest steel company.

Jonathan received his J.D. from the University of Michigan Law School. While in law school, Jonathan participated in the Campbell Moot Court and the Frank Murphy Society 1L Oral Advocacy Competition. He was awarded Legal Practice Honors for performing in the top 20% of his first-year legal research and writing classes.

Jonathan graduated *summa cum laude* from Chowan University, earning his B.S. in Business Administration with a double concentration in Information Systems and Accounting.

**JAMIE J. R. HOLZ** is an Associate at EDELSON PC where his practice focuses on tech and privacy-related class actions.

Jamie received his J.D., *magna cum laude*, from The John Marshall Law School. While attending law school, Jamie participated in The John Marshall Law Review and the Moot Court Honors Council, and was a Board Member for The John Marshall Trial Advocacy and Dispute Resolution Honors Board. Jamie competed nationally on several alternative dispute resolution teams, was the Herzog Moot Court Competition champion and a two-time Triple Crown Alternative Dispute Resolution Competition champion.

Jamie was an extern to the Honorable Arlander Keys in the United States District Court for the Northern District of Illinois and with the Cook County State's Attorney's Office. Jamie completed his time at John Marshall as a David R. Sargis Scholar and walked away with CALI awards in property law and civil procedure.

Prior to law school, Jamie attended Loras College where he earned a B.A. in Creative Writing and English Literature.

**ALICIA HWANG** is an Associate at EDELSON PC. Alicia practices in the area of consumer class action and general litigation.

Alicia received her J.D. from the Northwestern University School of Law, where she was an articles editor for the Journal of Law and Social Policy. During law school, Alicia was a legal intern for the Chinese American Service League, served as president of the Asian Pacific American Law Student Association and the Student Animal Legal Defense Fund, and was Chair of the Student Services Committee. She also worked as a student in the Northwestern Entrepreneurship Law Clinic and Complex Civil Litigation and Investor Protection Clinic.

Prior to joining EDELSON PC, Alicia worked as an Executive Team Leader for the Target Corporation, as well as a public relations intern for a tourism-marketing agency in London.

Alicia graduated *magna cum laude* from the University of Southern California, earning her B.A. in Communication. She is a member of the Phi Beta Kappa honor society.

**NICK LARRY** is an Associate at EDELSON PC where his practice focuses on technology and privacy class actions.

Nick has been appointed class counsel in multiple class actions that have resulted in tens of millions of dollars in refunds to consumers, including: *In re LinkedIn User Privacy Litig.*, No. 12-cv-3088 (N.D. Cal.); *Halaburda v. Bauer Publishing Co., LP*, No. 12-cv-12831 (E.D. Mich.); *Dunstan v. comScore*, No. 11-cv-5807 (N.D. Ill.); and *In re Netflix Privacy Litig.*, No. 11-cv-379 (N.D. Cal.).

Nick received his J.D., *cum laude*, from Northwestern University School of Law, where he was a senior editor of the Northwestern University Journal of International Law and Business. His student Comment, which examines the legal issues that may arise from National Hockey League players' participation in the 2014 Olympic Winter Games, appears in Vol. 32, No. 3A of the Northwestern University Journal of International Law and Business.

Nick attended Michigan State University, where he graduated with a B.A. in General Business Administration/Pre-law and played on the school's rugby team.

**J. AARON LAWSON** is an Associate at EDELSON PC where his practice focuses on appeals and complex motion practice.

Before coming to EDELSON PC, Aaron served for two years as a Staff Attorney for the United States Court of Appeals for the Seventh Circuit, handling appeals involving a wide variety of subject matter, including consumer-protection law, employment law, criminal law, and federal habeas corpus. While at the University of Michigan Law School, Aaron served as the Managing Editor for the Michigan Journal of Race & Law, and participated in the Federal Appellate Clinic. In the clinic, Aaron briefed a direct criminal appeal to the United States Court of Appeals for the Sixth Circuit, and successfully convinced the court to vacate his client's sentence.

**TODD LOGAN** is an Associate at EDELSON PC, where he focuses on privacy and technology-related class actions.

Todd received his J.D. *cum laude* from Harvard Law School. While in law school, Todd was Managing Editor or the Harvard Journal of Law and Technology (JOLT). He also served as a research assistant to Professor William B. Rubenstein, for whom he researched and analyzed a wide variety of class action related issues. Todd is credited for his work in more than eighty sections of Newberg on Class Actions.

Todd's past experiences include building SQL databases for a technology company and working in federal and state government. He received his bachelors degree in politics from Pomona co

**DAVID I. MINDELL** is an Associate at EDELSON PC where he helps direct a team of attorneys and engineers in investigating and litigating cases involving complex tech fraud and privacy violations. His team's research has led to lawsuits involving the fraudulent development, marketing, and sale of computer software, unlawful tracking of consumers through mobile-devices and computers, unlawful collection, storage, and dissemination of consumer data,

mobile-device privacy violations, large-scale data breaches, and the Bitcoin industry. On the other side, David also serves as a consultant to a variety of emerging technology companies.

Prior to joining EDELSON PC, David co-founded several tech, real estate, and hospitality related ventures, including a tech startup that was acquired by a well-known international corporation within its first three years. David has advised tech companies on a variety of legal and strategic business-related issues, including how to handle and protect consumer data. He has also consulted with startups on the formation of business plans, product development, and launch.

While in law school, David was a research assistant for University of Chicago Law School Kauffman and Bigelow Fellow, Matthew Tokson, and for the preeminent cyber-security professor, Hank Perritt at the Chicago-Kent College of Law. David's research included cyberattack and denial of service vulnerabilities of the Internet, intellectual property rights, and privacy issues.

David has spoken to a wide range of audiences about his investigations and practice.

**AMIR MISSAGHI** is an Associate at EDELSON PC where he focuses on technology and privacy class actions.

Amir received his J.D. from the Chicago-Kent College of Law, where he was a member of the Moot Court Honor Society and a teaching assistant in Property. Before law school, he attended the University of Minnesota, where he received his B.S. and M.S. in Applied Economics. He then began working at a Fortune 50 company as a programmer and data analyst. During that time Amir started working on his graduate studies in Applied Economics where he focused on analyzing consumer choice in healthcare markets.

**BEN THOMASSEN** is an Associate at EDELSON PC where he focuses on consumer litigation, with an emphasis on privacy and data breach class actions.

Ben's work at the firm has achieved significant results for classes of consumers. He has been appointed as class counsel in several high profile cases, including, for example, *Harris v. comScore, Inc.*, No. 11-cv-5807 (N.D. Ill.) (appointed class counsel in case against data analytics company, which is estimated to be the largest privacy class action certified on adversarial basis and resulted in $14MM settlement). Ben has also played critical and leading roles in developing, briefing, and arguing novel legal theories on behalf of his clients, including by delivering the winning oral argument to the Eleventh Circuit in the seminal case of *Resnick, et al. v. AvMed, Inc.*, No. 10-cv-24513 (S.D. Fla.) (appointed class counsel in industry-changing data breach case, which obtained a landmark appellate decision endorsing common law unjust enrichment theory, irrespective of whether identity theft occurred) and recently obtaining certification of a class of magazine subscribers in *Coulter-Owens v. Time, Inc.*, No. 12-cv-14390 (E.D. Mich.) (achieved adversarial certification in privacy case brought by class of magazine subscribers against magazine publisher under Michigan's Preservation of Personal Privacy Act). His cases have resulted in millions of dollars to consumers.

Ben graduated *magna cum laude* from Chicago-Kent College of Law, where he also earned a certificate in Litigation and Alternative Dispute Resolution and was named Order of the Coif. He also served as Vice President of Chicago-Kent's Moot Court Honor Society and earned (a currently unbroken firm record of) seven CALI awards for receiving the highest grade in Appellate Advocacy, Business Organizations, Conflict of Laws, Family Law, Personal Income Tax, Property, and Torts.

Before settling into his legal career, Ben worked in and around the Chicago and Washington, D.C. areas in a number of capacities, including stints as a website designer/developer, a regular contributor to a monthly Capitol Hill newspaper, and a film projectionist and media technician (with many years experience) for commercial theatres, museums, and educational institutions. Ben received a Master of Arts degree from the University of Chicago and his Bachelor of Arts degree, *summa cum laude*, from St. Mary's College of Maryland.

**ALEXANDER G. TIEVSKY** is an Associate at EDELSON PC, where he concentrates on complex motion practice and appeals in consumer class action litigation.

He received his J.D. from the Northwestern University School of Law, where he graduated from the two-year accelerated J.D. program. While in law school, Alex was Media Editor of the Northwestern University Law Review. He also worked as a member of the Bluhm Legal Clinic's Center on Wrongful Convictions. Alex maintains a relationship with the Center and focuses his public service work on seeking to overturn unjust criminal convictions in Cook County.

Alex's past experiences include developing internal tools for an enterprise software company and working as a full-time cheesemonger. He received his A.B. in linguistics with general honors from the College of the University of Chicago.

**SHAWN DAVIS** is the Director of Digital Forensics at EDELSON PC, where he leads a technical team in investigating claims involving privacy violations and tech-related abuse. His team's investigations have included claims arising out of the fraudulent development, marketing, and sale of computer software, unlawful tracking of consumers through digital devices, unlawful collection, storage, and dissemination of consumer data, large-scale data breaches, receipt of unsolicited communications, and other deceptive marketing practices.

Prior to joining EDELSON PC, Shawn worked for Motorola Solutions in the Security and Federal Operations Centers as an Information Protection Specialist. Shawn's responsibilities included network and computer forensic analysis, malware analysis, threat mitigation, and incident handling for various commercial and government entities.

Shawn is an Adjunct Industry Associate Professor for the School of Applied Technology at the Illinois Institute of Technology (IIT) where he has been teaching since December of 2013. Additionally, Shawn is a faculty member of the IIT Center for Cyber Security and Forensics Education which is a collaborative space between business, government, academia, and security professionals. Shawn's contributions aided in IIT's designation as a National Center of Academic Excellence in Information Assurance by the National Security Agency.

Shawn graduated with high honors from the Illinois Institute of Technology with a Masters of Information Technology Management with a specialization in Computer and Network Security. During graduate school, Shawn was inducted into Gamma Nu Eta, the National Information Technology Honor Society.