1  Susan D. Fahringer (CA Bar No. 162978)
   SFahringer@perkinscoie.com
2  Charles C. Sipos (*Pro Hac Vice*)
   CSipos@perkinscoie.com
3  Breena M. Roos (*Pro Hac Vice*)
   BRoos@perkinscoie.com
4  Ryan T. Mrazik (*Pro Hac Vice*)
   RMrazik@perkinscoie.com
5  PERKINS COIE LLP
   1201 Third Avenue, Suite 4900
6  Seattle, WA 98101-3099
   Telephone: (206) 359-8000
7  Facsimile: (206) 359-9000

8  Attorneys for Defendants
   Google Inc. and Google Payment Corporation

9

UNITED STATES DISTRICT COURT

10    NORTHERN DISTRICT OF CALIFORNIA

11    SAN JOSE DIVISION

12

13  ALICE SVENSON, individually and on behalf of all others similarly situated,

    Plaintiff,

14

15  v.

16  GOOGLE INC., a Delaware Corporation, and GOOGLE PAYMENT
17  CORPORATION, a Delaware Corporation,

18    Defendants.

19

20

---

Case No. CV-13-04080-BLF

**DEFENDANTS GOOGLE INC. AND GOOGLE PAYMENT CORPORATION'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S INDIVIDUAL CLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Date:     August 24, 2016
Time:     9:00 a.m.
Place:    Courtroom 3, 5th Floor
Judge:    Hon. Beth Labson Freeman

REDACTED VERSION - PUBLICLY FILED

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AS TO
PLAINTIFF'S INDIVIDUAL CLAIMS ............................................................................ vi

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS.................................... 2

        A.      Google Play and Google Wallet.............................................................. 2

        B.      Svenson's App Purchase ......................................................................... 3

                1.      Svenson's creation of her accounts and agreement to the relevant
                        terms and policies......................................................................... 3

                2.      Svenson's purchase ...................................................................... 4

        C.      Sharing of Buyer Information .................................................................. 5

                1.      The Wallet PN and GPP permit sharing under certain circumstances........ 5

                2.      Svenson has no evidence that her Buyer Information was shared
                        with YCDroid ............................................................................... 6

        D.      Svenson's Allegations of Damage .......................................................... 7

III.    ARGUMENT ........................................................................................................ 9

        A.      Summary Judgment Standard ................................................................. 9

        B.      Svenson Cannot Show She Suffered the Concrete Injury Necessary to
                Establish Article III Standing................................................................ 10

                1.      Legal standard ............................................................................ 10

                2.      Svenson cannot show that she suffered a concrete injury in fact
                        sufficient to confer Article III standing..................................... 10

                        a.      Svenson did not lose the "benefit of the bargain" because
                                she paid Defendants nothing for their privacy promises.............. 11

                        b.      Svenson did not lose her "benefit of the bargain," because
                                she has no evidence that any of her Buyer Information was
                                shared with YCDroid ................................................... 13

                        c.      Svenson cannot establish an injury in fact under her
                                diminution of value theory ........................................... 14

        C.      The Court Should Grant Summary Judgment Dismissing Each of
                Svenson's Claims ................................................................................... 16

                1.      Svenson cannot show damage resulting from any alleged breach of
                        contract ....................................................................................... 16

                        a.      Svenson cannot establish that Defendants breached the
                                Wallet ToS, Wallet PN, or GPP ..................................... 16

                        b.      Svenson cannot show that she incurred damage as a result of
                                Defendants' actions ................................................... 17

2.    Svenson cannot establish either a breach or the damage necessary to her claim for breach of the implied covenant of good faith and fair dealing ............................................................................................. 18

3.    Svenson cannot establish that Defendants violated the UCL, or that she suffered damage as a result ................................................................. 19

IV.    CONCLUSION .............................................................................................................. 20

MOTION FOR SUMMARY JUDGMENT (Case No. CV-13-04080-BLF)
131767880.2

# TABLE OF AUTHORITIES

**CASES**

*Addisu v. Fred Meyer, Inc.*,
  198 F.3d 1130 (9th Cir. 2000)......................................................................................9

*Aguilera v. Pirelli Armstrong Tire Corp.*,
  223 F.3d 1010 (9th Cir. 2000)....................................................................................17

*Auldridge v. Modesto Irrigation Dist.*,
  No. CV-F-04-6473 AWI DLB, 2007 WL 2500438 (E.D. Cal. Aug. 30, 2007) ...............16

*Avidity Partners, LLC v. State*,
  221 Cal. App. 4th 1180 (2013) ...................................................................................18

*Braunstein v. Ariz. Dep't of Transp.*,
  683 F.3d 1177 (9th Cir. 2012)....................................................................................10

*Carlsen v. GameStop, Inc.*,
  112 F. Supp. 3d 855, 862 (D. Minn. 2015) .................................................................13

*Chambliss v. Carefirst, Inc.*,
  No. RDB-15-2288, 2016 WL 3055299 (D. Minn. May 27, 2016) ...............................15

*Egan v. Mut. of Omaha Ins. Co.*,
  24 Cal. 3d 809 (1979) ...............................................................................................18

*FW/PBS, Inc. v. City of Dallas*,
  493 U.S. 215 (1990)...................................................................................................10

*Green Valley Landowners Ass'n v. City of Vallejo*,
  241 Cal. App. 4th 425 (2015), *review denied* (Jan. 13, 2016) ..................................19

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (9th Cir. 2013).....................................................................................12

*In re Facebook Internet Tracking Litig.*,
  140 F. Supp. 3d 922, 931-32 (N.D. Cal. 2015) ...........................................................15

*In re Google, Inc. Privacy Policy Litig.*,
  No. 5:12-cv-001382-PSG, 2015 WL 4317479 (N.D. Cal. July 15, 2015)..................2, 14

*In re LinkedIn User Privacy Litig.*,
  932 F. Supp. 2d 1089 (N.D. Cal. 2013) ......................................................................13

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
  45 F. Supp. 3d 14, 28 (D.D.C. 2014) ....................................................................14, 15

*In re SuperValu, Inc.*,
No. 14-MD-2586 ADM/TNL, 2016 WL 81792 (D. Minn. Jan. 7, 2016).................................15

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, &*
*Prods. Liab. Litig.*,
754 F. Supp. 2d 1145 (C.D. Cal. 2010) ................................................12

*Katz v. Pershing, LLC*,
672 F.3d 64 (1st Cir. 2012)................................................14

*Khan v. Children's Nat'l Health Sys.*,
No. TDC-15-2125, 2016 WL 2946165 (D. Md. May 19, 2016) ...........................15

*Khasin v. Hershey Co.*,
No. 5:12-CV-01862-EJD, 2014 WL 1779805 (N.D. Cal. May 5, 2014)....................10

*Krottner v. Starbucks Corp.*,
628 F.3d 1139 (9th Cir. 2010)................................................14

*Kwickset Corp. v. Super. Ct.*,
51 Cal. 4th 310 (2011) ................................................19, 20

*Low v. LinkedIn Corp.*,
900 F. Supp. 2d 1010 (N.D. Cal. 2012)................................................17

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)................................................10

*Martinez v. Welk Grp., Inc.*,
907 F. Supp. 2d 1123 (S.D. Cal. 2012) ................................................17, 18

*Mazza v. Am. Honda Motor Co.*,
666 F.3d 581 (9th Cir. 2012)................................................12

*Nelsen v. King Cty.*,
895 F.2d 1248 (9th Cir. 1990)................................................10

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
752 F.3d 807 (9th Cir. 2014)................................................16

*Rudgayzer v. Yahoo! Inc.*,
No. 5:12-CV-01399 EJD, 2012 WL 5471149 (N.D. Cal. Nov. 9, 2012) ....................18

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ................................................10

*St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*,
101 Cal. App. 4th 1038 (2002) ................................................17

*Stegall v. Citadel Broad. Co.*,
 350 F.3d 1061 (9th Cir. 2003)................................................................9

*Thornhill Publ'g Co. v. GTE Corp.*,
 594 F.2d 730 (9th Cir. 1979)................................................................9

*Von Koenig v. Snapple Beverage Corp.*,
 713 F. Supp. 2d 1066 (E.D. Cal. 2010)................................................20

*Vu v. Cal. Commerce Club, Inc.*,
 58 Cal. App. 4th 229 (1997) ................................................................19

*Wright v. Schock*,
 742 F.2d 541 (9th Cir. 1984)................................................................9

**STATUTES**

Cal. Bus. & Prof. Code § 17200 ..............................................................19

Cal. Bus. & Prof. Code § 17204 ..............................................................19

Cal. Bus. & Prof. Code § 22576 ..............................................................19

Cal. Civ. Code § 1644 ..............................................................................16

**RULES**

Fed. R. Civ. P. 12 .......................................................................................1

Fed. R. Civ. P. 12(h)(3)............................................................................10

Fed. R. Civ. P. 26(a)(2)..............................................................................9

Fed. R. Civ. P. 30(b)(6)..............................................................................6

Fed. R. Civ. P. 56 .......................................................................................9

Fed. R. Civ. P. 56(a)...................................................................................9

**OTHER AUTHORITIES**

*MacMillan's Dictionary* (2016) ..............................................................17

*Webster's Third New International Dictionary* (3d ed. 1966)..................16

MOTION FOR SUMMARY JUDGMENT (Case No. CV-13-04080-BLF)
131767880.2

## NOTICE OF MOTION AND MOTION FOR
## SUMMARY JUDGMENT AS TO PLAINTIFF'S INDIVIDUAL CLAIMS

To:     Plaintiff Alice Svenson and her counsel of record:

Please take notice that on August 24, 2016, at 9:00 a.m., or on such other date as the Court directs, in Courtroom 3, 5th Floor of the United States District Court, Northern District of California, San Jose Division, before the Hon. Beth Labson Freeman, Defendants Google Inc. and Google Payment Corporation (collectively, "Defendants") will move this Court for an Order dismissing Plaintiff Alice Svenson's claims for lack of Article III standing. Alternatively, Defendants will move that this Court grant summary judgment because the undisputed facts show she cannot establish the essential elements of her claims.

Defendants' Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in support thereof, the Omnibus Declaration of Charles C. Sipos, the Omnibus Declaration of Masha Kourakina, and upon such other matters as may be presented.

DATED: July 8, 2016                    **PERKINS COIE** LLP

                                       By: */s/ Charles C. Sipos*
                                           Charles C. Sipos

                                       Attorneys for Defendants
                                       Google Inc. and Google Payment Corporation

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Plaintiff Alice Svenson ("Svenson" or "Plaintiff") managed to drag this case past the pleading stage based on two assertions, both of which the record now confirms are false. First, Svenson claimed that when she bought an App from seller YCDroid on Google Play using Google Wallet, she "paid" Defendants Google Inc. and Google Payment Corporation ("Google," "GPC," and collectively "Defendants") for their privacy promises. Second, Svenson insisted that her App purchase caused the "automatic" sharing of her name, email address, and zip code[1] (her "Buyer Information") with YCDroid, causing her damage. When Defendants challenged these assertions as false, Svenson's lawyers took shelter in the presumptions of truth allowed by Federal Rule of Civil Procedure ("Rule") 12, and told the Court it was a "dispute" to resolve later. The time to resolve this so-called dispute is now.

The undisputed facts show that Svenson did not pay Defendants anything. Ever. Google Wallet is entirely free to buyers like Svenson. Her App purchase was a sales transaction between her and YCDroid. She paid for the App, not for Defendants' privacy promises. While there is a fee associated with App purchases that are processed by Google Wallet, it is the App seller who pays that fee, never the buyer. And there was no "automatic" sharing of Svenson's Buyer Information with YCDroid, at the time of App purchase or otherwise: sellers like YCDroid have to ask for Buyer Information, which they do by logging into secure portals then submitting queries or downloading reports. Svenson has no evidence that YCDroid did so, insisting that the fact of such access doesn't even "matter." She certainly has no evidence of any resulting damage.

This failure of proof requires summary judgment dismissing Svenson's claims on Article III grounds and on the merits, because the undisputed facts confirm she has not suffered

---

[1] As explained in Plaintiff's Motion for Class Certification, the alleged improper sharing of name, email address, and zip code is now the focus of Svenson's claims. *See* Plaintiff's Motion for and Memorandum in Support of Motion for Class Certification (Dkt. No. 159) ("Pl.'s Mot.") at 14, 17-18.

the "concrete injury" required by Article III, or the "damage" that is essential to each of her claims.

The Court does not need to look far for on-point authority in Defendants' favor. *First*, the Court previously held that if Svenson paid Defendants nothing and instead received "free services" (which we now know is true), then she could not have suffered damage from her App purchase and could not state a claim for relief. Aug. 12, 2014 Order (Dkt. No. 83) at 7-8. The undisputed record now proves that Svenson's purchase falls precisely within this Court's prior analysis.

*Second*, in a putative class action litigation challenging the exact alleged disclosure of Buyer Information at issue here, Judge Grewal held that because plaintiffs failed to show that Buyer Information was shared, or that any damage resulted, there was no Article III injury. *See In re Google, Inc. Privacy Policy Litig.*, No. 5:12-cv-01382-PSG, 2015 WL 4317479, at *4 (N.D. Cal. July 15, 2015). That analysis applies to this case and mandates the same result. It dooms Svenson's claims on the merits as well, because an essential factual predicate for all of them is that YCDroid actually obtained her Buyer Information, causing her damage.

Svenson has dragged Defendants through months of exhaustive discovery in an attempt to support her allegations. She can no longer shield these falsehoods from scrutiny. The Court should dismiss all of Svenson's claims.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     Google Play and Google Wallet

Google operates the Google Play Store ("Google Play"), a free platform where users can buy digital content, including Apps. Omnibus Declaration of Masha Kourakina ("Kourakina Decl.") ¶ 2; Plaintiff's First Amended Complaint ("FAC") (Dkt. No. 84) ¶ 58. Many Apps are free, but third-party App developers ("Sellers") can also sell Apps on Google Play. Kourakina Decl. ¶ 2; FAC ¶ 120. To buy an App on Google Play, a user ("Buyer") must create both a Google account and a Google Wallet ("Wallet") account. Omnibus Declaration of Charles C. Sipos ("Sipos Decl.") Ex. 1 (Defendant Google Inc.'s Fourth Amended Supplemental Answers to

Plaintiff's Interrogatories, Set One ("Answers to Interrogatories") at 8);[2] *see also* FAC ¶ 2.[3]  It is free to create these accounts, and Google Play and Wallet are free to Buyers.[4]  Ex. 7 (Wallet ToS at § 2.7 ("GPC does not charge a fee to use the Processing Service as a Buyer.")).

**B.      Svenson's App Purchase**

**1.      Svenson's creation of her accounts and agreement to the relevant terms and policies**

Svenson created her Google account in November 2012.  Ex. 30 (Deposition of Alice C. Svenson ("Svenson Tr.") at 11:1-11); *see also* Ex. 2 (Svenson's response to Interrogatory No. 7). When she did so, she agreed to the Google Terms of Service ("Google ToS") and Google Privacy Policy ("GPP").  Ex. 30 (Svenson Tr. at 14:23-15:3); *see also* Ex. 2 (Svenson's response to Interrogatory No. 8); Ex. 6 (Google ToS); Ex. 8 (GPP).

To buy her App, Svenson created a Wallet account on May 6, 2013.  Ex. 30 (Svenson Tr. at 22:23-23:3, 82:13-83:10); *see also* Ex. 2 (Svenson's response to Interrogatory No. 7).  She admits she agreed to the Google Wallet Terms of Service ("Wallet ToS") when she created her Wallet account.  Ex. 30 (Svenson Tr. at 83:12-17 (she "clicked on [the Wallet ToS] . . . to actually enter into the contract")); *see also* Ex. 2 (Svenson's response to Interrogatory No. 7).

The Wallet ToS incorporates the Wallet Privacy Notice ("Wallet PN"), which in turn incorporates the GPP.  Ex. 7 (Wallet ToS at § 5 ("You understand and agree that personal information provided to Google or GPC in connection with the Services is subject to the Google Wallet Privacy Policy.")); Ex. 10 (Wallet PN at GOOG-00000997, incorporating GPP).  Svenson testified that she considered herself and Google to be bound by the terms of the Wallet ToS— which include the privacy promises at issue—"prior to purchase."  Ex. 30 (Svenson Tr. at 36:5-37:9 ("[W]hen I agreed to their terms. . . .  It would have been prior to purchase.")).

---

[2] Unless otherwise noted, all citations to "Exhibit" or "Ex." herein refer to exhibits to the Sipos Declaration.

[3] *See also* Ex. 22 (Deposition of John Affaki ("Affaki Tr.") at 25:13-18); Ex. 33 (*In re Google Inc. Privacy Policy Litig.*, Case No. 5:12-cv-01382-PSG (N.D. Cal.), Deposition of Ficus Kirkpatrick ("Kirkpatrick Tr.") at 56:21-24).

[4] In the United States, Google operated Wallet (and its predecessor, Google Checkout) through its wholly-owned subsidiary GPC, which provides payment processing services for App sales made to U.S. Buyers through Google Play.  Kourakina Decl. ¶ 3.

MOTION FOR SUMMARY JUDGMENT (Case No. CV-13-04080-BLF)
131767880.2

### 2. Svenson's purchase

Svenson then purchased her App, entitled "SMS MMS to Email," for $1.77 from Seller YCDroid, on May 6, 2013. Ex. 2 (Svenson's response to Interrogatory No. 13); Ex. 30 (Svenson Tr. at 82:13-18). She alleged that she would not have made that purchase had she known about Defendants' alleged sharing practices, FAC ¶ 96, but discovery revealed the opposite: Svenson "love[d]" the App so much that she bought it a second time when she got a new phone in April 2014, *after* she filed this suit. Ex. 30 (Svenson Tr. at 24:8-25:19, 88:13-18); *see also* Ex. 2 (Svenson's response to Interrogatory No. 13). Just as she did with her first purchase, Svenson bought the App on Google Play, using Wallet. Ex. 30 (Svenson Tr. at 88:13-24).

Svenson paid the price of the App to the Seller, not Defendants, and because that is precisely how App sales on Google Play work, she has no evidence to the contrary. Her receipt for the purchase says that she bought the App from YCDroid, not Google: "You've made a purchase *from YCdroid* on Google Play." Ex. 19 (May 6, 2013 Receipt (emphasis supplied)); *see also* Ex. 30 (Svenson Tr. 131:24-132:19). The Google policies to which Svenson agreed reflect this. They show that App sales are between Buyer and Seller, not Buyer and Google. The Wallet ToS provide:

> You [the Buyer] acknowledge and agree that your purchases of Products are transactions *between you and the Seller, and not with GPC, Google or any of their affiliates.* Neither GPC nor Google are a party to your Payment Transaction for the Purchase of Products, and *GPC, Google, or other GPC affiliates are not a Buyer or a Seller in connection with any Payment Transaction*, unless expressly designated as such in the listing of the Product on a Google Web Site.

Ex. 7 (Wallet ToS at § 2.2) (emphasis supplied); *see also id.* ("GPC processes Payment Transactions on behalf of Sellers, as the agent of the Seller[.]"). The Google Play Terms of Service ("Play ToS"), to which Svenson admits she agreed,[5] also provide that the sale is between Buyer and Seller, not Buyer and Defendants. Ex. 11 (Play ToS at § 4 ("When you buy Content . . . on Google Play you will buy it . . . in the case of Android apps, from the Provider of the app[.]")).

---

[5] Svenson's discovery responses state that she agreed to the Play ToS when she bought the App (the first time) on May 6, 2013. Ex. 2 (Svenson's response to Interrogatory No. 8).

The contracts between Google and Sellers reflect this as well.  Sellers must agree to the Google Wallet *Seller* Terms of Service (the "Seller ToS") before they can sell Apps on Google Play.  *E.g.*, Ex. 12 (Seller ToS).  The Seller ToS provide:

> (i) Seller's sales of Products are transactions between Seller and the Buyer and not with GPC or any of GPC's affiliates;

> (ii) GPC is a third-party service provider facilitating Payment Transactions for the Seller, is not acting Buyer in a Payment transaction, and is not a party to any Payment Transaction.

> (iii)  GPC is not a buyer or a seller in connection with any Payment transaction.

*Id.* (Seller ToS at § 2.1).

And the flow of funds reflects this.  GPC collected and processed Svenson's payment for the App only *on behalf of* the Seller—not for itself.  *See* Kourakina Decl. ¶ 3.  For App sales to U.S. Buyers like Svenson, the Seller—not GPC or Google—is the merchant of record on the transaction.  *Id.*  Defendants receive a 30% processing fee, but that fee is paid exclusively by the Seller, not the Buyer.  *Id.* ¶ 4.

## C.      Sharing of Buyer Information

### 1.      The Wallet PN and GPP permit sharing under certain circumstances

The terms of service and privacy policies at issue in this case are the Wallet ToS, the Wallet PN, and the GPP.  *See* FAC, Exs. A-C (attaching Wallet ToS, Wallet PN, and GPP as contracts and policies at issue); *see also* Ex. 30 (Svenson Tr. at 89:11-25 (identifying contracts at issue as Wallet ToS and a "couple of privacy policies"), 93:6-94:20 (terms of the "buyer contract" are the Wallet ToS)).

The Wallet PN and the GPP provide that a Buyer's personal information may be "shared" with App Sellers under several circumstances.[6]  The GPP allows information to be shared if, for

---

[6] The Wallet PN and GPP both use the term "share" with respect to Defendants' privacy promises. Ex. 8 (GPP at GOOG-00000114 ("We do not share personal information with companies, organizations and individuals outside of Google unless one of the following circumstances applies[.]")); Ex. 10 (Wallet PN at GOOG-00000998 ("We will only share your personal information with other companies or individuals outside of Google in the following circumstances[.]")). Svenson does not dispute that the relevant language in the Wallet PN and GPP has been substantially the same throughout the class period. Pl.'s Mot. at 12.

example, Google or GPC has "a good faith belief" that such sharing is "reasonably necessary" to "meet any applicable law, regulation, legal process, or enforceable governmental request," or to "detect, prevent, or otherwise address fraud, security or technical issues." Ex. 8 (GPP at GOOG-00000114). The Wallet PN permits Google or GPC to share a Buyer's personal information as permitted under the GPP, and also "as necessary to process your transaction and maintain your account" or "to complete your registration for a service provided by a third party." Ex. 10 (Wallet PN at GOOG-00000998).

These provisions allow Sellers to obtain Buyer Information for legitimate purposes. For example, because Sellers are responsible for service obligations for their Apps, a Seller might need a Buyer's name or email address to process a refund or to provide customer support. Ex. 28 (Rule 30(b)(6) Deposition of Mekka Okereke ("Okereke Tr.") at 89:23-90:7, 94:4-25, 99:13-17); *see also* Ex. 24 (Deposition of Ibrahim Elbouchikhi at 122:9-21). Sellers' tax obligations can depend on the location of their Buyers, so Sellers would need to know where their Buyers are located—zip code, at least—to respond to tax inquiries and confirm that taxes are calculated accurately. Ex. 27 (Rule 30(b)(6) Deposition of Marlene Linda Macek at 26:24-27:20, 39:23-40:15, 41:24-42:19, 60:1-5, 61:2-12); Ex. 28 (Okereke Tr. at 89:23-90:7, 94:4-25). Or a Seller might need a Buyer's name and email address to distinguish between fraudulent and legitimate App purchases, because fraudulent purchases are sometimes made without accompanying name and email address. *Id.* (Okereke Tr. at 92:12-19, 99:13-17, 102:7-103:5).

### 2. Svenson has no evidence that her Buyer Information was shared with YCDroid

When an App sale occurs, the information the Buyer provided when she created her Google and Wallet accounts remains in secure servers within Google. Ex. 23 (Rule 30(b)(6) Deposition of Giles Douglas at 15:16-17:19); *see also* Ex. 3 (*In re Google Inc. Privacy Policy Litig.*, No. 5:12-cv-01382-PSG (N.D. Cal.), Declaration of Ficus Kirkpatrick in Support of Defendant Google Inc.'s Motion to Dismiss Plaintiffs' Consolidated Third Amended Class Action Complaint, or in the Alternative Motion for Summary Judgment ("Kirkpatrick Decl.") ¶ 10 ("[N]o [user] information is transmitted anywhere, by anyone, in the process of purchasing

an App.")).  The Seller can proactively ask for Buyer Information, but to do so the Seller must log in to one of four secure portals[7] that Google has made available over time, then proactively query for the information or take steps to export it.  Ex. 1 (Answers to Interrogatories at 10-11); Ex. 3 (Kirkpatrick Decl. ¶¶ 11-13 ("[D]evelopers can log into their Google Wallet Merchant Center accounts and request certain information concerning past purchasers of their products.")); *see also* Ex. 33 (Kirkpatrick Tr. at 71:22-72:16, 185:8-18); Ex. 32 (*In re Google Inc. Privacy Policy Litig.*, Case No. 5:12-cv-01382-PSG (N.D. Cal.), Deposition of Mark Thomas at 62:1-64:3).

Svenson has no evidence that YCDroid did this, and testified that it doesn't "matter" whether YCDroid ever did so.  Ex. 30 (Svenson Tr. at 54:19-55-9); *see also* Pl.'s Mot. at 5 n.3 (whether App developers accessed Buyer Information is "beside the point").  She admits she does not know whether her information was actually shared with YCDroid.  Ex. 30 (Svenson Tr. at 52:23-54:9).  She does not remember YCDroid ever having contacted her or having sent her marketing material.  *Id*. (Svenson Tr. at 68:16-69:21).  And she has no evidence that YCDroid ever viewed or used her Buyer Information, or gave it to anyone else.  *Id*. (Svenson Tr. at 55:12-56:8).

**D.    Svenson's Allegations of Damage**

Svenson says she was damaged when Defendants allegedly shared her Buyer Information with YCDroid, because she lost the "benefit of her bargain."  Under this theory, Svenson claims that she paid some part of the $1.77 purchase price of her App to Defendants in exchange for the privacy promises in the Wallet ToS, Wallet PN, and GPP.  FAC ¶¶ 142-148; Ex. 30 (Svenson Tr. at 107:20-109:20).  She has no evidence to support this.  In deposition, she did not know how much of the App purchase price went to Google in exchange for the privacy promises in the Wallet ToS—she just repeated that Defendants received 30% of the App purchase price.  *Id.* (Svenson Tr. at 110:15-19, 113:20-114:5 ("Q. Okay. How much of that 30 percent was attributable—that—that you—that you believe you paid the defendants, how much was

---

[7] The four portals available to Sellers were the Wallet Merchant Center, its predecessor the Checkout Merchant Center, the Checkout API, and the Play Developer Console.  Ex. 1 (Answers to Interrogatories at 10-11).

MOTION FOR SUMMARY JUDGMENT (Case No. CV-13-04080-BLF)
131767880.2

attributable to the privacy protections, how much was attributable to the other things you mentioned that you got from the defendants? Do you know? MR. NGUYEN: Objection, calls for speculation. BY MS. FAHRINGER: Q. If you know. A. Yeah, that I don't know.")). She acknowledged that none of the relevant contracts or policies include this supposed price term. *Id.* (Svenson Tr. at 125:11-16). She admitted that she did not even know about the supposed price term until her lawyers told her about the 30% transaction fee after she bought her App, and after she agreed to the GPP and the Wallet PN. *Id.* (Svenson Tr. at 110:15-111:19 ("Q. Okay. So when you purchased the app, you didn't know that Google took a 30-percent cut? A. I probably didn't know that. Q. And you came to learn that later. A. Yes.")).

Svenson also claims that she lost some of the market value of her Buyer Information due to the alleged sharing of that information with YCDroid, but she has no evidence of this either. Even if her Buyer Information was shared with YCDroid, Svenson does not know whether that affected its value. *Id.* (Svenson Tr. at 63:13-19, 67:19-68:10). She has no evidence of any market for her Buyer Information: she does not know whether she could sell it, who she would sell it to, the price she would get, or whether that price would be any different because of any alleged sharing. *Id.* (Svenson Tr. at 66:25-67:7 ("Q. Okay. As to that allegation is it fair to say, is it correct to say that as a result of that you don't know whether you can sell your information anymore? Do you understand the question? A. I think so. I think it's fair to say that I don't know if I can sell the information. Yes.")); *see also id.* (Svenson Tr. at 67:8-11, 67:16-68:12, 142:14-25, 144:11-145:10 (does not know value or change in value of her Buyer Information)). She never tried to sell her Buyer Information. *Id.* (Svenson Tr. at 67:12-15, 74:11-20, 140:22-141:5).

Moreover, she admits that she made her Buyer Information publicly available, for free, via multiple sources. Svenson acknowledged that her city, state, and zip code have been publicly available (and free) since before 2013. *Id.* (Svenson Tr. at 75:2-13, 76:22-77:14). Svenson herself published her hometown and place of residence on her Facebook page. *Id.* (Svenson Tr. at 75:20-76:8). Svenson's full name, city, state, and zip code all are publicly available for free in

reports of her political contributions.  *Id.* (Svenson Tr. at 76:22-77:17).  And she makes at least some of her email addresses freely available online.  Ex. 21 (Svenson's RNLA online bio).

Svenson tries to overcome this absence of proof with expert testimony, but that, too, offers no evidence of a market for her Buyer Information or of "diminished" value of her Buyer Information.  ███████████████████████████████████████████ Declaration of Rafey S. Balabanian In Support of Plaintiff's Motion for Class Certification (Dkt No. 159) ("Balabanian Decl.") Ex. 1-47 (Plaintiff's Rule 26(a)(2) Corrected Expert Report of Henry Fishkind, Ph.D. in Support of Class Certification ("Fishkind Rep.") ¶ 23).  ████████████ ██████████████████████████████████████████████████████ ██████████████████████████  *Compare* Pl.'s Mot. at 14 (identifying name, email address, and (for a Subclass) zip code as Buyer Information alleged to be improperly shared), *with* Balabanian Decl. Ex. 1-47 (Fishkind Rep. ¶¶ 23, 96, Tables 2, 8 ████████████████████████ ████████████████████████████████████).

### III.     ARGUMENT

### A.     Summary Judgment Standard

A motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  At the summary judgment stage, the court must view the evidence in the light most favorable to the nonmoving party and "all reasonable inferences that may be drawn from the facts placed before the court must be drawn" in favor of the opposing party.  *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003) (citation omitted).  However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, cannot defeat summary judgment.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

In a putative class action, a court may grant summary judgment before certification if it will save the parties time and expense.  *Wright v. Schock*, 742 F.2d 541, 543-44 (9th Cir. 1984) ("It is reasonable to consider a Rule 56 motion first when early resolution of a motion for

summary judgment seems likely to protect both the parties and the court from needless and costly further litigation."); *Khasin v. Hershey Co.*, No. 5:12-CV-01862-EJD, 2014 WL 1779805, at *5 (N.D. Cal. May 5, 2014) (summary judgment for defendant prior to class certification).

**B.** **Svenson Cannot Show She Suffered the Concrete Injury Necessary to Establish Article III Standing**

**1.** **Legal standard**

Courts have an independent duty to analyze subject-matter jurisdiction and confirm that standing is present. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990). Proof of standing is the plaintiff's burden, and must be established prior to any class certification decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (plaintiff's burden to establish standing); *Nelsen v. King Cty.*, 895 F.2d 1248, 1249-50 (9th Cir. 1990) (standing "is a jurisdictional element that must be satisfied prior to class certification") (citation omitted).

To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) fairly traceable to the challenged actions of the defendant, and (3) redressable by a favorable decision. *Lujan*, 504 U.S. at 560-61. An injury in fact must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.* at 560 (citation omitted). "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). The injury must be "'real' and not 'abstract.'" *Id.*

To survive a motion for summary judgment on standing, "the plaintiff [cannot] rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561 (internal quotation marks and citations omitted); *see also Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1184 (9th Cir. 2012) (affirming entry of summary judgment based on lack of Article III standing). If the plaintiff fails to meet her burden, the court must dismiss the action for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

**2.** **Svenson cannot show that she suffered a concrete injury in fact sufficient to confer Article III standing**

After propounding over six-hundred discovery requests and taking twelve depositions, Sipos Decl. ¶¶ 2-3—and two iterations of her Complaint—Svenson has not adduced a single

piece of evidence showing that she suffered any injury in fact. Instead, she has her expert offer

theories of damage that bear no rational relationship to her claims and are based on speculative

assumptions of liability and harm where no proof of either exists.

### a. Svenson did not lose the "benefit of the bargain" because she paid Defendants nothing for their privacy promises

To sustain her claims, Svenson argues that she, not the Seller, paid the transaction fee to

Defendants, and that a portion of that fee was in return for their privacy promises. She alleges

that she lost the value of what she allegedly paid, because those promises were broken. FAC

¶¶ 86, 159, 241. Svenson must now support these allegations with *evidence* and she has none.

In its ruling on Defendants' Motion to Dismiss Svenson's original complaint, this Court

held that if Defendants' services were "free services" and "the only payment made was the $1.77

to the third-party vendor for the App," which was not retained by Defendants, then Svenson could

not show damage through a benefit of bargain theory. Aug. 12, 2014 Order (Dkt. No. 83) at 7-8.

The undisputed evidence now shows that that is exactly what happened here. Svenson paid

Defendants *nothing* for the privacy promises at issue. The transaction documentation—

Svenson's receipt—establishes that YCDroid, not either Defendant, was the Seller. Ex. 19 (May

6, 2013 Receipt ("You've made a purchase from YCdroid on Google Play.")). The applicable

terms show this: the Wallet ToS, to which Svenson agreed, provide that GPC processes payments

for Apps only on behalf of the *Seller*. *E.g.*, Ex. 7 (Wallet ToS at § 2.2 ("GPC processes Payment

Transactions on behalf of Sellers, as the agent of the Seller.")). The Play ToS, to which Svenson

also agreed, provide the same. Ex. 11 (Play ToS at § 2 ("When you buy Content . . . on Google

Play you will buy it . . . in the case of Android apps, from the Provider of the app.")).

What Svenson bought with her $1.77 was the App from YCDroid, not the App for some

portion of the $1.77, plus some privacy promises from Defendants. FAC ¶ 88 ("Plaintiff

thereafter purchased the App for $1.77[.]"). Svenson paid nothing for the privacy promises.

Consistent with this, not one term in any of the contracts at issue here sets a price for the privacy

promises or requires Svenson to pay anything. The Wallet ToS actually do the opposite—they

specifically provide that GPC does *not* charge a fee to Buyers. Ex. 7 (Wallet ToS at § 2.7 ("GPC

MOTION FOR SUMMARY JUDGMENT (Case No. CV-13-04080-BLF)
131767880.2

does not charge a fee to use the Processing Service as a Buyer.")).  The only contract that mentions the 30% transaction fee is one to which Svenson was not a party—the Developer Distribution Agreement ("DDA"), entered into by GPC and Sellers (here, YCDroid).  Ex. 9 (DDA at § 3.2).  Accordingly, it is the Seller who owes, and the Seller who pays, the transaction fee.  Kourakina Decl. ¶ 4.  It is therefore unsurprising that Svenson first learned about the transaction fee when her lawyers told her about it—well after she agreed to the relevant contracts and privacy policies.  Ex. 30 (Svenson Tr. at 110:15-111:19).

Svenson has no evidence to the contrary.  The conclusions of her expert do not even speak to this issue.  Balabanian Decl. Ex. 1-47 (Fishkind Rep. ¶¶ 11-12); Ex. 25 (Deposition of Henry Fishkind at 47:22-48:10) ("Q.· Is it fair to say that your damages model does·not incorporate or reflect specific harms that may or·may not have happened to Mrs.  Svenson?  A.· That's correct.").

The gravamen of a "benefit of the bargain" theory is that the plaintiff must have suffered an economic injury by overpaying for a good or service.  *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1104 n.3 (9th Cir. 2013) ("[W]hen, as here, 'Plaintiffs contend that class members paid more for [a product] than they otherwise would have paid, or bought it when they otherwise would not have done so' they have suffered an Article III injury in fact.") (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012)); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1166 (C.D. Cal. 2010) ("[U]nder a 'benefit of the bargain' theory, Plaintiffs must allege 'overpayment, loss in value, or loss of usefulness.'  When those losses are sufficiently pled, they confer standing.").

Svenson has no evidence that that happened here.  She did her best to muddy the waters in the FAC, referring to a "Buyer's Contract," then speculating that she paid Defendants for something under that fictional contract.  *See* FAC ¶ 2 (alleging that App purchasers like Svenson "pay money to Defendants to purchase the App"), ¶ 71 ("After a Buyer has paid Defendants the sales price for an App . . . .").  But her actual agreements with Google and GPC did not require her to pay Defendants *anything*—in exchange for the privacy promises or otherwise.  Svenson's "bargain" is set forth in the Wallet ToS, which incorporates the Wallet PN and GPP, and it makes

clear that Google and GPC's payment processing services and accompanying privacy promises are free to Buyer, and that the only payment Svenson made was to YCDroid. Ex. 7 (Wallet ToS at § 2.3).

With the benefit of a complete record this Court's initial analysis has proven correct:

> [The evidence] does not show that Plaintiff paid anything for the asserted privacy protections. Plaintiff entered into the Google, Google Wallet and Google Play agreements separately from her actual purchase of the App. She does not allege that she made any payment for those services. In fact, a review of the contracts makes it clear that those were all free services….It appears clear from the face of the complaint that the only payment made was the $1.77 to the third-party vendor for the App, and Plaintiff does not allege that any portion of the $1.77 was retained by Defendants rather than being transmitted in full to the vendor.

Aug. 12, 2014 Order (Dkt. No. 83) at 7-8. Because Plaintiff did not pay anything to Google or GPC, she cannot establish injury in fact through a benefit of the bargain theory. *See Carlsen v. GameStop, Inc.*, 112 F. Supp. 3d 855, 862 (D. Minn. 2015); *In re LinkedIn User Privacy Litig.*, 932 F. Supp. 2d 1089, 1093 (N.D. Cal. 2013) (finding lack of standing where plaintiff did not pay for security services).

   **b.**  **Svenson did not lose her "benefit of the bargain," because she has no evidence that any of her Buyer Information was shared with YCDroid**

Svenson has no evidence that YCDroid ever logged into any of the portals that were available to Sellers over time, and claims that the fact of access doesn't "matter." *See supra*, Section II.C.2. But even if YCDroid had logged into any of these portals, Svenson has no evidence that YCDroid used her Buyer Information even if it did receive it, or used it for reasons not permitted by the relevant privacy policies. *Id.* And she has no evidence that that use, if it occurred, caused her any concrete damage at all. *See supra*, Section II.D.

Svenson fails to satisfy Article III standing requirements. On an indistinguishable record, Judge Grewal held that for Apps sold on Google Play using Wallet, without proof of actual "sharing," plaintiffs have no basis in fact to claim an Article III injury:

> With no allegation of dissemination *or improper receipt of information*, any profit or loss made from any alleged disclosure, let alone a potential disclosure, is "conjectural." With no allegation of "appreciable and actual" harm, Plaintiffs allege no injury-in-fact.

-13-

1   *In re Google, Inc. Privacy Policy Litig.*, No. 5:12-cv-01382-PSG, 2015 WL 4317479, at *4 (N.D.

2   Cal. July 15, 2015) (emphasis added) (footnotes omitted).  The court in *Privacy Policy Litigation*

3   went on to explain that the mere possibility of past "sharing" of information, without proof that

4   unauthorized sharing might still occur, was also fatal to Article III standing:  "While Plaintiffs

5   allege that for a period of time it was possible for developers to look up the record of a particular

6   transaction on a Google server and also access the user's email and rough address, mere risk of

7   future disclosure is not an Article III injury-in-fact."  *Id.*; *see also In re Sci. Applications Int'l*

8   *Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 28 (D.D.C. 2014) ("Existing case

9   law and legislation support that common-sense intuition: If no one has viewed your private

10  information (or is about to view it imminently), then your privacy has not been violated.").[8]

11        This analysis applies equally to Svenson's claims.  She has no evidence of any "improper

12  receipt of information" by YCDroid.  *Privacy Policy Litig.*, 2015 WL 4317479, at *4.  She has no

13  evidence that potential past "sharing" (which she did not prove occurred) gives rise to anything

14  more than non-actionable and speculative "risk of future disclosure."  *Id.*  Svenson has not

15  established Article III standing.

16        **c.      Svenson cannot establish an injury in fact under her diminution of**
         **value theory**
17

18        Svenson's "diminution of value theory" was premised on allegations that the value of her

19  Buyer Information was lessened by Defendants' alleged sharing.  FAC ¶ 159.  Plaintiffs seeking

20  to establish that their personal information is valuable must establish both that a market exists for

21  personal information and that *their* personal information has value.  *See, e.g.*, *Privacy Policy*

22  *Litig.*, 2015 WL 4317479, at *5 ("Plaintiffs plead neither the existence of a market for their email

23  addresses and names nor any impairment of their ability to participate in that market."); August

24  _____

25  [8] *See Katz v. Pershing, LLC*, 672 F.3d 64, 80 (1st Cir. 2012) (allegations that someone might
    access data in an unauthorized way without identifying any incident where data was accessed by
26  an unauthorized person were "fatal" for purposes of establishing Article III standing); *Krottner v.*
    *Starbucks Corp.*, 628 F.3d 1139, 1143 (9th Cir. 2010) ("[I]f no laptop had been stolen, and
27  Plaintiffs had sued based on the risk that it would be stolen at some point in the future—we would
    find the threat far less credible.  On these facts, however, Plaintiffs–Appellants have sufficiently
28  alleged an injury-in-fact for purposes of Article III standing.").

1  12, 2014 Order (Dkt. No. 83) at 8 ("[A]s a matter of common sense a theory of diminished

2  economic value would depend on the existence of a market for the information.").

3      Svenson does neither. She has not established the existence of a marketplace for her

4  Buyer Information. She does not even know who she would sell her Buyer Information to if she

5  tried, and she hasn't tried. *See supra*, Section II.D.[9] On the contrary—she gives this information

6  away by making it available, publicly, for free. *Id.*

7      Further, to establish standing, Plaintiff must show that the value of *her* Buyer Information

8  diminished due to Defendants' actions. *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d

9  922, 931-32 (N.D. Cal. 2015) ("Plaintiffs have not shown, for the purposes of Article III standing,

10  that they personally lost the opportunity to sell their information or that the value of their

11  information was somehow diminished after it was collected by Facebook."). But Svenson has no

12  evidence that Google's actions reduced the value of her Buyer Information. She has no idea

13  whether the value of her Buyer Information is higher or lower as a result of the sharing practices

14  at issue. *See supra*, Section II.D.[10] Because Svenson has no evidence of any concrete injury in

15  fact under her diminution in value theory, she lacks standing to assert her claims.

16

17  [9] *See also Chambliss v. Carefirst, Inc.*, No. RDB-15-2288, 2016 WL 3055299, at *6 (D. Minn. May 27, 2016) ("This Court need not decide whether such personal information has a monetary value, as Plaintiffs have not alleged that they have attempted to sell their personal information or

18  that, if they have, the data breach forced them to accept a decreased price for that information.");

19  *Khan v. Children's Nat'l Health Sys.*, No. TDC-15-2125, 2016 WL 2946165, at *6 (D. Md. May 19, 2016) ("[Plaintiff] does not, however, explain how the hackers' possession of that information

20  has diminished its value, nor does she assert that she would ever actually sell her own personal information."); *In re SuperValu, Inc.*, No. 14-MD-2586 ADM/TNL, 2016 WL 81792, at *7 (D.

21  Minn. Jan. 7, 2016) (holding that plaintiffs have not suffered an injury in fact, in part, because "Plaintiffs have not alleged that they tried to sell their PII but were not able to do so or were

22  forced to accept a lower price"); *In re Sci. Applications Int'l Corp.*, 45 F. Supp. 3d at 30

23  ("[P]laintiffs do not contend that *they* intended to sell this information on the cyber black market in the first place, so it is uncertain how they were injured by this alleged loss.").

24  [10] Svenson's inability to provide evidence of diminished value of her Buyer Information is consistent with her expert's testimony. ████████████████████████████████████████

25  ████████████████████████████ *Compare* Pl.'s Mot. at 14, 17-18 (identifying name, email address, and (for a Subclass) zip code as Buyer Information alleged to be improperly

26  shared), *with* Balabanian Decl. Ex. 1-47 (Fishkind Rep. ¶¶ 23, 96, Tables 2, 8 ██████████

27  ████████████████████████████). Nor is there any evidence of a "market" whereby a Seller would pay a Buyer for this information. Ex. 4 (Expert Report of

28  Douglas Kidder ¶¶ 149-150).

-15-

**C.      The Court Should Grant Summary Judgment Dismissing Each of Svenson's Claims**

For the same reasons that she cannot show the concrete injury necessary to establish Article III standing, Svenson cannot establish she was damaged as the result of Defendants' actions.  Because each of Svenson's claims requires her to show such damage, the Court should grant summary judgment in Defendants' favor.

**1.      Svenson cannot show damage resulting from any alleged breach of contract**

To prove a breach of contract, a plaintiff must "establish a contract, [Plaintiff's] performance or excuse for nonperformance, [Defendants'] breach, and resulting damages to [Plaintiff]."  *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 818 (9th Cir. 2014).  Here, Svenson has no evidence, even when viewed in the light most favorable to her, to establish two of these essential elements: breach and resulting damages.

**a.      Svenson cannot establish that Defendants breached the Wallet ToS, Wallet PN, or GPP**

The only contracts at issue here are the Wallet ToS, the Wallet PN, and the GPP.  The Wallet PN and GPP permit Defendants to share Buyers' personal information with third parties under certain circumstances.  Svenson alleges that Defendants violated these provisions by sharing her information with YCDroid.  But she has no evidence that *any* information was shared in violation of the Wallet PN and GPP.

*First*, Svenson has no evidence that any information was "shared" with YCDroid as that term is used in the Wallet PN and GPP.  Under California law, "share" should be understood "in [it]s ordinary and popular sense."  Cal. Civ. Code § 1644 ("The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage[.]").  That meaning is informed by standard dictionary definitions of such terms.  *Auldridge v. Modesto Irrigation Dist.*, No. CV-F-04-6473 AWI DLB, 2007 WL 2500438, at *3 (E.D. Cal. Aug. 30, 2007) (interpreting term "receive" in contract in accordance with dictionary definition of that term).  You have not "shared" information with a third party if that third party never gets the information, much less uses it.  *See Webster's Third New International Dictionary*

(3d ed. 1966) ("share (v.) . . . to *partake of, use, experience* or enjoy with others") (emphasis added); *MacMillan's Dictionary* (2016) ("share (intrans. v.) . . . to *use or to have* something at the same time as someone else") (emphasis added); *see also* Ex. 30 (Svenson Tr. at 53:22-54:1) (stating that when she says "shared or disclosed" she means information was "given to and received by" YCDroid). Here, Svenson has no evidence that YCDroid ever "partook in," "used," or "had" her Buyer Information: she has no evidence that YCDroid logged into any of the portals that made her information available for query or that YCDroid ever queried for her information.

      *Second*, even if Defendants did share her Buyer Information, Svenson cannot show that they did so in violation of their privacy policies. Not all sharing is prohibited; some is expressly permitted. *See supra*, Section II.C.1. For example, Buyer Information is necessary for customer support purposes, to respond to tax inquiries and to calculate taxes, and to detect fraudulent transactions. *Id.* It is not enough just to assert that Defendants breached their policies by sharing information—Svenson must have actual evidence that they did so in violation of those policies. She does not. Without evidence of breach, Svenson's contract claim fails.

### b.    Svenson cannot show that she incurred damage as a result of Defendants' actions

      Damage is an essential element of any contract claim. *Aguilera v. Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2000) ("Under California law, a breach of contract claim requires a showing of appreciable and actual damage.); *St. Paul Fire & Marine Ins. Co. v. Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1060 (2002) ("An essential element of a claim for breach of contract are damages resulting from the breach.") (emphasis omitted). Because contract damages are intended to put the nonbreaching party in the same economic position as she would have been had the contract been performed, *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1029 (N.D. Cal. 2012), that damage must be "appreciable and actual" and "clearly ascertainable in both [its] nature and origin," *Martinez v. Welk Grp., Inc.*, 907 F. Supp. 2d 1123, 1131 (S.D. Cal. 2012).

      Here, even if Defendants did breach their privacy policies (they did not), Svenson has no evidence of resulting damage. Her "benefit of the bargain" theory fails to do this for the same

reasons it does not support Article III standing. *See supra*, Section III.B.2.a. Her diminution of

value theory fails to do this, because Svenson has no evidence that there was a market for her

Buyer Information or that its value was reduced because of Defendants' actions. *See supra*,

Section III.B.2.c; *see also Rudgayzer v. Yahoo! Inc.*, No. 5:12-CV-01399 EJD, 2012 WL

5471149, at *6 (N.D. Cal. Nov. 9, 2012) ("[A]n allegation of the disclosure of personal or private

information does not constitute actionable damages for a breach of contract claim. . . . Mere

disclosure of such information in and of itself, without a showing of actual harm, is

insufficient."); *Martinez*, 907 F. Supp. 2d at 1131-32 (where plaintiffs failed to produce evidence

of diminution in value, damages were too speculative to state a claim for breach of contract).

Because Svenson cannot show she was damaged by the alleged sharing of her Buyer Information

with YCDroid, this Court should grant summary judgment in favor of Defendants on her breach

of contract claim.

> **2.      Svenson cannot establish either a breach or the damage necessary to her
> claim for breach of the implied covenant of good faith and fair dealing**

"The implied promise [of good faith and fair dealing] requires each contracting party to

refrain from doing anything to injure the right of the other to receive the benefits of the

agreement." *Avidity Partners, LLC v. State*, 221 Cal. App. 4th 1180, 1204 (2013) (quoting

*Egan v. Mut. of Omaha Ins. Co.*, 24 Cal. 3d 809, 818 (1979)). "The implied covenant of good

faith and fair dealing does not impose substantive terms and conditions beyond those to which the

parties actually agreed." *Id.*

In its order on Defendants' Motion to Dismiss the FAC, this Court allowed Svenson's

implied covenant claim to proceed based on her allegations that "while Defendants may share

personal information with third parties if 'necessary to process the user's transaction and maintain

the user's account,' that provision is not reasonably interpreted to allow *blanket, universal*

*disclosure* of any or all of the Packets Contents to third-party App Vendors" in connection with

every App purchase in the Play Store. *See* April 1, 2015 Order (Dkt. No. 118) at 10 (quoting

FAC ¶ 165) (emphasis supplied). But the alleged "blanket, universal disclosure" never happened.

Buyer Information was not "automatically" shared with Sellers, as the FAC falsely alleged. FAC

-18-

131767880.2

¶ 71 ("Defendants automatically take the extra step of disclosing, without App Vendor request, Packets Contents to the App Vendor by altering the App Vendor's access to Packets Contents and making that data available to the App Vendor on the App Vendor's Google Wallet portal"). Sellers had to ask for it, by querying for it after logging into secure portals. *See supra*, Section II.C.2. Not all Sellers did so, and there is no evidence that YCDroid did. *Id.* Svenson therefore cannot show that Defendants breached the implied covenant of good faith and fair dealing.

Svenson's implied covenant claim also fails because, as discussed above, *see supra*, Sections III.B.2 and III.C.1.b, Svenson cannot show she was damaged as the result of Defendants' breach of the implied covenant, and damage is an essential element of a claim for breach of implied covenant. *Green Valley Landowners Ass'n v. City of Vallejo*, 241 Cal. App. 4th 425, 433 (2015) (damage is essential element of claim for breach of contract—whether express or implied), *review denied* (Jan. 13, 2016); *Vu v. Cal. Commerce Club, Inc.*, 58 Cal. App. 4th 229, 233 (1997) ("An essential element of [implied covenant of good faith and fair dealing claim] was damages resulting from the breaches of contract."). The Court should grant summary judgment in favor of Defendants on this claim as well.

### 3. Svenson cannot establish that Defendants violated the UCL, or that she suffered damage as a result

To establish a claim for violation of the California Unfair Competition Law, a plaintiff must establish facts showing that the defendant engaged in an "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. To establish statutory standing, a plaintiff must allege that she has suffered (1) economic injury (2) as a result of the alleged unfair business practice. *Kwickset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 323 (2011); *see also* Cal. Bus. & Prof. Code § 17204 ("Actions for relief [under the UCL] shall be prosecuted . . . by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition."). Svenson's UCL claim fails for two reasons.

*First*, she has no evidence that Defendants engaged in an "unlawful, unfair, or fraudulent business act or practice." Svenson's UCL claim depends entirely on her breach of contract claim.

Her UCL claim alleges that Defendants violated California Business & Professions Code § 22576 by violating their own privacy policies and breaching the Wallet ToS. FAC ¶¶ 223, 224, 227. Because Svenson's breach of contract claims fail, *see supra*, Section III.C.1, her UCL claim must fail as well.

*Second*, Svenson cannot show the economic injury necessary to establish statutory standing. The requirement that a UCL plaintiff suffer "economic injury" is stricter than the injury requirement for Article III standing. *Kwikset*, 51 Cal. 4th at 322. It requires a loss of money or property. As to a lost benefit of the bargain theory, it requires that Svenson show she paid more than she otherwise would have. *Von Koenig v. Snapple Beverage Corp.*, 713 F. Supp. 2d 1066, 1078 (E.D. Cal. 2010) ("benefit of the bargain" damages, alleged in context of UCL claim, require plaintiff to allege she "paid more" for product than she would have otherwise). As discussed above, *see supra*, Section III.B.2.a, Svenson did not pay Defendants anything. Svenson lost neither money nor property as the result of Defendants' alleged violation of the UCL. She therefore lacks statutory standing to assert a claim for violation of the UCL.

## IV. CONCLUSION

After months of exhaustive discovery, it is now clear that Svenson's claims were nothing more than accusations. She did not pay Defendants for their privacy promises. She cannot show those promises were breached. And she has no evidence she was damaged. There is no evidentiary basis for Svenson's claims, and she lacks standing to bring them. The Court should dismiss Svenson's claims and grant summary judgment in Defendants' favor.

DATED: July 8, 2016                    **PERKINS COIE LLP**

                                       By: */s/ Susan D. Fahringer*
                                       Susan D. Fahringer

                                       Attorneys for Defendants
                                       Google Inc. and Google Payment Corporation