Susan D. Fahringer (CA Bar No. 162978)
SFahringer@perkinscoie.com
Charles C. Sipos (*Pro Hac Vice*)
CSipos@perkinscoie.com
Breena M. Roos (*Pro Hac Vice*)
BRoos@perkinscoie.com
Ryan T. Mrazik (*Pro Hac Vice*)
RMrazik@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone: (206) 359-8000
Facsimile:  (206) 359-9000

Attorneys for Defendants
Google Inc. and Google Payment Corporation

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| ALICE SVENSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE INC., a Delaware Corporation, and GOOGLE PAYMENT CORPORATION, a Delaware Corporation,<br><br>Defendants. | Case No. CV-13-04080-BLF<br><br>**DEFENDANTS GOOGLE INC. AND GOOGLE PAYMENT CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>REDACTED VERSION - PUBLICLY FILED |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................................ 1

II.   STATEMENT OF FACTS ......................................................................................... 2

 A.   Google Play and Google Wallet............................................................................ 2

 B.   Buyer Information Is Not Necessarily Shared with Sellers ................................... 2

 C.   The Relevant Privacy Policies and Terms of Service Permit Some Sharing .......... 3

 D.   Buyers Might Directly Share Their Buyer Information With Sellers ...................... 5

 E.   Svenson's App Purchase and Alleged Damage ...................................................... 6

III.  ARGUMENT .............................................................................................................. 7

 A.   Class Certification Standards ................................................................................. 7

 B.   Svenson Has Not Satisfied the Requirements of Rule 23(a) ................................. 7

  1.   Svenson has not established commonality ................................................. 7

  2.   Svenson has not established typicality and adequacy ................................. 8

 C.   The Court Should Deny Class Certification Because Individual Issues
  Predominate ........................................................................................................... 9

  1.   Individual issues predominate as to whether any Buyer Information
   was shared with Sellers ........................................................................... 10

  2.   Individual issues predominate on whether any sharing of Buyer
   Information breached the Wallet PN or GPP ........................................... 12

  3.   Individual issues predominate as to whether putative class members
   were damaged ......................................................................................... 14

  4.   Svenson's damages theories do not satisfy the predominance
   requirement ............................................................................................. 16

   a.   The Fishkind Report does not establish classwide liability .......... 16

   b.   The Fishkind Report does not establish the fact of classwide
    damage ......................................................................................... 17

   c.   The Fishkind Report does not measure damage resulting
    from Svenson's theories of liability ............................................. 18

    (i)    Fishkind's "benefit of the bargain" theory has no
     relation to the evidence or Svenson's theories of
     liability ............................................................................. 18

    (ii)   Fishkind's "diminished value" theory............................... 20

 D.   Class Treatment is Not Superior .......................................................................... 21

IV.   CONCLUSION......................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amchem Prods. Inc. v. Windsor*,
  521 U.S. 591 (1997)...........................................................................................................8

*Astiana v. Kashi Co.*,
  291 F.R.D. 493 (S.D. Cal. 2013)......................................................................................9

*Auldridge v. Modesto Irrigation Dist.*,
  No. CV-F-04-6473 AWI DLB, 2007 WL 2500438 (E.D. Cal. Aug. 30, 2007) ......................11

*Ballard v. Equifax Check Servs., Inc.*,
  186 F.R.D. 589 (E.D. Cal. 1999) ....................................................................................14

*Benedict v. Hewlett-Packard Co.*
  314 F.R.D. 457 (N.D. Cal. 2016) ................................................................................9, 12

*Blue Shield of Cal. v. Super. Ct.*,
  192 Cal. App. 4th 727 (2011) ........................................................................................18

*Bruce v. Teleflora, LLC*,
  No. 2:13-cv-03279-ODW, 2013 WL 6709939 (C.D. Cal. Dec. 18, 2013)................13, 14, 21

*Campion v. Old Republic Home Prot. Co.*,
  272 F.R.D. 517 (S.D. Cal. 2011)....................................................................................13

*Comcast Corp. v. Behrend*,
  133 S. Ct. 1426 (2013) .................................................................................7, 16, 18, 19

*Davis v. Chase Bank U.S.A., N.A.*,
  No. CV 06-04804 DDP, 2013 WL 169868 (C.D. Cal. Jan. 16, 2013)....................................13

*Diacakis v. Comcast Corp.*,
  No. C 11-3002 SBA, 2013 WL 1878921 (N.D. Cal. May 3, 2013) ........................................17

*Dietz v. Comcast Corp.*,
  No. C 06-06352 WHA, 2007 WL 2015440 (N.D. Cal. July 11, 2007) ...................................15

*Ellis v. J.P. Morgan Chase & Co.*,
  No. 12-cv-03897 YGR, 2015 WL 9178076 (N.D. Cal. Dec. 17, 2015) ...............................7, 8

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998)..........................................................................................8

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992)............................................................................................8

-ii-

*Herron v. Best Buy Stores, LP*,
    No. 2:12-cv-02103-TLN-CKD, 2016 WL 1572909 (E.D. Cal. Apr. 19, 2016) ......................20

*Herskowitz v. Apple, Inc.*,
    301 F.R.D. 460 (N.D. Cal. 2014) ........................................................................................12

*In re Google, Inc. Privacy Policy Litig.*,
    Case No. 5:12-cv-01382-PSG, 2015 WL 4317479 (N.D. Cal. Jul. 15, 2015) ................ passim

*In re Graphics Processing Unites Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008) ........................................................................................17

*In re NJOY, Inc. Consumer Class Action Litig.*,
    120 F. Supp. 3d 1050 (C.D. Cal. 2015) ..........................................................................19, 20

*In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*,
    45 F. Supp. 3d 14 (D.D.C. 2014) ........................................................................................11

*In re: Taco Bell Wage & Hour Actions*,
    No. 1:07-cv-01314-OWW-DLB, 2011 WL 4479730 (E.D. Cal. Sept. 26, 2011) ...................13

*Levya v. Medline Indus., Inc.*,
    716 F.3d 510 (9th Cir. 2013)), *cert. denied*, No. 15-1101, 2016 WL 816276
    (U.S. 2016) ........................................................................................................................16

*Low v. LinkedIn Corp.*,
    900 F. Supp. 2d 1010 (N.D. Cal. 2012) .............................................................................18

*Mazur v. eBay Inc.*,
    257 F.R.D. 563 (N.D. Cal. 2009) ........................................................................................17

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) .........................................................................................7, 9

*Moore v. Apple, Inc.*,
    309 F.R.D. 532 (N.D. Cal. 2015) ..................................................................................13, 17

*Preap v. Johnson*,
    303 F.R.D. 566 (N.D. Cal. 2014) ..........................................................................................7

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ..............................................................................................15

*Rahman v. Mott's LLP*,
    No. 13-cv-03482-SI, 2014 WL 6815779 (N.D. Cal. Dec. 3, 2014) ...................................16, 18

*Rodman v. Safeway, Inc.*,
    No. 11-cv-03003-JST, 2014 WL 988992 (N.D. Cal. Mar. 10, 2014) .......................................14

-iii-

*Ruiz v. Gap*,
    380 F. App'x 689 (9th Cir. 2010) ...........................................................................11

*Saavedra v. Eli Lilly & Co.*,
    No. 2:12-cv-9366-SVW, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014)..................19

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ...........................................................................................15

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ........................................................................................9, 10

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................................................7, 14

*Werdebaugh v. Blue Diamond Growers*,
    No. 12-cv-02724-LHK, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) ............16, 18

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001)................................................................................21

**STATUTES**

Cal. Civ. Code § 1644 ....................................................................................................11

**RULES**

Fed. R. Civ. P. 23 ................................................................................................. passim

Fed. R. Civ. P. 23(a)................................................................................................1, 7, 8

Fed. R. Civ. P. 23(a)(2) ....................................................................................................7

Fed. R. Civ. P. 23(b) ....................................................................................................7, 9

Fed. R. Civ. P. 23(b)(3)......................................................................................... passim

Fed. R. Civ. P. 26(a)(2) ..................................................................................................16

Fed. R. Civ. P. 30(b)(6)....................................................................................................4

**OTHER AUTHORITIES**

*MacMillan's Dictionary* (2016) ....................................................................................11

*Webster's Third New International Dictionary* (3d ed. 1966)......................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.  INTRODUCTION

According to Plaintiff Alice Svenson ("Svenson"), this case is about Defendants' alleged unauthorized sharing of certain user contact information ("Buyer Information")[1] with the sellers ("Sellers") from whom the users bought Apps on Google Play.  To establish her claims and certify a class, Svenson must show that the sharing occurred, that it breached Google's privacy policies, and that it caused damage—and that all of this is subject to common proof.  Yet after three years of litigation and relentless discovery, Svenson has no evidence whatsoever that this is true even for her, much less that it is uniformly true for all putative class members.[2]

Whether a user's Buyer Information is shared with the Seller, whether that violated Google's privacy policies, and whether it caused damage, all depend completely on the individual circumstances of each transaction.  Buyer Information is not automatically shared with Sellers. Sellers have to affirmatively ask for it—by querying the information or by downloading reports, after logging in to secure portals.  Not all Sellers do this, and when they do, their access to and use of the information is subject to many restrictions, including their own agreements with Google.  And Google's privacy policies expressly *permit* sharing under certain circumstances, so if a Seller did ask for Buyer Information, multiple terms in those policies could have allowed it. Finally, Svenson must show she and other Buyers were damaged in some uniform way, but she cannot even show she was damaged, much less that all Buyers were.

A class cannot be certified here.  The individual issues that are central to Svenson's claims overwhelm any common issues, so Svenson cannot meet the requirements of Federal Rule of Civil Procedure ("Rule") 23(b)(3).  And because of the many individualized issues, because she cannot show anyone is in the class, and because she herself has no claim and so is neither an adequate nor a typical class representative, Svenson cannot satisfy the requirements of Rule 23(a) either.  The Court should deny Plaintiff's Motion for Certification.

---

[1] Svenson's claims are now limited to the alleged sharing of only buyers' names, email addresses, and zip codes ("Buyer Information"), not any of the other information referred to in the First Amended Complaint, Dkt. No. 84 ("FAC").  *See* Pl.'s Mot. (Dkt. No. 159) at 1, 5-7, 17-18.

[2] Simultaneously with this Opposition, Defendants have moved for summary judgment dismissing Svenson's claims.  *See* Defendants' Motion for Summary Judgment ("MSJ").

## II.    STATEMENT OF FACTS

### A.    Google Play and Google Wallet

Google, Inc. ("Google") operates the Google Play Store ("Google Play"), a free platform where users can buy and download digital content, including Apps.  Omnibus Declaration of Masha Kourakina ("Kourakina Decl.") ¶ 2; FAC ¶ 58.[3]  Most Apps on Google Play are free, but some are available for purchase from Sellers.  Kourakina Decl. ¶ 2; FAC ¶ 120.

To buy an App, a user ("Buyer") must create both a Google account and a Google Wallet ("Wallet") account.  Omnibus Declaration of Charles C. Sipos ("Sipos Decl.") Ex. 1 (Defendant Google Inc.'s Fourth Amended Supplemental Answers to Plaintiff's Interrogatories, Set One ("Answers to Interrogatories") at 8);[4] FAC ¶ 2.[5]  It costs nothing to create either account, and Wallet's processing services are free for Buyers.  Ex. 7 (Wallet ToS at § 2.7 ("GPC does not charge a fee to use the Processing Service as a Buyer.")).

To create a Google Account, a user creates a Gmail address, chooses a password, and provides a name, birthdate, and email address.  Ex. 1 (Answers to Interrogatories at 8).  To create a Wallet account, a user provides her name, country, and zip code.  *Id.*  Only name, email address, and zip code are at issue here.[6]

### B.    Buyer Information Is Not Necessarily Shared with Sellers

The information a Buyer gives when she creates her Google and Wallet accounts is stored, and stays, in secure servers within Google.  Ex. 23 (Deposition of Giles Douglas ("Douglas Tr.") at 15:16-17:19).  Defendants do not share any Buyer Information automatically.  Ex. 3 (Declaration of Ficus Kirkpatrick) ¶¶ 10-11 ("No user information is transmitted anywhere, by

---

[3] Apps are electronically-delivered software applications designed for use on mobile devices. Kourakina Decl. ¶ 2; FAC ¶ 2.
[4] Unless otherwise noted, all citations to "Exhibit" or "Ex." herein refer to exhibits to the Sipos Declaration.
[5] *See also* Ex. 22 (Deposition of John Affaki at 25:13-18); Ex. 33 (*In re Google Inc. Privacy Policy Litig.*, No. 5:12-cv-01382-PSG (N.D. Cal.), Deposition of Ficus Kirkpatrick ("Kirkpatrick Tr.") at 56:21-24).
[6] Svenson claims that Defendants shared putative class members' name and email address with the Sellers who sold them Apps (for her proposed "Class"), and shared name, email address and zip codes with developers located in the EU (for her proposed "Subclass"), in violation of applicable privacy policies, described below.  *See* Pl.'s Mot. at 6-7. The arguments set forth in Defendants' Opposition to Svenson's Motion apply equally to her proposed Class and Subclass.

1    anyone, in the process of purchasing an App.")); *see also* Ex. 33 (Kirkpatrick Tr. at 185:13-

2    185:18).  If a Seller wants to view Buyer Information, the Seller has to ask for it by affirmatively

3    submitting queries and downloading reports on one of four secure portals that Google has made

4    available over time.  Ex. 1 (Answers to Interrogatories at 10-12), Ex. 32 (*In re Google Inc.*

5    *Privacy Policy Litig.*, No. 5:12-cv-01382-PSG (N.D. Cal.), Deposition of Mark Thomas at 62:1-

6    64:3), Ex. 33 (Kirkpatrick Tr. at 71:22-72:16), Ex. 23 (Douglas Tr. at 31:19-33:23); *see also* Ex.

7    31 (Deposition of Mark Thomas ("Thomas Tr.") at 12:4-12:12).

8           The portals are the Wallet Merchant Center, its predecessor the Checkout Merchant

9    Center, the Checkout API, and the Play Developer Console.  *Id.*  These were available during

10   different time periods and made different information available for query.  Ex. 1 (Answers to

11   Interrogatories at 10-14).  ███████████████████████████████████████████

12   ███████████████████  *Id.* at 13.  ████████████████████████████████

13   ███████████████████████████████████  *Id.* at 11, 13; *see*

14   *also* Exs. 13-14 (screenshots of Checkout Merchant Center).  ███████████████████

15   ███████████████████████████████████████████████████████████

16   ███████████████████████████████████████████████

17   ███████████████████████████  Ex. 1 (Answers to Interrogatories at 10-14).  ███

18   ███████████████████████████████████████████████████████████

19   ███████████████████████████████.[7]  *Id.* at 13.  ████████████████

20   ███████████████████████  *Id.* at 12.  █████████████████████████

21   ███████████████████████████████████████████████████

22   ██████████████████████████████████████████████  *Id.* at 11, 14.

23   **C.    The Relevant Privacy Policies and Terms of Service Permit Some Sharing**

24          Buyers agree to the Google Terms of Service ("Google TOS") when they create a Google

25   Account.  Ex. 6.  The Google TOS cover all Google services (including Play and Wallet), and

26   ────────────────────────────────
     [7] ██████████████████████████████████████████████████████████████

27   ███████████████████████████████████████  *Id.* at 13.  ████████████████

28   *Id.* at 11, 13; *see also* Exs. 15-17 (screenshots of order search page and order details page).

-3-

1  incorporate the Google Privacy Policy ("GPP").  *Id.* at 2.  The GPP permits "sharing" under a

2  variety of circumstances:  personal information may be shared if, for example, Google or GPC

3  has "a good faith belief" that such sharing is "reasonably necessary" (1) to "meet any applicable

4  law, regulation, legal process, or enforceable governmental request," or (2) to "detect, prevent, or

5  otherwise address fraud, security or technical issues." [8]  Ex. 8 (GPP at GOOG-00000114).

6      Buyers agree to the Google Wallet Terms of Service ("Wallet ToS") when they create a

7  Wallet account.  Ex. 7.  The Wallet ToS incorporate the GPP and the Wallet Privacy Notice

8  ("Wallet PN").  Ex. 7 (Wallet ToS at § 5), Ex. 10 (Wallet PN, incorporating GPP).[9]  The Wallet

9  PN permits Defendants to "share" information under the circumstances described in the GPP, and

10  also "as necessary to process your transaction and maintain your account" or "to complete your

11  registration for a service provided by a third party."  Ex. 10 (Wallet PN at GOOG-00000998).

12      Sellers might need to query for Buyer Information for reasons permitted under the GPP

13  and the Wallet PN.  For example, Sellers are responsible for their Apps and the associated service

14  obligations.  A Seller might need a Buyer's name or email address to process a refund or to

15  provide customer support.  Ex. 28 (Rule 30(b)(6) Deposition of Mekka Okereke ("Okereke Tr.")

16  at 90:2-90:12, 99:13-100:2, 104:14-104:20, 105:1-105:8); Ex. 29 (Deposition of Elizabeth Powers

17  ("Powers Tr.") at 111:20-112:12, 141:20-142:10, 158:23-159:21); Ex. 31 (Thomas Tr. at 12:4-

18  12:12); Ex. 26 (Deposition of Kyrk Justin Lawyer at 24:23-25:5).  The Wallet PN allows this.

19  Ex. 10 (Wallet PN at 2) (sharing permitted "as necessary to process your transaction and maintain

20  your account").  Sellers' tax obligations depend on the location of their Buyers, so Sellers need to

21  know where their Buyers are located to respond to tax inquiries and to confirm that taxes have

22  been calculated accurately.  Ex. 27 (Deposition of Marlene Macek at 27:14-27:20, 39:23-40:15,

23  41:24-42:19, 44:9-44:18, 46:3-46:19); Ex. 28 (Okereke Tr. at 59:9-59:13, 90:2-90:12, 94:4-

24  94:25). This is also allowed under the GPP.  Ex. 8 (GPP at GOOG-00000114) (sharing permitted

25

26  [8] This language has been substantially the same throughout the class period.  Pl.'s Mot. at 12.
   [9] The Wallet ToS, and by extension the GPP and Wallet PN, apply to both Google and to GPC.

27  Ex. 7 (Wallet ToS at § 5) ("You understand and agree that personal information provided to
   Google or GPC in connection with the Services is subject to the Google Wallet Privacy

28  Policy . . . .").

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION_(Case No. 5:13-cv-04080-BLF)
41063-0065/131788647

"to meet any applicable law, [or] regulation").  Or a Seller might need a Buyer's name and email to distinguish between fraudulent and legitimate App purchases, because fraudulent purchases are sometimes made without an accompanying name and email address.  *Id.* Ex. 28 (Okereke Tr. 92:12-92:18, 94:4-94:25, 99:13-17, 102:7-103:5, 104:14-104:20, 105:1-105:8).  The GPP allows this, too.  Ex. 8 (GPP at GOOG-00000114) (sharing permitted "to detect, prevent, or otherwise address fraud").

If a Seller does obtain any Buyer Information, it is subject to additional restrictions: Sellers agree to the Wallet Seller Terms of Service ("Seller ToS"), which require the Seller to "hold confidential and [not to] use any Buyer information obtained through the Service, except for uses expressly permitted by the Program Policies."  Ex. 12 (Seller ToS at § 7.1).  And Sellers also agree to the Developer Distribution Agreement ("DDA"), which prohibits Sellers from using "customer information obtained from the Market to sell or distribute products outside the Market," and provides that the information remains subject to the Wallet PN and GPP.  Ex. 9 (DDA at § 7.1) ("Seller acknowledges that Buyer information received from GPC in connection with the Service is subject to the Service Privacy Policy"), *id*. § 1.12 ("Service Privacy Policy" defined to include the Wallet PN and GPP).

**D.**   **Buyers Might Directly Share Their Buyer Information With Sellers**

Some Buyers might also share their Buyer Information with the Seller, either directly or by making it publicly available.  A Buyer might supply her name and email to the Seller to resolve customer service issues or when she registers the App she bought (some Apps require this).  *See supra*, Section II.C; *see also* Ex. 29 (Powers Tr. 117:12-117:25).  Buyers can make their Buyer Information public in any number of ways, including by posting reviews on Google Play,[10] through social media, or by creating their own websites.  Ex. 29 (Powers Tr. at 189:16-190:4, 202:5-202:18).  Svenson herself gave the Seller access to her email when she registered her App, and she made her name, zip, and various of her email addresses publicly available, including on websites associated with her law practice.  Ex. 30 (Deposition of Alice C. Svenson)

---

[10] For the App Svenson purchased, dozens of reviews publicly disclose Buyer name.  Ex. 20 (examples of YCDroid reviews with names).

("Svenson Tr.") at 75:2-77:17); Ex. 2 (Plaintiff's Response to Defendant Google's First Interrogatories ("Pl.'s Answers to Interrogatories") at 8-9, Answer to Interrogatory No. 9); Ex. 21 (Svenson's Republican National Lawyers Association Biography).

**E.      Svenson's App Purchase and Alleged Damage**

Svenson created her Google account in November 2012, using the email address ███████████████████ and giving Google her name and phone number.  Ex. 30 (Svenson Tr. at 11:1-8); *see also*  Ex. 2 (Pl.'s Answers to Interrogatories at 7-8, Answer to Interrogatory No. 7).  She created her Wallet account on May 6, 2013, when she bought the "SMS MMS to Email" App at issue here, for $1.77 from Seller YCDroid.  *Id.* Ex. 30 (Svenson Tr. at 22:23-23:3, 82:13-83:10); *see also* Ex. 2 (Pl.'s Answers to Interrogatories at 7-8, Answer to Interrogatory No. 7).

There is no reason to believe that Svenson's Buyer Information was shared with YCDroid. Ex. 30 (Svenson Tr. at 52:23-54:9).  There is no evidence that YCDroid ever logged in or queried for any of Svenson's Buyer Information, or that he did anything with it even if he did obtain it. *Id.* (Svenson Tr. at 52:23-56:8); *see also* Ex. 1 (Answers to Interrogatories at 11) (YCDroid never logged in to the Checkout API).  Svenson cannot remember YCDroid ever having contacted her or having sent her marketing material.  Ex. 30 (Svenson Tr. at 68:16-69:21).

The "SMS MMS to Email" App performed as expected, and Svenson had no complaints about it.  Ex. 30 (Svenson Tr. at 25:8-25:12).  In fact, she "love[d]" the App and bought it (on Google Play, using Wallet) a second time in April 2014.  *Id.* (Svenson Tr. at 24:8-25:19, 88:13-88:18).

As for the purported value of her Buyer Information, Svenson testified that she: (1) never tried to sell her Buyer Information; (2) does not know whom she would sell it to; (3) does not know what price she might get; and (4) does not know whether the alleged sharing affected its price in any way.  *Id.* (Svenson Tr. at 66:25-68:12, 74:11-74:20, 140:22-141:5, 142:14-142:25, 144:11-145:10).

1

## III.   ARGUMENT

2

### A.   Class Certification Standards

Class certification is an exception to the rule that litigation is conducted on behalf of individuals, so a party seeking certification must "affirmatively demonstrate [her] compliance with Rule 23," *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)), and this Court "must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the perquisites of Rule 23," *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

To prevail on her Motion, Svenson must "demonstrat[e] by a preponderance of the evidence that all four requirements of Rule 23(a) . . . and at least one of the three requirements under Rule 23(b)" are met. *Preap v. Johnson*, 303 F.R.D. 566, 584 (N.D. Cal. 2014).  When a plaintiff fails to carry her burden, class certification must be denied.  *See Ellis v. J.P. Morgan Chase & Co.*, No. 12-cv-03897 YGR, 2015 WL 9178076, at *4 (N.D. Cal. Dec. 17, 2015) (denying class certification based on failure to carry burden of proof).

### B.   Svenson Has Not Satisfied the Requirements of Rule 23(a)

Svenson's Motion fails principally on predominance grounds, *see infra*, Section III.C, but she also does not establish the commonality, typicality and adequacy that are required under Rule 23(a).

#### 1.   Svenson has not established commonality

"Commonality" requires Svenson to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  Commonality requires not just any common questions; what matters are questions that are likely to "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (citation omitted).

Svenson acknowledges that to certify her putative classes, certain "common questions" must be answered: (1) whether Buyer Information was disclosed to Sellers in violation of the Wallet PN and GPP, and (2) whether class members were damaged as a result.  Pl.'s Mot. at 13, 15.  But no evidence will provide common *answers* to these questions "in one stroke." *Wal-Mart*, 564 U.S. at 350.  As discussed in more detail at Section III.C, *infra*, whether a Seller

-7-

1 queried Buyer Information, whether they did so in a way that violated the GPP or the Wallet PN,

2 or whether that caused any damage—these are questions that must be answered Buyer by Buyer,

3 and Seller by Seller.

4       Svenson's own App purchase is a good example.  Svenson has no evidence that YCDroid

5 ever queried for her Buyer Information.  *See supra*, Section II.E.  Buyer Information is not

6 automatically sent to Sellers, and Svenson cannot show that all Sellers asked for their Buyers'

7 Information, so answering this question requires an individualized inquiry.  *See supra*,

8 Section II.B. Whether providing Buyer Information to a Seller breached Google's privacy

9 policies also is an individualized question, as is determining whether any damage resulted.  This

10 is not a situation where a policy applied uniformly to all class members gives rise to some

11 claim—here, because sharing is permitted under some circumstances, whether Google's privacy

12 policies were breached will vary, case by case.  *Ellis*, 2015 WL 9178076, at *6 (commonality not

13 established where named plaintiff failed to establish defendant "applied a policy uniformly to all

14 class members").  The answers to the questions that matter here all are individualized.  Svenson

15 therefore cannot show the commonality required by Rule 23(a).

16      **2.**     **Svenson has not established typicality and adequacy**

17       Typicality and adequacy both look to whether the named plaintiff's claims are uniquely

18 defective.  *Amchem Prods, Inv. v. Windsor*, 521 U.S. 591, 626 n.20 (1997).  Typicality considers

19 "whether other members have the same or similar injury" as the named plaintiff.  *Hanon v.*

20 *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted).  Adequacy turns on

21 whether the named plaintiff has "any conflicts of interest with other class members."  *Hanlon v.*

22 *Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

23       Svenson's claims are uniquely defective.  She is typical of Buyers only in that she

24 suffered no damage from Defendants' sharing practices.  But she purports to represent a different

25 putative class—one that values the privacy of their Buyer Information and that was injured by its

26 disclosure to a Seller.  However, Svenson is a lawyer who made her name and various email

27 addresses widely, and publicly, available.  *See supra*, Section II.D.  She herself gave her email

28 address to her Seller when she registered her App.  Ex. 2 (Pl.'s Answers to Interrogatories at 8-9,

-8-

1    Answer to Interrogatory No. 9).  Svenson does not know whether her Buyer Information has any

2    value to begin with; she does not know whether it lost that value, or why.  *See supra*, Section II.E.

3    She never tried to sell her Buyer Information.  *Id.*  And the evidence indicates that Svenson did

4    not feel damaged by her purchase of the App—she bought it again, *after* she filed this lawsuit, on

5    Google Play, using Wallet, from the same Seller, because she liked it so much.  *Id.*

6        If there were a class of people who was harmed when their Buyer Information was shared

7    with Sellers, Svenson is not typical of it and cannot adequately represent it.  *See In re Google Inc.*

8    *Privacy Policy Litig.*, No. 5:12-cv-001382-PSG, 2015 WL 4317479, at *5 (N.D. Cal. July 15,

9    2015) (where plaintiffs publicly published their name and email, the possibility that the

10   information might also have been disclosed to an App developer "would not constitute injury").

11   **C.    The Court Should Deny Class Certification Because Individual Issues Predominate**

12       To satisfy the predominance requirement, a plaintiff must have evidentiary proof that

13   "questions of law or fact common to class members predominate over any questions affecting

14   only individual members."  Fed. R. Civ. P. 23(b)(3); *Mazza*, 666 F.3d at 588.  This is a more

15   exacting inquiry than the other Rule 23 requirements.  *Astiana v. Kashi Co.*, 291 F.R.D. 493, 504

16   (S.D. Cal. 2013) ("The predominance inquiry under Rule 23(b) is more rigorous as it tests

17   whether proposed classes are sufficiently cohesive to warrant adjudication by representation.")

18   (quotations omitted).

19       "An individual question is one where 'members of a proposed class will need to present

20   evidence that varies from member to member,' while a common question is one where 'the same

21   evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible

22   to generalized, class-wide proof.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045

23   (2016) (citation omitted).  To satisfy the requirement to show that common questions

24   predominate over individual ones, the plaintiff must offer common proof on the core issues in the

25   case that "obviate[s] the need for individualized inquiries."  *Benedict v. Hewlett-Packard Co.* 314

26   F.R.D. 457, 474 (N.D. Cal. 2016) (Freeman, J.) (denying certification on predominance grounds

27   where "common evidence Plaintiffs have offered does not suffice to make these determinations

28   [as to the validity of plaintiffs' claims]").

-9-

1   Svenson acknowledges that certification under Rule 23(b)(3) will require common proof:

2   (1) that Buyer Information was shared with Sellers; (2) in a way that breached the GPP or Wallet

3   PN; (3) causing damage to Buyers.  Pl.'s Mot. at 21-24.  Svenson has no evidence that this is true

4   as to *any* putative class member, much less all of them.  Even if such a class member did exist,

5   proof of that person's claim would require evidence that "varies from member to member."

6   *Tyson*, 136 S. Ct. at 1045 (citation omitted).

7       **1.    Individual issues predominate as to whether any Buyer Information was
             shared with Sellers**

8

9   Every one of Svenson's claims requires her to show that Defendants "shared"[11] Buyer

10  Information with Sellers in violation of the GPP or Wallet PN. [12]  The first step in doing so is to

11  establish that Buyer Information actually was shared:  without that, Svenson cannot show she was

12  harmed by the alleged practice, and she has no legal basis to seek relief on her claims.[13]

13      The same alleged sharing practices were challenged in *Privacy Policy Litigation.*  There,

14  Judge Grewal held that unless there was evidence that information had been shared with a Seller,

15  harm was only conjectural: "With no allegation of *dissemination or improper receipt* of

16  information, any profit or loss made from any alleged disclosure, let alone a potential disclosure,

17  is 'conjectural.'  With no allegation of 'appreciable and actual' harm, Plaintiffs allege no injury-

18  _____

[11] "Shared" is the term used in both the GPP and the Wallet PN.  *See* Exs. 8, 10.

19  [12] Svenson's breach of contract, UCL, and breach of the implied covenant claims each depend on
    common proof that information was shared with Sellers in violation of the GPP and Wallet PN.
20  *See* FAC ¶¶ 54-57 (alleging Defendants' obligations to App Buyers based on limitations on
    sharing in Wallet PN and GPP) ¶ 158 (conduct allegedly breach because "Defendants materially
21  breached…Wallet Terms"); ¶¶ 223-224 (conduct allegedly unlawful under UCL because conduct
    "violate[s]" the "Wallet Terms"); ¶ 227 (conduct allegedly unfair under UCL because
22  "Defendants breached the Wallet Terms by"); ¶ 164 (conducted allegedly breaches implied
    covenant because of "unnecessary disclosure").  In addition, Svenson's Motion argues that these
23  claims all depend on the same (absent) common proof that Buyer Information was shared with
    Sellers in violation of the GPP or Wallet PN.  *See* Pl.'s Mot. at 22 (breach of contract based on
24  "disclosure of names and emails the App vendors"); *id.* (implied covenant claim depends on an
    alleged "common course of conduct to common contractual terms"); *id* at 23 (UCL claims
25  "rooted in Defendants' disclosure of Buyers' information in violation of the Privacy Policies").
    [13] Svenson knows that if this question must be answered, it will be fatal to her class certification
26  prospects, so she says it is "beside the point."  *See* Pl.'s Mot. at 5 n.3 (classwide sharing is
    "beside the point"); *see also id.* at 6 n.5 (arguing certification is proper "regardless of whether
27  vendors actually downloaded the information").

28

-10-

in-fact." 2015 WL 4317479, at *4 (quoting *Ruiz v. Gap*, 380 F. App'x 689, 691-92 (9th Cir. 2010)) (emphasis supplied) (footnotes omitted).[14] *See also In re Sci. Applications Int'l Corp. (SAIC) Backup Tape Data Theft Litig.*, 45 F. Supp. 3d 14, 28 (D.D.C. 2014) ("Existing case law and legislation support that common-sense intuition: If no one has *viewed* your private information (or is about to view it imminently), then your privacy has not been violated.") (emphasis supplied).

California contract law dictates that "sharing" is "to be understood in [its] ordinary and popular sense." Cal. Civ. Code § 1644 ("The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage."). That meaning is informed by standard dictionary definitions. *See Auldridge v. Modesto Irrigation Dist.*, No. CV-F-04-6473 AWI DLB, 2007 WL 2500438, at *3 (E.D. Cal. Aug. 30, 2007) (interpreting term "receive" in contract in accordance with dictionary definition of that term). Both sources confirm that you have not "shared" information with a third party if that third party never gets the information, much less uses it. *See Webster's Third New International Dictionary* (3d ed. 1966) ("share (v.) . . . to *partake of, use, experience* or enjoy with others") (emphasis supplied); *MacMillan's Dictionary* (2016) ("share (intrans. v.)  . . . to *use or to have* something at the same time as someone else") (emphases supplied); *see also* Ex. 30 (Svenson Tr. at 53:22-54:1) (stating that when she says "shared or disclosed" she means information was "given to and received by" YCDroid).

Evidence of "sharing" requires that a Seller actually "partook in," "used," or "had" Buyer Information. But the mere purchase of an App does not automatically share any Buyer Information; Buyer Information stays on Google servers. So Sellers will not get Buyer Information unless they ask for it, and not all Sellers did so. *See supra*, Section II.B.

---

[14] Judge Grewal's ruling on the issue of sharing was based on absence of Article III standing. 2015 WL 4317479, at *4. It still applies here because it sets down the legal principle that actual disclosure to the Seller must occur before any claim for relief accrues.

-11-

1    Answering the threshold question of whether any particular item of Buyer Information

2    was shared with a Seller is therefore a highly individualized inquiry, and depends on whether, for

3    example, a particular Seller logged in to a portal; if they did, which portal they logged into and

4    when (to determine what Buyer Information was available for query); and whether and what

5    items of Buyer Information they queried.  Without common proof answering these questions,

6    Svenson cannot establish predominance.  *Benedict*, 314 F.R.D. at 457.  But Svenson has not

7    answered these questions even for her own purchase, much less for all class members.  She

8    therefore cannot satisfy the showing required by *Privacy Policy Litigation*, and she fails to

9    provide the common proof necessary for class certification as to predominance.  2015 WL

10   4317479, at *4; *see also Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 471-72, 476 (N.D. Cal. 2014)

11   (denying class certification on predominance grounds for breach of contract, UCL, and implied

12   covenant claims because individualized issues of proof necessary to determine whether alleged

13   common course of conduct, in fact, occurred as to "specific transactions").

14        **2.    Individual issues predominate on whether any sharing of Buyer Information breached the Wallet PN or GPP**

15

16        If Svenson does establish sharing, she then must show that it violated the GPP or the

17   Wallet PN.  *See* Exs. 8, 10; Pl.'s Mot. at 13-14.  This, too, is necessarily a highly individualized

18   inquiry.

19        Both the Wallet PN and GPP allow sharing under certain circumstances, including "as

20   necessary to process your transaction and to maintain your account," or if, in Google's "good

21   faith-belief," it is "reasonably necessary to: meet any applicable law . . . [or] detect, prevent, or

22   otherwise address fraud, security or technical issues."  Ex. 10 (Wallet PN at GOOG-00000998);

23   Ex. 8 (GPP at GOOG-00000114).  Whether those conditions existed for any particular Buyer,

24   Seller, or App purchase, will necessarily be an individualized inquiry.  Google witnesses testified

25   that Google believed that when Sellers did query Buyer Information, they did so consistent with

26   Google's privacy policies—for example, to prevent fraud, to maintain customer accounts, or to

27

28

1    satisfy tax obligations.  *See supra*, Section II.C.[15]  Svenson has absolutely no evidence to the

2    contrary, and she certainly has no evidence of uniform breach of the privacy policies.  Svenson

3    therefore fails to satisfy the predominance requirement for this reason as well.  *Bruce v. Teleflora,*

4    *LLC*, No. 2:13-cv-03279-ODW (CWx), 2013 WL 6709939, at *6-7 (C.D. Cal. Dec. 18, 2013)

5    ("This is not a situation where the representative class members have demonstrated *that a*

6    *common policy necessarily produces some uniform result*.") (emphasis added) (denying

7    Rule 23(b)(3) certification because individualized fact inquiries needed to determine whether

8    breach occurred); *Davis v. Chase Bank U.S.A., N.A.*, No. CV 06-04804 DDP (PJWx), 2013 WL

9    169868, at *6 (C.D. Cal. Jan. 16, 2013) (denying motion for class certification for breach of

10   contract, UCL, and implied covenant claims, where "individual circumstances are likely to

11   predominate over factual questions common to the class" as to whether agreement at issue was

12   breached); *Campion v. Old Republic Home Prot. Co.*, 272 F.R.D. 517, 531 (S.D. Cal. 2011)

13   (denying class certification on predominance grounds for breach of contract, breach of implied

14   covenant, and UCL claims because individualized proof necessary to determine whether

15   defendant's conduct had violated an alleged "uniform policy"); *see also Moore v. Apple, Inc.*, 309

16   F.R.D. 532, 545 (N.D. Cal. 2015) (denying class certification on predominance grounds due to

17   "individualized issues" concerning whether contracts at issue were breached).

18          Svenson makes two arguments to sidestep this fatal problem.  First, she says it is enough

19   if she simply "assert[s]" that Buyer Information was shared in violation of Google's privacy

20   policies.  Pl.'s Mot. at 22 (arguing "each Class Member and Subclass Member asserts" that

21   improper sharing occurred).  But the Court cannot certify a Rule 23(b)(3) class based on

22   *assertions*—common *proof* is required.  *See In re: Taco Bell Wage & Hour Actions*, No. 1:07-cv-

23   01314-OWW-DLB, 2011 WL 4479730, at *7 (E.D. Cal. Sept. 26, 2011) ("Plaintiffs do not offer

24   _____

25   [15] Plaintiff argues for her Subclass that because EU Sellers only require country of residence in order to calculate applicable taxes, disclosure of zip code to those Sellers was a per se breach of the Wallet PN or GPP.  *See* Pl.'s Mot. at 14 n.11.  But the GPP allows for disclosure of Buyer

26   nformation for "legal reasons," and gives discretion to share as "reasonably necessary."  *See* Ex. 8

27   (GPP at GOOG-00000114).  A United States Buyer's zip code communicates that the Buyer resides in the United States, and Plaintiff does not even try to argue that providing a zip code that

28   communicates United States residency to an EU Seller is "unreasonable."

-13-

1   any *proof* to support their *assertion* that [defendant] has a common pattern and practice of late-

2   paying involuntarily terminated employees their final paychecks.") (emphasis added); *accord*

3   *Wal-Mart*, 564 U.S. at 350 ("Rule 23 does not set forth a mere pleading standard.").

4        Second, Svenson argues that cases involving "form contracts" are "routinely certified."

5   Pl.'s Mot. at 13 (quoting *Rodman v. Safeway, Inc.*, No. 11-cv-03003-JST, 2014 WL 988992, at *7

6   (N.D. Cal. Mar. 10, 2014)); *see also id.* at 22 n.13.  But in the cases Svenson cites, the parties did

7   not dispute that there were uniform facts regarding how a contract was performed, only whether

8   that common performance constituted breach.  *See Rodman*, 2014 WL 988992, at *7 (common

9   proof that defendant's online prices for groceries were higher than local prices, but whether that

10   conduct constituted breach turned on interpretation of terms "in the store" or "local store" in form

11   contracts); *Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589, 595 (E.D. Cal. 1999) (common

12   proof that defendant sent form letters demanding $20 service charge paid by putative class

13   members, but whether charge permitted depended on federal or California debt collection

14   statutes).  The opposite is true here:  whether any sharing breached the privacy policies is

15   anything but a common question.  *Teleflora*, 2013 WL 6709939, at *5.  This must be resolved on

16   a case-by-case, Seller-by-Seller, Buyer-by-Buyer basis.

17        **3.**     **Individual issues predominate as to whether putative class members were**

18                **damaged**

     Svenson acknowledges that proof of damage is required for all of her claims.  *See* Pl.'s

19   Mot. at 15-16.  But to establish the *fact* of damage, this Court would have to answer a series of

20   highly individualized questions about the Buyers, Sellers, and Purchases.  Did the Seller ever

21   actually ask for the Buyer's Information?  If so, did they do so in compliance with the privacy

22   policies?  If not, did the Seller do anything with the Buyer Information, and did that harm the

23   Buyer in any way?  And did the Buyer previously disclose her name or email address publicly or

24   otherwise provide it directly to the Seller—such that there was no harm to her from a second

25   disclosure of the same information?[16]  Svenson cannot answer these questions even for herself.  It

26

27      [16] As is outlined above, Buyers often publish their name when posting public reviews of
purchased Apps, making that information readily available to the general public, including the

28   Seller.  *See supra*, Section II.D.  For the App Svenson purchased, SMS MMS to Email, dozens of

-14-

1    would be difficult to conduct a trial to answer these questions for just one putative class member.

2    It would be impossible to conduct a trial that answered those questions for millions of them.  *See*

3    *Dietz v. Comcast Corp.*, No. C 06-06352 WHA, 2007 WL 2015440, at *6 (N.D. Cal. July 11,

4    2007) (denying certification where "[i]t would be impossible to determine, on class-wide proof,

5    whether all [plaintiffs] were harmed").

6         For example, Buyers cannot have been damaged if they had already disclosed the Buyer

7    Information at issue to the Seller directly or otherwise.  The court addressed exactly this issue in

8    *Privacy Policy Litigation*, and held that an App Buyer is not damaged by the possibility that name

9    and email that was already otherwise freely available might be shared again.  2015 WL 4317479,

10   at *5 ("Indeed, the named Plaintiffs freely publish their names and email addresses through their

11   work websites. If disclosure did occur, then, *it would not constitute injury*.") (emphasis added);

12   *accord Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1550 (2016) ("It is difficult to imagine how the

13   dissemination of an incorrect zip code, without more, could work any concrete harm").[17]  Here,

14   just to identify the putative class members who had already published their name, email address

15   and zip would require a host of individualized inquiries.  To try to avoid these problems, Svenson

16   tries to argue that classwide proof of damage is not required.  Pl.'s Mot. at 22.  But this is simply

17   incorrect.  As the Ninth Circuit has recognized, differences in the *calculation* of damage do not

18   necessarily defeat class certification, but classwide proof of the *fact* of damage is always required.

19   *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987-88 (9th Cir. 2015) ("We [have]

20

21   reviews publicly disclose Buyer name. Ex. 20 (examples of YCDroid reviews with names).
     Moreover, a Buyer might have provided her email address directly to the Seller in order to make

22   the App function (some Apps require this), for ongoing maintenance of the App, or in the context
     of customer service communications between the Seller and the Buyer. *See supra*, Sections II.C-

23   D.

     [17] This conjectural future risk is lessened even further where, as here, the challenged practices

24   have changed.  Svenson concedes that no later than May 2014, Defendants' practices complied
     with the relevant privacy policies.  Pl.'s Mot. at 6-7.  The Court in *Privacy Policy Litigation*

25   considered this fact and concluded that the possibility of past sharing was too attenuated to satisfy
     Article III—because in that case, like this one, there was no evidence of the fact of any damage.

26   2015 WL 4317479, at *4 ("While Plaintiffs allege that for a period of time it was possible for

27   developers to look up the record of a particular transaction on a Google server and also access the
     user's email and rough address, mere risk of future disclosure is not an Article III injury-in-

28   fact.").

1    explained that *Comcast* stood for the proposition that '*plaintiffs must be able to show that their*

2    *damages stemmed from the defendant's actions that created the legal liability.*'") (emphasis

3    added) (quoting *Levya v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)), *cert. denied*,

4    No. 15-1101, 2016 WL 816276 (U.S. 2016); *Werdebaugh v. Blue Diamond Growers*, No. 12-cv-

5    02724-LHK, 2014 WL 7148923, at *14 (N.D. Cal. Dec. 15, 2014) ("The Court is not decertifying

6    the Rule 23(b)(3) damages class because of the need for individualized damages calculations.

7    Rather, Plaintiff has failed to put forth evidence that damages can be determined and attributed to

8    plaintiff's theory of liability on a classwide basis.").

9        **4.    Svenson's damages theories do not satisfy the predominance requirement**

10        Because she has no evidence of damage, Svenson is forced to rely entirely on the report of

11    her expert, Fishkind, to "determine both Defendants' classwide liability, as well as the damages

12    owed to any particular member, by applying the expert's formula to common evidence (i.e., App

13    purchase records)."  Pl.'s Mot. at 16; Declaration of Rafey S. Balabanian (Dkt. 159-1) Ex. 1-47

14    (Plaintiff's Rule 26(a)(2) Expert Report of Henry Fishkind, Ph.D in Support of Class

15    Certification) ("Fishkind Rep.").  But to satisfy the requirements of Rule 23(b)(3), the report must

16    demonstrate that: (1) "damages are capable of measurement on a classwide basis," and (2) "there

17    is a nexus between [her] theory of liability and [her] method of proving damages."  *Rahman v.*

18    *Mott's LLP*, No. 13-cv-03482-SI, 2014 WL 6815779, at *7 (N.D. Cal. Dec. 3, 2014) (quoting

19    *Comcast*, 133 S. Ct. at 1433).  The Fishkind Report does neither.

20        **a.    The Fishkind Report does not establish classwide liability**

21        The Fishkind Report does not establish "classwide liability"—it *assumes* it.   Fishkind

22    testified that his Report does not address liability; he was asked to "assume liability applies."

23    Ex. 25 (Deposition of Henry Fishkind ("Fishkind Tr.") at 20:19-21:11) ("I'm not—I'm not the

24    expert on liability.  I was asked to assume liability applies.").  The Fishkind Report does not

25    establish sharing or breach—it ignores those elements.  It purports only to calculate damage, and

26    it does not even do that.  *See* Ex. 4 (Expert Report of Douglas Kidder ("Kidder Rep.") at 11-12

27    ("Thus, Dr. Fishkind has developed damages theories ██████████████████████████

28    ████████████████████████████████████████████████████).

1  Unsurprisingly, because it assumes liability across the board, Fishkind's methodology does not

2  allow the Court to separate persons who were actually injured from those who were not.  Ex. 25

3  (Fishkind Tr. at 22:13-22:20) ("Q: And you have no idea how one would go about identifying

4  individual class members where the disclosure at issue doesn't exceed the bounds of the contract

5  [with Google], correct? A: That—that wouldn't be something I was asked to do and would be

6  outside my area of expertise.").  Svenson cannot establish "classwide liability" by foisting that

7  job on her expert, only to have her expert turn that job down.  *See In re Graphics Processing*

8  *Unites Antitrust Litig.*, 253 F.R.D. 478, 493, 494 (N.D. Cal. 2008) (plaintiffs' expert "evaded the

9  very burden that [the expert] was supposed to shoulder . . . to show that individual differences

10  between products and purchasers *could* be accounted for, *not* that individual differences could be

11  ignored").

12                    **b.      The Fishkind Report does not establish the fact of classwide damage**

13             Although Svenson argues otherwise, the Fishkind Report does not calculate "damages

14  owed to any particular [class] member."  Pl.'s Mot. at 16.  The evidence it relies on—App

15  purchase records—reflects only that an App was purchased, not that Buyer Information was

16  shared, that it was shared in violation of the privacy policies, or that any damage resulted.  *See id*;

17  *see also id.* at 8 (citing Declaration of Rafey S. Balabanian Exs. 1-15, 1-30, 1-31).  As a result,

18  Fishkind's methodology sweeps into the putative class some unknown, undetermined number of

19  people who are *not* properly members of the class, and were not damaged.

20             Rule 23(b)(3) does not allow damages methodologies that extend to cover uninjured

21  persons.  *Moore*, 309 F.R.D. at 542 (denying class certification because the class "necessarily

22  includes individuals who could not have been injured by Defendant's alleged wrongful conduct as

23  a matter of law"); *cf. Diacakis v. Comcast Corp.*, No. C 11-3002 SBA, 2013 WL 1878921, at *4

24  (N.D. Cal. May 3, 2013) (denying class certification because proposed class includes persons who

25  have not been harmed and is therefore not ascertainable); *Mazur v. eBay Inc.*, 257 F.R.D. 563,

26  567 (N.D. Cal. 2009) (denying class certification because proposed class includes persons who

27  have not been harmed and therefore is "imprecise, overbroad and unascertainable").  Svenson

28

therefore cannot establish the fact of damage either through evidence or the testimony of her expert.

### c. The Fishkind Report does not measure damage resulting from Svenson's theories of liability

*Comcast* requires that there be a "nexus between [Svenson's] theory of liability and [Svenson's] method of proving damages." *Rahman*, 2014 WL 6815779, at *7 (citing *Comcast*, 133 S. Ct. at 1433). This requires that an expert's damages model "purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to the [pled] theory." *Comcast*, 133 S. Ct. at 1433.

Svenson asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of the UCL. Damages for breach of contract should put the non-breaching party in the same economic position as she would have been had the contract been performed. *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1017 (N.D. Cal. 2012). For a breach of the implied covenant that sounds in contract (like Svenson's), damages are limited to contract remedies. *Blue Shield of Cal. v. Super. Ct.*, 192 Cal. App. 4th 727, 730 n.1 (2011) (damages for breach of implied covenant equivalent to contract damages). Damages under the UCL are limited to restitution, which must be supported by evidence and calculate "the difference between the market price actually paid by consumers and the true market price that reflects the impact of the unlawful, unfair, or fraudulent business practices." *Werdebaugh*, 2014 WL 7148923, at *8.

Here, Svenson's damages models bear utterly no relation to her theories of liability: her expert assumed that *all* App purchases should be included, and drew his conclusions from the entire pool of purchases made, without distinguishing among them in any way. *See generally* Fishkind Rep. This sort of expert testimony is insufficient under Rule 23. *Comcast*, 133 S. Ct. at 1433.

### (i) Fishkind's "benefit of the bargain" theory has no relation to the evidence or Svenson's theories of liability

Fishkind's "benefit of the bargain" methodology ████████████████████████████
██████████████████████████████████████████████████████████████████████████
████████████████ *See* Fishkind Rep. at 3-5. ████████████████████████████████

1 ███████████████████████████████████████████████████

2 ███████████████████████████████████████ *Id.*

3       What Fishkind did bears no relation to how an App purchase actually takes place, nor

4 does it account for other variables that are more important, like any market factors that determine

5 pricing for Apps.  Fishkind's methodology ████████████████████████████████

6 ███████████████████████████████████████████████████

7 ████████████████ Ex. 4 (Kidder Rep. at 32-35).  And the prices of Apps vary widely, based

8 on market factors, and are set not by Defendants but by the Sellers.  *Id.* at 7.  Under Fishkind's

9 theory, ████████████████████████████████████████████

10 ███████████████████████████████████████████████████

11 ███████████████████████████████████████████████████

12 ████████████████ *Id.* at 32-35.  This makes no sense at all, and illustrates how Fishkind's

13 Report is completely untethered to Svenson's theories of liability.

14       Fishkind's methodology also ████████████████████████

15 ███████████████████████████████████████████

16 ███████████████████████████████████████████████████

17 ███████████████████████████ *See generally* Ex. 4 (Kidder Rep.); Ex. 5 (Expert

18 Report of Professor Dominique M. Hanssens) ("Hanssens Rep.")

19       As explained by *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050,

20 1119 (C.D. Cal. 2015), "willingness to pay" methodologies like Fishkind's that do not account for

21 market realities do not satisfy predominance under *Comcast*.  Relying on the "subjective

22 valuation" that a surveyed consumer places on a particular attribute (here, the value of purported

23 privacy protections that allegedly were not delivered), while ignoring other factors that affect

24 price, will not produce an objective measure of damage: "A consumer's subjective valuation of

25 the purported [privacy promise], measured by their relative willingness to pay for [Apps] with or

26 without the [privacy promise], is not an accurate indicator of restitutionary damages, because it

27 does not permit the court to calculate the true market price of [the App] absent the purported

28 [promise]."  *In re NJOY*, 120 F. Supp. 3d at 1122; *accord Saavedra v. Eli Lilly & Co.*, No. 2:12-

1 cv-9366-SVW (MANx), 2014 WL 7338930, at *7 (C.D. Cal. Dec. 18, 2014) (Rule 23(b)(3) not

2 satisfied based on "willingness to pay" calculation because of "the disconnect between the price

3 paid by a given individual and that individual's valuation"); *Herron v. Best Buy Stores, LP*,

4 No. 2:12-cv-02103-TLN-CKD, 2016 WL 1572909, at *10 (E.D. Cal. Apr. 19, 2016) (same).[18]

5       Here, Fishkind's "benefit of the bargain" methodology is the very definition of a

6 "subjective valuation" divorced from market realities. *In re NJOY*, 120 F. Supp. 3d at 1119.  It is

7 myopically focused on a subjective valuation of privacy promises, one that varies with App price,

8 yet completely disregards the market realities that directly affect the App price.  Fishkind's

9 Report does not offer the objective proof of damage resulting from sharing Buyer Information

10 that Svenson's claims require.  Ex. 5 (Hanssens Rep. at 10) ("Dr. Fishkind's survey focuses on

11 consumers' App purchase decisions, and incorrectly and without any basis links an *App store's*

12 privacy policy with the price the *App vendor* sets for the App.").

13               **(ii)**    **Fishkind's "diminished value" theory**

14       The Fishkind Report's alternative model, "diminished value" of Buyer Information, also is

15 unrelated to any of Svenson's theories of liability.  Fishkind assumes that if Buyer Information is

16 shared with Sellers, that sharing *necessarily* "diminished the value of that information" to the

17 Buyer.  Fishkind Rep. at 6.  But Fishkind's "diminished value" model ignores whether any actual

18 sharing occurred or whether a Buyer was harmed.  Ex. 25 (Fishkind Tr. at 223:17-224:6), Ex. 4

19 (Kidder Rep. at 42-45).[19]  And the "diminished value" figures in the Fishkind Report are not

20 calculations of "damage" at all.  Information such as name and email address are intangible goods

21 that can be replicated without cost.  Ex. 4 (Kidder Rep. at 43-44); *see also* Ex. 25 (Fishkind Tr.

22    [18] As further explained in *In re NJOY*, "willingness to pay" measures do not reliably calculate

23 damages under Rule 23(b)(3), whether those damages are classified as "restitutionary" or, as

Svenson has characterized her damages, "benefit of the bargain."  120 F. Supp. 3d at 1120

24 (rejecting plaintiff's claimed distinction between "restitutionary" and "benefit of the bargain"

damages as immaterial for purposes of Rule 23(b)(3)).

25    [19] Separate from these conceptual flaws, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

                                       *Compare* Pl.'s

27 Mot. at 1, 5-7, 17-18 (identifying alleged disclosure of "name and email" or "zip code" as the

basis of the putative Class) *with* Fishkind Rep., ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28 ▮▮▮▮▮▮▮▮▮▮▮▮▮

at 220:1-220:17).  Just because one Seller might know a Buyer's name and email won't mean that the absolute value of the Buyer Information decreases.  *Id.*  Fishkind himself testified that the market will command the same price the second, third, or fourth time personal information is sold.  Ex. 25 (Fishkind Tr. at 220:1-220:17); *see also* Ex. 4 (Kidder Rep. at 43-44).

Finally, even if Fishkind had established diminished value, the figures he relies on do not establish the existence of any market for the type of information and sharing claimed here.  Ex. 4 (Kidder Rep. at 44) ("There is absolutely no evidence that there's a market in which vendors pay for individual contact information for their own customers").  Fishkind's methodology is flawed for this reason as well.

**D.    Class Treatment is Not Superior**

Finally, Svenson cannot demonstrate that class litigation is superior here.  *See* Fed. R. Civ. P. 23(b)(3).  Factors relevant to superiority include: (1) difficulties in management of the action, (2) putative members' interest in controlling the prosecution of their claims, (3) the extent and nature of any litigation concerning the controversy already commenced, and (4) the desirability of concentrating the litigation in the particular forum.  *Id.*  Here, the manageability factor cuts sharply against class treatment.  "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'"  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir. 2001).  Determination of Defendants' liability and damages would require scores of mini-trials as to each and every class member.  *See supra*, Section III.C.  These individualized inquiries obviate the purpose of a class.  And when balancing the complexities of class action treatment against the relative benefits obtained, certification is unwarranted.  *Zinser*, 253 F.3d at 1192.[20]

---

[20] Svenson's argument that individual trials are impractical given the amount of potential recovery per individual does not establish superiority *per se*.  *Teleflora*, 2013 WL 6709939, at *8 ("The Court understands that the damages for each individual [putative class member], if any, are small—thus making it unlikely that each putative class member will bring her own suit.  But Rule 23 is only a solution where the plaintiffs can establish how their putative class satisfies each of the Rule's requirements; there is no leeway to certify a class simply based on the difficulty of adjudicating individual claims.") (denying certification on superiority grounds).

1

### IV.   CONCLUSION

2      The questions that matter to Svenson's class claims are, overwhelmingly, individual ones.

3 The scarce evidence in her Motion reflects that: because so many individualized issues

4 predominate, Svenson simply tried to ignore them.  But the rigorous analysis of proof that

5 Rule 23 requires does not allow her to pretend any longer.  The Court should deny Svenson's

6 Motion.

7

8
DATED:  July 8, 2016                          **PERKINS COIE LLP**
9

10
                                             By:  _s/ Susan D. Fahringer_
11                                                   Susan D. Fahringer, Bar No. 162978

12                                           Attorneys for Defendants
                                             Google Inc. and Google Payment Corporation
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO MOTION FOR CLASS CERTIFICATION_(Case No. 5:13-cv-04080-BLF)
41063-0065/131788647