**Conditionally Filed Under Partial Seal**

REDACTED VERSION - PUBLICLY FILED

Exhibit 1

Exhibit 1

Susan D. Fahringer, Bar No. 21567
SFahringer@perkinscoie.com
Charles C. Sipos (*Pro Hac Vice*)
CSipos@perkinscoie.com
Breena M. Roos (*Pro Hac Vice*)
BRoos@perkinscoie.com
Ryan T. Mrazik (*Pro Hac Vice*)
RMrazik@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Sunita Bali, Bar No. 274108
SBali@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105
Telephone: 415.344.7000
Facsimile: 415.344.7050

Attorneys for Defendants
Google Inc. and Google Payment Corporation

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| Alice Svenson, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Google Inc. and Google Payment Corporation,<br><br>Defendants. | Case No. 5:13-cv-04080-BLF<br><br>CLASS ACTION<br><br>DEFENDANT GOOGLE INC.'S FOURTH AMENDED SUPPLEMENTAL ANSWERS TO PLAINTIFF'S INTERROGATORIES, SET ONE<br><br>CONTAINS INFORMATION DESIGNATED "CONFIDENTIAL" PURSUANT TO THE PARTIES' PROTECTIVE ORDER ENTERED AUGUST 6, 2014 |

PROPOUNDING PARTY:     PLAINTIFF ALICE SVENSON

RESPONDING PARTY:     DEFENDANT GOOGLE INC.

SET NO:                ONE

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Google Inc. ("Google"), by and through its attorneys, Perkins Coie LLP, submits these Responses and Objections to Plaintiff's Interrogatories, Set One ("Interrogatories").

## GENERAL RESPONSES AND OBJECTIONS

1.      Google objects to the Interrogatories to the extent they call for the disclosure of confidential, sensitive, or proprietary information, and will produce such documents or information only subject to the Protective Order entered by the Court on August 6, 2014 (Dkt. No. 82).

2.      Google objects to the Interrogatories to the extent they seek materials and/or information protected by the attorney-client privilege, attorney work product doctrine, or any other privilege recognized by law.

3.      Google objects to the temporal scope of the Interrogatories to the extent they seek information or documents "without any limitation in time" and/or between September 5, 2009 and the date of trial in this action.  Requests for production seeking information without time limit are unduly burdensome and expensive, taking into account the needs of the case, the amount in controversy, the parties' limited resources, and the issues at stake in this litigation.  The purported class period begins September 19, 2011, as alleged in the Complaint.  Information and documents that predate September 19, 2011 are not reasonably calculated to lead to the discovery of admissible evidence, and production of them would be unduly burdensome.  Google will respond to these Interrogatories with information as of September 19, 2011.

4.      Google objects to the Interrogatories on the grounds of undue burden, taking into account the needs of the case, the amount in controversy, the parties' limited resources, and the importance of the issues at stake in this litigation.  Google further objects on the grounds of undue

GOOGLE'S 4th AM. SUPP. ANSWERS TO PL.'S INTERROGATORIES (5:13-cv-04080-BLF)
*CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER*
LEGAL129864809.1

burden to the extent that the Interrogatories seek information already in the possession of, or otherwise available to, Plaintiff.

5.     Google objects to the Interrogatories to the extent they purport to require Google to review each and every document contained in all of its files (including electronic files) and to interview every one of its agents and employees to determine if they may have information responsive to one of the interrogatories.  Such a requirement imposes upon Google an undue burden and expense not commensurate with Plaintiff's legitimate discovery needs, and seeks discovery beyond that reasonably calculated to lead to the discovery of admissible evidence.

6.     Google objects to the Interrogatories to the extent they are unreasonably cumulative or duplicative or ask for information obtainable from some other source that is more convenient, less burdensome, or less expensive.

7.     Google objects to the Interrogatories on the grounds that they are overly broad, are not reasonably tailored to Plaintiff's legitimate discovery needs, and are not reasonably calculated to lead to the discovery of admissible evidence.

8.     Google objects to interrogatories that call for contentions, claims, or legal conclusions regarding issues or potential issues in this litigation.  Regardless of whether such interrogatories may be proper at some other time in the lawsuit, they are premature at this point in the case, before discovery has been conducted.

9.     Google objects to the "Definitions and Instructions" to the extent they seek to alter or expand upon the obligations imposed by the Federal Rules of Civil Procedure, including, without limitation, the duty to supplement responses to discovery requests set forth in Federal Rule of Civil Procedure 26(e)(1).  Specific Definitions and Instructions that exceed such obligations include the following:

a.     "App" on the grounds that it is overbroad, unduly burdensome, and not reasonably tailored to Plaintiff's legitimate discovery needs.  Google interprets the term "App" to mean electronically delivered software applications designed for use on mobile devices purchased through Google Play using Google Wallet. Consistent

GOOGLE'S 4th AM. SUPP. ANSWERS TO PL.'S INTERROGATORIES (5:13-cv-04080-BLF)
*CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER*
LEGAL129864809.1

with Plaintiff's allegations, the term "App" does not include, and cannot reasonably be interpreted to include, electronic subscriptions designed for use on mobile devices purchased on Google Play using Google Wallet.

b.  "BUYER" on the grounds that it is vague, overbroad and not reasonably tailored to Plaintiff's legitimate discovery needs. Google interprets the term "Buyer" to mean any person in the United States who utilized Google Wallet to purchase an App via Google Play between September 19, 2011 and the present.

c.  "Google," "you," and "your" on the grounds that requests for such information go beyond the requirements of the Federal Rules of Civil Procedure, impose an undue burden, and seek information not reasonably calculated to lead to the discovery of admissible evidence. Google interprets the defined terms "Google," "you," and "your" to mean Google and its current employees.

d.  "Google Payment" on the grounds that it goes beyond the requirements of the Federal Rules of Civil Procedure, imposes an undue burden, and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Google interprets the defined term "Google Payment" to mean Google Payment Corporation (referred to hereinafter as "GPC") and its current employees.

e.  "Google Terms," "Wallet Terms" and "Google Play Terms" as vague and ambiguous. Google will respond with the understanding that the following terms have the following meanings:

(i) "Google Terms of Service" means the terms of service available here, https://www.google.com/policies/terms/, including all earlier publicly-available versions of the same;

(ii) "Google Privacy Policy" means the policy available here, http://www.google.com/policies/privacy/, including all earlier publicly-available versions of the same;

(iii) "Google Wallet Buyer Terms of Service" means the terms available here, https://wallet.google.com/legaldocument?docId=0.androidbuyertos/US/4/0/und and here https://wallet.google.com/termsOfService?type=Buyer&gl=US, including all earlier publicly-available versions of the same;

(iv) "Google Wallet Privacy Notice" means the policy available here,

https://wallet.google.com/legaldocument?family=0.privacynotice, including all earlier publicly-available versions of the same;

(v) "Google Wallet Sellers Terms of Service" means the terms available here, https://wallet.google.com/termsOfService?type=SELLER, including all earlier publicly-available versions of the same;

(vi) "Google Play Terms of Service" means the terms available here, https://play.google.com/intl/en-US_us/about/play-terms.html, including all earlier publicly-available versions of the same;

(vii) "Developer Distribution Agreement" means the agreement available here, http://play.google.com/about/developer-distribution-agreement.html, including all earlier publicly-available versions of the same; and

(viii) "Google Play Developer Program and Policies" means the policy available here, http://play.google.com/about/developer-content-policy.html, including all earlier publicly-available versions of the same.

f.    "Google Wallet" on the grounds that it is unduly prejudicial, vague, and overbroad.  Google interprets the defined term "Google Wallet" to mean the product described here:  http://www.google.com/wallet/.

g.    "Identify" on the grounds that it is overbroad, unduly burdensome, and not reasonably tailored to Plaintiff's legitimate discovery needs.

h.    "Relating to," "relates," "referring to," refer," "concerning," "pertaining," and/or "regarding," on the grounds that these terms are overbroad, unduly burdensome, and not reasonably calculated to lead to Plaintiff's legitimate discovery needs, insofar as these terms purports to call for the production of any documents or information "logically or factually connected to, directly or indirectly, formally or informally, in any way, the subject matter identified in a particular request."

i.    "Shipping information" or "Shipping Info" on the grounds that it is vague, overbroad and not reasonably tailored to Plaintiff's legitimate discovery needs or reasonably calculated to lead to the discovery of admissible evidence.  Google's responses herein are specifically limited to Contact Information, as defined in the following paragraph.

1  j.  "SID" on the grounds that it is unduly prejudicial, vague, overbroad, not
2      reasonably tailored to Plaintiff's legitimate discovery needs, and not reasonably
3      calculated to lead to the discovery of admissible evidence.  The information
4      alleged to be at issue in Plaintiff's original Complaint in this case was name, email
5      address, city, state, zip, and, potentially, telephone number, which Plaintiff alleged
6      is provided by Buyers in connection with the purchase of an App via Google Play,
7      using Google Wallet.  Complaint ¶¶ 49-50.  Plaintiff also alleged that "user name"
8      is at issue.  Google understands "user name" to be the name appearing before
9      "@gmail.com" in a gmail address.  Accordingly, Google's initial responses were
10     limited to such information, i.e., name, gmail address, city, state, zip, and phone
11     number, which it defined as "Registration Information."  The Court's order
12     dismissing the Complaint referred to this information as "Contact Information."  In
13     her First Amended Complaint, the information at issue is identity, address, city,
14     zip code, email address, or telephone number.  FAC ¶ 74.  Google understands
15     "identity" to mean a buyer's name and the word "address" to mean a buyer's
16     physical street address.  Google has therefore supplemented its responses, where
17     applicable, to address the following information:  name, street address, city, zip
18     code, email address, or telephone number ("Contact Information").

19  k.  "VENDOR" on the grounds that it is overbroad, unduly burdensome, and not
20     reasonably tailored to Plaintiff's legitimate discovery needs.  Google will respond
21     to these Requests with the understanding that the term "Sellers" means individuals
22     and entities who sold Apps (as defined in these objections) on Google Play to
23     Buyers within the United States using Google Wallet, from September 19, 2011 to
24     the present.

10.    Google objects to the Interrogatories as unduly burdensome and overbroad to the
extent that they, and the identical Interrogatories to GPC, ask both Defendants about information
relating to Google Play and Google Wallet, when Google or GPC is not the custodian for or does
not have in its possession knowledge, information, or records pertaining to the product or
platform in question.

-6-

11.     Each of these general objections is hereby specifically incorporated into each of the specific answers set forth below.

<u>**GOOGLE'S RESPONSES AND OBJECTIONS**</u>
<u>**TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**</u>

<u>**INTERROGATORY NO. 1:**</u>

Identify and describe, in detail, what types of BUYERS' Sensitive Identifiable Data ("SID"), including without limitation credit or charge card information (credit or charge card number or portion thereof, expiration date, security code), any billing information (first and last name and street address), phone number, and/or email address, and/or other BUYER information, that you PROVIDE to VENDORS and when, including any purposes, reasons, or other explanations for providing SID to VENDORS.

<u>**ANSWER:**</u>

This Interrogatory is compound and, coupled with Plaintiff's many other compound interrogatories, far exceeds the limit on interrogatories imposed by the Federal Rules of Civil Procedure. Google objects to this Interrogatory on that basis. In addition, this Interrogatory seeks information that is subject to a highly individualized inquiry regarding each purchase of an App on Google Play using Google Wallet. It is impossible to provide a general answer applicable to all purchases of Apps, and Google objects to this Interrogatory on that basis. Google also incorporates its general objections, above, particularly with regard to the definitions of the terms "SID," "Identify," "BUYERS," and "VENDORS," as well as the time period at issue. Google further objects to this Interrogatory as unreasonably broad and unduly burdensome.

Notwithstanding and without waiving these objections, Google answers as follows:

Google and GPC may share a Buyer's Contact Information as set forth in the applicable privacy policies, including the Google Privacy Policy and the Wallet Privacy Notice. Copies of the privacy policies and privacy notice applicable during the Class Period have been produced, and Defendants direct Plaintiff to those policies pursuant to Rule 33(d) in answer to this Interrogatory. Defendants complied with the applicable policies throughout the Class Period.

**Information provided by a Buyer**

The information that a Buyer provides to Google or GPC is a highly individualized question, and may vary depending upon the choices made by the Buyer. For example, as of the date of these responses, a person creates a Google account by creating a Gmail address (which also serves as the person's user name), designating a password, and supplying a name (which need not be the person's actual name), day and year of birth, mobile phone number and current email address. A person also may choose to provide his or her month of birth and gender. A person may or may not provide additional information to Google in connection with creating a Google profile, including, for example, the person's street address.

A person cannot use Google Wallet unless he or she has a Google account. When registering to use Google Wallet, a person located in the U.S. provides his or her name, country and zip code to GPC. The person also may provide her credit card number, expiration date, and security code (the security code is not permanently stored). Once the person decides to purchase an App via Play using Wallet (and become a Buyer), additional information might be required or supplied in connection with the purchase, depending on the nature of the purchase. For example, a Buyer who had not provided credit card or other payment information at registration would do so at purchase. As another example, a Buyer purchasing physical goods provides his or her city and/or state of residence and their street address for shipping purposes. In addition, if a Buyer purchases goods (even if only digital goods) over $300, the Buyer provides her city and state of residence, as well as country and zip code.

No separate registration beyond creation of a Google account is required for Google Play.

Current representative screenshots of the steps one takes to create a Google account and to register for Google Wallet ("registration flows") will be produced. Google directs Plaintiff to those documents pursuant to 33(d) in further answer to this Interrogatory.

**Circumstances of disclosing Buyer Contact Information to Seller**

The circumstances under which GPC or Google might share any particular item of Contact Information that a Buyer provided are highly individualized. They will depend first on

what information a particular Buyer supplied, which varies as discussed above. Additional variables that will affect whether any item of Contact Information that a buyer provided is shared, when, and under what circumstances include the following:

1. Whether the Buyer consented to the disclosure. For example, some Buyers might choose to make any or all of their Contact Information publicly available on their Google Profiles. Buyers also might disclose their name or other information to the Seller (or publicly) in connection with their review of a product they purchased; if the Seller's App requires a secondary login the Seller controls, which may require the Buyer to enter buyer information; when contacting the Seller for customer service purposes; for in-App purchases, which some Apps allow; in connection with subscription services; or through other means.

2. If Google or GPC has a good-faith belief that access, use, preservation or disclosure of the information is reasonably necessary to meet any applicable law, regulation, legal process or enforceable governmental request. This would include, for example, Google's good-faith belief that disclosure or access to certain information is necessary to comply with tax regulations. The Seller is responsible for paying appropriate tax on sales of products. A Seller's tax obligation typically will vary depending upon the Buyer's location (city, state, country of residence). Accordingly, these items of Contact Information might be reasonably necessary to Sellers to verify a Seller's tax obligations.

3. If Google or GPC has a good-faith belief that access, use, preservation or disclosure of the information is reasonably necessary to detect, prevent, or otherwise address fraud, security or technical issues. During the Class Period, fraud and security issues may include, for example, the need for Sellers to ensure proper refunds or payment adjustments, for which the Seller is responsible under the Seller Terms of Service, which might require any item of a Buyer's Contact Information.

4. For purchases using Google Wallet, items of Contact Information might be shared as necessary to process a Buyer's transaction and maintain his or her account, including to process refunds, provide product updates, and address issues if an App does not work properly or requires an update.

5. For purchases using Google Wallet, items of Contact Information also might be shared to complete a person's registration for a service provided by a third party.

**How a Buyer's Contact Information may be displayed to a Seller**

How a Buyer's Contact Information may be displayed (and what specific items are displayed) by Google or GPC to a Seller is highly individualized and varies with the date of and circumstances surrounding a particular transaction. Certain Buyer Contact Information has been displayed to Sellers via both Play and Wallet (and their predecessors) in different ways.

As to Play (and its predecessor), certain Buyer Contact Information is and has been made available in sales and payout reports, which a Seller could request through a service called the Google Play Developer Console. Sellers also could access Wallet Merchant Center reports through the Play Developer Console, subject to the same restrictions imposed in the Merchant Center. Buyer Contact Information has never otherwise been displayed in Play. Buyers might also directly provide certain items of their Contact Information to a Seller via Play, for example, by posting a review on Google Play, by contacting the Seller directly or through Google Play, or by accepting permissions when they purchase an App. The particular items of information shared will vary based on individual circumstances. (For example, a Buyer might post a review of an App on Play that discloses the Buyer's name both publicly and to the Seller; a Buyer might directly contact a Seller via Play to request a refund or for customer support; or a Buyer might give permission to access their profile or other identity information when they purchase an App.)

As to Wallet, certain items of Buyer Contact Information (described in more detail below) are and historically have been available for review by a Seller in two ways. First, certain Buyer Contact Information might be available via a secure user interface associated with Google Wallet (and its predecessor, Google Checkout), which the Seller might access only after logging in. For

-10-

the vast majority of Sellers, that user interface is currently referred to as the "Wallet Merchant Center" or "MC 3.0." Its predecessor was referred to as the "Checkout Merchant Center." While logged in to the Wallet Merchant Center or Checkout Merchant Center, a Seller could request essentially the same items of Buyer Contact Information as were available in the user interface through a query for an order export report.

Second, previously, Sellers located in the United States and the United Kingdom who signed up for a Google Checkout account, and who also obtained a Merchant Key from Google, might have access to certain items of Buyer Contact Information through the Checkout API, which allowed merchants to directly access similar buyer Contact Information. The Checkout API was retired on November 20, 2013, and a comparable product no longer exists.

*The following sentence is designated CONFIDENTIAL pursuant to the parties' Protective Order:* ████████████████████████████████

In further response to this Interrogatory, Google has produced the following documents, and directs Plaintiff to those documents pursuant to Rule 33(d): GOOG-00001392 and GOOG-00001394 are screenshots of Plaintiff's App purchase from YCDroid, viewed through the Checkout Merchant Center. GOOG-00001089 and GOOG-00001093 (produced on October 14, 2014) are screenshots of Plaintiff's App purchase from YCDroid, viewed through the Wallet Merchant Center on or about June 3, 2014. GOOG-00001395, GOOG-00001396, and GOOG-00001397 are screenshots of Plaintiff's App purchase from YCDroid, viewed through the Wallet Merchant Center on or about October 14, 2014.

A particular Seller might not ever actually access the Wallet Merchant Center or the Play Developer Console to access or review any Buyer Contact Information available through those services. Further, even if a Seller did log in to the services, it might not query for an order export report in the Wallet Merchant Center or sales report or payout report in the Play Development Console, or review the Buyer Contact Information for any particular Buyer or transaction. A Seller could view Buyer Contact Information only for those Buyers to whom the Seller had sold an App.

*The remaining answer to this Interrogatory is designated CONFIDENTIAL pursuant to the parties' Protective Order:*

GOOGLE'S 4th AM. SUPP. ANSWERS TO PL.'S INTERROGATORIES (5:13-cv-04080-BLF)
*CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER*
LEGAL129864809.1



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

GOOGLE'S 4th AM. SUPP. ANSWERS TO PL.'S INTERROGATORIES (5:13-cv-04080-BLF)
*CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER*
LEGAL129864809.1



*Google will supplement its response to this Interrogatory with further information regarding Play.*

**INTERROGATORY NO. 2:**

Identify and describe, in detail, what SID you PROVIDE to VENDORS to process BUYER transactions and maintain BUYER accounts, complete registration for third-party services, for external processing, to domain administrators, with the BUYER's consent, and/or for legal reasons, respectively, including any categories of VENDORS who are PROVIDED such information for each such purpose, under what circumstances or conditions SID is PROVIDED to

GOOGLE'S 4th AM. SUPP. ANSWERS TO PL.'S INTERROGATORIES (5:13-cv-04080-BLF)
*CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER*
LEGAL129864809.1

and from whom you collect it; and the process by which you remit the remainder of the App

purchase price to the VENDOR.

**ANSWER:**

Google incorporates its general objections, in particular its objections to Plaintiff's

definition of the term "Identify." Notwithstanding and without waiving these objections, Google

incorporates by reference GPC's response to Plaintiff's Interrogatories, Set One, Interrogatory

No. 16.

Dated: February 10, 2016           **PERKINS COIE** LLP

By: *Susan D. Fahringer*
    Susan D. Fahringer, Bar No. 21567
    SFahringer@perkinscoie.com

Attorneys for Defendants
Google Inc. and Google Payment Corporation

**Publicly Filed**

Exhibit 2

Exhibit 2

1   Kathryn Diemer
    Diemer, Whitman & Cardosi, LLP
2   75 East Santa Clara Street, Suite 290
    San Jose, CA 95113
3   Tel: (408) 971-6270

4
    Frank Jablonski (*Pro Hac Vice*)
5   Progressive Law Group LLC
    354 West Main Street
6   Madison WI 53703
    Tel: (608) 258-8511
7   frankj@progressivelaw.com

8   Elizabeth Roberson-Young (*Pro Hac Vice*)
    Mark Bulgarelli (*Pro Hac Vice*)
9   PROGRESSIVE LAW GROUP LLC
    1 N. LaSalle Street, Suite 2255
10  Chicago, IL 60602
    Tel: (312) 787-2717
11  liza@progressivelaw.com
12  markb@progressivelaw.com

13  *Attorneys for Plaintiff*

14

15                          UNITED STATES DISTRICT COURT
                            NORTHERN DISTRICT OF CALIFORNIA
16                                  SAN JOSE DIVISION

17
    Alice Svenson, individually and on behalf of      Case No.: 5:13-cv-04080-BLF
18  all others similarly situated,

19                                                     **CLASS ACTION**
                            Plaintiff,
20  v.                                                 **PLAINTIFF'S      RESPONSE      TO
                                                       DEFENDANT GOOGLE'S  FIRST SET
21  Google,    Inc.,    and    Google    Payment       OF INTERROGATORIES**
    Corporation,
22
23                          Defendants.

24

25  PROPOUNDING PARTY:      DEFENDANT GOOGLE, INC.

26  RESPONDING PARTY:       PLAINTIFF ALICE SVENSON

27  SET NO:                 ONE

28

1     Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Alice Svenson hereby

2   objects and responds to Defendant Google Inc.'s First Set of Interrogatories as follows:

3                              **PRELIMINARY STATEMENT**

4         The following objections and responses are made in good faith after a preliminary inquiry

5   within the timeframe accorded by the applicable rules and court orders. Plaintiff's inquiry and

6   analysis are continuing. Without in any way undertaking any obligation to do so, Plaintiff reserves

7   the right to alter, supplement, amend, or otherwise modify these objections and responses in any

8   way at any time in light of additional facts revealed through subsequent inquiry and investigation.

9   Plaintiff further reserves the right to use or rely on, at any time, subsequently discovered documents

10  or information omitted from these objections and responses as a result of mistake, error, oversight,

11  or inadvertence. In addition, by asserting these objections, Plaintiff does not waive her right to seek

12  further relief from the above-captioned Court. Plaintiff is willing to meet and confer to discuss these

13  objections should counsel for Defendant desire to do so.

14           **GENERAL QUALIFICATIONS, OBJECTIONS, AND DEFINITIONS**

15        The following general objections apply to each of the interrogatories and, unless otherwise

16  stated, shall have the same force and effect as if set forth in full in response to each of the

17  interrogatories.

18        1.      Plaintiff objects to each interrogatory and to Defendant's definitions and instructions

19  to the extent that they seek to impose on Plaintiff any discovery obligation greater than or different

20  from those imposed by the Federal Rules of Civil Procedure, by the Local Rules of the United

21  States District Court for the Northern District of California, or by an order entered by the Court in

22  this matter.

23        2.      Plaintiff objects to each interrogatory to the extent that it seeks information that is

24  protected from disclosure by the attorney-client privilege, the work product doctrine, or any other

25  applicable privilege or protection. Plaintiff does not intend to waive any applicable privilege or

26  protection and will not disclose any privileged or protected information. In the event Plaintiff

27  inadvertently discloses any such information, this disclosure is not intended and shall not be deemed

28                                          -2-

1   to be a waiver by Plaintiff of any privilege or protection. Plaintiff reserves the right to demand that

2   Defendant return or destroy any materials containing privileged or protected information that were

3   inadvertently disclosed. Specific objections on the grounds of privilege are provided for emphasis

4   and clarity only, and the absence of a specific objection should not be interpreted as evidence that

5   Plaintiff does not object to an interrogatory on the basis of an applicable privilege.

6       3.      Plaintiff objects to each interrogatory to the extent that it seeks information either

7   protected from disclosure by any law, court order, confidentiality or non-disclosure agreement, or

8   the disclosure of which would violate applicable privacy rights. Plaintiff will produce otherwise

9   discoverable confidential information subject to any protective order entered in this litigation.

10      4.      Plaintiff objects to each interrogatory to the extent that it seeks information that is a

11  matter of public record, is equally available to Defendant, or is already in Defendant's possession,

12  custody, or control.

13      5.      Plaintiff objects to each interrogatory to the extent that it seeks information that is

14  not reasonably calculated to lead to the discovery of evidence that is relevant to a claim or a defense

15  in this action, nor reasonably calculated to lead to the discovery of admissible evidence.

16      6.      Plaintiff objects to each interrogatory and to Defendant's definitions and instructions

17  to the extent that they seek information that is not known or reasonably readily available to Plaintiff.

18      7.      Plaintiff objects to each interrogatory to the extent that it is unduly burdensome,

19  overbroad, vague, ambiguous, and/or unclear, including the use of terms that are not defined and/or

20  not otherwise susceptible to any single meaning or any lack of instructions on a relevant time period

21  to limit the scope of said interrogatory.

22      8.      Plaintiff objects to each interrogatory to the extent that it is compound and/or is

23  comprised of subparts constituting more than one interrogatory.

24      9.      Plaintiff reserves her rights to (a) further object to the interrogatories or Defendant's

25  definitions and instructions; (b) object to the use or admissibility of any information provided in

26  response to the interrogatories, for any purpose, in any proceeding in this action or any other action;

27  (c) object on any basis permitted by law to any other discovery request involving or relating to the

28

-3-

subject matter of these objections and responses; (d) alter, amend, or supplement her responses to the interrogatories; and (e) use or rely on, at any time, including trial, subsequently discovered information or information omitted from Plaintiff's objections and responses as a result of mistake, error, oversight, or inadvertence.

10.    The failure of Plaintiff to make an objection to any particular aspect of the interrogatories is not, and shall not be construed as, an admission that responsive information exists. Likewise, any statement that Plaintiff will produce information in response to an interrogatory does not mean that Plaintiff in fact has any such information, or that any such information exists, but instead reflects the intention of Plaintiff, subject to her objections, to provide responses based on a reasonable search through available responsive information.

11.    The information produced herein or herewith is for use in this litigation and for no other purpose.

12.    "Plaintiff" means the named Plaintiff in the instant action, Alice Svenson.

13.    "Defendant," "Defendants," "Google," and "GPC" mean, individually and collectively, Google, Inc. and Google Payment Corporation, the named Defendants in the instant action.

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:** Identify each and every legal proceeding to which You have been a party or in which You have given testimony (whether by deposition, declarant, affidavit or in court) at any point in time. As to each, please state the case name, case number, court, date, and whether You were a party, witness, or both.

**RESPONSE TO INTERROGATORY NO. 1:** Plaintiff hereby incorporates the above general qualifications, objections, and definitions as if fully set forth in this response. Plaintiff objects that this interrogatory is overbroad and is designed to harass rather than lead to relevant or admissible evidence. Plaintiff also objects to this request on the ground that it is not limited by a defined time period. Plaintiff further objects to this interrogatory to the extent that any responsive information is protected by the Attorney-Client Privilege and/or the Work Product Doctrine.

-4-

1   Internet), where you have knowingly publicly disclosed such information, including but not limited
2   to the reason(s) You made such disclosure(s) and the date you made such disclosure(s).

3       **RESPONSE TO INTERROGATORY NO. 5:** Plaintiff hereby incorporates the above
4   general qualifications, objections, and definitions as if fully set forth in this response. Plaintiff
5   objects that this interrogatory is overbroad, vague (e.g., the word "publicly"), unduly burdensome
6   and, as indicated above in response to Interrogatory No. 4, and for the same reasons, not reasonably
7   calculated to lead to admissible evidence. Plaintiff also objects to this request on the ground that it
8   is not limited by a defined time period, thus creating an extraordinary burden. Without waiving and
9   subject to these objections, Plaintiff states that she has not publicly disclosed portions of her
10  registration information.

11  **INTERROGATORY NO. 6:** Identify each and every business, person, entity, website, or any
12  other source from whom You considered purchasing the YCDroid App (regardless of whether You
13  considered the purchase before or after You purchased the YCDroid App on Google Play), and for
14  each such business, person, entity, website or other source you considered, state the date(s) on
15  which You considered such source and the price of the YCDroid App offered by such source.

16      **RESPONSE TO INTERROGATORY NO. 6:** Plaintiff hereby incorporates the above
17  general qualifications, objections, and definitions as if fully set forth in this response. Without
18  waiving and subject to these objections, Plaintiff states that she did not consider purchasing the
19  YCDroid App from any other business, person, entity, website, or other source.

20  **INTERROGATORY NO. 7:** For each item of Registration Information, your phone number, and
21  any other item of information You identified in answer to Interrogatory No. 2, Identify the date You
22  supplied such information to Google and the circumstances of such disclosure. Your answer should
23  include, without limitation, the reason for such disclosure, such as whether the disclosure was made
24  in connection with registration for a Google product or service (and if so the name of such product
25  or service).

26      **RESPONSE TO INTERROGATORY NO. 7:** Plaintiff hereby incorporates the above
27  general qualifications, objections, and definitions as if fully set forth in this response. Plaintiff

28                                            -7-

objects to producing any information that is already in Defendant's possession, custody, or control. Without waiving and subject to these objections, Plaintiff states that, to the best of her recollection, she provided Defendants with her name and phone number on November 12, 2012 for the purpose of registering a Gmail account. Plaintiff additionally states that, to the best of her recollection, she provided Defendants with her name, phone number, credit card number, and home address, including city, state, and zip code, on May 6, 2013 for the purpose of registering Google Wallet and Google Play accounts. Investigation continues. Plaintiff will supplement her response as necessary.

**INTERROGATORY NO. 8:** For each one of the Google Terms and Policies, state the first date upon which You read each such Term or Policy, the portion(s) You read, and the purpose for Your review of such Term or Policy.

**RESPONSE TO INTERROGATORY NO. 8:** Plaintiff hereby incorporates the above general qualifications, objections, and definitions as if fully set forth in this response. This query is not calculated to lead to the discovery of admissible evidence because it seeks information that does not matter and that will not lead to information that matters under the law. Plaintiff objects to this interrogatory to the extent that any responsive information is protected by the Attorney-Client Privilege and/or the Work Product Doctrine. Subject to, and without waiving her objections, Plaintiff recalls agreeing to the Google Terms of Service and Google Privacy Policy when she registered her Gmail account on November 12, 2012 and agreeing to the Google Play Terms of Service, Google Wallet Terms of Service, and Google Wallet Privacy Policy when she registered her Google Play and Google Wallet accounts on May 6, 2013, but not reading specific portions of those Terms and Policies.

**INTERROGATORY NO. 9:** Identify each and every item of Registration Information, Your phone number, and any other item of information You identified in answer to Interrogatory No. 2, that You supplied directly to YCDroid or to the YCDroid App. Your answer should include, without limitation, all information You supplied to YCDroid or the YCDroid App to register, use, update, or otherwise enable any service or function of the YCDroid App.

-8-

1    **RESPONSE TO INTERROGATORY NO. 9:** Plaintiff hereby incorporates the above
2    general qualifications, objections, and definitions as if fully set forth in this response. The query is
3    not calculated to lead to the discovery of admissible evidence because any voluntary election to
4    share information does not mean that the Defendants are relieved of their statutory or contractual
5    obligations. In addition, the query is vague ("supplied directly . . ."). Without waiving and subject
6    to these objections, Plaintiff states that she did not supply any Registration Information directly to
7    YCDroid to her knowledge. When setting up the "SMS MMS to Email" App manufactured by
8    YCDroid, the Plaintiff enabled the App to access her text messages, email, and phone contacts list.
9    This was, to her understanding, to facilitate operation of the App's provision of services, not to
10   deliver any element of her Registration Information to YC Droid.

11   **INTERROGATORY NO. 10:** Identify each and every element of damage that You suffered as
12   the result of Google's alleged disclosure of your Registration Information, Your phone number, or
13   any other information You identified in answer to Interrogatory No. 2, including, as to each such
14   element of damage, the amount or other measure of such damage, Your method for calculating such
15   damage, and the first date on which You suffered such damage.

16   **RESPONSE TO INTERROGATORY NO. 10:** Plaintiff hereby incorporates the above
17   general qualifications, objections, and definitions as if fully set forth in this response. Plaintiff
18   objects to producing any information that is already in Defendant's possession, custody, or control.
19   Plaintiff further objects to this interrogatory to the extent that any responsive information is
20   protected by the Attorney-Client Privilege and/or the Work Product Doctrine. Without waiving and
21   subject to these objections, Plaintiff states that she, and the class, are entitled to damages as
22   articulated by her attorneys in her Complaint in this matter, which includes actual, statutory,
23   compensatory, punitive, and consequential damages, including but not limited to statutory damages
24   under the Stored Communications Act, injunctive relief and restitutionary disgorgement under
25   California's Unfair Competition Law, all, or some ascertainable portion of, the $1.77 purchase price
26   of the YCDroid App, and, for other class members or Apps, or both, all, or some ascertainable

27

28

PLAINTIFF'S RESPONSE TO DEFENDANT GOOGLE'S FIRST SET OF INTERROGATORIES

1  Interrogatories Nos. 10 and 11. Damages are continuing in nature. Investigation continues.
2  Plaintiff will supplement her response as necessary.

3  **INTERROGATORY NO. 13:** Identify each and every App you purchased via Google Play, using
4  Google Wallet, including as to each: (1) the name of the App; (2) the seller of the App; (3) the date
5  of such purchase; (4) the price You paid.

6  **RESPONSE TO INTERROGATORY NO. 13:** Plaintiff hereby incorporates the above
7  general qualifications, objections, and definitions as if fully set forth in this response. Plaintiff
8  objects to producing any information that is already in Defendant's possession, custody, or control.
9  Plaintiff objects that this interrogatory is overbroad, unduly burdensome and not reasonably
10  calculated to lead to admissible evidence. Plaintiff also objects to this request on the ground that it
11  is not limited by a defined time period. Without waiving and subject to these objections, Plaintiff
12  states that she purchased the following Apps from Google Play using Google Wallet:

13  (a)  "SMS MMS to Email" App, published by third-party vendor YCDroid, purchased on
14  May 6, 2013 for $1.77;

15  (b)  An unknown App, published by third-party vendor Crafty Apps, purchased on June
16  11, 2013 for $2.99. Plaintiff no longer has this App on her phone and does not recall the App's
17  name or function;

18  (c)  "SMS MMS to Email" App, published by third-party vendor YCDroid, purchased in
19  or around December 2013. Plaintiff repurchased the App when she replaced her phone but does not
20  recall the date of purchase or purchase price and has been unable to locate a receipt or other
21  financial record of the transaction.

22  Investigation continues. Plaintiff will supplement her response as necessary.

23  **INTERROGATORY NO. 14:** Identify each and every person with whom You have
24  communicated regarding any aspect of the facts alleged or claims pled in the Complaint, including
25  the date(s) of each such communication(s), and as to each non-privileged communication, the
26  substance of such communication.

27

28  -13-

1    **RESPONSE TO INTERROGATORY NO. 14:**  Plaintiff hereby incorporates the above

2    general qualifications, objections, and definitions as if fully set forth in this response. Plaintiff

3    objects to this interrogatory because the responsive information is protected by the Attorney-Client

4    Privilege and/or the Work Product Doctrine. Without waiving and subject to these objections,

5    Plaintiff states that she has no information that is responsive to this Interrogatory except for

6    information she understands to be protected by the Work Product doctrine and/or the Attorney-

7    Client privilege.

8

9    Dated:  May 27, 2014.

10                                              ALICE SVENSON, individually and on
11                                              behalf of all others similarly situated

12                                              By:  /s/Elizabeth Roberson-Young
13                                                   One of Plaintiff's Attorneys

14                                              Elizabeth Roberson-Young (*Pro Hac Vice*)
                                                Mark Bulgarelli (*Pro Hac Vice*)
15                                              PROGRESSIVE LAW GROUP, LLC
                                                1 N. LaSalle Street, Suite 2255
16                                              Chicago, IL 60602
                                                Tel: (312) 787-2717
17                                              liza@progressivelaw.com
                                                markb@progressivelaw.com
18
                                                Frank Jablonski (*Pro Hac Vice*)
19                                              Progressive Law Group LLC
                                                354 West Main Street
20                                              Madison WI 53703
                                                Tel: (608) 258-8511
21                                              frankj@progressivelaw.com

22
                                                Kathryn Diemer
23                                              Diemer, Whitman & Cardosi, LLP
                                                75 East Santa Clara Street, Suite 290 San
24                                              Jose, CA 95113
                                                Tel: (408) 971-6270
25

26

27

28                                       -14-

**PROOF OF SERVICE**

I, Elizabeth Roberson-Young, am a resident of the State of Illinois and over the age of eighteen years. My business address is 1 N. LaSalle Street, Chicago, IL 60602. On **May 27, 2014**, via U.S. Mail, I served **PLAINTIFF'S RESPONSE TO DEFENDANT GOOGLE'S FIRST SET OF INTERROGATORIES** to counsel for the parties of record, as follows:

Susan D. Fahringher
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101

Sunita B. Bali
Perkins Coie LLP
4 Embarcadero Center, Suite 2400
San Francisco, CA 94111

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on May 27, 2014, at Chicago, Illinois.

/s/ Elizabeth Roberson-Young
Elizabeth Roberson-Young

-15-

**Publicly Filed**

Exhibit 3

Exhibit 3

1  DURIE TANGRI LLP
   MICHAEL H. PAGE (SBN 154913)
2  mpage@durietangri.com
   JOSHUA H. LERNER (SBN 220755)
3  jlerner@durietangri.com
   SONALI D. MAITRA (SBN 254896)
4  smaitra@durietangri.com
   217 Leidesdorff Street
5  San Francisco, CA  94111
   Telephone:    415-362-6666
6  Facsimile:    415-236-6300

7  Attorneys for Defendant
   GOOGLE INC.

8

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                    SAN JOSE DIVISION

12                                    | Case No. 5:12-cv-01382-PSG

13                                    | **CONSOLIDATED CLASS ACTION**

14  IN RE GOOGLE, INC. PRIVACY POLICY  | **DECLARATION OF FICUS KIRKPATRICK**
    LITIGATION                         | **IN SUPPORT OF DEFENDANT GOOGLE**
15                                     | **INC.'S MOTION TO DISMISS PLAINTIFFS'**
                                       | **CONSOLIDATED THIRD AMENDED CLASS**
16                                     | **ACTION COMPLAINT, OR IN THE**
                                       | **ALTERNATIVE MOTION FOR SUMMARY**
17                                     | **JUDGMENT**

18                                     | Date:    April 21, 2015
                                       | Time:    10:00 a.m.
19                                     | Ctrm:    5 - 4th Floor
                                       | Judge:   Honorable Paul Singh Grewal
20

21

22

23

24

25

26

27

28

1    I, Ficus Kirkpatrick, declare as follows:

2    1.    I am the Head of Engineering for the Google Play Store at Google Inc.  The factual

3  assertions made herein are made of my personal knowledge and, if called upon to do so, I could and

4  would testify competently thereto.

5    2.    I am familiar with the operation of both Google Play and Google Wallet, and have

6  reviewed the allegations contained in both the Consolidated Second Amended Complaint ("CSAC") and

7  the Consolidated Third Amended Complaint ("CTAC") in the above-captioned matter.  In particular, I

8  have reviewed the allegation in the CTAC that, each time an Android user downloads an App (whether

9  free or purchased) from Google Play, information concerning that user (such as name, username, zip

10  code, and the like, referred to in the CSAC and herein as "personal information") is automatically

11  transmitted from that user's Android device to the developer of that App, and that in the process the

12  device's battery charge is depleted.  I have also reviewed the allegation in the CTAC that, each time an

13  Android user purchases an App from the Google Play store, some sort of "trigger" is send to Google's

14  servers that causes the automatic disclosure of the buyer's personal information to the developer of that

15  App.  Both of those allegations are false.

16    3.    In order to understand the process by which Apps are downloaded from Google Play, it is

17  important to distinguish between paid and free Apps, as the process differs between the two.

18    4.    In order to download a free App from Google Play, an Android user opens the Google

19  Play App on his Android device, and can then search from among the thousands of Apps available there.

20  That search process is conducted via a series of communications between the user's device and the

21  Google servers and software that comprise Google Play.  Once the user selects an App, the computer

22  code that constitutes that App is transmitted (or "downloaded") from Google's servers to the user's

23  device, where after an installation process is complete, the App is ready for use.

24    5.    At no point in the process of downloading and installing a free App does the user's device

25  communicate with the developer of the App or any server operated by that developer.  Google does not

26  provide the developer of a free App with any personal information concerning users who have

27  downloaded free Apps.  No Google Wallet account is required in order to download free Apps, and

28  anyone with a basic Google account can download free Apps without providing any additional personal

1

KIRKPATRICK DECL. ISO GOOGLE'S MTD PLAINTIFFS' CONSOLIDATED THIRD AMENDED
CLASS ACTION COMPLAINT, OR IN THE ALTERNATIVE MSJ / CASE NO. 5:12-CV-01382-PSG

1  information.

2  6.     The process for purchasing an App is slightly different.  Just as with free Apps, the user's

3  device communicates directly with Google's servers only, not with the developer or its equipment.

4  Before a user can purchase a paid App, however, she must have a Google Wallet account in addition to a

5  basic Google account.  Google Wallet is Google's payment mechanism for purchases from Google Play

6  and other services and merchants.  The personal information associated with a user's Google Wallet

7  account is initially provided by the user to Google (either by means of the user's Android device or via

8  the internet) and is stored on Google's servers.  That personal information varies depending on the user

9  and her purchase history.  A user can open a Google Wallet account without providing credit card or

10  other payment information, but in order to make a purchase will later have to either establish a credit

11  balance or provide credit card information, just as in any online or telephonic credit card purchase.

12  Similarly, a user must provide country and zip code (or similar information in other countries) in order

13  for the merchant to determine applicable taxes.  Similarly, if a user used Google Wallet to purchase

14  physical goods, he would have needed to provide address information for shipment.  Regardless of the

15  information involved, it is transmitted from the user to Google in the process of setting up or maintaining

16  that user's Google Wallet account, and stored on Google's secure servers.

17  7.     The process of purchasing an App from Google Play does not involve the user or his

18  device transmitting any personal information to Google or anyone else:  any personal information

19  concerning the user is provided by the user to Google Wallet's servers in the separate process of setting

20  up or maintaining that user's Google Wallet account.  When the user purchases an App, his Google

21  Wallet records are updated accordingly, to add such information as the product purchased, the price, the

22  date and time, the version of the product, and similar transaction information, so that Google Wallet can

23  then charge the user's credit card or other payment method and pay the merchant from whom the App is

24  purchased.

25  8.     Google Wallet (and its predecessor, Google Checkout) makes certain information

26  available to merchants concerning customers who have purchased that merchant's Apps.  That

27  information has varied over time, and at one time included names, usernames, and "coarse" addresses

28  (i.e. country and zip code or local equivalent).  At present, the only user-related information the merchant

2

1    sees is the coarse address.  That information, however, was and is made available to merchants only in

2    response to the merchant's inquiry:  a merchant can log into its Google Wallet account and retrieve

3    certain information concerning its sales to its customers via its Wallet Dashboard.  At all relevant times,

4    that process has entailed a request from the merchant, directed to Google's servers, and a response to the

5    merchant, sent from Google's servers.  At no time has that process entailed the transmission of personal

6    information, or any data whatsoever, from a user's Android device to the merchant.

7        9.      I have reviewed the allegations contained in the CTAC.  In particular, I have reviewed the

8    allegations contained in paragraphs 17, 18, 67, 68, 147, 148, and 166 through 173.  In those paragraphs,

9    Plaintiffs allege that, every time a Google Play user purchases an App, some sort of signal is transmitted

10   from their Android device to "trigger the disclosure to third party developers of their personal

11   information," (¶147), and that Google "causes this disclosure to occur automatically . . . each and every

12   time they purchase an Android application through Google Play."  ¶17.  As a result, Plaintiffs allege,

13   "Android device users that purchase paid applications are made to carry the burden of involuntarily

14   transmitting this additional data to third parties, in the form of depleted device battery power and extra

15   bandwidth consumed by the device."  ¶18.

16       10.     These allegations are categorically false.  As explained above, no information is ever

17   transmitted from a user's device to any third party developer in the process of buying an App.  Neither is

18   any personal information automatically transmitted to third party developers by Google in that process,

19   whether "triggered" by the user's device or otherwise.  Transmission of a user's personal information to

20   Google occurs only during the signup process for Google Wallet, and no such information is transmitted

21   anywhere, by anyone, in the process of purchasing an App.

22       11.     Moreover, Google does not automatically transmit personal information to developers in

23   any circumstance. Rather, as explained above, developers can log into their Google Wallet Merchant

24   Center accounts and request certain information concerning past purchases of their products.  But that

25   process is initiated by the merchant, not by some "trigger" from the user's device, and does not involve

26   the user's device at all.

27       12.     An example may help illustrate this.  Suppose two users each purchase an App from

28   Google Play.  Assuming they each have a valid Wallet account, the Apps are downloaded to their

3

1  devices, their Google Wallet records are updated to include that purchase, and their payment method on
2  file is charged. At no point in the process is any personal information transmitted to anyone, and at no
3  point in the process is any information transmitted from either user's device to the third-party developer
4  or anyone other than Google.

5      13.    Now suppose that the developer of the first App logs into his Google Wallet Merchant
6  Center account and looks up information about one or more purchasers of his App, including our
7  hypothetical user. That merchant can get certain information about his customer from Google's servers,
8  as described above, without involving the user's device at all. And suppose that, in contrast, the
9  developer of the second App chooses not to look up information about our second hypothetical user. In
10 neither case does the process involve the user's device at all, or use any battery power or bandwidth.
11 And in both cases, the battery power and bandwidth used in purchasing and downloading the App is
12 unaffected by, and has nothing to do with, the process of providing information to developers, as that
13 process is the same regardless whether the developer later queries his Google account or not. Plaintiffs'
14 allegations of signals using battery power and triggering automatic transmissions or disclosures of
15 personal information to third parties are entirely false.

16     .I declare under penalty of perjury under the laws of the State of California that the foregoing is
17 true and accurate to the best of my knowledge. Executed on March 12, 2015 at Mountain View,
18 California.

FICUS KIRKPATRICK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I certify that all counsel of record is being served on March 13, 2015 with a copy of this document via the Court's CM/ECF system.

*/s/ Michael H. Page*
MICHAEL H. PAGE

KIRKPATRICK DECL. ISO GOOGLE'S MTD PLAINTIFFS' CONSOLIDATED THIRD AMENDED
CLASS ACTION COMPLAINT, OR IN THE ALTERNATIVE MSJ / CASE NO. 5:12-CV-01382-PSG

**Conditionally Filed Under Seal**

Exhibit 4

Exhibit 4

**Conditionally Filed Under Seal**

Exhibit 5

Exhibit 5

**Publicly Filed**

Exhibit 6

Exhibit 6



## Policies & Principles

1. Overview
2. Terms of Service

- Terms of Service
- Archive

# Google Terms of Service

Last modified: March 1, 2012

## Welcome to Google!

Thanks for using our products and services ("Services"). The Services are provided by Google Inc. ("Google"), located at 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States.

By using our Services, you are agreeing to these terms. Please read them carefully.

Our Services are very diverse, so sometimes additional terms or product requirements (including age requirements) may apply. Additional terms will be available with the relevant Services, and those additional terms become part of your agreement with us if you use those Services.

## Using our Services

You must follow any policies made available to you within the Services.

Don't misuse our Services. For example, don't interfere with our Services or try to access them using a method other than the interface and the instructions that we provide. You may use our Services only as permitted by law, including applicable export and re-export control laws and regulations. We may suspend or stop providing our Services to you if you do not comply with our terms or policies or if we are investigating suspected misconduct.

Using our Services does not give you ownership of any intellectual property rights in our Services or the content you access. You may not use content from our Services unless you obtain permission from its owner or are otherwise permitted by law. These terms do not grant you the right to use any branding or logos used in our Services. Don't remove, obscure, or alter any legal notices displayed in or along with our Services.

Our Services display some content that is not Google's. This content is the sole responsibility of the

GOOG-00000041

entity that makes it available. We may review content to determine whether it is illegal or violates our policies, and we may remove or refuse to display content that we reasonably believe violates our policies or the law. But that does not necessarily mean that we review content, so please don't assume that we do.

In connection with your use of the Services, we may send you service announcements, administrative messages, and other information. You may opt out of some of those communications.

## Your Google Account

You may need a Google Account in order to use some of our Services. You may create your own Google Account, or your Google Account may be assigned to you by an administrator, such as your employer or educational institution. If you are using a Google Account assigned to you by an administrator, different or additional terms may apply and your administrator may be able to access or disable your account.

If you learn of any unauthorized use of your password or account, follow these instructions.

## Privacy and Copyright Protection

Google's privacy policies explain how we treat your personal data and protect your privacy when you use our Services. By using our Services, you agree that Google can use such data in accordance with our privacy policies.

We respond to notices of alleged copyright infringement and terminate accounts of repeat infringers according to the process set out in the U.S. Digital Millennium Copyright Act.

We provide information to help copyright holders manage their intellectual property online. If you think somebody is violating your copyrights and want to notify us, you can find information about submitting notices and Google's policy about responding to notices in our Help Center.

## Your Content in our Services

Some of our Services allow you to submit content. You retain ownership of any intellectual property rights that you hold in that content. In short, what belongs to you stays yours.

When you upload or otherwise submit content to our Services, you give Google (and those we work with) a worldwide license to use, host, store, reproduce, modify, create derivative works (such as those resulting from translations, adaptations or other changes we make so that your content works better with our Services), communicate, publish, publicly perform, publicly display and distribute such content. The rights you grant in this license are for the limited purpose of operating, promoting, and improving our Services, and to develop new ones. This license continues even if you stop using our Services (for example, for a business listing you have added to Google Maps). Some Services may offer you ways to access and remove content that has been provided to that Service. Also, in some of our Services, there are terms or settings that narrow the scope of our use of the content submitted in those Services. Make sure you have the necessary rights to grant us this license for any content that you submit to our Services.

GOOG-00000042

You can find more information about how Google uses and stores content in the privacy policy or additional terms for particular Services. If you submit feedback or suggestions about our Services, we may use your feedback or suggestions without obligation to you.

## About Software in our Services

When a Service requires or includes downloadable software, this software may update automatically on your device once a new version or feature is available. Some Services may let you adjust your automatic update settings.

Google gives you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you by Google as part of the Services. This license is for the sole purpose of enabling you to use and enjoy the benefit of the Services as provided by Google, in the manner permitted by these terms. You may not copy, modify, distribute, sell, or lease any part of our Services or included software, nor may you reverse engineer or attempt to extract the source code of that software, unless laws prohibit those restrictions or you have our written permission.

Open source software is important to us. Some software used in our Services may be offered under an open source license that we will make available to you. There may be provisions in the open source license that expressly override some of these terms.

## Modifying and Terminating our Services

We are constantly changing and improving our Services. We may add or remove functionalities or features, and we may suspend or stop a Service altogether.

You can stop using our Services at any time, although we'll be sorry to see you go. Google may also stop providing Services to you, or add or create new limits to our Services at any time.

We believe that you own your data and preserving your access to such data is important. If we discontinue a Service, where reasonably possible, we will give you reasonable advance notice and a chance to get information out of that Service.

## Our Warranties and Disclaimers

We provide our Services using a commercially reasonable level of skill and care and we hope that you will enjoy using them. But there are certain things that we don't promise about our Services.

OTHER THAN AS EXPRESSLY SET OUT IN THESE TERMS OR ADDITIONAL TERMS, NEITHER GOOGLE NOR ITS SUPPLIERS OR DISTRIBUTORS MAKE ANY SPECIFIC PROMISES ABOUT THE SERVICES. FOR EXAMPLE, WE DON'T MAKE ANY COMMITMENTS ABOUT THE CONTENT WITHIN THE SERVICES, THE SPECIFIC FUNCTION OF THE SERVICES, OR THEIR RELIABILITY, AVAILABILITY, OR ABILITY TO MEET YOUR NEEDS. WE PROVIDE THE SERVICES "AS IS".

GOOG-00000043

SOME JURISDICTIONS PROVIDE FOR CERTAIN WARRANTIES, LIKE THE IMPLIED
WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-
INFRINGEMENT. TO THE EXTENT PERMITTED BY LAW, WE EXCLUDE ALL WARRANTIES.

## Liability for our Services

WHEN PERMITTED BY LAW, GOOGLE, AND GOOGLE'S SUPPLIERS AND DISTRIBUTORS,
WILL NOT BE RESPONSIBLE FOR LOST PROFITS, REVENUES, OR DATA, FINANCIAL
LOSSES OR INDIRECT, SPECIAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE
DAMAGES.

TO THE EXTENT PERMITTED BY LAW, THE TOTAL LIABILITY OF GOOGLE, AND ITS
SUPPLIERS AND DISTRIBUTORS, FOR ANY CLAIM UNDER THESE TERMS, INCLUDING FOR
ANY IMPLIED WARRANTIES, IS LIMITED TO THE AMOUNT YOU PAID US TO USE THE
SERVICES (OR, IF WE CHOOSE, TO SUPPLYING YOU THE SERVICES AGAIN).

IN ALL CASES, GOOGLE, AND ITS SUPPLIERS AND DISTRIBUTORS, WILL NOT BE LIABLE
FOR ANY LOSS OR DAMAGE THAT IS NOT REASONABLY FORESEEABLE.

## Business uses of our Services

If you are using our Services on behalf of a business, that business accepts these terms. It will hold
harmless and indemnify Google and its affiliates, officers, agents, and employees from any claim, suit or
action arising from or related to the use of the Services or violation of these terms, including any liability
or expense arising from claims, losses, damages, suits, judgments, litigation costs and attorneys' fees.

## About these Terms

We may modify these terms or any additional terms that apply to a Service to, for example, reflect
changes to the law or changes to our Services. You should look at the terms regularly. We'll post notice
of modifications to these terms on this page. We'll post notice of modified additional terms in the
applicable Service. Changes will not apply retroactively and will become effective no sooner than
fourteen days after they are posted. However, changes addressing new functions for a Service or changes
made for legal reasons will be effective immediately. If you do not agree to the modified terms for a
Service, you should discontinue your use of that Service.

If there is a conflict between these terms and the additional terms, the additional terms will control for
that conflict.

These terms control the relationship between Google and you. They do not create any third party
beneficiary rights.

If you do not comply with these terms, and we don't take action right away, this doesn't mean that we are
giving up any rights that we may have (such as taking action in the future).

If it turns out that a particular term is not enforceable, this will not affect any other terms.

The laws of California, U.S.A., excluding California's conflict of laws rules, will apply to any disputes arising out of or relating to these terms or the Services. All claims arising out of or relating to these terms or the Services will be litigated exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts.

For information about how to contact Google, please visit our contact page.

## Good to Know

- Our Good to Know site helps you stay safe and protect your family's information online. Visit to learn more

## Technologies

- Technologies and Principles
- Advertising
- How Google uses cookies
- Types of cookies used by Google
- Managing cookies in your browser

## Legal policies

- Privacy Policy
- Terms of Service
- FAQ

English    ▼

- Google
- About Google
- Privacy & Terms

**Publicly Filed**

Exhibit 7

Exhibit 7

# Terms of Service - Buyer (US)

To use Google Wallet for in-store purchases with your Google Wallet Mobile Application, Bancorp will issue you a Google Wallet Virtual Card, which terms are located at http://wallet.google.com/files/virtualcard-tos.html ("Google Wallet Virtual Card Terms of Use"). I authorize Google Wallet to charge my selected card when I make in-store purchases with my Google Wallet Mobile Application. Please see Section 3 for more information.

**Google Wallet –Terms of Service**

**August 1, 2012**

These Terms of Service are a legal agreement, between you, Google Inc. and Google Payment Corp., a wholly-owned subsidiary of Google Inc., that governs your access to and use of Google Wallet. The services described below are provided by Google Payment Corp. Please review these Terms of Service before you decide whether to accept them and continue with the registration process.

By agreeing to these Terms of Service, you represent that you are:

* 18 years old or older; and
* capable of entering into a legally binding agreement.

If you are a business entity, you also represent that you are:

* duly authorized to do business in the country or countries where you operate; and

your employees, officers, representatives, and other agents accessing Google Wallet are duly authorized to access Google Wallet and to legally bind you to these Terms of Service and all transactions conducted under your username and password.

**Table of Contents:**

1. Definitions
2. Processing Service
3. Google Mobile Wallet
4. Limitations on Use of the Services
5. Privacy
6. Username and Password Information
7. Electronic Communications
8. Termination of Service
9. Responsibility for Taxes
10. No Endorsement of Products
11. Indemnification
12. Disclaimer
13. Limitation of Liability; Force Majeure
14. Governing Law

GOOG-00000067

15. <u>Notice</u>
16. <u>**Modification of the Terms of Service**</u>
17. <u>Assignment</u>
18. <u>**Survival**</u>
19. <u>**Other Provisions**</u>

## 1. Definitions.

The following defined terms appear in these Terms of Service.

- "**Applicable Law**" Any and all federal, state and local laws, rules and regulations applicable to the Processing Service
- "**Buyer**": A Customer that uses the Processing Service to purchase goods and/or services from Sellers.
- "**Carrier**": A mobile telephone operator approved by GPC that offers a Carrier Billing Account.
- "**Carrier Billing Service**": The payment process whereby GPC, on behalf of Seller, submits a Payment Transaction to the Carrier for billing to the Buyer's Carrier Billing Account.
- "**Carrier Billing Account**": The monthly or other periodic billing account provided to you by your Carrier that you register with the Processing Service to fund certain Payment Transactions.
- "**Customer**": A person that registers with the Processing Service as a Buyer or a Seller.
- "**Google**": means Google Inc.
- "**Google Mobile Wallet**": The Google Wallet features that enable you to (i) make purchases at participating retail locations using a smartphone with near-field communication ("**NFC**") capabilities; and (ii) make purchases on participating merchant websites from the mobile browser on your smart phone.
- "**Google Wallet Account**" The account that is assigned to you upon your completion of the Google Wallet set-up.
- "**Google Wallet Virtual Card**" means the MasterCard-branded prepaid virtual payment card product downloaded and stored on the near-field communication chip of a mobile phone issued by The Bancorp Bank.
- "**Google Wallet Virtual Card Terms of Use**" The terms and conditions applicable to use of the Google Wallet Virtual Card.
- "**Google Web Sites**": The web site pages of Google, a Google affiliate or a Google-affiliated or partner company.
- "**GPC**": Google Payment Corp.
- "**Offer(s)**": The Google Mobile Wallet service which enables you to store information on your mobile device or in GPC's servers for offers, coupons, or other valuable content that can be redeemed at a participating merchant for Products.
- "**Online Card Processing Service**": The service by which GPC holds a Buyer's registered Payment Instrument information and, at the time of a Buyer's purchase from a Seller using the Google Wallet, GPC provides such information to the Seller (or the Seller's card processor, including potentially GPC itself) for processing through the applicable card network, which Seller, in turn, provides to the issuer of the Payment Instrument for approval and financial settlement through the card network to the Seller.
- "**Payment Instrument**": The credit card, debit card or Carrier Billing Account that is registered by a Customer with the Processing Service to facilitate the processing of Payment Transactions. A Payment Instrument must be associated with a billing address in a country where the Processing Service is made available.
- "**Payment Method(s)**": A Payment Instrument, merchant gift cards and other prepaid payment methods,

GOOG-00000068

and/or financial accounts.

- **"Payment Transaction"**: The processing of a payment through the Processing Service that results in the debiting, charging, or other related transaction, of the Purchase Amount to a Buyer's Payment Instrument by a Seller that is registered with GPC to receive payment processing services.
- **"Processing Service"**: The Online Card Processing Service and the Carrier Billing Service.
- **"Product"**: Any merchandise, good or service that a Buyer may purchase using the Service.
- **"Purchase Amount"**: The dollar amount of a Payment Transaction to pay for a Product, and any related fees, taxes or shipping charges, as applicable.
- **"Rewards Program Item(s)"**: The Google Mobile Wallet service which enables you to store information on your mobile device or in GPC's servers for reward program points, or other incentives that can be redeemed at a participating merchant for Products.
- **"Seller"**: A Customer that uses the Processing Service to process Payment Transactions from Buyers.
- **"Service(s)"**: The Google Wallet products and services described in these Terms of Service that are or facilitate (i) the Processing Service, and, (ii) the Google Mobile Wallet.
- **"We"**, **"us"**: Google Inc. and Google Payment Corp.
- **"You"**, **"you"**: A person that applies to, or registers to use, or uses, the Services.

## 2. The Processing Service.

### 2.1 Getting Started with the Processing Service.

In order to use the Processing Service, you must complete all required information elements on the Processing Service registration web pages. You must register a valid credit or debit card or Carrier Billing Account as a Payment Instrument to make Payment Transactions and pay fees and other obligations arising from your use of the Processing Service. You must provide current, complete and accurate information and maintain it as current and accurate. GPC may require you to provide additional information as a condition of continued use of the Processing Service, or to assist in determining whether to permit you to continue to use the Processing Service.

You authorize GPC to confirm that your Payment Instrument is in good standing with the issuing financial institution and/or Carrier (as applicable), including, but not limited to, by submitting a request for a payment authorization and/or a low dollar credit and/or debit to the Payment Instrument, in accordance with the relevant card association or Carrier rules as applicable. You also authorize GPC to obtain from time to time a credit report and/or to otherwise make credit or other background inquiries as GPC deems appropriate to evaluate your registration for or continued use of the Processing Service. GPC, in its sole and absolute discretion, may refuse to approve or may terminate existing registrations for the Processing Service with or without cause or notice, other than any notice required by any Applicable Law, and not waived herein.

### 2.2 Online Card Processing Service.

The Online Card Processing Service facilitates a credit or debit card purchase by a Buyer from a Seller that is registered with GPC to receive certain merchant payment processing services. The Online Card Processing Service stores information from Buyers, such as their Payment Instruments and shipping information. GPC processes Payment Transactions on behalf of Sellers, as the agent of the Seller, through the appropriate credit card or debit card network or through a participating Carrier, as applicable. When Buyer chooses to pay for Products with the Processing Service, Buyer authorizes the Seller to submit charges (and, in the case of refunds, credits) to Buyer's registered Payment Instrument. GPC will assist the Seller in accessing the card networks and processing the

Payment Transaction. Purchases made through the Online Card Processing Service are also subject to the terms and conditions governing Buyer's Payment Instrument between Buyer and the issuer of the Payment Instrument. Buyer is responsible for any charges and related fees that may be imposed under the Payment Instrument terms and conditions as a result of Buyer's use of a Payment Instrument.

GPC may delay payment processing of suspicious transactions or attempted Payment Transactions which may involve fraud or misconduct, or violate Applicable Law, these Terms of Service, or other applicable GPC policies, as determined in GPC's sole and absolute discretion. Buyer authorizes the charge or debit to Buyer's Payment Instrument, by GPC as agent of the Seller, as necessary to complete processing of a Payment Transaction. Buyer also authorizes the crediting to Buyer's Payment Instrument, by GPC as agent of the Seller, in connection with reversals, refunds, or adjustments through the Processing Service by a Seller.

You acknowledge and agree that your purchases of Products are transactions between you and the Seller, and not with GPC, Google or any of their affiliates. Neither GPC nor Google are a party to your Payment Transaction for the purchase of Products, and GPC, Google, or other GPC affiliates are not a Buyer or a Seller in connection with any Payment Transaction, unless expressly designated as such in the listing of the Product on a Google Web Site.

**2.3 Carrier Billing Service.**

Certain Sellers that use the Processing Service may permit you to have your purchase billed to your Carrier Billing Account. These additional terms apply when you use the Carrier Billing Service through the Processing Service:

- Registering your Carrier Billing Account as a payment option requires your mobile telephone number, name and billing address of the Carrier Billing Account associated with that number. You consent to your Carrier providing this information to GPC, and you will review the information during sign-up for the Carrier Billing Service, and correct any inaccuracies. This information will be used by GPC for the purpose of establishing your Carrier Billing Account as a Payment Instrument in your Google Wallet, and for operating the Processing Service. You also agree that GPC and your Carrier may share information with each other regarding your Carrier Billing Account activity in order to charge or credit your Carrier Billing Account and otherwise complete payments for purchases, reversals, refunds or adjustments of Payment Transactions, resolve disputes, provide customer support, and for other Carrier Billing-related purposes.
- When you choose to pay for Products with the Carrier Billing Service, you authorize the Seller and GPC, as agent of and processor for the Seller, to submit charges and credits to your Carrier, and your Carrier to make such charges and credits to your Carrier Billing Account, as necessary to complete the Payment Transaction, or to complete the reversal, refund, or adjustment of that Payment Transaction.
- You can use the Carrier Billing Service to purchase applications (e.g., downloadable or networked applications, wallpapers, ring-tones, games, and productivity tools) ("Apps") for and with your compatible device from certain merchants on Android Market. These Apps are not sold by your Carrier, Google, GPC, or Android Market. You can identify the Seller of the App at the point of purchase.
- Purchases made through the Carrier Billing Service are also subject to the terms and conditions of your Carrier Billing Account. You are responsible for any charges and related fees that may be imposed under your Carrier Billing Account terms and conditions as a result of your use of the Carrier Billing Service.
- You may contact your Carrier's customer service if you have a question about the charges or fees billed to your Carrier Billing Account. You should direct support questions regarding products, such as Android Apps, purchased through the Carrier Billing Service to the Seller from whom you purchased the App.
- None of Carrier, Google, GPC, or Android Market is responsible for any product (including an App) purchased

with the Carrier Billing Service, including download, installation, use, transmission failure, interruption, or delay, refunds, third party advertisements you may encounter while using the product or App, alterations any App may make to the functionality of your device, including any changes that may affect your Carrier's plan, service, or billing, or any content or website you may be able to access through the App.

## 2.4  One Time Wallet Account.

Where offered by a Seller, you may use the Processing Service to make a Payment Transaction through a one-time Google Wallet Buyer account, also referred to as a "One Time Account", "Guest Account" or a similar name.  If you make a Payment Transaction through a One Time Account, these Terms of Service apply except:

- You will create the One Time Account at the time you make the Payment Transaction and you can use the One Time Account only for that single Payment Transaction.
- You will not create a username or password for the One Time Account.
- Information about a Payment Transaction made through the One Time Account will be accessible at the time of the Payment Transaction and subsequently through a dedicated webpage link provided to you.
- Information about a Payment Transaction made through a One Time Account will not be accessible through any other Google Wallet Account you may have.

## 2.5  Subscriptions/Recurring Transactions Purchases

Your subscription will start when you click "Accept & buy" on a subscription purchase. This is a recurring billing transaction. Unless otherwise stated, your subscription and the relevant billing authorization will continue indefinitely until cancelled by you.  The subscription services described in this paragraph are not currently available when using the Google Mobile Wallet.

By clicking 'Accept & buy,' you authorize the applicable Seller to bill your chosen Payment Instrument during the subscription at the Purchase Amount.    The Purchase Amount will continue to be charged to your Payment Instrument, until you cancel your subscription, unless as otherwise stated in the terms and conditions.  The billing rate is subject to change by the Seller during the subscription period.

Your Payment Instrument will be billed each period based on the date of the subscription purchase.

You may cancel a subscription at any time, but the cancellation will not become effective until the end of the current billing period. You will not receive a refund for the current billing period. You will continue to be able to access the relevant subscription for the remainder of the current billing period.

We reserve the right to issue refunds or credits at our sole discretion. If we issue a refund or credit, we are under no obligation to issue the same or similar refund in the future.

## 2.6  Permissible Payment Transactions.

You may only use the Processing Service to process a Payment Transaction for a Product that is purchased from a Seller through a legitimate, bona fide sale of the Product. The Processing Service may not be used to process a Payment Transaction, or otherwise transfer money between a Buyer and Seller, that is unrelated to a purchase of a

Product. The Processing Service may not be used to receive cash advances from Sellers or to facilitate the purchase of cash equivalents (travelers checks, prepaid cards, money orders, etc.). You may not use the Processing Service to process Payment Transactions in connection with the sale or exchange of any illegal goods or services or any other underlying illegal transaction.

You agree that you will not use the Processing Service to process Payment Transactions for any Products that violate these Terms of Service, other policies or rules applicable to the Processing Service, or Applicable Law. The current policy that establishes the Products and other transactions that may not be paid for with the Processing Service is provided here. Failure to comply with these limitations may result in suspension or termination of your use of the Processing Service.

### 2.7 Service Fees.

GPC does not charge a fee to use the Processing Service as a Buyer. The financial institution that issues, or the Carrier that provides, your Payment Instrument may charge a fee in connection with the debiting or charging of the Payment Instrument resulting from the Payment Transaction. You should consult the terms and conditions governing your Payment Instrument for more information about any such fees.

### 2.8 Disputes.

GPC will provide various tools to assist Customers in communicating with each other to resolve a dispute that may arise between Buyers and Sellers with respect to their transaction. If Customers are unable to resolve a dispute, GPC can mediate disputes between buyers and sellers if either party requests assistance. If this occurs, GPC will review the dispute and propose a non-binding solution, if appropriate. For more detailed information, please see our Frequently Asked Questions.

GPC may offer a feedback or other ranking system on the Processing Service to assist you in evaluating other Customers of the Service. You acknowledge that any such feedback or ranking system represents solely the opinion of other Customers of the Processing Service, and is not an opinion, representation, or warranty by GPC with respect to other Customers of the Processing Service.

You agree to release GPC, Google, and other GPC affiliates, and their agents, contractors, officers and employees, from all claims, demands and damages (actual and consequential) arising out of or in any way connected with a dispute. You agree that you will not involve GPC in any litigation or other dispute arising out of or related to any transaction, agreement, or arrangement with any Seller, other Buyer, advertiser or other third party in connection with the Service. If you attempt to do so, (i) you shall pay all costs and attorneys' fees of GPC, Google, and other GPC affiliates and shall provide indemnification as set forth below, and (ii) the jurisdiction for any such litigation or dispute shall be limited as set forth below. However, nothing in these Terms of Service shall constitute a waiver of any rights, claims or defenses that you may have with respect to a Payment Transaction under the Buyer's card issuer agreement or Carrier Billing Account terms and conditions, the card association rules or Applicable Law, including, but not limited to, the federal Truth in Lending Act and the Electronic Fund Transfer Act.

If you are a California resident, you hereby expressly waive California Civil Code §1542, which states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if not known by him must have materially affected his settlement with the debtor."

### 2.9 Refunds.

If you believe your Google Wallet Account has been opened or used in an unauthorized manner in connection with a Payment Transaction, please see our fraud protection process. Also, please see our Frequently Asked Questions for more information on how GPC protects you from fraud.

Except as set forth in these Terms of Service, all Payment Transactions processed through the Processing Service are non-refundable to Buyer by GPC and are non-reversible by Buyer through the Processing Service. You may have additional refund or charge-back rights under your Payment Instrument issuer agreement or Applicable Law. You should review your periodic statement received from the issuer of your Payment Instrument which will reflect all Payment Transactions for that Payment Instrument.

### 2.10 Unclaimed Property.

If GPC is holding funds due to you arising from a Payment Transaction processed through the Processing Service or otherwise, and GPC is unable to contact you and has no record of your use of the Processing Service for several years, Applicable Law may require GPC to report these funds as unclaimed property. If this occurs, GPC will try to locate you at the address shown in our records, but if GPC is unable to locate you, it may be required to deliver any such funds to the applicable state as unclaimed property. GPC reserves the right to deduct a dormancy fee or other administrative charges from such unclaimed funds, as permitted by Applicable Law.

### 2.11 GPC Not a Banking Institution.

GPC processes Payment Transactions through the Processing Service as an agent of and on behalf of Sellers. GPC is not a bank or other chartered depository institution. Funds held by GPC or its service providers (including any bank service providers) in connection with the processing of Payment Transactions are not deposit obligations of Buyer and are not insured for the benefit of Buyer by the Federal Deposit Insurance Corporation or any other governmental agency.

### 3. The Google Mobile Wallet.

### 3.1 General Description.

The Google Mobile Wallet consists of two components: (a) the Google Mobile Wallet application residing on your smartphone or any other method by which GPC delivers or otherwise makes available the Online Card Processing Service to Customers (the "**Google Mobile Wallet Application**") and (b) the Google Mobile Wallet service hosted by Google Wallet servers or hosted by a third party provider designated by GPC (the "**Google Mobile Wallet Service**"). Section 3 of these Terms of Service describes GPC's provision of the Google Mobile Wallet Service to you.

(a) Google Mobile Wallet Application. The Google Mobile Wallet Application enables you to (a) store one or more Payment Methods, Offers, Reward Program Items and/or other related items on your eligible NFC mobile device, and (b) present these Payment Methods, Offers, and/or Reward Program Items to a participating merchant for use in Payment Transactions or redemption transactions. The Google Mobile Wallet Application also gives you access to information stored on your mobile device related to these Payment Methods, Offers, and/or Reward Program Items. This may include access to Payment Method transaction history or available balance information. The Google Mobile Wallet Application may also be enabled for non-NFC mobile devices, in which case the Google Mobile Wallet Application may have reduced functionality.

(b) <u>Google Mobile Wallet Service</u>. The Google Mobile Wallet Service may enable you to store on GPC's servers and access your Offers, Reward Program Items, Payment Method transaction history or available balance information and payment credentials. The Google Mobile Wallet Service also gives you the ability to make purchases on participating merchant websites from your smartphone using Payment Methods stored on GPC's servers.

### 3.2 Getting Started with Google Mobile Wallet.

In order to use the Google Mobile Wallet, you must (i) be a resident of the United States, (ii) link Google Mobile Wallet to your Google Wallet and (iii) if you are using the Google Mobile Wallet Application, set a PIN code. You are responsible for maintaining the confidentiality of your PIN code. You agree to notify Google Wallet immediately of any unauthorized use of Google Mobile Wallet or any other breach of security regarding the Google Mobile Wallet of which you have knowledge.

### 3.3 Using the Google Mobile Wallet Application.

The Google Mobile Wallet Application enables you to store account information for one or more Payment Methods on your NFC mobile device to use for purchases at participating merchants.

(a) <u>Storing Your Payment Methods</u>. Using the Google Mobile Wallet Application, you may store on your NFC mobile device (i) Payment Instruments issued to you by a third party, (ii) a Merchant-branded credit card ("**Merchant-Branded Card**"), or (iii) a gift card ("**Gift Card**") issued by a merchant or financial institution. In addition, GPC and The Bancorp Bank will arrange for a Google Wallet Virtual Card to be issued to you and stored in the NFC mobile device. (See section 3(c) below on how the Google Wallet Virtual Card works.)

- <u>Your Payment Instruments</u>. In order to upload one of your Payment Instruments on your NFC mobile device, you will need to provide the information requested through the Google Mobile Wallet Application in order to store the Payment Instrument in your Google Wallet Account. GPC does not guarantee and makes no representations that the issuer of your Payment Instruments will honor any usual rewards or benefits (including any purchase protection or insurance) for your purchases using the Google Mobile Wallet Application.

- <u>Storing a Merchant-Branded Card</u>. In order to store a Merchant-Branded Card on your NFC mobile device, you will need to provide the information requested by the merchant via the Google Mobile Wallet Application in order to authorize the merchant to load your Merchant-Branded Card credentials and store them on the NFC mobile device. Whether or not to do so is at the discretion of the merchant, not GPC. GPC does not guarantee and makes no representations that the issuer of your Merchant-Branded Card will honor any usual rewards or benefits for your purchases using the Google Mobile Wallet Application.

- <u>Storing a Gift Card</u>. In order to store a Gift Card on your NFC mobile device, you will need to provide the information requested by the Google Mobile Wallet Application.

(b) <u>Transacting with a Payment Method</u>. In order to use a Payment Method available in the Google Mobile Wallet Application to purchase Products from a participating merchant, follow the instructions on the Google Mobile Wallet Application to log in and then place your NFC mobile device near the merchant's NFC reader. By placing your mobile device near the merchant's NFC reader, you authorize the information for your selected Payment Method to be transferred from your NFC mobile device to the merchant for use in processing the payment for the merchant's Products. The selected Payment Method will be used to pay for the merchant's Products in lieu of your presenting

another physical payment card or device.

You acknowledge that Payment Method information stored using Google Mobile Wallet is provided to the merchant by you (not by GPC) and contains personal financial information. GPC does not make any representation or verify that your Payment Method is in good standing or that the issuer of your Payment Method will authorize or approve any purchase of Products from a merchant when you use the Google Mobile Wallet in connection with that purchase.

3.4.  Google Wallet Payments and the Google Wallet Virtual Card.

(a)      Issuance of the Google Wallet Virtual Card.  As part of the Google Mobile Wallet Service, GPC has arranged for The Bancorp Bank ("Bancorp") to provide you with access to a MasterCard®-branded virtual prepaid payment card product, the Google Wallet Virtual Card.  By using the Google Mobile Wallet Service and the Google Wallet Virtual Card, you also agree to the GoogleWallet Virtual Card Terms of Use, which may be updated from time to time.  For avoidance of doubt, the Google Wallet Virtual Card Terms of Use are between you and Bancorp, not Google or GPC.

(b)      How to Use Google Mobile Wallet with Google Wallet Virtual Card To Make Merchant Purchases.  The Google Wallet Virtual Card functions as a prepaid debit card that can be used to make purchases when you present the Google Wallet Virtual Card at a merchant location that accepts MasterCard® PayPass™, even if the issuer of your registered debit or credit card is not a Google Wallet partner for NFC transactions. The Google Wallet Virtual Card is different than your debit or credit card registered in Google Wallet. The merchant will not receive your registered debit or credit card information. Rather, Bancorp will settle the Google Wallet Virtual Card payment to the merchant. Then, GPC will bill your selected Payment Method for the total purchase amount of the Payment Transaction.

(c)      Payment Transaction Limits.  There are maximum dollar limits on purchase payments that you may make using Google Wallet Virtual Card. Maximum purchase payments may not exceed the lesser of $3,000 or any daily purchase transaction limit imposed by your selected credit or debit card.

The Google Wallet Virtual Card is not a credit card, and GPC and Bancorp are not extending you credit in connection with your use of the Google Mobile Wallet Service or the Google Wallet Virtual Card. GPC will instruct Bancorp to deny a requested Google Wallet purchase if GPC has reason to believe that it will not be able to initiate a charge to your selected Payment Method, or if GPC otherwise believes that GPC will not be able to obtain funds from you to complete the requested purchase payment.  We reserve the right to decline any Google Wallet Virtual Card-initiated Payment Transaction.  We reserve the right to suspend your use of the Google Wallet Virtual Card for any reason.

We may impose limits on the types of merchants where Google Wallet will permit payments. For example, you cannot use the Google Mobile Wallet Service to purchase outbound telemarketing services or direct marketing travel related arrangement services.  Please refer to the GoogleWallet Virtual Card Terms of Use for additional restrictions on permissible payments with the Google Wallet that are facilitated with the Google Wallet Virtual Card.

(d)      Your Authorization for Google Wallet Virtual Card Billing.  By using Google Wallet to make a purchase payment at a merchant, you authorize the use of the Google Wallet Virtual Card to complete a payment to the merchant, and you authorize GPC to charge the applicable credit card or debit card that is registered in Google Wallet and selected by you as the default Payment Method for the Purchase Amount.

(e)      Receipts At Merchant Locations.  You may receive a transaction receipt from a merchant when you use the Google Wallet and the Google Wallet Virtual Card.  This merchant receipt will reflect the Google Wallet Virtual Card

number, and not your credit card or debit card number that will be charged by Google Wallet for the payment. GPC is under no obligation to provide you with a receipt or other written confirmation in connection with the charge to your selected credit card or debit card to complete the Payment Transaction initiated with the Google Wallet Virtual Card.

(f)    Periodic Statements / Customer Service / Error Resolution. You agree that we will not provide you with a separate periodic statement for your use of the Google Wallet Virtual Card. An electronic transaction statement showing all transactions with the Google Wallet Virtual Card and your other Google Wallet Account transactions in electronic format will be made available free of charge at www.google.com/wallet. You are responsible for reviewing your Google Wallet Virtual Card transactions reflected on the Google Wallet Account transaction statement. If you have a inquiry regarding a payment made with Google Wallet and the Google Wallet Virtual Card, or you believe there has been an error or unauthorized transaction regarding a payment transaction using Google Wallet and the Google Wallet Virtual Card, please contact Google Wallet Support at 855-492-5538. Google Wallet provides you with certain rights and protections in the event of an error or unauthorized transaction arising from your use of Google Wallet in which the Google Wallet Virtual Card has been used to facilitate a payment to a merchant. With respect to Payment Transactions made using the Google Wallet Virtual Card, see the Virtual Card Terms of Use for more details regarding these protections and a statement of your potential liability for use of the Google Wallet Virtual Card. You may also have certain rights and protections that are provided to you under your agreement with the issuer of your Payment Method or Applicable Law with respect to the charges for a purchase payment made to your registered credit or debit card. You should consult your agreement with the issuer of your Payment Method for details.

### 3.5 Offers and Reward Program Items.

(a)    Saving an Offer to Google Mobile Wallet. Offers may be presented to you on Google online properties (websites) or participating third party websites, through the Google Mobile Wallet Application or at a merchant's physical location. If you are logged into your Google Wallet account, you may select an Offer and store the Offer on your mobile device for redemption at the participating merchant, which will also be stored in the Google Mobile Wallet Service.

(b)    Storing Reward Program Items. In order to store Reward Program Items in Google Mobile Wallet, you must provide all information required by Google Mobile Wallet.

(c)    Redemption of an Offer/Reward Program Item. In order to redeem an Offer and/or Reward Program Item stored in Google Mobile Wallet at a participating merchant, you must, at the request of the merchant, either (i) permit the merchant to read the Offer and/or Reward Program Item off the screen of the mobile device, or (ii) place the mobile device near the NFC reader. By presenting your mobile device to the merchant, you authorize the information regarding the Offer and/or Reward Program Item to be transferred from your mobile device to the merchant for redemption. The redemption is processed by the merchant at its discretion, in accordance with the merchant's terms and conditions for the Offer and/or Reward Program Item, as applicable. If you have questions regarding redemption of an Offer and/or Reward Program Item, please contact the merchant.

### 3.6 Using the Google Mobile Wallet Service.

(a)    Storing Payment Methods. Through the Google Mobile Wallet Service, Google Mobile Wallet may enable you to store and access Payment Method, Offer, or Reward Program Item information, including balance and transaction information, on Google Wallet's servers. You can store a Payment Method with the Google Mobile Wallet Service by providing the information requested on the Google Mobile Wallet Service sign-up page, including

payment credentials and billing address. If you have already stored a Payment Method through the Processing Service, that Payment Method will be available for use with the Google Mobile Wallet Service. The Google Mobile Wallet will also synchronize your existing Payment Methods between the Google Mobile Wallet Service and the Google Mobile Wallet Application.

(b)    <u>Transactions with a Payment Method.</u> In order to use a Payment Method stored by the Google Mobile Wallet Service to purchase Products from a participating merchant, you need to click the Google Wallet button on the merchant website when you are completing your online transaction. By clicking the Google Wallet button, you authorize the information for your selected Payment Method to be transferred from the Google Mobile Wallet Service to the merchant for their use in processing the payment for the merchant's Products. You may be required to provide additional payment credential information to complete the transaction. GPC does not make any representation or verify that your Payment Method is in good standing or that the issuer of your Payment Method will authorize or approve any purchase of Products from a merchant when you use the Google Mobile Wallet Service in connection with that purchase.

### 3.7 Communication with Issuers.

By electing to use Google Mobile Wallet, you authorize GPC or the Google Mobile Wallet Application, as applicable, to communicate with the issuer of your Payment Method, Offer or Reward Program Item to obtain any information required by that issuer. An issuer that provides this information does not endorse and is not responsible for Google Mobile Wallet.

### 3.8 Third Party Providers.

GPC may have arranged for third party providers to provide products or services to you through the Google Mobile Wallet ("**Third Party Providers**"). In order to use these products or services, you may be required to agree to additional terms and conditions from those Third Party Providers, and may be subject to additional requirements of the Third Party Provider. By agreeing to these Terms of Service or continuing to use the Google Mobile Wallet, you hereby agree to any Third Party Provider terms that apply to your use of such products and services through Google Mobile Wallet, http://www.google.com/wallet/thirdpartyterms.html, which may be updated from time to time. For avoidance of doubt, these Third Party Provider terms are between you and the applicable Third Party Provider, not GPC.

### 3.9 Google-branded Prepaid Card.

You may choose to have a Google-branded prepaid card issued to you through the Google Mobile Wallet. The Google-branded prepaid card is issued to you by a Third Party Provider financial institution, not Google Wallet and is separate from the Google Wallet Virtual Card. By accepting these Terms of Service, you also agree to the Terms of Service and Privacy Policy for the Google-branded Prepaid Card located here, www.firstdata.com/moneynetwork/terms/google/meta/, which may be updated from time to time. For avoidance of doubt, these financial institution terms are between you and the applicable financial institution, not GPC.

USA PATRIOT ACT NOTICE: *To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each individual or business that opens an account or requests credit. When an individual opens an account, or requests credit, a financial institution will ask for their name, address, date of birth, Social Security Number and other information that allows the financial institution to identify them. The financial institution may also ask to see their driver's license or*

GOOG-00000077

*other identifying documents. When a business opens an account or requests credit, the financial institution will ask for the business name, business address, Employer Identification Number, and other information that allows the financial institution to identify the business and signatories. The financial institution may also ask to see other identifying documents showing existence of the business.*

### 3.10 GPC is Not a Banking Institution, Issuer, or Processor.

Google Mobile Wallet provides you with the ability to store Payment Methods, Offers, and Reward Program Items, and to communicate such information to participating merchants. GPC is not a bank or other chartered depository institution. GPC is not an issuer of any Payment Method, Offer, or Reward Program Item. Your purchases of Products and/or redemptions of Offers or Reward Program Items using Google Mobile Wallet are transactions between you as a Buyer and the merchant as the Seller, and not with GPC or any Google affiliates. GPC is not a party to your purchase of Products or redemption of Offers or Reward Program Items. With respect to Google Mobile Wallet transactions, all payment processing is handled solely by the merchant, and GPC is not involved in the merchant's processing of the payment. For the Payment Transaction facilitated with the Google Wallet Virtual Card, GPC handles the payment to the merchant and the charging of your registered credit or debit card to conduct your payment for the purchase.

These Terms of Service do not amend or otherwise modify your agreement with the issuer of your Payment Method, Offer, or Reward Program Item, and you are responsible for ensuring your use of the Google Mobile Wallet complies with such agreements. You also are responsible for all charges and/or debits to your Payment Method resulting from purchases of Products or redemptions of Offers or Reward Program Items using the Google Mobile Wallet, in accordance with such agreements. In the event of any inconsistency between these Terms of Service and your agreement with the issuer of your Payment Method, Offer, or Reward Program Item, these Terms of Service govern the relationship between you and GPC solely with respect to Google Mobile Wallet, and your agreement with the issuer of your Payment Method, Offer, or Reward Program Item governs the relationship between you and the issuer of the Payment Method, Offer, or Reward Program Item. You acknowledge and agree that you are solely responsible for the Payment Method, Offer, Reward Program Item, and other information you enter or otherwise store in the Google Mobile Wallet. GPC is not responsible for the accuracy or availability of any information you enter or otherwise store in the Google Mobile Wallet, including, without limitation, whether such information is current and up-to-date.

### 3.11 Advertising.

Some of the features of Google Mobile Wallet may be supported by advertising revenue and may display advertisements and promotions. In consideration for GPC granting you access to and use of Google Mobile Wallet, you agree that GPC may place such advertising. In addition, you may have the choice to opt-in to allowing information from Google Mobile Wallet to be used by GPC and Google in order to present you with more relevant advertising, Offers and Reward Program Items.

### 3.12 Third Party Fees.

You are responsible for any fees charged by your telecommunications provider, Payment Method, Offer, or Reward Program Item issuer, merchant, or any other third party in connection with your use of Google Mobile Wallet.

### 4. Limitations on Use of Services.

Notwithstanding any limitations described elsewhere in this Agreement, we may establish general practices and limits concerning use of the Services, including without limitation individual or aggregate transaction limits on the dollar amount or number of Payment Transactions during any specified time period(s). We reserve the right to change, suspend or discontinue any aspect of the Services at any time, including hours of operation or availability of the Services or any Service feature, without notice and without liability. We also reserve the right to impose limits on certain Service features or restrict access to some or all of the Services without notice and without liability. We may decline to process any Payment Transaction without prior notice to Buyer or Seller.

We may limit or suspend your use of one or more Services at any time, in our sole and absolute discretion. If we suspend your use of a Service, we will attempt to notify you by electronic mail. Suspension of your use of a Service will not affect your rights and obligations pursuant to these Terms of Service arising before or after such suspension or with respect to any non-terminated Services.

The Google Mobile Wallet Application is intended for use on mobile devices, Android operating systems, or other devices or operating systems approved by Google, as provided to you directly by Google or your mobile carrier. You are strictly prohibited from using the Google Mobile Wallet Application on a mobile device or Android operating system, or other device or operating system approved by Google, that has been modified or customized in any way. You bear sole responsibility for such unauthorized use of the Google Mobile Wallet Application on a modified mobile device, Android operating system, or other device or operating system approved by Google.

**5. Privacy.**

You understand and agree that personal information provided to Google or GPC in connection with the Services is subject to the Google Wallet Privacy Policy: http://www.google.com/wallet/privacy.html. By agreeing to these Terms of Service you hereby agree to the Google Wallet Privacy Policy, which may be updated by Google or GPC from time to time. You understand and agree that, to the extent permitted by Applicable Law, any data you provide to GPC in connection with the Services may be shared with Google and, conversely, any data you provide to Google in connection with the Services may be shared with GPC.

You may opt-in to providing location data through your mobile device so that Google Mobile Wallet can provide you with more relevant advertising, payment information, Offers or Reward Program Items based on your location. If you opt-in to providing location data, you consent to the collection, use, sharing, and onward transfer of location data, as further set forth in the Google Wallet Privacy Policy. Google may receive information through your mobile device about your actual location (such as GPS signals sent by your mobile device) or information that can be used to approximate a location (such as a cell ID).

**6. Username and Password Information.**

You are responsible for: 1) maintaining the confidentiality of your username and password, 2) any and all transactions by persons that you give access to or that otherwise use such username or password, and 3) any and all consequences of use or misuse of your username and password. You agree to notify us immediately of any unauthorized use of your username or password or any other breach of security regarding the Services of which you have knowledge.

If you are a business entity, you agree that all officers, employees, agents, representatives and others having access to the username and/or password shall be vested by you with the authority to use the Services and to legally bind

you. You shall be responsible for all actions by current and former officers, employees, agents, representatives and others, regardless of whether authorized by you, that access the Services using the business' user name and password.

## 7. Electronic Communications.

Google, GPC and Third Party Providers may communicate with you by means of electronic communications, including by (a) posting a notice or communicating to you through the Services, (b) sending electronic mail to the email address you provided during registration, or (b) posting notices or communications on a Google, GPC or Third Party Provider web site. You agree that the following may be communicated to you by means of electronic communications: the Terms of Service and Privacy Policy (and revisions or amendments), the Third Party Provider terms, notices or disclosures, payment authorizations, and any other matter relating to your use of Google Wallet or Third Party Provider products and services.

You should maintain copies of electronic communications by printing a paper copy or saving an electronic copy as applicable. Electronic communications shall be deemed received by you when they are posted or communicated to you through the Services, sent to the email address you provided at the time of registration or as revised by you thereafter in accordance with these Terms of Service, or when the electronic communication is posted on a Google or Third Party Provider web site, as applicable.

For those communications or records that GPC, Google or a Third Party Provider are otherwise required under Applicable Law to provide in a written paper form to you, you agree that such communications or records may be provided by means of electronic communications. The following additional terms will apply to such electronic communications: (a) you may contact GPC, Google or the Third Party Provider, as applicable, to request another electronic copy of the electronic communication without a fee; (b) you may request a paper copy of such an electronic communication, and GPC, Google or the Third Party Provider, as applicable, reserves the right to charge a fee to provide such paper copy; (c) you may contact Google through the contact page to update your registration information used for electronic communications or to withdraw consent to receive electronic communications; and (d) we reserve the right to terminate your use of Google Wallet and the associated Third Party Provider products and services if you decline or withdraw consent to receive electronic communications.

## 8. Termination of Service.

We may, in our sole and absolute discretion without liability to you or any third party, terminate your use of one or more Services for any reason, including without limitation inactivity or violation of these Terms of Service or other policies we may establish from time to time.

Upon termination of your use of the Services, you remain liable for all Payment Transactions and any other obligations you have incurred under these Terms of Service. Upon termination, we have the right to prohibit your access to the Services, including without limitation by deactivating your username and password, and to refuse future access to the Services by you or if a business entity, its parent, affiliates or subsidiaries or its or their successors).

## 9. Responsibility for Taxes.

The reporting and payment of any applicable taxes arising from the use of the Services is your responsibility. You hereby agree to comply with any and all applicable tax laws in connection with your use of the Services, including the

GOOG-00000080

reporting and payment of any taxes arising in connection with Payment Transactions made through the Processing Service.

**10. No Endorsement of Products.**

GPC and Google do not represent or endorse, and shall not be responsible for: (a) the reliability or performance of any Seller, merchant or Third Party Provider; (b) the safety, quality, accuracy, reliability, integrity or legality of any Product, Offer or Reward Program Item; (c) the truth or accuracy of the description of any Product, Offer, or Reward Program Item, or of any advice, opinion, offer, proposal, statement, data or other information (collectively, "**Content**") displayed or distributed, purchased or paid through the Service, or the Google Web Sites; or (d) your ability to buy or redeem Products, Offers or Reward Program Items using the Services. GPC and Google hereby disclaim any liability or responsibility for errors or omissions in any Content in the Services. GPC and Google reserve the right, but shall have no responsibility, to edit, modify, refuse to post or remove any Content, in whole or in part, that in its sole and absolute discretion is objectionable, erroneous, illegal, fraudulent or otherwise in violation of these Terms of Service.

**11. Indemnification.**

You agree to indemnify, defend and hold harmless GPC, Google, and their subsidiaries and other affiliates, and its and their directors, officers, owners, agents, co-branders or other partners, employees, information providers, licensors, licensees, consultants, contractors and other applicable third parties (including without limitation, Bancorp and Paymentech, L.P. and relevant Customers) (collectively "**Indemnified Parties**") from and against any and all claims, demands, causes of action, debt or liability, including reasonable attorneys fees, including without limitation attorneys fees and costs incurred by the Indemnified Parties arising out of, related to, or which may arise from: (i) your use of the Services; (ii) any breach or non-compliance by you of any term of these Terms of Service or any GPC Party policies; (iii) any dispute or litigation caused by your actions or omissions; or (iv) your negligence or violation or alleged violation of any Applicable Law or rights of a third party.

**12. Disclaimer.**

THE SERVICES, INCLUDING ALL CONTENT, SOFTWARE, FUNCTIONS, MATERIALS, AND INFORMATION MADE AVAILABLE ON, PROVIDED IN CONNECTION WITH OR ACCESSIBLE THROUGH THE SERVICES, ARE PROVIDED "AS IS." TO THE FULLEST EXTENT PERMISSIBLE BY LAW, GPC, GOOGLE, AND THEIR SUBSIDIARIES AND OTHER AFFILIATES, AND THEIR AGENTS, CO-BRANDERS OR OTHER PARTNERS, INCLUDING BUT NOT LIMITED TO, DEVICE MANUFACTURERS (COLLECTIVELY, "**GPC PARTIES**"), MAKE NO REPRESENTATION OR WARRANTY OF ANY KIND WHATSOEVER FOR THE SERVICES OR THE CONTENT, MATERIALS, INFORMATION AND FUNCTIONS MADE ACCESSIBLE BY THE SOFTWARE USED ON OR ACCESSED THROUGH THE SERVICES, OR FOR ANY BREACH OF SECURITY ASSOCIATED WITH THE TRANSMISSION OF SENSITIVE INFORMATION THROUGH THE SERVICES. EACH GPC PARTY DISCLAIMS WITHOUT LIMITATION, ANY WARRANTY OF ANY KIND WITH RESPECT TO THE SERVICES, NONINFRINGEMENT, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. THE GPC PARTIES DO NOT WARRANT THAT THE FUNCTIONS CONTAINED IN THE SERVICES WILL BE UNINTERRUPTED OR ERROR FREE. THE GPC PARTIES SHALL NOT BE RESPONSIBLE FOR ANY SERVICE INTERRUPTIONS, INCLUDING, BUT NOT LIMITED TO, SYSTEM FAILURES OR OTHER INTERRUPTIONS THAT MAY AFFECT THE RECEIPT, PROCESSING, ACCEPTANCE, COMPLETION OR SETTLEMENT OF PAYMENT TRANSACTIONS OR THE SERVICES.

THE GPC PARTIES ARE NOT RESPONSIBLE FOR THE ACCURACY OF ANY PAYMENT METHOD, OFFER, OR REWARD PROGRAM ITEM INFORMATION, INCLUDING, WITHOUT LIMITATION, WHETHER SUCH INFORMATION IS CURRENT AND UP-TO-DATE. WITHOUT LIMITING THE GENERALITY OF THE PRECEDING SENTENCE, YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT SUCH INFORMATION IS REPORTED BY THE ISSUER AS OF A PARTICULAR TIME ESTABLISHED BY THE ISSUER AND MAY NOT ACCURATELY REFLECT YOUR CURRENT TRANSACTIONS, AVAILABLE BALANCE, OR OTHER ACCOUNT OR PROGRAM DETAILS AT THE TIME THEY ARE DISPLAYED TO YOU THROUGH THE SERVICES OR AT THE TIME YOU MAKE A PURCHASE OR REDEMPTION. YOU MAY INCUR FEES, SUCH AS OVERDRAFT FEES OR OTHER CHARGES AS A RESULT OF SUCH TRANSACTIONS, PER YOUR AGREEMENT WITH YOUR PAYMENT METHOD, OFFER, OR REWARD PROGRAM ITEM ISSUER, OR YOUR ATTEMPT TO MAKE A PURCHASE OR REDEMPTION MAY NOT BE SUCCESSFUL.

### 13. Limitations of Liability; Force Majeure.

IN NO EVENT SHALL ANY GPC PARTY BE RESPONSIBLE OR LIABLE TO YOU OR ANY THIRD PARTY UNDER ANY CIRCUMSTANCES FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY, DAMAGES OR LOSSES, INCLUDING BUT NOT LIMITED TO DAMAGES FOR LOSS OF PROFITS, GOODWILL, USE, DATA, OR OTHER INTANGIBLE LOSSES WHICH MAY BE INCURRED IN CONNECTION WITH ANY GPC PARTY OR THE SERVICES, OR ANY GOODS, SERVICES, OR INFORMATION PURCHASED, RECEIVED, SOLD, OR PAID FOR BY WAY OF THE SERVICES, REGARDLESS OF THE TYPE OF CLAIM OR THE NATURE OF THE CAUSE OF ACTION, EVEN IF THE GPC PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE OR LOSS. IN NO EVENT SHALL THE GPC PARTIES' TOTAL CUMULATIVE LIABILITY ARISING FROM OR RELATING TO THIS AGREEMENT EXCEED THE NET FEES GPC HAS ACTUALLY RECEIVED AND RETAINED FROM THE YOUR VALID PAYMENT TRANSACTIONS DURING THE THREE MONTH PERIOD IMMEDIATELY PRECEDING THE DATE OF THE CLAIM. Each party acknowledges that the other party has entered into these Terms of Service relying on the limitations of liability stated herein and that those limitations are an essential basis of the bargain between the parties. In addition to and without limiting any of the foregoing, no GPC Party shall have any liability for any failure or delay resulting from any condition beyond the reasonable control of such party, including but not limited to governmental action or acts of terrorism, earthquake, fire, flood or other acts of God, labor conditions, power failures and Internet disturbances.

### 14. Governing Law.

These Terms of Service shall be governed by the laws of California, except for California's choice of law rules, and applicable federal United States laws. Each party agrees to submit to personal and exclusive jurisdiction of the courts located in Santa Clara County, California. The parties specifically exclude from application to the Terms of Service the United Nations Convention on Contracts for the International Sale of Goods and the Uniform Computer Information Transactions Act.

### 15. Notice.

In addition to the electronic communications authorized under the Section entitled, "Electronic Communications", statements, notices and other communications to you may be made by mail, email, postings on the Google Web Sites or other reasonable means. We may also provide notices of changes to the Terms of Service or other matters by displaying links to notices on the Google Web Sites. Notice to GPC and Google may be made by mail to:

Google Inc.
Attn: Google Wallet
1600 Amphitheatre Parkway
Mountain View, CA 94043

## 16. Modification of Terms of Service.

We have the right, in our sole and absolute discretion, to change, modify, or amend any portion of these Terms of Service at any time by posting notification here or otherwise communicating the notification to you. The changes will become effective, and shall be deemed accepted by you, after the initial posting and shall apply on a going-forward basis with respect to transactions initiated after the posting date. In the event that you do not agree with any such modification, your sole and exclusive remedy is to terminate your use of the Services.

## 17. Assignment.

You may not assign these Terms of Service or any rights or obligations hereunder, by operation of law or otherwise, without our prior written approval and any such attempted assignment shall be void. We reserve the right to freely assign these Terms of Service and the rights and obligations hereunder, to any third party without notice or consent. Subject to the foregoing, these Terms of Service shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns.

## 18. Survival.

Upon termination of your use of the Services or termination of these Terms of Service for any reason, in addition to this section, the following sections shall survive termination: 2.2, 2.7 through 2.10, 3.9, and 7 through 19.

## 19. Other Provisions.

The failure of GPC or Google to exercise or enforce any right or provision of the Terms of Service shall not constitute a waiver of such right or provision. If any provision of these Terms of Service shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that these Terms of Service shall otherwise remain in full force and effect and remain enforceable between the parties. Headings are for reference purposes only and in no way define, limit, construe or describe the scope or extent of such section. These Terms of Service, including GPC's or Google policies governing the Services referenced herein, constitutes the entire agreement between you and GPC with respect to the use of the Services. These Terms of Service is not intended and shall not be construed to create any rights or remedies in any parties other than you and GPC, Google, and other GPC affiliates which each shall be a third party beneficiary of these Terms of Service, and no other person shall assert any rights as a third party beneficiary hereunder.

**Publicly Filed**

Exhibit 8

Exhibit 8

Google

## **Policies & Principles**

- Overview
- Privacy
    - Privacy Policy
    - Advertising
    - Principles
    - Tools
    - Blogs
    - Videos
    - FAQ
- Terms of Service

- Current version
- Past versions
- Self Regulatory Frameworks
- Key terms

# **Privacy Policy**

Last modified: July 27, 2012 (view archived versions)

There are many different ways you can use our services – to search for and share information, to communicate with other people or to create new content. When you share information with us, for example by creating a Google Account, we can make those services even better – to show you more relevant search results and ads, to help you connect with people or to make sharing with others quicker and easier. As you use our services, we want you to be clear how we're using information and the ways in which you can protect your privacy.

Our Privacy Policy explains:

- What information we collect and why we collect it.
- How we use that information.
- The choices we offer, including how to access and update information.

We've tried to keep it as simple as possible, but if you're not familiar with terms like cookies, IP addresses, pixel tags and browsers, then read about these key terms first. Your privacy matters to Google so whether you are new to Google or a long-time user, please do take the time to get to know our practices – and if you have any questions contact us.

GOOG-00000110

## Information we collect

We collect information to provide better services to all of our users – from figuring out basic stuff like which language you speak, to more complex things like which ads you'll find most useful or the people who matter most to you online.

We collect information in two ways:

- **Information you give us.** For example, many of our services require you to sign up for a Google Account. When you do, we'll ask for personal information, like your name, email address, telephone number or credit card. If you want to take full advantage of the sharing features we offer, we might also ask you to create a publicly visible Google Profile, which may include your name and photo.

- **Information we get from your use of our services.** We may collect information about the services that you use and how you use them, like when you visit a website that uses our advertising services or you view and interact with our ads and content. This information includes:

  - **Device information**

    We may collect device-specific information (such as your hardware model, operating system version, unique device identifiers, and mobile network information including phone number). Google may associate your device identifiers or phone number with your Google Account.

  - **Log information**

    When you use our services or view content provided by Google, we may automatically collect and store certain information in server logs. This may include:

    - details of how you used our service, such as your search queries.
    - telephony log information like your phone number, calling-party number, forwarding numbers, time and date of calls, duration of calls, SMS routing information and types of calls.
    - Internet protocol address.
    - device event information such as crashes, system activity, hardware settings, browser type, browser language, the date and time of your request and referral URL.
    - cookies that may uniquely identify your browser or your Google Account.

  - **Location information**

    When you use a location-enabled Google service, we may collect and process information about your actual location, like GPS signals sent by a mobile device. We may also use various technologies to determine location, such as sensor data from your device that may, for example, provide information on nearby Wi-Fi access points and cell towers.

  - **Unique application numbers**

Certain services include a unique application number. This number and information about your installation (for example, the operating system type and application version number) may be sent to Google when you install or uninstall that service or when that service periodically contacts our servers, such as for automatic updates.

- **Local storage**

  We may collect and store information (including personal information) locally on your device using mechanisms such as browser web storage (including HTML 5) and application data caches.

- **Cookies and anonymous identifiers**

  We use various technologies to collect and store information when you visit a Google service, and this may include sending one or more <u>cookies</u> or <u>anonymous identifiers</u> to your device. We also use cookies and anonymous identifiers when you interact with services we offer to our partners, such as advertising services or Google features that may appear on other sites.

## How we use information we collect

We use the information we collect from all of our services to provide, maintain, protect and improve them, to develop new ones, and to protect Google and our users. We also use this information to offer you tailored content – like giving you more relevant search results and ads.

We may use the name you provide for your Google Profile across all of the services we offer that require a Google Account. In addition, we may replace past names associated with your Google Account so that you are represented consistently across all our services. If other users already have your email, or other information that identifies you, we may show them your publicly visible Google Profile information, such as your name and photo.

When you contact Google, we may keep a record of your communication to help solve any issues you might be facing. We may use your email address to inform you about our services, such as letting you know about upcoming changes or improvements.

We use information collected from cookies and other technologies, like <u>pixel tags</u>, to improve your user experience and the overall quality of our services. For example, by saving your language preferences, we'll be able to have our services appear in the language you prefer. When showing you tailored ads, we will not associate a cookie or anonymous identifier with sensitive categories, such as those based on race, religion, sexual orientation or health.

We may combine personal information from one service with information, including personal information, from other Google services – for example to make it easier to share things with people you know. We will not combine DoubleClick cookie information with personally identifiable information unless we have your opt-in consent.

We will ask for your consent before using information for a purpose other than those that are set out in

this Privacy Policy.

Google processes personal information on our servers in many countries around the world. We may process your personal information on a server located outside the country where you live.

## Transparency and choice

People have different privacy concerns. Our goal is to be clear about what information we collect, so that you can make meaningful choices about how it is used. For example, you can:

- Review and control certain types of information tied to your Google Account by using Google Dashboard.
- View and edit your ads preferences, such as which categories might interest you, using the Ads Preferences Manager. You can also opt out of certain Google advertising services here.
- Use our editor to see and adjust how your Google Profile appears to particular individuals.
- Control who you share information with.
- Take information out of many of our services.

You may also set your browser to block all cookies, including cookies associated with our services, or to indicate when a cookie is being set by us. However, it's important to remember that many of our services may not function properly if your cookies are disabled. For example, we may not remember your language preferences.

## Information you share

Many of our services let you share information with others. Remember that when you share information publicly, it may be indexable by search engines, including Google. Our services provide you with different options on sharing and removing your content.

## Accessing and updating your personal information

Whenever you use our services, we aim to provide you with access to your personal information. If that information is wrong, we strive to give you ways to update it quickly or to delete it – unless we have to keep that information for legitimate business or legal purposes. When updating your personal information, we may ask you to verify your identity before we can act on your request.

We may reject requests that are unreasonably repetitive, require disproportionate technical effort (for example, developing a new system or fundamentally changing an existing practice), risk the privacy of others, or would be extremely impractical (for instance, requests concerning information residing on backup tapes).

Where we can provide information access and correction, we will do so for free, except where it would require a disproportionate effort. We aim to maintain our services in a manner that protects information from accidental or malicious destruction. Because of this, after you delete information from our services, we may not immediately delete residual copies from our active servers and may not remove information from our backup systems.

GOOG-00000113

## Information we share

We do not share personal information with companies, organizations and individuals outside of Google unless one of the following circumstances apply:

- **With your consent**

  We will share personal information with companies, organizations or individuals outside of Google when we have your consent to do so. We require opt-in consent for the sharing of any sensitive personal information.

- **With domain administrators**

  If your Google Account is managed for you by a domain administrator (for example, for Google Apps users) then your domain administrator and resellers who provide user support to your organization will have access to your Google Account information (including your email and other data). Your domain administrator may be able to:

  - view statistics regarding your account, like statistics regarding applications you install.
  - change your account password.
  - suspend or terminate your account access.
  - access or retain information stored as part of your account.
  - receive your account information in order to satisfy applicable law, regulation, legal process or enforceable governmental request.
  - restrict your ability to delete or edit information or privacy settings.

  Please refer to your domain administrator's privacy policy for more information.

- **For external processing**

  We provide personal information to our affiliates or other trusted businesses or persons to process it for us, based on our instructions and in compliance with our Privacy Policy and any other appropriate confidentiality and security measures.

- **For legal reasons**

  We will share personal information with companies, organizations or individuals outside of Google if we have a good-faith belief that access, use, preservation or disclosure of the information is reasonably necessary to:

  - meet any applicable law, regulation, legal process or enforceable governmental request.
  - enforce applicable Terms of Service, including investigation of potential violations.
  - detect, prevent, or otherwise address fraud, security or technical issues.
  - protect against harm to the rights, property or safety of Google, our users or the public as required or permitted by law.

We may share aggregated, non-personally identifiable information publicly and with our partners – like publishers, advertisers or connected sites. For example, we may share information publicly to show

trends about the general use of our services.

If Google is involved in a merger, acquisition or asset sale, we will continue to ensure the confidentiality of any personal information and give affected users notice before personal information is transferred or becomes subject to a different privacy policy.

## Information security

We work hard to protect Google and our users from unauthorized access to or unauthorized alteration, disclosure or destruction of information we hold. In particular:

- We encrypt many of our services using SSL.
- We offer you two step verification when you access your Google Account, and a Safe Browsing feature in Google Chrome.
- We review our information collection, storage and processing practices, including physical security measures, to guard against unauthorized access to systems.
- We restrict access to personal information to Google employees, contractors and agents who need to know that information in order to process it for us, and who are subject to strict contractual confidentiality obligations and may be disciplined or terminated if they fail to meet these obligations.

## Application

Our Privacy Policy applies to all of the services offered by Google Inc. and its affiliates, including services offered on other sites (such as our advertising services), but excludes services that have separate privacy policies that do not incorporate this Privacy Policy.

Our Privacy Policy does not apply to services offered by other companies or individuals, including products or sites that may be displayed to you in search results, sites that may include Google services, or other sites linked from our services. Our Privacy Policy does not cover the information practices of other companies and organizations who advertise our services, and who may use cookies, pixel tags and other technologies to serve and offer relevant ads.

## Enforcement

We regularly review our compliance with our Privacy Policy. We also adhere to several self regulatory frameworks. When we receive formal written complaints, we will contact the person who made the complaint to follow up. We work with the appropriate regulatory authorities, including local data protection authorities, to resolve any complaints regarding the transfer of personal data that we cannot resolve with our users directly.

## Changes

Our Privacy Policy may change from time to time. We will not reduce your rights under this Privacy Policy without your explicit consent. We will post any privacy policy changes on this page and, if the changes are significant, we will provide a more prominent notice (including, for certain services, email

GOOG-00000115

notification of privacy policy changes). We will also keep prior versions of this Privacy Policy in an archive for your review.

## Specific product practices

The following notices explain specific privacy practices with respect to certain Google products and services that you may use:

- Chrome and Chrome OS
- Books
- Wallet
- Fiber



- Google
- Privacy & Terms

**Publicly Filed**

Exhibit 9

Exhibit 9



# Developer Distribution Agreement

**Definitions**

**Google:** Google Inc., a Delaware corporation with principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States.

**Device:** Any device that can access the Market, as defined herein.

**Products:** Software, content and digital materials distributed via the Market.

**Market:** The marketplace Google has created and operates which allows registered Developers in certain countries to distribute Products directly to users of Devices.

**Developer or You:** Any person or company who is registered and approved by the Market to distribute Products in accordance with the terms of this Agreement.

**Developer Account:** A publishing account issued to Developers that enables the distribution of Products via the Market.

**Payment Processor(s):** Any party authorized by Google to provide payment processing services that enable Developers with optional Payment Accounts to charge Device users for Products distributed via the Market.

**Payment Account:** A financial account issued by a Payment Processor to a Developer that authorizes the Payment Processor to collect and remit payments on the Developer's behalf for Products sold via the Market. Developers must be approved by a Payment Processor for a Payment Account and maintain their account in good standing to charge for Products distributed in the Market.

**Authorized Carrier:** A mobile network operator who is authorized to receive a distribution fee for Products that are sold to users of Devices on its network.

## 1. Introduction

1.1 The Market is a publicly available site on which Android Developers can distribute Products for Devices. In order to distribute Products on the Market, you must acquire and maintain a valid Developer Account.

1.2 If you want to charge a fee for your Products, you must also acquire and maintain a valid Payment Account from an authorized Payment Processor.

GOOG-00000846

## 2. Accepting this Agreement

2.1 This agreement ("Agreement") forms a legally binding contract between you and Google in relation to your use of the Market to distribute Products. In order to use the Market to distribute Products, you must first agree to this Agreement by clicking to accept where this option is made available to you. You may not distribute Products on the Market if you do not accept this Agreement.

2.2 You may not use the Market to distribute Products and may not accept the Agreement unless you are verified as a Developer in good standing. This Agreement will automatically terminate if you are (a) not a Developer in good standing, or (b) a person or entity barred from using Android software under the laws of the United States or other countries including the country in which you are resident or from which you use the Android software.

2.3 If you are agreeing to be bound by this Agreement on behalf of your employer or other entity, you represent and warrant that you have full legal authority to bind your employer or such entity to this Agreement. If you do not have the requisite authority, you may not accept the Agreement or use the Market on behalf of your employer or other entity.

## 3. Pricing and Payments.

3.1 This Agreement covers both Products you choose to distribute for free and Products for which you charge a fee (once payment processing is enabled on the Market). In order to charge a fee for your Products, you must have a valid Payment Account under a separate agreement with a Payment Processor. If you already have a Payment Account with a Payment Processor before signing up for the Market, then the terms of this Agreement shall supersede your Payment Account terms and condition for Products sold via the Market.

You may set the price for your Products in the currencies permitted by the Payment Processor. The Market may display to users the price of Products in their native currency, but it is not responsible for the accuracy of currency rates or conversion

3.2 The price you set for Products will determine the amount of payment you will receive. A Transaction Fee, as defined below, will be charged on the sales price and apportioned to the Payment Processor and, if one exists, the Authorized Carrier. The remainder (sales price less Transaction Fee) will be remitted to you. The "Transaction Fee" is set forth here and may be revised by Google from time to time. Developer is responsible for determining if a Product is taxable and the applicable tax rate for the Payment Processor to collect for each taxing jurisdiction where Products are sold. Developer is responsible for remitting taxes to the appropriate taxing authority.

3.3 You may also choose to distribute Products for free. If the Product is free, you will not be charged a Transaction Fee. You may not collect future charges from users for copies of the Products that those users were initially allowed to download for free. This is not intended to prevent distribution of free trial versions of the Product with an "upsell" option to obtain the full version of the Product: Such free trials for Products are encouraged. However, if you want to collect fees after the free trial expires, you must collect all fees for the full version of the Product through the Payment Processor on the Market. In this Agreement, "free" means there are no charges or fees of any kind for use of the Product. All fees

received by Developers for Products distributed via the Market must be processed by the Market's Payment Processor.

3.4 **Special Refund Requirements.** The Payment Processor's standard terms and conditions regarding refunds will apply except the following terms apply to your distribution of Products on the Market.

Products that can be previewed by the buyer (such as ringtones and wallpapers): No refund is required or allowed.

Products that cannot be previewed by the buyer (such as applications): You authorize Google to give the buyer a full refund of the Product price if the buyer requests the refund within 48 hours after purchase.

3.5 **You Support Your Product.** You will be solely responsible for support and maintenance of your Products and any complaints about your Products. Your contact information will be displayed in each application detail page and made available to users for customer support purposes.

Failure to provide adequate support for your Products may result in low Product ratings, less prominent product exposure, low sales and billing disputes. Except in cases when multiple disputes are initiated by a user with abnormal dispute history, billing disputes received by Payment Processor for Products sold for less than $10 may be automatically charged back to the Developer, in addition to any handling fees charged by the Payment Processor. Chargeback requests for Products $10 or more will be handled in accordance with the Payment Processor's standard policy.

3.6 **Reinstalls.** Users are allowed unlimited reinstalls of each application distributed via the Market, provided however that if you remove a Product(s) from the Market pursuant to clauses (i), (ii), (iii) or (iv) of Section 7.1, such Product(s) shall be removed from all portions of the Market and users shall no longer have a right or ability to reinstall the affected Products.

# 4. Use of the Market by You

4.1 Except for the license rights granted by you in Section 5 below, Google agrees that it obtains no right, title or interest from you (or your licensors) under this Agreement in or to any of Products, including any intellectual property rights which subsist in those applications.

4.2 You agree to use the Market only for purposes that are permitted by (a) this Agreement and (b) any applicable law, regulation or generally accepted practices or guidelines in the relevant jurisdictions (including any laws regarding the export of data or software to and from the United States or other relevant countries).

4.3 You agree that if you use the Market to distribute Products, you will protect the privacy and legal rights of users. If the users provide you with, or your Product accesses or uses, user names, passwords, or other login information or personal information, you must make the users aware that the information will be available to your Product, and you must provide legally adequate privacy notice and protection for those users. Further, your Product may only use that information for the limited purposes for which the user has given you permission to do so. If your Product stores personal or sensitive information provided by users, it must do so securely and only for as long as it is needed. But if the user has opted into a separate agreement with you that allows you or your Product to store or use personal or sensitive

GOOG-00000848

information directly related to your Product (not including other products or applications) then the terms of that separate agreement will govern your use of such information. If the user provides your Product with Google Account information, your Product may only use that information to access the user's Google Account when, and for the limited purposes for which, the user has given you permission to do so.

4.4 **Prohibited Actions.** You agree that you will not engage in any activity with the Market, including the development or distribution of Products, that interferes with, disrupts, damages, or accesses in an unauthorized manner the devices, servers, networks, or other properties or services of any third party including, but not limited to, Android users, Google or any mobile network operator. You may not use customer information obtained from the Market to sell or distribute Products outside of the Market.

4.5 **Non-Compete.** You may not use the Market to distribute or make available any Product whose primary purpose is to facilitate the distribution of software applications and games for use on Android devices outside of the Market.

4.6 You agree that you are solely responsible for (and that Google has no responsibility to you or to any third party for) any Products you distribute through the Market and for the consequences of your actions (including any loss or damage which Google may suffer) by doing so.

4.7 You agree that you are solely responsible for (and that Google has no responsibility to you or to any third party for) any breach of your obligations under this Agreement, any applicable third party contract or terms of service, or any applicable law or regulation, and for the consequences (including any loss or damage which Google or any third party may suffer) of any such breach.

4.8 The Market will allow you to protect your Products so that users may not share Products with other users or devices.

4.9 **Product Ratings.** The Market will allow users to rate Products. Only users who download the applicable Product will be able to rate it. Product ratings will be used to determine the placement of Products on the Market with higher rated Products generally given better placement, subject to Google's ability to change placement at Google's sole discretion. The Market may also assign you a composite score for any Product that has not received user ratings. A Developer Composite Score will be a representation of the quality of your Product based on your history and will be determined at Google's sole discretion. For new Developers without Product history, Google may use or publish performance measurements such as uninstall and/or refund rates to identify or remove Products that are not meeting acceptable standards, as determined by Google. Google reserves the right to display Products to users in a manner that will be determined at Google's sole discretion.

Your Products may be subject to user ratings to which you may not agree. You may contact Google if you have any questions or concerns regarding such ratings.

4.10 **Marketing Your Product.** You will be responsible for uploading your Products to the Market, providing required Product information to users, and accurately disclosing the security permissions necessary for the Product to function on user Devices. Products that are not properly uploaded will not be published in the Market.

4.11 Restricted Content. Any Product you distribute on the Market must adhere to the <u>Developer Program Policies</u>.

# 5. License Grants

5.1 You grant to Google a nonexclusive, worldwide, and royalty-free license to: copy, perform, display, and use the Products for administrative and demonstration purposes in connection with the operation and marketing of the Market and to use the Products to make improvements to the Android platform.

5.2 You grant to Google a nonexclusive, and royalty-free license to distribute the Products according to the publishing options selected by you on the Product upload page of the Market.

5.3 Google may use consultants and other contractors in connection with the performance of obligations and exercise of rights under this agreement, provided that such consultants and contractors will be subject to the same obligations as Google. After termination of this Agreement, Google will not distribute your Product, but may retain and use copies of the Product for support of the Market and the Android platform.

5.4 You grant to the user a non-exclusive, worldwide, and perpetual license to perform, display, and use the Product on the Device. If you choose, you may include a separate end user license agreement (EULA) in your Product that will govern the user's rights to the Product in lieu of the previous sentence.

5.5 You represent and warrant that you have all intellectual property rights, including all necessary patent, trademark, trade secret, copyright or other proprietary rights, in and to the Product. If You use third-party materials, You represent and warrant that you have the right to distribute the third-party material in the Product. You agree that You will not submit material to Market that is copyrighted, protected by trade secret or otherwise subject to third party proprietary rights, including patent, privacy and publicity rights, unless You are the owner of such rights or have permission from their rightful owner to submit the material.

# 6. Brand Features and Publicity

6.1 **"Brand Features"** means the trade names, trade marks, service marks, logos, domain names, and other distinctive brand features of each party, respectively, as owned (or licensed) by such party from time to time.

6.2 Each party shall own all right, title and interest, including without limitation all intellectual property rights, relating to its Brand Features. Except to the limited extent expressly provided in this Agreement, neither party grants, nor shall the other party acquire, any right, title or interest (including, without limitation, any implied license) in or to any Brand Features of the other party. Subject to the terms and conditions of this Agreement, Developer grants to Google and its affiliates a limited, non-exclusive license during the term of this Agreement to display Developer Brand Features, submitted by Developer to Google, for use solely online or on mobile devices and in either case solely in connection with the distribution and sale of Developer's Product through the Market, or to otherwise fulfill its obligations under this Agreement. If Developer discontinues the distribution of specific Products on the Market, Google will cease use of the discontinued Products' Brand Features pursuant to this Section 6.2, except as

GOOG-00000850

necessary to allow Google to effectuate Section 3.6. Nothing in this Agreement gives Developer a right to use any of Google's trade names, trademarks, service marks, logos, domain names, or other distinctive brand features.

6.3 **Publicity.** In addition to the license granted in 6.2 above, for purposes of marketing the presence, distribution and sale of the Developer's Product in the Market, Google and its affiliates may include Developer Brand Features, submitted by Developer to Google: (i) within the Market and in any Google-owned online or mobile properties; (ii) in online or mobile communications outside the Market when mentioned along with other Market Products; (iii) when making announcements of the availability of the Product online or on mobile devices; (iv) in presentations; and (v) in customer lists which appear either online or on mobile devices (which includes, without limitation, customer lists posted on Google websites). If Developer discontinues the distribution of specific Products on the Market, Google will cease use of the discontinued Products' Brand Features for such marketing purposes. Google grants to Developer a limited, non-exclusive, worldwide, royalty-free license to use the Android Brand Features for the term of this Agreement solely for marketing purposes and only in accordance with the Android Brand Guidelines).

# 7. Product Takedowns.

7.1 **Your Takedowns.** You may remove your Products from future distribution via the Market at any time, but you must comply with this Agreement and the Payment Processor's Payment Account terms of service for any Products distributed through the Market, including but not limited to refund requirements. Removing your Products from future distribution via the Market does not (a) affect the license rights of users who have previously purchased or downloaded your Products, (b) remove your Products from Devices or from any part of the Market where previously purchased or downloaded applications are stored on behalf of users, or (c) change your obligation to deliver or support Products or services that have been previously purchased or downloaded by users. Notwithstanding the foregoing, in no event will Google maintain on any portion of the Market (including, without limitation, the part of the Market where previously purchased or downloaded applications are stored on behalf of users) any Product that you have removed from the Market and provided written notice to Google that such removal was due to (i) an allegation of infringement, or actual infringement, of any copyright, trademark, trade secret, trade dress, patent or other intellectual property right of any person, (ii) an allegation of defamation or actual defamation, (iii) an allegation of violation, or actual violation, of any third party's right of publicity or privacy, or (iv) an allegation or determination that such Product does not comply with applicable law.

If you remove a Product from the Market pursuant to clauses (i), (ii), (iii) or (iv) of this Section 7.1, and an end user purchased such Product within a year before the date of takedown, at Google's request, you must refund to the affected end user all amounts paid by such end user for such affected Product, less the portion of the Transaction Fee specifically allocated to the credit card/payment processing for the associated transaction.

7.2 **Google Takedowns.** While Google does not undertake an obligation to monitor the Products or their content, if Google is notified by you or otherwise becomes aware and determines in its sole discretion that a Product or any portion thereof or your Brand Features; (a) violates the intellectual property rights or any other rights of any third party; (b) violates any applicable law or is subject to an injunction; (c) is pornographic, obscene or otherwise violates Google's hosting policies or other terms of service as may be

updated by Google from time to time in its sole discretion; (d) is being distributed by you improperly; (e) may create liability for Google or Authorized Carriers; (f) is deemed by Google to have a virus or is deemed to be malware, spyware or have an adverse impact on Google's or an Authorized Carrier's network; (g) violates the terms of this Agreement or the Developer Program Policies for Developers; or (h) the display of the Product is impacting the integrity of Google servers (i.e., users are unable to access such content or otherwise experience difficulty), Google may remove the Product from the Market or reclassify the Product at its sole discretion. Google reserves the right to suspend and/or bar any Developer from the Market at its sole discretion.

Google enters into distribution agreements with device manufacturers and Authorized Carriers to place the Market software client application for the Market on Devices. These distribution agreements may require the involuntary removal of Products in violation of the Device manufacturer's or Authorized Carrier's terms of service.

In the event that your Product is involuntarily removed because it is defective, malicious, infringes intellectual property rights of another person, defames, violates a third party's right of publicity or privacy, or does not comply with applicable law, and an end user purchased such Product within a year before the date of takedown,: (i) you must refund to Google, all amounts received, plus any associated fees (i.e. chargebacks and payment transaction fees), and (ii) Google may, at its sole discretion, withhold from your future sales the amount in subsection (i) above.

## 8. Your Developer Credentials

8.1 You agree that you are responsible for maintaining the confidentiality of any developer credentials that may be issued to you by Google or which you may choose yourself and that you will be solely responsible for all applications that are developed under your developer credentials. Google may limit the number of Developer Accounts issued to you or to the company or organization you work for.

## 9. Privacy and Information

9.1 In order to continually innovate and improve the Market, Google may collect certain usage statistics from the Market and Devices, including but not limited to, information on how the Market and Devices are being used.

9.2 The data collected is examined in the aggregate to improve the Market for users and Developers and is maintained in accordance with Google's Privacy Policy. To ensure the improvement of Products, limited aggregate data may be available to you upon written request.

## 10. Terminating this Agreement

10.1 This Agreement will continue to apply until terminated by either you or Google as set out below.

10.2 If you want to terminate this Agreement, you must provide Google with thirty (30) days prior written notice (unless this Agreement terminates under Section 14.1) and cease your use of any relevant developer credentials.

GOOG-00000852

10.3 Google may at any time, terminate this Agreement with you if:

(A) you have breached any provision of this Agreement; or

(B) Google is required to do so by law; or

(C) you cease being an authorized Developer; or

(D) Google decides to no longer provide the Market.

# 11. DISCLAIMER OF WARRANTIES

11.1 YOU EXPRESSLY UNDERSTAND AND AGREE THAT YOUR USE OF THE MARKET IS AT YOUR SOLE RISK AND THAT THE MARKET IS PROVIDED "AS IS" AND "AS AVAILABLE" WITHOUT WARRANTY OF ANY KIND.

11.2 YOUR USE OF THE MARKET AND ANY MATERIAL DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF THE MARKET IS AT YOUR OWN DISCRETION AND RISK AND YOU ARE SOLELY RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER SYSTEM OR OTHER DEVICE OR LOSS OF DATA THAT RESULTS FROM SUCH USE.

11.3 GOOGLE FURTHER EXPRESSLY DISCLAIMS ALL WARRANTIES AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO THE IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT.

# 12. LIMITATION OF LIABILITY

12.1 YOU EXPRESSLY UNDERSTAND AND AGREE THAT GOOGLE, ITS SUBSIDIARIES AND AFFILIATES, AND ITS LICENSORS SHALL NOT BE LIABLE TO YOU UNDER ANY THEORY OF LIABILITY FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL CONSEQUENTIAL OR EXEMPLARY DAMAGES THAT MAY BE INCURRED BY YOU, INCLUDING ANY LOSS OF DATA, WHETHER OR NOT GOOGLE OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF OR SHOULD HAVE BEEN AWARE OF THE POSSIBILITY OF ANY SUCH LOSSES ARISING.

# 13. Indemnification

13.1 To the maximum extent permitted by law, you agree to defend, indemnify and hold harmless Google, its affiliates and their respective directors, officers, employees and agents, and Authorized Carriers from and against any and all third party claims, actions, suits or proceedings, as well as any and all losses, liabilities, damages, costs and expenses (including reasonable attorneys fees) arising out of or accruing from (a) your use of the Market in violation of this Agreement, and (b) your Product that infringes any copyright, trademark, trade secret, trade dress, patent or other intellectual property right of any person or defames any person or violates their rights of publicity or privacy.

13.2 To the maximum extent permitted by law, you agree to defend, indemnify and hold harmless the

GOOG-00000853

applicable Payment Processors (which may include Google and/or third parties) and the Payment Processors' affiliates, directors, officers, employees and agents from and against any and all third party claims, actions, suits or proceedings, as well as any and all losses, liabilities, damages, costs and expenses (including reasonable attorneys fees) arising out of or accruing from taxes related to Your distribution of Products distributed via the Market.

## 14. Changes to the Agreement

14.1 Google may make changes to this Agreement at any time by sending the Developer notice by email describing the modifications made. Google will also post a notification on the Market site describing the modifications made. The changes will become effective, and will be deemed accepted by Developer, (a) immediately for those who become Developers after the notification is posted, or (b) for pre-existing Developers, the modified Agreement will become effective upon Developer's acceptance of the modified Agreement (except changes required by law which will be effective immediately). Pre-existing Developers will show their acceptance of the modified Agreement by going to the Market site and accepting the modified Agreement. In the event that Developer does not agree with the modifications to the Agreement within thirty (30) days after the date the email is sent, then Google will suspend the distribution of your Products until Developer agrees to the modified Agreement. In the event that You do not agree with the modifications within ninety (90) days after the date the email is sent, then You must terminate your use of the Market, which will be your sole and exclusive remedy.

## 15. General Legal Terms

15.1 This Agreement constitutes the whole legal agreement between you and Google and governs your use of the Market, and completely replaces any prior agreements between you and Google in relation to the Market.

15.2 You agree that if Google does not exercise or enforce any legal right or remedy which is contained in this Agreement (or which Google has the benefit of under any applicable law), this will not be taken to be a formal waiver of Google's rights and that those rights or remedies will still be available to Google.

15.3 If any court of law, having the jurisdiction to decide on this matter, rules that any provision of this Agreement is invalid, then that provision will be removed from this Agreement without affecting the rest of this Agreement. The remaining provisions of this Agreement will continue to be valid and enforceable.

15.4 You acknowledge and agree that each member of the group of companies of which Google is the parent shall be third party beneficiaries to this Agreement and that such other companies shall be entitled to directly enforce, and rely upon, any provision of this Agreement that confers a benefit on (or rights in favor of) them. Other than this, no other person or company shall be third party beneficiaries to this Agreement.

15.5 EXPORT RESTRICTIONS. PRODUCTS ON THE MARKET MAY BE SUBJECT TO UNITED STATES EXPORT LAWS AND REGULATIONS. YOU MUST COMPLY WITH ALL DOMESTIC AND INTERNATIONAL EXPORT LAWS AND REGULATIONS THAT APPLY TO YOUR DISTRIBUTION OR USE OF PRODUCTS. THESE LAWS INCLUDE RESTRICTIONS ON

DESTINATIONS, USERS AND END USE.

15.6 The rights granted in this Agreement may not be assigned or transferred by either you or Google without the prior written approval of the other party. Neither you nor Google shall be permitted to delegate their responsibilities or obligations under this Agreement without the prior written approval of the other party.

15.7 This Agreement, and your relationship with Google under this Agreement, shall be governed by the laws of the State of California without regard to its conflict of laws provisions. You and Google agree to submit to the exclusive jurisdiction of the courts located within the county of Santa Clara, California to resolve any legal matter arising from this Agreement. Notwithstanding this, you agree that Google shall still be allowed to apply for injunctive remedies (or an equivalent type of urgent legal relief) in any jurisdiction.

15.8 The obligations in Sections 5, 6.2 (solely as necessary to permit Google to effectuate Section 3.6), 7, 11, 12, 13, and 15 will survive any expiration or termination of this Agreement.

- © Google
- Privacy & Terms
- Help



**Publicly Filed**

Exhibit 10

Exhibit 10

## Privacy Notice

An updated Google Wallet Privacy Notice will take effect on May 7th, 2014. Please click here to review the updated notice.

# Google Wallet Privacy Notice

Last modified August 1, 2012

The Google Privacy Policy describes how we treat personal information when you use Google's products and services. "Google Wallet" is a product offered to Google Account holders. Your use of Google Wallet is therefore subject to the Google Privacy Policy. In addition, the following notice describes our privacy practices that are specific to Google Wallet.

Google Wallet refers to Google payment services that are provided by both Google Inc. and its wholly owned subsidiaries. For US users, that subsidiary is Google Payment Corporation ("GPC"), and for users in the European Economic Area (EEA), it is Google Payment Limited ("GPL") (based in the United Kingdom). For countries outside of the United States and the EEA, please consult the Google Wallet Terms of Service made available to you within the service to learn more about the subsidiary offering the service.

Your use of Google Wallet is governed by the Google Wallet Terms of Service. Please consult the Terms of Service for detailed information about the specific services of Google Wallet. Capitalized terms not defined in this Google Wallet Privacy Notice shall have the meaning ascribed to them in the Terms of Service.

# Information we collect

In addition to the information listed in the Google Privacy Policy, we may also collect the following:

- **Registration information** - When you sign up for Google Wallet, you are creating a Wallet account that is associated with your Google Account. Depending on the services of Google Wallet you use, in addition to the information listed in the Google Privacy Policy, you may be asked to provide the following information: Credit or debit card number and card expiration date, bank account number and expiration date, address, date of birth, last four digits of your social security number, and for sellers or businesses specifically, your business category and certain information about your sales or transaction volume. In addition, for services requiring additional customer or seller identification, you may also be asked to provide your full social security or taxpayer identification number (or some other government-issued identification number). In some cases, we may also ask you to send us additional information or to answer additional questions to help verify your information. Finally, if you register a Carrier Billing Account, we will ask you to provide your mobile telephone number and the name and billing address associated with that number.
- **Information obtained from third parties** - We may obtain information about you from third party verification services, information arising from Google Wallet transactions at merchant locations,

GOOG-00000997

information regarding your use of payment methods issued by third parties that are linked to the Google Wallet service, information regarding access to balances held in your Google Wallet account, and information from a Carrier in connection with Carrier Billing.

Also, for sellers, we may obtain information about you and your business from a credit bureau or a business information service.

- **Transaction information** - When you use Google Wallet to conduct a transaction, we may collect information about the transaction, including: Date, time and amount of the transaction, a description provided by the seller of the goods or services purchased, any photo you choose to associate with the transaction, the names and email addresses of the seller and buyer (or sender and recipient), the type of payment method used, your description of the reason for the transaction, and the offer associated with the transaction, if any.

## How we use the information we collect

In addition to the uses listed in the Google Privacy Policy, we use the information you provide us, as well as information about you from third parties, in order to provide you with Google Wallet services, and to protect you from fraud, phishing or other misconduct. Such information may also be used to assist third parties in the provision of products or services that you request from them.

Your registration information is stored in association with your Google Account and your registration of a payment method will be stored on Google's servers. In addition, certain data elements may also be stored on your mobile device in encrypted form.

## Use of Google Wallet with third parties

We are not responsible for which merchants or other third parties you choose to share information with from Google Wallet. These include third party provider Wallet services that you register for directly and access through Google Wallet. The third party's receipt of, use of, and disclosure of your personal information from Google Wallet is subject to the third party's privacy policy, data security policy and terms and conditions. This Google Wallet Privacy Notice does not apply to your use of Google Wallet with third parties and any resulting data uses or disclosures by such third parties.

## Information we share

We will only share your personal information with other companies or individuals outside of Google in the following circumstances:

- As permitted under the Google Privacy Policy.
- As necessary to process your transaction and maintain your account.
- To complete your registration for a service provided by a third party.

## Information security

For more information about our security practices, please see the main Google Privacy Policy.

The security of your Google Wallet account depends on you keeping your account password confidential. If you share your account information with a third party, he or she will have access to your account and your personal information.

It is your responsibility to control access to your mobile device and the Google Wallet application on your device, including keeping your PIN confidential and not sharing it with anyone. It is also your responsibility to alert Google or the relevant partner if you believe that the security of the information in the Google Wallet application has been compromised.

## Sharing between affiliates

The information that we collect, including information obtained from third parties, is shared between GPC and its affiliates, including Google Inc., to operate the service. Neither GPC nor its affiliates will share your information with others except as described in this Privacy Notice.

We provide you with the right to opt out of certain sharing between GPC and its affiliates. Specifically, you may choose to opt out of:

- The sharing between GPC and its affiliates of personal information about your creditworthiness; and,
- The sharing of information between GPC and its affiliates for those affiliates to market to you.

We will not share your personal information with anyone outside of GPC or its affiliates except as described in this Privacy Notice. As explained above, Google Wallet is a product offered to Google Account holders. Data you provide to Google Inc. for the purpose of signing up for a Google Account is not affected by the opt-out provisions in this notice.

If you don't want us to share personal information about your creditworthiness between GPC and its affiliates, please click here.

If you don't want us to use any information shared between GPC and its affiliates for those affiliates to market to you, please click here.

©2011 Google - Google Home  Google Terms of Service  Previous Privacy Notices

GOOG-00000999

**Publicly Filed**

Exhibit 11

Exhibit 11



# Google Play Terms of Service

## 1. Introduction

**Applicable Terms**. By using digital content on Google Play, you agree to the following terms, in addition to the Google Terms of Service ("Google ToS") and the Google Play Business and Program Policies (found at http://play.google.com/about/android-developer-policies.html), all of which together are the **"Terms"**. If there is any conflict between the following terms and the Google ToS, the following terms shall prevail. Google's provision of Google Play and the services described in these Terms is a **"Service"** as defined in the Google ToS. These Terms apply to the provision of digital content from Google Play. Separate terms here apply to sales of devices from the Google Play store.

**Access to Products.** You may use Google Play to browse, locate, and/or download **Products** (defined as data files, applications, written text, mobile device software, music, audio files or other sounds, photographs, videos or other images) for your mobile, computer or other supported device **("Device")**. Some of these Products may be offered by Google while others may be made available by third-parties not affiliated with Google. You agree that Google is not responsible for any Product on Google Play that originates from a source other than Google.

**Age Restrictions**. In order to use Google Play you must be 13 years of age or older. If you are between 13 and 18 years of age, you must have your parent or legal guardian's permission to use Google Play. You must not access Google Play or accept these Terms if you are a person who is either barred or otherwise legally prohibited from receiving or using the Service or any Products under the laws of the country in which you are resident or from which you access or use Google Play.

## 2. Google's provision of Google Play

**Payment Processing.** Google may make available to you various payment processing methods to facilitate the purchase of Products from Google Play. You must abide by any relevant terms and conditions or other legal agreement, whether with Google or a third party, that governs your use of a given payment processing method. Google may add or remove payment processing methods at its sole discretion and without notice to you. You agree to pay for any Products that you order and that Google may charge your credit card or other form of payment that you indicate for any Products ordered, along with any additional amounts (including any taxes). You agree that you are solely responsible for all fees associated with purchases you make on Google Play.

**Google Wallet.** You will need a Google Wallet account to purchase Products. If you do not have a Google Wallet Account, you can set one up by going to this link, where you can also find more information about Google Wallet. The Wallet Terms of Service located here also apply whenever you want to purchase a Product using Google Wallet. Please ensure that you read those terms carefully before

GOOG-00001179

making any purchase.

**Pricing.** For sales as both principal or agent, Google displays the pricing for Products on Google Play. Pricing and availability of all Products are subject to change at any time.

**Taxes.** You are responsible for any Taxes, and must pay Google for Products without any reduction for Taxes. If Google is obligated to collect or pay Taxes, the Taxes will be invoiced to you, unless you provide Google with a valid tax exemption certificate authorized by the appropriate taxing authority. If you are required by law to withhold any Taxes from your payments to Google, you must provide Google with an official tax receipt or other appropriate documentation to support such payments. **"Taxes"** means any duties, customs fees, or taxes (other than Google's income tax) associated with the sale of Products, including any related penalties or interest.

# 3. Your Use of Google Play

**Basic Use Requirements.** To use the Service, you will need a Device that meets the system and compatibility requirements for the relevant Product, which may change from time to time, working Internet access, and compatible software. Your ability to use the Service and the performance of the Service may be affected by these factors. Such system requirements are your responsibility.

**Third-Party Fees.** You may incur access or data fees from third parties (such as your Internet provider or mobile carrier) in connection with your use of Products and Google Play. For instance, you may incur such fees if you use services provided through Google Play on or through third-party services or devices. You are responsible for all such fees.

**Updates.** You may need to install updates to Google Play or related Google software that we introduce from time to time to use Google Play and to access or download Products. Products originating from Google may communicate with Google servers from time to time to check for available updates to the Products and to the functionality of Google Play, such as bug fixes, patches, enhanced functions, missing plug-ins and new versions (collectively, **"Updates"**). By using the Google Play store and installing these Products, you agree to such automatically requested and received Updates.

**Information about You.** In order to access certain services in Google Play, you may be required to provide information about yourself such as your name, address, and billing details. Google's privacy policies explain how we treat your personal data and protect your privacy when using Google Play. You agree that any such information you provide to Google will always be accurate, correct and up to date.

**Unauthorised Access to Accounts.** You must keep your user details secure and must not share them with anyone else. You must not collect or harvest any personal data of any user of Google Play, including account names.

**Disabled Accounts.** If Google disables access to your account, you may be prevented from accessing Google Play, your account details or any files or other Products that are stored with your account.

**Eligibility for Carrier Billing.** In order to determine your eligibility to have purchases of Products that you make through your mobile Devices billed to your mobile network provider's account, when you create a Google Play account on a Device we will send identifiers of your Device, subscriber ID and SIM

card serial number to your network provider. To permit this you will need to accept the network provider's terms of service. The network provider may send us your billing address information to help us create your Google Play account. We will hold and use this information in accordance with Google's privacy policies.

# 4. Purchases and Payments.

**Free Products.** Google may allow you to download or use Products free of charge. Any terms and conditions that apply to purchased Products will apply to free Products, except with respect to payment-related matters (for example, the refund-related provisions of these Terms do not apply to such free Products). Google may impose limitations on your access and use of certain free Products.

**Pre-orders of Products.** When you place a pre-order for a Product, your contract for the purchase and use of that item is completed when the Product becomes available in your account, and you are not able to withdraw from the contract after that point.

**Purchase of Products.** When you buy a Product, your contract for the purchase and use of that item is completed once you click the button indicating that your purchase is complete and you are not able to withdraw from the contract after that point.

**Product Purchases are Services.** When you purchase a Product, you are buying a service. Performance of this service begins as soon as the purchase is complete, as the Product will then be available to you through your account.

**Direct, Agency and App Sales.** When you buy Products from Google Play you will buy them either:

(a)  directly from Google (which is referred to as "Google", "we", "our", or "us" in these Terms) (a **"Direct Sale"**);

(b)  from the provider of the Product (the "Provider"), where Google is acting as agent for the Provider (an **"Agency Sale"**); or

(c)  in the case of Android apps, from the Provider of the app (an **"App Sale"**).

Each time that you purchase a Product, you enter into a contract based on these Terms with: Google in relation to the use of Google Play and (in the case of a Direct Sale) the purchase of that Product; and also (in the case of Agency Sales and App Sales) with the Provider of the Product you have purchased.

**All Sales Final.** Except as expressly set forth in these Terms or other Google Play policies, all sales are final, and no returns, replacements or refunds are permitted. If a replacement, return or refund is granted for any transaction, the transaction may be reversed, and you may no longer be able to access the Product that you acquired through that transaction. Your rights to cancel or return purchases and get a refund are set out in the additional terms for the relevant Product type below and related policies.

# 5. Subscriptions.

**Free Trials of Magazines.** If you purchase a subscription for a magazine that includes a free trial, you will receive free access to content for the duration of the free trial period. If you cancel the subscription during the free trial period you will not be billed. You will retain access to the content you receive during the free trial period. If you do not cancel during the free trial period you will be billed at the end of the free trial period for the first period of the subscription that you purchased, which will commence at the end of the free trial period. Free trials are limited to one per user per magazine.

**Free Trials of Apps.** Subscribing to a free trial for an Android app gives you access to the subscription benefits for that app for a duration specified by the application developer. At the end of the trial period, you will be charged the price of the subscription and will continue to be charged until you cancel your subscription. To avoid any charges, you must cancel before the end of the trial period. Once you cancel your trial, you will immediately lose access to any subscription privileges.

**Cancellations.** If you purchase an auto-recurring periodic subscription (whether monthly, annual or another period) to a Product, you may cancel that subscription at any time before the end of the applicable billing cycle, and the cancellation will apply to the next period. For example, if you purchase a monthly subscription, you may cancel that subscription at any time during any month of the subscription, and the subscription will be cancelled as of the following month. You will not receive a refund for the current billing period. You will continue to receive issues and updates of the relevant subscription during the remainder of the current billing period, and your access to these will not be affected by the cancellation. Additional refund policies for magazines are set out in section 10 below.

**Price Changes.** When you purchase a subscription, you will initially be charged at the rate applicable at the time of your agreement to subscribe. If the Provider later increases the price of the subscription, Google will notify you. The increase will apply to the next payment due from you after the notice, provided that you have been given at least 10 days' prior notice before the charge is made. If you are given less than 10 days' prior notice, the price increase will not apply until the payment after the next payment due.

**Declining Price Changes.** If you do not wish to pay the increased price for a subscription, you may cancel the subscription in the manner described in the Google Play help center and you will not be charged further amounts for the subscription, provided you have notified us before the end of the current billing period. In some cases where the Provider increases the price of a subscription Google may cancel your subscription unless you agree to re-subscribe at the new price. If your subscription is cancelled and you later decide to re-subscribe, you will initially be charged at the then current subscription rate.

# 6. Rights and Restrictions

**License to Use Products.** Following payment of the applicable fees for a Product, you will have the non-exclusive right, for the period selected by you in the case of a purchase for a rental period, and in other cases for as long as Google and the applicable copyright holder have rights to provide you that Product, to download or stream, in each case, solely as expressly permitted by Google via the Play user interface and subject to the restrictions set forth in these Terms and associated policies, copies of the applicable Product to your Devices, and to view, use, and display the Product on your Devices or as otherwise authorized by Google as part of the Service for your personal, non-commercial use only. All rights, title and interest in Google Play and Products not expressly granted to you in these Terms are reserved by

GOOG-00001182

Google and its licensors.

**Violation of License Terms.** If you violate any of the terms and conditions of the Terms, your rights under this license will immediately terminate and Google may terminate your access to Google Play, the Products and/or your Google account without notice and without refund to you.

**No Public Performance.** You agree not to display content contained in Products in whole or in part as part of any public performance or display even if no fee is charged (except where such use would not constitute a copyright infringement). Use of a tool or feature provided as an authorized part of Google Play (for example, "Social Recommendations", as defined in the Music terms below) is permitted, provided that as you use the tool or feature as specifically permitted and only in the exact manner specified and enabled by Google.

**Sale, Distribution or Assignment to Third Parties.** You may not sell, rent, lease, redistribute, broadcast, transmit, communicate, modify, sublicense or transfer or assign your rights to Products to any third party without authorization, including with regard to any downloads of Products that you may obtain through Google Play. Use of any tool or feature provided as an authorized part of Google Play (for example, "Social Recommendations") shall not violate this provision so long as you use the tool as specifically permitted and only in the exact manner specified and enabled by Google.

**Capturing of Streams.** You may not use Google Play or any Product in conjunction with any stream-ripping, stream capture or similar software to record or create a copy of any Product that is presented to you in streaming format.

**Sharing.** You may not use Products as part of any service for sharing, lending or multi-person use, or for the purpose of any other institution, except as specifically permitted and only in the exact manner specified and enabled by Google (for example, through "Social Recommendations").

**Security Features.** You may not attempt to, nor assist, authorise or encourage others to circumvent, disable or defeat any of the security features or components, such as digital rights management software or encryption, that protect any Product or Google Play. If you violate any security feature, you may incur civil or criminal liability.

**Proprietary Notices.** You may not remove any watermarks, labels or other legal or proprietary notices included in any Product, and you may not attempt to modify any Products obtained through Google Play, including any modification for the purpose of disguising or changing any indications of the ownership or source of a Product.

**Defective Products.** Once a Product is available to you through your account, you should check the Product as soon as reasonably possible to ensure that it downloads or streams correctly (as applicable) and performs as stated, and notify us as soon as reasonably possible if you find any errors or defect. In the case of Android apps, you should contact the developer concerning any defects or performance issues in the apps, as described in the Google Play help center. In the case of Products other than apps, subject to any limitations in the additional terms for the specific Product below, You may return Products that you purchased from Google Play to Google if Google Play does not perform as stated with respect to that purchased Product, and Google will provide at its option either a replacement Product or a refund of the purchase price. If Google elects to issue you a refund, the refund of your purchase price shall be your

GOOG-00001183

sole remedy. Google reserves the right to issue refunds or credits at its sole discretion. If Google issues a refund or credit, it is under no obligation to issue the same or similar refund in the future.

**Removal or Unavailability of Products.** Subject to these Terms, Products that you purchase will be available to you through Google Play for the period selected by you in the case of a purchase for a rental period, and in other cases as long as Google has the right to make such content available to you. In certain cases (for example, if Google loses the relevant rights, discontinues a service or a Product is discontinued, breaches applicable terms or the law), Google may remove from your Device or cease providing you with access to certain Products that you have purchased. If reasonably practicable, Google will provide you with reasonable prior notice of any such removal or cessation. If you are not able to download a copy of the Product before such removal or cessation, then Google will, at its option and solely as an accommodation to you, offer you either (a) a replacement of the Product if possible or (b) a refund of the price of the Product. If Google chooses to issue you a refund, the refund of your purchase price shall be your sole remedy.

**Effect of Refunds.** If Google chooses to issue you a refund of the purchase price of a Product for any reason, you will no longer have the right to access the relevant Product.

**Select, Copy and Paste.** Select, copy and paste functions may be available for some text-based Products, and you must use these features within the prescribed limits and only for personal non-commercial purposes.

**Multiple Accounts.** If you have multiple Google accounts with different user names, in some cases you may transfer Products out of an account and into another account, provided you are the owner of each such account and provided Google has enabled a feature of the relevant service allowing such transfers.

**Limits on access on Devices.** Google may at any time place limits on the number of Devices and/or software applications you may use to access Products, at Google's discretion. Google may record and store the unique device identifier numbers of your Devices in order to enforce such limits.

**Compliance with Tax Laws.** You must comply with any and all applicable tax laws, including the reporting and payment of any taxes arising in connection with your use of Google Play or the purchase of Products through Google Play. The reporting and payment of any such applicable taxes are your responsibility.

**Dangerous Activities.** NONE OF THE PRODUCTS ARE INTENDED FOR USE IN THE OPERATION OF NUCLEAR FACILITIES, LIFE SUPPORT SYSTEMS, EMERGENCY COMMUNICATIONS, AIRCRAFT NAVIGATION OR COMMUNICATION SYSTEMS, AIR TRAFFIC CONTROL SYSTEMS, OR ANY OTHER SUCH ACTIVITIES IN WHICH CASE THE FAILURE OF THE PRODUCTS COULD LEAD TO DEATH, PERSONAL INJURY, OR SEVERE PHYSICAL OR ENVIRONMENTAL DAMAGE.

**Changes to these Terms.**

If these Terms change, you will be asked to accept new terms before you next purchase Products. Once you have accepted the new terms, they will apply to your use of all Products (including Products you have purchased in the past) and all subsequent purchases, until we notify you of further changes.

If you refuse to accept the updated terms then you will not be able to buy any further Products through Google Play, and the latest version of these Terms that you accepted will continue to apply to your use of Products. In this case we will, if we are able to do so, give you a reasonable period of time in which to download a copy of any Product you have previously bought from Google Play to your Device, and you may continue to view that copy of the Product on your Devices in accordance with the last version of these Terms that you accepted.

After that time has expired, you will not be given a further opportunity to download the Products you have previously bought and it is possible that you will no longer be able to use Google Play to access or use the Products you have already bought or related support services. To do so you may also need to create a new account.

# 7. Music on Google Play

**Introduction.** Google Play includes certain music-related services, which are described in greater detail below and defined as the "Music Services."

**Music Products.** The Google Play store allows you to browse, preview, stream, purchase, download, recommend and use a variety of digital music and music-related content (such as music files, music video files, previews, clips, artist information, user reviews, professional third-party music reviews and other digital content) **("Music Products")**. Music Products may be owned by Google or its third-party partners and licensors and may contain watermarks or other embedded data.

**Stored Content.** You can also use Google Play to store digital content (such as music files, related metadata and album art) in Music Storage through the Music Software, as each is defined below **("Stored Content")**. For the avoidance of doubt, "Music Products" do not include Stored Content. Stored Content may include both files that you upload directly to Music Storage and/or files that Google "scans and matches" to files stored locally on your Device.

**Music Services.** Google Play may provide you with access to (a) server space that you can use to store music and associated data files, including Music Products and Stored Content **("Music Storage")** and/or (b) software applications (including web, desktop and mobile applications) and related services that allow you to upload, manage, access and play music through Music Storage ("**Music Software**"). Music Storage and Music Software are collectively referred to in these Terms as the "Music Services".

**Use of Music Services.** By storing Music Products and Stored Content in Music Storage, you are storing a unique copy of such content and requesting Google to retain it on your behalf and to make it accessible to you through your Google account. By using the Music Services, you are requesting that Google make all of the necessary functions and features of the Music Services available to you in order to facilitate your use of Music Products and Stored Content. Additionally, by accessing or using Music Products and Stored Content through the Music Software, you are initiating and performing the corresponding functions on Google's servers, together with any related steps necessary to achieve them, through the Music Services. You understand that Google, in performing the required technical steps at your direction to provide you with the Music Services, may (a) transmit Music Products and Stored Content over various networks and in various media and (b) make such changes to Music Products and Stored Content as are necessary to conform and adapt it to the technical requirements of connecting networks, devices,

services or media. You confirm and warrant to Google that you have the necessary rights to store in Music Storage any Stored Content that you direct Google to upload or store in Music Storage, and to instruct Google to perform the actions described in this section.

**Cancelling a Music Purchase; Refunds.** You have the right to cancel each purchase of a Music Product from Google for a refund within 7 working days of the day after that Music Product becomes available for you to download or stream. Once you download or stream any Music Product that you purchase, you no longer have the right to cancel your purchase of that Music Product (unless the Music Product is defective).

**Social Recommendations.** When you purchase Music Products, you may be given the opportunity to share all or a portion of the Music Products to your profile on Google+ or other Google-approved social networks or online destinations, as determined by Google in its sole discretion (**"Social Recommendation"**). Your use of Social Recommendations shall be subject to the Terms and any other terms and conditions applicable to the social networks or online destinations to which you share such Social Recommendations. Google may impose limitations on your Social Recommendations. For example, Google may render the Music Product associated with any Social Recommendation as a limited-length preview rather than a full-length play.

**Rights to Stored Content.** You retain any rights that you already hold in Stored Content. For the avoidance of doubt, Stored Content is not subject to the license grant to Google in the section of the Google Terms of Service titled "Your Content in our Services."

**Geographic Restrictions.** The Music Services and Music Products are currently available only in some countries. You agree that you will not present any false, inaccurate or misleading information in an effort to misrepresent yourself as a resident of a supported country, and you will not attempt to circumvent any restrictions on access to or availability of the Music Services or Music Products.

**Compliance With Settings.** You must observe and comply with any settings or parameters set by Google or a copyright holder in connection with Music Products. For example, Google or the copyright holders may correct errors in Music Products, add additional features or change the security features or regional availability of the Music Products. Where these changes are made, the Music Products may automatically update.

**Third-Party Provisions.** Notwithstanding anything to the contrary in these Terms, the third parties who license their musical or other content to Google as Music Products or for other use in connection with the Google Play store (including Providers in the case of Agency Sales) are intended third party beneficiaries under these Terms solely with respect to the specific provisions of these Terms that directly concern their content (**"Third-Party Provisions"**), and solely for the purpose of enabling such third parties to enforce their rights in such content. For the avoidance of doubt, nothing in these Terms confers a third-party beneficiary right upon any party, with respect to any provision that falls outside the Third Party Provisions, which includes but is not limited to any provisions or agreements incorporated by reference, or that may be referenced without incorporation, in these Terms.

**Third-Party Software and Data.** Information regarding third-party software (including open source) and data in the Music Services can be obtained at the following location: http://music.google.com/about/thirdparty.html.

**Licensing Partners.** If you are interested in learning more about some of the partners we work with to bring you music on Google Play, please visit this page.

# 8. Books on Google Play

**Privacy Policy for Books.** The Google Play Privacy Policy for Books http://books.google.com/googlebooks/privacy.html describes how we treat personal and certain other information generated by your use of Products that are books (**"Books Products"**).

**Device Requirements.** For information on the system requirements including what Devices are compatible with the Service and the purchase of and access to Books Products, please look at http://support.google.com/mobile/?p=books_devices.

**Updates to Books Content.** Google or the copyright holders of Books Products may update such Books Products and change digital rights settings for such Books Products from time to time. For example Google or the copyright holders may correct errors in the Books Products or may add additional features, or may change the security features for the Books Products. Where these changes are made the Books Products that you see will automatically update, except where you have downloaded a copy of the Books Products to a Device.

**Pricing.** Prices and availability of any Books Products are subject to change at any time. We try very hard to make sure there are no pricing mistakes. However, we (and, in the case of Agency and App Sales, the Provider) will not be bound by mistakes in the price of the Books Products (unless you have already purchased Books Products at the incorrect price).

**Cancellation.** You have the right to cancel the contract for each purchase of a Book Product from Google for a refund within a period of 7 days beginning with the day after that Book Products becomes available for you to read. Following Google's provision of a refund to you, the transaction will be reversed, and you will no longer have the right to access the applicable Book Product.

**Pre-Ordering.**

(a)   When you pre-order Books Products, the Books Content will automatically be available in your account once it becomes available to read, and you will be charged for the purchase at that time.

(b)   You can cancel your pre-order at any time up to the point at which the Books Product becomes available to read (if you want to cancel the pre-order you will be able to do so by visiting the "My Orders" page and following the instructions there). Once the Books Product is available for you to read, your cancellation and return rights are the same as for other Books Products that you purchase through Google Play. Please see the terms above for more information.

(c)   In some cases, we will need to cancel a pre-order you have placed (for example, we will cancel the pre-order if: the price of the Books Product changes between the time of your pre-order and the time at which the Books Product becomes available in your account; the Publisher of the Books Product requires us to withdraw the Books Content from sale; we have not been able to process your payment for the Books Product; or where we are required to do so by law). In this situation, your pre-order will be cancelled.

GOOG-00001187

## 9. Movies and TV Shows on Google Play

**Introduction.** Google Play includes certain video services, which are defined as the **"Video Services"**. In these Terms Products made available for purchase through the Video Services are **"Video Products"**.

**Cancellation.** You can cancel your purchase of a Video Product and get a refund for an unwatched rental as long as it's within 7 working days of your order. Requests for refunds for any other reason must be directed through the form in the Google Play help center. Google reserves the right to approve or deny refund requests after 7 working days at its sole discretion.

**Purchase Options.** When you order a Video Product through the Service, you may either (i) rent the Video Product for viewing an unlimited number of times during the period of time specified on the transaction page displayed at the time of your payment (**"Viewing Period"**) and noted in your confirmation email (**"Rental Video Product"**) or (ii) purchase the Video Product for storage in a digital locker and for viewing and unlimited number of times as long as the Video Product is available in the digital locker (**"Locker Video Product"**).

**Viewing Periods - Rentals.** Pausing, stopping, or rewinding a Rental Video Product will not extend your applicable Viewing Period for that Rental Video Product. Each item of Rental Video Product may have a different Viewing Period and you agree to review the Viewing Period before you order it.

**Viewing Periods - Purchases.** Each Locker Video Product will be available for unlimited viewing for as long as Google is able to maintain the rights to continue providing you that Locker Video Product (**"Locker Period"**). Pausing, stopping, or rewinding an item of Locker Video Product will not extend the Locker Period. Each item of Locker Pay Content may have a different Locker Period.

**Viewing requirements.** You agree to watch each Video Product only within territories within which Google makes the relevant Video Product available for viewing. You may view Video Products when (1) online, with an internet connection and logged onto your Google account or (2) offline and viewing from a previously authorized device. You must be online to authorize a device for viewing Video Products.

**Device Limits - Rentals.** For each purchased Rental Video Product, you may watch such Rental Video Product on only one Device at a time (either online or on an authorized offline Device).

**Viewing Limits - Purchases.** For Locker Video Products, (1) you may view only one stream of each Locker Video Product at a time, (2) you may view up to 3 streams of Locker Video Products from your locker at a time, (3) you may authorize up to 5 Devices for offline playback of Locker Video Products at a time and to authorize additional devices, you must de-authorize one of those 5 Devices, (4) you may only authorize the same Device three times in any 12 month period and de-authorize the same Device twice in any 12 month period, (5) you may only de-authorize a total of 2 Devices for offline playback every 90 days, and (6) you may authorize no more than 3 Google accounts on the same Device.

## 10. Magazines on Google Play

**Reductions for Print Subscribers.** Some Providers of magazines may allow you to purchase a subscription of magazine Products on Google Play at a reduced rate if you are already a print subscriber.

If you cancel your print subscription of that magazine or your print subscription expires and you do not renew it, your reduced rate subscription of that Product on Google Play will be cancelled automatically.

**Refunds.** Where you are granted a refund, Google may issue a refund for the entire term or grant a partial refund (if available) for the remaining term of a subscription. Following Google's provision of a refund to you, you will no longer have the right to access the applicable issues of the relevant magazine Product delivered during the refunded period, or if a partial refund is given, any issues of the relevant magazine Product not yet received. If a Product is no longer available on Magazines on Google Play (for example, if a title goes out of business or is sold to another publisher that does not provide Products to Magazines on Google Play), Google will give you a refund (which may be a full refund for the current period of the subscription or a partial refund for issues not yet received in the current period).

**Information Google Shares with Magazine Publishers.** If you purchase a subscription of any length on Magazines on Google Play, Google will share your name, email address, mailing address and a unique identifier with the magazine's publisher. The magazine publisher will use this information in accordance with its privacy policy. You will be provided the opportunity to opt out of any communications from the publisher that do not relate to the subscription you are purchasing, and to opt out of marketing communications from third parties, at the time you purchase your subscription. If you purchase a single issue on Magazines on Google Play, Google may provide your postal code to the magazine's publisher. We also provide magazine publishers with sales information on magazine purchases.

**Verifying Print Subscriptions.** If you are accessing a subscription on Magazines on Google Play through an existing print subscription from that magazine's publisher, we may ask a third party service provider to verify your print subscription with the magazine publisher, and we may ask you for certain information relating to your print subscription in order to do so. Google will use this information in accordance with the Google Privacy Policy (located at https://www.google.com/policies/privacy/).

- © Google
- Privacy & Terms
- Help


English ▾

**Publicly Filed**

Exhibit 12

Exhibit 12

# Terms of Service - Seller (US)

July 19, 2011

These Seller Terms of Service (the **"Agreement"**) are a legal agreement between Google Payment Corp. (**"GPC"**) and you (**"Seller"**). GPC is a subsidiary of Google Inc. (**"Google"**). You should review this entire Agreement before you decide whether to accept this Agreement and continue with the registration process.

BY CLICKING "I AGREE TO THE TERMS OF SERVICE" BELOW AND CLICKING ON THE "COMPLETE SIGN UP" BUTTON YOU AGREE TO BE BOUND BY THIS AGREEMENT.

## SECTION 1. DEFINED TERMS

1.1 **"Beta Features"** means those features of the Service which are identified by GPC as beta or unsupported in GPC's then current technical documentation, including without limitation the Integration Guidelines for the version of the Service that Seller has implemented.

1.2 **"Brand Features"** means the trade names, trademarks, service marks, logos, domain names, and other distinctive brand features of each party.

1.3 **"Buyer"** means a person or entity that registers to use the Service to make payments using a Payment Account.

1.4 **"Carrier"** means a mobile telephone operator approved by GPC that offers a Carrier Billing Account to Buyers.

1.5 **"Carrier Billing"** means a mobile telephone operator approved by GPC that offers a Carrier Billing Account to Buyers.

1.6 **"Carrier Billing Account"** means the monthly or other periodic billing account provided by a Carrier registered by a Buyer with the Service to fund certain Payment Transactions.

1.7 **"Disputes"** means any disagreements, litigation, or other disputes between Seller and a Buyer or between Seller and a third party arising from the use of the Service, but excluding Service Disputes.

1.8 **"Google Website"** means the website pages of any website owned or operated by Google or its affiliates.

1.9 **"Intellectual Property Rights"** means any and all rights existing from time to time under patent law, copyright law, semiconductor chip protection law, moral rights law, trade secret law, trademark law, unfair competition law, publicity rights law, privacy rights law, and any and all other proprietary rights, as well as, any and all applications, renewals, extensions, restorations and re-instatements thereof, now or hereafter in force and effect worldwide.

1.10 **"Payment Account"** means the credit card account, debit card account, Carrier Billing Account, or other payment instrument that is registered by a Buyer with the Service and accepted by GPC to facilitate the processing of Payment Transactions.

GOOG-00001273

1.11 **"Payment Transaction"** means the processing of a payment through the Service that results in the debiting or charging of the Purchase Amount to a Buyer's Payment Account and the issuance of funds to Seller's Settlement Account.

1.12 **"Policies"** means the various policies, guidelines, and other terms and conditions that are referenced in this Agreement but are not expressly set forth in this Agreement. The Policies may be updated from time to time by GPC. The Policies include, without limitation, the following:

- https://checkout.google.com/seller/policies.html
  (the **"Program Policies"**)
- http://checkout.google.com/seller/content_policies.html
  (the **"Content Policies"**)
- http://code.google.com/apis/checkout/
  http://code.google.com/apis/checkout/terms.html
  (together, the **"Integration Guidelines"**)
- http://www.google.com/privacypolicy.html
  http://checkout.google.com/files/buyerprivacy.html
  (together, the **"Service Privacy Policy"**)
- http://checkout.google.com/seller/checkout_buttons.html
  http://checkout.google.com/seller/acceptance_logos.html
  (together, the **"Button and Acceptance Logo Guidelines"**)
- http://www.google.com/permissions/guidelines.html
  (the **"Google Brand Feature Guidelines"**)
- http://checkout.google.com/seller/fees.html
  (the **"Fee Schedule"**)

1.13 **"Products"** mean any digital or physical merchandise, goods, or services offered by Seller that a Buyer may pay for using the Service.

1.14 **"Purchase Amount"** means the monetary amount of a Payment Transaction, which includes any taxes, shipping charges, handling charges, or other fees that are charged to the Buyer as part of the Payment Transaction.

1.15 **"Seller Website"** means the website pages of Seller.

1.16 **"Service"** means the service, described in this Agreement, that facilitates the processing of Payment Transactions on behalf of Seller to complete a payment for a purchase between Seller and Buyer.

1.17 **"Service Disputes"** mean any disagreements, litigation, or other disputes between GPC and Buyers arising solely from an error in the functioning of the Service.

1.18 **"Settlement Account"** means the deposit account of Seller maintained at a financial institution located in the United States that is designated by Seller and approved by GPC for receipt of funds from the processing of Payment Transactions through the Automated Clearing House network (**"ACH Network"**).

## SECTION 2. SERVICE FEATURES AND DESCRIPTION

2.1 **Service Description**. Seller acknowledges and agrees that: (i) Seller's sales of Products are transactions between Seller and the Buyer and not with GPC or any of GPC's affiliates; (ii) GPC is a third-party service provider facilitating Payment Transactions for Seller and is not a party to any Payment Transaction; (iii) GPC is not a Buyer or a seller in connection with any Payment Transaction; (iv) GPC will not be responsible for and does not control any aspect of the Products or the description of the Products; and (v) GPC will not be responsible for and does not control if a Buyer will complete the purchase of or payment for Products. When a Buyer seeks to make a purchase with a Payment Account, the Service will process the Payment Transaction on behalf of Seller either (a) through the appropriate payment processing network, including without limitation credit card or debit card networks or (b) to the Carrier for payment and collection through Carrier Billing as described below.

2.2 **Permissible Payment Transactions**. Seller may only use the Service to process a Payment Transaction for a Product that is purchased by a Buyer through a legitimate, bona fide sale of the Product. A Payment Transaction may not be submitted for capture through the Service until Seller has satisfied the requirements for charging and shipping as described in the Program Policies. The Service may not be used to process a Payment Transaction for Seller, or otherwise transfer money between a Buyer and Seller, that does not directly result from a Buyer's purchase of a Product. Notwithstanding the foregoing, if Seller identifies its primary product type as "non-profit" and is verified by GPC as a valid IRS certified nonprofit organization, then Seller may use the Service to process donations from Buyers. Seller may not use the Service to provide cash advances to Buyers or to facilitate the purchase by Buyers of cash equivalents (e.g., travelers checks, prepaid cards, money orders); provided however, that Seller may use the Service to facilitate the purchase by Buyers of a gift certificate or stored value card as permitted by the Policies. GPC may establish general practices and limits concerning use of the Service, including without limitation individual or aggregate transaction limits on the dollar amount or number of Payment Transactions during one or more specified time periods. Seller may not use the Service to process Payment Transactions in connection with an illegal transaction or the sale or exchange of any illegal or prohibited goods or services, including without limitation prohibited Products as set forth in the Content Policies.

2.3 **Limitations on the Use of Service**. Seller must comply with the Policies and any other limits concerning use of the Service as updated by GPC from time to time, including without limitation: (i) the Integration Guidelines; (ii) the Button and Acceptance Logo Guidelines and the Google Brand Feature Guidelines; (iii) GPC requirements for data security; (iv) operating rules and/or policies of the card associations or networks that are used to process the Payment Transactions attached hereto as **Exhibit A** (as may be updated from time to time); or (v) Carrier requirements applicable to Carrier Billing. Seller's Payment Transactions may be protected pursuant to the chargeback resolution policies (**"Chargeback Resolution Policy"**) and payment guarantee policy (**"Payment Guarantee Policy"**) as each are described in the Program Policies. GPC has the right (i) to change, suspend or discontinue the Service, in whole or in part, as necessary to perform maintenance or updates to the Service and (ii) to impose limits on certain features or restrict access to parts or all of the Service without notice and without liability. GPC may decline to process any Payment Transaction in connection with, among other reasons, fraud prevention activities, applicable law, or GPC policies.

2.4 **Prohibited Actions**. Unless expressly permitted in writing by GPC, Seller may not: (a) establish a minimum or maximum Purchase Amount as a condition for Buyer's use of the Service to pay for a Product; (b) require Buyer to provide Seller with the account numbers of any credit card, debit card, Carrier Billing Account or other payment instrument; (c) add any Service use surcharge to a Payment Transaction; (d)

separately process as a Payment Transaction the amount of any tax applicable to a purchase of a Product; (e) submit to the Service a Payment Transaction that was previously returned as a chargeback; or (f) permit the use of the Service for payment of any debt owed to Seller by Buyer.

2.5 **Payment Transaction Authorization**. Seller acknowledges that the receipt of an authorization for a Payment Transaction indicates only that, as of the date of the authorization, the underlying Payment Account has sufficient credit with the card issuer or Carrier for the amount of the Purchase Amount. Seller acknowledges that the authorization is not a confirmation of the Buyer's identity; nor is an authorization a guarantee by GPC that the transaction will not be subject to a chargeback or other reversal.

2.6 **Additional Carrier Billing Terms**. When a Buyer makes a Payment Transaction using Carrier Billing, GPC, as processor for the Seller, will submit charges to the Carrier for payment and processing through the Buyer's Carrier Billing Account. A reversal, refund, or adjustment of that Payment Transaction also may be submitted by GPC, as processor for the Seller, to the Carrier for processing through the Buyer's Carrier Billing Account. GPC is not obligated to Seller or any other person to make settlement for Buyer's Payment Transaction (or reversals, refunds or adjustments thereof) in the event that the Carrier is unable or unwilling for any reason to collect the funds from the Carrier Billing Account or otherwise from the Buyer (for payment of a Payment Transaction) or to credit the Carrier Billing Account or otherwise credit the Buyer (for a reversal, refund or adjustment of a Payment Transaction). In the event GPC provides any settlement funds to the Seller pending payment from the Carrier, GPC reserves the right to chargeback or reclaim the funds from the Seller in the event the Carrier does not complete the Payment Transaction processing to the Buyer's Carrier Billing Account or otherwise does not obtain payment from the Buyer. GPC may limit the types of Sellers that may use Carrier Billing and the types of products that may be purchased with Carrier Billing.

2.7 **Beta Features**. From time to time, GPC may make Beta Features available to Seller as part of the Service, which are provided "as is." Seller's use of Beta Features is solely at Seller's own risk. GPC reserves the right, in its sole discretion, to include or cease providing Beta Features as part of the Service at any time.

## SECTION 3. SERVICE IMPLEMENTATION

3.1 **Implementation of Service**. Seller agrees not to use the Service through websites other than the Seller Websites. GPC at all times reserves approval authority as to the implementation of the Service on each Seller Website, and GPC may upon notice suspend Seller's use of the Service until Seller corrects implementation issues as reasonably specified by GPC.

3.2 **Implementation Setup**. Seller agrees to provide current, complete and accurate registration information for the Service and to maintain and promptly update the information. Seller will set up and maintain a Settlement Account that is capable of receiving funds through the ACH Network. Seller authorizes GPC to confirm that the Settlement Account is in good standing with the financial institution, including by submitting a request for a payment authorization and/or a low monetary credit to the Settlement Account. Seller authorizes GPC to reconfirm the Settlement Account any time the account information is changed. Seller also authorizes GPC to obtain from time to time a credit report and to otherwise make credit or other background inquiries on Seller as GPC deems appropriate to assess Seller's eligibility for continued use of the Service. GPC may require Seller to provide additional information from time to time as a condition of Seller's continued use of the Service in connection with a credit or other background inquiry.

3.3 **Implementation Updates**. Seller will provide GPC with sixty (60) days advance notice of any change to a Seller Website or the code or technology used to implement the Service on a Seller Website that could reasonably be expected to adversely affect Seller's implementation of the Service; provided that giving notice will not relieve Seller of its obligations under this Agreement. If GPC updates the technical or implementation specifications for the Service, Seller will implement the updates as soon as reasonably practical, but no later than ninety (90) days of receiving notice of the updates. If GPC updates its look and feel or branding specifications, Seller will implement the updates as soon as reasonably practical, but no later than thirty (30) days of receiving notice of the updates.

3.4 **Support**. Prior to making any support request to GPC, Seller will first use reasonable efforts to resolve the problem on its own without any escalation to GPC. Thereafter, Seller may submit a written request for technical support via the methods specified by GPC. Any support that Seller provides to Buyers will be at Seller's own expense. Seller agrees that any telephone communications between Seller and GPC related to the support or operation of the Service may be recorded by GPC for quality assurance and training purposes.

## SECTION 4. ADDITIONAL SERVICE TERMS

4.1 **GPC Not A Banking Institution**. Seller hereby acknowledges and agrees that (i) GPC offers the Service to facilitate the processing of Payment Transactions in connection with Product purchases by Buyers, (ii) GPC processes Payment Transactions on behalf of Seller, (iii) GPC is not a bank or other chartered depository institution and (iv) funds held by GPC or its service providers (including any bank service providers) in connection with the processing of Payment Transactions are not deposit obligations of Seller and are not insured for the benefit of Seller by the Federal Deposit Insurance Corporation or any other governmental agency.

4.2 **Unclaimed Property**. Seller acknowledges and agrees that if (i) GPC is holding funds that are due to Seller arising from a Payment Transaction processed through the Service or otherwise, (ii) GPC is unable to contact Seller and (iii) GPC has no record of Seller's use of the Service for several years, then GPC may be required under applicable law to report the balance of such funds as unclaimed property. In the event of the foregoing, GPC will try to locate Seller at the Seller's mailing address shown in GPC's records and, if GPC is unable to locate Seller, Seller acknowledges and agrees that GPC may be required to deliver any such funds to the applicable state as unclaimed property; provided, however that GPC may deduct a dormancy fee and other administrative charges from such unclaimed funds, as permitted by applicable law.

4.3 **No Endorsement**. Seller acknowledges that GPC does not endorse the Seller Website, any of the information or other content appearing on the Seller Website or provided by Seller to GPC ("**Seller Content**"), or any of the Products. Seller agrees not to state or imply any endorsement by GPC or Google on the Seller Website or otherwise. To the extent that Seller Content appears within the Service or on Google Websites, GPC reserves the right to modify or remove the Seller Content at its sole discretion.

4.4 **Buyer Identity**. GPC has no responsibility to Seller to investigate the background or confirm the identity of Buyers, except to the extent required by applicable law. GPC may offer a feedback or other ranking system to assist Seller in evaluating Buyers or to assist Buyers in evaluating Seller. Seller acknowledges that any feedback or ranking system represents solely the opinion of third parties, and is not an opinion, representation, or warranty by GPC.

GOOG-00001277

4.5 **Disputes**. Except as expressly provided for in the Chargeback Resolution Policy, Seller is solely responsible for Disputes and GPC is not a party to and will not be responsible for any Disputes. With respect to Disputes, Seller is subject to the Chargeback Resolution Policy and other dispute procedures as provided by GPC from time to time. GPC may provide tools to facilitate communication between Seller and a Buyer to resolve Disputes. If Seller and a Buyer are unable to resolve a Dispute, GPC may mediate the Dispute upon either party's request and may propose a non-binding solution at GPC's sole discretion. GPC is solely responsible for Service Disputes and Seller is not a party to and will not be responsible for any Service Disputes; provided, that Seller agrees to provide reasonable assistance to GPC in resolving Service Disputes.

## SECTION 5. BRAND FEATURES

5.1 **GPC Brand Features**. Subject to this Agreement and after Seller has implemented the Service, GPC grants Seller a limited, nonexclusive and nonsublicensable license to display GPC Brand Features to promote the availability of the Service on the Seller Websites. Seller may use buttons and acceptance logos in accordance with the Button and Acceptance Logo Guidelines without prior approval from GPC. Other uses of GPC Brand Features require prior approval from GPC in accordance with the Google Brand Feature Guidelines. GPC may revoke the permission granted in this paragraph to use GPC Brand Features by providing notice to Seller and a reasonable period of time to cease usage. Seller agrees to adhere to the Google Brand Feature Guidelines.

5.2 **Seller Brand Features**. Subject to this Agreement, Seller grants GPC and its affiliates a limited, nonexclusive and nonsublicensable license to display Seller Brand Features in connection with (i) operating the Service and (ii) promotions, presentations, marketing materials, verbal communications, and lists of sellers (e.g. a seller directory posted on a Google Website) that identify Seller as a seller that has implemented the Service.

5.3 **Brand Feature Rights**. Each party retains all right, title and interest, including without limitation all Intellectual Property Rights, relating to its Brand Features. Except as expressly provided in this Agreement, neither party acquires any right, title or interest in any Brand Features of the other party, and any rights not expressly granted are deemed withheld. All use by GPC of Seller Brand Features (including any associated goodwill) will inure to the benefit of Seller, and all use by Seller of GPC Brand Features (including any associated goodwill) will inure to the benefit of GPC. While this Agreement remains in effect and upon request, each party agrees to furnish the other party with samples of the usage of the other party's Brand Features as contemplated by this Section 5 to enable the other party to monitor and ensure that the usage is consistent with the other party's quality control requirements. While this Agreement remains in effect, Seller agrees not to challenge or assist others to challenge the GPC Brand Features (except to protect Seller's rights to its own Brand Features) and not to register any Brand Features or domain names that are confusingly similar to those of GPC.

## SECTION 6. SERVICE FEES AND PAYMENT TERMS

6.1 **Service Fees**. Subject to Section 12, the transaction processing and other fees for the Service will be as set forth on the Fee Schedule (the **"Service Fees"**). GPC reserves the right to earn interest and/or other compensation from its service provider banks or others arising from the processing of Payment Transactions that have not settled to Seller.

GOOG-00001278

6.2 **Payment Terms**. GPC will hold amounts due and payable to Seller (subject to adjustments as described in Section 6.3) separate from GPC's general corporate funds and will not use the amounts for GPC's corporate operating expenses. Subject to Section 12, unless otherwise mutually agreed upon by the parties, GPC will use commercially reasonable efforts to electronically transfer funds to Seller's Settlement Account before the end of the second business day (excluding bank holidays) after the day that Payment Transactions are submitted for capture by Seller. Notwithstanding the foregoing, GPC will not be obligated to settle funds to Seller (i) for any Payment Transaction for which GPC has not received full settlement in final available funds if Seller does not capture funds during an authorization hold period indicated in the Program Policies or (ii) if Seller's earned balance at the time of disbursement or transfer is less than one dollar.

6.3 **Payment Adjustments**. Seller acknowledges that Buyers may retain a chargeback right pursuant to card association and network rules and/or their agreement with the holder of the Payment Account (including a Carrier), and GPC will have the right (but not the obligation) to pass chargebacks to Seller if the particular transactions are not covered by the Payment Guarantee Policy. As to particular Payment Transactions, GPC may withhold payments or reverse previous payments if (i) a Buyer makes a claim to GPC for a refund or other reversal or (ii) GPC believes that the Payment Transactions are invalid, involve misconduct or fraud (such as fraudulent use of a payment instrument), or otherwise violate applicable law, this Agreement, or the Policies. Seller agrees to cooperate with GPC and to provide any information that may be reasonably requested by GPC in its investigation of any of the foregoing circumstances. GPC may offset any payment obligation that GPC may have to Seller under this Agreement against (i) Service Fees owed by Seller, (ii) amounts overpaid to Seller due to a later reversal, refund, chargeback or other adjustment to prior Payment Transactions, and (iii) any other amounts owed by Seller to GPC under this Agreement or any other agreement. In the event that Seller incurs a negative balance (i.e. due to negative adjustments exceeding the settlement proceeds for a particular period), GPC may debit the Settlement Account for the amount of the negative balance. Furthermore, GPC may choose to invoice Seller for any amounts owed by Seller under this Agreement which will be immediately due and payable.

6.4 **Reserve**. GPC reserves the right to withhold a portion of the proceeds that are payable to Seller with respect to the processing of Payment Transactions (a **"Reserve"**) to help ensure that sufficient funds are available to GPC in the event of chargebacks, reversals and other liabilities related to Seller's use of the Service. Circumstances where GPC may impose a Reserve include, but are not limited to: (a) adverse changes in Seller's financial condition or its payment record with creditors; (b) excessive rate of chargebacks, reversals, or Buyer support issues; or (c) significant changes in the nature of Seller's business or product lines. GPC is not responsible for any losses sustained by Seller as a result of the imposition of a Reserve.

6.5 **Refunds and Adjustments**. Seller will disclose its return/cancellation policy on the Seller Website. If Seller allows returns, cancellations or price adjustments in connection with a Payment Transaction, Seller will initiate a credit to the Buyer using the refund function of the Service within three (3) days of receiving the Buyer's request. Refunds cannot exceed the total amount of the Payment Transaction. Seller agrees not to accept cash or any other consideration from a Buyer in exchange for issuing a refund to a Buyer. Seller agrees not to give cash refunds to a Buyer in connection with a Product paid for with the Service unless required by law. If Seller provides a refund through a means other than through the Service, Seller remains responsible if the Payment Transaction results in a chargeback through the Service. Seller acknowledges that even if Seller's return/cancellation policy prohibits returns or cancellations, Seller may still receive

chargebacks relating to the transactions. GPC may reject or delay a refund request from Seller through the Service if GPC is unable to obtain sufficient funds from Seller to fund the refund.

6.6 **Taxes and Other Charges**. Seller will pay any applicable taxes, including sales, use, personal property, value-added, excise, customs fees, import duties or stamp duties or other taxes and duties imposed by governmental entities of whatever kind and imposed with respect to the transactions under this Agreement, including penalties and interest, but specifically excluding taxes based upon GPC's net income. For purposes of clarification, GPC is not responsible for, and is not the entity collecting sales or income or other taxes with respect to Payment Transactions. When GPC has the legal obligation to collect any applicable taxes, the appropriate amount will be invoiced to and paid by Seller net thirty (30) days from the date of invoice or other notification. Seller will promptly provide GPC with documentation as may be required by the applicable governmental entity in order for GPC to process payments hereunder (including, without limitation, a valid certificate of Seller's exemption from obligation to pay taxes as authorized by the appropriate governmental entity), and GPC may withhold any payments required to be made hereunder until Seller has provided the documentation. Seller acknowledges that, beginning in 2011, GPC will report to the Internal Revenue Service the gross annual sales made by Seller through GPC in any calendar year where Seller both (i) receives aggregate payments exceeding $20,000, and (ii) has more than 200 transactions. Seller will promptly provide GPC with original or certified copies of all tax payments or other sufficient evidence of tax payments at the time the payments are made by Seller pursuant to the Agreement.

## SECTION 7. CONFIDENTIALITY AND PROPRIETARY RIGHTS

7.1 **Confidentiality**. Seller will hold confidential and will not use any Buyer information obtained through the Service, except for uses expressly permitted by the Program Policies. Seller acknowledges that Buyer information received by GPC in connection with the Service is subject to the Service Privacy Policy. Seller will not disclose or cause to be disclosed any GPC Confidential Information without GPC's prior written consent, except to those employees, agents, representatives, or contractors of Seller who require access to GPC Confidential Information to perform under this Agreement ("**Authorized Personnel**") and who are bound by a written agreement not to disclose third party confidential information. Seller agrees that Seller is responsible for any act and/or omission of any Authorized Personnel in breach of this paragraph. Seller agrees to use the same degree of care, but no less than a reasonable degree of care, as Seller uses with respect to its own information of a similar nature to protect the GPC Confidential Information and to prevent communication of GPC Confidential Information to any unauthorized third parties. "**GPC Confidential Information**" includes without limitation: (a) all GPC software, technology, programming, specifications, materials, guidelines and documentation relating to the Service; (b) any information provided pursuant to this Agreement, including, without limitation, tangible, intangible, visual, electronic, present, or future information such as: (i) trade secrets; (ii) financial information, including pricing; (iii) technical information, including research, development, procedures, algorithms, data, designs, and know-how; and (iv) business information, including operations, planning, marketing and promotion plans, and products; and (c) any other information designated in writing by GPC or Google as "Confidential" or an equivalent designation. This Agreement imposes no obligation upon Seller with respect to GPC Confidential Information that: (a) was known to Seller before receipt from GPC or Google; (b) is or becomes publicly available through no fault of Seller; (c) is rightfully received by Seller from a third party without a duty of confidentiality; or (d) is independently developed by Seller without a breach of this Agreement. If GPC Confidential Information is required to be produced by law, court order, or other governmental demand ("**Process**"), Seller must immediately notify GPC of that obligation. Seller will not produce or disclose GPC

Confidential Information in response to the Process unless GPC has (i) requested protection from the court or other legal or governmental authority requiring the Process and the request has been denied, or (ii) consented in writing to the production or disclosure of the GPC Confidential Information in response to the Process. Upon GPC's written request, Seller will promptly return all GPC Confidential Information, together with all copies, or certify in writing that all GPC Confidential Information and copies have been destroyed.

7.2 **Username, Password, and Merchant Key**. Seller will be responsible for maintaining the confidentiality of its Service username/password and merchant key (as described in the Integration Guidelines). Seller is responsible for all Service activity by persons that use the username/password and merchant key, including any consequences of the use or misuse of the username/password and merchant key. Seller agrees to notify GPC immediately of any unauthorized use of its username/password or merchant key or any other breach of security regarding the Service of which Seller has knowledge. Seller agrees that all officers, employees, agents, representatives and others having access to the Service username/password and merchant key will be vested by Seller with the authority to use the Service and legally bind Seller.

7.3 **Proprietary Rights**. GPC and its licensors retain all right, title and interest, including without limitation all Intellectual Property Rights relating to the Service (and any derivative works or enhancements thereof), including but not limited to, all software, technology, information, content, materials, guidelines, and documentation. Seller does not acquire any right, title, or interest therein, except for the limited use rights expressly set forth in the Agreement. Any rights not expressly granted in this Agreement are deemed withheld. Seller agrees not modify, adapt, translate, prepare derivative works from, decompile, reverse engineer, disassemble or otherwise attempt to derive source code from the Service.

## SECTION 8. WARRANTIES; DISCLAIMER OF WARRANTIES

8.1 **Representations and Warranties**. Seller represents and warrants that (a) if an individual, Seller is at least 18 years old, (b) if a business entity, Seller is duly authorized to do business in the United States, (c) Seller is capable of and has full power and authority to enter into the Agreement and this Agreement will constitute the valid and binding obligations of Seller, (d) Seller is a resident of the United States, (e) Seller owns and controls the Seller Websites and otherwise has and will maintain all rights, authorizations and licenses that are required to permit Seller to use the Service on the Seller Websites; (f) Seller's execution of this Agreement and use of the Service does not violate any other agreement to which Seller or its affiliates are subject; and (g) Seller will comply with all applicable laws, regulations and ordinances in connection with Seller's use of the Service.

8.2 **DISCLAIMER OF WARRANTIES**. THE SERVICE (INCLUDING ALL CONTENT, SOFTWARE, DATA TRANSMISSION, FUNCTIONS, MATERIALS AND INFORMATION PROVIDED IN CONNECTION WITH OR ACCESSIBLE THROUGH THE SERVICE) IS PROVIDED "AS IS" AND WITHOUT WARRANTY. GPC AND ITS AFFILIATES AND AGENTS DISCLAIM ALL WARRANTIES (WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE), INCLUDING WITHOUT LIMITATION WARRANTIES OF NONINFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. GPC does not warrant that the OPERATION OF the Service will be uninterrupted or error free. GPC WILL not be responsible for any service interruptions, including, but not limited to, power outages, system

GOOG-00001281

failures or other interruptions that may affect the receipt, processing, acceptance, completion or settlement of Payment Transactions or the Service.

## SECTION 9. LIMITATION OF LIABILITY AND INDEMNIFICATION

9.1 **LIMITATION OF LIABILITY**. GPC (INCLUDING ITS AFFILIATES AND AGENTS) WILL NOT BE LIABLE TO SELLER FOR ANY INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO DAMAGES FOR LOST PROFITS, LOST REVENUE, LOSS OF GOODWILL, OR PROCUREMENT OF SUBSTITUTE SERVICES, HOWEVER CAUSED AND REGARDLESS OF THE TYPE OF CLAIM OR THE NATURE OF THE CAUSE OF ACTION, EVEN IF GPC HAS BEEN ADVISED OF THE POSSIBILITY OF DAMAGE OR LOSS. IN NO EVENT WILL GPC'S LIABILITY ARISING OUT OF THIS AGREEMENT AND THE SERVICE (WHEN AGGREGATED WITH GPC'S LIABILITY FOR ALL OTHER CLAIMS ARISING OUT OF THIS AGREEMENT AND THE SERVICE) EXCEED THE NET FEES THAT GPC HAS RECEIVED AND RETAINED UNDER THIS AGREEMENT DURING THE THREE (3) MONTHS IMMEDIATELY PRECEDING THE DATE ON WHICH THE CLAIM ARISES. THE FOREGOING LIMITATIONS WILL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. Each party acknowledges that the other party has entered into this Agreement relying on the limitations of liability stated in this paragraph and that these limitations are an essential basis of the bargain between the parties.

9.2 **Seller Indemnification**. Seller will indemnify, defend and hold the GPC Indemnified Parties harmless from and against any and all third party claims, liability, loss, and expense (including damage awards, settlement amounts, and reasonable legal fees) brought against any of the GPC Indemnified Parties, arising out of or related to (i) the Seller Websites, (ii) Seller Brand Features; (iii) Seller's use of the Service; and/or (iv) any breach of or non-compliance with this Agreement or the Policies by Seller. "**GPC Indemnified Parties**" include (i) GPC, Google, and their subsidiaries and affiliates and (ii) officers, directors, agents, employees, information providers, licensors, licensees, consultants, contractors and other applicable third parties (including without limitation Paymentech, L.P.) of GPC, Google, and their subsidiaries and affiliates. GPC may join in defense with counsel of its choice at its own expense

## SECTION 10. TERMINATION

10.1 **By Seller**. Seller may terminate this Agreement or Seller's use of the Service at any time upon providing prior written notice to GPC or as otherwise permitted by GPC.

10.2 **By GPC**. GPC may terminate, limit or suspend this Agreement or Seller's use of the Service at any time for any reason and without liability to Seller, including without limitation (i) inactivity, (ii) violation of this Agreement or the Policies, or (iii) if Seller's use of the Service, in GPC's reasonable discretion, creates a risk of financial harm or loss of goodwill to GPC or any of the payment card systems used for processing Payment Transactions.

10.3 **Effect of Termination**. Sections 1, 4, 5.3, 6.3, 6.5, 6.6, 7.1, 7.3, 8, 9, 10.3, and 11 will survive any termination or expiration of this Agreement. Notwithstanding the payment terms described in Section 6.2 (Payment Terms), upon the expiration or termination of this Agreement or other cessation of Seller's use of the Service, GPC may withhold funds to cover GPC's expectation of potential chargeback exposure for up

to one hundred eighty (180) days. Seller will remain liable for chargebacks and any other obligations incurred by Seller after the expiration or termination of this Agreement. Following the expiration or termination of this Agreement, GPC may disable Seller's access to the Service.

## SECTION 11. GENERAL

11.1 **Notice to GPC**. Except as otherwise specified in the Agreement, all notices given under this Agreement by Seller to GPC will be in English and in writing to Google Payment Corp., 1600 Amphitheatre Parkway, Mountain View, CA 94043, with a copy to Attn: Legal Department at the same address. Notice to GPC will be deemed given upon receipt when delivered personally, upon written verification of receipt from overnight courier, or upon verification of receipt of registered or certified mail.

11.2 **Notice to Seller**. GPC may communicate with Seller regarding the Service by means of electronic communications, including (i) sending electronic mail to the email address Seller provided to GPC during registration or (ii) posting of notices or communications within the Service console or on a Google Website. GPC and Seller agree that GPC may communicate by means of electronic communications the following types and categories of communications and records: this Agreement (and revisions or amendments), notices or disclosures regarding the Service, payment authorizations, and any other matter relating to Seller's use of the Service. Seller is responsible for providing its own hardware, software and electronic access to the Internet in order to use the Service and access the electronic communications. Seller should maintain copies of electronic communications by printing a paper copy or saving an electronic copy on Seller's computer. Electronic communications will be deemed received by Seller when GPC sends the electronic communication to the email address of Seller provided at the time of registration or as revised by Seller thereafter in accordance with this Agreement or when GPC posts the electronic communication within the Service console or on a Google Website. For those categories of communications or records that GPC is otherwise required under applicable law to provide in a written paper form to Seller, GPC and Seller agree that GPC may provide the communications or records to Seller by means of electronic communications. The following additional terms will apply to electronic communications: (a) Seller may contact GPC here to request another electronic copy of the electronic communication without a fee; (b) Seller may request a paper copy of an electronic communication, and GPC reserves the right to charge Seller a fee to provide a paper copy; (c) Seller may contact GPC through the Service contact page to update Seller's registration information (such as email address) used for electronic communications or to withdraw consent to receive electronic communications; and (d) GPC reserves the right to terminate Seller's use of the Service if Seller declines or withdraws consent to receive electronic communications from GPC.

11.3 **Governing Law; Venue**. The laws of California, excluding California's choice of law rules, and applicable federal United States laws will govern this Agreement. The exclusive venue for any dispute related to this Agreement will be the state or federal courts located in Santa Clara County, California, and each party consents to personal jurisdiction in these courts. The parties specifically exclude from application to this Agreement the United Nations Convention on Contracts for the International Sale of Goods and the Uniform Computer Information Transactions Act.

11.4 **Entire Agreement; Modification**. This Agreement constitutes the entire agreement between the parties with respect to the subject matter. This Agreement supersedes any other prior or collateral agreements, whether oral or written, with respect to the subject matter. The Agreement will be binding on

GOOG-00001283

and inure to the benefit of each of the parties and their permitted successors and assigns. GPC will have the right, at its sole and absolute discretion, to change, modify, or amend any portion of this Agreement at any time by posting notification on a Google Website or otherwise communicating the notification to Seller. The changes will become effective, and will be deemed accepted by Seller, after the initial posting by GPC or the sending by GPC of notification to Seller and will apply on a going-forward basis with respect to Payment Transactions initiated after the posting or sending date. In the event that Seller does not agree with the modification, Seller must terminate its use of the Service, which will be Seller's sole and exclusive remedy.

11.5 **Assignment**. Seller may not assign (including by way of merger, sale of stock, or sale of assets) this Agreement or any rights or obligations under this Agreement without the prior written consent of GPC. Any attempt by Seller to make an assignment or transfer in violation of this paragraph will be void and without effect. GPC may assign this Agreement or any rights or obligations under this Agreement to Google or subsidiary of Google.

11.6 **Force Majeure**. Neither party will be liable for failing or delaying performance of its obligations (except for the payment of money) resulting from any condition beyond its reasonable control, including but not limited to, governmental action, acts of terrorism, earthquake, fire, flood or other acts of God, labor conditions, power failures, and Internet disturbances.

11.7 **Other Provisions**. The failure of GPC to exercise or enforce any right or provision of the Agreement will not constitute a waiver of the right or provision. Headings are for reference purposes only and will not be used for interpretation of this Agreement. Unless otherwise expressly stated, all amounts stated in this Agreement are denominated in United States dollars. The Policies and URLs referenced in this Agreement are incorporated by reference and may be updated by GPC from time to time. The parties are and will remain independent contractors and nothing in this Agreement will be deemed to create any agency, partnership, or joint venture relationship between the parties. Neither party will be deemed to be an employee or legal representative of the other nor will either party have any right or authority to create any obligation on behalf of the other party. If any provision of this Agreement is adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement will otherwise remain in full force and effect and remain enforceable between the parties. This Agreement is not intended and will not be construed to create any rights or remedies in any parties other than Seller and GPC and no other person may assert any rights as a third party beneficiary; provided, that Google will be a third party beneficiary; provided, further that the GPC Indemnified Parties will be a third party beneficiary of the Seller indemnity in Section 9; provided, further that Paymentech, L.P will be a third party beneficiary of the agreement in **Exhibit A** and the Seller indemnity in Section 9.

## SECTION 12. SPECIAL TERMS FOR ANDROID MARKETPLACE AND OTHER GOOGLE MARKETPLACES AND GOOGLE IN-APP PAYMENTS

This Section 12 only applies to Sellers that use the Service on Android Marketplace or one or more other Google marketplaces (each a **"Google Marketplace"**), including use of the Service to process in-application payments (**"Google In-App Payments"**) related to a Google Marketplace, except that Section 12.3 will also apply to Sellers that use the Service to process Google In-App Payments not related to a Google Marketplace.

12.1 **Android Marketplace and other Google Marketplaces.** Notwithstanding the first sentence of Section 3.1, Seller may use the Service to process transactions on a Google Marketplace. To use the Service on a Google Marketplace, a Seller must separately agree to the terms of service applicable to such Google Marketplace (the **"Google Marketplace TOS"**) and have the Seller's Service account linked to the Seller's account for that Google Marketplace. In the event of any conflict between this Agreement and the applicable Google Marketplace TOS, the terms of the applicable Google Marketplace TOS will control.

12.2 **Service Fees; Payment Guarantee Policy.** For transactions conducted through a Google Marketplace, Seller will be charged: i) Service Fees payable to GPC; or ii) a revenue share payable to the Google Marketplace, as set forth in the applicable Google Marketplace TOS.. Any fee discounts or fee waivers that are being offered by GPC for the Service do not apply to the revenue share specified in the applicable Google Marketplace TOS. The Payment Guarantee Policy does not apply to transactions conducted through a Google Marketplace.

12.3 **Payment Terms; Monthly Payment Schedule Beginning February 1, 2011.** Notwithstanding the payment schedule described in Section 6.2, if the Sellers Service account is linked to any Google Marketplace pursuant to this Section 12, or if the Seller uses the Service to process Google In-App Payments, GPC will for any Payment Transaction occurring on or after February 1, 2011, use commercially reasonable efforts to electronically transfer funds for Payment Transactions submitted for capture by Seller within a calendar month to Seller's Settlement Account before close of business on the 15th day of the following calendar month. The monthly payment schedule described in the foregoing sentence will apply to all of Sellers Payment Transactions, whether or not they are conducted through a Google Marketplace or for Google In-App Payments. At GPCs option, and with no prior notice to Seller, funds may be transferred to Sellers Settlement Account more frequently than monthly.

12.4. **Bank Fees.** Seller agrees to pay all fees, including any applicable currency conversion fees, associated with the conversion of funds and the processing of the ACH to the Settlement Account. Seller acknowledges and agrees that Seller bears all risk of loss arising from any changes in the currency exchange rates between the time Payment Transactions are processed and the time that settlement funds are sent by ACH to the Settlement Account. Banks that process the ACH to the Settlement Account also may impose fees and charges related to processing of the ACH and related currency conversion, and the Seller is solely responsible for all such fees and charges.

12.5 **Buyer Currency.** A Google Marketplace may permit Seller to list purchase prices for Seller's Products, and a Buyer to purchase Seller's Products, in a currency different from that of the Seller's Settlement Account ("Buyer Currency Purchase Transaction"). For any Buyer Currency Purchase Transaction, Seller will be paid by GPC in the currency of Seller's Settlement Account, based on an exchange rate that will be applied to the purchase amount (denominated in Buyer Currency) at the time the Payment Transaction is submitted to GPC for processing by Seller. The exchange rate will be determined by a financial institution utilized by GPC to calculate exchange rates, and may be adjusted based on market conditions without notice to Seller. If a Buyer Currency Purchase Transaction is subsequently subject to refund, reversal, chargeback or other adjustment, GPC will apply the same exchange rate and currency that applied to the original Buyer Currency Purchase Transaction in calculating the obligation of the Seller for the refund, reversal, chargeback or other adjustment. GPC reserves the right to impose fees on this currency conversion.

## Exhibit A

### Three Party Agreement between Seller, GPC, and Paymentech, L.P.

This Exhibit A applies to Seller if Seller uses the Service to engage in aggregate payment card transaction amounts of five thousand dollars ($5,000) or more in gross merchandise volume (GMV) for three consecutive months. This Exhibit contains terms required by the groups of Card issuer banks or debit networks that facilitate the use of payment cards (**"Associations"**). These terms form a three-party agreement between Seller, GPC, and Paymentech, L.P. (**"Paymentech"**), the service provider with which GPC has entered into a separate agreement to assist GPC in processing Seller's Payment Transactions involving payment cards.

### Definitions

- Seller agrees to comply with all Association Rules, as may be applicable and in effect from time to time. Seller understands that GPC or Paymentech may be required to modify this Exhibit A in order to comply with requirements imposed by the Association Rules.
- Association Rules are the bylaws, rules, and regulations, as they exist from time to time, of the Associations.
- Card is both the plastic card or other evidence of the account and the account number, issued by a Card issuer or a debit network to the Cardholder, either of which are accepted for the purpose of paying Seller, and which will be processed under this Seller Payment Terms of Service.
- Cardholder is the person to whom the Card is issued and who is entitled to use the Card.
- Retrieval Request is a request for information by a Cardholder or Card issuer relating to a claim or complaint concerning a Card sale Seller has made.
- Sales Data is the evidence and/or electronic record of a Payment Transaction representing payment by use of a Card or of a refund/credit to a Cardholder.

### Seller Acceptance of Cards

- Seller agrees to comply with all Association Rules, as may be applicable and in effect from time to time. Seller understands that GPC or Paymentech may be required to modify this Exhibit A in order to comply with requirements imposed by the Association Rules.
- The Association Rules require that each Sales Data Seller tenders to GPC for processing comply with the following conditions: (1) The Sales Data represents payment or refund of payment, for the bona fide sale or lease of the goods, services or both, which Seller has provided in the ordinary course of its business; (2) The Sales Data does not involve any element of credit for any purpose other than payment for a current transaction (including payment of a previously-dishonored check) and, except in the case of approved installment or pre-payment plans, the goods have been shipped or services actually rendered to the Cardholder; (3) To Seller's knowledge, the Sales Data is free from any material alteration not authorized by the Cardholder; and (4) Seller has not advanced any cash to the Cardholder in connection with the Card transaction, nor has Seller accepted payment for effecting credits to a Cardholder's account.

### Refunds and Adjustments

- The Card Associations require Seller to maintain a fair policy with regard to the return/cancellation of

merchandise or services and adjustment of Card sales. Seller must also disclose its return/cancellation policy to Seller's customers.
- If Seller allows a price adjustment, return of merchandise or cancellation of services in connection with a Card sale, Seller must prepare and deliver to GPC Sales Data reflecting the refund or adjustment within 3 days of receiving the customer's request for the refund/adjustment.
- The amount of the refund/adjustment cannot exceed the amount shown as the total on the original Sales Data except by the exact amount required to reimburse the Cardholder for postage that the Cardholder paid to return merchandise. Seller is not allowed to accept cash or any other payment or consideration from a customer in return for preparing a refund to be deposited to the Cardholder's account nor to give cash refunds to a Cardholder in connection with a Card sale, unless required by law.
- If Seller's refund policy prohibits returns under certain circumstances, Seller may still receive a chargeback relating to the sales pursuant to the Association rules.

## Retrieval Requests

- The Associations require Seller to store original documentation of each transaction for at least six months from the date of the respective transaction, and to retain copies of all the data for at least 18 months from the date of the respective transaction. The Associations do not allow Seller to charge a fee for the creation or storage of the copies.

## Data Security and Privacy

- Seller must exercise reasonable care to prevent disclosure of Card information, other than to Seller's agents and contractors for the purpose of assisting Seller in completing a Card transaction, or to the applicable Association, or as specifically required by law. Association Rules require Seller to comply with all security standards and guidelines that may be published from time to time by Visa, MasterCard or any other Association, including, without limitation, the Visa U.S.A. Cardholder Information Security Program (collectively, the "Security Guidelines"). Seller understands and agrees that failure to comply with the Payment Card Industry Data Security Standard requirements and other Security Guidelines may result in fines and/or penalties being levied against Seller or against GPC or Paymentech because of Seller's actions by the Associations. If this occurs Seller agrees to reimburse GPC or Paymentech immediately for any fine or penalty imposed due to violation of the Security Guidelines.
- The Association Rules provide that Cardholder information and transaction data is owned by the Associations, the Card issuer and the Cardholder.

**Conditionally Filed Under Seal**

Exhibit 13

Exhibit 13

Conditionally Filed Under Seal

Exhibit 14

Exhibit 14

Conditionally Filed Under Seal

Exhibit 15

Exhibit 15

**Conditionally Filed Under Seal**

Exhibit 16

Exhibit 16

**Conditionally Filed Under Seal**

Exhibit 17

Exhibit 17

**Publicly Filed**

Exhibit 18

Exhibit 18

 Commerce Blog

The official blog for the latest news from Google Commerce

# An update to Google Checkout for merchants
==5/20/13==

==Today, we're letting web merchants know that in six months, Google Checkout will be retired as we transition to Google Wallet== — a platform that enables merchants to meet the demands of a multi-screen world where consumers shop in-stores, at their desks and on their mobile devices.

Just last week, we announced two enhancements to the Google Wallet platform that are simple to integrate. The Instant Buy API enables merchants to offer a fast buying experience to Google Wallet shoppers buying physical goods and services on their Android apps and websites, while processing their own payments. In addition, the new Wallet Objects API enables merchants to engage their customers with loyalty, offers, and more.

All Google Play developers will continue to be supported. Also, shoppers can continue to use Google Wallet to make safer and more secure payments anywhere they see the Google Wallet button.

## What this means for Checkout merchants

GOOGHANSSENS-00000259

Merchants can continue to accept payments using Google Checkout until November 20, 2013.

- If you don't have your own payment processing, you will need to transition to a different solution within six months. To make things easier, we've partnered with Braintree, Shopify and Freshbooks to offer you discounted migration options.
- If you are a U.S. merchant that does have payment processing, you can apply for Google Wallet Instant Buy, which offers a fast buying experience to Google Wallet shoppers.

We invite merchants to join us for a live webinar on May 23, 2013 at 10AM PST to learn more. Or, you can visit the Help Center for more details.

**What this means for Google Play developers**

Developers selling through other Google properties (such as Google Play, Chrome Web Store and Offers Marketplace) will continue to be supported and will automatically transition to the Google Wallet Merchant Center in the next few weeks.

**What this means for shoppers**

Shoppers can continue to use Google Wallet to make purchases on merchant apps and sites (such as Priceline, Uber, and Rue La La), as well as on Google properties, such as Google Play and Chrome Web Store. Just look for the Google Wallet button to make safer and more secure payments.

Finally, we'd like to thank our merchant partners that have used Google Checkout and we look forward to helping many more businesses grow with Google Wallet.

*Posted by Justin Lawyer, Senior Product Manager, Google Wallet*

GOOGHANSSENS-00000260

  

**No comments :**

**Post a Comment**







Google · Privacy · Terms

GOOGHANSSENS-00000261

**Publicly Filed**

Exhibit 19

Exhibit 19

# Thank you.

You've made a purchase from YCdroid on Google Play.

Order number: 12999763169054705758.1360217457185535
Order date: May 6, 2013 10:33:00 AM CDT
Payment method: DISCOVER xxx-████

| Item | Price |
|------|-------|
| SMS MMS to Email | $1.77 |

Tax: $0.00
Total: $1.77

Questions? Contact YCdroid.

Also popular with SMS MMS to Email users

Email My Texts
ZLE SOFTWARE APPS

SMS2Mail
BOBBY GALATI

See your Google Play Order History.
View the Google Play Refund Policy and the Terms of Service.

Need help? Visit the Google Play help center.
Please do not reply to this message.



EXHIBIT ___5___
NAME: Svenson
DATE: 9-25-15 cc

© 2013 Google | All Rights Reserved.
Google, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA



**Publicly Filed**

Exhibit 20

Exhibit 20



**New Google Account features**
Get more transparency and control
LATER
LEARN MORE

Google Play
Search

Apps
Categories | Home | Top Charts | New Releases

My apps
Shop

Games
Family
Editors' Choice

Account
My Play activity
My wishlist
Redeem
Send gift
Add credit
Parent Guide

# SMS MMS to Email

**YCdroid** **Productivity** ★★★★☆ 52

**Everyone**

You don't have any devices

Add to Wishlist | $1.70 Buy

Select one of your SMS conversations or one of your MMS attachments and send it via email.

There is free trial version which you can download and use for one day. Please use the trial version first to make sure that the app works on your phone without any problems.

use this simple application to backup your text threads, save your MMS attachments or forward your

READ MORE

## REVIEWS

3.9
★★★★☆
52 total

| Stars | Count |
|---|---|
| 5 | 30 |
| 4 | 7 |
| 3 | 3 |
| 2 | 5 |
| 1 | 7 |

Helpfulness | All Versions

## User reviews

 **A Google User** August 7, 2013
★★★★★

**Exactly what I wanted** Extremely easy-to-use and provides well formatted emails containing two-way text conversations, all for a fair price. I have no idea why some reviewers found it hard to use, but I note they were reviewing an older version.

 **Joe Kincaid** July 17, 2015
★★★★★

**Not working as described** Upgraded from free version. Long messages that are automatically converted to mms are not included in thread. They need to be sent separately. Making the thread hard to follow when reading. Now it doesn't work at all. Asks me to select message type then thread and then goes back to select message type again. Very disappointed.

 **Mike Schleter** March 29, 2014
★★★★★

**Exactly as promised, easy text forwarding to email!** I upgraded to full version after trial worked perfectly. Others I tried were unusable. Whole text chain from a number to my email in 30 seconds!

 **Jacque Frias** January 4, 2014
★★★★★

**Galaxy s3** Excellent app. I had downloaded some free apps, but my texts were always all jumbled up when I tried to print them. Used the free version of this one and it was flawless! Thank you!



---

## WHAT'S NEW

fixed issue with SMS threads and contacts with two or more numbers

---

## ADDITIONAL INFORMATION

| | | |
|---|---|---|
| **Updated** | **Size** | **Installs** |
| October 11, 2013 | 92k | 1,000 - 5,000 |
| **Current Version** | **Requires Android** | **Content Rating** |
| 1.5 | 2.1 and up | Everyone |
| | | Learn more |
| **Permissions** | **Report** | **Offered By** |
| View details | Flag as inappropriate | YCdroid |

**Developer**
Email panagra6@gmail.com
106A Fox Lane
Palmers Green
LONDON, UK N13 4AH
United Kingdom

 60

## Similar

See more

   

 **Kim Musser** April 15, 2014
★★★★★

**So Simple It's Almost Stupid** I downloaded the free trial, transferred one set of text messages to my email and immediately bought this app. Super easy and no problems at all. Full version is really cheap so it was a no-brainer. Doesn't send pictures but that's not a big deal. Love it!

 **Troy Dunbar** November 18, 2014
★★☆☆☆

**App support is lacking** App initially worked like a dream but after a few months, app no longer updated to show new text & continued to show deleted text. I emailed support for help & never received a response.

 **Melody Angry** September 11, 2014
★★★★★

**Awesome!!!!** It took me a minute to figure it all out but finally I did and bought the app right away. Works beyond well keeping the texts in order and labeled with sender info, time and date. Perfect for anyone who needed to have their text messages for proof of anything. This saved me in many ways. Thank you *\(^_^)/*



**Surya Switchgear** August 15, 2014
★★☆☆☆

Trial found ok but now I purchased it shows some error pl help error 491

 **Shannon Ryan** April 17, 2014
★★★★★

**YAAAAY!!!!!! Brilliant** Finally after two days I came across you app. It done exactly what was needed on my S3. Keep up the good work, where most others in your field fail!

---

## WHAT'S NEW

fixed issue with SMS threads and contacts with two or more numbers

---

## ADDITIONAL INFORMATION

| | | |
|---|---|---|
| **Updated** | **Size** | **Installs** |
| October 11, 2013 | 92k | 1,000 - 5,000 |
| **Current Version** | **Requires Android** | **Content Rating** |
| 1.5 | 2.1 and up | Everyone |
| | | Learn more |
| **Permissions** | **Report** | **Offered By** |
| View details | Flag as inappropriate | YCdroid |

**Developer**
Email panagra6@gmail.com
106A Fox Lane
Palmers Green
LONDON, UK N13 4AH
United Kingdom



---

Similar                                    [ See more ]

   

 **Nicole Roberts** February 2, 2014
★★★★★

Awesome...easy! This app is
awesome! I'm not tech savvy at all so I
needed something very simple to use.
This app is great, I love it:) First I
downloaded the one day trial version,
but within 20 minutes I upgraded to
the full version! Soooo worth the
$1.70:)

 A Google User February 4, 2014
★☆☆☆☆

Missing long texts so is worthless I
have a very important conversation
that I needed. I could not figure out
why some texts were missing and
these were the ones i had to have. It
turns out that these long texts were
MMS and they are not included in the
conversation. I also do not see all my
threads: What is up with that?

 **David Hickman** November 3, 2014
★★★★★

Baby momma dramma I love this app
I used it for sending all the texts that
my ex wife sent me to my lawyer.
Great program!

 **Jamie O** May 15, 2015
★★★★☆

Needs update It's what I was looking
for, to send texts to my email.
However, I have some texts locked to
keep, and when I send texts to email, it
sends the same ones all over again, in
addition to the new ones. I REALLY
need the ability to choose individual
texts as well as all!! Also, a nice fresh
look would be nice, a polish, cause it
looks so generic now. Vibrant blue
colors? Light tan? Light purple?



## WHAT'S NEW

fixed issue with SMS threads and contacts with two or more numbers

## ADDITIONAL INFORMATION

| Updated | Size | Installs |
|---|---|---|
| October 11, 2013 | 92k | 1,000 - 5,000 |

| Current Version | Requires Android | Content Rating |
|---|---|---|
| 1.5 | 2.1 and up | Everyone |
| | | Learn more |

| Permissions | Report | Offered By |
|---|---|---|
| View details | Flag as inappropriate | YCdroid |

**Developer**
Email panagra6@gmail.com
106A Fox Lane
Palmers Green
LONDON, UK N13 4AH
United Kingdom

 G+1 60

Similar                                                                                    See more






 **john smith** March 30, 2016
★★★★★

**Great app** One the most useful apps I've found.

 **Robin White** August 8, 2013
★★★★★

**Great app!** Easy to use and very fast.

 **Marilisa Rau** July 5, 2014
★★★★★

**It works!** It took me an hour but I got it.

 **Joanne Willems** August 27, 2013
★★★★★

**Well worth the cost.** Love this and have gotten my money worth in a short time. This is by far the Best app ever!!!!!!

 **Jim Towslee** November 23, 2014
★★★★★

SMS to Email Great

 **TOBI WILLIAMS** October 29, 2014
★☆☆☆☆

Thread not working

 **A Google User** November 24, 2012
★★☆☆☆

on Motorola Droid 3 Poor instructions on how to use it. The incoming text messages show the correct time sent to my phone, but when it shows up on the email where I sent the stream of text, the time shows completely differently. Not useful for documenting for court purposes. Does not grab the MMS messages and keep them in the text stream. I had to choose each one individually and send it to my email, but then it doesn't show the phone number, date and time where the text came from. Again, for documenting harassment, this doesn't help me in court.

## WHAT'S NEW

fixed issue with SMS threads and contacts with two or more numbers

## ADDITIONAL INFORMATION

| | | |
|---|---|---|
| **Updated** | **Size** | **Installs** |
| October 11, 2013 | 92k | 1,000 - 5,000 |
| **Current Version** | **Requires Android** | **Content Rating** |
| 1.5 | 2.1 and up | Everyone |
| | | Learn more |
| **Permissions** | **Report** | **Offered By** |
| View details | Flag as inappropriate | YCdroid |

**Developer**
Email panagra6@gmail.com
106A Fox Lane
Palmers Green
LONDON, UK N13 4AH
United Kingdom



## Similar

See more








**Anthony quattrucci** June 13, 2013

★ ☆ ☆ ☆ ☆

**Not as expland** It won't transfer all of the SMS to email from a single contact.. i changed the default amount...won't even open a contact with a lot of SMS.. this is a junk app! I WANT A REFUND NOW!!!



A Google User July 1, 2012

★ ★ ★ ★ ★

**Great App (Samsung Galaxxy )** I needed this app at least two phones ago. It does what it says and I like how it captures the entire thread from the text from both the sender and the receiver.



A Google User August 11, 2012

★ ★ ★ ★ ★

**Outstanding** I really needed all the text messages from my out of sorts wife to defend myself against false accusations. I was able to send the entire thread to my email in a perfect timelined format and print. Proving she is setting me up. Thank you very much.



**Shane Powell** October 8, 2014

★ ★ ★ ★ ★

**Slightly less easy than pouring liquid out of a boot.** Seriously! After copy and pasting individual text messages and the tedium that involves, I tried it. Wow!!! I couldn't send them my money fast enough! Its as simple as 1,2,3. Great app!

---

**WHAT'S NEW**

fixed issue with SMS threads and contacts with two or more numbers

---

**ADDITIONAL INFORMATION**

| | | |
|---|---|---|
| **Updated** October 11, 2013 | **Size** 92k | **Installs** 1,000 - 5,000 |
| **Current Version** 1.5 | **Requires Android** 2.1 and up | **Content Rating** Everyone Learn more |
| **Permissions** View details | **Report** Flag as inappropriate | **Offered By** YCdroid |

**Developer**
Email panagra6@gmail.com
106A Fox Lane
Palmers Green
LONDON, UK N13 4AH
United Kingdom

G+1 60

---

Similar

See more






| Email Extractor Lite | Email To Self | Email Widget | Email Manager |
|---|---|---|---|
| PPP Infotech | Intrications | invalidobject.com | Zenith Apps Pro |
| ★★★★★  $2.99 | ★★★★⯪  $0.99 | ★★★★★  $1.99 | ★★★★★  $0.99 |

More from developer                                    See more



| Fast Video Rotate T | Coin Miner Trial | SMS MMS to Email ` | Voice Full Screen Ca |
|---|---|---|---|
| YCdroid | YCdroid | YCdroid | YCdroid |
| ★★★⯪☆  FREE | ★★★☆☆  FREE | ★★★★☆  FREE | ★★★★☆  FREE |

©2016 Google    Site Terms of Service   Privacy Policy   Developers   Artists   About Google
By purchasing this item, you are transacting with Google Payments and agreeing to the Google Payments Terms of Service and Privacy Notice .

**Publicly Filed**

Exhibit 21

Exhibit 21



# R N L A
## Republican National Lawyers Association
### The National Bar Association for Republican Lawyers

www.RNLA.org

*Advancing Professionalism, Honest Elections, Career Opportunity, and Republican Ideals*

ABOUT US   EVENTS   NEWS   FIND A LAWYER   JOIN US   BLOG   SUPPORT US   MEMBERS ONLY

## Member Profile

**Ms. Christine Svenson**

Svenson Law Offices
Board Member and Vice-Chair for Finance, RNLA
Sustaining Member
Office:
     505 N. La Salle St.
     Suite 350
     Chicago, IL 60654

Phone: 312.467.2900
Fax: 312.467.2902
Email: christine@svensonlawoffices.com
Web Site: www.svensonlawoffices.com

Law School: Chicago-Kent College of Law (1995)
Foreign Languages: French, Spanish, Italian

**Practice Areas:**
     Election Law
     Family/Domestic
     Labor/Employment

Principal, Svenson Law Offices

Illinois Chapter Leader, RNLA

Past Counsel for Cook County GOP

Board of Directors, Federalist Society of Chicago

Board of Directors, Lawyers Committee for Fair Elections (Illinois)

Member, French-American Chamber of Commerce, Chicago

Member, Illinois State Bar Association

Member, Workers' Compensation Lawyers Association

Member, Chicago Yacht Club

---

Disclaimer: Content contained or made available through this web site is not intended to and does not constitute legal advice and no attorney-client relationship is formed, nor is anything submitted to any party through this web site treated as confidential. The accuracy, completeness and adequacy of information on this web site is not warranted or guaranteed. Biographic information on this web site is provided by the listees, and the RNLA does not review or confirm its accuracy. Determination of a need for legal services and selection of a lawyer should never be based only on review of biographic materials. The listing of "practice areas" by members on this web site does not mean either that the member is an expert in that area, or that any organization has certified the member as being a specialist or competent in that area. No representation is made that the quality of legal services performed by members is greater than the quality of other lawyers. Neither RNLA nor its officers or employees assume any liability, whether arising from contract, negligence, or otherwise.

~ Help Our Mission ~

$ DONATE NOW

JOIN US

 VOTE FRAUD NEWS

~ Stay Connected With RNLA ~

Find us on Facebook   Follow us on Twitter   LinkedIn

~ How to Contact RNLA ~

Republican National Lawyers Association
PO Box 18965
Washington, DC 20036
Email: info@RepublicanLawyer.net

---

**About Us**    **Events**    **News**    **Find a Lawyer**    **Join Us**    **Blog**    **Support Us**    **Members Only**

About the RNLA    Press Releases    By Name or State    Become a Member    Donate
Leadership    Vote Fraud News    By Practice Area    Member Benefits    Sponsor
Local Contacts    Newsletter

© 2011-12 - Republican National Lawyers Association (RNLA) - All Rights Reserved
Website by: DaveScans

**Conditionally Filed Under Seal**

Exhibit 22

Exhibit 22

Conditionally Filed Under Seal

Exhibit 23

Exhibit 23

**Conditionally Filed Under Seal**

Exhibit 24

Exhibit 24

**Publicly Filed**

Exhibit 25

Exhibit 25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CASE NO.:  CV-13-04080-BLF

ALICE SVENSON, individually
and on behalf of all others
similarly situated,

     Plaintiff,

vs.

GOOGLE, a Delaware
Corporation, and GOOGLE
PAYMENT CORPORATION, a
Delaware Corporation,

     Defendants.


*   *   *   *   *   *   *   *   *   *   *   *   *   *


VIDEOTAPED DEPOSITION OF:    Henry Fishkind, Ph.D.

DATE TAKEN:                  April 8, 2016

TIME:                        8:38 a.m. – 4:32 p.m.

PLACE:                       Fishkind & Associates
                             12051 Corporate Boulevard
                             Orlando, Florida 32817

REPORTED BY:                 Stacey B. Walters
                             Notary Public


*   *   *   *   *   *   *   *   *   *   *   *   *   *




```
 1   A P P E A R A N C E S :

 2


 3        JAMES DOMINICK LARRY, ESQUIRE
          Edelson, PC
 4        350 N. LaSalle Street
          Suite 1300
 5        Chicago, Illinois 60654
          312-572-7212
 6        nlarry@edelson.com

 7             Representing the Plaintiff

 8


 9


10        CHARLES C. SIPOS, ESQUIRE
          Perkins Coie, LLP
11        1201 Third Avenue
          Suite 4900
12        Seattle, Washington 98101-3099
          206-359-8000
13        csipos@perkinscoie.com

14             Representing the Defendants

15

16   ALSO PRESENT:

17        Jeff Fleming - Videographer (a.m.)
          Jake Vigliotti - Videographer (p.m.)
18

19

20

21

22

23

24

25
```



```
 1                    TABLE OF CONTENTS

 2   HENRY FISHKIND, PH.D.:                         PAGE
     April 8, 2016
 3
     Appearances                                       2
 4   Exhibits                                          3
     Stipulations                                      4
 5
     Testimony of Henry Fishkind, Ph.D.:
 6
          Direct Examination by Mr. Sipos             5
 7        Cross-Examination by Mr. Larry            231
          Redirect Examination by Mr. Sipos        234
 8
     Certificate of Oath                            236
 9   Certificate of Reporter                        237
     Deposition Errata Sheet                        238
10

11

12

13

14

15

16                   E X H I B I T S

17   DEFENDANTS':

18   No. 1     Expert Report of Henry Fishkind, Ph.D.    6
     No. 2     Objections & Responses to Subpoena       13
19   No. 3     First Amended Complaint                  24
     No. 4     Bates Nos. Fishkind_02042 - 02046        77
20   No. 5     Bates Nos. Fishkind_01491 - 01498        84
     No. 6     April 5, 2016 e-mail from Guzman        178
21   No. 7     April 7, 2016 letter from Hoffman       182
     No. 8     Bates Nos. Fishkind_03892 - 3894        184
22   No. 9     Bates Nos. Fishkind_03889              185

23

24

25
```



1

2

3

4

5

6                    S T I P U L A T I O N S

7        It is hereby stipulated and agreed by and between

8    counsel present for the respective parties and the

9    deponent that the reading and signing of the deposition

10   is expressly RESERVED.

11

12                      (End of stipulation)

13

14

15                        * * * * *

16

17   Reporter's key to punctuation:

18   --    at the end of question or answer references an
           interruption.
19
     ...   references a trail-off by the speaker.
20         no testimony omitted.

21

22

23

24

25



1              P R O C E E D I N G S

2          THE VIDEOGRAPHER:  This is the deposition of

3     Henry Fishkind, Ph.D., being taken in the matter of

4     Svenson, et al., vs. Google, Incorporated, et al.

5     The date is April 8, 2016.  The time is 8:38 a.m.

6          Will counsel please introduce themselves.

7          MR. SIPOS:  Charles Sipos on behalf of

8     defendants, Google and Google Payment Corporation.

9          MR. LARRY:  Nick Larry on behalf of the

10     plaintiff and putative class.

11          THE VIDEOGRAPHER:  And will the court reporter

12     please swear in the witness.

13          THE COURT REPORTER:  Do you swear or affirm

14     the testimony you're about to give will be the

15     truth, the whole truth, and nothing but the truth?

16          THE WITNESS:  Yes, ma'am.

17                    —  —  —

18          HENRY FISHKIND, PH.D.,

19     having been duly sworn, testified as follows:

20                  DIRECT EXAMINATION

21  BY MR. SIPOS:

22     Q.   Dr. Fishkind, good morning.  Again, for the

23  record, I'm Charles Sipos and we met earlier this

24  morning.  I'm going to start by marking your report as

25  an exhibit to your deposition and ask a few questions



 1  │ Google's privacy policies?

 2  │        MR. LARRY:  Objection, form.

 3  │     A.   No, I've not been asked to do that.  I've been

 4  │ asked to assume that the plaintiff's theories of

 5  │ liability are accepted by the court.  And so it's my job

 6  │ to try to quantify the economic harm that would flow

 7  │ from them.

 8  │     Q.   If the sharing at issue in this litigation is

 9  │ permitted under those policies -- let's assume that it's

10  │ permitted under those policies.  Does your damages model

11  │ still apply?

12  │        MR. LARRY:  Objection, form.

13  │     A.   Well, you're essentially creating a tautology.

14  │ You're saying if there's no liability, then there

15  │ wouldn't be any damage.  That would be true.  So I have

16  │ to assume that -- I was asked to assume there's

17  │ liability.

18  │     Q.   And does your damages model -- well, strike

19  │ that.  You -- what's your understanding of the

20  │ definition of the class in this case?

21  │     A.   It's all people who purchased an app during

22  │ the prescribed time period.

23  │     Q.   So you understand that it's -- the putative

24  │ class is many, many people; correct?

25  │     A.   I would suspect millions, if the numbers in



1    the complaint are right.

2         Q.    Does your damages model account for in any way

3    an ability to identify people within that class whose --

4    where the disclosure at issue was permitted versus

5    people within the class where the disclosure at issue

6    was not permitted?

7              MR. LARRY:   Objection, form.

8              You can go ahead.

9         A.    I'm a little confused.  Let me make sure I

10   understand what you're asking me.  Does my model apply

11   to people who don't have any -- or let me say it

12   differently.  Does my model apply in situations where

13   there's no liability is essentially what you're asking

14   me.

15        Q.    Well, no, I'm asking a slightly different

16   question.

17        A.    Okay.  That's what I -- that's why I wanted to

18   be sure.  I'm -- I'm sorry.  I misunderstood.

19        Q.    Yeah.  No, my question is, does your model

20   have within it any methodology that would allow the

21   court to identify class members -- particular class

22   members whose information was disclosed but disclosed

23   not in violation of the policy versus potential class

24   members whose information was disclosed but disclosed in

25   violation of the policy?  And is there any methodology



1   that allows you to distinguish between those groups of

2   people?

3              MR. LARRY:  Objection, form.

4              You can answer.

5        A.   I'm -- I'm not the expert on liability.  I was

6   asked to assume liability applies.  So I take it from

7   that point forward.  If there's an issue about the

8   class, as you're describing it, and that some members

9   might have liability, and therefore damages, and others

10  might not, then I'm working with the subclass that has

11  liability and damages.

12       Q.   Okay.

13       A.   I'm not -- I'm not here to parse through that

14  piece of the puzzle.

15       Q.   And your methodology doesn't account for or

16  include any technique that would allow the court to

17  separate out those two subclasses, as you described

18  them, people whose -- people where the disclosure at

19  issue was permitted under the policy versus people where

20  the disclosure may not have been permitted?

21       A.   I'm -- I'm not the expert to do that.  And it

22  maybe a combination of technical expertise and legal

23  expertise, but that's not what I was asked to do.

24       Q.   Okay.  And to be clear, because you weren't

25  asked to do that, your model doesn't provide any



1  mechanism to do that; correct?

2          MR. LARRY:  Objection, form.

3      A.   My model focuses strictly on damages.  So for

4  the cases as the plaintiff has alleged them that there

5  is liability, then my model would apply to the entire

6  class and would be useful in that regard.

7      Q.   Does your model assume that for every person

8  to whom it applies, there has, in fact, been a breach of

9  the privacy policies at issue by way of another

10  unauthorized disclosure?

11      A.   Yes.  There would have to be some liability in

12  order for damages to arise.

13      Q.   And you have no idea how one would go about

14  identifying individual class members where the

15  disclosure at issue doesn't exceed the bounds of the

16  contract; correct?

17      A.   That --

18          MR. LARRY:  Objection, asked and answered.

19      A.   That -- that wouldn't be something I was asked

20  to do and would be outside of my economic expertise.

21      Q.   What -- what information would you need to

22  know, if you know, in order to determine whether or not

23  the particular sharing at issue for an individual class

24  member did or did not exceed the limits of the stated

25  privacy policies?



1             MR. LARRY:   Objection, form, relevance.

2        A.   I -- I haven't studied that issue.  I can't

3   give you an expert opinion.  It wasn't anything that I'm

4   prepared to provide, nor was I asked to.

5        Q.   So it's not encompassed within the scope of

6   your work here any conclusion about whether or not class

7   members' disclosures exceeded the policies, nor any

8   mechanism to identify who those class members are;

9   correct?

10            MR. LARRY:   Objection, form.

11        A.   Right.  I was asked to estimate damages to the

12   class based on the plaintiff's theory of liability.

13        Q.   So turn, if you would, to Paragraph 27 of your

14   report.

15        A.   Yes, I'm with you.

16        Q.   So is this Paragraph 27 what you were

17   referring to in your testimony earlier when you were

18   describing the circumstances under which you understood

19   sharing was permitted under the relevant policies?

20        A.   Yes, that's a summary of that information

21   provided for background.

22        Q.   And Paragraph 27 is -- or, rather, refers to

23   the Google Privacy Policy; correct?

24        A.   It refers to the policy and also to discussion

25   amplifying that from Mr. Lawyer.



1           THE COURT REPORTER:  What's the name?

2           THE WITNESS:  L-A-W-Y-E-R.  It's very

3      confusing, Lawyer.

4  BY MR. SIPOS:

5      Q.   Did you review the Google Privacy Policy as

6  well?

7      A.   Yes, I did.

8      (Defendants' Exhibit No. 3 was marked for

9  identification.)

10 BY MR. SIPOS:

11     Q.   So, Dr. Fishkind, I'm going to hand you what

12 is Exhibit 3 to your deposition.  Is Exhibit 3 something

13 that you've reviewed before, Dr. Fishkind?

14     A.   Yes.

15     Q.   And can you tell me for the record what this

16 is?

17     A.   This is the First Amended Complaint in this

18 matter.

19     Q.   Turn, if you would, to Exhibit C of the

20 complaint, which is -- just to make things a little

21 easier, the -- it's toward the very, very back, starting

22 at the seventh page from the last.

23          MR. LARRY:  Is that docket entry 843, Page 1?

24     Is that what you're looking at?

25          MR. SIPOS:  It is.



1      Q.   Can you just tell me for the record -- well,

2   why don't we do this:  Can you read into the record the

3   two sentences there that describe the economic harms

4   that accrue -- potentially accrue for releasing PII in

5   connection with consumer transactions?

6      A.   Certainly.  "Firms may use personal

7   information collected for advertising or spam, or to

8   price discriminate based on a person's shopping habits.

9   Firms may also transmit customer information to third

10  parties for deceptive marketing, identity fraud, or

11  other nefarious purposes.  For these reasons, among

12  others, consumers place a value on protecting their

13  PII."

14     Q.   So let's go back to the hypothetical we were

15  talking about.  Would you agree with me that a third

16  party who never reviews an individual's personal

17  information would -- would have no information upon

18  which to visit any of these harms upon that person?

19  Correct?

20         MR. LARRY:  Objection, form, relevance.

21     A.   Generally speaking, sure, that would be fair.

22  If they don't ever access the information, then they're

23  not utilizing it for any harmful purpose.

24     Q.   And in your final sentence of Paragraph 46,

25  you say that -- if I understand you, that the avoidance



1    of these harms is among the reasons why consumers place

2    a value on personal information; correct?

3            A.    Yes, that's right.

4            Q.    And so at least some component of the privacy

5    benefit involves the avoidance of these harms; right?

6            A.    In many circumstances, yes, that's correct.

7            Q.    Okay.  Does your benefit-of-the-bargain model

8    include any discount for the privacy benefit -- strike

9    that.  Your benefit-of-the-bargain model has a -- what I

10   understand to be a -- a number of fixed variables for

11   the discount associated with revealing certain

12   components of private information; is that right?

13           A.    Yes, that's correct.

14           Q.    And does your benefit-of-the-bargain model

15   assume or not assume that any of these harms described

16   in 46 have actually occurred when applying that

17   discount?

18           A.    It does not assume that any of those harms has

19   occurred.

20           Q.    So your benefit-of-the-bargain model, then,

21   just so I understand, assumes that none of the harmful

22   aspects of revealing personal information as described

23   in 46 actually took place; is that right?

24               MR. LARRY:  Objection, form.

25           A.    That's right, no assumption of harm coming



1    from the unauthorized disclosure is assumed in my model.

2         Q.   It's your understanding and testimony in this

3    matter, however, that the avoidance of that harm has

4    some value; correct?

5         A.   In many circumstances the avoidance of that

6    harm has some value, yes.

7         Q.   And is -- why isn't the fact that that harm

8    didn't occur incorporate in your model at all?  Why did

9    you assume that that harm had no value for purposes of

10   your model?

11        MR. LARRY:  Objection, form.

12        A.   No, that isn't quite right.  The way I

13   structured the model and the way I structured the survey

14   was to as best and most accurately as possible reflect

15   the fact situation in this case where there is no

16   allegation of harm arising.  I would have a different

17   model as I did in Sony if there was evidence of harm

18   arising.  Instead I recognized that in this fact

19   situation there's been no assertion of harm arising, no

20   evidence that I know of, so I structured the analysis to

21   focus on benefit of the bargain without reference to

22   harm, only with reference to disclosure.

23        Q.   If -- it's your belief and testimony, I

24   understand, that the privacy benefit is part of what the

25   consumer paid for in the transactions at issue in this



1   case; correct?

2        A.   Yes.

3        Q.   And some specific monetary amount can be

4   attributed to that privacy benefit; correct?

5        A.   That's my opinion, and that's where my work

6   went to try to assist in this case, yes.

7        Q.   Okay.  So if consumers weren't paying for the

8   avoidance of harms associated with revealing personal

9   information in your model, what, in your opinion, were

10  they paying for with respect to privacy?

11            MR. LARRY:  Objection, form.

12       A.   They were paying for the protection of their

13  personal information and the benefit of not having it

14  disclosed.

15       Q.   If no harm has accrued, how have they been

16  deprived of that benefit?

17            MR. LARRY:  Objection, form.

18       A.   They entered a transaction and paid for an

19  increment of privacy that they did not get.  So I think

20  it's very clear that they paid for something they did

21  not get.  Whether or not there was harm that resulted

22  from the disclosure as there was in Sony is a different

23  matter not applicable here, but I could create a model

24  in a different format if there was evidence of harm.

25            But that doesn't mean that the privacy doesn't



1   once the information is disclosed, whether any harm

2   arises.  That -- that isn't at all what the model is

3   designed to -- to estimate.

4        Q.   So if those policies -- and by "those

5   policies" I mean the policies as between Google and

6   developers -- restrict or limit the use of personal

7   information in some way, that's not anything that you

8   took account for either in your survey or in the

9   subsequent damages model that the survey helped inform

10  and produce; correct?

11             MR. LARRY:  Objection, form.

12       A.   Yes, it would be immaterial to the damages

13  that I was asked to estimate and that I have estimated.

14       Q.   Turn briefly to Paragraph 79 of your report,

15  which is on Page 22.

16       A.   Yes, sir, I'm there.

17       Q.   I want to try to make sure that I clarify --

18  that's one of the reasons I'm here today -- any

19  potential --

20       A.   Sure.

21       Q.   -- tension between your testimony and what I

22  understand is reflected in your report.

23             In Paragraph 79, the first sentence, it

24  indicates:  "It also appeared from the discovery that

25  users could potentially receive unsolicited mail such as



1    spam."

2            Dr. Fishkind, have you drawn any conclusion in

3    this case that potential class members received

4    unsolicited mail such as spam from app developers?

5        A.   No, I have not.

6        Q.   Are you aware of any evidence that that, in

7    fact, took place?

8        A.   No, sir.

9        Q.   Okay.  The first sentence of Paragraph 79,

10   then, is not intended to reflect the conclusion by you

11   that that did, in fact, take place or that consumers who

12   might be members of the putative class were, in fact,

13   harmed in the way potentially described in the first

14   sentence of Paragraph 79?

15       A.   Well, I -- I -- the words stand and speak for

16   themselves.  It appears from the discovery -- and

17   Footnote 37 describes some documentation that might

18   support that.  But I don't know of any spam, nor am I

19   asserting any, nor did my model attempt to measure

20   consequential harm from the lack of protection to the

21   privacies we discussed earlier.

22       Q.   Have you reviewed Ms. Svenson's testimony in

23   this case?

24       A.   I believe so.

25       Q.   Can you recall what she said with respect to



1    any harm that she might have suffered as a result of any

2    alleged disclosure that's the subject of this

3    litigation?

4              MR. LARRY:  Objection, form.

5         A.   I don't -- I don't recollect what she may have

6    said about harm.

7         Q.   Is it fair to say that your damages model does

8    not incorporate or reflect specific harms that may or

9    may not have happened to Mrs. Svenson?

10        A.   That's correct.

11             MR. LARRY:  Objection.

12             THE WITNESS:  I'm so sorry.

13             MR. LARRY:  Go ahead.

14        A.   That's correct.

15        Q.   And just to be clear -- because I may have

16   missed it too; it's been known to happen -- I don't see

17   Mrs. Svenson's deposition transcript as among those

18   identified on Exhibit 3 in the materials that you relied

19   on.  Is that an omission or error on Exhibit 3 or is it

20   possible that you're recollecting erroneously that you

21   may have, in fact, reviewed her testimony?

22        A.   No, I think it's --

23             MR. LARRY:  Objection, form.

24             THE WITNESS:  I'm sorry.

25



1          MR. LARRY:  You can go ahead.

2      A.   I think it's the former.  I think I neglected

3  to put it on the list.  I know I've read her deposition.

4      Q.   Okay.  So I want to try to -- I'm not an

5  economist, so I want to try to pull apart and -- and

6  make sure I understand each of the various pieces that

7  go into your benefit-of-the-bargain damages model.  And

8  the first piece I want to try to understand is

9  willingness to pay.  Can -- can you tell me just in your

10  own words what willingness to pay, as an economic

11  concept, is intended to measure or reflect?  And then

12  I'll ask you some follow-up questions more specific to

13  this case.

14      A.   Sure.  I described it in the report.  It's the

15  maximum amount that someone would pay for a particular

16  good or service.

17      Q.   And my understanding of the reference to

18  maximum amount, or my interpretation of maximum amount,

19  was that because willingness to pay and -- if it makes

20  life easier for the court reporter and because I think

21  you understand it as well, I'm going to say WTP because

22  that's how it's referred to consistently in your

23  report -- that because WTP reflects a maximum amount,

24  that some buyers would, in fact, pay less; that WTP is

25  the most that they would pay for that particular --



1  sir.

2      Q.    And, in fact, in Paragraph 69 of your report,

3  you describe the survey as presenting a hypothetical

4  purchase of an app?

5      A.    Of course.

6      Q.    Can you tell me what, if anything, you did in

7  either the design or administration of your survey --

8  and I want to limit my question now to the Web survey

9  because I think that's really what -- what's at issue

10  for purposes of my question -- to try to replicate

11  real-world conditions of app purchasing?

12      A.    Most apps are purchased electronically.  I

13  don't know a whole lot of people that call up some call

14  center to get an app or write a letter or use a check.

15  I tried to structure the hypothetical to be as

16  consistent as possible with the facts and allegations in

17  this case.

18      Q.    So -- so your methodology for dealing with

19  hypothetical bias was to have the hypothetical question

20  track as closely as possible to the actual facts of the

21  case; do I understand that right?

22      A.    Yes.

23      Q.    Do you know whether or not the Web-based

24  survey was administered or capable of -- well, let me

25  just ask the first question first -- was administered



1   via mobile devices, such as phones or tablets, or was it

2   administered via computers?  I know it was Web based but

3   I don't know how it was administered.

4        A.   I believe respondents could respond either

5   way, but I believe the majority would respond through a

6   computer, not through a mobile device.

7        Q.   Did Opinion Access provide you with any

8   information one way or the other as to whether or not

9   survey participants completed the Web-based survey on a

10  computer versus a mobile device?

11       A.   No, sir.

12       Q.   Is it your assumption that at least some

13  survey participants perform the Web-based survey via

14  computer?

15       A.   Absolutely.

16       Q.   There wasn't any sort of account registration

17  or sign-up flow similar to what you might do in the

18  Google Play environment that was part of your Web-based

19  survey, was there?

20            MR. LARRY:   Objection, form.

21            Go ahead.

22       A.   The survey was structured with the assumption

23  that people had already done that.  We -- we gave that

24  as a condition.  They were returning customers.

25       Q.   And your Web-based survey didn't -- in -- in



1    the conduct of the survey, it didn't present consumers

2    with a privacy policy to -- to review and accept

3    during -- during the administration of the survey, did

4    it?

5         A.   No, because it was based upon the fact that

6    they were returning customers, so that had already

7    happened.

8         Q.   So the returning customer piece, in your mind,

9    was an important element for correcting against this

10   hypothetical bias?

11        A.   It's helpful.  I mean, I recognized the issue,

12   so I was trying to structure to minimize the potential

13   for hypothetical bias.

14        Q.   And I'll go back to the Savage and Waldman in

15   just a minute, but -- but I just want to make sure that

16   we're talking about the same thing.  If you could turn

17   back to your report and turn to Exhibit 5 of your

18   report.

19        A.   Yes.

20        Q.   Question 1.2 --

21        A.   Yes.

22        Q.   -- there's language there indicating:

23   "Suppose you are a returning customer to the App Store."

24   Is this the language you were referring to in your

25   testimony earlier that was intended to correct for



1   hypothetical bias?

2        A.    Yes.  In part, yes.

3        Q.    And that was there in order to try to

4   replicate actual market conditions in order to get more

5   accurate responses from the survey participants; is that

6   a fair statement?

7        A.    Yes, and also to track what I understood to be

8   the fact pattern in the case.

9        Q.    And this "Suppose you are a returning customer

10  to the App Store, so you know that the Store" has --

11  "the Store already has your name, email address, billing

12  address, mobile number, and credit card number," that

13  was intended to communicate to survey participants that

14  they had, in fact, already registered with the service,

15  were a returning customer to that service, and the

16  service therefore had the information reflected in this

17  sentence?

18        A.    That's correct.

19        Q.    Okay.  Now that you have Exhibit 5 in front of

20  you, I'll just try to do what I can to close out this

21  particular line of questioning.

22              Other than that, can you identify for me other

23  language -- any other language in the survey instrument

24  that you intended as a means to correct for hypothetical

25  bias?



1      A.   Certainly.  I think it's very important, in my

2   mind, that we have the two screening questions so that

3   we limit the survey to people who have a smartphone and

4   who have purchased an app.  So we have focused on, I

5   think, the proper group and -- and we're working with

6   people that have some working knowledge of buying an app

7   on a smartphone so that this proposed hypothetical

8   transaction would not be foreign to them; it would be

9   something they would be familiar with.  So I think that

10   that also is of critical importance in limiting

11   hypothetical bias.

12      Q.   Is it -- is it your understanding that

13   hypothetical bias can be corrected for with a proper

14   survey population?

15      A.   It can be mitigated by focusing on the correct

16   facts, which obviously they have to do, and working in

17   an environment and asking questions that are questions

18   that your panel has some experience with.  I think there

19   would be far more potential for hypothetical bias in a

20   novel situation.

21      Q.   But the participants in your survey

22   nonetheless responded with an understanding, so far as

23   you know, that no actual app purchase was being made and

24   this was an entirely hypothetical transaction that they

25   were being asked about; correct?



1   That is the cumulative probability -- that's a -- it's

2   an index of the cumulative probability of the logistics

3   curve that basically tells you the probability of

4   selecting the disclosure -- no disclosure option,

5   holding price constant.

6        Q.   And is -- is it possible to convert that

7   coefficient to a percentage likelihood?

8        A.   Well, it -- it -- it is an index that

9   represents a percentage.  Yes.  It's rather complicated,

10  but yes, you could do that.

11       Q.   Do you do that in your report at all, convert

12  the coefficient to a percentage likelihood?

13       A.   No.  There's no reason to do that.  I can work

14  with the indexes and accomplish the same aim without the

15  (inaudible) damage of doing that.

16       Q.   So let's move down a step, then, in Table 4 to

17  coefficient 1.547145.  What does that coefficient

18  represent relative to the 1.789 coefficient?

19       A.    It is the cumulative -- it is the index of the

20  cumulative probability that a consumer would select and

21  pay for the disclosure of name and e-mail, again holding

22  price constant.

23       Q.   And is the same thing true with respect to all

24  the remaining coefficients on Table 4?

25       A.    Yes, Mr. Sipos, it is.



1     Q.    Okay.  And when you say when holding price

2  constant, what do you mean by that?

3     A.    Well, we have a price term at the bottom of

4  the table.  So statistically we're holding the price

5  constant.  We're not letting the price vary.  We have

6  prices that vary from 1 to 5, but we are statistically

7  holding the price constant, and then assuming the price

8  was constant, then these would be the cumulative

9  probabilities.

10     Q.    And so then in -- in order to calculate the

11  percentage of privacy delivered -- and this is in

12  Paragraph 90 -- you divide those two coefficients;

13  correct?

14     A.    That's what I do, yes, sir.

15     Q.    Okay.  Explain to me why dividing those two

16  coefficients produces the percent of privacy delivered

17  for the particular variable.

18     A.    Well, we have the index that relates to the

19  probability of selecting no privacy, which has the

20  highest -- highest probability; exactly what we would

21  expect.  Price has a negative coefficient; exactly what

22  we would -- we would expect.  So holding price constant,

23  all other things being equal, people will choose no

24  privacy disclosure over disclosure of name and e-mail.

25  And these index numbers tell us what those probabilities



1   are.

2        So if I divide the disclosure by the

3   non-disclosure, that gives me the percent change in

4   probability for the reflection of the privacy not

5   delivered.

6        Q.   Why isn't that 14 percent in this example

7   instead of privacy not delivered simply 14 percent less

8   likely to purchase?

9        A.   Well, because -- the less likely to purchase

10  because holding everything else equal, they didn't get

11  the privacy.

12       Q.   So it is less likely to purchase, but you

13  interpret that as being attributable to the privacy

14  variable?

15       A.   Of course, because we've held everything else

16  constant.

17       Q.   Now, neither -- as I understand it, neither

18  Savage and Waldman or Butler or Glasgow performed this

19  sort of calculation in -- in either of their studies;

20  correct?

21       A.   Of course not.  Their facts are different.

22  If -- if I wasn't evaluating these facts, if I was

23  merely trying -- and I don't mean merely.  If I was

24  trying to estimate the parameters that they were trying

25  to estimate, I would have done it the way they did it.



1    This is a different fact situation.  The question here

2    is:  What is the value of the privacy components not

3    delivered?  It's a -- it's a different -- we have a

4    different fact situation.

5        Q.   Are -- are you aware of any published

6    literature that calculates the damage or value

7    associated with privacy by dividing coefficients in the

8    manner that's reflected here in Paragraph 90?

9        A.   No.  But that's not really the -- the issue.

10   That's a rather arcane point you're trying to make.

11   The -- the -- looking at relative -- looking at

12   coefficients one relative to the other is commonplace in

13   econometrics.  And so there's nothing unique about it

14   except that, yes, this applies to privacy.  But it's a

15   logit function, so there's nothing inherently unique,

16   novel about it.  You will find, I'm sure, similar things

17   in other logit analyses outside of the privacy realm.

18       Q.   But you're not aware of any?

19       A.   No.  No, I -- no, it's such a common technique

20   I didn't even look for any.  As I -- as I -- you know,

21   am I concerned about, you know, dividing 4 by --

22   dividing 2 by 4 and coming up with 50 percent?  I

23   wouldn't, like, go look for other literature that would

24   say that was okay.

25       Q.   Well, let me ask this:  Are you --



1  best professional practice.

2      Q.   Well, the -- as I understand it, the only

3  studies that you point to that have measured privacy

4  using a contingent valuation model are the Waldman

5  and --

6      A.   Glasgow.

7      Q.   -- Glasgow -- thank you -- studies?

8      A.   No, that's not true.  The -- the experimental

9  studies are CV-type studies.  And the first estimate I

10 think goes back to 2002 from Hamm [sic].  So there is a

11 significant volume of work that has privacy numbers in

12 it, and there's certainly no discernable trend.

13     Q.   Are the privacy variables -- or privacy

14 interests measured in those studies the same as the

15 privacy interests that you measured in your study?

16          MR. LARRY:  Objection, form.

17     A.   No.  And the privacy issues that are in the

18 studies will vary amongst and between them as well.  But

19 as a broad review of all of that literature, there's no

20 discernable or dramatic structural change in people's

21 privacy.  I do think people are becoming more concerned

22 about it over time.  I do think that's true.  But I

23 don't have any empirical metric for that.

24     Q.   So we spoke earlier about Google's policies

25 and practices with respect to sharing, and I believe



1    your testimony -- your prior testimony was that you

2    wanted the survey instrument itself as best as possible

3    to reflect the facts of the case; correct?

4         A.   Yes.

5         Q.   Can you point me to any language in your

6    survey instrument, which is Exhibit 5 to your report,

7    that is or is intended to account for permitted

8    disclosures under any of Google's various policies?

9              MR. LARRY:   Objection, form.

10        A.   Yes.  By structuring the survey question at

11   1.2 as we discussed, that we have a returning customer,

12   was already providing significant information.  I think

13   that's very consistent with the facts of the case and is

14   consistent with whatever the parameters were governing

15   those initial registrations, sir.

16        Q.   So is it your testimony, then, it's the

17   "Suppose you are a returning customer to the App Store"

18   language that was intended to communicate the fact that

19   there are permitted disclosures under the relevant

20   policies?

21        A.   Certainly.  If you are a returning customer,

22   then you have clicked the little box, whether you read

23   the whole disclosure or not.  So I think that that puts

24   this question well within the ambit of the facts of this

25   case and would satisfy the concern that you're raising.



1        Q.   Is there anything in the survey instrument

2   other than the "Suppose you are a returning customer to

3   the App Store" language that was designed or intended by

4   you to account for the fact that there are exceptions

5   under the various policies that allow sharing?

6            MR. LARRY:   Objection, form.

7        A.   No.  I don't think there would need to be in

8   the survey.  And you're tiptoeing back to liability

9   again, I believe.

10        Q.   Well, right now I'm just trying to understand

11   the relationship between the survey instrument and what

12   you wanted to be reflected or not reflected in the

13   survey instrument.

14        A.   Fair point.  And so that -- that's the key

15   design element in the survey.

16        Q.   This "Suppose you're a returning customer to

17   the App Store"?

18        A.   Sure, because then you've already registered

19   and in theory you would be as knowledgeable as a normal

20   or reasonable person would be of the parameters of what

21   could be shared or not.

22        Q.   Were -- was there pretesting done in

23   connection with the survey?

24        A.   Yes.

25        Q.   Did you receive those pretest results from



1  OAC?

2       A.   Well, let's back up.  The short answer to your

3  question is yes, I received pretest results from OAC.

4  Those were the first 200 surveys.  That was the soft

5  opening that we reviewed before I authorized them to

6  move forward with the balance of the survey.  So I used

7  those 200 to check whether we were getting accurate

8  results from the work.

9            But there was a lot of pretesting that went on

10  before that.  Before we could even launch the soft test,

11  we had to test the questions.  We did that first in this

12  office and then I did it by calling some of my other

13  offices to test the clarity of the questions before we

14  set up the 200-individual-respondent soft launch.

15      Q.   Okay.  Let me take those one by one and in

16  what I think would be chronological order.  What was the

17  nature of the testing that was done at your offices that

18  gauged the clarity of the questions in the survey?

19      A.   I designed the survey and then I began

20  administering it to my colleagues.

21      Q.   Other --

22      A.   So --

23      Q.   -- people at Fishkind & Associates?

24      A.   Yes.  Yes.  I could just test whether the

25  language was clear enough to even go forward with the



1  questions.

2        A.    Sure.

3        Q.    And in particular Section 1.2.

4        A.    Yes.

5        Q.    So -- and we can turn to Paragraph 71, which I

6  think repeats the same information.

7        A.    Okay.

8        Q.    So Paragraph 71 contains the same language

9  that's in Section 1.2 of the survey.  And then you go on

10 to say:  "This question was designed to mimic the facts

11 of this case whereby Buyers would have already disclosed

12 to Defendants the same PII by the time they're about to

13 purchase an App."

14        Can you explain to me how, in your mind, this

15 Question 1.2 -- or Statement 1.2 is designed to mimic

16 the facts of the case?

17        A.    Yes.  People are purchasing an app from the

18 app store.  They are returning customers.  And we make

19 sure that they remember that as a returning customer

20 that the app store already has their name, e-mail

21 address, billing address, mobile number, and credit card

22 number.

23        Q.    Included within this question or this

24 statement -- well, strike that.  In the administration

25 of your survey, did you consider important -- consider



1    it important that survey participants understood that

2    with respect to the app store itself, the information at

3    issue had been disclosed and given willingly to the app

4    store?

5         A.    The registration information; is that what

6    you're referring to?

7         Q.    Correct.

8         A.    Yes, of course.

9         Q.    Okay.  And how did you attempt to communicate

10   that to survey participants?  And by communicate that I

11   mean communicate the fact that the app store had your

12   registration information already lawfully and properly,

13   that it hadn't obtained your information in some

14   improper way.

15        A.    I think the language is very clear.  You're a

16   returning customer so you know that they already have

17   that information.  It's very clear, very simple.

18        Q.    And it's that "Suppose you are a returning

19   customer" language that you're referring to as being

20   very clear and very simple on that point?

21        A.    Yes.

22        Q.    Let me turn back to 5, Exhibit 5.

23        A.    Okay.

24        Q.    So the term "information" in your survey --

25   and I'm going to be referring to information as used in



1  Alternative 1, although I think the same word,

2  "information," is used in all the various permutations.

3        A.   Yes.

4        Q.   Did your survey define or specify in any way

5  what was meant by the term "information"?

6        A.   Yes.

7        Q.   Okay.  And how is that defined and specified

8  in your survey?

9        A.   It's in the "suppose" language.

10       Q.   So the "your information" language was meant

11 to refer to name, e-mail address, billing address,

12 mobile number, and credit card number?

13       A.   Yes, of course.

14       Q.   Do you know when the survey was actually

15 administered if 1.2 was -- the statement in 1.2, was

16 that presented on the same screen as Alternative No. 1

17 or whatever alternative the consumer was -- happened to

18 be presented with or was that a click-through such that

19 1.2 is gone by the time you answer whichever alternative

20 you happen to be presented with?

21       A.   I don't know.

22       Q.   Would that have any bearing on your view as to

23 whether or not information is sufficiently defined for

24 purposes of your survey whether or not 1.2 was adjacent

25 to this later question or was -- or presented in a



1        Q.    So do I understand your model correctly that

2    for the model to -- to work or able to be applied you

3    would need to know the price of the particular app being

4    fed into the model and the particular category or bundle

5    of disclosure at work?  Those are two variables that are

6    necessary to your model; correct?

7        A.    Yes, those would be two inputs.  And that way

8    it would be generally applicable to the class.

9        Q.    And without those two pieces of information,

10   your benefit-of-the-bargain damages model can't spit out

11   a number; correct?

12       A.    Without inputs it can't make outputs.  That

13   would be a fair -- fair statement.  I prefer to

14   characterize it as calculating the outputs.  But with

15   that nicety on a Friday . . .

16       Q.    Sure.  So -- and I'll -- and I'll rephrase it

17   so we can reach agreement.  Without both the price and

18   the particular bundle, or category, within which a

19   consumer might fall, your model cannot calculate a

20   damages figure; correct?

21       A.    That would be correct.

22       Q.    Have you assumed one way or the other that

23   there is common proof to provide both of those two

24   variables?  And --

25       A.    Sure.



1          Q.   -- those -- those two variables being the

2    price and the disclosure bucket that any individual

3    consumer might fall into it.

4              MR. LARRY:  Can you reread the first part of

5         the question.

6    (Question read back as follows:)

7              THE COURT REPORTER:  Have you assumed one way

8         or the other that there is common proof to provide

9         both of those two variables?

10             MR. LARRY:  Objection, form.

11             You can go ahead and answer.

12         A.   Yeah.  Essentially, yeah, sure.  They'd be

13   commonly known prices and they'd be commonly known

14   classes of information that was [sic] allegedly wrongly

15   disclosed for any class member.  I mean, there obviously

16   would be some variation in what price they may have

17   paid; there obviously would be some variation in terms

18   of what category they would fall into it, but as a

19   common matter, sure, the model would work on the basis

20   of the inputs that are commonly available in the class.

21         Q.   Do you know how or does your report purport to

22   propose a methodology for determining how a particular

23   class member can be identified as falling in -- within

24   any one of these bundles or categories?  I'm taking the

25   second variable in your damages model.



1          A.    I wasn't asked to do --

2                MR. LARRY:  Objection.

3                THE WITNESS:  I'm sorry to interrupt.

4                MR. LARRY:  Objection, form, relevance.

5                You can go ahead.

6          A.    I wasn't asked to then take the next step in

7    determining how to administer all of this.  I think it

8    could be administered in a straightforward fashion, but

9    I've been only asked to develop the formula that could

10   be used for that administration.

11         Q.    So you're not in possession of any information

12   nor have you done any analysis that would allow you to

13   conclude one way or the other that there would be common

14   proof to determine which category or bucket any given

15   consumer falls into; correct?

16               MR. LARRY:  Objection, form.

17         A.    No.  I think there would be common proof about

18   the liability and I think there would be the formula,

19   which is generalizable to all of the class, and then

20   they would have their information about what they paid

21   and which privacy they received.

22         Q.    But on that second piece -- and the way it's

23   done in your model is by identifying very -- various

24   categories of personal information that may have been

25   revealed -- what proof are you aware of -- and perhaps



1  you just weren't asked to do this and don't know, and if

2  that's fine [sic], that's the answer -- that would allow

3  for the identification and placement of class members

4  into any one of these various categories?

5            MR. LARRY:  Objection, form.

6       A.   (A) I wasn't asked to do it, to sort, to

7  actually do the administration.  As to the second part,

8  I did see information relative to alleged disclosure of

9  these different groups of information, but that's all I

10  could tell you.

11       Q.   What -- what -- could you point me to the --

12  to the extent it's reflected in your report, could you

13  point me to where in your report you believe you've seen

14  proof that would allow you -- if this is not what you're

15  saying, say so -- that would allow you to determine

16  which one of your bundled categories a particular class

17  member falls into?

18            MR. LARRY:  Objection, form, relevance.

19       A.   No, I -- I didn't answer your question clearly

20  enough, and I'm sorry.  What I said was I've seen some

21  evidence that each of these groups of disclosures were

22  made, but I didn't see an entire printout of everybody

23  potentially in the class and which exact piece of

24  information was disclosed nor which precise price each

25  one of them paid for the app.  That information -- I



1    the various alts?

2         A.   Yes.

3         Q.   Okay.  Dr. Fishkind, what's your basis for

4    concluding that that is an accurate reflection of the

5    facts of this case, that the app store has a strict

6    policy of not sharing any of your information with the

7    developer or seller?

8              MR. LARRY:  Objection, form.

9         A.   I think that is consistent with the

10   allegations in the First Amended Complaint, and it was

11   further vetted by the attorneys for its accuracy

12   relative to the legal issues only.  So I believe it does

13   reflect the issues in the case, especially when that is

14   read in the context of "Suppose you are a returning

15   customer."  So I do think it accurately reflects the

16   situation of the case.

17        Q.   Well, you and I engaged in a colloquy earlier

18   this morning about the fact that the relevant policies

19   do, in fact, contain exceptions; correct?

20        A.   Yes, sir.

21        Q.   And why, in your view, does the language

22   "strict policy of not sharing any of your information

23   with the developer or seller" accurately communicate the

24   facts of this case in light of those exceptions?

25        A.   Calling --



1          MR. LARRY:  Objection, form.

2     A.   Calling your attention again to the "suppose"

3  language.  Whatever the permissions are that you are

4  indicating, which I do know exist, they're already part

5  of the "returning customer" language.  So once that's

6  been taken care of, after that there's not supposed to

7  be any additional sharing.

8          So I think this does accurately reflect the

9  economic situation, and the attorneys have vetted that

10 it is consistent with the way in which they were

11 drafting the complaint -- the amended complaint.

12     Q.   So in -- in your view the "Suppose you are a

13 returning customer to the App Store" language is doing

14 the work of advising potential survey -- well, not

15 potential, actual survey participants that there might

16 be exceptions to this strict policy of not sharing any

17 of your information?

18     A.   Yes.  I mean, by -- by -- by this language of

19 a returning customer, it means that someone has had the

20 opportunity to read the privacy policies.  And we all

21 know that not everybody studies the privacy policies.

22 But that -- that aside, that language, "Suppose you are

23 a returning customer," sets the stage for the fact that

24 they have knowledge of or the opportunity to have

25 knowledge of what the privacy policies are.



1      Q.   Did you think it was important in the

2  implementation of your survey that participants

3  understood that there were such exceptions?

4      A.   I think this language correctly reflects the

5  real situation, that most people have the opportunity to

6  review that language and they may or may not do so and

7  they may or may not understand it.  But I don't want to

8  bias the situation, so I want it to be as reflective of

9  the real situation consumers are in.

10          When you're a returning customer, you're a

11  returning customer.  If you've paid attention and

12  studied all the detailed disclosures and understand the

13  privacy, great.  If you don't, you don't.  It is what it

14  is.

15      Q.   The word "sharing" in this portion of the

16  question or -- well, the question comes next --

17      A.   Yes.

18      Q.   -- but the statement that precedes the

19  question, how do you think -- well, no, strike that.  Do

20  you believe that the word "sharing" as it's presented

21  here communicates to consumers or survey participants

22  that the developer has actually reviewed the information

23  referred to in the question?

24      A.   I think it is indifferent to that.  We spoke

25  about that this morning.  It is immaterial whether the



1    app vendor has reviewed the information or not.  That's

2    not what is at issue in my opinion.

3        Q.   And do you believe that -- and if it's your

4    testimony, that's -- that's fine.  Reasonable people can

5    disagree.  Is it your view that survey participants were

6    indifferent to the issue of whether or not the

7    information shared was, in fact, ever viewed by the app

8    seller or developer?

9        A.   I would say it differently.  I would say I am

10   testing to determine what people think about a price

11   they're willing to pay for a promise of protection.

12   Whether they get the protection or not, the price that

13   people pay for promises of various kinds of protection

14   or disclosure, that's what this is focused upon.

15        What happens if we're in Alternative 2 and

16   information is shared, people make their own decision

17   about how they feel about that and what price they're

18   willing to pay with that level of disclosure.  It

19   doesn't matter whether or not the contra-party looks at

20   the shared information.  That doesn't matter at all to

21   the question of, what would you pay for the app you're

22   interested in, knowing that certain information such as

23   name and e-mail would be disclosed?  Whether the

24   contra-party looks at the information, uses the

25   information is a whole separate issue.

1          And it's separate from, and I do not believe

2    it biases the question of, what would you be willing to

3    pay under those circumstances?  Because that is the

4    situation, as I understand it, that the class members,

5    in fact, faced in this situation.

6          Q.   Let me ask it a different way, Dr. Fishkind.

7    Is there any language in your survey instrument that

8    tells survey participants anything about whether or not

9    the information that has been shared is or is not

10   actually viewed by the app seller or developer?

11         A.   No, there is not.  And that was done

12   purposefully.  That was not an omission.

13         Q.   Is there anything in your survey instrument

14   that tells participants anything about contractual

15   restrictions placed on the app sellers or developers

16   themselves with respect to how they might use that

17   information?

18         A.   I know it's Friday.  We talked about that this

19   morning.  Whatever the --

20         Q.   And -- and to be clear, because I'm not --

21         A.   That's okay.

22         Q.   I value my own time too, and I'm not trying to

23   be redundant.

24         A.   No, no.  I'm not --

25         Q.   I was talking about it earlier, I think, in



1     A.    Right.   That's why I chose it.

2     Q.    So dealing with Table 6 --

3     A.    Yes.

4     Q.    -- and dealing with -- limiting my question

5  now to the disclosure of name and e-mail piece on

6  Line 1 --

7     A.    Yes.

8     Q.    -- so the value of the privacy -- I want to

9  try to ask this -- this -- this in a -- in a clear way.

10 The -- in this exemplar isn't it the case that the value

11 of the privacy benefit is equivalent to the value of the

12 entire price of the app?

13    A.    No.

14    Q.    Why not?

15    A.    Because it's 14 percent, so it's not the

16 entire value of the app.

17    Q.    But let -- let me work my way left to right.

18 So -- and we're again dealing with the first line.

19 What's calculated here is the percent of the privacy

20 benefit delivered; right?

21    A.    Yes.

22    Q.    That's 86 percent?

23    A.    Yes.

24    Q.    And there is a discount applied because in

25 this instance name and e-mail was disclosed, thus the



1    full privacy benefit was not conferred; correct?

2        A.   Right.

3        Q.   And if you add up -- this is the part where I

4    think I can keep up with the math.  If you add up 86 and

5    14, you get 100 percent; right?

6        A.   Yep.

7        Q.   So that's the entire value, 100 percent?

8        A.   Yes.

9        Q.   This 14 percent is applied to the price $1.77;

10   correct?

11       A.   That's right.

12       Q.   So why isn't it the case that combining 86 and

13   14 percent, right, which is the full amount of privacy

14   that could have been possibly delivered less the amount

15   that was not, in fact, delivered -- that adds up in this

16   line to the whole price of the app; right?

17       A.    Let me try it this way:  The benefit of the

18   bargain was to get 100 percent of the privacy.  You only

19   got 86 percent.  What part didn't you get?  You didn't

20   get 14 percent.  So 14 percent is what you bargained for

21   but did not get.  You paid $1.77.  So what you didn't

22   get is 25 cents worth of the $1.77, which equals

23   14 percent.

24       Q.   Right, but $1.77 -- Ms. Svenson got the app

25   too.  And -- and so what I'm struggling with



1    understanding, what I'm confused by is your model treats

2    the privacy value and the price of the app in its

3    entirety as the same thing, doesn't it?

4         A.   No, absolutely not.  What I'm doing here is

5    reflecting the fact that $1.77 was paid for three

6    things, for the app, for the processing, and for the

7    privacy.  So the question is, to me, if you don't get

8    100 percent of the privacy -- and we determined what

9    percentage based upon what you're willing to pay for

10   privacy of various types of descriptions -- then you

11   didn't get 14 percent of what you bargained for.  You

12   didn't get the full complement of the privacy component

13   that is one part of what you paid $1.77 to receive.

14        Q.   But your discount is being applied to the

15   price of the app in its entirety.  Do you think the

16   price of the app in its entirety reflects only the

17   privacy value that might come with its purchase?

18        A.   No, sir, of course not.  You paid $1.77 for

19   three things, the app, the processing, and the privacy,

20   but you didn't get all the privacy that you bargained

21   for.  So with the survey and the econometrics, we can

22   determine what percentage of the bargain you didn't

23   receive based upon what you were willing to pay for the

24   privacy piece.  So we're only calculating the privacy

25   piece as a percentage of the total.



1      Q.   All right.  Turn, then, to -- I don't know

2  that it's consistent with what else is in your report,

3  and -- and let me point to why.  Perhaps you can

4  reconcile it for me.

5      A.   Of course.

6      Q.   Turn it Page 4 and Footnote 6 of your report.

7      A.   Yes.

8      Q.   So Footnote 6 explains that you use your

9  formula with regard to the entire purchase price of the

10 app?

11     A.   That's right.

12     Q.   And you say you do so because there was a

13 single bundled purchase; correct?

14     A.   That's right.

15     Q.   But again, looking at Table 6, what's -- what

16 the privacy calculation accounts for here is the

17 entirety of the price of the app.  I mean, if you add up

18 the quantum of money that would be -- and I could do it

19 myself, but 86 percent of $1.77 and 14 percent

20 representing the amount of privacy delivered under your

21 model --

22     A.   No.  That's where you're going off.  Excuse me

23 to interrupt you.

24     Q.   Well, it says right here in your report --

25     A.   That's the piece of privacy that was not



1    package of services from this machine called the

2    Cadillac and vice versa for the Rent-A-Wreck.  So I

3    think that for a higher priced app people would value

4    the components at higher prices as well.

5         Q.   Who sets the prices of the apps in this case?

6    Do you know?

7         A.   I believe the app vendors.

8         Q.   And do the app vendors dictate the terms of

9    the privacy policies at issue in this case?

10             MR. LARRY:  Objection, form.

11        A.   I don't think so.  I think it's the -- I think

12   it's the defendants that do that.

13             MR. SIPOS:  All right.  Let's take a

14        five-minute break.

15             THE WITNESS:  Sure.

16             THE VIDEOGRAPHER:  The time is 3:24 p.m.  Off

17        the record.

18        (Break taken from 3:24 p.m. to 3:30 p.m.)

19             THE VIDEOGRAPHER:  The time is 3:30 p.m.  Back

20        on the record.

21   BY MR. SIPOS:

22        Q.   Dr. Fishkind, if you could in your report turn

23   back to Footnote 6 --

24        A.   Sure.

25        Q.   -- on Page 4.



1          A.    Yes.  Yes, sir, I'm with you.

2          Q.    So the -- the final sentence of Footnote 6

3    reflects that if instructed by the court your model

4    could be adjusted and applied to only that 30 percent of

5    the app purchase price that you contend is retained by

6    defendants.  Do you see that?

7          A.    Yes.

8          Q.    What's your understanding of who pays that

9    30 percent, the purchaser of the app or the developer

10   who sells it?

11         A.    The purchaser.

12         Q.    What's that understanding based on?

13               MR. LARRY:  Objection, relevance.

14         A.    My understanding is from the complaint that

15   indicates that Google retains 30 percent of the price

16   paid for the app for the processing.

17         Q.    Would -- well, first of all, is there anything

18   other than the complaint that you're relying on to

19   conclude that it is the buyer, versus the seller of the

20   app, who pays that 30 percent?

21         A.    Well, it has to be the buyer when they buy the

22   app.  I mean, that's where the gross revenue is coming

23   from.  I mean, if we want to account for it in different

24   ways and flow money differently and try to make it

25   different, I suppose that's possible.  But I mean, the



1    revenue comes from the purchase.  So I think it's

2    logical to believe that the 30 percent would apply to

3    that.

4         Q.   Well, respectfully, Dr. Fishkind, and what I'm

5    asking for is not your economic rationalization of where

6    it might be coming from, but what I'm asking for is your

7    understanding, based on evidence, as to who is paying

8    that amount, the developer or the buyer.

9              MR. LARRY:  Objection, form.

10        A.   The only information I have is that Google

11   retains 30 percent of the price.  So it would seem to me

12   that it's got to be coming from the buyer whether --

13   yeah, it's got to come from the buyer, because it goes

14   through the Google app store.  I don't know logically

15   how it could be otherwise.

16        Q.   Other than your logical abilities as to how

17   the transaction would have to be structured, what

18   evidence are you relying on to conclude that that

19   30 percent is paid by the buyer --

20             MR. LARRY:  Objection, form.

21        Q.   -- versus the developer?

22             MR. LARRY:  Same objection.  Sorry.

23        A.   I have no further evidence to provide, sir.

24        Q.   You haven't tested your logic against any

25   evidence produced in this case?



1          A.    I --

2                MR. LARRY:   Same objection.

3          A.    I haven't seen any other evidence.

4          Q.    So sticking with the 30 percent figure itself

5    and setting to one side for the moment who pays it, is

6    it your -- either your understanding or your assertion

7    that the entirety of that 30 percent reflects the value

8    of a privacy benefit?

9                MR. LARRY:   Objection, form.

10         A.    No, I don't think so.

11         Q.    For your formula to work, would you have to

12   make some further adjustment to it in order to determine

13   what proportion or amount of that 30 percent comprises

14   the privacy value versus other services being provided?

15         A.    No.  I mean, if the court wants to change the

16   base from being the price paid, which is what I would

17   advocate for, to just the portion that Google retains,

18   then the formula can work; it would just work as if the

19   price was lower.

20         Q.    So you would simply apply 30 percent to the

21   full price of the app and then run your calculation --

22   your benefit-of-the-bargain calculation as though that

23   30 percent were the full price of the app in your

24   existing model?

25         A.    If that's what the court determined it wanted



1  to make as the base for the damage estimate, that would

2  be up to the court.  I wouldn't advocate for that.  But

3  the formula could work if the court decided that they

4  wanted to find liability but did not want to base the

5  liability amount on the full price of the app.

6        Q.   What -- what amount of that 30 percent would

7  your formula be applied to in your mind?

8        A.   It would be 30 percent against the price of

9  the app times the decrement for the reduction in privacy

10 as shown in Table 6.

11       Q.   So that you -- you wouldn't apply any

12 subsequent discounting of that 30 percent to reflect

13 other things encompassed within that 30 percent value,

14 would you?  You would just apply your formula to the

15 30 percent amount in its entirety?

16            MR. LARRY:  Objection, form.

17       A.   Well, I would advocate for applying Table 6 to

18 the full price of the app.  If the court in its wisdom

19 decided that, no, it only wanted to apply it to the

20 portion of the revenue that Google kept and that the

21 privacy piece that -- in that calculation, the

22 70 percent -- which is the app provided -- it wasn't

23 their fault and the court didn't want to penalize them

24 for whatever reason, believing that, well, they didn't

25 compromise the privacy, Google did; then the court could



1   there be restrictions on how it could be used other

2   than, you know, beyond not using it for an illegal

3   purpose?

4        A.   I don't know of any.

5        Q.   So it's your understanding that -- that once

6   purchased you had -- you could use it in an unrestricted

7   fashion for marketing or sales contacts or those sorts

8   of purposes?

9        A.   Yes.  Certainly the expectation is that would

10  be how they would be used rather than to do something

11  outside of normal business practice with sales lead

12  information.

13       Q.   And for each of these various values, is it

14  your testimony that the estimate given here is for just

15  these pieces of information alone, or would something

16  else have -- have accompanied the purchase?  So, for

17  example, in the first one, name and address, you

18  might -- you get name and address but you would also get

19  some information on the person's prior purchase history

20  with respect to something else, real estate, whatever?

21  It doesn't matter.  I'm just trying to understand if --

22       A.   Sure.

23       Q.   -- all you got was this.

24       A.   All we got was that.  That's what we asked for

25  and that was all that the quote was for.



1          Q.    And the values on Table 2, is -- am I right in

2    assuming that this would be a non-exclusive use?  So you

3    wouldn't be in a position to buy someone's name and

4    address, for example, and be the only person who could

5    buy that piece of information; correct?

6          A.    That's right.

7          Q.    So any number of other people could buy it;

8    correct?

9          A.    Sure.

10         Q.    And is it your understanding that the party

11   offering it for sale would put it on offer for the same

12   price as the person who bought it in line in front of

13   you?

14         A.    Yep.

15         Q.    And the third and fourth person would pay the

16   same price too?

17         A.    I'm sure that would be the case.

18         Q.    Okay.  Either in terms of the information

19   that was provided to you by these sources in preparing

20   Table 2 or whatever conclusions you've independently

21   drawn as a result of your work in this case, does the

22   availability of the same information for free publicly

23   affect the price or value of that information through a

24   sales channel?  So, for example, if the same name and --

25   same name and e-mail was publicly available, would that



1  have some effect on the price you might have to pay in

2  order to get it in a business transaction?

3          MR. LARRY:  Objection, form.

4          But you can answer.

5      A.   My expectation would be the more exclusive the

6  information, the higher the price.  I mean, certainly

7  these -- some of these components are available

8  publicly.  Bundling them up into some usable fashion is

9  different.  But sure, I mean, people's names and

10  addresses if they own property is available publicly.

11     Q.   So turn now to Paragraph 115 of your report.

12     A.   Yes, sir, I'm there.

13     Q.   So Paragraph 115 indicates that the values

14  that are reflected on Table 2 and reproduced in Table 9

15  are for large-volume batches, 10,000, and by location;

16  is that right?

17     A.   I'm sorry.  I missed the last part of what you

18  said.

19     Q.   That -- that the -- that the PI as made -- as

20  put on offer for sale is sold with -- in a bundle of

21  10,000?

22     A.   Right.

23     Q.   And it's sold -- bundled in a way that the

24  10,000 individuals in that bundle, you know something

25  about location of those people?



1      A.   If you have the addresses, yes.

2      Q.   Well, let me -- and perhaps it's just a

3  misunderstanding of language.  In the last paragraph

4  of -- excuse me, the last sentence of Paragraph 115:

5  "While there is some value added by the vendors in

6  providing large volumes of PII by location."  What I'm

7  trying to understand is what you mean by the words "by

8  location."

9      A.   Sure.  All of the bundles have -- I was just

10  looking at Table 2.  All of the bundles have address in

11  them.  So you do have some locational information.

12      Q.   Okay.  And -- and it's -- it's your

13  conclusion, however, that while those things add value,

14  it's still a comparable figure because of an offset for

15  that value when compared to the type of PI at issue in

16  this case because it is tied to a purchase and it's a

17  recent and actual purchase; is that right?

18      A.   Yes.  So I was trying to use the public market

19  information as the minimum value for the purpose of 116

20  and 117.

21      Q.   What -- what's your basis for concluding that

22  that offset is accurate and appropriate; so in other

23  words, that you can true-up the value relying on these

24  estimates because of the fact that the PI in this case

25  may be tied to a particular purchase?



1        A.   Well, there is some evidence that I quote in

2   the body of the report that the vendors wanted that

3   information.  It is clear that advertisers prefer

4   information as closely tied to purchases as possible for

5   it gives them the sales leads.  So I think it reasonable

6   to believe that the publicly available information on a

7   non-exclusive basis would provide some type of floor by

8   which we could compare much more specific information

9   tied to actual completed transactions.

10       Q.   Is there anything other than the information

11  that you cite in Footnote 60 of Paragraph 116 that

12  you're relying on as evidence for the fact that those --

13  that the PI here is more valuable than the PI that's

14  placed on offer as reflected in Table 2?

15       A.   There may be but I -- that would be what I

16  would mostly rely upon.

17       Q.   Is it your opinion or testimony, Dr. Fishkind,

18  that because certain personal information may have been

19  disclosed to app vendors that that same personal

20  information is no longer marketable?

21       A.   No.

22       Q.   Is it your testimony that the same personal

23  information is no longer marketable at the same price it

24  would have been marketable for prior to the disclosure

25  at issue?



1        A.    No, that's not quite it either.

2        Q.    So you would agree that people who may have

3    had their information disclosed to app sellers could

4    still sell that information and could still sell it at

5    the same price prior to the disclosure?

6        A.    Possibly.

7        Q.    Let me ask a question about the relationship

8    between the two models.

9        A.    Sure.

10       Q.    So in the diminution of value model, one of

11   the things that you say makes the information marketable

12   is the fact that it can then be used by the purchaser

13   for some secondary sales and marketing; right?

14       A.    That would be one way, yes.

15       Q.    And -- and in the benefit-of-the-bargain

16   model, one of the economic harms that the privacy

17   interest is there to protect is preventing yourself from

18   being the subject of that sort of marketing; right?  So

19   in other words, you keep the information private and so

20   as a result you can't be subject to targeted sales and

21   marketing of that type; right?

22            MR. LARRY:  Objection, form.

23       A.    That's one of the benefits, yes.

24       Q.    Is it -- is it -- would you agree with me that

25   the -- that the harm, in [sic] the one hand, in the



1   privacy example and the benefit in the diminution of

2   value example I just gave you, that those two things are

3   essentially mirror images of one another?  In the

4   benefit-of-the-bargain model you're trying to stop

5   yourself from being marketed to and -- and subject to

6   sales pitches as a result of that private information

7   being disclosed.  In the second case you're trying to

8   capitalize on the ability that that very use can be made

9   with that information.  Is that -- is that a fair

10  characterization?

11        A.   No. I --

12             MR. LARRY:  Objection, form.

13        A.   No.  I see it differently.

14        Q.   How do you see it?

15        A.   Well, on the benefit of the bargain, you're

16  paying for not having the information disclosed, not

17  necessarily to prevent anything nefarious.  There are

18  opportunities and I believe there are people who want

19  their privacy, value their privacy separate and apart

20  from not wanting to be marketed to.  That also is

21  something people value, no doubt.

22             In the diminution side, if someone gets the

23  benefit of the bargain and then they decide that they

24  would be willing to share some of their personal

25  information with an app vendor, they would expect



1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF ORANGE

5

6            I, STACEY B. WALTERS, Certified Shorthand

7    reporter, certify that I was authorized to and did

8    stenographically report the foregoing proceedings at the

9    time and place herein designated; and that the foregoing

10   pages 5 through 235, inclusive, constitute a true,

11   complete and accurate transcription of my said stenotype

12   notes.

13           I further certify that I am not of counsel

14   for, related to, or employed by any party hereto or

15   attorney involved herein, nor am I financially

16   interested in the outcome of this action.

17           Witness my hand this 12th day of April, 2016.

18

19

20

21   _____

22   STACEY B. WALTERS
     Court Reporter

23

24

25



**Conditionally Filed Under Seal**

Exhibit 26

Exhibit 26

Conditionally Filed Under Seal

Exhibit 27

Exhibit 27

**Conditionally Filed Under Seal**

Exhibit 28

Exhibit 28

**Conditionally Filed Under Seal**

Exhibit 29

Exhibit 29

**Conditionally Filed Under Partial Seal**

REDACTED VERSION - PUBLICLY FILED

Exhibit 30

Exhibit 30

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

-----------------------------------X

ALICE SVENSON, individually and on

behalf of all others similarly

situated,

             Plaintiff,               Case No.

     -v-                       CV-13-04080-BLF

GOOGLE INC., a Delaware Corporation,

and GOOGLE PAYMENT CORPORATION, a

Delaware Corporation,

             Defendants.

-----------------------------------X

CONFIDENTIAL

VIDEOTAPE DEPOSITION OF ALICE C. SVENSON

Chicago, Illinois

September 25, 2015

9:00 a.m.

Reported by:
Cynthia J. Conforti, CSR, CRR
Job No.: 40853

2

1

2

3                    Alice C. Svenson

4                   September 25, 2015

5                      9:00 a.m.

6

7            Videotaped deposition of ALICE C.

8    SVENSON, held at the offices of Perkins Coie LLP,

9    131 South Dearborn Street, Suite 1700, Chicago,

10   Illinois, pursuant to Notice, before CYNTHIA J.

11   CONFORTI, CSR, CRR, and Notary Public within and for

12   the State of Illinois.

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1    A P P E A R A N C E S:

2

3    FOR THE PLAINTIFF:

4         EDELSON, PC

5         350 North LaSalle Street

6         13th Floor

7         Chicago, Illinois 60654

8         312.589.6370

9         By:  Alexander T.H. Nguyen, Esq.

10            anguyen@edelson.com

11

12   FOR THE DEFENDANTS:

13        PERKINS COIE, LLP

14        1201 Third Avenue

15        Suite 4900

16        Seattle, Washington 98101-3099

17        206.359.8687

18        BY:  Susan Fahringer, Esq.

19            sfahringer@perkinscoie.com

20

21   ALSO PRESENT:

22        Jeremy Mangan, Videographer

23

24

25

4

1          THE VIDEOGRAPHER:  We are now on the

2     record.  This marks the beginning of media

3     number one in the deposition of Alice Svenson

4     in the matter of Alice Svenson v. Google Inc.,

5     in the U.S. District Court, Northern District

6     of California, San Jose Division.

7          This deposition is being held at 131

8     South Dearborn Street, Chicago, Illinois, on

9     September 25th, 2015, and the time is now

10     9 a.m.

11          Will the attorneys please identify

12     themselves.

13          MS. FAHRINGER:  Susan Fahringer,

14     Perkins Coie, on behalf of defendants.

15          MR. NGUYEN:  Alex Nguyen, Edelson PC,

16     on behalf of the plaintiff and the putative

17     class.

18          THE VIDEOGRAPHER:  Would the court

19     reporter please swear in the witness.

20          ALICE C. SVENSON,

21  having been sworn by the Notary Public (Cynthia

22  Conforti) was examined and testified

23  as follows:

24

25

5

1                          EXAMINATION

2       BY MS. FAHRINGER:

3            Q.        Please state your name.

4            A.        Christine Svenson.

5            Q.        Alice C. Svenson is your --

6            A.        Legal name.

7            Q.        -- legal name?

8            A.        Correct.

9            Q.        Alice Christine Svenson, I assume?

10           A.        You got it.

11           Q.        Your website, Svenson Law Offices,

12      says you're a, quote, "highly experienced civil

13      litigator."  Is that true?

14           A.        That's right.

15           Q.        You've practiced over 20 years?

16           A.        20 years.

17           Q.        You've taken and defended many

18      depositions?

19           A.        I have.

20           Q.        You've got experience with contracts?

21           A.        I have.

22           Q.        Have you litigated contract matters?

23                     MR. NGUYEN:  Objection to form.

24      BY MS. FAHRINGER:

25           Q.        Have you litigated contract matters?

6

```
1        A.      I --

2                MR. NGUYEN:  Objection to relevance.

3                THE WITNESS:  I have not.

4   BY MS. FAHRINGER:

5        Q.      You have not litigated contract

6   issues?

7                MR. NGUYEN:  Object to relevance.

8                THE WITNESS:  I have to think about

9        it.

10  BY MS. FAHRINGER:

11       Q.      Employment contracts, settlement

12  agreements?

13       A.      I've drafted a lot of employment

14  contracts.  I don't think I've litigated any.  I may

15  have, but few and far between if -- if I have.

16       Q.      Okay.  And do you know the basics of

17  contract law?

18       A.      Sure.

19       Q.      Let's talk about your Google account.

20  Do you have a Google account?

21       A.      I do.

22       Q.      And Gmail account --

23       A.      Gmail is what you -- right.

24       Q.      And what is the name of that account?

25       A.      So it's ████████████████████
```

1      A.      I didn't lose it.  I either decided to

2  get a new one, an updated one, something like that.

3      Q.      Okay.  And then for the new phone you

4  created you created the svensonlawoffice --

5  ████████████████████████

6      A.      Right.

7      Q.      Okay.  And when you created your --

8  either one of these accounts, I take it you created

9  them using the phone not a PC?

10     A.      On the phone, right.

11     Q.      What did you use -- what did you use

12 the ██████████████████████████ address for?

13     A.      So I only opened up that e-mail

14 account so that I would be able to use Google Apps.

15     Q.      Okay.  Why did you want to use Google

16 Apps?

17     A.      Because I really like them.

18     Q.      What apps have you bought?

19     A.      So I rarely buy apps, and I believe

20 I've only purchased two or three of them to date.

21     Q.      How about free apps?

22     A.      I have tons of them.

23     Q.      How many would you say?

24     A.      Currently?  I probably have over a

25 hundred.

1       Q.       Let's go to the creation of the

2  Svenson -- of the ████████████  account.

3                In your response to discovery in this

4  case, you said that to the best of your recollection

5  you provided defendants with your name and phone

6  number on November 12, 2012, for the purpose of

7  registering a Gmail account.  Is that true?

8       A.       That sounds right.

9       Q.       And the name you provided was Alice C.

10 Svenson?

11      A.       Yes.

12      Q.       What phone number, if you remember,

13 did you provide at account creation when you created

14 on November 12, 2012, when you created the

15 ████████████  account?

16      A.       I'm not sure if I gave my work or my

17 mobile.

18      Q.       Okay.  What is your work number?

19      A.       █████████████

20      Q.       What's your mobile number?

21      A.       █████████████

22      Q.       Is that unlisted?

23      A.       Oh, I don't know.

24      Q.       Have you ever tried to make it

25 unlisted or paid to make it unlisted?

1        A.        No.

2        Q.        And the mobile number, is that

3   current?

4        A.        Yes.

5        Q.        Before 2013, in 2012, do you know

6   whether the mobile number was unlisted?

7        A.        Oh, you -- I thought you were asking

8   about the --

9        Q.        The mobile number.

10       A.        The mobile number, okay.  I don't

11   think it's unlisted.

12       Q.        Okay.

13       A.        I don't think it has been ever.

14            MR. NGUYEN:  Again, we'd ask that the

15       mobile numbers be marked confidential.

16            MS. FAHRINGER:  Fine.  The -- I've --

17       I've been under the impression that you were

18       marking the deposition confidential.

19            MR. NGUYEN:  That's correct.  Okay.

20       That's fine.  Okay.

21            MS. FAHRINGER:  And we'll discuss

22       later what designations need to be removed.

23            MR. NGUYEN:  Yeah, that's fine, yeah.

24   BY MS. FAHRINGER:

25       Q.        And to the best of your recollection

1    your mobile number isn't unlisted.  It's public

2    information?

3         A.      It probably is.

4         Q.      Probably available for free.

5              MR. NGUYEN:  Object, it's vague.

6              MS. FAHRINGER:  You can object to

7         form.  The witness will answer.

8              MR. NGUYEN:  I'm making my objection.

9              THE WITNESS:  Can you repeat the

10        question?

11   BY MS. FAHRINGER:

12        Q.      I've forgotten it too.

13              Can you read back the question?

14                   (Record read as requested.)

15   BY MS. FAHRINGER:

16        Q.      That is your mobile number.  Publicly

17   available for free.

18        A.      I don't know if it's available for

19   free.

20        Q.      Do you have the same mobile number now

21   on your phone that you did in 2012?  Have you

22   changed your mobile number?

23        A.      Same number.

24        Q.      Going back to when you provided

25   information in November 2012 at the account creation

1    of ███████████████████  you provided your name,

2    you provided your phone number.  Do you recall

3    providing any other information?  Do you recall, for

4    example, providing country?

5          A.      I don't recall.

6          Q.      Okay.  It's possible?

7          A.      It is possible.

8          Q.      Okay.  So also in your answers to

9    discovery, you said that you agreed to the Google

10   terms of service and the Google privacy policy when

11   you registered your Gmail account on November 12,

12   2012.  Is that true?

13                 MR. NGUYEN:  Objection, calls for

14         legal conclusion.

15                 MS. FAHRINGER:  This is interrogatory

16         responses.

17                 MR. NGUYEN:  Again, I object on that

18         basis.

19   BY MS. FAHRINGER:

20         Q.      Is that true?  Do you want me to read

21   it back?

22         A.      Please.

23         Q.      Okay.  In your responses to

24   interrogatories, you stated that you agreed to the

25   Google terms of service and the Google privacy

1    policy when you registered your Gmail account on

2    November 12, 2012.  Is that true?

3         A.        I indicated that I agreed.

4         Q.        Okay.  Did you have the opportunity to

5    review your interrogatory responses?

6         A.        I did.

7         Q.        Did you approve them once you reviewed

8    them?

9         A.        I did.

10        Q.        And this was at the time before you

11   finalized them and they were submitted to defendants

12   in response to discovery in this case, correct?

13        A.        Yes.

14        Q.        Have you had the opportunity since

15   then to review your discovery responses?

16        A.        Yes.

17        Q.        Have -- at any of the points during

18   your review of your discovery responses have you

19   indicated to defendants that any of those responses

20   should be changed or corrected --

21        A.        Have I --

22        Q.        Or has your counsel to your knowledge

23   indicated to defendants as much?

24        A.        I don't know --

25                  MR. NGUYEN:  Objection to the extent

1    it calls for attorney-client privileged

2    communications.

3  BY MS. FAHRINGER:

4    Q.       To your knowledge did your counsel or

5  you communicate to defendants any desire, any

6  indication of the need for a change to those

7  discovery responses?

8    A.       I don't know.  Because I don't know

9  what my counsel may have done.

10    Q.       Understood.  To your knowledge.

11    A.       I don't know.

12    Q.       Now, let's go through the steps

13  that -- it's to the best of your recollection --

14  that you took to create your Gmail account on

15  November 12, 2012.  This is the ███████████ --

16    A.       Right.

17    Q.       -- gmail account.  You used your phone

18  to create the account, correct?

19    A.       Yes.

20    Q.       And, if you would, just describe for

21  me generally the best you recall what steps you

22  took.

23              MR. NGUYEN:  Object to form.

24              THE WITNESS:  So I would have gone

25    into -- the phone may have actually even

1          MR. NGUYEN:  Object to form.

2    BY MS. FAHRINGER:

3          Q.      Do you understand the question?

4          A.      No.

5          Q.      Okay.  I want to understand, and maybe

6    you've answered this already, but what the privacy

7    commitments were if you remember.

8          A.      I don't remember.

9          Q.      Okay.  Let's now move to Google Play.

10   When did you first use Google Play?  Do you

11   remember?

12         A.      That would have been with my first

13   Droid phone.

14         Q.      How long ago was that?

15         A.      I think I've had three or four of them

16   by now.

17         Q.      Can you place a year on it roughly?

18   Was it years before 2000 -- well, it wouldn't be

19   Google Play.

20         A.      I would have to guess.  Do you want me

21   to guess?

22         Q.      I want you to estimate based on the

23   best of your recollection, but if you have no idea

24   whatsoever, that's fine, you can just say so.  And

25   I'll try to help you by narrowing it down a little

22

1    bit.

2         A.        Right.  So I'm just thinking about how

3    many Droid phones I've had.  I probably had Droid

4    phones for 7 or 8 years.  I'm guessing.  That's a

5    guess.

6         Q.        Now, you -- you recall that you've

7    used free apps for -- for some time I take it?

8         A.        Yes.

9         Q.        Years.

10        A.        Years.

11        Q.        Do you recall that at some point

12   Google Play was launched as a brand, Google Play

13   [indicating]?

14        A.        I remember it, yeah.

15        Q.        How long ago would you say you

16   remember it happening?

17        A.        Five years ago.  Maybe it's been

18   longer.

19        Q.        Okay.  Do you remember at what point

20   or any details at all about agreeing to the Play

21   terms of service?

22        A.        No.

23        Q.        Okay.  Let's then move to Google

24   Wallet.  Have you created a Google Wallet account?

25        A.        Yes.

1      Q.      When did you create the Google Wallet

2  account?

3      A.      So that was in, I believe, May of '13.

4      Q.      Okay.  Now, how many Google Wallet

5  accounts do you have?

6      A.      I thought I only had one.

7      Q.      Just the one?

8      A.      I think -- I think I only have one.

9      Q.      You don't have a separate one under

10  your Svenson -- ▇▇▇▇▇▇▇▇▇▇▇▇▇ address?

11      A.      That's possible.

12      Q.      Okay.  Would you be the one who

13  creates the -- the account and so forth for the

14  account, the Google Wallet account, the Google

15  account for Svenson Law?

16      A.      Yes.

17      Q.      Are you the only attorney in that

18  office?

19      A.      I have a contract attorney.

20      Q.      Okay.

21      A.      But they don't handle my e-mail.

22      Q.      Why did you create the Google Wallet

23  account in May 2013?

24      A.      Because I realized that I needed to

25  purchase an app I was hoping to get for free, but I

1    had to purchase it.

2            Q.       Which ap was that?

3            A.       That was the YCDroid.

4            Q.       And do you remember the name of the

5    app?

6            A.       The SMS to e-mail.  Oh, I'm sorry,

7    yeah, so I -- YCDroid was the vendor, so SMS.

8            Q.       Thanks.  When did you last -- when did

9    you last -- when's the most recent time you've used

10   your Wallet account?  And by that I mean the one at

11   ██████████████████

12           A.       Last time I purchased anything?

13           Q.       Um-hmm.

14           A.       So I believe that I purchased

15   something most recently in April of '14.

16           Q.       Do you remember what it was?

17           A.       It was the SMS app again.

18           Q.       In April of 2014?

19           A.       I think that's right.

20           Q.       Did you get a new phone in April of

21   2014?

22           A.       No, I got it in December of '13 or

23   November of '13, one or the other, and then I

24   needed -- I was in court, and I needed the app.

25   That's how it works.

25

1        Q.       Do you remember how much you paid for

2  it?

3        A.       It was -- I mean I don't -- it was

4  less than I purchased it -- than when I purchased it

5  the first time.

6        Q.       Price had gone down?

7        A.       Correct.

8        Q.       Did -- so I take it it performed as

9  expected.

10       A.       Yes.

11       Q.       No complaints about the performance?

12       A.       No.

13       Q.       In fact, you bought it again?

14       A.       That's right.  I love that app.

15       Q.       How come?

16       A.       Oh, well, in my business I constantly

17  have clients texting me and opposing counsel, and so

18  if I'm in a pinch and I've got a hearing coming up,

19  I need to upload it and such.

20       Q.       So other than the purchase of the --

21  both purchases of the SMS to e-mail apps, do you

22  recall any other purchases you've made with Wallet?

23       A.       I did purchase another app, Crafty

24  Apps.

25       Q.       Oh.

1    A.    And I don't even know what it is.

2    Q.    Why did you buy it?

3    A.    I don't remember.  It's a good

4    question.

5    Q.    Do you still have it on your phone?

6    A.    I don't think so, because I think it

7    was on the old phone.

8    Q.    Okay.  Going back to the Wallet

9    account creation, in your answers to discovery, you

10   said that you provided defendants with your name,

11   phone number, credit card number and home address

12   including city, state and zip code on May 6, 2013,

13   for the purpose of registering Google Wallet and

14   Google Play accounts.  Is that true?

15   A.    Yes.

16   Q.    Okay.  And e-mail address isn't

17   included on that list because you were already

18   signed in to your Google account under the

19   ████████████████████████ address?

20   A.    Right.

21         MR. NGUYEN:  Object to form.

22   BY MS. FAHRINGER:

23   Q.    I'm sorry.  Did you say "right"?

24   A.    I said "right."

25   Q.    And your name, when you say you

1    BY MS. FAHRINGER:

2          Q.      Okay.  And this all that you're --

3    that we're discussing here, that would have

4    occurred, this -- this review and then indicating

5    your assent would have occurred when?

6          A.      I don't -- I don't know what you mean

7    by "when."

8          Q.      Would it have been May 6, 2013 --

9          A.      Oh.

10         Q.      -- or would it have been some other

11   time?

12         A.      It would have been May 6th.

13         Q.      Okay.  Do you remember -- when you

14   created the account on May 6, 2013, did you

15   understand Google to have made any new privacy

16   promises beyond those already made in the Google

17   terms of service Google privacy policy?

18                 MR. NGUYEN:  Objection, vague.

19   BY MS. FAHRINGER:

20         Q.      Do you understand the question?

21         A.      I think I understand it, and I don't

22   remember.

23         Q.      Okay.  So you don't remember that a --

24   let me back up a step.

25                 Do you remember the terms of the

36

1    Wallet privacy notice and whether those differed

2    from or supplemented or were in any way different

3    from the Google privacy policy terms?

4          A.        I don't remember.

5          Q.        So when you created your Wallet

6    account, May 2013, did you consider -- and you

7    indicated your assent to the Wallet terms of service

8    and the Wallet privacy notice, at that point did you

9    consider Google to be bound by the privacy promises

10   set forth in the privacy notice?

11                   MR. NGUYEN:  Objection, calls for a

12         legal conclusion.

13                   THE WITNESS:  Yes.

14   BY MS. FAHRINGER:

15         Q.        And why?

16         A.        Well --

17                   MR. NGUYEN:  Objection, calls for

18         speculation, legal conclusions.

19   BY MS. FAHRINGER:

20         Q.        You can answer.

21         A.        So Google was the drafter of a

22   document they were giving to me, and so I presumed

23   when I agreed to their terms that they also agreed

24   to the terms.

25         Q.        Okay.  And so this was all prior to

1    purchase --

2                    MR. NGUYEN:  Objection --

3    BY MS. FAHRINGER:

4            Q.        -- correct?

5                    MR. NGUYEN:  -- misstates prior

6        testimony.

7    BY MS. FAHRINGER:

8            Q.        Was it?

9            A.        It would have been prior to purchase.

10           Q.        Okay.  We have been going a half hour.

11   How are you doing?

12           A.        Oh, fine.

13           Q.        Okay.  So I'm going to move on to a

14   different topic now.

15                    Let's talk about your involvement in

16   this case.  How did you become involved in this

17   case?

18           A.        So a colleague of mine mentioned to me

19   that he was in search of a plaintiff who had

20   purchased an app through Google Wallet.

21           Q.        Who is the colleague?

22           A.        Ilan Chorowsky.

23           Q.        And so did you know him prior to that?

24           A.        He was my office mate.

25           Q.        Okay.  At what office?

1     A.      █████████████  my current office.

2  He was my office mate at the time.

3     Q.      What do you mean by "office mate"?

4     A.      Oh, shared office space.

5     Q.      Okay.  How long had he been your

6  office mate?

7     A.      When we had that discussion?

8     Q.      Oh, good question.  When did you have

9  the discussion?

10     A.      I don't know exactly.

11     Q.      Was it before or after you created

12  your Google account?

13     A.      Oh, it was after.

14     Q.      Okay.  Was it before or after you

15  purchased the SMS app?

16     A.      After.

17     Q.      So it would have been after May 2013?

18     A.      Yes.

19     Q.      Has he or you ever served as each

20  other's counsel in litigation or for any purpose?

21          MR. NGUYEN:  Objection to the extent

22       it calls for attorney-client communications.  I

23       caution you --

24          MS. FAHRINGER:  No, I don't --

25          MR. NGUYEN:  Yeah, of course.

1    BY MS. FAHRINGER:

2         Q.        Right.  What are you alleging as to

3    with whom Google shared that information?

4         A.        One of my allegations is that Google

5    shared my information with YCDroid.

6         Q.        Okay.  Are you alleging in this case

7    that Google shared your information with any other

8    party?

9         A.        I don't know.

10        Q.        To your knowledge are you alleging

11   that Google shared your information with other than

12   YCDroid?

13             MR. NGUYEN:  Objection, asked and

14        answered.

15             MS. FAHRINGER:  I'm -- and I'm

16        entitled to ask this question.

17             MR. NGUYEN:  Objection, asked and

18        answered.

19             THE WITNESS:  I'm the plaintiff,

20        Google's the defendant, so I don't know what

21        Google has done.  I don't know.

22   BY MS. FAHRINGER:

23        Q.        I'm asking -- that's why I'm asking

24   about your allegations.

25             So in this case, your allegations, are

```
1    you alleging that Google shared your information

2    with anyone other than YCDroid?  I need to know

3    this.

4         A.       I don't know.

5         Q.       Do you have any basis to say that

6    Google -- to allege or to say or to believe that

7    either defendant shared your information, name,

8    Gmail, address, phone number, with anyone other than

9    YCDroid?  Do you have any basis for that at all?

10                 MR. NGUYEN:  Object to form.

11                 THE WITNESS:  Well, they shared my

12        information with YCDroid.  What's to prevent

13        them from sharing my information with other

14        vendors?

15   BY MS. FAHRINGER:

16        Q.       Any other basis?

17        A.       That's it.

18        Q.       So you believe they might.

19        A.       Anything's possible.

20        Q.       Okay.  But you have no basis to

21   believe they did.

22        A.       That's not what I said.

23        Q.       Okay.  What is your basis to believe

24   they did share this information with someone other

25   than YCDroid?
```

53

1        A.      What I previously said.

2        Q.      Which is?

3        A.      Can we have the answer read back?

4        Q.      I think you can answer this question.

5                MR. NGUYEN:  Object to form.

6                THE WITNESS:  Based upon the fact that

7        they shared my information with YCDroid, what

8        is to prevent them from disseminating my

9        information to other vendors.

10   BY MS. FAHRINGER:

11       Q.      Okay.  When you say "shared," or

12   "disclose," what is it you mean?  Do you mean sent

13   to?

14       A.      Given to.

15       Q.      Okay.  How?

16       A.      I don't know how they do it.

17       Q.      You don't know the mechanics of it?

18       A.      I can -- no.

19       Q.      Do you mean received by?

20                MR. NGUYEN:  Objection to form.

21   BY MS. FAHRINGER:

22       Q.      When you say "shared or disclosed," do

23   you mean also received by YCDroid?

24                MR. NGUYEN:  Object to form.

25                THE WITNESS:  Given to and received

1          by.

2     BY MS. FAHRINGER:

3          Q.      Okay.  Do you mean viewed by YCDroid?

4     When you say Google shared the information with

5     YCDroid, do you mean that YCDroid viewed the

6     information?

7                     MR. NGUYEN:  Objection to form,

8          relevance.

9                     THE WITNESS:  And I don't know.

10    BY MS. FAHRINGER:

11         Q.      You don't know whether you -- whether

12    you mean that YCDroid viewed the information as

13    well?

14                    MR. NGUYEN:  Objection to form and

15         relevance.

16                    THE WITNESS:  Yeah, I don't understand

17         that question.

18    BY MS. FAHRINGER:

19         Q.      Do you think it matters whether

20    YCDroid looked at the information?

21                    MR. NGUYEN:  Objection, relevance,

22         form.

23                    THE WITNESS:  No.

24                    MS. FAHRINGER:  Would you mark that?

25

1    BY MS. FAHRINGER:

2        Q.     You don't think it matters?

3        A.     No.

4        Q.     Why not?

5        A.     Because it's not for Google to decide

6    how to use my information.  It's my information.

7        Q.     Regardless of whether YCDroid sees it

8    or not?

9        A.     Correct.

10          MR. NGUYEN:  Object to form.

11    BY MS. FAHRINGER:

12        Q.     Okay.  So if YCDroid did see it, let's

13    just assume that, do you know whether he or she used

14    the information?  That is, and by "the information,"

15    I'm referring to your name, e-mail address, city,

16    state, zip, phone and possibly street address.

17          MR. NGUYEN:  Objection, form, calls

18      for speculation.

19          THE WITNESS:  And I don't know.

20    BY MS. FAHRINGER:

21        Q.     You don't know whether they used the

22    information?

23        A.     No.

24        Q.     For shorthand, I'm going to refer to

25    YCDroid sometimes as "he."  Do you know whether

1    YCDroid sent the information to anyone?

2          A.      I don't know.

3          Q.      Do you know whether YCDroid shared the

4    information with anyone else?

5          A.      I don't know.

6          Q.      Do you know whether YCDroid made the

7    information public?

8          A.      I don't know.

9          Q.      Now, some of the information -- well,

10   some of the information -- your name, for example,

11   was already public, correct?

12                 MR. NGUYEN:  Objection, vague.

13   BY MS. FAHRINGER:

14         Q.      Is your name private?

15         A.      I think it's private.

16         Q.      Your name.

17         A.      I don't know what you mean by

18   "private."

19         Q.      Okay.  When did you discover this --

20   this sharing?  Shall I -- shall I rephrase that?

21                 (Simultaneous speaking.)

22                 MR. NGUYEN:  And, again, I --

23   BY MS. FAHRINGER:

24         Q.      When did you first hear -- I'll

25   withdraw that question.

57

1          When did you first hear that app

2     developers had access to this sort of information?

3     Was it -- was it in that initial conversation with

4     -- with your office mate Ilan?

5          A.     I don't recall.

6          Q.     But it was after you purchased the app

7     on May 6, 2013, or before?

8          A.     So I guess I'd have to have the

9     question read back to me.

10         Q.     Sure.  I'll go ahead and repeat it.

11         A.     Okay.

12         Q.     The question is:

13                When you first heard that app

14    developers might have access to this sort of

15    information --

16         A.     So just in a generic sense?

17         Q.     Yeah.

18         A.     I don't know when I first found out,

19    first heard about that.

20         Q.     Okay.  In a generic sense, would it

21    have been before or after May 2013?

22         A.     That I don't know.

23         Q.     Could it have been before?

24         A.     I don't know.

25         Q.     Okay.  So you're aware that the

1          MS. FAHRINGER:  Someone does.

2          MR. NGUYEN:  For my sake, yeah,

3     appreciate it.

4          MS. FAHRINGER:  Okay.  We'll take a

5     10-minute break.

6          THE VIDEOGRAPHER:  Going off the

7     record.  The time is now 9:59 p.m.

8               (Recess taken.)

9          THE VIDEOGRAPHER:  Going on the

10     record.  This marks the beginning of media

11     number two.  The time is now 10:08 a.m.

12  BY MS. FAHRINGER:

13     Q.     Ms. Svenson, how did the alleged

14  sharing affect you?

15     A.     Well, it affected me because I lost

16  the right to sell my own information for one thing.

17  And I lost an asset.

18     Q.     Any other ways?

19     A.     None that I can think of.

20     Q.     Why do you say you lost the right to

21  sell your information?

22     A.     Because it was already sold.

23     Q.     To whom?

24     A.     YCDroid for one thing.

25     Q.     So who did you lose the right to sell

1     your information to?

2          A.        Any potential vendor, any and all.  I

3     mean, yeah, there's loads of entities that purchase

4     personal information.

5          Q.        And you feel that you've now lost the

6     right to sell your information to any of those

7     entities?

8          A.        That's possible.

9          Q.        On what basis do you say that?

10          A.        Because my information's already been

11     sold, so the value of my information has been

12     diminished.

13          Q.        Do you -- do you believe that

14     Google's -- let me just make sure I'm understanding

15     this -- that Google's disclosure of the information

16     at issue in this case to YCDroid resulted in your

17     being utterly unable to sell any of that information

18     to anyone ever?

19          A.        That I don't know.

20               MR. NGUYEN:  Objection to form.

21               THE WITNESS:  Yeah, I don't know.

22     BY MS. FAHRINGER:

23          Q.        Okay.  If you don't know that, then

24     what do you know?  What -- what is it that you feel

25     you lost the right to do?

64

1        A.        Oh, I already testified to that.

2        Q.        Well, let me make sure I understand

3    your testimony.

4                  You lost the right to sell the

5    information -- as I -- as I heard your testimony you

6    testified that you feel you lost the right to sell

7    your information.

8        A.        Right.  And I also lost the privacy of

9    my information, I lost my privacy.

10        Q.        Okay.  And my question is:

11                  To whom did you lose the right to sell

12    your information?  I asked you whether you lost the

13    right to sell it to anyone.  And if I recall your

14    testimony correctly, your answer was no.  So who did

15    you lose the right to sell it to?

16                  MR. NGUYEN:  Object to form, calls for

17        speculation.

18    BY MS. FAHRINGER:

19        Q.        Do you understand the question --

20        A.        I don't.

21        Q.        -- you want me to ask it again?

22                  So the question, and I'm -- and I'm

23    following up on this because my impression is that

24    -- is that I feel you've given inconsistent answers.

25    And so I want to make sure I understand what you're

1    saying.

2                    I want to make sure I understand who

3    you feel you can no longer sell your information to.

4         A.      And I don't know the answer -- I don't

5    know who I could sell it to.

6         Q.      But the reason that you think you

7    can't sell your information any more is because of

8    the sharing that is alleged in this case?

9                    MR. NGUYEN:  Object to form.

10   BY MS. FAHRINGER:

11        Q.      If -- if true.

12        A.      Yeah, I don't know.

13        Q.      You don't know why you can't

14   share -- do you know why you feel you can't sell

15   your information any more?

16        A.      Well, it's lost value.

17        Q.      So what is it that caused your

18   inability to sell the information any more?

19                    MR. NGUYEN:  Objection to form and to

20        the extent it misstates prior testimony.

21                    MS. FAHRINGER:  Could you read back

22        the question?

23                        (Record read as requested.)

24                    THE WITNESS:  I guess I should state I

25        don't know if I can sell the information.  So I

1          should clarify what I previously said.

2     BY MS. FAHRINGER:

3          Q.        Okay.  So you don't know whether you

4     can sell the information --

5          A.        Right.

6          Q.        -- any more.

7          A.        I don't know.

8          Q.        So you don't have any basis to say

9     whether or not you can sell your information any

10    more?

11              MR. NGUYEN:  Object to form.

12              MS. FAHRINGER:  The question was

13         incomplete.

14    BY MS. FAHRINGER:

15         Q.        You don't -- is it fair to say you

16    don't have any basis to say whether or not you can

17    sell your information any more?

18              I'm going to withdraw that question.

19         A.        Yeah, I didn't understand it.

20         Q.        I'm going to ask another one.

21              The allegation in this case is that

22    Google shared your information with YCDroid,

23    correct?

24         A.        That's one of the allegations.

25         Q.        Okay.  As to that allegation is it

1    fair to say, is it correct to say that as a result

2    of that you don't know whether you can sell your

3    information any more?  Do you understand the

4    question?

5          A.      I think so.  I think it's fair to say

6    that I don't know if I can sell the information.

7    Yes.

8          Q.      So you don't know whether the price

9    you might get for the information would be higher or

10   lower as a result of the alleged sharing practices?

11         A.      I wouldn't know.

12         Q.      And you don't -- and you haven't tried

13   to sell the information at issue in this case to

14   anyone I take it?

15         A.      No, I have not.

16         Q.      Do you know how much the information

17   would be worth to anyone?

18         A.      I do not know.

19         Q.      You don't know if that information

20   would be higher or lower as a result of the alleged

21   sharing practices in this case?

22         A.      I would think it would be lower.

23         Q.      But you don't know?

24         A.      I don't know.

25         Q.      And this is true for -- this is true

1    for each of the items at issue in this case or any

2    of them in combination, correct?  And by "the items

3    in this case" I mean name, Gmail address, city,

4    state, zip, possibly street address and phone

5    number.

6                    MR. NGUYEN:  Objection, compound.

7    BY MS. FAHRINGER:

8        Q.        Correct?  Do you need the question

9    read back?

10       A.        Yes.

11                     (Record read as requested.)

12                 THE WITNESS:  Yes.

13   BY MS. FAHRINGER

14       Q.        Okay.  And this was true -- oh, never

15   mind.  I withdraw that question.

16                 Did the developer at issue here

17   YCDroid, did he ever contact you?

18       A.        Not that I know of.

19       Q.        Has any developer ever contacted you?

20       A.        I don't --

21                 MR. NGUYEN:  Objection, vague.

22                 THE WITNESS:  I don't know.

23   BY MS. FAHRINGER:

24       Q.        Well, to your knowledge.

25       A.        When you say "any developer," any

1      contact that I --

2           Q.      Fair enough.  By that I mean any app

3      developer from whom you purchased an app on Google

4      Play using Wallet.  So I assume that would mean

5      YCDroid or the developer Crafty Apps and -- and any

6      others you can recall?

7           A.      So not to my knowledge.

8           Q.      Okay.  And have -- has any developer

9      from whom you've purchased an app ever sent you any

10     marketing material to your knowledge?

11          A.      Yeah, that I don't know.  It's

12     possible.

13          Q.      But you have no -- you don't have any

14     marketing material to produce.  You don't have any

15     recollection of any marketing material sent?

16          A.      Right.  I don't read marketing

17     material so...

18          Q.      Okay.  You can't say one way or

19     another whether -- whether a developer has sent you

20     marketing material.

21          A.      Correct.

22          Q.      Do you know whether sharing the

23     information with a developer, the sharing at issue

24     in this case, was necessary to process your

25     transaction or maintain your account?

1          MR. NGUYEN:  Object to form, calls for

2      speculation.

3  BY MS. FAHRINGER:

4      Q.      If you know.

5      A.      I don't see how it would be necessary.

6      Q.      Do you know?  Do you know whether it

7  was, to complete the question?

8      A.      Again, I don't think -- I don't see

9  how it would be necessary, but...

10     Q.      But do you know whether or not the

11  sharing practice -- the sharing at issue in this

12  case was necessary to process your transaction or

13  maintain your account?  Do you know one way or the

14  other?

15          MR. NGUYEN:  Objection, asked and

16      answered.

17          THE WITNESS:  I don't see how it would

18      be necessary.

19  BY MS. FAHRINGER:

20     Q.      Do you know whether -- whether sharing

21  the information -- the sharing at issue in this

22  case, do you know whether it was necessary to

23  prevent fraud?

24     A.      I don't see how it would be necessary

25  to prevent fraud.  To me that almost seems

1              MR. NGUYEN:  Completely vague.

2         Objection.

3              MS. FAHRINGER:  You're allowed to

4         object as to form and the witness can answer.

5              MR. NGUYEN:  I'm making my objection.

6              THE WITNESS:  How do I determine

7         value?

8    BY MS. FAHRINGER:

9         Q.      Um-hmm.

10        A.      Is the question?

11        Q.      Right.  What would you look at?

12             MR. NGUYEN:  Asked and answered.

13             THE WITNESS:  You would look at its

14        viability or desirability on the market -- in

15        the marketplace.

16   BY MS. FAHRINGER:

17        Q.      Okay.  Would you look at whether there

18   have been offers to buy it?

19             MR. NGUYEN:  Object to form.

20             THE WITNESS:  Perhaps.

21   BY MS. FAHRINGER:

22        Q.      Price offered?

23        A.      Perhaps.

24        Q.      The price previously charged for it,

25   would you look at that?

74

1        A.        Maybe.

2        Q.        Would you look at whether it was

3    available for free?

4                  MR. NGUYEN:  Object to form.

5                  THE WITNESS:  Maybe.

6    BY MS. FAHRINGER:

7        Q.        Anything else you can think of that

8    you would look at in determining how much something

9    is worth?

10       A.        No.

11       Q.        Okay.  Let's look at your name, Gmail

12   address, city, state, zip, phone number, possibly

13   street address.  Have you ever been paid for any of

14   these items of information alone or in combination?

15       A.        Not that I recall.

16       Q.        Okay.  And I think you testified

17   earlier, but correct me if I'm wrong, that you never

18   tried to sell or entertain any offers to buy any of

19   these items either alone or in combination, correct?

20       A.        That's correct.

21       Q.        And some of these items of information

22   are publicly available for free, correct?

23                 MR. NGUYEN:  Objection.

24                 THE WITNESS:  I don't know if they're

25       free, to be honest.

1    BY MS. FAHRINGER:

2         Q.         Okay.  Let's take a look at that then.

3                    The fact that you live in ███████

4    ████████████████████████  for example, that's

5    publicly available for free, correct?

6         A.         Well, you're telling me that it is.  I

7    don't know that that's true.

8         Q.         That's my question to you.  Do you

9    know whether it is or not?

10        A.         That probably is.

11        Q.         Okay.  And has been since before 2013;

12   is that correct?

13        A.         Most likely, yes.

14        Q.         Your phone number is publicly

15   available for free, correct?

16                   MR. NGUYEN:  Object to form.

17                   THE WITNESS:  Yeah, I'm not sure

18        that's true.

19   BY MS. FAHRINGER:

20        Q.         Okay.  How about your Facebook page.

21   You have a Facebook page, do you not?

22        A.         I do.

23        Q.         And on the Facebook page you identify

24   your likes, your hometown, your current place of

25   residence, correct?

1          A.          Yes.

2          Q.          And that's a public Facebook page,

3   correct?

4          A.          You know, I had thought it was

5   private.  And I learned yesterday that it wasn't.

6          Q.          And it hasn't been private since

7   before 2013, correct?

8          A.          I think that's right.

9          Q.          Okay.  When you say you learned

10  yesterday that it wasn't, and I don't want the

11  contents of any communications with counsel, was it

12  in a conversation that involved someone other than

13  counsel?

14         A.          No.

15         Q.          Okay.  On your Facebook page you

16  identify a number of likes, correct?  Over 160 of

17  them?

18         A.          Probably.

19         Q.          You're not shy about advertising --

20         A.          No.

21         Q.          -- your likes?

22                     You also make political contributions

23  and the amounts, recipients and your full name,

24  Alice Christine Svenson, and your city, state, zip

25  and profession, all are publicly available for free,

77

1    correct?

2                     MR. NGUYEN:  Object to form.

3                     THE WITNESS:  Those are probably

4         available for free.

5    BY MS. FAHRINGER:

6         Q.         Okay.  And you haven't taken any steps

7    to remove the information or -- or ask that it be

8    private?

9         A.         That can't be private.  As an election

10   lawyer, I happen to know that.

11        Q.         So you knew when you made the

12   political contributions that this information would

13   be made publicly available for free, correct?

14        A.         Yes.

15        Q.         And you've made such political

16   contributions since at least 2010, correct?

17        A.         Yes.

18        Q.         So if you were to try to keep some of

19   this information private, do you know what steps you

20   might take?

21        A.         What information?

22        Q.         Any of the -- any of the information

23   we're talking about, name, Gmail address, city,

24   state, zip, possibly street address and phone

25   number?

1          A.          It would be difficult.

2          Q.          Why?

3          A.          Because we live in the information

4     age.

5          Q.          And what do you mean by that?

6          A.          Well, every -- Google is a verb, so

7     everything is Googlable.

8          Q.          What do you mean by that?

9          A.          So just type in Christine Svenson, and

10    a lot pops up.

11         Q.          Like what?

12         A.          The fact that I'm a lawyer, where my

13    office is, cases that I've handled, political

14    contributions, that sort of thing.

15         Q.          Are you aware that different people

16    might take different steps to protect this sort of

17    information?

18              MR. NGUYEN:  Object to form.

19    BY MS. FAHRINGER:

20         Q.          Let me withdraw that question and ask

21    a better one.

22              Are you aware that different people

23    might do different things to try to keep some of

24    this information private?

25         A.          People can try, I don't think it's

1   Q.      And just to make sure I'm -- I am

2   recalling your answer correctly, you -- am I -- and

3   correct me if I'm wrong, but do I remember correctly

4   that you can't identify whether the value of your

5   information changed or not before or after the

6   sharing at issue in this case?  Do I remember that

7   correctly?

8   A.      Can you repeat that?

9   Q.      Am I correct in remembering that you

10  testified that you can't -- I'm sorry.  That you

11  don't know whether the value of your -- of the

12  information at issue in this case changed before or

13  after May 6, 2013?

14  A.      So I believe my answer was I don't

15  know, but I would assume that it decreased.

16  Q.      Okay.  By how much?

17  A.      I have no idea.

18  Q.      Decreased as to whom?

19  A.      What do you mean "as to whom?"

20  Q.      Decreased as to everybody, just as to

21  YCDroid?

22  A.      Oh, I don't know.

23  Q.      And you can't quantify the value of

24  your -- of any of the information at issue in this

25  case?

82

1          A.        No.

2          Q.        Okay.  Moving on to another topic.

3                    Okay.  Now, I'd like to talk about

4    your purchase in May 2013 of the SMS e-mail app,

5    okay?

6                    That's the app purchase at issue in

7    this case, correct?

8          A.        Right.

9          Q.        Okay.  So you allege in the First

10   Amended Complaint that you purchased the app for

11   $1.77.  Is that true?

12         A.        Yes.

13         Q.        And you identified the app in your

14   discovery requests -- responses as the, quote:

15                   SMS-MMS to e-mail app published from

16   third-party inventory for YCDroid purchased on

17   May 6, 2013, for $1.77.  That's true, correct?

18         A.        Yes.

19         Q.        So, if you would, walk through

20   everything you can remember about the purchase -- we

21   have talked already about the account creation

22   process for Google and Gmail and the registration

23   process for Wallet.  Now I want to talk about the

24   purchase process for this app.

25                   If you would walk me through

1    everything you can remember about that purchase

2    process.

3                    MR. NGUYEN:  Object to form.

4                    THE WITNESS:  So I believe that I

5         tried to download the app, and it, you know,

6         indicated that there was a cost and referred me

7         to Google Wallet.  And at Google -- so I was --

8         so I went to Google Wallet and was prompted to

9         enter my name, address, credit card

10        information.

11   BY MS. FAHRINGER:

12        Q.        Okay.  Then what happened?

13        A.        I was given -- I was probably provided

14   with the terms of service of Google Wallet then.

15        Q.        Okay.

16        A.        And I then clicked on Google Wallet to

17   actually enter into the contract.

18        Q.        Okay.

19        A.        And then the -- I got probably an

20   e-mail receipt, and the app probably downloaded on

21   to my phone.

22        Q.        At what point -- was there a point

23   where you clicked "buy"?

24        A.        Where I clicked bye?  I'm sorry.

25        Q.        Yes, B-U-Y, buy.

ALICE C. SVENSON - CONFIDENTIAL

1    A.    Oh, B-U-Y.  I don't remember.

2 Probably.

3    Q.    Were you doing this on your phone?

4    A.    Yes.

5    Q.    Do you remember anything about the

6 screens that you saw?

7    A.    No, because it was on my phone.

8    Q.    You had -- hmm.

9          Do you remember when you clicked buy

10 on that screen, do you remember whether or not there

11 was any link to any terms of service?

12    A.    I don't remember when I saw the terms

13 of service, you know, if it was on the same screen

14 as the buy.  I don't remember that.

15    Q.    You just don't remember any of that.

16    A.    Right.

17    Q.    Okay.  We might have something that

18 will refresh your recollection.

19    A.    Okay.

20    Q.    When you bought this app, do you

21 recall there being any app permissions, whether you

22 gave the app permission to look at anything?

23    A.    I don't remember.

24    Q.    Okay.  In your discovery responses you

25 said:

1     particular app from any other source?

2         A.       No.

3         Q.       Why not?

4         A.       Because I've had success with Google

5     Play just typing in the type of app that I want in

6     the past.

7         Q.       Would you have bought the app from

8     another source at the time?  Have you ever bought an

9     app from another source?  That was two questions.

10         A.       Yeah, right.  I'm confused.

11         Q.       I just meant to ask the second one.

12                Have you ever bought an app from

13     another source than Google Play?

14         A.       I don't think so, no.

15         Q.       How come?

16         A.       Because Google Play is so easy.

17         Q.       How come?

18         A.       Because, I mean Droid, at least I

19     think I'm right about this, Droid is affiliated with

20     Google.

21         Q.       Why do you say that?

22         A.       Just things I've heard on the street.

23     I've never actually Googled it to find out if that's

24     true.  I just -- that's my impression.

25         Q.       It's not based on anything on Play?

1          A.       On Google Play?

2          Q.       Yeah.

3          A.       No, that's just my own sort of

4 instinct.  I don't even know if I'm right about

5 that.

6          Q.       Okay.  Do you know whether the

7 app -- the SMS app at issue in this case, do you

8 know whether it was available elsewhere?

9          A.       I've since learned that it was.

10         Q.       Okay.  Do you know whether it's more

11 or less expensive elsewhere?

12         A.       That I don't know.

13         Q.       When -- so you bought the app, the

14 same app twice, correct?

15         A.       Yes.

16         Q.       Once for phone number one, once for

17 phone number two, correct?

18         A.       Yes.

19         Q.       Once for account number

20 ██████████████████████ in May 2013.  The second

21 time under -- with phone number too under the

22 ████████████████ account?

23         A.       I think the second time was also under

24 ████████████

25         Q.       Are you sure about that?

1        A.      No.

2        Q.      Okay.  You paid -- you paid -- if I

3 recall your testimony correctly, you paid each time,

4 correct?

5        A.      Yes.

6        Q.      Okay.  And the price had gone down a

7 little bit the second time?

8        A.      That's my recollection.

9        Q.      Have you used iPhones ever?

10       A.      No.

11       Q.      Okay.  All right.  You've asserted a

12 claim for breach of contract here, correct?

13       A.      Yes.

14       Q.      And you attached the contracts at

15 issue to the complaint, correct?

16       A.      Yes.

17       Q.      And do you recall what those contracts

18 are?

19       A.      Yes.

20       Q.      What are they?

21       A.      Well, there's the Google Wallet terms

22 of service.

23       Q.      Um-hmm.

24       A.      And there's a couple of privacy

25 policies I believe.

1    Q.        Okay.  Are there any other contracts

2    at issue in this case?

3                MR. NGUYEN:  Objection to form, calls

4        for a legal conclusion.

5    BY MS. FAHRINGER:

6        Q.        Just to make sure I understand the

7    allegations.

8        A.        Not that I am aware of.

9        Q.        No oral contracts --

10       A.        Oh, no.

11       Q.        -- no other -- no other contracts to

12   your knowledge?

13       A.        Not that I know of.

14       Q.        And you've asserted breach of privacy

15   promises, and those are found in the contracts

16   you've attached to the complaint, correct?

17       A.        Yes.

18       Q.        And nowhere else, correct?  To your

19   knowledge.

20       A.        Not to my knowledge, right.

21       Q.        And -- and you're asserting that both

22   defendants breached those contracts, correct?

23       A.        Correct.

24       Q.        By sharing your information at issue

25   in this case with YCDroid?

92

1   contract?

2             MR. NGUYEN:  Objection, calls for a

3      legal conclusion.

4   BY MS. FAHRINGER:

5      Q.      If you're not --

6      A.      I'm not.

7      Q.      That's fine.  Okay.

8             So if I were to ask you a lot of

9   questions about this other buyer's contract --

10      A.      Maybe I'm not understanding you

11  correctly.

12     Q.      Okay.  Is there any other contract you

13  agreed to?

14     A.      I guess I would have to look at the

15  complaint.

16     Q.      Okay.

17              (Svenson Exhibit 3 marked for

18              identification.)

19  BY MS. FAHRINGER:

20     Q.      Showing you what's been marked

21  Exhibit 3, do you recognize this as the current

22  complaint in this case?

23     A.      Yes.

24     Q.      This is the First Amended Complaint

25  filed September 2nd, 2014, correct?

1          A.      Yes.

2          Q.      And to the complaint are attached as

3   the Google terms the terms and the privacy notices

4   you referred to earlier, correct?

5          A.      Yes.

6          Q.      And what are those?

7          A.      Yes, so there's the Google Wallet

8   terms of service and there's privacy policies.

9                  Oh, yeah, so when I -- when I clicked

10  on the software button, I entered into the buyer

11  contract.

12         Q.      Okay.

13         A.      Is that what you're referring to?

14  Yeah.

15         Q.      So let's talk about the terms of that

16  buyer contract.

17         A.      Yeah.

18         Q.      What are they?

19                 MR. NGUYEN:  Objection, vague.

20                 THE WITNESS:  Yeah, so essentially

21  Google, who directed the document, offered

22  terms to me that I could accept or that I had

23  to actually accept, in essence, outlining what

24  it is they were to get -- what they were

25  promising to me and what I was promising them

94

1          in return.

2     BY MS. FAHRINGER:

3          Q.        Okay.  And were the terms in writing?

4          A.        Yes.

5          Q.        Where were they in writing?

6          A.        On their website.

7          Q.        And what was the title of the document

8     that reflected the buyer's contract?

9          A.        I'm assuming that's the -- we're

10     talking about the Google Wallet terms of service.

11          Q.        Yeah, that's the question to you.

12          A.        Okay.

13          Q.        Where would I find the terms of the

14     buyer's contract?

15          A.        Oh, yeah, so the buyer contract is

16     entered into with the purchase and payment.

17          Q.        Right.  And where would I find the

18     terms of the buyer contract?

19          A.        I think it's the Google Wallet terms

20     of service.

21          Q.        Take your time.

22          A.        Okay.

23          Q.        You're reading from a couple of pages

24     in the complaint.  Which pages are those?

25          A.        I'm looking at the pages 5 and 6.

MR. NGUYEN: You can take as much time as you need obviously.

THE WITNESS: Okay. Okay. This is refreshing my recollection.

BY MS. FAHRINGER:

Q. Okay. So what is the buyer's contract?

A. So the buyer's contract is entered into every time that you actually purchase an app on Google Wallet.

Q. Where are the terms of the buyer's contract reflected?

A. Oh. I believe it's when I actually -- they're probably listed before I purchase the app.

Q. Okay.

A. On the website.

Q. Where are they listed? What is the document that includes the terms of the buyer's contract?

A. What do you mean, "What is the document?" It's on the screen. Is that what you mean?

Q. Right. What is the title of the document?

1    Q.      Right.  Do you see the buyer's

2    contract there?

3    A.      No.

4    Q.      Okay.

5            MR. NGUYEN:  Objection.

6    BY MS. FAHRINGER:

7    Q.      So these are -- and the ones that are

8    attached to the complaint, these are all the

9    policies and terms of service you agreed to in

10   connection with registration, correct?

11           MR. NGUYEN:  Objection, calls for a

12        legal conclusion.

13   BY MS. FAHRINGER:

14   Q.      And by "registration," I mean both

15   registration for your Google account, in the case of

16   the Google terms of service, Google privacy -- ah,

17   the Google terms of service aren't attached, are

18   they?

19   A.      So you asked me a bunch of things --

20   Q.      I did.  I did.  I withdraw those

21   questions.  Let me back up a step and ask a

22   different one.

23           The Wallet terms of service, Wallet

24   privacy notice, Google privacy policy that are

25   attached to the First Amended Complaint, these are

1    all documents that you agreed to in connection with

2    creating your Gmail account,

3    ███████████████████████  and creating your Google

4    Wallet account, correct?

5                    MR. NGUYEN:  I object because that

6         calls for a legal conclusion.

7    BY MS. FAHRINGER:

8         Q.        You can answer.

9         A.        So I clicked on the boxes to agree to

10   those.

11        Q.        When you created those accounts,

12   correct?

13        A.        Yes.

14        Q.        Okay.  In your -- and you can -- you

15   can have that near you if you want, but you can put

16   it aside.  I'm not going to ask any more questions

17   about that.

18                    MR. NGUYEN:  Okay.

19   BY MS. FAHRINGER:

20        Q.        But you alleged and you responded in

21   discovery that you purchase the app for $1.77,

22   correct?

23        A.        Yes.

24        Q.        Do you allege that you paid the

25   defendant some portion of that?

1    A.    I believe that they received a portion
2 of that.
3    Q.    Okay.  Do you allege that you paid
4 them a portion of that?
5    A.    Yes.
6    Q.    Okay.  In return for what?
7    A.    Oh.  I mean in return for my receiving
8 the use of the app.
9    Q.    Anything else?
10    A.    Oh.  In return for -- I mean it's
11 Google, so I presume that they are going to keep my
12 information confidential.
13    Q.    Okay.  Anything else -- and you -- you
14 are alleging you paid for that?
15    A.    Yeah, I think so.
16    Q.    That you paid Google for that?
17    A.    I think that's part of what I paid
18 for.
19    Q.    Okay.  Anything else you feel you paid
20 for?
21    A.    Oh, nothing that I can think of.
22    Q.    How about like the fraud protection
23 process, tools to communicate with the seller, that
24 sort of thing, the platform?
25    A.    Yeah, I mean them hooking me up with

1    the seller -- or with the vendor.  Is that what you

2    mean?

3         Q.       Anything else you feel you paid the

4    defendants for?

5         A.       I feel like I paid them for hooking me

6    up with YCDroid and, you know, being the

7    intermediary in that transaction.

8         Q.       When you say hooking you up with

9    YCDroid, I think I know what you mean.  But what do

10   you mean?

11        A.       So Google is...

12                 Providing me with a vendor and

13   processing the transaction.

14        Q.       Okay.  And what do you mean when you

15   say "being the intermediary in the transaction?"

16        A.       Well, they're actually taking in the

17   money, and they are processing the transaction.

18        Q.       And you feel you are paying the

19   defendants for that?

20        A.       Yes.

21        Q.       How much?

22        A.       Well, I paid $1.77.

23        Q.       And how much were you paying -- and

24   some of that went to YC -- well, are you

25   distinguishing between YCDroid and the defendants in

1    your answer?

2         A.       Which answer?

3         Q.       In the answer that says you were

4    paying for processing services and what -- when you

5    were describing what you were paying for.

6         A.       I was paying Google for that.

7         Q.       Okay.  So -- and -- and YCDroid -- you

8    testified YCDroid was the vendor, correct?

9         A.       Right.

10        Q.       And so you paid YCDroid something for

11   the app, correct?

12        A.       Correct.

13        Q.       $1.77 for the app.

14        A.       Well, I paid Google the $1.77.

15        Q.       Okay.  So do you know what portion was

16   for the app and what portion was for other things?

17   And, if so, how do you know?

18        A.       Yeah, so I've learned that Google I

19   believe took a 30-percent cut.

20        Q.       And how did you learn that?

21                 MR. NGUYEN:  Objection to the extent

22            it calls for any attorney-client

23            communications.

24                 THE WITNESS:  So am I -- can I answer?

25                 MR. NGUYEN:  Only to the extent that

1          you are not going to disclose any client

2          communications.

3                    THE WITNESS:  I can't answer.

4     BY MS. FAHRINGER:

5          Q.        So you learned that through

6     communications with counsel and not through any

7     other source, correct?

8          A.        That's right.

9          Q.        Okay.  So you didn't know that at the

10    time -- and your communications with

11    counsel -- well, I suppose I should ask.

12                   When did you learn that?  Before or

13    after you purchased the app?

14         A.        That would be after.

15         Q.        Okay.  So when you purchased the app,

16    you didn't know that Google took a 30-percent cut?

17         A.        I probably didn't know that.

18         Q.        And you came to learn that later.

19         A.        Yes.

20         Q.        Do you know what portion of the

21    30 percent -- let me back up a step.

22                   You conclude that you paid -- why do

23    you allege that you paid the defendant some amount?

24                   Why do you believe that you paid the

25    defendant some amount?

112

1      A.      Well, a bunch of reasons.

2      Q.      Okay.

3      A.      I mean I've learned that they took a

4  percentage.

5      Q.      You learned that after, after payment,

6  correct?

7      A.      Yes.  But now that I think about it, I

8  mean, I probably -- I mean, it makes sense -- I

9  probably even knew when I purchased it that Google

10 took a portion of it.

11     Q.      Do you remember that?

12     A.      No.

13     Q.      And you conclude that you paid

14 defendants because you later learned that the

15 defendant kept a portion of the payment?

16             MR. NGUYEN:  Objection, misstates

17     prior testimony.

18             THE WITNESS:  Can you repeat that?

19 BY MS. FAHRINGER:

20     Q.      If it's wrong, let me know.

21             Can you -- can you read that back,

22 please?

23                 (Record read as requested.)

24             THE WITNESS:  I believe that I paid

25     the defendants.

1    BY MS. FAHRINGER:

2         Q.        Right.  And -- and I don't want to go

3    around and around on this, but I want to make sure I

4    know why.

5         A.        Um-hmm.

6         Q.        Is that because of what you later

7    learned or for some other reason?

8         A.        It's partly because of what I learned.

9         Q.        Okay.  And what's -- what's the rest

10   of it from?

11        A.        That I was purchasing the actual app

12   from them.  So, of course, they would get some of

13   the money.

14        Q.        You assumed they would.

15        A.        Yeah.

16        Q.        Do you remember any -- any -- anything

17   that would that would cause you to conclude that

18   other than the fact that you were on Google Play?

19        A.        No.

20        Q.        Okay.  How much of that 30 percent was

21   attributable -- that -- that you -- that you believe

22   you paid the defendants, how much was attributable

23   to the privacy protections, how much was

24   attributable to the other things you mentioned that

25   you got from the defendants?  Do you know?

114

1        MR. NGUYEN:  Objection, calls for

2    speculation.

3    BY MS. FAHRINGER:

4        Q.        If you know.

5        A.        Yeah, that I don't know.

6        Q.        Okay.  Do you have any objective

7    criteria for determining that?

8        A.        I'm not an economist, so I would have

9    no idea.

10       Q.        Okay.  Any subjective criteria for

11   determining that?

12       A.        I couldn't even speculate.

13       Q.        Okay.  And it's not reflected in any

14   document anywhere or nor was it reflected on any

15   screen you saw, correct?

16       A.        It wasn't reflected on any of the

17   terms that I looked at.

18       Q.        Okay.  Did you have any communications

19   with the defendants other than the flows we've

20   talked about, the purchase flow and the account

21   signup flow?  Is there any other e-mails exchanged

22   or anything else that you remember that we should be

23   looking at?

24       A.        I probably received e-mail receipts

25   from them.

1    Q.      Okay.  And then there's e-mail

2  receipts.  Can you remember anything else?

3    A.      No.

4    Q.      Okay.  Do you know whether -- let

5  me -- I want to -- I want to make sure I steer well

6  clear of your communications with your counsel.  I

7  don't want to know anything about what you talked

8  about with counsel, so I'd like to just limit -- I'd

9  like you to limit your answers to what you know

10  outside of what counsel -- you learned from your

11  counsel, okay?

12    A.      Yes.

13    Q.      Do you know that Google or Google

14  Payment Corporation, the defendants in this case,

15  other than from communications with counsel that

16  they kept; that is, they didn't transfer to an

17  account for the benefit of the seller the 30 percent

18  of the purchase price?

19            MR. NGUYEN:  Objection, it's been

20       asked and answered.

21            THE WITNESS:  I wouldn't have any

22       idea.

23  BY MS. FAHRINGER:

24    Q.      Okay.  If the defendants deposited

25  that 30 percent in an account -- well, or the whole

124

1      Q.        Okay.  Is that portion, how to

2  determine that portion or the fact of payment of

3  that portion reflected by any of the contracts at

4  issue in this case?

5      A.        In a sense, yes, because there are

6  included in the terms in the privacy policies is

7  Google's promise not to disseminate my information.

8      Q.        How about the payment term?  Is that

9  reflected anywhere in those contracts, the payment

10 that you're discussing now?

11     A.        Which payment?

12     Q.        In return for the privacy promises?

13     A.        As I said, I paid $1.77.

14     Q.        Okay.  And the portion of that that

15 was paid in return for the privacy promises, is that

16 discussed or addressed in any of the contracts at

17 issue in this case?

18     A.        As I said before, it is addressed in

19 the sense of there are provisions that lay out

20 privacy promises of Google.  So I would say that

21 yes, it is addressed.

22     Q.        The payment by you to defendants, is

23 that discussed anywhere?

24     A.        Well, in the buyer's contract.

25     Q.        Okay.  But not in the attachments to

1     the complaint?

2                   MR. NGUYEN:   Objection, calls for a

3           legal conclusion.

4                   THE WITNESS:   The actual -- well, if

5           you're asking me if -- if the -- the amount of

6           $1.77 is listed within these documents, yeah,

7           right.

8     BY MS. FAHRINGER:

9           Q.        So the answer would be no?

10          A.        Correct.

11          Q.        And now I'm asking -- and what I'm

12    asking you is the amount, the price term, the amount

13    that you allege you paid in return for these

14    promises, is that found anywhere in the attachments

15    to the complaint?

16          A.        The actual amount is not in there.

17          Q.        How about a means of determining the

18    amount?

19          A.        I don't know how to answer that.  I

20    guess I would say I don't know.

21          Q.        Okay.  How about the fact that you

22    would pay the defendants?

23          A.        Depending on which documents you're

24    referring to I'm not really sure.

25          Q.        Any of them -- any of them attached to

1   the complaint?

2          A.      Any of the exhibits.

3          Q.      Any of the exhibits to the complaint,

4   correct.

5          A.      I mean I would have to go back and

6   look through them.

7          Q.      Could it be that the Wallet terms of

8   service, for example, provide that you're paying --

9   that the transaction is between you and -- and the

10  seller?

11         A.      Yeah, I'd have to --

12                 MR. NGUYEN:  Objection, form.

13                 THE WITNESS:  Yeah, I'd have to go

14         through and look.

15  BY MS. FAHRINGER:

16         Q.      So you don't know either way.

17         A.      I mean I've read the document, but I

18  can't just, as I sit here, just tell you exactly

19  what it says.

20         Q.      Okay.  Do you know whether the price

21  paid -- that you've paid or would pay in return for

22  the privacy promises, whether it would vary based on

23  any variables?

24                 MR. NGUYEN:  Objection, calls for

25         speculation.

1          THE WITNESS:  Yeah, I don't know.

2     BY MS. FAHRINGER:

3          Q.     You don't know what it would mean to

4     you if the receipt said that you made a purchase

5     from YCDroid?

6               MR. NGUYEN:  Maybe if she got a chance

7          to look at the document.

8               THE WITNESS:  If the document said

9          that I purchased something from YCDroid?  So

10         what is the question?  I guess --

11    BY MS. FAHRINGER:

12         Q.     What would it mean to you?

13         A.     Oh.

14              MR. NGUYEN:  It's completely

15         irrelevant.

16              THE WITNESS:  Oh.  What would it mean

17         to me.

18              That I purchased it from YCDroid.

19    BY MS. FAHRINGER:

20         Q.     Would it -- would it indicate from you

21    that the purchase was from YCDroid and not from

22    defendants?

23              MR. NGUYEN:  Objection, it calls for a

24         legal conclusion.

25              THE WITNESS:  Yeah, not necessarily.

1   BY MS. FAHRINGER:

2        Q.        Why not?

3        A.        Because these days there's so

4   much -- I mean the Internet is a crazy thing and

5   something that I don't entirely understand as a

6   layperson, and there's so many intermediaries that I

7   never know exactly who I'm buying what from.

8   Because you always get routed to different sites and

9   so on.

10       Q.        So even if the receipt said you were

11  buying it from someone, you don't know that that's

12  true?

13       A.        Not always.

14       Q.        What would you rely on to try and

15  figure out legally who you were buying it from?

16  Would it be the contracts and the receipt?

17                 MR. NGUYEN:  I'm going to object.

18  BY MS. FAHRINGER:

19       Q.        You can answer to the extent you know.

20       A.        Yeah, I would look at a contract.

21       Q.        In this case that would be the

22  exhibits to the complaint, correct?

23       A.        Right.

24                 (Svenson Exhibit 5 marked for

25                 identification.)

1    BY MS. FAHRINGER:

2         Q.        Ms. Svenson, showing you what's been

3    marked Exhibit 5, do you recognize this as your

4    receipt?

5         A.        I do.

6         Q.        And this is the receipt for the

7    purchase at issue in this case, order date May 6,

8    2013, for the SMS-MMS to e-mail app?

9         A.        Yes.

10        Q.        And this indicates, does it not, that

11   you've made a purchase from YCDroid on Google Play,

12   correct?

13        A.        That's what it says.

14        Q.        Your payment method was your Discover

15   card, correct?

16        A.        Yes.

17        Q.        And the item purchased was the SMS-MMS

18   to e-mail app.  The price for the app was 1.77,

19   correct?

20        A.        Yes.

21        Q.        This came from -- this is an e-mail

22   that you received from Google or one of the

23   defendants?

24        A.        Yeah, I assume so.  That's probably

25   right.

133

1        Q.      This came from your files?

2        A.      Yes.

3        Q.      And it was e-mailed to you?

4        A.      Yes.

5        Q.      Does this refresh your recollection as

6  to who you purchased the app from?

7               MR. NGUYEN:  Objection, it calls for a

8        legal conclusion.

9               THE WITNESS:  It refreshes my

10       recollection that this is the document -- this

11       is -- that this is the e-mail that I received.

12              (Svenson Exhibit 6 marked for

13              identification.)

14  BY MS. FAHRINGER:

15        Q.      Ms. Svenson, I'm placing before you

16  Exhibit 6.  Do you recognize this?

17        A.      Yes.

18        Q.      What is it?  It's a document entitled

19  General Transaction Information.  Is this a printout

20  from your credit card?

21        A.      That's what I'm thinking.

22        Q.      Take your time and let me know --

23        A.      Okay.

24        Q.      -- if you recognize this.

25        A.      Yeah, I do remember this now.

1    A.       He was at the time as well.

2    Q.       And he was at the time.  What was the

3 office-sharing arrangement?

4    A.       Oh, I'm the primary tenant along with

5 Saper Law Offices, so it's Svenson Law and Saper Law

6 that are the primary tenants, and Progressive Law

7 subleased from us.

8    Q.       Okay.  So Progressive Law would pay

9 you rent?

10   A.       Correct.

11   Q.       Have you ever served with Ilan or

12 Progressive Law or any of your counsel in this case,

13 individually or as firms, ever served with him as

14 co-counsel?

15   A.       No.

16   Q.       Do you refer clients to each other?

17   A.       We have, I believe.  I think they have

18 referred me a couple of clients.  I'm not sure if

19 I've referred any to them.

20   Q.       Okay.  How long have you and

21 Progressive been office mates?

22   A.       We are no longer.

23   Q.       Um-hmm.

24   A.       So we probably were I'm guessing for

25 about three years.

1      Q.      Which years?

2      A.      So that would have been -- I've been

3  in my current space for 5 1/2 years.  They were

4  probably 2011 to maybe end of 2013.

5      Q.      Did you know them before they became

6  sublessees or office mates with you?

7      A.      No.

8      Q.      Next series of questions is regarding

9  the information at issue in this case:  Name, Gmail,

10  city, state, zip, street address, and phone.

11          Have you -- I think you testified

12  earlier that you've not made any effort to sell that

13  information, correct?

14      A.      Correct.

15      Q.      Either alone or in combination, any of

16  those items?

17          MR. NGUYEN:  Object to form.

18  BY MS. FAHRINGER:

19      Q.      Do you want me to repeat the whole

20  question?

21      A.      Yes, please.

22      Q.      Okay.  Have you ever made any effort

23  to sell any of those items of information, name,

24  Gmail address, city, state, zip, phone, street

25  address, have you ever made any effort to sell any

1    of those items individually?

2        A.        No.

3        Q.        Have you ever made any effort to sell

4    any of those items in any combination?

5        A.        No.

6        Q.        Have you ever received any offers to

7    buy any of those items of information either alone

8    or in combination?

9        A.        Well, that's difficult to answer,

10   because I believe I get solicitations to be on

11   mailing lists all the time.

12       Q.        Okay.  When?  What solicitations?

13       A.        E-mail solicitations.  I probably get

14   things in the U.S. mail as well.

15       Q.        So how would a solicitation that you

16   received by e-mail be an offer to purchase any of

17   these items of information?

18       A.        I don't know, because I don't read

19   them.

20       Q.        Okay.  Do you know how any of those

21   communications -- well, let me back up a step.

22            Did I hear your testimony correctly

23   that you said that those solicitations were an offer

24   to purchase any of these items of information alone

25   or in combination?

142

1          MR. NGUYEN:  Object to form.

2          THE WITNESS:  And, again, I don't

3     exactly know what may have been offered to me,

4     because I don't -- I get a lot of

5     solicitations, and I generally don't read them.

6  BY MS. FAHRINGER:

7          Q.      Okay.  So you don't know whether or

8  not you have received an offer to purchase any of

9  these items of information either alone or in

10 combination --

11         A.      I don't know.

12         Q.      -- is that correct?

13         A.      That's right.

14         Q.      And I believe you might have testified

15 earlier, but correct me if I'm wrong, that you have

16 no basis to estimate the value of any of these items

17 of information either alone or in combination?

18         MR. NGUYEN:  Objection, form, vague.

19         THE WITNESS:  Correct.  I have no

20    basis for being able to value any of those

21    items.

22 BY MS. FAHRINGER:

23         Q.      Okay.  Either alone or in combination,

24 correct?

25         A.      Yes.

1      Q.      And those items are name, Gmail

2   address, city, state, zip, phone, street address,

3   correct?

4      A.      That's right.

5      Q.      There's a reference in the complaint

6   to the Google account name.  By that do you mean to

7   refer to the name that goes before gmail.com, that

8   is, ██████████████

9      A.      I would have to look at what you're

10  referring to.

11     Q.      It's the complaint.

12     A.      I mean what page --

13     Q.      Yeah, it's just a mere reference to

14  the Google account name.  And I just wondered

15  what -- what you understood "Google account name"

16  meant.

17     A.      Could you direct me to what page it's

18  on?

19     Q.      While I'm looking for that, do you

20  understand Google account name to be at issue in

21  this case?

22     A.      What do you mean "at issue"?

23     Q.      Do you understand that to be among the

24  information that you contend was shared?

25     A.      Yes.

1          Q.          Okay.  And so what do you mean by

2     "Google account name" when you say that?

3          A.          Most likely that would be my e-mail

4     address.

5          Q.          Okay.  Do you have any other Google

6     account name --

7          A.          No.

8          Q.          -- to your knowledge?

9          A.          I'm sorry.  I should wait until you're

10    done.  No.

11         Q.          As to any of these items of

12    information, same list as before:

13                     Name, Gmail address, which presumably

14    includes Google account name, city, state, zip,

15    phone and street address, do you have any basis to

16    say whether the value of that information changed in

17    the last five years?

18         A.          I have --

19                     MR. NGUYEN:  Objection, calls for

20         speculation.

21                     THE WITNESS:  I have no idea.

22    BY MS. FAHRINGER:

23         Q.          Okay.  And by that question I intended

24    to ask as to the information alone or in

25    combination.  Still no idea whether that -- let me

1    withdraw that question.

2                    Do you have any basis to say that any

3    of the items of information changed value in the

4    last five years either alone or in combination?

5         A.        No idea.

6         Q.        So if I were to ask you -- so you

7    don't know whether the value decreased or increased?

8                    MR. NGUYEN:  Asked and answered.

9                    MS. FAHRINGER:  I think...

10                   THE WITNESS:  I don't know.

11   BY MS. FAHRINGER:

12        Q.        What have you done to prepare yourself

13   as a class representative?  Did you review the

14   complaint?

15        A.        Yes.

16        Q.        Did you review the complaint before

17   filing?

18        A.        Yes.

19        Q.        And did you review the First Amended

20   Complaint before filing?

21        A.        I believe so.

22        Q.        And did you take any steps to make

23   sure it was accurate as to you?

24        A.        Yes.

25        Q.        Outside of reviewing and being named

1    in a complaint and appearing for this deposition,

2    preparing for this deposition, what else have you

3    done to pursue your claims and serve as a class

4    representative if anything?

5         A.     Consulted with my lawyers.

6         Q.     Have you done anything to preserve

7    evidence for this case?

8         A.     Yes.

9         Q.     What did you do?

10        A.     Well, I mean I kept all of the e-mails

11   and credit card statements.

12        Q.     Do you -- did you retain e-mails

13   regarding -- let me back up a step.

14               Do you make other on-line purchases if

15   not of apps then of other things?

16               MR. NGUYEN:  Objection, vague.

17   BY MS. FAHRINGER:

18        Q.     Do you buy things on-line?

19        A.     Yes.

20        Q.     When you buy things on-line, do you

21   provide an e-mail address?

22        A.     Yes.

23        Q.     How much are you paid for that e-mail

24   address when you buy on-line, do you know?

25        A.     I have no idea.

1    STATE OF ILLINOIS      )

2                           ) SS:

3    COUNTY OF C O O K      )

4

5         I, Cynthia J. Conforti, a notary public within

6    and for the County of Cook and State of Illinois, do

7    hereby certify that heretofore, to-wit, on the 25th

8    day of September, 2015, personally appeared before

9    me at 131 South Dearborn Street, Suite 1700,

10   Chicago, Illinois, ALICE SVENSON, in a cause now

11   pending and undetermined in the United States

12   District Court, Northern District of Illinois,

13   Eastern Division, wherein ALICE C. SVENSON is the

14   Plaintiff, and Google Inc, et al., are the

15   Defendants.

16        I further certify that the said witness was

17   first duly sworn to testify the truth, the whole

18   truth and nothing but the truth in the cause

19   aforesaid; that the testimony then given by said

20   witness was reported stenographically by me in the

21   presence of the said witness, and afterwards reduced

22   to typewriting by Computer-Aided Transcription, and

23   the foregoing is a true and correct transcript of

24   the testimony so given by said witness as aforesaid.

25        I further certify that the signature to the

**Conditionally Filed Under Seal**

Exhibit 31

Exhibit 31

**Conditionally Filed Under Seal**

Exhibit 32

Exhibit 32

**Conditionally Filed Under Seal**

Exhibit 33

Exhibit 33