1   Kathryn Diemer
    kdiemer@diemerwhitman.com
2   DIEMER, WHITMAN & CARDOSI, LLP
    75 East Santa Clara Street, Suite 290
3   San Jose, California 95113
    Tel: 408.971.6270
4   CA Bar No.: 133977

5   Rafey S. Balabanian (Admitted *Pro Hac Vice*)
    rbalabnian@edelson.com
6   EDELSON PC
    123 Townsend Street
7   San Francisco, CA 94107
    Tel: 415.234.5342
8   Fax: 415.373.9435

9   Frank Jablonski (Admitted *Pro Hac Vice*)
    frankj@progressivelaw.com
10  PROGRESSIVE LAW GROUP LLC
    354 West Main Street
11  Madison, WI 53703
    Tel: 608.258.8511
12  Fax: 608.442.9494

13  *Attorneys for Plaintiff and the Putative Class*

14  (Additional counsel on signature block.)

15              **UNITED STATES DISTRICT COURT**
16             **NORTHERN DISTRICT OF CALIFORNIA**
                    **SAN JOSE DIVISION**
17
    ALICE SVENSON, individually and on behalf    Case No. 5:13-cv-04080-BLF
18  of all others similarly situated,
                                                 **PLAINTIFF'S RESPONSE IN**
19              *Plaintiff,*                      **OPPOSITION TO DEFENDANTS'**
                                                 **MOTION FOR SUMMARY JUDGMENT**
        v.
20
    GOOGLE INC., and GOOGLE PAYMENT             Judge: Honorable Beth Labson Freeman
21  CORP.,
22
                *Defendants*.
23

24

25

26

27

28

---

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS ....................................... 2

I.  Google and Its Services. ..................................................................................... 2

    A.  Google Wallet. ............................................................................................ 2

    B.  Google Play. ................................................................................................ 3

        1.  In purchasing apps, Buyers enter into additional contracts with Google. ..... 4

        2.  At the point of purchase, Google shared Buyers' personal information ....... 5

II.  Svenson's Experience. ........................................................................................ 7

    A.  Svenson purchases the App. ....................................................................... 7

    B.  Google shares Svenson's Personal Information, and Svenson is harmed. ................ 8

ARGUMENT ................................................................................................................. 9

I.  Summary Judgment Should Be Denied as to Svenson's UCL Claim Because She Lost Money When Google Violated the Terms of Its Privacy Policies. ....................................... 9

    A.  Google engaged in unlawful conduct by violating its Privacy Policies. ................ 10

        1.  Google's sharing violated its Privacy Policies. ............................................ 11

        2.  Google's "sharing" was prohibited by the Privacy Policies ....................... 13

    B.  Google engaged in unfair conduct by violating its Privacy Policies ..................... 15

    C.  Svenson UCL claim is independent of her breach of contract claim. .................... 16

    D.  Svenson's economic injuries confer standing under the UCL ............................... 17

II.  Summary Judgment Should Be Denied as to Svenson's Contract Claim Because Google Unnecessarily Shared Her Personal Information, Causing Her Damages. ......................... 20

    A.  Google Breached the contract when it made Svenson's Personal Information available to ███████████████████. ...................................................... 20

    B.  Google's broken promise to honor the Privacy Policies damaged Svenson. .......... 21

        1.  Svenson did not receive the benefit of her bargain. ..................................... 21

        2.  Google diminished the value of Svenson's Personal Information. ............. 22

        3.  Even if the Court finds that Svenson has not proven damages as a result of

Google's breach, she is nevertheless entitled to nominal damages............. 23

III.    The Court Should Deny Summary Judgment on Plaintiff's Good Faith and Fair Dealing
        Claim Because Google Frustrated the Purpose of the Contracts......................................... 23

IV.     Svenson Has Article III Standing to Sue........................................................................... 24

CONCLUSION ...................................................................................................................... 25

# **TABLE OF AUTHORITIES**

**United States Supreme Court:**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..................................................................................9, 20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................25

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ....................................................................................25

**United States Court of Appeals:**

*Davis v. HSBC Bank Nevada, N.A.*,
    691 F.3d 1152 (9th Cir. 2012) ........................................................................10

*Horphag Research Ltd. v. Garcia*,
    475 F.3d 1029 (9th Cir. 2007) ..........................................................................9

*Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Employees of
    Transferred GE Operations*, 244 F.3d 1109 (9th Cir. 2001) ...................................9

*In re Facebook Privacy Litig.*,
    572 F. App'x 494 (9th Cir. 2014) ...............................................................20, 23

*Preminger v. Peake*,
    552 F.3d 757 (9th Cir. 2008) ..........................................................................25

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
    752 F.3d 807 (9th Cir. 2014) ..........................................................................20

*Rubio v. Capital One Bank*,
    613 F.3d 1195 (9th Cir. 2010) ........................................................................16

*Senne v. Vill. of Palatine, Ill.*,
    695 F.3d 597 (7th Cir. 2012) ....................................................................12, 13

*Sybersound Records, Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) ........................................................................16

*United States v. Reingold*,
    731 F.3d 204 (2d Cir. 2013) ...........................................................................12

*United States v. Spriggs*,
    666 F.3d 1284 (11th Cir. 2012) ......................................................................12

*United Steel, Paper & Forestry, Rubberg, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO/CLC v. Cookson Am., Inc.*, 710 F.3d 470 (2d Cir. 2013)......................................25

**United States District Court:**

*Apple, Inc. v. Samsung Elecs. Co.*,
No. 11-CV-01846-LHK, 2012 WL 2571719 (N.D. Cal. June 30, 2012) .............................23

*Asghari v. Volkswagen Grp. of Am., Inc.*,
42 F. Supp. 3d 1306 (C.D. Cal. 2013) ..................................................................................16

*Bekins v. Zheleznyak*,
No. CV15-4478-CAS(ASX), 2016 WL 1091057 (C.D. Cal. Mar. 21, 2016) .....................17

*Crowley v. Peterson*,
206 F. Supp. 2d 1038 (C.D. Cal. 2002) ...............................................................................23

*Ewert v. eBay, Inc.*,
No. 07-cv-2198, 2010 WL 4269259 (N.D. Cal. Oct. 25, 2010) ...................................13 n. 6

*GameTech Int'l, Inc. v. Trend Gaming, LLC*,
No. 02-cv-899 PHX HRH, 2004 WL 3242398 (D. Ariz. Sept. 17, 2004).........................24

*In re Adobe Sys., Inc. Privacy Litig.*,
66 F.Supp. 3d 1197 (N.D. Cal. 2014)............................................................................15, 19

*In re Anthem, Inc. Data Breach Litig.*,
No. 15-md-2617, 2016 WL 589760 (N.D. Cal. Feb. 14, 2016) ..................16, 18, 19–20, 22

*In re Facebook Privacy Litig.*,
No. 10-CV-02389-RMW, 2016 WL 3523850 (N.D. Cal. June 28, 2016).....................23, 25

*In re Google, Inc. Privacy Policy Litig.*,
No. 5:12-CV-001382-PSG, 2015 WL 4317479 (N.D. Cal. July 15, 2015)........12–13, 23 n.9

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ...............................................................................18

*Johns v. Bayer Corp.*,
280 F.R.D. 551 (S.D. Cal. 2012) .........................................................................................18

*Kosta v. Del Monte Corp.*,
No. 12-cv-01722-YGR, 2013 WL 2147413 (N.D. Cal. May 15, 2013) .............................25

*New Sensations, Inc. v. Does 1-426*,
No. 12-3800 JSC, 2012 WL 4675281 (N.D. Cal. Oct. 1, 2012) .........................................12

*Opperman v. Path, Inc.*,

No. 13-CV-00453-JST, 2016 WL 3844326 (N.D. Cal. July 15, 2016) ...............................23

*Rodman v. Safeway, Inc.,*
    125 F. Supp. 3d 922 (N.D. Cal. 2015)...................................................................22

*Rosenfeld v. JPMorgan Chase Bank, N.A.,*
    732 F. Supp. 2d 952 (N.D. Cal. 2010)...................................................................24

*Sanchez v. Wal-Mart Stores, Inc.,*
    No. 06-cv-2573, 2008 WL 3272101 (E.D. Cal. Aug. 6, 2008) ...........................21

*Svenson v. Google Inc.,*
    No. 13-CV-04080-BLF, 2015 WL 1503429 (N.D. Cal. Apr. 1, 2015)...........15, 20

*Travelers Indem. Co. of Am. v. Portal Healthcare Sols., LLC,*
    35 F. Supp. 3d 765 (E.D. Va. 2014)................................................................12–13

**State Court:**

*Avidity Partners, LLC v. State,*
    221 Cal. App. 4th 1180 (2013) .............................................................................24

*Bunker Hill Park Ltd. v. U.S. Bank Nat'l Ass'n,*
    231 Cal. App. 4th 1315 (2014) .............................................................................21

*Cortez v. Purolator Air Filtration Products Co.,*
    999 P.2d 706 (Cal. 2000)...........................................................................9–10, 18

*Drum v. San Fernando Valley Bar Ass'n,*
    182 Cal. App. 4th 247 (2010) ..........................................................................15–16

*Kwikset Corp. v. Superior Court,*
    246 P.3d 877 (Cal. 2011) ......................................................................10, 18, 19

*Lewis Jorge Const. Mgmt., Inc. v. Pomona Unified Sch. Dist.,*
    102 P.3d 257 (Cal. 2004) .......................................................................................22

*New W. Charter Middle Sch. v. Los Angeles Unified Sch. Dist.,*
    187 Cal. App. 4th 831 (2010) ...............................................................................21

*Troyk v. Farmers Grp., Inc.,*
    90 Cal. Rptr. 3d 589 (Cal. App. 4th 2009) ...........................................................17

**State Statutes:**

Cal. Civ. Code. § 1654 ...................................................................................13 n. 6

Cal. Civ. Code § 1644 ............................................................................................21

Cal. Civ. Code § 3360 ..................................................................................23

Cal. Bus. & Prof. Code § 17200 *et seq.* .......................................... *passim*

Cal. Bus. & Prof. Code § 22576 *et seq.* .......................................... *passim*

**Miscellaneous:**

Cal. Bill Analysis, A.B. 68 (Apr. 22, 2003)...................................................18

Dictionary.com,
     www.dictionary.com/browse/share ..................................................11

Fed. R. Civ. P. 56(a)........................................................................................9

Google.com,
     https://www.google.com/search?q=define%3A%20share&rct=j........................11

Merriam-Webster Online,
     www.merriam-webster.com/dictionary/share..................................11

Office of the California Attorney General,
     *Making Your Privacy Practices Public* (May 2014) ....................................10, 19

Share Files and Folders, Drive Help,
     https://support.google.com/drive/answer/
     2494822?co=GENIE.Platform%3DDesktop&hl=en ..........................................12

## **INTRODUCTION**

Although Google would have this Court believe otherwise, nothing comes for "free" in the digital age. That's why, when Plaintiff Alice Svenson purchased a mobile application on Defendants Google Inc. and Google Payment Corp.'s (collectively, "Google") online marketplace––Google ████████████████████████████████████ ████ wasn't the only cost that Svenson paid. When she used Google's payment-processing service—Google Wallet—to purchase the app, Google also unnecessarily shared her ███████████ ████████ her "Personal Information") with the app seller, without her consent and in violation of its own privacy policies and terms of service. Google now seeks summary judgment, arguing that Plaintiff cannot prove that its sharing of her Personal Information breached the privacy policies applicable to her purchase, that Plaintiff has not suffered any damages, and that she lacks standing to sue. Google's Motion for Summary Judgment should be denied for two reasons.

***First***, Google impermissibly "shared" Svenson's Personal Information without her consent in violation of the privacy policies to which she assented, giving rise to her claims here—violation of California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code § 17200, breach of contract, and breach of the implied covenant of good faith and fair dealing. Unsurprisingly, Google does not deny that Svenson's Personal Information was shared and available for the app sellers' taking. Instead, it urges for a strained interpretation of the word "share," which requires the *recipients* to view or use information in order for "sharing" to occur. The Court should reject that interpretation. By definition, particularly in the digital context, a company can "share" information regardless of whether the *recipient* actually views or uses it. In other words, to "share" simply means to make something (here, Plaintiff's Personal Information) available, which is exactly what Google did. And while Google also argues that its sharing was lawful or necessary, the fact that it later—after this lawsuit was ███████████████████████████████████████ ███████████████████████████████████████.

***Second***, Svenson was harmed because by sharing her Personal Information, Google (a) deprived her of the privacy protections she paid Google ████████████████████ for, and (b) diminished the value of her Personal Information—a valuable commodity for which there is

now at least one less purchaser. Despite Google's argument that it was not a party to this transaction, and that its payment processing services were "free," the evidence shows otherwise. There can be no question that cash flowed directly from Svenson's wallet into Google's pocket. In other words, she overpaid for the app and thus, lost the benefit of her bargain.

As explained fully herein, the Court should deny Google's Motion for Summary Judgment.

## PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS

### I.     Google and Its Services.

Google is one of the world's largest technology companies, offering consumers around the globe services that they rely on every day—such as Google search and "Gmail"—while also working to develop new concepts and innovations. *See* Google, What We Do, https://www.google. com/intl/en_US/about/company/products/ (last visited July 28, 2016). Nothing comes for free, however, and for every service that Google provides, consumers turn over valuable personal information and data that Google can use to track and analyze their behavior. (*See, e.g.*, Ex. 8 to Pl.'s Mot. for Class Cert.,[1] Google Privacy Policy (07/27/12), at GOOG-00000111.) As some consolation, Google promises its consumers that will not share their personal information except in very limited, need-based circumstances. (*See e.g.*, *id.* at GOOG-00000114.)

### A.     Google Wallet.

Amongst its many services, Google offers consumers the ability to purchase items through its online payment processing service, Google Wallet ("Wallet"), previously known as "Google Checkout." (*See* Pl.'s Mot. for Class Cert. ("Cert. Mot.") at 2–3 and exhibits cited therein.) At all times relevant, Wallet was operated in the United States by Google, Inc.'s wholly owned subsidiary, Google Payment Corp. (Defs.' Mot. for Summary Judgment ("Mot.") at 3 n.4.)

To use Wallet, consumers needed a Google account, which required them to provide their name and email address. (*Id.* at GOOG-00001193–GOOG-00001194; Cert. Ex. 13, Google's 3d Am. Supp. Answers to Pl.'s Interrogs. (02/04/16), at 8.) To complete their Wallet account registration, consumers further had to provide, at a minimum, their name, country, and zip code. (*Id.*) When they choose to make purchases using Wallet, additional information, such as payment

---

[1]      Hereinafter, exhibits to Plaintiff's Class Certification Motion shall be cited as "Cert. Ex."

instrument information, was required if it had not already been provided. (*Id.*) From approximately 2006 to 2014, consumers' Wallet account information was stored █████ ████████████████████████ █ ███████████████████

When consumers created Wallet accounts, they agreed to the Wallet Terms of Service ("Wallet ToS"). In so doing, they entered into "legal agreement[s]" with Google "that govern[ed] their] access to and use of Google Wallet." (*See* Cert. Ex. 1, Wallet ToS (10/23/12), at GOOOG-00001191.) The Wallet ToS incorporated two privacy policies: (1) the Wallet Privacy Notice, and (2) the Google Privacy Policy (collectively, the "Privacy Policies"). (*Id.* at GOOG-0001207; Cert. Ex. 7, Wallet Privacy Notice (08/01/12), at GOOG-00000997–00000998.)

Under the Privacy Policies incorporated into the Wallet ToS, Google promised not to "share personal information with organizations and individuals outside of Google," (Cert. Ex. 8, Google Privacy Policy (07/27/12), at GOOG-00000114), and to only share personal information in six limited circumstances: (1) "as necessary to process your transaction and maintain your account," (2) "to complete your registration for a service provided by a third party, (3) "with your consent," (4) "with domain administrators," (5) "for external processing," and (6) "for legal reasons." (Cert. Ex. 7, Wallet Privacy Notice (08/01/12), at GOOG-00000998; Cert. Ex. 8, Google Privacy Policy (07/27/12), at GOOG-00000114.) In exchange for Google's payment-processing services and privacy protections, consumers agree to abide by the Wallet ToS's other provisions. (*See, e.g*, Cert. Ex. 1, Wallet ToS, at GOOG-00001194 ("You are responsible for providing accurate registration information"), GOOG-00001196 "You may not use the Processing Service . . . in connection with the sale or exchange of any illegal goods or services . . .").)

**B.    Google Play.**

In addition to its payment-processing service, Google also provided a place to shop. Google Play ("Play"), previously known as "Android Market," is an online marketplace, accessible on a computer or mobile device, where consumers can purchase mobile applications ("apps") for use on their Android smartphones as well as a variety of other media. (*See* Cert. Mot.

---

[2]    All new exhibits cited in Plaintiff's opposition brief are attached to the Declaration of Rafey S. Balabanian, filed contemporaneously herewith.

at 3–4 and exhibits cited therein.)[3] At all times relevant, Wallet was the only means that Buyers could use to purchase apps in Play. (Cert. Ex. 2, Play Terms of Service ("Play ToS") (11/24/12), at GOOG-00001179 ("You will need a Google Wallet account to purchase Products.").)

For app developers wanting to become Sellers, the barrier to entry for the Play store is low. The first step is to create a developer account, which takes mere moments and costs only $25. (*See* Ex. 2, Powers Dep. Tr., at 26:2–27:3; Ex. 3 at GOOG-00002604). From there, the app developer need only create a Google payments merchant account before selling. (*See* Ex. 3 at GOOG-2604). Once developers are registered, Google ███████████████████████████████████████████████████████████████████████████████████████.)

### 1.    *In purchasing apps, Buyers enter into additional contracts with Google.*

When a Buyer purchased an app in Play, Google required the Buyer to affirm agreement to the Play ToS with respect to that transaction. (Cert. Ex. 12 at GOOG-00002898 ("By clicking 'Buy' you agree to these Terms of Service."). The Play ToS then incorporates the Wallet ToS and Privacy Policies as to that purchase. (Cert. Ex. 2, Play ToS (11/24/12), at GOOG-00001179 ("You must abide by any relevant terms and conditions or other legal agreement, whether with Google or a third party, that governs your use of *a given payment processing method* [i.e. Wallet] . . . The Wallet [ToS] located here also apply whenever you want to purchase a Product using Google Wallet. Please ensure you have read those terms carefully . . . .") (emphasis added).) Thus, by clicking "Buy," Buyers became bound by a contract providing for the purchase of the apps for specific prices, and requiring compliance with the terms of four documents: (1) Play ToS, (2) Wallet ToS, (3) Wallet Privacy Notice, and (4) Google Privacy Policy (collectively, the "Contract"). (*See* Cert. Ex. 11 at GOOG-00009091 ("Wallet won't let the user complete purchases if there are unaccepted legal documents."); Cert. Ex. 12 at GOOG-00002898.) The Play ToS made clear that at the point of purchase, Buyers entered into contracts with both Google and the Seller:

> Each time that you purchase a Product, you enter into a contract based on these Terms with: [1] Google in relation to the use of Google Play . . . and also [2] (in the case of App Sales . . . with the Provider of the Product you have purchased.

---

[3]    As used here, "Buyers" refers to persons—like Svenson—who purchased apps in Play, while "Sellers" refers to the merchants and app developers who sell them there.

(Cert. Ex. 2, Play ToS (11/24/12), at GOOG-00001181.)[4] Thus, under the Buyer-Google Contract, Buyers agreed to abide by the Play and Wallet ToS and pay the amounts necessary to complete their transactions, and Google agreed to deliver the privacy protections contained in the Privacy Policies, specifically including not sharing personal information with vendors outside of certain enumerated (and inapplicable here) exceptions.

### 2. *At the point of purchase, Google shared Buyers' personal information.*

As soon as a Buyer purchased an app on Play with their Wallet account at any point during the class period (March 1, 2012–April 30, 2014), the Seller gained unprecedented, immediate access to the Buyer's personal information through its Merchant Center tool.

████████████████████████████████████████████████████████████
████████████████████████ To view orders, ████████████████████
████████████████████████████████████████████████████████████
████████████████████████████ Here, Buyers' ██████████████████
██████████████████████████████████ whether or not a Seller wanted to see them. (Cert. Ex. 13, Google's 3d Am. Supp. Answers to Pl.'s Interrogs. (02/04/16), at 11–13); Ex. 1, Douglas Dep. Tr. at 29:19–32:8, 44:2–25.) *See also* Taylor Armerding, *Google Play shares too much personal info, app developer says*, CSO (Feb. 15, 2013), www.csoonline.com/article/ 2132939/privacy/google-play-shares-too-much-personal-info--app-developer-says.html (last visited Jul. 28, 2016) ("'Under no circumstances should I be able to get the information of the people who are buying my apps unless they opt into it and it's made crystal clear to them that I'm getting this information.'") In addition, sellers could also use Merchant Center to generate reports displaying this same information. (Cert. Ex. 13, Google's 3d Am. Supp. Answers to Pl.'s Interrogs. (02/04/16), at 10.)

The history of Merchant Center reveals Google's ongoing struggle to safeguard Personal Information. ████████████████████████████████████████████████████

---

[4] Google notes that under the Seller Terms of Service ("Seller ToS") (which do not bind Svenson or class members in any case), app sales are "transactions between Seller and the Buyer, not with [Google]." (Mot. at 5 (internal quotations omitted).) However, this point does not contradict the fact that app *purchases* also result in contracts between the Buyer and Google.

Buyers' problems did not end there. From February to May 2013, ███████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████

Google continued to make changes, but personal information remained readily available. From May to June 2013, ██████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ███████ (Cert. Ex. 13, Google's 3d Am. Supp. Answers to Pl.'s Interrogs. (02/04/16), at 12.) Finally, and only after this case was filed in May 2014, ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████

Though Sellers could ██████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████████ █████████████████. Moreover, although Google states that the information was necessary to calculate sales tax, ████████████████████████ ████████████████████████████████████

1 ████████████████████████████████████████████████████████████

2 ███████████████████████████████████████████████████████

3 ███████████ Moreover, for purchases involving sellers then based in the EU (including YC Droid),

4 Google likewise ████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████

6 ████████████████████████████████████████ Finally, because

7 personal information became available to ██████████████████████████ the

8 information could not have been needed at that same point for the other reasons Google offers,

9 such as "████████████████████████████ (Mot. at 6.)

## II. Svenson's Experience.

### A. Svenson purchases the App.

Svenson frequently needs to export work-related text messages to her email account. (*Id.* at 25:16–19.) To do so, Svenson decided to purchase app on Play called "SMS MMS to Email" (the "App"), created by a Seller known as YCDroid. (*Id.* at 23:22–24:7.) To purchase the App, Svenson first created a Google Wallet account on May 6, 2013, providing her name, email address, home address, phone number, and credit card number. (*See* Defs.' Ex. 2 in support of Mot. for Summary Judgment, Pls'. Resp. to Def. Google's 1st Interrogs., at 8.) In creating her account, Svenson assented to the Wallet ToS and incorporated Privacy Policies. (Mot. at 3.) That same day, using her newly created Wallet account, Svenson █████████████████████████████████████

████████████████████ In so doing, as part of the purchase transaction, Svenson entered into the Contract with Google—agreeing to pay money for the App, and to abide by the Play ToS and Wallet ToS in exchange for the app and Google's payment processing service and privacy guarantees. (*See* Cert. Ex. 11 at GOOG-00009091; Cert. Ex. 12 at GOOG-00002898.)

Google's payment processing service and privacy guarantees came at a price. When Svenson clicked the "Buy" button in Play, Google charged her credit card $1.77 for the App. (Cert. Ex. 33 at GOOG-00001190; Ex. 4, ███████████████████████████████████████████

████████████) Google claims it ████████████████████████████████████████

████████████████████████████████████████████████████. (*See* Mot. at 5.)

1    However, the evidence shows that of the ██████████████████████████████████

2    ████████████████████████████████████████████████████████████████████████

3    (*See* Ex. 11, Google Payment Corp.'s Am. Supp. Answers to Pl.'s Interrogs. (10/27/14), at 14; *see*

4    *also* Cert. Ex. 30 at GOOG-00001392; ██████████████████████████████████

5    ████████████████████████████████████████████ Ex. 12 at GOOG-

6    00005709 ("Google will . . . calculate the 30% transaction fee of the net price of the product.");

7    Ex. 7, Thomas GPP Dep. Tr. at 54:9–18 ██████████████████████████████

8    ██████████████████████████████████████████████████").

**B.    Google shares Svenson's Personal Information, and Svenson is harmed.**

10    When Svenson purchased the App, ██████████████████████████████

11    ████████████████████████████████████████████████████████████████

12    ██████████████████████████████████████; Cert. Ex. 13, Google's 3d Am. Supp.

13    Answers to Pl.'s Interrogs. (02/04/16), at 11–13). Contrary to Google's assertion, YCDroid did not

14    have to ████████████████████████████████████ (Mot. at 7), before the

15    information became automatically *available* to it. Svenson's Personal Information was there for

16    YCDroid's taking in the Merchant Center, regardless of whether YCDroid ever chose to view it.

17        As Plaintiff testified, and as confirmed by the report of Dr. Henry Fishkind, when she

18    purchased the App, a portion of the $1.77 paid was for the privacy protections offered by Google's

19    Wallet processing service. (Ex. 10, Svenson Dep. Tr., at 123:22–25; Cert. Ex. 47, Expert Report of

20    Henry Fishkind ("Fishkind Rpt."), at 23–27.) And because Google did not in fact deliver those

21    protections, Svenson did not receive the full value she paid for. Further, in giving the information

22    away to YCDroid, Google diminished its market value. (*Id.*, at 27–32.) Google suggests that

23    Svenson's information lacked value because she made "some of her email addresses freely

24    available online," (*See* Def.'s Mot. at 9 (citing RNLA online bio displaying Svenson's work email

25    address), but there is no evidence that she did so with her Gmail address, much less in conjunction

26    with her name and address information. As Google is well aware, a robust market exists for

27    Svenson's Personal Information. (Cert. Ex. 47, Fishkind Rpt., at 27–32.) When Google gave that

28    information to YCDroid, one less purchaser existed for it, thereby decreasing its value. (*See id.*)

# ARGUMENT

Summary judgment is only appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court's task "is not to weigh conflicting evidence, but rather to ask whether the non-moving party has produced sufficient evidence to permit the fact finder to hold in his favor." *Ingram v. Martin Marietta Long Term Disability Income Plan for Salaried Employees of Transferred GE Operations*, 244 F.3d 1109, 1114 (9th Cir. 2001) (citing *Anderson*, 447 U.S. at 249). In ruling a motion for summary judgment, a court must "view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in [her] favor." *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007).

## I. Summary Judgment Should Be Denied as to Svenson's UCL Claim Because She Lost Money When Google Violated the Terms of Its Privacy Policies.

Google claims it is entitled to summary judgment on Svenson's UCL claim because: (1) it depends entirely on her (supposedly) deficient breach of contract claim, and (2) she cannot show the required economic injury. Google is wrong on both fronts. First, although Svenson's breach of contract claim is viable, (*see* Section II, *infra*), it need not be for her to take her UCL claim to trial. The unlawful conduct on which she bases her claim includes Google's breach of contract as well as its violation of the California Online Privacy Protection Act ("OPPA"), which Google barely addresses in its Motion. Second, as a result of Google's violation of the Privacy Policies, Svenson lost money—exactly the type of economic injury that gives her standing to assert a UCL claim.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Its purpose "is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 883 (Cal. 2011). As such, the UCL is "an equitable action by means of which a plaintiff may recover money or property obtained from the plaintiff . . . through unfair or unlawful business practices." *Cortez v. Purolator Air Filtration Products Co.*, 999 P.2d 706, 712 (Cal.

2000). Because the statute is written in the disjunctive to prohibit unlawful or unfair acts and practices, a plaintiff may bring a UCL action under either prong. *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012).

### A.    Google engaged in unlawful conduct by violating its Privacy Policies.

A defendant's conduct is "unlawful" under the UCL when it violates another "borrowed" law. *Id.* "Virtually any state, federal or local law can serve as the predicate for an action under section 17200." *Id.* (citation and internal quotations omitted). Here, Google violated the UCL's unlawful prong by violating the terms of its Privacy Policies, in violation of California's Online Privacy Protection Act ("OPPA").

OPPA requires all commercial website operators collecting personal information to post privacy policy online, and prohibits them from violating the terms of those Privacy Policies in a willful or negligent manner. Cal. Bus. & Prof. Code § 22576. Personal information includes name or email addresses, as well as other identifying information. Cal. Bus. & Prof. Code § 22577(a). In enacting the law in 2003, the California Legislature recognized online privacy as a "matter of statewide concern." Cal. Bus. & Prof. Code § 22578. A "privacy landmark," OPPA was "the first law in the nation with a broad requirement for privacy policies." Office of the California Attorney General, *Making Your Privacy Practices Public* (May 2014), *available at* https://oag.ca.gov/sites/all/files/agweb/pdfs/cybersecurity/making_your_privacy_practices_public.pdf.

It is undisputed that Google collects Personal Information and that it provided the two Privacy Policies at issue in this case, the Wallet Privacy Notice and the Google Privacy Policies. (*See* Cert. Ex. 7, Wallet Privacy Notice (08/01/12), at GOOG-00000998; Cert. Ex. 8, Google Privacy Policy (07/27/12), at GOOG-00000114.) Under these Privacy Policies, Google promises not to "share personal information with organizations and individuals outside of Google" except in six limited circumstances, none of which apply here. (*See* Cert. Ex. 7, Wallet Privacy Notice (08/01/12), at GOOG-00000998; Cert. Ex. 8, Google Privacy Policy (07/27/12), at GOOG-00000114.) It is further established that these Privacy Policies governed Svenson's purchase and use of the App. (*See* Cert. Ex. 2, Play ToS (11/24/12), at GOOG-00001181 ("Each time that you purchase a Product, you enter into a contract based on these Terms with: [1] Google in relation to

the use of Google Play . . .”); Cert. Ex. 1, Wallet ToS (10/23/12), at GOOOG-00001191 (“These [ToS] are a legal agreement between you, Google, Inc., and Google Payment Corp. . . .”).) Thus, Google's only possible defense to a violation of OPPA (and with it, Svenson's UCL claim) is that Svenson cannot prove that it *violated* the Privacy Policies. As explained below, however, Google plainly violated the Privacy Policies by sharing Svenson's Personal Information with YCDroid.

### 1. Google's sharing violated its Privacy Policies.

Through the Privacy Policies, Google promises not to “share personal information” with third parties, except in limited circumstances. (*See* Cert. Ex. 8, Google Privacy Policy (07/27/12), at GOOG-00000114; Cert. Ex. 7, Wallet Privacy Notice (08/01/12), at GOOG-00000998.) Yet Google's provision of information through the Merchant Center falls squarely within the dictionary, common, and legal definitions of “sharing.”

Google insists that “sharing” requires a recipient to “partake of, use, experience or enjoy it,” or “to use or have” the information from Google. (Mot. at 16–17 (citations and quotations omitted).) However, numerous dictionary definitions do not make “sharing” contingent on what a recipient does or does not do with what they receive. *See, e.g.*, Merriam-Webster Online, www.merriam-webster.com/dictionary/share (last visited July 28, 2016) (“to tell”); MacMillan Dictionary Online, www.macmillandictionary.com/us/dictionary/american/share (last visited Jul. 28, 2016) (“to *allow someone to use* or have something you own”) (emphasis added). Particularly in the context of digital technology like that at issue here, “sharing” simply means to make available, and it occurs regardless of whether a recipient uses, or even receives, information. *See, e.g.*, Dictionary.com, www.dictionary.com/browse/share (last visited Jul. 28, 2016) (“*Digital Technology.* to give specific users access to online content: *You can share via email, Facebook, or Twitter*”); Google.com, https://www.google.com/search?q=define%3A%20share&rct=j (last visited Jul. 28, 2016) (“post or repost (something) on a social media website or application”).

This contemporary meaning of “share” is perhaps best exemplified in Google's own technology. For instance, through its service “Google Drive,” Google enables consumers to “share” files and folders. Under Google's own parlance, sharing occurs regardless of whether an item is actually opened. *See* Share Files and Folders, Drive Help, https://support.google.com/

drive/answer/2494822?co=GENIE.Platform%3DDesktop&hl=en (last visited Jul. 28, 2016).
Numerous other websites and online services incorporate "sharing" technology that is wholly
unrelated to what the recipient of information does with it. *See generally* N.Y. Times,
www.nytimes.com (last visited Jul. 28, 2016) (providing "share" link with articles allowing
consumers to email, "tweet," or "pin" content, or post it to other websites).

In accord, numerous courts have recognized that information can be shared, distributed, or
disclosed even if it is never accessed. For instance, in cases involving peer-to-peer networks where
numerous users share small pieces of files, courts have reasoned that "sharing" begins as soon as a
user makes a file "available" online. *See, e.g.*, *New Sensations, Inc. v. Does 1-426*, No. 12-3800
JSC, 2012 WL 4675281, at *2 (N.D. Cal. Oct. 1, 2012). Likewise, courts have affirmed sentencing
enhancements for the "distribution" of child pornography across peer-to-peer networks regardless
of whether shared content was ever accessed. *See, e.g.*, *United States v. Reingold*, 731 F.3d 204,
229 (2d Cir. 2013) (noting that "knowingly placing child pornography files in a shared folder on a
peer-to-peer file-sharing network constitutes distribution . . . even if no one actually obtains an
image from the folder" and collecting cases) (citation and internal quotations omitted); *United
States v. Spriggs*, 666 F.3d 1284, 1287 (11th Cir. 2012) ("When the user knowingly makes the files
accessible to others, the distribution is complete."). Finally, courts have found that the unlawful
disclosure of information may occur even where "no specific recipient is proven." *Senne v. Vill. of
Palatine, Ill.*, 695 F.3d 597, 603 (7th Cir. 2012) (finding that consumer had alleged violation of
statute prohibiting "disclosure" of personal information based on defendant's placement of a
parking citation on his windshield); *see also Travelers Indem. Co. of Am. v. Portal Healthcare
Sols., LLC*, 35 F. Supp. 3d 765, 772 (E.D. Va. 2014) ("[U]nder the plain meaning of 'disclosure,'
the records were disclosed the moment they were posted publicly online, regardless of whether a
third party viewed them."), *aff'd*, 2016 WL 1399517 (4th Cir. Apr. 11, 2016). And while Google
cites *In re Google, Inc. Privacy Policy Litig. ("GPP")* for the proposition that "sharing" requires
the "improper receipt of information," Judge Grewal required no such thing—he reasoned instead
that injury could be shown through "*dissemination* or improper receipt of information," but
plaintiffs had not alleged "any dissemination at all." No. 5:12-CV-001382-PSG, 2015 WL

4317479, at *4–5 (N.D. Cal. July 15, 2015) (emphasis added).

Here, the undisputed evidence shows that, Google "shared" Svenson's Personal Information by making it available to YCDroid in the Merchant Center, violating the provision of the Privacy Policies in which it promised not to "share personal information with companies, organizations and individuals outside of Google" absent exceptional circumstances. (*See* Cert. Ex. 8, Google Privacy Policy (07/27/12), at GOOG-00000114.) In Merchant Center, ███████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ (*See* Cert. Ex. 30 at GOOG-00001392; Cert. Ex. 13, Google's 3d Am. Supp. Answers to Pl.'s Interrogs. (02/04/16), at 11–13.) As the dictionary definitions and case law demonstrate, that YCDroid may not have viewed or analyzed this information is immaterial—Svenson's Personal Information was shared as soon as Google made it available, even if "no specific recipient is proven," *Senne*, 695 F.3d at 603, and "regardless of whether a third party viewed [it]," *Travelers*, 35 F. Supp. 3d at 772.[5] Thus, Google "shared" Svenson's Personal Information, regardless of whether YCDroid ever chose to view it.

### 2.   Google's "sharing" was prohibited by the Privacy Policies.

Google further contends that even if it did "share" Svenson's Personal Information, it was permitted to do so under the Privacy Policies. (Mot. at 17.) While it is true that the Privacy Policies allow sharing in six limited circumstances, including "as necessary to process your transaction and maintain your account," (*see* Cert. Ex. 7, Wallet Privacy Notice (08/01/12), at GOOG-00000998; Cert. Ex. 8, Google Privacy Policy (07/27/12), at GOOG-00000114), Google does not even identify the specific exception that permitted it to share *Plaintiff's* personal information with YCDroid. (Mot. at 17.) Nor could it: If YCDroid had actually needed Plaintiff's personal information for any of the six permitted reasons, it would have queried or viewed it within Merchant Center, and as Google reminds the Court *ad nauseam*, YCDroid never did so.

Nonetheless, Google raises hypothetical justifications for why sharing some Buyers' personal information may be permissible in some cases. (Mot. at 17.) For instance, Google argues

---

[5]   To the extent ambiguity remains, it must be construed against Google. *See Ewert v. eBay, Inc.*, No. 07-cv-2198, 2010 WL 4269259, at *7 (N.D. Cal. Oct. 25, 2010); Cal. Civ. Code. § 1654.

that "zip code, at least" was necessary for sales tax calculations. (Mot. at 6.) This argument, however, misses the mark for several reasons. ████████████████████████████ ████████████████████████████████████████████. (*See* Ex. 9 at GOOG-00005127–GOOG-00005128.) More importantly, ████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████. (Cert. Ex. 46, Macek Dep. Tr., at 82:1–23.) On top of that, ████████████████████████ ████████████████████████████████████████████████. (*Id.* at 27:23–28:3.)

Google likewise argues that situations *may* arise in which it may be permitted to provide Sellers with Personal Information after a purchase. (Mot. at 5–6.) Those hypothetical scenarios are beside the point, however, because Google's policy is to share Personal Information preemptively. Svenson's name, email address, and zip code, for instance, ████████████████████████ ████████████████████████████ (*See* Plaintiff's Statement of Undisputed Facts, Section I.B.2, *supra.*) That Google made Svenson's Personal Information ████████████████ ████████████████████████ disproves any contention by Google that such information was *necessary* for order processing, customer service, tax, or any other purpose. Google's sharing of Svenson's Personal Information, therefore, violates the Privacy Policies, which provide that Google "will" share personal information only in specific scenarios. (*See* Cert. Ex. 7, Wallet Privacy Notice (08/01/12), at GOOG-00000998; Cert. Ex. 8, Google Privacy Policy (07/27/12), at GOOG-00000114.) Most importantly, any argument that it was necessary for Google to make Svenson's Personal Information available to YCDroid is undercut by the (oft-repeated) fact that YCDroid never actually viewed Svenson's Personal Information.

Finally, and further undermining its arguments, Google recognized ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ As

a result, a reasonable jury could ecertainly find that Google's immediate sharing of Svenson's

Personal Information fell outside the bounds of the Privacy Policies, violating their terms.

### B. Google engaged in unfair conduct by violating its Privacy Policies.

Holding to its assertion that "Svenson's UCL claim depends entirely on her breach of contract claim," (Mot. at 19), Google does not even bother to address Svenson's claim under the UCL's unfair prong. "The 'unfair' prong of the UCL creates a cause of action for a business practice that is unfair even if not proscribed by some other law." *In re Adobe Sys., Inc. Privacy Litig.*, 66 F.Supp. 3d 1197, 1225 (N.D. Cal. 2014). "The UCL does not define the term 'unfair.' . . . [And] the proper definition of 'unfair' conduct against consumers 'is currently in flux' among California courts." *Id.* (citation and internal quotations omitted). As this court previously recognized, "[t]hree lines of authority have developed among the California Courts of Appeal." *Svenson v. Google Inc.*, No. 13-CV-04080-BLF, 2015 WL 1503429, at *9 (N.D. Cal. Apr. 1, 2015). Under the first test, the public policy behind a consumer's claim of unfairness must be "tethered to specific constitutional, statutory, or regulatory provision." *Id.* (citation and internal quotations omitted). The first test is met here because Svenson's claim is clearly tethered to OPPA.

Under the second test, the challenged conduct must be "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers," and also the court must "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Id.* (citation and internal quotations omitted). Here, the evidence shows that the personal information that Google shared with consumers was ███████████████████████████. (Ex. 7, Thomas GPP Dep. Tr. at 113:13–114:1; 198:12–19; Ex. 8 at GOOG-00004271; Ex. 4, Elbouchikhi Dep. Tr. at 94:22–95:1, 209:18–23.) And though YCDroid may have eventually needed Svenson's Personal Information, for instance to process a refund or provide customer service, none of these justifications could have applied at the moment Svenson clicked "Buy." Based on this evidence, a reasonable jury could find that the gravity of the harm to Svenson outweighed any potential "benefits" they might have enjoyed. Finally, under the third test, "the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have

avoided." *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010) (citation and internal quotations omitted). Here again, the evidence indicates that Svenson's injury—Google's retention of almost a third of the App price—was substantial, and as noted above, provided no palpable benefits to consumers. Likewise, there was nothing Svenson could have done to prevent the sharing that occurred automatically when she clicked "Buy." Thus, Svenson should also be allowed to proceed on her UCL claim under the unfair prong.

### C.     Svenson's UCL claim is independent of her breach of contract claim.

Google provides little analysis supporting its argument that judgment should be entered against Plaintiff's UCL claim. Instead, it simply argues that her "UCL claim depends entirely on her breach of contract claim." (Mot. at 19.) To the contrary, even if Plaintiff's contract claim fails—which, as described in Section II, *infra*, it cannot—Plaintiff's UCL claim would survive.

Courts regularly allow UCL claims to survive beyond substantially related contract claims. *See, e.g.*, *Rubio v. Capital One Bank*, 613 F.3d 1195, 1205 (9th Cir. 2010) (affirming dismissal of contract claim for lack of formation, but reinstating UCL claims under unfair, unlawful, and fraudulent prongs). For instance, while contract claims may fail for lack formation, privity, consequential damages, or other defects, UCL claims are able to avoid such deficiencies. *See Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1152 (9th Cir. 2008) (noting that "[u]nder the sweeping standing provisions of California's UCL, '[s]ection 17200 does not require that a plaintiff prove that he or she was directly injured by the unfair practice . . . .'"); *In re Anthem, Inc. Data Breach Litig.*, No. 15-md-2617, 2016 WL 589760, at *12 (N.D. Cal. Feb. 14, 2016) (allowing UCL claims to proceed where Plaintiff could not identify specific contract term breached); *Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1331 (C.D. Cal. 2013) (allowing UCL claim to proceed while dismissing contract claims for lack of privity).

Here, Google's challenges to Plaintiff's contract claims, even if accepted, would have no effect on Plaintiff's UCL claim. For instance, Google argues that Plaintiff's contract claim fails because "Svenson paid the price of the App to the Seller, not to Defendants," and because the sale of the App was between "Buyer and Seller, not Buyer and Defendants." (Mot. at 4.) Those points, however, have no bearing on whether Defendants violated *their own* Privacy Policies (as needed

for Plaintiff's unlawful-prong claim), and whether those violations caused Plaintiff and millions of Buyers like her to overpay for their purchases, regardless of who the contracting parties ultimately were (as needed for Plaintiff's UCL claims). Google likewise contends that Svenson's breach of contract claim fails because Google provided Wallet's payment processing services free of charge, and that the 30% transaction fee was charged to YCDroid—not Svenson directly. (Mot. at 11.) Regardless of who the transaction fee is ultimately charged to, however, Plaintiff paid for a transaction that included Google abiding by its Privacy Policies, and she did not receive the benefits of what she paid for. (Ex. 10, Svenson Dep. Tr., at 123:22–25; Cert. Ex. 47, Fishkind Rpt., at 23–27.). *See Troyk v. Farmers Grp., Inc.*, 90 Cal. Rptr. 3d 589, 618 (Cal. App. 4th 2009) ("[A]lthough class members did not pay the service charges directly to either [defendant], the trial court could have properly inferred from the undisputed facts that [defendants] received a benefit from those service charge payments (which [defendants] required) even though they did not directly receive money.").[6]

Ultimately, each of Defendants' arguments as to Plaintiff's contract claims are irrelevant to Svenson's claims under the UCL. That is, even if the Court finds that *no contract* existed between Google and Svenson, the evidence would still show that Google violated its Privacy Policies when it shared Svenson's Personal Information (yet pocketed the 30% transaction fee for itself). *See, e.g.*, *Bekins v. Zheleznyak*, No. CV15-4478-CAS(ASX), 2016 WL 1091057, at *10 (C.D. Cal. Mar. 21, 2016) (permitting UCL claim based on statutory violation to move forward, noting that it was "entirely distinct from the allegations supporting plaintiffs' claim for breach of contract").

### D. Svenson's economic injuries confer standing under the UCL.

Google argues that Svenson lacks standing to assert her UCL claim because she "cannot show the economic injury necessary to establish statutory standing." (Mot. at 20.) However, Svenson presents two viable theories of economic loss—(1) that she was deprived the benefit of the bargain, under which Google (in exchange for retaining 30% of the App price) was obligated

---

[6]     Google's arguments are problematic for several reasons (*see* Section II, *infra*), not the least of which is the fact that the Play ToS makes clear that by purchasing an App, Buyers "enter into a contract based on these Terms with: [1] Google in relation to the use of Google Play . . . ." (Cert. Ex. 2, Play ToS (11/24/12), at GOOG-00001181.)

to provide private payment-processing services consistent with the Privacy Policies, and (2) that Google's sharing diminished value of her personal information.

To assert a UCL claim, a party must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury,* and (2) show that that economic injury was the result of, i.e., *caused by,* the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset*, 246 P.3d at 885. Notably, the UCL does not provide for recovery of consequential damages based on a plaintiff's economic injury, but instead serves as "an equitable action by means of which a plaintiff may recover money or property obtained from the plaintiff . . . through unfair or unlawful business practices." *Cortez v*, 999 P.2d at 712.

One way Svenson may establish an economic injury is to "surrender in a transaction more, or acquire in a transaction less, than . . . she otherwise would have." *Kwikset*, 246 P.3d at 877; *see e.g.*, *In re iPhone Application Litig.,* 844 F. Supp. 2d 1040, 1072 (N.D. Cal. 2012) (finding UCL standing was adequately pleaded where plaintiffs claimed they paid more for iPhones than they would if they had known of defendant's alleged misrepresentations or omissions); *In re Anthem, Inc. Data Breach Litig.*, 2016 WL 589760, at *18 (noting that "recent case law within the data breach context confirms that benefit of the bargain damages represent economic injury for purposes of the UCL.") (collecting cases); *see also Johns v. Bayer Corp.*, 280 F.R.D. 551, 557 (S.D. Cal. 2012) ("[I]t is about point-of-purchase loss. Plaintiffs and class members were allegedly injured when they paid money to purchase the [product].").

Here, the evidence shows that Svenson surrendered more in the transaction than she received. Specifically, Svenson's $1.77 purchase entitled her to receive the App as well as Defendant's payment processing service and privacy protections, but she never received the privacy protections she paid for. (*See* Ex. 10, Svenson Dep. Tr., at 123:22–25; Cert. Ex. 47, Fishkind Rpt., at 23–27; *see also* Cal. Bill Analysis, A.B. 68 (Apr. 22, 2003) ("Many consumers refuse to do business online because they have little protection against abuse . . . This bill provides such protection by allowing individuals to rely on a privacy policy posted online.").

As to value, courts and other authorities have opined that transactions protected by privacy or secure transactions are worth more to consumers than ones where their information is unsecure.

*See In re Adobe*, 66 F. Supp. 3d at 1224 ("It is also plausible that a company's reasonable security practices reduce the risk of theft of customer's personal data and thus that a company's security practices have economic value."); Office of the California Attorney General, *Making Your Privacy Practices Public* ("Studies of privacy trust identify disclosures of privacy and security practices as one of the key factors that build trust in a company."); Ex. 20, Scott J. Savage and Donald M. Waldman, *The Value of Online Privacy*, Oct. 16, 2013, http://papers.ssrn.com/ sol3/papers.cfm?abstract_id=2341311 (study analyzing apps' privacy settings and finding consumers would pay between $1.19 and $4.05 to prevent applications from sharing certain information). (*See also* Cert. Ex. 47, Fishkind Rpt., at 13 ("Firms may use personal information collected for advertising or spam, or to price discriminate based on a person's shopping habits. Firms may also transmit customer information to third parties for deceptive marketing, identity fraud, or other nefarious purposes. For these reasons, among others, consumers place a value on protecting their PII."). Indeed, it stands to reason that if Google did not believe that Buyers would value its privacy promises, it would have little reason to make them.

Another way a plaintiff may establish an economic injury is to "have a present or future property interest diminished." *Kwikset*, 246 P.3d at 885–86. Here, a jury could reasonably conclude that Google diminished the market value of Svenson's Personal Information, which, like the personal information of any consumer in the digital age, is a sought-after commodity. (Cert. Ex. 47, Fishkind Rpt., at 27–32.) By validating and packaging this information and making it available to YCDroid, Svenson was deprived of the opportunity to sell this information, including at least the opportunity to attempt to sell it to YCDroid. Courts including the Ninth Circuit have recognized that the lost value of personal information resulting from unauthorized disclosures is a form of economic injury. *See In re Facebook Privacy Litig.*, 572 F. App'x 494 (9th Cir. 2014); *accord Svenson*, 2015 WL 1503429, at *5; *In re Anthem, Inc. Data Breach Litig.*, 2016 WL 589760, at *27 (Feb. 14, 2016) (noting that numerous other courts have adopted the Ninth Circuit's reasoning, and "the consistent theme running through these decisions . . . is that 'Loss of Value of PII' represents a cognizable form of economic injury.").

Under either of her two damages theories, Svenson is able to show that she suffered an

economic injury sufficient for standing under the UCL. Because she also establishes that Google's conduct was unlawful and unfair, Google is not entitled to summary judgment on this claim.

**II.     Summary Judgment Should Be Denied as to Svenson's Contract Claim Because Google Unnecessarily Shared Her Personal Information, Causing Her Damages.**

The Court should also deny summary judgment on Plaintiff's breach of contract claim. To prevail on that claim, Svenson must establish (1) a contract, (2) her performance (or excuse for nonperformance), (3) Google's breach, and (4) resulting damages. *See Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 818 (9th Cir. 2014). Google does not challenge the first two elements. It is undisputed that when a Buyer assents to the Play ToS at the point of purchase, it is bound to the Contract, which consists of four interrelated documents: (1) Play ToS, (2) Wallet ToS, (3) Wallet Privacy Notice, and (4) Google Privacy Policy. (*See* Cert. Ex. 2, Play ToS (11/24/12), at GOOG-00001181 ("Each time that you purchase a Product, you enter into a contract based on these Terms with: [1] Google in relation to the use of Google Play . . ."); Cert. Ex. 1, Wallet ToS (10/23/12), at GOOOG-00001191 ("These [ToS] are a legal agreement between you, Google, Inc., and Google Payment Corp. . . .").) Thus, the only issues are breach and damages.

Here again, Google requests summary judgment because (1) it never "shared" Svenson's Personal Information or alternatively, its "sharing" was permissible, and (2) Svenson has no evidence of damages. Google is wrong on both fronts. As explained above, dictionary definitions, contemporary usage, and case law all show that "sharing" is not contingent on what a *recipient* does with information. And, because Google's sharing took place automatically, Google cannot reasonably argue that they fell within one of the need-based exceptions outlined in the Privacy Policies. As to damages, Svenson has assembled ample evidence—including expert testimony and documents showing that 30% of the App's purchase price flowed directly to Google—from which a jury could readily conclude that Svenson was damaged. *See Anderson*, 477 U.S. at 248.

**A.     Google breached the contract when it made Svenson's Personal Information available to YCDroid in the Merchant Center.**

With respect to breach, Google's provision of information through Merchant Center meets the definition of "sharing," which simply means to *make available*, and does not depend on the

recipient's actions. As Google correctly notes, under California law, contract terms are understood in their "ordinary and popular sense," absent a showing that a contrary meaning was intended. Cal. Civ. Code § 1644; *accord Bunker Hill Park Ltd. v. U.S. Bank Nat'l Ass'n*, 231 Cal. App. 4th 1315, 1327 (2014). Courts may "appropriately refer" to dictionaries to ascertain the ordinary meaning of a word in a contract. *Bunker Hill*, 231 Cal. App. 4th at 1327. As explained in Section I.A.1, *supra*, dictionary definitions make clear that, within the e-commerce context, that Google "shared" Plaintiff's personal information.

Thus, by making Svenson's Personal Information available to YCDroid, Google breached its contractual duty to not share such information "with companies, organizations and individuals outside of Google," (*see* Cert. Ex. 8, Google Privacy Policy (07/27/12), at GOOG-00000114).

**B.      Google's broken promise to honor the Privacy Policies damaged Svenson.**

Google contends that it provided payment-processing services through Wallet free of charge, and that its automatic sharing of her Personal Information did not damage Svenson. The evidence shows otherwise.

### *1.      Svenson did not receive the benefit of her bargain.*

First, Svenson lost the "benefit of the bargain" because she did not receive the full value she paid for as part of the Contract with Google. "Contract damages compensate a plaintiff for its lost expectation interest," also known as "the benefit of the bargain that full performance would have brought." *New W. Charter Middle Sch. v. Los Angeles Unified Sch. Dist.*, 187 Cal. App. 4th 831, 844 (2010); *see also Sanchez v. Wal-Mart Stores, Inc.*, No. 06-cv-2573, 2008 WL 3272101, at *3–4 (E.D. Cal. Aug. 6, 2008) (noting that plaintiff "seek[ing] benefit of the bargain damages grounded in contract law" alleged "actual economic harm (e.g., overpayment, loss in value, or loss of usefulness) emanating from the loss of her benefit of the bargain. That is, she [sought] to recover the difference between what she contracted for and what she actually received.").

Here, Svenson never received the privacy protections that Google promised under the Contract, even though Google kept almost a third of the $1.77 that she paid. Thus, the payment-processing service that Svenson actually received in exchange for Google's $0.53 cut of the purchase price—in which her personal information was shared with YCDroid—was worth less

than what she paid for. *See Rodman v. Safeway, Inc.*, 125 F. Supp. 3d 922, 933 (N.D. Cal. 2015) (recognizing "contract law principle that 'the plaintiff is entitled to damages that are equivalent to the benefit of the plaintiff's contractual bargain.'") (quoting *Lewis Jorge Const. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 102 P.3d 257, 261 (Cal. 2004)). Accordingly, Plaintiff did not receive the benefit of her bargain, and in fact overpaid for what was delivered. *See* Section I.D*, supra*.

Google attempts to disavow its Contract with Svenson by arguing that the purchase transaction was exclusively between her and YCDroid. Quoting from the Wallet and Play ToS and, Google argues that it "does not charge a fee to use the Processing Service as a Buyer," and that Buyers purchase content "from the Provider of the App," not Google. (Mot. at 11–12.) However, these same terms make clear that when Svenson purchased the app, she contracted with both the Buyer *and* Google. (Cert. Ex. 2, Play ToS, at GOOG-0000118 ("Each time that you purchase a Product, you enter into a contract based on these Terms with: Google in relation to the use of Google Play . . . ."; Cert. Ex. 1, Wallet ToS (10/23/12) at GOOOG-00001191 (noting that consumers enter a "legal agreement" with Google "that governs [their] access and use of Google Wallet"). Thus, when Google did not honor the its promises in the Privacy Policies, but kept $0.53 of the App price, Svenson did not receive what she bargained for in this particular transaction.[7]

### 2. *Google diminished the value of Svenson's Personal Information.*

Second, Google diminished the market value of Svenson's personal information, which, like the personal information of any consumer in the digital age, is a sought-after commodity. The Ninth Circuit has recognized that the diminished sales value of an individual's personal information is a form of contract damages under California law. (Dkt. 118 at 9 (citing *In re Facebook*, 572 F. App'x at 494)). *See also In re Anthem*, 2016 WL 589760, at *27. In a footnote that occupies almost half the page, Google cites a number of cases suggesting that a consumer must try and fail to sell her data before damages can arise under this theory. However, they are all from outside of the Ninth Circuit, which has given no indication consumers must attempt to sell

---

[7]     That Svenson provided some of her Personal Information on other websites does not diminish the fact that she did not receive the benefit of her bargain in this particular transaction. In addition, there is no evidence that Svenson made her Gmail address "freely available online," as Defendants suggest (Mot. at 9 (citing online bio displaying Svenson's work email address).)

their personal data in order to suffer damages under California law. *See In re Facebook*, 57 F. App'x 494.[8] As explained above, personal information is a commodity with a market value that "can be actively traded on an exchange." (Cert. Ex. 47, Fishkind Rpt., at 28–29.) By neatly packaging this information—the quality of which Google had already ensured—and giving it to YCDroid, Google deprived Svenson of an opportunity to sell it on the market. As such, Google diminished the value of Svenson's Personal Information and damaged her in the process.

### 3. Even if the Court finds that Svenson has not proven damages as a result of Google's breach, she is nevertheless entitled to nominal damages.

Finally, if nothing else, Svenson is entitled to nominal damages based on her breach of contract claim. "Nominal damages are awarded for the infraction of a legal right, where the extent of loss is not shown, or where the right is one not dependent upon loss or damage.'" *Crowley v. Peterson*, 206 F. Supp. 2d 1038, 1045 n.4 (C.D. Cal. 2002) (citation and internal quotations omitted); *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571719, at *28 (N.D. Cal. June 30, 2012) "[W]here the amount of damages is uncertain, nominal damages may still be awarded."). Nominal damages are appropriate in breach of contract actions where "a breach of duty has caused no appreciable detriment to the party affected," Cal. Civ. Code § 3360, even in the absence of actual damages. *See In re Facebook Privacy Litig.*, No. 10-CV-02389-RMW, 2016 WL 3523850, at *6 (N.D. Cal. June 28, 2016) (collecting cases).

Thus, to the extent that Svenson's damages cannot be proven with absolute precision, she is nevertheless entitled to nominal damages. *See, e.g.*, *Opperman v. Path, Inc.*, No. 13-CV-00453-JST, 2016 WL 3844326, at *2 (N.D. Cal. July 15, 2016) (certifying nominal damages class based on claim that defendant accessed plaintiffs' personal contact information without permission).

### III. The Court Should Deny Summary Judgment on Plaintiff's Good Faith and Fair Dealing Claim Because Google Frustrated the Purpose of the Contracts.

Google's arguments as to Svenson's breach of the implied covenant of good faith and fair dealing claim are identical to those raised against her breach of contract claim: (1) no

---

[8]     In the *In re GPP* case, Judge Grewal never rejected plaintiff's diminished value theory—the only problem with it, he reasoned in dismissing plaintiff's claims, was that the theory was "not reflected anywhere" in plaintiffs' third amended complaint. 2015 WL 4317479, at *5.

impermissible "sharing" occurred, and (2) Svenson was not damaged by its actions. Google's arguments should be rejected here for the same reasons.

To prevail on a claim for the breach of the implied covenant of good faith and fair dealing, a plaintiff must establish that (1) a contract existed, (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Rosenfeld v. JPMorgan Chase Bank, N.A.,* 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010). "The implied promise [of good faith and fair dealing] requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the agreement." *Avidity Partners, LLC v. State*, 221 Cal. App. 4th 1180, 1204 (2013) (citation and internal quotations omitted).

Here, only the fourth and fifth elements are at issue, and Plaintiff can readily establish both. As explained in detail in Section I.A.1, *supra*, Google did "share" Svenson's Personal Information by making it immediately available to YCDroid as soon as she clicked "Buy." And because this information was shared automatically, there was no legitimate need for it to be distributed. *See* Section I.A.2, *supra*. By automatically sharing Svenson's Personal Information when she bought the App, Google frustrated the purpose of the Contract, which provided that Svenson would be able to purchase the App without the unnecessary sharing of her Personal Information. As to damages, Svenson was injured for the reasons stated in Section I.D, *supra*—because she did not receive the full benefit of her bargain, and because Google lessened the value of her personal information. And, if nothing else, she is entitled to nominal damages. *GameTech Int'l, Inc. v. Trend Gaming, LLC*, No. 02-cv-899 PHX HRH, 2004 WL 3242398, at *2 (D. Ariz. Sept. 17, 2004) (awarding nominal damages based on implied covenant claim).

Accordingly, this Court should deny Google's motion on this claim as well.

## IV. Svenson Has Article III Standing to Sue.

Because Svenson has adduced sufficient evidence to show (1) that she was damaged by Google's breach of contract and implied covenant of good faith and fair dealing, and (2) that she suffered an economic injury as a result of Google's unfair and unlawful practices, she necessarily

has standing to sue. Article III of the United States Constitution does not impose a heavy burden on litigants seeking access to the federal courts. *See Preminger v. Peake*, 552 F.3d 757, 763 (9th Cir. 2008) ("The injury may be minimal.") (collecting cases). To establish standing, a plaintiff must have "suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590 (1992)). An injury in fact must be both "particularized," affecting a plaintiff in a personalized and individual way, and "concrete," such that it is non-abstract and "actually exist[s]." *Id.* at 1548. Here, Defendant only challenges concreteness. (Mot. at 10.)

As this Court recognized in ruling on Google's motion to dismiss, because the UCL imposes a narrower standing requirement than Article III, Svenson's ability to establish economic loss and UCL standing necessarily means that she has constitutional standing to sue. *See Kosta v. Del Monte Corp.*, No. 12-cv-01722-YGR, 2013 WL 2147413, at *11 (N.D. Cal. May 15, 2013) ("Article III's injury-in-fact requirement is effectively the same as that under the UCL . . . except that Article III allows standing for non-economic injuries and the UCL does not."). Even if Svenson's breach of contract claim is limited to pursuit of nominal damages, she would still have standing to sue. *See In re Facebook*, 2016 WL 3523850, at *4 ("This court . . . is persuaded that a California breach of contract claim for nominal damages may support Article III standing."); *see also United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO/CLC v. Cookson Am., Inc.*, 710 F.3d 470, 475 (2d Cir. 2013) ("[I]t is axiomatic that a party to an agreement has standing to sue a counter-party who breaches that agreement[.]").

Because Svenson suffered a concrete and particularized "injury in fact" when Google deprived her of paid-for, privacy payment-processing services, and because Google otherwise diminished the value of her personal information, Svenson has Article III standing to sue.

### **CONCLUSION**

For the reasons described above, the Court should deny Defendants' Motion for Summary Judgment in its entirety.

Respectfully submitted,

**ALICE SVENSON**, individually and on behalf of all others similarly situated,

Dated: July 29, 2016

By: s/ Rafey S. Balabanian
        One of Plaintiff's Attorneys

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, CA 94107
Tel: 415.234.5342
Fax: 415.373.9495

Jay Edelson (Admitted *Pro Hac Vice*)
jedelson@edelson.com
Benjamin H. Richman (Admitted *Pro Hac Vice*)
brichman@edelson.com
J. Dominick Larry (Admitted *Pro Hac Vice*)
nlarry@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, IL 60654
Tel: 312.589.6370
Fax: 312.589.6378

Kathryn Diemer
kdiemer@diemerwhitman.com
DIEMER, WHITMAN & CARDOSI, LLP
75 East Santa Clara Street, Suite 290
San Jose, CA 95113
Tel: 408.971.6270

Mark A. Bulgarelli (Admitted *Pro Hac Vice*)
markb@progressivelaw.com
PROGRESSIVE LAW GROUP LLC
140 S. Dearborn Street, Suite 315
Chicago, IL 60603
Tel: 312.787.2717
Fax: 888.574.9038

Frank Jablonski (Admitted *Pro Hac Vice*)
frankj@progressivelaw.com
PROGRESSIVE LAW GROUP LLC
354 West Main Street
Madison, WI 53703
Tel: 608.258.8511

## CERTIFICATE OF SERVICE

I, Rafey S. Balabanian, an attorney, hereby certify that on July 29, 2016, I electronically filed the above and foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By: s/ Rafey S. Balabanian