Kathryn Diemer
kdiemer@diemerwhitman.com
Diemer, Whitman & Cardosi, LLP
75 East Santa Clara Street, Suite 290
San Jose, California 95113
Tel: 408.971.6270
CA Bar No.: 133977

Jay Edelson (Admitted *Pro Hac Vice*)
jedelson@edelson.com
Edelson PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Frank Jablonski (Admitted *Pro Hac Vice*)
frankj@progressivelaw.com
Progressive Law Group LLC
354 West Main Street
Madison, WI 53703
Tel: 608.258.8511

*Attorneys for Plaintiff and the Putative Class*

(Additional counsel on signature block.)

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| ALICE SVENSON, individually and on behalf of all others similarly situated, | Case No. 5:13-cv-04080-BLF |
| | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY** |
| *Plaintiff,* | |
| v. | |
| Google Inc., and Google Payment Corp., | Judge: Honorable Beth Labson Freeman |
| *Defendants.* | |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

ARGUMENT .........................................................................................................................4

 **I.** **Dr. Fishkind's Benefit-of-the-Bargain Model Adopts Common Methodology and Reflects Well-Understood Principles of the Behavioral Economics of Privacy** ........................................................................................................4

 **II.** **Dr. Fishkind's Survey Methodology Confirms That Damage Can Be Calculated on a Class-Wide Basis** ......................................................................9

 **III.** **The Diminished-Value Theory Reflects the Fact That Each Instance of Sharing the Class's Personal Information Reduced the Market for That Information** ...............................................................................................11

 **IV.** **Even If the Court Accepted Google's Critiques of Dr. Fishkind's Report, Exclusion Would Be Improper** ....................................................................12

CONCLUSION ....................................................................................................................14

## <u>TABLE OF AUTHORITIES</u>

<u>United States Supreme Court</u>:

*Brazemore v. Friday*,
    478 U.S. 385 (1986) ...........................................................................13

<u>United States Circuit Court of Appeals:</u>

*Chavez v. Blue Sky Natural Beverage Co.*,
    340 Fed. App'x 359 (9th Cir. 2009) ...................................................4

*Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*,
    383 F.3d 110 (3d Cir. 2004)...................................................11, 12–13

*Ebner v. Fresh, Inc.*,
    No. 13-cv-56644, 2016 WL 1056088 (9th Cir. Mar. 17, 2016) ......5 n.1

*Hemmings v. Tidyman's Inc.*,
    285 F.3d 1174 (9th Cir. 2002)............................................................13

*In re Facebook Privacy Litig.*,
    572 Fed. App'x 494 (9th Cir. 2014) ..................................................11

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) ................................................................5

*Mangold v. Cal. Pub. Utils. Comm'n*,
    67 F.3d 1470 (9th Cir. 1995)............................................................14

*Obrey v. Johnson*,
    400 F.3d 691 (9th Cir. 2005)............................................................14

*Walker v. Gordon*,
    46 Fed. App'x 691 (3d Cir. 2002)....................................................13

<u>United States District Court:</u>

*Apple iPod Antitrust Litig.*,
    No. 05-cv-0037, 2014 WL 4809288 (N.D. Cal. Sept. 26, 2014) .........13

*Brotherson v. Prof. Basketball Club, L.L.C.*,
    262 F.R.D. 564 (W.D. Wash. 2009).................................................5 n.1

*Dukes v. Wal-Mart, Inc.*,
    222 F.R.D. 185 (N.D. Cal. 2004)...............................................10 n.3, 14

*Guido v. L'Oreal, US, Inc.*,
    2014 WL 6603730 (C.D. Cal. July 24, 2014) ...................................10

*Hartle v. FirstEnergy Generation Corp.*,
   7 F. Supp. 3d 510, 516 (W.D. Pa. 2014)................................................................6

*Hartle v. FirstEnergy Generation Corp.*,
   No. CIV.A. 08-1019, 2014 WL 1317702 (W.D. Pa. Mar. 31, 2014)....................6, 12–13

*In re iPhone Application Litig.*,
   844 F. Supp. 2d 1040 (N.D. Cal. 2012).................................................................4

*In re Scotts EZ Seed Litig.*,
   304 F.R.D. 397 (S.D.N.Y. 2015).........................................................................14

*In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Products Liab. Litig.*,
   No. MDL 10-02172-CJC, 2012 WL 4904412 (C.D. Cal. Sept. 20, 2012) ...........................9

*Kurihara v. Best Buy Co., Inc.*,
   No. 06-cv-1884, 2007 WL 2501698 (N.D. Cal. Aug. 30. 2007) ....................................14

*Johns v. Bayer Corp.*,
   280 F.R.D. 551 (S.D. Cal. 2012) ........................................................................5

*Miller v. Fuhu Inc.*,
   No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794 (C.D. Cal. Dec. 1, 2015).......................9

*Patrick v. FirstEnergy Generation Corp.*,
   No. CIV.A. 08-1025, 2014 WL 5463885 (W.D. Pa. Oct. 27, 2014)...................................6

*Robocast, Inc. v. Microsoft Corp.*,
   No. 10-cv-1055, 2014 WL 293434 (D. Del. Jan. 24, 2014)...................................5–6

*TVIIM, LLC v. McAfee, Inc.*,
   No. 13-cv-4545, 2015 WL 4148354 (N.D. Cal. July 9, 2015).........................................13

*Wallace v. Countrywide Home Loans Inc.*,
   No. 08-cv-1462, 2012 WL 11896333 (C.D. Cal. Aug. 31, 2012)................................10 n.3

*Werdebaugh v. Blue Diamond Growers*,
   No. 12-CV-2724-LHK, 2014 WL 2191901 (N.D. Cal. May 23, 2014)..............................14

**State Court:**

*Kwikset Corp. v. Superior Court*,
   246 P.3d 877 (2011)........................................................................................4

**<u>Miscellaneous</u>:**

Aviv Nevo, *A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demand*, 9 Journal of Economics & Management Strategy 513, 525 (2000) ........................6

Jeffrey M. Wooldridge, Introduction Econometrics 583–89 (South-Western 2013)........................6

Julia Gideon et al., *Powerstrips, Prophylactics, and Privacy, Oh My!* in Proceedings of the 2006 Symposium on Usable Privacy and Security 133–144 (2006)...............................................8

Serge Egelman et al*., Choice Architecture and Smartphone Privacy: There's A Price for That*, in The 2012 Workshop on the Economics of Information Security (WEIS) (2012).................8

Timothy C. Haab and Kenneth E. McConnell, Valuing Environmental and Natural Resources (Edward Elgar 2002) .........................................................................................................6

1

**INTRODUCTION**

2       This case is about Plaintiff Alice Svenson's claim that Defendants Google, Inc. and Google

3    Payment Corp. (collectively, "Google" or "Defendants") violated their privacy policies by sharing

4    the personal information of millions of customers who purchased smartphone applications

5    ("apps") using Defendants' payment-processing platform known as Google Wallet. As a result,

6    Plaintiff asserts that the putative class of app buyers suffered two types of economic harm. First,

7    the app buyers did not receive what they paid for: while they paid for an app and payment

8    processing services that would keep their personal information private in accordance with

9    Google's privacy policy, what they actually received was an app along with a payment processing

10   service that *shared* their personal information with the seller of the app. And second, that by

11   sharing that personal information with app sellers, Google deprived the buyers of the opportunity

12   to sell that information themselves.

13       To show that damages can be calculated using a common methodology for all putative

14   class members, Plaintiff submitted the expert report of Dr. Henry Fishkind. Using methods honed

15   over the course of his 30-plus year career as an economist, Dr. Fishkind was able to propose class-

16   wide methodologies for each of Plaintiff's damages theories. To determine a methodology for

17   calculating damages under the "benefit of the bargain" theory, Dr. Fishkind created a survey that

18   tested individuals' willingness to purchase apps at different price points and with varying levels of

19   privacy protections, and ran a regression analysis to determine the extent to which those privacy

20   protections affected demand. Using that information, Dr. Fishkind was then able to compare the

21   value of what was sold to buyers (i.e., apps, plus private payment processing) to what was

22   delivered (i.e., apps, with non-private payment processing), and propose a damages formula that

23   could be applied to all class members based on the price of the app sold. As to the "diminution of

24   value" theory of damages, Dr. Fishkind surveyed the data regarding the sales value of personal

25   information—both on an individual and aggregate level, and using data from industry publications

26   and obtained from data brokers themselves—and calculated the average prices charged for the

27   types of personal information shared by Google. This, in turn, allows for the calculation of the lost

28   sales value of that personal information suffered by each class member.

Google now seeks to exclude Dr. Fishkind's testimony in its entirety based on a series of flawed criticisms of his methods. Arguing that Dr. Fishkind's methods are too hypothetical and academic, and that their own practices are too individualized to allow for common analysis, Google asserts that the Court should not even consider Dr. Fishkind's findings in assessing the propriety of class certification. As explained in detail below, each of those criticisms miss their mark by a wide margin and are inconsistent with the well-settled body of Ninth Circuit case law on these issues. Moreover, even if accepted, none of Google's arguments would require a finding that Dr. Fishkind's testimony and report are inadmissible. Rather, the question would be the weight a jury could give to his testimony.

Ultimately, because Google did, in fact, violate its privacy policies in the same fashion with respect to each putative class member, Google's conduct and the resultant harms suffered by class members are amenable to class-wide analysis. Dr. Fishkind's detailed survey analysis—under either damages theory—provides just that. Accordingly, Google's motion should be denied, and Dr. Fishkind's testimony in support of class certification should be allowed.

## **BACKGROUND**

In its order denying (in part) Defendants' last motion to dismiss, the Court identified two theories of damages on which Plaintiff could seek relief. (Dkt. 118 at 7–9.) The first is known as the "benefit-of-the-bargain" theory, and it posits that when Plaintiff and the class members gave money to Google, they paid for an app *and* payment processing that would protect their personal information, but that they received something worth less: the app, and payment processing that *did not* protect their personal information. (Dkt. 118 at 8.) The second is known as the "diminution-of-value" theory. Under this theory, Plaintiff's personal information is viewed as a valuable asset, and by sharing that information with app Sellers without consent, Google deprived Plaintiff of the ability to monetize it. (*Id.* at 8–9.)

To show that these damages theories can be applied on a class-wide basis, Plaintiff retained Dr. Henry Fishkind, an economist with over 30 years of experience in the field who, in addition to substantial experience providing complex valuations for public and private entities, is regularly retained as an expert witness on the issue of damages. (Ex. 47 to Pl.'s Mot. for Class Cert. ("Cert.

Ex."), Expert Report of Henry Fishkind ("Fishkind Rpt."), at 1–3.) Dr. Fishkind set about accomplishing two goals: (1) developing a model to allow for benefit-of-the-bargain damages calculations across all class members, who purchased a variety of apps at varying prices, and (2) developing a model for diminished-value damages to allow for a calculation for each class member based on the information shared by Google. (*Id.* at 3–6.)

Dr. Fishkind's benefit-of-the-bargain model used a contingent-valuation ("CV") survey to measure individuals' willingness to purchase apps at different price points, and with different levels of privacy offered by the provider of the app store through which the purchase was made. (*Id.* at 10–11.) Once 5,000 individuals were surveyed, a logit regression was performed to isolate the effect of the varying levels of privacy protections on consumer demand for the apps. (*Id.* at 23–26.) From there, Dr. Fishkind created a formula that compared the demand for apps sold under different sharing regimes to the demand for apps sold within a store that did not share any personal information in conjunction with a sale. (*Id.* at 4.) That formula could then be applied to any purchase by a class member by simply inputting the price paid into the formula. (*Id*.) Dr. Fishkind's diminution-of-value model, on the other hand, was not based on a survey of consumer behavior, but on a survey of the market for consumer information. (*Id.* at 27–32.) Relying on both publicly obtained data about the demand for personal information as well as his own research into the prices charged by various data brokerage firms, Dr. Fishkind was able to calculate average sales prices for various pieces of consumer information. (*Id*.) Thus, through his report, Dr. Fishkind provided methodologies for calculating both benefit-of-the-bargain and diminished-value damages on a class-wide basis.

Google now seeks to exclude Dr. Fishkind's testimony, relying on a series of misunderstandings and mischaracterizations of his report. Throughout its motion, Google argues that both of Dr. Fishkind's methodologies are flawed because they fail to distinguish between class members who had their information shared and those who did not. As explained more fully in Plaintiff's contemporaneously filed response to Google's summary judgment motion, however, such a distinction is immaterial. ███████████████████████████

████████████████████████████████████████████

1 ████████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████. As such, Dr.

3 Fishkind's survey can and should properly assume Google's liability as to each class member.

4      As detailed below, Google's attacks specific to the benefit-of-the-bargain and diminution-

5 of-value models are similarly off-base. The Court should deny Google's motion, and admit Dr.

6 Fishkind's testimony to show that damages can be calculated at trial on a class-wide basis.

7 **ARGUMENT**

8 **I.      Dr. Fishkind's Benefit-of-the-Bargain Model Adopts Common Methodology and**

9 **Reflects Well-Understood Principles of the Behavioral Economics of Privacy.**

10      Google raises a number of challenges to Dr. Fishkind's benefit-of-the-bargain model, each

11 arguing essentially that the model is not widely accepted for calculating damages in a privacy

12 case, and that even if it was, the model doesn't apply to the facts of this case. Specifically, Google

13 argues that Dr. Fishkind's model is not based on established principles in the privacy space, that

14 ███████████████████████████████████████, that Dr. Fishkind hasn't measured

15 the change in demand that would have been caused by Google's sharing, and that any changes in

16 demand observed should not be applied to the app price as a whole.

17      As this Court has recognized, the benefit-of-the-bargain theory is rooted in the concept that

18 a plaintiff has "lost money [when] he did not receive what he paid for." (Dkt. 118, at 7 (citing

19 *Chavez v. Blue Sky Natural Beverage Co.*, 340 Fed. App'x 359 (9th Cir. 2009)).) Put differently, a

20 plaintiff states a claim under a benefit-of-the-bargain theory where she "(1) surrender[s] in a

21 transaction more, or acquire[s] in a transaction less, than . . . she otherwise would have." *Kwikset*

22 *Corp. v. Superior Court*, 246 P.3d 877, 886 (2011); *see e.g.*, *In re iPhone Application Litig.*, 844 F.

23 Supp. 2d 1040, 1072 (N.D. Cal. 2012) (finding UCL standing was adequately pleaded where

24 plaintiffs claimed they paid more for iPhones than they would if they had known of defendant's

25 alleged misrepresentations or omissions).

26      With this standard in mind, it is clear that Dr. Fishkind's report establishes its goal of

27 showing that damages under a benefit-of-the-bargain theory can be determined by common

28 methodology. Dr. Fishkind's survey and analysis measured and found a difference between

consumers' willingness to purchase an app from a store offering complete privacy protections and those offering some protection, but allowing for sharing of personal information. (*See* Cert. Ex. 47, Fishkind Rpt., at 6, Table 1.) Those findings map squarely onto the facts of this case. Discovery has shown that ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████. (*See* Pl.'s Mot. for Class Cert. ("Cert. Mot.") at 4–6.) Thus, at the ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████. *See Johns v. Bayer Corp.*, 280 F.R.D. 551, 557 (S.D. Cal. 2012) ("[I]t is about point-of-purchase loss. Plaintiffs and class members were allegedly injured when they paid money to purchase the [product]."). As such, Dr. Fishkind's report shows that the class members suffered damages, and it provides a formula for calculating those damages across the entirety of the class.[1]

Each of Google's attacks on Dr. Fishkind's methodology is fundamentally flawed. To start, that Dr. Fishkind cites ████████████████████████████████████████ ████████████████████████," is beside the point. (Defs.' Mot. to Exclude Expert Testimony ("Mot.") at 5.) Courts throughout the country recognize that accepted methodologies can and should be applied to new contexts in expert analysis, and that there is no requirement that the methodology be previously applied to an identical factual scenario. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 781 (3d Cir. 1994) (reversing district court's decision to exclude well-established animal study results introduced to establish proof of causation in humans); *Robocast, Inc. v. Microsoft Corp.*, No. 10-cv-1055, 2014 WL 293434, at *1 (D. Del. Jan. 24, 2014)

---

[1]   It also bears noting that damages will be consistent among the class members, regardless of subjective valuations of privacy rights, because damages under each cause of action in this case are determined using a reasonable person standard. *See Ebner v. Fresh, Inc.*, No. 13-cv-56644, 2016 WL 1056088, at *4 (9th Cir. Mar. 17, 2016) (noting California's "consumer protection statutes are governed by the 'reasonable consumer' test"); *Brotherson v. Prof. Basketball Club, L.L.C.*, 262 F.R.D. 564, 570–71 (W.D. Wash. 2009) (applying reasonable person standard in contract damages).

1   (admitting expert testimony regarding pricing on "dynamic advertising" even though technology

2   at issue differed); *Hartle v. FirstEnergy Generation Corp.*, 7 F. Supp. 3d 510, 516 (W.D. Pa. 2014)

3   (finding challenges of methodology's "fit" to the facts to go to weight, rather than admissibility).

4       Furthermore, taking the ratio of two coefficients in a logit regression analysis is a standard,

5   and in fact an elementary textbook methodology, used routinely to calculate elasticities (i.e. the

6   percentage change in response from a percentage change in an explanatory variable). *See* Cert. Ex.

7   47, Fishkind Rpt., at 23 n.39 (citing Jeffrey M. Wooldridge, Introduction Econometrics 583–89

8   (South-Western 2013)); *see also* Ex. 19,[2] Aviv Nevo, *A Practitioner's Guide to Estimation of*

9   *Random-Coefficients Logit Models of Demand*, 9 Journal of Economics & Management Strategy

10   513, 525 (2000). And to be sure, numerous studies have calculated differences in willingness to

11   pay in other contexts through similar comparisons. *See* Cert Ex. 47, Fishkind Rpt. at 12 n.29

12   (citing Timothy C. Haab and Kenneth E. McConnell, Valuing Environmental and Natural

13   Resources (Edward Elgar 2002)). The conclusion to be drawn, therefore, is that it is commonplace

14   to measure the effect of a variable (here, privacy protections) on hypothetical pricing by

15   comparing the ratio of logit coefficients for that variable. As such, Dr. Fishkind's decision to do

16   that here, in the privacy-protection context, is absolutely supportable. And to the extent Google

17   disagrees, that disagreement leads to a question of the weight of Dr. Fishkind's testimony, not

18   whether it is admissible in the first instance. *See Hartle v. FirstEnergy Generation Corp.*, No.

19   CIV.A. 08-1019, 2014 WL 1317702, at *5 (W.D. Pa. Mar. 31, 2014), *reconsideration denied sub*

20   *nom. Patrick v. FirstEnergy Generation Corp.*, No. CIV.A. 08-1025, 2014 WL 5463885 (W.D.

21   Pa. Oct. 27, 2014).

22       Google's next broad critique is that Dr. Fishkind's methodology is flawed because it fails

23   to distinguish between class members who were harmed and those who were not. Once again,

24   Google misreads (or mischaracterizes) Dr. Fishkind's report, as well as the facts of the case. To

25   start, the fact is that █████████████████████████████████████████████

26   ████████████████████████████████████████████████████████

27   _____

28   [2]     All new exhibits cited in Plaintiff's opposition brief are attached to the Declaration of
Rafey S. Balabanian, filed contemporaneously herewith.

1  ████████████████████████████ t. (*See* Cert. Mtn., at 4, 13–14.) Even if there were

2  such a distinction, however, it would have no bearing on the validity of Dr. Fishkind's analysis. Dr.

3  Fishkind's model, on its face, purports to establish damages for those class members entitled to

4  recover them, i.e., ████████████████████████████████████████

5  ████████████████████████████████████████████

6  ████████████████████████████████████████████

7  ████████████████████████████████████████████

8  ██████████████ Thus, Google's argument that Dr. Fishkind fails to distinguish between damaged

9  and undamaged class members simply reflects its rebuttal expert's admission that ██████████

10  ████████████████████████████████████████

11  ██████████ (Ex. 2, Douglas Kidder Dep. Tr. at 50:25–51:2.)

12      Next, Google's argument that App Buyers didn't pay for privacy protections is mistaken.

13  Google claims that ████████████████████████████

14  ████████████████████████████████████. (Mot. at 6.)

15  Google misses the point. As Dr. Fishkind's report makes clear, his survey is not focused on ████

16  ████████████████████████████████ Rather, it analyzes the

17  purchase from the customer's perspective, ████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████████████ (Cert.

20  Ex. 47, Fishkind Rpt., at 24.) Indeed, if prospective App Buyers did not believe they were paying

21  for privacy protections, the survey should have shown no distinction in demand between the

22  privacy-protective apps and those that offered the weakest protections. But the survey found quite

23  the opposite, reflecting the well-accepted concept that all else being equal, consumers prefer (and

24  will pay more for) services that protect their privacy over those that do not. (*Id.* at 12–14.) Thus,

25  Dr. Fishkind's survey properly measured the effect of the delivery of various privacy protections

26  on the willingness to purchase the app bundle with privacy protections as a whole.

27      Likewise, Google's assertion that Dr. Fishkind hasn't actually measured any change in

28  demand is mistaken. Google appears to mistakenly believe that Dr. Fishkind sought to ████████

1   ████████████████████████████████████████████████

2   ██████ (Mot. at 3.) To the contrary, Dr. Fishkind's methodology seeks to measure the amount

3   that a person would have been willing to pay for *app bundles* including various degrees of privacy

4   protections that *were actually delivered* by Google in practice. (Cert. Ex. 47, Fishkind Rpt., at 3.)[3]

5   Google's Motion does not dispute that Dr. Fishkind's methodology does as much. Moreover, Dr.

6   Fishkind's approach in this regard correctly speaks to the facts of this case—another inaccurate

7   criticism of Google's, as discussed above—inasmuch as each class member here paid for *a bundle*

8   of an app and privacy protections, rather than the sorts of *stand-alone* privacy measures Google's

9   motion appears to focus on.

10       Finally, Google's contention that changes in demand can't be applied to the price of the

11   app as a whole is simply mistaken. Google asserts that this ████████████████

12   ████████████████████████████████████████....'' (Mot. at

13   6.) Google ignores the substantial research showing that consumers are willing to pay for privacy

14   protections, and that the more consumers pay, the greater their privacy expectations. *See* Ex. 18,

15   Julia Gideon et al., *Powerstrips, Prophylactics, and Privacy, Oh My!* in Proceedings of the 2006

16   Symposium on Usable Privacy and Security 133–144 (2006); *see also* Ex. 17, Serge Egelman et

17   al*., Choice Architecture and Smartphone Privacy: There's A Price for That*, in The 2012 Workshop

18   on the Economics of Information Security (WEIS) (2012). In turn, therefore, when those

19   protections are denied, they are damaged to a greater degree than when they make smaller

20   purchases.

21       All things considered, Google's challenges to Dr. Fishkind's benefit-of-the bargain theory

22   are mistaken, and ignore the facts of the case, the plain meaning of Dr. Fishkind's report, and the

23   case law regarding benefit-of-the-bargain damages. The motion should be denied.

24

25

---

26   [3]    As Dr. Fishkind explains in his report, the distinction between how much buyers would
       have been willing to pay for privacy as a stand-alone purchase (which his report did not measure),
27   and the difference in willingness to purchase apps in a private-protective versus a privacy-invasive
       environment (which it did measure), is substantial. (*See* Ex. 1, Henry Fishkind Dep. Tr. at 226:24–
28   228:1.)

## II.  Dr. Fishkind's Survey Methodology Confirms That Damage Can Be Calculated on a Class-Wide Basis.

Google next asserts that Dr. Fishkind's survey methodology suffered from implementation errors that render his report inadmissible as to the ability to calculate class-wide damages. (Mot. at 7.) Specifically, Google argues that ███████████████████████████████████████ ████████████████████████████████████████████████████████████████. (*Id.*)

Google is mistaken for several reasons. The first being that even Google's expert ████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████ (Ex. 3, Dominique Hanssens Dep. Tr. at 37:17–38:12.) More importantly, however, is that Google ignores the purpose of Dr. Fishkind's survey, which was to establish a *methodology* for calculating damages on a class-wide basis, not to actually do so. (Cert. Ex. 47, Fishkind Rpt., at 9.) As Dr. Fishkind made clear at his deposition, the actual survey implementation was merely a proof of concept. (Ex. 1, Henry Fishkind Dep. Tr. at 130:1–2.) As such, any errors in the execution of the survey could be corrected prior to the results actually being presented to the jury as a basis for assisting its damages calculation. (*See* Dkt. 128 (setting case management schedule).) And nothing in Google's attacks on the survey goes to the methodology itself, as opposed to its technical implementation. *See In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Practices & Products Liab. Litig.*, No. MDL 10-02172-CJC, 2012 WL 4904412, at *4 (C.D. Cal. Sept. 20, 2012) (noting that "proposed methods of analysis" including "hedonic regression, contingent valuation, and discrete choice, are generally accepted, have been tested, and are part of peer-reviewed studies.").

Google also argues that Dr. Fishkind's survey is ████████████████████████████ (Mot. at 7.) At a high level, Google argues that ████████████████████████████████ ███████████████████████████████████████████████████████████. (Mot. at 7–8.) To the extent Google is arguing that CV surveys can never be used to measure benefit-of-the-bargain damages, however, the courts disagree. *See, e.g., Miller v. Fuhu Inc.*, No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794, at *21 (C.D. Cal. Dec. 1, 2015) ("As an initial matter, numerous courts, including this one, have accepted . . . [contingent valuation methods] as reliable methodologies for calculating price premiums on a classwide basis in consumer class actions.");

1   *Guido v. L'Oreal, US, Inc*., 2014 WL 6603730, at \*5 (C.D. Cal. July 24, 2014) ("Conjoint analysis

2   has been used for decades as a way of estimating the market's willingness to pay for various

3   product features.").[4]

4          Moreover, the alleged biases do not justify exclusion. Google starts with the concept of

5   ██████████████████████████████████████████████████████████████████████████

6   ██████████████████████████████████████████." (Mot. at 8.) Google argues that

7   Dr. Fishkind's survey suffers from ████████████████████████████████████████████████

8   ███████████████████████████████████████████████████████████████████████████

9   █████████████████████████████████████ (Mot. at 8.) As the depositions of Defendants'

10  experts made clear, however, █████████████████████████████████████████████

11  ███████████████████████████████████████████████████████████████████████████

12  ███████████████████████████████████████████████████████████████████

13  █████████████████████████████████████████████████████████████

14  █████████████████████ (Mot. at 8.) Google contends that ████████████████████████

15  ████████████████████████████████████████████████████ That criticism,

16  however, misunderstands the survey instrument. Because each respondent was only presented with

17  a single app (and privacy level) at a single price, ██████████████████████████████████

18  ████████████████████████████████.

19         Finally, Google argues that the survey does not ████████████████████████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████████

22  █████████████████████████████████████ (Mot. at 9.) As Google's own experts recognized

23  however, ████████████████████████████████████████████████

24  _____

25  [4]      Despite the widespread acceptance of CV methodology, Google offers two cases
    supporting the idea that "biases inherent in the contingent valuation methodology . . . make

26  testimony drawn from the survey unreliable." (Mot. at 8.) The cases do nothing of the sort, as
    neither even addresses CV methodology. Instead, they stand for the unremarkable proposition that

27  a series of biases, if significant, can render expert testimony inadmissible. *Wallace v. Countrywide
    Home Loans Inc.*, No. 08-cv-1462, 2012 WL 11896333, at \*3 (C.D. Cal. Aug. 31, 2012); *Dukes v.*

28  *Wal-Mart, Inc.*, 222 F.R.D. 185, 197 (N.D. Cal. 2004).

1 ██████████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████. (Ex. 3,

3 Dominique Hanssens Dep. Tr. at 37:17–38:12.)

4      Ultimately, each of Google's bias challenges is purely speculative, and lacks any actual

5 evidence that the alleged biases had any effect on the results of Dr. Fishkind's survey and analysis.

6 As such, even if Google is correct, they are, at most, "mere technical flaws" insufficient to justify

7 exclusion. *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 121 (3d Cir.

8 2004).

9  **III.    The Diminished-Value Theory Reflects the Fact That Each Instance of Sharing the
         Class's Personal Information Reduced the Market for That Information.**

10

11      Google also raises a number of challenges to Dr. Fishkind's opinions regarding the

12 "diminished value of PII" theory of damages. As the Ninth Circuit explains, to state a diminution-

13 of-value claim, a plaintiff must only establish that the defendant's conduct caused "lost sales value

14 of [his] information." *In re Facebook Privacy Litig.*, 572 Fed. App'x 494, 494 (9th Cir. 2014). Dr.

15 Fishkind's report makes that showing, and establishes that such a theory can be pursued on a class-

16 wide basis here. In his diminution-of-value analysis, Dr. Fishkind showed that a market exists for

17 personal information, at both the individual and aggregate level. (Cert. Ex. 47, Fishkind Rpt., at

18 27–29.) And because Google did in fact share that same information, Dr. Fishkind showed that

19 each instance of unauthorized sharing deprived each class member of the opportunity to sell that

20 information to the receiving party. Thus, Dr. Fishkind's report establishes average market values

21 for those types of information, and it succeeds in establishing a class-wide methodology for

22 applying damages.

23      Google argues that ████████████████████████████████████████████

24 ███████████████████████ (Mot. at 9.)[5] While the model is indifferent to that fact, that is

25 ─────────────────────
  [5]    Google also argues that Dr. Fishkind's report █████████████████████████

26 ████████████████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████████████████

28 ████████████.

1    not a mistake. Dr. Fishkind's explanation of the diminished-value model is that because App

2    Buyers' personal information has value, each time Google made that information available to

3    another Seller, it deprived the individual of the opportunity to sell their personal information to

4    that seller. (Cert. Ex. 47, Fishkind Rpt., at 30.) There is no reason to believe—and Google

5    certainly offers none—that the diminution does not occur until that information is accessed by the

6    Seller. To the contrary, as soon as the Seller knew that information was available ███████████

7    ████████████████████████ there was no need to purchase the information

8    from the class member, and the information's value was therefore diminished.

9            Google also argues that Dr. Fishkind's report ███████████████████████

10    ███████████████ Specifically, it argues, ████████████████████

11    ████████████████████████████████████████████████

12    ███████████████████ (Mot. at 10.) Dr. Fishkind's report makes no such

13    assumption, nor did he need to do so, as it is clear that each instance of sharing with a Seller

14    obviated *that Seller's* need to otherwise obtain the information from the Buyer.

15            Finally, Google argues that Dr. Fishkind's report ██████████████. (Mot. at 9.)

16    Google mischaracterizes Dr. Fishkind's ███████████████████████████████

17    ███████████████████ (*Id.*) That is a gross mischaracterization. As Dr.

18    Fishkind made clear during his deposition, he reviewed publications regarding the sale of

19    consumer data, and went the extra step of contacting data brokers to determine the prices charged

20    for various bundles of personal information, before averaging those numbers to arrive at his

21    damages figures. (Ex. 1, Henry Fishkind Dep. Tr. at 218.) Thus, while Google contends that Dr.

22    Fishkind's analysis lacked any relation to the data at issue—despite specifically valuing it—the

23    reality is Dr. Fishkind in fact appropriately calculated the market value of the information at issue.

24    **IV.    Even If the Court Accepted Google's Critiques of Dr. Fishkind's Report, Exclusion
            Would Be Improper.**

25

26            As detailed above, Google's challenges to Dr. Fishkind's testimony misunderstand the

27    facts of the case, the import of his opinions, or both. Even if Google's criticisms were valid,

28    however, Google's motion would still have to be denied. Courts routinely "hold that 'mere

technical flaws' in a survey's design or execution go to the weight to be afforded to the survey, not its admissibility." *Hartle*, 2014 WL 1317702, at *5 (quoting *Citizens Fin. Grp.*, 383 F.3d at 121). "In other words, in most cases, objections to inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002).

Courts' reluctance to wholly exclude expert testimony, and to deny the finder of fact even the opportunity to evaluate it, is particularly strong when the testimony deals with price comparisons, where objections to the emphasis, inclusion, or exclusion of potential pricing variables is routinely held to go to the weight accorded expert testimony, rather than its admissibility. *See Apple iPod Antitrust Litig.*, No. 05-cv-0037, 2014 WL 4809288, at *6 (N.D. Cal. Sept. 26, 2014) (noting that "supposed failure to account properly for relevant pricing factors . . . raises issues of weight rather than admissibility.") (collecting cases); *Brazemore v. Friday*, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.").

Each of Google's challenges falls within the spectrum of mere technical flaws that should, at most, reduce the weight the finder-of-fact accords the testimony, rather than precluding its inclusion in the record outright. Google's arguments regarding the various biases that may have existed in Dr. Fishkind's survey offer a prime example. Google's own experts admit ████████. (Ex. 2, Douglas Kidder Dep. Tr. at 185:11–186:1; Ex. 3, Dominique Hanssens Dep. Tr. at 37:17–38:9) ████████ (*Id.*) In the face of such an equivocal challenge, however, it would be error to exclude Dr. Fishkind's testimony outright, rather than simply allowing the finder of fact to adjust the weight given to the findings as appropriate. *Walker v. Gordon*, 46 Fed. App'x 691, 695 (3d Cir. 2002) ("In performing its gatekeeping function, and, in particular, in deciding whether an expert's report meets the reliability factor of a *Daubert* and Rule 702 analysis, the District Court is not to weigh the evidence relied upon or determine whether it agrees with the conclusions reached therein.":); *TVIIM, LLC v. McAfee, Inc.*, No. 13-cv-4545, 2015 WL 4148354, at *4 (N.D. Cal. July 9, 2015)

1  (denying *Daubert* challenge where "Plaintiff's arguments [went] to the weight of the evidence,

2  and it is the province of the jury to compare and weigh the evidence."). The same goes for the

3  survey's ███████████████████████████████████. Because the exclusion of that

4  language can be easily cured by simply re-running the survey, Google's "objections to [the]

5  study's completeness generally go to 'the weight, not the admissibility of the statistical evidence,'

6  *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1476 (9th Cir. 1995), and should be addressed

7  by rebuttal, not exclusion." *Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005).

8        Google's arguments are especially misplaced at the class certification stage, where a

9  plaintiff's expert is not even required to actually implement his analysis, but merely to show that

10  such analysis could be applied on a class-wide basis. *See In re Scotts EZ Seed Litig.*, 304 F.R.D.

11  397, 414 (S.D.N.Y. 2015) (collecting cases); *see also Werdebaugh v. Blue Diamond Growers*, No.

12  12-CV-2724-LHK, 2014 WL 2191901, at *25 (N.D. Cal. May 23, 2014) ("Because *Comcast* did

13  not articulate any requirement that a damage calculation be performed at the class certification

14  stage, that [plaintiffs' expert] has yet to actually run the regressions and provide results is not

15  fatal.") (internal quotation marks omitted)). Striking Dr. Fishkind's testimony due to

16  implementation errors—when the controlling law does not even require his survey to have been

17  implemented at all, and when the case management schedule still allows the submission of expert

18  reports on the merits that could go address the criticism—would therefore be an improper remedy.

19  *See Kurihara v. Best Buy Co., Inc.*, No. 06-cv-1884, 2007 WL 2501698, at *5 (N.D. Cal. Aug. 30,

20  2007) ("An evidentiary hearing on class certification is not required . . . and the court should not

21  weigh conflicting expert evidence. . . . At this early stage, robust gatekeeping of evidence is not

22  required; rather the court must query only whether expert evidence is 'useful in evaluating whether

23  class certification requirements have been met.'") (quoting *Dukes v. Wal-Mart, Inc.*, 222 F.R.D.

24  189, 191 (N.D. Cal. 2004)) (other internal citations omitted).

25        Accordingly, to the extent the Court finds Google's challenges credible, it should still

26  refuse Google's request to exclude the testimony in its entirety.

27

28

1

## **CONCLUSION**

2          For all these reasons, Defendants' Motion to Exclude the Expert Testimony of Dr. Henry

3    Fishkind should be denied in its entirety.

4                                             Respectfully submitted,

5                                             **ALICE SVENSON**, individually and on behalf of all
                                             others similarly situated,

6

7    Dated: July 29, 2016                    By: s/ Rafey S. Balabanian
                                                 One of Plaintiff's Attorneys

8                                             Rafey S. Balabanian (Admitted *Pro Hac Vice*)
                                             rbalabanian@edelson.com
9                                             Edelson PC
10                                            123 Townsend Street, Suite 100
                                             San Francisco, CA 94107
11                                            Tel: 415.234.5342
                                             Fax: 415.373.9495
12
                                             Jay Edelson (Admitted *Pro Hac Vice*)
13                                            jedelson@edelson.com
                                             Benjamin H. Richman (Admitted *Pro Hac Vice*)
14                                            brichman@edelson.com
                                             J. Dominick Larry (Admitted *Pro Hac Vice*)
15                                            nlarry@edelson.com
                                             Edelson PC
16                                            350 North LaSalle Street, 13th Floor
                                             Chicago, IL 60654
17                                            Tel: 312.589.6370
                                             Fax: 312.589.6378
18
19                                            Kathryn Diemer
                                             kdiemer@diemerwhitman.com
20                                            Diemer, Whitman & Cardosi, LLP
                                             75 East Santa Clara Street, Suite 290
21                                            San Jose, CA 95113
                                             Tel: 408.971.6270
22
                                             Frank Jablonski (Admitted *Pro Hac Vice*)
23                                            frankj@progressivelaw.com
24                                            Progressive Law Group LLC
                                             354 West Main Street
25                                            Madison, WI 53703
                                             Tel: 608.258.8511
26
27                                            Mark Bulgarelli (Admitted *Pro Hac Vice*)
                                             markb@progressivelaw.com
28                                            Progressive Law Group LLC

140 S. Dearborn, Suite 315
Chicago, IL 60603
Tel: 312.787.2717

## **CERTIFICATE OF SERVICE**

I, Rafey S. Balabanian, an attorney, hereby certify that on July 29, 2016, I electronically filed the above and foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By: s/ Rafey S. Balabanian