Kathryn Diemer
kdiemer@diemerwhitman.com
Diemer, Whitman & Cardosi, LLP
75 East Santa Clara Street, Suite 290
San Jose, California 95113
Tel: 408.971.6270
CA Bar No.: 133977

Jay Edelson (Admitted *Pro Hac Vice*)
jedelson@edelson.com
Edelson PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Frank Jablonski (Admitted *Pro Hac Vice*)
frankj@progressivelaw.com
Progressive Law Group LLC
354 West Main Street
Madison, WI 53703
Tel: 608.258.8511

*Attorneys for Plaintiff and the Putative Class*

(Additional counsel on signature block.)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

ALICE SVENSON, individually and on behalf of all others similarly situated,

*Plaintiff*,

*v.*

Google Inc., and Google Payment Corp.,

*Defendants*.

Case No. 5:13-cv-04080-BLF

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY**

Judge: Honorable Beth Labson Freeman

# TABLE OF CONTENTS

**INTRODUCTION** .......... 1

**BACKGROUND** .......... 1

**ARGUMENT** .......... 3

- **I. Dr. Fishkind's Benefit-of-the-Bargain Model Adopts Common Methodology and Reflects Well-Understood Principles of the Behavioral Economics of Privacy** .......... 3
- **II. Dr. Fishkind's Showed That Damage Can Be Calculated on a Class-Wide Basis** .......... 6
- **III. The Diminished-Value Theory Reflects the Fact That Each Instance of Sharing the Class's Personal Information Reduced the Market for That Information** .......... 8
- **IV. Even If the Court Accepted Google's Critiques, Exclusion Would Be Improper** .......... 9

**CONCLUSION** .......... 10

## TABLE OF AUTHORITIES

**United States Supreme Court**:

*Brazemore v. Friday*,
478 U.S. 385 (1986) ........................................ 9

**United States Circuit Court of Appeals:**

*Chavez v. Blue Sky Natural Beverage Co.*,
340 Fed. App'x 359 (9th Cir. 2009) ........................................ 3

*Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*,
383 F.3d 110 (3d Cir. 2004) ........................................ 8, 9

*Ebner v. Fresh, Inc.*,
No. 13-cv-56644, 2016 WL 1056088 (9th Cir. Mar. 17, 2016) ........................................ 4 n.1

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002) ........................................ 9

*In re Facebook Privacy Litig.*,
572 Fed. App'x 494 (9th Cir. 2014) ........................................ 8

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994) ........................................ 4

*Mangold v. Cal. Pub. Utils. Comm'n*,
67 F.3d 1470 (9th Cir. 1995) ........................................ 10

*Obrey v. Johnson*,
400 F.3d 691 (9th Cir. 2005) ........................................ 10

*Walker v. Gordon*,
46 Fed. App'x 691 (3d Cir. 2002) ........................................ 10

**United States District Court:**

*Apple iPod Antitrust Litig.*,
No. 05-cv-0037, 2014 WL 4809288 (N.D. Cal. Sept. 26, 2014) ........................................ 9

*Dukes v. Wal-Mart, Inc.*,
222 F.R.D. 185 (N.D. Cal. 2004) ........................................ 7 n.4, 10

*Guido v. L'Oreal, US, Inc.*,
2014 WL 6603730 (C.D. Cal. July 24, 2014) ........................................ 7

*Hartle v. FirstEnergy Generation Corp.*,
7 F. Supp. 3d 510, 516 (W.D. Pa. 2014) ........................................ 4

*Hartle v. FirstEnergy Generation Corp.*, No. CIV.A. 08-1019, 2014 WL 1317702 (W.D. Pa. Mar. 31, 2014)....................................9

*In re iPhone Application Litig.*, 844 F. Supp. 2d 1040 (N.D. Cal. 2012)....................................................................................3

*In re Scotts EZ Seed Litig.*, 304 F.R.D. 397 (S.D.N.Y. 2015)...........................................................................................10

*Kurihara v. Best Buy Co., Inc.*, No. 06-cv-1884, 2007 WL 2501698 (N.D. Cal. Aug. 30. 2007) .........................................10

*Miller v. Fuhu Inc.*, No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794 (C.D. Cal. Dec. 1, 2015)........................7

*Robocast, Inc. v. Microsoft Corp.*, No. 10-cv-1055, 2014 WL 293434 (D. Del. Jan. 24, 2014)..................................................4

*Rodman v. Safeway, Inc.*, No. 11-cv-3003, 2014 WL 988992 (N.D. Cal. Mar. 10, 2014).......................................4 n.1

*TVIIM, LLC v. McAfee, Inc.*, No. 13-cv-4545, 2015 WL 4148354 (N.D. Cal. July 9, 2015)............................................10

*Wallace v. Countrywide Home Loans Inc.*, No. 08-cv-1462, 2012 WL 11896333 (C.D. Cal. Aug. 31, 2012)...................................7 n.4

*Werdebaugh v. Blue Diamond Growers*, No. 12-CV-2724-LHK, 2014 WL 2191901 (N.D. Cal. May 23, 2014)..............................10

**State Court:**

*Kwikset Corp. v. Superior Court*, 246 P.3d 877 (2011)...........................................................................................................3

**Miscellaneous:**

Aviv Nevo, *A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demand*, 9 Journal of Economics & Management Strategy 513, 525 (2000) .......................4

Jeffrey M. Wooldridge, Introduction Econometrics 583–89 (South-Western 2013)........................4

Julia Gideon et al., *Powerstrips, Prophylactics, and Privacy, Oh My!* in Proceedings of the 2006 Symposium on Usable Privacy and Security 133–144 (2006).............................................6

Serge Egelman et al., *Choice Architecture and Smartphone Privacy: There's A Price for That*, in The 2012 Workshop on the Economics of Information Security (WEIS) (2012) ..................6

Timothy C. Haab and Kenneth E. McConnell, Valuing Environmental and Natural Resources (Edward Elgar 2002) ....4

## INTRODUCTION

Plaintiff Alice Svenson claims that Defendants Google, Inc. and Google Payment Corp. (collectively "Google" or "Defendants") shared her personal information and that of consumers nationwide, in conjunction with mobile application ("App") purchases made using Google's Wallet payment platform, and in violation of Google's terms of use and privacy policies. Plaintiff asserts that this harmed her and the Class in two ways: (1) by depriving them of the privacy benefits they were entitled to as part of their purchases, and (2) by diminishing the value of the personal information Google shared. To demonstrate a common methodology for quantifying damages, Plaintiff submitted the expert report of Dr. Henry Fishkind.

Using methods honed over the course of his 30-plus year career as an economist, Dr. Fishkind proposed two models for performing class-wide damages calculations. First, he proposed, designed, and tested a contingent valuation ("CV") survey to arrive at a uniform metric for determining how the presence or absence of certain privacy protections affects the value of the App purchases, which can then be applied to the Class by comparing the value of the services paid for versus those delivered. As to the "diminution of value" theory of damages, Dr. Fishkind surveyed the data regarding the sales value of personal information—both on an individual and aggregate level—using data from industry publications and obtained from data brokers themselves and then calculated the average prices charged for the types of personal information shared by Google. This, in turn, allows for the calculation of the lost sales value of that personal information suffered by each class member.

Google now seeks to exclude Dr. Fishkind's testimony, arguing that Dr. Fishkind's methods are too hypothetical and academic, and that Google's practices are too individualized to allow for common analysis. As explained below, Google's criticisms are misplaced and inconsistent with Ninth Circuit law directly on point. Moreover, Google's arguments only go to the weight accorded Dr. Fishkind's testimony, not to its admissibility. Accordingly, Google's motion should be denied.

## BACKGROUND

The Court's order denying in part Google's motion to dismiss identified two damages

theories for Plaintiff to pursue. (Dkt. 118 at 7–9.) The first is the "benefit-of-the-bargain" theory, which posits that when Plaintiff and the Class paid Google for an app *and* payment processing that would protect their personal information, but that they received something worth less: the app, and payment processing that *did not* protect their personal information. (Dkt. 118 at 8.) The second is the "diminution-of-value" theory, under which Google's sharing of Buyers' Personal Information with app Sellers without consent deprived the Buyers the ability to monetize it. (*Id.* at 8–9.)

To show the class-wide applicability of these theories, Plaintiff retained Dr. Henry Fishkind, an economist with over 30 years of experience and substantial experience testifying as an expert on damages issues. (Ex. 47 to Pl.'s Mot. for Class Cert. ("Cert. Ex."), Expert Report of Henry Fishkind ("Fishkind Rpt."), at 1–3.) Dr. Fishkind sought to develop a model for calculating benefit-of-the-bargain damages applicable to all Class members and their purchases, and a diminution-of-value model based on the free-market value of the data wrongfully disclosed.

Dr. Fishkind's benefit-of-the-bargain model used a CV survey to measure individuals' willingness to purchase apps at different price points in App stores offering different levels of privacy protection. (*Id.* at 10–11.) After surveying 5,000 people, Dr. Fishkind performed a logit regression to isolate the effect of privacy protections on demand for the Apps (*id.* at 23–26), and from there developed a formula that would compare demand for the purchases promised by Google (with no sharing of Personal Information) to demand for purchases with the protections actually delivered. (*Id.* at 4.) The diminution-of-value model, by contrast, was based on a survey of the market for customer information, as obtained through publicly available data and Dr. Fishkind's own research into prices charged by data brokerage firms. (*Id.* at 27–32.)

Google now seeks to exclude Dr. Fishkind's testimony. It argues that Dr. Fishkind's methodologies fail to distinguish between Class members who had their information shared and those who did not, but (as explained in Plaintiff's reply in support of class certification), Google made *every* class member's name, email, and zip code available automatically to app sellers in violation of its terms and privacy policies. Google also attacks the soundness of Dr. Fishkind's methods. But its attacks misunderstand the facts and Dr. Fishkind's survey, and in any event go to the weight that should be given to Dr. Fishkind's survey, not its admissibility.

As detailed below, the Court should deny Google's motion, and admit Dr. Fishkind's testimony to show that damages can be calculated at trial on a class-wide basis.

## ARGUMENT

### I. Dr. Fishkind's Benefit-of-the-Bargain Model Adopts Common Methodology and Reflects Well-Understood Principles of the Behavioral Economics of Privacy.

Google argues that Dr. Fishkind's model is not based on established principles in the privacy space, that App Buyers did not pay Google for secure payment processing, that Dr. Fishkind hasn't measured the change in demand that would have been caused by Google's sharing, and that any changes in demand observed should not be applied to the app price as a whole.

The benefit-of-the-bargain theory is rooted in the concept that a plaintiff has "lost money [when] he did not receive what he paid for." (Dkt. 118, at 7 (citing *Chavez v. Blue Sky Natural Beverage Co.*, 340 Fed. App'x 359 (9th Cir. 2009)).) Put differently, a plaintiff states a claim under a benefit-of-the-bargain theory where she "(1) surrender[s] in a transaction more, or acquire[s] in a transaction less, than . . . she otherwise would have." *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 886 (2011); *see e.g.*, *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1072 (N.D. Cal. 2012) (finding UCL standing pleaded where plaintiffs claimed they paid more for iPhones than they would if they had known of defendant's alleged misrepresentations or omissions).

Given this standard, Dr. Fishkind's report shows a common methodology for calculating benefit-of-the-bargain damages. Dr. Fishkind showed that consumers place a higher value on apps purchased from stores offering complete privacy protections than those offering some protection, but allowing for the sharing of personal information. (*See* Cert. Ex. 47, Fishkind Rpt., at 6, Table 1.) And those findings map squarely onto the facts here, where discovery has shown that Google shared Class members' names, email addresses, and zip codes with Sellers automatically, despite promising to do so only as needed for certain purposes. (*See* Pl.'s Mot. for Class Cert. ("Cert. Mot.") at 4–6.) Thus, Class members' purchases entitled them to Apps without information sharing (since, at the time of purchase, the sharing was not "necessary"), and Dr. Fishkind's report shows that what the Class members received—Apps with information sharing—was worth less, in an

amount that can be calculated on a class-wide basis.[1]

Google's arguments in response are mistaken. To start, that Dr. Fishkind cites "no papers in which privacy value is calculated as the ratio of two coefficients in a logit regression," is beside the point. (Defs.' Mot. to Exclude Expert Testimony ("Mot.") at 5.) Well-accepted methodologies can and should be applied to new contexts in expert analysis, and there is no requirement that a sound methodology be previously applied to the same facts. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 781 (3d Cir. 1994) (reversing district court's decision to exclude well-established animal study results introduced to establish proof of causation in humans); *Robocast, Inc. v. Microsoft Corp.*, No. 10-cv-1055, 2014 WL 293434, at *1 (D. Del. Jan. 24, 2014) (admitting expert testimony regarding pricing on "dynamic advertising" even though technology at issue differed); *Hartle v. FirstEnergy Generation Corp.*, 7 F. Supp. 3d 510, 516 (W.D. Pa. 2014) (finding challenges of methodology's "fit" to the facts to go to weight, rather than admissibility).

Taking the ratio of two logit coefficients—as Dr. Fishkind did here—is actually a standard methodology routinely used to calculate elasticities (i.e., the percentage change in response from a percentage change in an explanatory variable.) (*See* Cert. Ex. 47, Fishkind Rpt., at 23 n.39 (citing Jeffrey M. Wooldridge, Introduction Econometrics 583–89 (South-Western 2013)); *see also* Ex. 19,[2] Aviv Nevo, *A Practitioner's Guide to Estimation of Random-Coefficients Logit Models of Demand*, 9 Journal of Economics & Management Strategy 513, 525 (2000).) And numerous studies have calculated differences in willingness to pay in other contexts through similar comparisons. (*See* Cert Ex. 47, Fishkind Rpt. at 12 n.29 (citing Timothy C. Haab and Kenneth E. McConnell, Valuing Environmental and Natural Resources (Edward Elgar 2002)).) Thus, it is commonplace to measure the effect of a variable (here, privacy protections) on hypothetical

---

[1] Damages will be consistent among the Class members, regardless of subjective preferences, because damages under Plaintiff's claims are determined using a reasonable person standard. *See Ebner v. Fresh, Inc.*, No. 13-cv-56644, 2016 WL 1056088, at *4 (9th Cir. Mar. 17, 2016) (noting California's "consumer protection statutes are governed by the 'reasonable consumer' test"); *Rodman v. Safeway, Inc.*, No. 11-cv-3003, 2014 WL 988992, at *7 (N.D. Cal. Mar. 10, 2014) ("California recognizes the objective theory of contracts . . . .")

[2] Unless otherwise stated, all exhibit references are to the exhibits to the Declaration of Rafey S. Balabanian, (dkt. 175.)

pricing by comparing the ratio of logit coefficients for that variable, and Dr. Fishkind's decision to do so was proper.

Google next argues that Dr. Fishkind fails to distinguish Class members who were harmed from those who were not. But Google did in fact "share" *each* Class member's Personal Information without consent, meaning there is no division within the Class in terms of sharing. (*See* Cert. Mtn., at 4, 13–14.) Even if there were Class members whose information had not been improperly shared, Dr. Fishkind's model purports to establish damages only for class members whose information Google shared, and shows that Class members who did receive the privacy protections they paid for suffered no damages. Google's claim that Dr. Fishkind fails to account for which Class members were damaged simply reflects its expert's admission that "I don't think I actually have a very clear understanding of the permissible types of damages that might be recoverable here." (Ex. 2, Douglas Kidder Dep. Tr. at 50:25–51:2.) In fact, damages are not measured subjectively for each individual, but rather using an objective standard. *See* 4 n.1, *supra*.

Google's argument that Dr. Fishkind wrongfully assumed that App Buyers paid a separate fee for payment processing, (mot. at 6), is similarly mistaken. As Dr. Fishkind's report makes clear, his survey was focused on the purchase from the Buyer's perspective, in which the Buyer makes a lump-sum payment to Google in exchange for the App, its delivery, and payment processing with certain privacy guarantees. (Cert. Ex. 47, Fishkind Rpt., at 24.) Indeed, if prospective App Buyers did not believe they were paying for privacy protections, the survey should have shown no distinction in demand between the privacy-protective apps and those that offered the weakest protections. But the survey found the opposite, reflecting the well-accepted concept that all else equal, consumers prefer and will pay for services that protect their privacy over those that do not. (*Id.* at 12–14). Thus, Dr. Fishkind's report properly measured consumers' willingness to purchase Apps together with privacy protections.

Google is also mistaken in its assertion that Dr. Fishkind didn't measure any change in demand because he sought to "measure how much a person [would] pay for different levels of privacy protection" as a stand-alone purchase. (Mot. at 3.) To the contrary, Dr. Fishkind measured consumers' willingness to pay for *app bundles* including various degrees of privacy protections

that *were actually delivered* by Google in practice. (Cert. Ex. 47, Fishkind Rpt., at 3.)[3]

Finally, Google mistakenly contends that applying changes in demand to the price of an app as a whole "leads to the nonsensical conclusion that people value privacy promises more depending on the price of the Apps they buy . . . ." (Mot. at 6.) But that argument ignores the substantial research showing that consumers are willing to pay for privacy protections, and that the more consumers pay, the greater their privacy expectations. (*See* Ex. 18, Julia Gideon et al., *Powerstrips, Prophylactics, and Privacy, Oh My!* in Proceedings of the 2006 Symposium on Usable Privacy and Security 133–144 (2006); *see also* Ex. 17, Serge Egelman et al*., Choice Architecture and Smartphone Privacy: There's A Price for That*, in The 2012 Workshop on the Economics of Information Security (WEIS) (2012).) In turn, therefore, when those protections are denied, they are damaged to a greater degree than when they make smaller purchases.

Thus, Google's challenges to Dr. Fishkind's benefit-of-the bargain theory are mistaken.

## II. Dr. Fishkind Showed That Damage Can Be Calculated on a Class-Wide Basis.

Google next argues that Dr. Fishkind's failure to include certain language in the final version of the survey is an implementation error that renders his testimony wholly inadmissible. Google is mistaken for several reasons. First, its own expert admitted that he had no evidence that the failure to include that language affected survey results. (Ex. 3, Hanssens Dep. Tr. at 37:17–38:12.) More importantly, Google ignores the purpose of Dr. Fishkind's report, which was merely to establish a *methodology* for calculating damages on a class-wide basis. (Cert. Ex. 47, Fishkind Rpt., at 9.) As Dr. Fishkind made clear at his deposition, the actual survey implementation was merely a proof of concept. (Ex. 1, Henry Fishkind Dep. Tr. at 130:1–2.) As such, any errors in execution could be corrected prior to the results actually being presented to the jury as a basis for assisting its damages calculation. (*See* Dkt. 128 (setting case management schedule).)

Google's argument that Dr. Fishkind's survey is "infected with known survey biases" is similarly off-point. (Mot. at 7.) To the extent Google argues that such biases are endemic to CV

[3] As Dr. Fishkind explained, the distinction between what Buyers would have paid for privacy on its own (which he did not measure), and their willingness to purchase apps in different privacy regimes (which he did), is substantial. (*See* Ex. 1, Fishkind Dep. Tr. at 226:24–228:1.)

surveys, to the point that such surveys could never be used to measure benefit-of-the-bargain damages, the courts disagree. *See, e.g.*, *Miller v. Fuhu Inc.*, No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794, at *21 (C.D. Cal. Dec. 1, 2015) ("As an initial matter, numerous courts, including this one, have accepted . . . [contingent valuation methods] as reliable methodologies for calculating price premiums on a classwide basis in consumer class actions."); *Guido v. L'Oreal, US, Inc.*, 2014 WL 6603730, at *5 (C.D. Cal. July 24, 2014) ("Conjoint analysis has been used for decades as a way of estimating the market's willingness to pay for various product features.").[4]

Moreover, the alleged biases do not justify exclusion. Google argues that Dr. Fishkind's survey suffers from focalism bias—"the phenomenon whereby people focus too much on the occurrence in question and fail to consider other circumstances" (Mot. at 8)—because it only tested two factors: the app store's privacy policy and the price of the app, when it supposedly should have included factors such as "familiarity with the App store and App vendor." (Mot. at 8.) Defendant's experts made clear, however, that they had no evidence that Buyers assumed unfamiliarity with the app store in the survey, or that familiarity would have changed the results in any meaningful fashion. (Ex. 3, Hanssens Dep. Tr. at 105:16–107:25.) Google also contends that Dr. Fishkind's survey improperly "signals to respondents that . . . a strict policy of not sharing any personal information is the desired outcome." (Mot. at 8.) However, because each respondent was only presented with a single app (and privacy level) at a single price, respondents would have had no context to determine which answer was "correct" for the question posed.

Finally, Google argues that any results drawn from the survey cannot be applied here because it failed to capture "how Google obtained buyers' contact information (with consent, at account registration), and buyers' actual experience purchasing Apps on Google Play using Google Wallet." (Mot. at 9.) Again though, Google's experts admitted that they had no evidence that respondents assumed the collection to be nonconsensual, nor any reason to believe they were

---

[4] Google offers two cases to support the idea that "biases inherent in the contingent valuation methodology . . . make testimony drawn from the survey unreliable." (Mot. at 8.) Neither case even addresses CV methodology. Instead, they stand for the unremarkable proposition that a series of biases, if significant, can render expert testimony inadmissible. *Wallace v. Countrywide Home Loans Inc.*, No. 08-cv-1462, 2012 WL 11896333, at *3 (C.D. Cal. Aug. 31, 2012); *Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 185, 197 (N.D. Cal. 2004).

not basing their responses on their experiences with real app stores such as those offered by Google and its competitors, like Apple. (Ex. 3, Hanssens Dep. Tr. at 37:17–38:12.)

Ultimately, each of Google's challenges lack actual evidence that the alleged biases had any effect on the results of Dr. Fishkind's survey and analysis. As such, even if Google is correct, they are, at most, "mere technical flaws" and go to the weight of the evidence, not to admissibility. *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004).

## III. The Diminished-Value Theory Reflects the Fact That Each Instance of Sharing the Class's Personal Information Reduced the Market for That Information.

Google also challenges Dr. Fishkind's diminished-value methodology. To state a diminished-value claim, a plaintiff must only establish that the defendant's conduct caused "lost sales value of [his] information." *In re Facebook Privacy Litig.*, 572 Fed. App'x 494, 494 (9th Cir. 2014). In his diminished-value analysis Dr. Fishkind showed that a market exists for personal information, at both the individual and aggregate level. (Cert. Ex. 47, Fishkind Rpt., at 27–29.) And because Google *did* share personal information, each instance of unauthorized sharing deprived Buyers of the opportunity to sell that personal information to the receiving party. Because Dr. Fishkind's report establishes average market values for different types of personal information, he therefore shows a class-wide method of applying diminished-value damages.

Google also argues that Dr. Fishkind's model is erroneously indifferent to whether Sellers ever actually obtained Buyer information. (Mot. at 9.). That indifference is not a mistake. Dr. Fishkind's explanation of the diminished-value model is that because App Buyers' personal information has value, each time Google made that information available to another Seller, it deprived the individual of the opportunity to sell their personal information to that Seller. (Cert. Ex. 47, Fishkind Rpt., at 30.) Google offers no reason to believe that diminution does not occur until that information is viewed by the Seller. Rather, as soon as Google made that information available to Sellers, there was no need to purchase the information from the class member.

Google also argues that Dr. Fishkind improperly assumes "that, once an individual's user information is sold, it diminishes in value and cannot be again sold for the same price." (Mot. at 10.) No such assumption was needed, however, as each instance of Google sharing Personal

Information with a Seller obviated *that Seller's* need to obtain the information from the Buyer.

Finally, Google argues that Dr. Fishkind's review of sales prices for aggregated personal information as "cherry-pick[ed]" to reflect prices "he favored." (*Id.*) As Dr. Fishkind made clear, however, he reviewed publications regarding the sale of consumer data, and went the extra step of contacting data brokers to determine the prices charged for personal information, before averaging those numbers to arrive at his damages figures. (Ex. 14, Fishkind Dep. Tr. at 218:3–22.) Thus, Dr. Fishkind appropriately calculated the market value of various types of personal information.

**IV. Even If the Court Accepted Google's Critiques, Exclusion Would Be Improper.**

Even if Google's criticisms described above were valid, Google's motion would have to be denied. Courts routinely "hold that 'mere technical flaws' in a survey's design or execution go to the weight to be afforded to the survey, not its admissibility." *Hartle v. FirstEnergy Generation Corp.*, No. CIV.A. 08-1019, 2014 WL 1317702, at *5 (W.D. Pa. Mar. 31, 2014) (quoting *Citizens Fin. Grp.*, 383 F.3d at 121). "In other words, in most cases, objections to inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002). Courts' reluctance to exclude expert testimony is particularly strong when the testimony deals with price comparisons, where objections regarding pricing variables are routinely held to go to the weight accorded expert testimony, rather than its admissibility. *See Apple iPod Antitrust Litig.*, No. 05-cv-0037, 2014 WL 4809288, at *6 (N.D. Cal. Sept. 26, 2014) (noting that "supposed failure to account properly for relevant pricing factors . . . raises issues of weight rather than admissibility.") (collecting cases); *Brazemore v. Friday*, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.")

Each of Google's challenges is of the sort that, at most, should reduce the weight accorded to Dr. Fishkind's testimony, rather than precluding its inclusion outright. Google's bias arguments offer a prime example. Google's experts admit that they have no idea whether those supposed biases in fact had any effect on Dr. Fishkind's results. (Ex. 2, Kidder Dep. Tr. at 185:11–186:1; Ex. 3, Hanssens Dep. Tr. at 37:17–38:9.) Instead, the most they could say was that they expected they would. (*Id.*) In the face of such equivocal challenges, excluding Dr. Fishkind's testimony—

rather than reducing its weight—would be error. *See Walker v. Gordon*, 46 Fed. App'x 691, 695 (3d Cir. 2002) ("In performing its gatekeeping function, and, in particular, in deciding whether an expert's report meets the reliability factor of a *Daubert* and Rule 702 analysis, the District Court is not to weigh the evidence relied upon or determine whether it agrees with the conclusions reached therein."); *TVIIM, LLC v. McAfee, Inc.*, No. 13-cv-4545, 2015 WL 4148354, at *4 (N.D. Cal. July 9, 2015) (denying *Daubert* challenge where "Plaintiff's arguments [went] to the weight of the evidence, and it is the province of the jury to compare and weigh the evidence."). The same goes for the survey's failure to include the "recurring customer" language. Because the exclusion of that language can be easily cured by simply rerunning the survey, Google's "objections to [the] study's completeness generally go to 'the weight, not the admissibility of the statistical evidence,' *Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1476 (9th Cir. 1995), and should be addressed by rebuttal, not exclusion." *Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005).

Google's arguments are especially misplaced at the certification stage, where a plaintiff need not even implement his analysis, but merely show that it could be applied on a class-wide basis. *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 414 (S.D.N.Y. 2015) (collecting cases); *see also Werdebaugh v. Blue Diamond Growers*, No. 12-CV-2724-LHK, 2014 WL 2191901, at *25 (N.D. Cal. May 23, 2014) ("Because *Comcast* did not articulate any requirement that a damage calculation be performed at the class certification stage, that [plaintiffs' expert] has yet to actually run the regressions and provide results is not fatal.") (internal quotations omitted).

Striking Dr. Fishkind's testimony due to implementation errors would therefore be an improper remedy. *See Kurihara v. Best Buy Co., Inc.*, No. 06-cv-1884, 2007 WL 2501698, at *5 (N.D. Cal. Aug. 30. 2007) ("An evidentiary hearing on class certification is not required . . . and the court should not weigh conflicting expert evidence. . . . At this early stage, robust gatekeeping of evidence is not required; rather the court must query only whether expert evidence is 'useful in evaluating whether class certification requirements have been met.'") (quoting *Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 191 (N.D. Cal. 2004)) (other internal citations omitted).

## **CONCLUSION**

For all these reasons, Defendants' Motion to Exclude should be denied in its entirety.

Respectfully submitted,

**ALICE SVENSON**, individually and on behalf of all others similarly situated,

Dated: August 12, 2016

By: s/ Rafey S. Balabanian
One of Plaintiff's Attorneys

Rafey S. Balabanian (Admitted *Pro Hac Vice*)
rbalabanian@edelson.com
Edelson PC
123 Townsend Street, Suite 100
San Francisco, CA 94107
Tel: 415.234.5342
Fax: 415.373.9495

Jay Edelson (Admitted *Pro Hac Vice*)
jedelson@edelson.com
Benjamin H. Richman (Admitted *Pro Hac Vice*)
brichman@edelson.com
J. Dominick Larry (Admitted *Pro Hac Vice*)
nlarry@edelson.com
Edelson PC
350 North LaSalle Street, 13th Floor
Chicago, IL 60654
Tel: 312.589.6370
Fax: 312.589.6378

Kathryn Diemer
kdiemer@diemerwhitman.com
Diemer, Whitman & Cardosi, LLP
75 East Santa Clara Street, Suite 290
San Jose, CA 95113
Tel: 408.971.6270

Frank Jablonski (Admitted *Pro Hac Vice*)
frankj@progressivelaw.com
Progressive Law Group LLC
354 West Main Street
Madison, WI 53703
Tel: 608.258.8511

Mark Bulgarelli (Admitted *Pro Hac Vice*)
markb@progressivelaw.com
Progressive Law Group LLC
140 S. Dearborn, Suite 315
Chicago, IL 60603
Tel: 312.787.2717

**CERTIFICATE OF SERVICE**

I, J. Dominick Larry, an attorney, hereby certify that on August 17, 2016, I electronically filed the above and foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

By: s/ J. Dominick Larry