1
2
3
4          **UNITED STATES DISTRICT COURT**
5          **NORTHERN DISTRICT OF CALIFORNIA**
6          **SAN JOSE DIVISION**
7
8    ALICE SVENSON, individually and on         Case No.  13-cv-04080-BLF
     behalf of all others similarly situated,
9                                               **ORDER DENYING PLAINTIFF'S**
              Plaintiff,                        **MOTION FOR CLASS**
10                                              **CERTIFICATION; GRANTING**
          v.                                    **DEFENDANTS' MOTION FOR**
11                                              **SUMMARY JUDGMENT AS TO**
     GOOGLE INC., a Delaware Corporation,       **PLAINTIFF'S INDIVIDUAL CLAIMS;**
12   and GOOGLE PAYMENT                         **AND GRANTING IN PART AND**
     CORPORATION, a Delaware Corporation,       **DENYING IN PART DEFENDANTS'**
13                                              **MOTION TO EXCLUDE THE**
              Defendants.                       **OPINIONS OF PLAINTIFF'S EXPERT,**
14                                              **DR. HENRY FISHKIND**
15                                              [Re:  ECF 159, 164, 165]
16
17          Plaintiff Alice Svenson ("Svenson") sues Google, Inc. and Google Payment Corporation
18   (collectively "Google") following her purchase of a mobile device application ("App") on
19   Google's online marketplace, the Google Play Store ("Google Play").  Svenson's payment of
20   $1.77 was processed without incident, she received the "SMS MMS to Email" App that she
21   purchased from third party seller YCDroid, and she was happy with how the App performed.
22   Svenson nonetheless claims that she was cheated on the deal because Google granted YCDroid the
23   ability to access to her personal information – specifically, her name, email address, and zip code
24   – in violation of Google's privacy policies.  There is no evidence that YCDroid ever used that
25   potential access to view Svenson's personal information.  However, Svenson asserts that she was
26   injured because YCDroid *could have* done so.  She also claims that she would not have bought the
27   "SMS MMS to Email" App on Google Play had she known that it was Google's practice to grant
28   App sellers ("Sellers") the unrestricted ability to access the personal information of App buyers

("Buyers").  But when Svenson got a new smartphone, she bought the "SMS MMS to Email" App for a second time on Google Play *after* discovering Google's practice and *after* filing this suit.

Svenson seeks certification of a class of Buyers who bought Apps on Google Play between March 1, 2012 and April 30, 2014 ("Class Period"), asserting that Google's practice of granting Sellers the unrestricted ability to access Buyers' personal information during that period gives rise to classwide claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair competition.  Google opposes the motion for class certification and seeks summary judgment on Svenson's individual claims, arguing that Svenson lacks Article III standing and, alternatively, that she cannot prove required elements of her claims.  Google also moves to exclude the opinions of Svenson's damages expert, Dr. Henry Fishkind.

For the reasons discussed below, Svenson's motion for class certification is DENIED, Google's motion for summary judgment is GRANTED, and Google's motion to exclude Dr. Fishkind's opinions is GRANTED IN PART AND DENIED IN PART.

## I.     FACTS[1]

Google operates Google Play, an online marketplace where users can buy digital content, including Apps, from third party Sellers.  To buy an App on Google Play, a user must create a Google account and a Google Wallet ("Wallet") account.  Wallet is an electronic payment processing service operated by Google to facilitate the transmission of payments for Apps and other products.[2]

Google and Wallet accounts are governed by two privacy policies, the Google Privacy Policy and the Wallet Privacy Notice.  To create a Google account, the user must agree to the Google Terms of Service ("Google TOS") and the Google Privacy Policy.  To create a Wallet account, the user must agree to the Wallet Terms of Service ("Wallet TOS"), which incorporate the Wallet Privacy Notice, which in turn incorporates the Google Privacy Policy.

---

[1] The facts set forth in this section are undisputed by the parties unless otherwise noted.

[2] At all relevant times, Wallet was operated in the United States by Google, Inc.'s wholly owned subsidiary, Google Payment Corporation ("GPC").  Except where necessary to distinguish between them, this Order refers to these defendants collectively as "Google."

The Google Privacy Policy and the Wallet Privacy Notice (collectively "Privacy Policies")
explain that Google will not share personal information with companies and individuals outside of
Google except under certain circumstances listed in the policies. *See* Google Privacy Policy at
GOOG-00000114, Exh. 8 to Sipos Decl., ECF 168-1; Wallet Privacy Notice at GOOG-00000998,
Exh. 10 to Sipos Decl., ECF 168-1. "Personal information" may include the user's name, email
address, telephone number, and credit card number. Google Privacy Policy at GOOG-00000111,
Exh. 8 to Sipos Decl., ECF 168-1. Circumstances under which Google may share personal
information under its policies include: (1) as necessary to process a transaction and maintain the
user's account; (2) to complete the user's registration for a service provided by a third party; (3)
with the user's consent; (4) with domain administrators; (5) with trusted businesses for processing;
and (6) when necessary for legal reasons. *See* Google Privacy Policy at GOOG-00000114, Exh. 8
to Sipos Decl., ECF 168-1; Wallet Privacy Notice at GOOG-00000998, Exh. 10 to Sipos Decl.,
ECF 168-1.

Google and Wallet accounts are free to users. Google makes money on its Wallet service
by charging a transaction fee for each sale. For Apps sold on Google Play, the transaction fee is
thirty percent of the App purchase price. Kourakina Decl. ¶ 4, ECF 167.

In order to purchase an App on Google Play, the Buyer is required to click a "Buy" button,
signifying agreement to the Play Terms of Service ("Play TOS"). The Play TOS state that a
Wallet account is required to buy products on Google Play and that the Wallet TOS apply
whenever a product is purchased using Wallet. Play TOS at GOOG-00001179, Exh. 11 to Sipos
Decl., ECF 168-1. The Play TOS go on to explain that products may be purchased on Google
Play either from Google or from a third party Provider. *Id.* at GOOG-00001181. Finally, as
relevant here, the Play TOS inform the Buyer that "[e]ach time that you purchase a Product, you
enter into a contract based on these Terms with: Google in relation to the use of Google Play . . .
and also . . . with the Provider of the Product you have purchased." *Id.*

Svenson created a Google account in November 2012. She created a Wallet account on
May 6, 2013, and on that same date she bought the "SMS MMS to Email" App from third party
YCDroid for $1.77 on Google Play. Consistent with the Play TOS cited above, by clicking the

"Buy" button she entered into a contract with Google governed by the Play TOS and the Wallet TOS, including the Privacy Policies incorporated in the Wallet TOS.  Svenson claims that Google breached that contract by sharing her personal information with YCDroid for reasons other than those permitted by the Privacy Policies.  By "sharing" Svenson does not mean that Google transmitted her personal information to YCDroid.  Her information remained on secure servers within Google.  However, during the Class Period, Google granted Sellers the unrestricted ability to access Buyers' personal information on Google's servers through secure portals.  YCDroid thus could have viewed Svenson's personal information following her purchase of the "SMS MMS to Email" App.  There is no evidence that YCDroid ever did view Svenson's information.  However, Svenson claims that granting YCDroid the unrestricted ability to access her personal information constituted "sharing" in violation of Google's Privacy Policies even if YCDroid never chose to use that access.[3]

Svenson filed the present suit against Google on September 3, 2013, on behalf of herself and a putative class of Buyers.  Following motion practice, three claims remain in the operative first amended complaint ("FAC"):  (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, and (3) violation of California's unfair competition law ("UCL").  All three claims are anchored in Svenson's assertions that during the Class Period, Google had a practice of granting Sellers the unrestricted ability to access Buyers' personal information in violation of its own Privacy Policies.  Although Svenson claims that she would not have bought the "SMS MMS to Email" App on Google Play had she known of Google's practice, Svenson bought the App on Google Play a second time in April 2014, after she filed this lawsuit.

## II.    ORDER IN WHICH MOTIONS SHOULD BE CONSIDERED

Because Svenson relies on the testimony and report of her damages expert, Dr. Henry Fishkind, in bringing her motion for class certification and opposing Google's motion for summary judgment, the Court addresses Google's motion to exclude Dr. Fishkind's opinions before taking up the parties' substantive motions.  Ordinarily, the Court would next turn to

---

[3] Google stopped granting Sellers the unrestricted ability to access Buyers' personal information after the close of the Class Period.

4

Svenson's motion for class certification, which was the first of the three motions to be filed. However, the Court has discretion to address Google's motion for summary judgment before Svenson's motion for class certification, *see Wright v. Schock*, 742 F.2d 541, 543-44 (9th Cir. 1984), and deems it appropriate to do so here because the briefing on summary judgment addresses the threshold question of Svenson's Article III standing while the briefing on class certification does not.

The Ninth Circuit has described standing as "a jurisdictional element that must be satisfied prior to class certification." *Nelsen v. King Cnty.*, 895 F.2d 1248, 1249 (9th Cir. 1990) (internal quotation marks and citation omitted). This Court and several others in this district have held that Article III standing must be determined prior to consideration of the requirements for class certification under Federal Rule of Civil Procedure 23. *See, e.g., Darisse v. Nest Labs, Inc.*, No. 5:14-CV-01363-BLF, 2016 WL 4385849, at *2 (N.D. Cal. Aug. 15, 2016) ("The Court thus must consider Darisse's standing to pursue his proposed class-wide declaratory, injunctive, and damages relief before anything else."); *In re Facebook Privacy Litig.*, --- F. Supp. 3d ----, No. 10-CV-02389-RMW, 2016 WL 3523850, at *3 (N.D. Cal. June 28, 2016) (holding that at the class certification stage, "plaintiffs must show standing through evidentiary proof") (internal quotation marks and citations omitted); *In re Abbott Labs. Norvir Anti-Trust Litig.*, No. 04-cv-1511-CW, 2007 WL 1689899, at *2 (N.D. Cal. June 11, 2007) ("[P]rior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim.").

Other courts in this district have concluded that Article III standing may be addressed either before or after class certification. *See, e.g., In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 971 (N.D. Cal. 2016) ("[T]he Court finds that it has discretion to decide in the instant action when to consider issues of standing."); *In re Carrier IQ, Inc.*, *Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1074 (N.D. Cal. 2015) ("[T]he Court finds that it has the discretion to defer questions of standing until after class certification."); *United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74

1   F. Supp. 3d 1052, 1079 (N.D. Cal. 2014) (exercising discretion to determine standing before class

2   certification).

3           Even assuming that it has discretion to decide when to take up the issue of Article III

4   standing, the Court finds it appropriate to do so here before addressing Rule 23 considerations.  As

5   discussed below, Google's motion for summary judgment raises serious challenges to Svenson's

6   Article III standing that go to the heart of her claims.  Consequently, this is not a case in which it

7   is apparent that *some* class members will have standing even if the named class representative

8   does not.  In such a case, addressing class certification first might be appropriate because

9   certification of the class could resolve the standing issue.  *See Senne v. Kansas City Royals*

10  *Baseball Corp.*, 114 F. Supp. 3d 906, 922 (N.D. Cal. 2015) (noting that once a class is certified,

11  standing requirements must be assessed as to the class as a whole and not only as to the individual

12  named plaintiffs).  Here, resolution of the Article III standing issue is necessary to determine

13  whether the claims asserted by Svenson can go forward at all.

14          The Court therefore addresses Google's motion to exclude Dr. Fishkind's opinions, then

15  Google's motion for summary judgment, and finally Svenson's motion for class certification.

16  **III.    GOOGLE'S MOTION TO EXCLUDE SVENSON'S DAMAGES EXPERT**

17          Google moves to exclude Dr. Fishkind's testimony and report under Federal Rule of

18  Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

19  Svenson relies on Dr. Fishkind's opinions in seeking class certification and opposing summary

20  judgment.

21          **A.      Legal Standard**

22          Federal Rule of Evidence 702 provides that a qualified expert may testify if "(a) the

23  expert's scientific, technical, or other specialized knowledge will help the trier of fact to

24  understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient

25  facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert

26  has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  In

27  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court held

28  that Rule 702 requires the district court to act as a gatekeeper to "ensure that any and all scientific

testimony or evidence admitted is not only relevant, but reliable." These standards apply not only at trial, but also when a challenge to expert opinion is brought in the context of class certification or summary judgment. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (district court correctly applied *Daubert* standard to a motion to strike an expert opinion submitted in support of class certification); *In re Ford Tailgate Litig.*, No. 11-CV-02953-RS, 2015 WL 7571772, at *5 n.3 (N.D. Cal. Nov. 25, 2015) ("*Daubert* dictates the analysis necessary for a motion to exclude expert testimony in the context of a motion for summary judgment."); *Tietsworth v. Sears, Roebuck & Co.*, No. 5:09-CV-00288-JF, 2012 WL 1595112, at *7 (N.D. Cal. May 4, 2012) (applying *Daubert* standard to expert testimony at class certification stage).

In *Daubert*, the Supreme Court discussed four factors that may be used to determine reliability: (1) whether the theory or technique used by the expert "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) whether there is "general acceptance" of the theory or technique in the "relevant scientific community." *Daubert*, 509 U.S. at 593-94; *see also Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (reciting factors).

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999), the Supreme Court clarified that the "basic gatekeeping obligation" articulated in *Daubert* applies not only to scientific testimony but to *all* expert testimony. The Supreme Court also made clear that the four factors discussed in *Daubert* "do *not* constitute a definitive checklist or test" for reliability. *Id.* at 150 (internal quotation marks and citation omitted). The reliability inquiry is a flexible one, and "whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* at 153. The Ninth Circuit has held that another "very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). While opinions developed expressly for litigation are not necessarily unreliable, the district court "may not ignore the fact that a scientist's normal workplace is the lab

1    or the field, not the courtroom or the lawyer's office." *Id.*

2         The district court "also has broad latitude in determining the appropriate form of the

3    inquiry." *Barabin*, 740 F.3d at 463. Pretrial *Daubert* hearings are commonly used but they are

4    not required. *Id.* However, the district court must make explicit findings with respect to relevance

5    and reliability. *See id.* at 464; *United States v. Jawara*, 474 F.3d 565, 583 (9th Cir. 2007). In

6    making those findings, the district court must address the soundness of the expert's methodology,

7    not the correctness of his or her conclusions. *See Barabin*, 740 F.3d at 463. "The duty falls

8    squarely upon the district court to act as a gatekeeper to exclude junk science that does not meet

9    Federal Rule of Evidence 702's reliability standards." *Id.* (internal quotation marks and citation

10   omitted). The district court must take care not to act as a fact finder. *Primiano v. Cook*, 598 F.3d

11   558, 564-65 (9th Cir. 2010) ("[T]he district judge is a gatekeeper, not a fact finder.") (internal

12   quotation marks and citation omitted). "When an expert meets the threshold established by Rule

13   702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give

14   that testimony." *Id.* at 565.

15        **B.    Discussion**

16        Dr. Fishkind has a Ph.D. in economics and more than thirty years of experience in

17   economic analysis and econometric modeling. Fishkind Report at 1-2, Exh. 1-47 to Balabanian

18   Decl. in support of Class Cert, ECF 159-1. His clients include local and state governments, the

19   United States Department of Justice, Fortune 500 companies, property developers, and plaintiffs

20   and defendants in litigation. *Id.* at 1. Dr. Fishkind worked as a Research Economist with the

21   Bureau of Economic and Business Research at the University of Florida for nine years. *Id.* at 2.

22   During that time, he conducted many surveys and administered the Bureau's monthly economic

23   confidence index, which involved using sample surveys. *Id.* Dr. Fishkind also designed and

24   executed the Bureau's economic forecasting program. *Id.* He has held many prestigious positions

25   in the field of economics, and he has been qualified as an expert witness on more than 50

26   occasions in both state and federal courts. *Id.*

27        In drafting his expert report on damages, Dr. Fishkind assumed that Svenson paid some

28   part of the App purchase price for protection of her personal identifying information ("PII") and

that Google disclosed her PII to third parties.  *See* Fishkind Report at 10, Exh. 1-47 to Balabanian Decl. in support of Class Cert, ECF 159-1.  Assuming these facts to be true, Dr. Fishkind identified two theories of damages, (1) lost benefit of the bargain and (2) diminution in value of personal information, and provided damages calculations for each.  *See* Fishkind Report at 1-2, Exh. 1-47 to Balabanian Decl. in support of Class Cert, ECF 159-1.

Google does not challenge the relevance of Dr. Fishkind's opinions.  Evidence is relevant if it will "'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Daubert*, 509 U.S. at 591 (quoting Fed. R. Evid. 702).  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* (internal quotation marks and citation omitted).  This consideration has been described as one of "fit" – "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* (internal quotation marks and citation omitted).  Dr. Fishkind's opinions regarding appropriate measures for lost benefit of the bargain and diminution in value of personal information go directly to Svenson's theories of the case.  Accordingly, Google's challenge to Dr. Fishkind's opinions turns on the issue of reliability.  Google argues that Dr. Fishkind's models are based upon unreliable methodology and thus that his opinions must be excluded.

### 1.    Benefit of the Bargain

To value Svenson's lost benefit of the bargain, Dr. Fishkind designed an online contingent-valuation survey that was administered to more than 5,000 people.  *See* Fishkind Report at 17-22, Exh. 1-47 to Balabanian Decl. in support of Class Cert, ECF 159-1.  The survey asked the respondents whether they would buy a hypothetical App at varying prices with varying levels of disclosure of their PII.  *Id.*  Based on the results, Dr. Fishkind determined the "% privacy delivered" for each level of disclosure.  *Id.* at 23-26.  As most relevant here, Dr. Fishkind calculated the percent privacy delivered when the App Buyer's "Name and Email" are disclosed to be eighty-six percent.[4]  *Id.* at 25.  The remaining fourteen percent represents the "discount" for the

---

[4] It does not appear that the survey determined the "% privacy delivered" when the Buyer's name, email address *and* zip code were disclosed, which is what is alleged to have occurred in this case.

1    privacy that was *not* delivered.  *Id.*  Dr. Fishkind opines that the value of the lost benefit of the

2    bargain – that is, the value of the privacy that was promised but not delivered – is the App

3    purchase price multiplied by the discount.  *Id.*  Thus for Svenson, who bought the "SMS MMS to

4    Email" App for $1.77, Dr. Fishkind concludes that the lost benefit of the bargain for disclosure of

5    her name and email address is $0.25 ($1.77 x .14).[5]  *Id.*

6            In evaluating Dr. Fishkind's reliability, the Court ordinarily would begin with the four

7    factors discussed in *Daubert*.  However, Google does not frame its challenge to Dr. Fishkind's

8    methodologies with reference to those factors.  With respect to Dr. Fishkind's survey, which forms

9    the basis of his benefit of the bargain analysis, Google attacks the survey design and the precise

10   formula he used to evaluate the survey results, asserting for example that the survey suffers from

11   focalism bias, demand effects, and other biases specific to contingent valuation analysis, and that

12   Dr. Fishkind cannot cite any papers "in which privacy value is calculated as the ratio of two

13   coefficients in a logit regression."  Defs.' Motion to Exclude at 5, ECF 163-6.  In mounting these

14   attacks, Google relies heavily upon the reports of its own experts, Professor Douglas Kidder and

15   Professor Dominique Hanssens.  In essence, Google has turned its *Daubert* motion into a battle of

16   the experts.  As discussed above, Dr. Fishkind is well-qualified in the field of economic analysis

17   and he has substantial experience in using surveys to generate data from which conclusions may

18   be drawn.  That Google's competing experts criticize Dr. Fishkind's opinions does not persuade

19   the Court that those opinions are inadmissible.

20           Google also argues that Dr. Fishkind's opinions are unreliable because they do not

21   distinguish between class members whose personal information was viewed by Sellers for reasons

22   permitted under the Privacy Policies, class members whose information was viewed by Sellers for

23   reasons not permitted under the Privacy Policies, and class members whose personal information

24   was never viewed by Sellers.  Google's argument ignores the fact that Svenson's theory of the

25   case is that Google's practice of granting Sellers the unrestricted *ability to access* to Buyers'

26   information immediately upon conclusion of the App sale constituted sharing under the Privacy

27

28   *See* Fishkind Report at 25, Exh. 1-47 to Balabanian Decl. in support of Class Cert, ECF 159-1.
     [5] Notably, this amount is almost one-half of the fee Google collected on Svenson's App purchase.

1    Policies.  Svenson contends that in granting Sellers this type of blanket, unrestricted potential

2    access, Google violated its Privacy Policies and thus injured Buyers.

3         Google likewise contends that Dr. Fishkind's opinions are unreliable because they are

4    based upon the false assumption that Buyers paid Google some amount in return for Google's

5    promise to comply with its Privacy Policies.  Again, Dr. Fishkind's assumption is based upon

6    Svenson's theory of the case.  Google certainly may argue – and does argue in its summary

7    judgment motion – that Svenson's theory is unsupported by the evidence because in fact she paid

8    nothing for the privacy promises.  However, that argument goes to the merits of Svenson's claims

9    rather than the admissibility of Dr. Fishkind's opinions.  Svenson is entitled to present expert

10   opinions consistent with her theory of the case.

11        Google's challenges of this nature do not demonstrate the types of global infirmities with

12   Dr. Fishkind's opinions epitomized by the inquiries laid out in *Daubert*.  *See Daubert*, 509 U.S. at

13   593-94.  To the extent that Google relies upon its own experts' opinions in picking apart various

14   aspects of Dr. Fishkind's opinions, and relies upon its own theories of the case in discounting Dr.

15   Fishkind's reliance on Svenson's theories, Google's arguments go to the weight to be given Dr.

16   Fishkinds' opinions, not the opinions' admissibility.  At most, those arguments provide a road map

17   to effective cross-examination of Dr. Fishkind should he ever testify at trial.

18        However, Dr. Fishkind's admitted error in implementing his survey presents a different

19   issue.  Dr. Fishkind testified that he intended to include the following introductory language in the

20   survey:  "Suppose you are a returning customer to the APP Store, so you know that the Store [ ]

21   already has your name, email address, billing address, mobile number, and credit card number."

22   Fishkind Dep. 74:9-17, 137:1-21, Exh. 25 to Sipos Decl., ECF 168-1.  Dr. Fishkind considered

23   that language to be "the key design element in the survey."  *Id.* 137:14-21.  He thought that

24   including the language would indicate that the respondent already had registered and "would be as

25   knowledgeable as a normal or reasonable person would be of the parameters of what could be

26   shared or not."  *Id.* 137:18-21.  Dr. Fishkind "was trying to structure [the survey] to minimize the

27   potential for hypothetical bias" by building in an assumption that the survey respondents

28   previously had registered for an account, had an opportunity to review privacy policies, and had

disclosed personal information. *Id.* 72:16-74:18. However, the "Suppose you are a returning customer" language was *not* included in the survey when it was implemented. Hanssens Report at 24-27, Exh. 5 to Sipos Decl., ECF 163-12.[6] Consequently, while Dr. Fishkind's credentials certainly qualify him to conduct the type of survey at issue, the fact that the survey he designed for this case was conducted *without its key design element* renders Dr. Fishkind's opinions based on the survey unreliable.

Svenson argues that Google's experts have not established that the exclusion of the "Suppose you are a returning customer" language affected the survey results. That argument misses the point that *Svenson's expert* testified that the excluded language was the "key design element" of the survey. Svenson also argues that the purpose of Dr. Fishkind's report was to establish a methodology for calculating damages on a classwide basis. Svenson argues that the implementation error could be corrected in a new survey that could be presented to a jury to aid in damages calculation. As the Court indicated above, Dr. Fishkind's credentials qualify him to create and implement a survey such as he describes. And it may be that Dr. Fishkind could implement the survey he designed, or a modification of that survey, without the type of error that renders his opinions based on the survey he *did* implement unreliable. However, speculation as to whether Dr. Fishkind could or could not provide a reliable opinion in the future has no bearing on Google's challenge to Dr. Fishkind's current opinions based upon flawed implementation.

Accordingly, Google's motion to exclude Dr. Fishkind's opinions is GRANTED as to his opinions regarding lost benefit of the bargain which are based on his survey results.[7]

---

[6] Both Google's brief and the report of its expert, Hanssens, cite to pages 185-187 of Dr. Fishkind's deposition, in which he apparently admitted that the "Suppose you are a returning customer . . ." language was omitted from the survey as implemented. Those pages are not included in the deposition excerpts submitted to the Court. However, the Hanssens report discusses the omission in some detail and Svenson does not dispute that it occurred. *See* Pl.'s Opp. at 6-7, 10, ECF 189-4 ("the survey's failure to include the 'recurring customer' language . . . can be easily cured.").

[7] The Court notes that the exclusion of Dr. Fishkind's survey-based opinions has no practical effect on the outcome of Google's motion for summary judgment because, as is discussed below, Google would be entitled to summary judgment even if those opinions were considered.

### 2.     Diminution in Value

To value the diminution in value of Svenson's PII, Dr. Fishkind relied on prices at which different categories of PII may be bought in the market when bundled into batches of 10,000.  *See* Dr. Fishkind Report at 31, Exh. 1-47 to Balabanian Decl. in support of Class Cert, ECF 159-1. Based on those values, Dr. Fishkind opines that the unauthorized disclosure of Buyers' PII in the present case diminished the value of that PII in an amount between $0.08 and $0.17 per Buyer.  *Id.* at 32.  Google argues that Dr. Fishkind's opinions on diminution must be discarded because they do not prove the value if *Svenson's* information.  Google argues that Dr. Fishkind's report does not indicate that when PII is marketed in bundles, the value of a particular individual's PII is diminished if that PII has been disclosed previously.  Google also argues that Dr. Fishkind's report does not establish a one-to-one market for PII.

Google's arguments go to the weight of Dr. Fishkind's opinions on diminution in value rather than the admissibility of those opinions.  Google does not challenge Dr. Fishkind's opinions as to how markets for PII function or his data regarding market prices for bundled PII.  Instead, Google argues that the data does not provide adequate support to show that the value of *Svenson's* personal information was diminished.  That argument more properly should be raised – and in fact is raised – in the context of summary judgment.

Accordingly, Google's motion to exclude Dr. Fishkind's opinions is DENIED as to his opinions regarding diminution in value.

## IV.     GOOGLE'S MOTION FOR SUMMARY JUDGMENT

Google seeks summary judgment on all of Svenson's individual claims.

### A.     Legal Standard

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  The moving party has the burden of establishing that there is no dispute as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the

1    nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. "[T]he 'mere existence of a scintilla of

2    evidence in support of the plaintiff's position'" is insufficient to defeat a motion for summary

3    judgment. *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "'Where the

4    record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there

5    is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

6    *Corp.*, 475 U.S. 574, 587 (1986)).

7         **B.     Svenson's Claims**

8         Three claims remain in Svenson's operative FAC:  Claim 1 for breach of contract, Claim 2

9    for breach of the implied covenant of good faith and fair dealing, and Claim 5 for violation of

10   California's UCL.  As framed in the FAC, these claims are somewhat unclear.  Svenson alleges

11   that she entered into a "Buyer Contract" when she purchased the "SMS MMS to Email" App.

12   FAC ¶¶ 139-59, ECF 84.  There is no document in the record called "Buyer Contract."

13        Reading the FAC in conjunction with Svenson's briefing and evidence submitted in

14   connection with the current motions, the Court understands Svenson to assert that when she

15   clicked the "Buy" button to purchase the "SMS MMS to Email" App on Google Play (the first

16   time), she and Google entered into a contract in which Google promised to comply with its

17   preexisting Privacy Policies.  Svenson asserts that Google breached that contract by sharing her

18   personal information with YCDroid immediately after the App transaction for reasons other than

19   those permitted under the Privacy Policies.  With respect to her claim for breach of the implied

20   covenant, Svenson asserts that Google's sharing of her personal information was pursuant to

21   Google's practice of granting Sellers the unrestricted ability to access Buyers' information during

22   the Class Period, which practice frustrated the protections ostensibly offered by the Privacy

23   Policies.  Finally, with respect to her UCL claim, Svenson asserts that Google's sharing of her

24   personal information with YCDroid, and general practice of granting Sellers unrestricted potential

25   access to Buyers' personal information during the Class Period, constituted unlawful and unfair

26   business practices.

27        Google argues that Svenson lacks Article III standing to pursue these claims and that she

28   cannot prove required elements of the claims.  The Court takes up the standing issue first and then

                                                    14

addresses Google's argument regarding the merits of the claims.

## C.    Article III Standing

"[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id.* (citing *Lujan*, 504 U.S. at 560-61).  "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements."  *Id.*

Google challenges the first element, injury in fact.  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560).  "[S]tanding is claim- and relief-specific, such that a plaintiff must establish Article III standing for each of her claims and for each form of relief sought."  *In re Carrier IQ*, 78 F. Supp. 3d at 1064-65 (N.D. Cal.  2015) (internal quotations omitted) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("our standing cases confirm that a plaintiff must demonstrate standing for each claim he seeks to press")).

In the FAC, Svenson claims two types of injury:  lost benefit of the bargain and diminution in value of her personal information.  In opposition to Google's motion for summary judgment, she makes the additional claims that the potential for a recovery of nominal damages on her contract claims constitutes an injury in fact for purposes of Article III, and that her UCL claim establishes Article III standing.  Because the last three claims of injury based on diminution in value, nominal damages, and UCL injury are easily disposed of, the Court addresses those before turning to Svenson's only potentially plausible claim of injury based on lost benefit of the bargain.

### 1.    Diminution in Value

Svenson claims that by making her personal information available to YCDroid, Google diminished the value of that information.  The Ninth Circuit has recognized diminution in value of personal information as a viable theory of damages under state contract law.  *See Facebook Privacy Litig.*, 572 Fed. Appx. 494, at 494 (9th Cir. 2014).  In order to show injury in fact under

15

1    this theory, Svenson must establish both the existence of a market for her personal information

2    and an impairment of her ability to participate in that market.  *See Google Privacy Policy Litig.*,

3    2015 WL 4317479, at *4.[8]

4        In support of its motion for summary judgment, Google points to an absence of evidence in

5    the record with respect to either a market for Svenson's personal information or an impairment to

6    her ability to participate in such a market resulting from Google's alleged sharing of her personal

7    information.  Google notes that while Svenson's expert, Dr. Fishkind, opines that an active

8    marketplace for consumers' personal information exists, he describes a market in which such

9    information is bundled in groups of 1,000 individuals or 10,000 individuals.  *See* Fishkind Report

10   at 27-32, Exh. 1-47 to Balabanian Decl. in support of Class Cert, ECF 159-1.  Dr. Fishkind does

11   not suggest that, as bundled, an individual's personal information would have less value if

12   previously disclosed to an App developer such as YCDroid.  *See id.*

13       Svenson argues that she could have sold her personal information separately, and that by

14   disclosing that information to YCDroid Google deprived her of the opportunity to market the

15   information to YCDroid and others.  However, Google points out that Dr. Fishkind does not

16   describe the existence of a one-to-one market in which Svenson could have sold her personal

17   information.  *See* Fishkind Report, Exh. 1-47 to Balabanian Decl. in support of Class Cert, ECF

18   159-1.  Moreover, when asked in his deposition whether he has "any evidence that a market exists

19   for the individual sale of a person's name and e-mail to an app vendor," Dr. Fishkind answered in

20   the negative.  Fishkind Dep. at 226:4-11, Exh. C to Suppl. Sipos Decl., ECF 188.  Even if Dr.

21   Fishkind had described such a market, the record is devoid of evidence that YCDroid ever saw

22   Svenson's personal information.  Thus Svenson cannot establish that Google's asserted sharing of

23   her personal information – meaning granting YCDroid the *ability to access* to the information –

24   eliminated YCDroid or anyone else as a potential buyer for the information.

25

26   ───────────────

27   [8] The Court is unpersuaded by Google's argument that Svenson additionally must show that she
     attempted to sell her personal information but was unable to do so.  While Google cites cases from
     other jurisdictions in which that additional requirement was imposed, *see* Defs.' MSJ at 15 n. 9,
28   ECF 164, Google has not cited, and the Court has not discovered, any cases in the Ninth Circuit
     adopting that rule.

16

Google has met is initial burden with respect to Svenson's diminution in value theory of injury by highlighting the absence of evidence in the record to support that theory. The burden thus shifts to Svenson to present evidence from which a reasonable jury could find that Google's conduct diminished the value of Svenson's personal information. In response to Google's motion, Svenson merely reiterates her assertions that Google's sharing of her information with YCDroid diminished her ability to market that information to YCDroid and others. However, Svenson does not cite to any *evidence* from which a reasonable jury could conclude that those assertions are true. Consequently, Svenson has failed to show the existence of a triable issue of material fact with respect to her claim of injury in fact based on diminution in value of her personal information.

### 2. Nominal Damages

Although Svenson does not allege nominal damages in her FAC, she argues in opposition to Google's summary judgment motion that she can recover nominal damages for breach of contract under California Civil Code § 3360 and that nominal damages constitute injury in fact under Article III. Section 3360 provides that "[w]hen a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages."

Courts in this district are split on the issue of whether a claim of nominal damages under California law is sufficient to confer Article III standing. *Compare In re Facebook*, 2016 WL 3523850, at *6 ("plaintiffs have established injury in fact through Ms. Marfeo's breach of contract claim for nominal damages"), *with Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 990-91 (N.D. Cal. 2015) ("Section 3360 sets forth the rule that a plaintiff who has suffered an injury, but whose damages are speculative, is entitled to nominal damages . . . . But the statute does not relieve the plaintiff of proving injury."). This Court agrees with *Opperman* that a claim of nominal damages is insufficient to establish injury in fact for purposes of Article III.

The Supreme Court recently explicated the injury in fact requirements for Article III standing in *Spokeo*. *See Spokeo*, 136 S. Ct. at 1547. While *Spokeo's* discussion was in the context of an alleged statutory violation rather than an alleged breach of contract, the decision's emphasis on the requirement of both particularized *and* concrete injury informs this Court's view of Svenson's argument in the present case. "A 'concrete' injury must be 'de facto'; that is, it must

actually exist." *Spokeo*, 136 S. Ct. at 1548.  Thus in *Spokeo* the plaintiff's allegation that the defendant website operator had published inaccurate information about him in violation of the Fair Credit Reporting Act ("FCRA") was insufficient, standing alone, to establish Article III injury. The defendant had reported that the plaintiff was married, had children, was in his fifties, had a job, was affluent, and held a graduate degree, all of which was wrong according to the plaintiff. *Id.* at 1546.  The Ninth Circuit found those allegations sufficient to establish injury in fact under Article III because they asserted violations of the plaintiff's statutory rights and because the plaintiff had asserted his own personal interest in the handling of his credit information.  *Id.* at 1546.  The Supreme Court held that the Ninth Circuit's analysis focused only on the requirement that an injury be particularized and ignored the requirement that the injury be concrete.  The Supreme Court remanded the case for determination whether the plaintiff had alleged that the defendant's inaccurate reporting placed him at "a degree of risk sufficient to meet the concreteness requirement."  *Id.* at 1550.

Applying these principles, this Court concludes that although California law permits recovery of nominal damage when it is difficult to quantify the amount of damages flowing from a particular injury, a plaintiff still must show the *fact* of injury in order to have Article III standing. The potential availability of nominal damages once an injury has been established does not satisfy Article III.

### 3.    UCL Claim

In opposition to Google's summary judgment motion, Svenson asserts that she has standing to sue under the UCL.  The injuries asserted under Svenson's UCL claim are Google's violation of California Business and Professions Code § 22576, which prohibits an operator of a commercial website or online service from failing to comply with its own privacy policies, diminution in value of her personal information, and lost benefit of the bargain.

As discussed above, Svenson's assertion of a statutory violation is insufficient, by itself, to establish Article III standing.  Svenson must establish that the statutory violation resulted in

1　particularized and concrete injury to her.[9]  *See Spokeo,* 136 S. Ct. at 1548.  Svenson has failed to

2　establish diminution in value for the reasons discussed above.  Thus her Article III standing to

3　assert her UCL claim depends on her ability to establish lost benefit of the bargain, discussed

4　below.

5　　　　　　　　　　**4.　　　Lost Benefit of the Bargain**

6　　　　　Svenson claims that she bought the "SMS MMS to Email" App on Google Play in the

7　expectation that Google would comply with its Privacy Policies and that she was deprived of the

8　benefit of her bargain when Google shared her personal information with YCDroid for reasons

9　other than those permitted under the Privacy Policies.  In her claim for breach of the implied

10　covenant of good faith and fair dealing, Svenson alleges that Google's Wallet payment processing

11　system was designed in a manner that deprived Buyers of the benefit of the bargain each time an

12　App purchase was made because under the payment processing system Sellers were granted

13　unrestricted potential access to Buyers' personal information following an App purchase.  Finally,

14　in her UCL claim, Svenson contends that Google's practice of sharing Buyers' personal

15　information with Sellers, and the sharing of her information with YCDroid, constituted unfair

16　business practices that deprived her of the benefit of her bargain.

17　　　　　Lost benefit of the bargain is a viable theory of injury for breach of contract and unfair

18　competition.  *See Chavez v. Blue Sky Natural Beverage Co.*, 340 Fed. Appx. 359 (9th Cir. 2009)

19　(UCL claim); *In re Facebook*, 2016 WL 3523850, at *4 (contract claim); *New West Charter*

20　*Middle School v. Los Angeles Unified School Dist.*, 187 Cal. App. 4th 831, 844 (2010) ("Contract

21　damages compensate a plaintiff for its lost expectation interest.  This is described as the benefit of

22　the bargain that full performance would have brought.").

23　　　　　Google argues that Svenson cannot establish lost benefit of the bargain because she did not

24　pay Google anything for the privacy protections that she claims she did not receive.  Google also

25

26

27

28

---

[9] The Court notes that even if Svenson were able to establish Article III standing with respect to her UCL claim, that claim would fail on the merits because as discussed below, Svenson cannot establish the loss of money or property.  *See* Cal.  Bus. & Prof. Code § 17204 (plaintiff must allege that he or she "suffered injury in fact *and* has lost money or property as a result of the unfair competition") (emphasis added).

argues that Svenson cannot prevail on her benefit of the bargain theory because Google did not share her personal information with YCDroid.

In opposition to Google's summary judgment motion, Svenson asserts that Google was paid for the privacy protections in the form of a thirty percent  transaction fee on her purchase of the "SMS MMS to Email" App.  It is unclear from Svenson's brief whether she asserts that she lost the benefit of the bargain because *she* paid that transaction fee, or whether she asserts that she can prevail on a lost benefit of the bargain theory even if YCDroid paid the transaction fee.  Both theories are addressed below.  Svenson also argues that Google shared her personal information with YCDroid.

### a.    Payment for Privacy Protection

Google submits the following evidence that Svenson paid YCDroid for the App and that YCDroid, not Svenson, paid Google the thirty percent transaction fee.  First, the agreements that Google enters into with App developers who wish to sell their products on Google Play state that the Seller pays the transaction fee.  *See* Seller TOS at GOOG-00001285, Exh. 12 to Sipos Decl., ECF 168-1 ("For transactions conducted through a Google Marketplace, Seller will be charged: i) Service Fees payable to GPC.)"; Developer Distribution Agreement at GOOG-00000847, Exh. 9 to Sipos Decl., ECF 168-1) (providing that developers who sell products on a Google marketplace are charged a transaction fee while developers who distribute products on a Google marketplace for free are not charged a transaction fee).  Second, the Play TOS, to which Svenson agreed when she pushed the "Buy" button, state that Google Play purchases made with Wallet are governed by the Wallet TOS.  Play TOS at GOOG-00001179, Exh. 11 To Sipos Decl., ECF 168-1.  The Wallet TOS inform the Buyer that:

> You acknowledge and agree that *your purchases of Products are transactions between you and the Seller*, and not with GPC, Google or any of their affiliates. *Neither GPC nor Google are a party to your Payment Transaction for the purchase of Products*, and GPC, Google or other GPC affiliates are not a Buyer or a Seller in connection with any Payment Transaction, unless expressly designated as such in the listing of the Product of the Google Web Site.

Wallet TOS at GOOG-00000070, Exh. 7 to Sipos Decl., ECF 168-1 (emphasis added).  Third, Google's Business Controller, Masha Kourakina, submits a declaration stating expressly that, "In

20

connection with a sale of an App on Google Play, a Seller pays a transaction fee totaling thirty percent of the purchase price of each App sold. This transaction fee is paid by the Seller, not the Buyer." Kourakina Decl. ¶ 4, ECF 167. Kourakina states further that "[n]either Google nor GPC collects any money from a Buyer in connection with the sale of an App, outside of his or her payment for the App." *Id.* This evidence is sufficient to meet Google's initial burden on the issue of who pays the transaction fee. The burden thus shifts to Svenson to submit evidence from which a reasonable jury could conclude that she paid the transaction fee rather than YCDroid.

Svenson submits the following evidence. First, she submits Google's discovery responses explaining that Defendant Google Payment Corporation ("GPC") collects the entire purchase price, deducts the thirty percent transaction fee owed by the Seller, and remits the remainder of the transaction proceeds to the Seller. Google's Reponses to Interrogs. 15-16, Exh. 11 to Balabanian Decl. in Opposition to MSJ, ECF 175. This evidence does not dispute – and in fact is entirely consistent with – Google's evidence that the Seller pays the transaction fee. The purpose of Google's Wallet service is to process Buyers' payments for Apps and other products, so it is hardly surprising that a Google entity collects those payments. Google's discovery responses make clear that GPC collects the purchase price "on behalf of and as an agent of the Seller" and deducts the thirty percent transaction fee only with the Seller's authorization. *Id.* Google's discovery responses also state expressly that, "Consistent with the Developer Distribution Agreement, *Sellers* pay a transaction fee totaling 30% of the purchase price of Apps sold on Google Play via Google Wallet." *Id.* (emphasis added).

Svenson submits other evidence, including a screen shot of her checkout screen showing that Google charged her credit card $1.77, Screen Shot, Exh. 30 to Balabanian Decl. in Support of Class Cert, ECF 159-1; a screenshot titled "Transaction fees" stating that the fee for each transaction is thirty percent of the price, Screen Shot, Exh. 12 to Balabanian Decl. in Opposition to MSJ, ECF 175; an email stating that Google charges a thirty percent transaction fee, Email, Exh. 13 to Balabanian Decl. in Opposition to MSJ, ECF 175; and deposition testimony of a Google employee, Mark Thomas, stating that Google "make[s] some money on every transaction," Thomas Dep. 54:9-18, Exh. 7 to Balabanian Decl. in Opposition to MSJ, ECF 175. None of

1    Svenson's evidence suggests that the transaction fee collected by Google is paid by the *Buyer*
2    rather than the Seller as set forth in the relevant contracts.

3         Svenson also submits her own deposition testimony.  In response to a question asking
4    whether she "paid a portion of that $1.77 in return for the privacy promises," Svenson stated, "Oh,
5    I think that's right."  Svenson Dep. 123:22-25, Exh. 10 to Balabanian Decl. in Opposition to MSJ,
6    ECF 175.  While the cited testimony perhaps suggests that Google's Privacy Policies were
7    important to Svenson when she purchased the "SMS MMS to Email" App, the testimony sheds no
8    light on who paid the thirty percent transaction fee to Google.  Finally, Svenson, cites the report of
9    her damages expert, Dr. Fishkind.  *See* Fishkind Report, Exh. 1-47 to Balabanian Decl. in support
10   of Class Cert, ECF 159-1.  As discussed above, Dr. Fishkind's opinions regarding benefit of the
11   bargain are excluded.  Moreover, even if the Court were to consider those opinions, they go to
12   calculation of damages when lost benefit of the bargain is presumed.  They do not address the
13   question of whether Svenson or YCDroid paid the thirty percent transaction fee to Google.  Thus
14   to the extent that Svenson's benefit of the bargain theory depends upon her assertion that she paid
15   Google money in exchange for privacy protections, Google has established its entitlement to
16   summary judgment and Svenson has failed to submit evidence sufficient to create a triable issue of
17   fact.

18        The inquiry does not end there, however.  Another court in this district has concluded that
19   a plaintiff who asserts lost benefit of the bargain based upon a company's violation of its privacy
20   policies may establish Article III standing regardless of the fact that the company's services were
21   free.  *See In re Facebook*, 2016 WL 3523850, at *4.  In *In re Facebook*, the plaintiffs alleged that
22   each class member gave up something of value, personal information, in exchange for access to
23   Facebook and Facebook's privacy promises.  *Id.*  The plaintiffs asserted that Facebook breached
24   those contracts by transmitting their personal information to advertisers in violation of Facebook's
25   privacy terms, thus depriving the plaintiffs and the class of the benefit of the bargain.  *Id.*  The
26   plaintiffs also alleged that the value of the benefit they were denied could be ascertained by
27   measuring the value of their personal information.  *Id.*  The court found those allegations sufficient
28   to defeat a motion to dismiss for lack of Article III standing.  *Id.*

To the extent that Google argues that concrete injury cannot be demonstrated in regard to a free product – here, access to the Wallet and Google Play platforms with the attendant Privacy Policies contained in the TOS – the Court disagrees. In the present case it is undisputed that Svenson and Google entered into a binding contract at the point of purchase of the App. *See* Play TOS at GOOG-00001181, Exh. 11 to Sipos Decl., ECF 168-1 ("Each time that you purchase a Product, you enter into a contract based on these Terms with: Google in relation to the use of Google Play . . . and also . . . with the Provider of the Product you have purchased."). Google earns substantial revenue when Buyers choose its services to purchase Apps, and in return, Google agrees that it will not share Buyers' personal information except in certain circumstances described in its Privacy Policies. Based on the record before the Court, and applying the reasoning of *In re Facebook*, the Court concludes that Article III standing is not defeated by a contract for a free product or service. That being said, however, Svenson still must demonstrate that Google breached the contract in a manner that caused her injury in fact. That injury, although it must be concrete, is not limited to a portion of a "purchase price." The Court therefore turns to Google's argument that Svenson cannot establish that her personal information was shared with YCDroid in breach of the parties' agreement.

### b. Sharing

Google argues that Svenson cannot show lost benefit of the bargain because Google never shared her personal information with YCDroid. The question presented by Google's motion is whether providing YCDroid with *the ability to access* Svenson's personal information, absent any evidence that YCDroid actually *viewed* the information, constituted "sharing" within the meaning of the Privacy Policies.[10] Google says no and Svenson says yes. The Court concludes that there

---

[10] It is undisputed that as soon as Svenson bought the "SMS MMS to Email" App, YCDroid was granted the ability to view Svenson's name, email address, and zip code via the "Merchant Center," an online portal to Google's servers. *See* Thomas Decl. 24:7-25:10, 31:7-33:25, Exh. D to Suppl. Sipos Decl., ECF 188. The parties quibble about the precise steps that YCDroid would have had to take to view the information, with Svenson asserting that YCDroid could have seen it merely by clicking on an "Orders" tab in an easy-to-use interface and Google asserting that YCDroid would have had to make a specific query. This dispute is immaterial to Google's motion, as it is clear that YCDroid was granted the ability to access Svenson's personal information.

1    are disputed issues regarding the scope of the term "sharing," but that even if Svenson's

2    construction of the term is adopted, the extent of the "sharing" that occurred may be sufficient to

3    establish breach of contract but not injury in fact.

4         Google asks the Court to determine that the term "share" as used in the Privacy Policies

5    requires not only that Google provided a Seller with the ability to access a Buyer's personal

6    information but also that the Seller actually viewed the information.  Under California law,[11] a

7    contract must be interpreted to give effect to the mutual intention of the parties at the time the

8    contract was formed.  Cal. Civ. Code § 1636.  The parties' intent is determined from the language

9    of the contract, "if the language is clear and explicit, and does not involve an absurdity."  Cal. Civ.

10   Code § 1638.  "The words of a contract are to be understood in their ordinary and popular sense . .

11   . unless a special meaning is given to them by usage."  Cal. Civ. Code § 1644.  However, "[t]he

12   proper interpretation of a contract is disputable if the contract is susceptible of more than one

13   reasonable interpretation, that is, if the contract is ambiguous."  *Fremont Indem. Co. v. Fremont*

14   *Gen. Corp.*, 148 Cal. App. 4th 97, 114 (2007).  "Extrinsic evidence may be admitted if it serves to

15   prove a meaning to which the contract is reasonably susceptible."  *Shum v. Intel Corp.*, No. C-02-

16   03262-DLJ, 2008 WL 4414722, at *6 (N.D. Cal. Sept. 26, 2008) (citing *Powers v. Dickson,*

17   *Carlson & Campillo*, 54 Cal. App. 4th 1102, 1111 (1997)).

18        Neither party addresses these rules of contract interpretation.  Instead, each makes its best

19   argument for its own interpretation of the term "share," relying primarily on dictionary definitions

20   and interpretations that other courts have given the term in other cases.  Google cites definitions

21   from two dictionaries, which defined share to mean "to partake of, use, experience or enjoy with

22   others," and "to use or to have something at the same time as someone else."  *See* Defs.' MSJ at

23   17, ECF 164.  Svenson cites definitions from other dictionaries, which define share to mean "to

24   allow someone to use or have something you own," and "to give specific users access to online

25   content:  You can share via email, Facebook, or Twitter."  *See* Pl.'s Opp. at 11, ECF 172-4.  The

26

27   ───────────────
     [11] Svenson's claims are asserted under California law, which Svenson claims is applicable under
28   the Wallet TOS.  See FAC ¶ 134, ECF 84; Wallet TOS at GOOG- 00000082, Exh. 7 to Sipos
     Decl., ECF 168-1.  Google does not challenge the applicability of California law.

1    Court finds the term "share" to be reasonably susceptible of both meanings, and the parties have

2    not provided the Court with extrinsic evidence to resolve this ambiguity. Accordingly, there is a

3    disputed issue whether Google shares a Buyer's personal information within the meaning of the

4    Privacy Policies merely by providing the App Seller with the ability to access the information, or

5    whether sharing requires that the Seller actually view the information.

6         Considering the record in the light most favorable to Svenson, and thus adopting

7    Svenson's construction of the term "sharing" for purposes of this motion, the Court concludes that

8    while the "sharing" asserted by Svenson may be sufficient to establish breach of contract it is not

9    sufficient to establish injury in fact. Svenson has not demonstrated that she suffered concrete

10   injury resulting from Google's storage of Svenson's personal information in such a way that it

11   *could* have been, but never was, viewed by YCDroid. Svenson's only conceivable interest in

12   Google's compliance with its Privacy Policies was to ensure the protection of her personal

13   information. There is no evidence that anyone outside of Google ever viewed her personal

14   information. Under these circumstances, Svenson cannot establish injury in fact based on lost

15   benefit of the bargain.

16        Svenson has not cited, and the Court has not discovered, any case in which Article III

17   standing was found to exist under similar circumstances. Another judge in this district, addressing

18   the precise Privacy Policies at issue here in the context of claims for breach of contract and unfair

19   competition, found that no Article III standing existed. *See In re Google, Inc. Privacy Policy*

20   *Litig.*, No. 5:12-cv-01382-PSG, 2015 WL 4317479 (N.D. Cal. July 15, 2015). In *Google Privacy*

21   *Policy Litig.*, the plaintiffs brought a putative class action on behalf of persons who bought at least

22   one paid application on Google Play or its predecessor, Android Market. The plaintiffs alleged

23   claims for breach of contract and unfair competition, asserting among other things that when users

24   bought Apps, Google disclosed their personal information – including name and email address –

25   to the App sellers in contravention of Google's express privacy policies. *Id.* at *2. The district

26   court held that the plaintiffs had failed to allege the injury in fact required under Article III based

27   upon the alleged disclosure to App sellers, because the plaintiffs had alleged only that "for a

28   period of time it was possible for developers to look up the record of a particular transaction on a

25

Google server and also access the user's email and rough address." *Id.* at *4. The court held that "mere risk of future disclosure is not an Article III injury-in-fact," and that "[w]ith no allegation of dissemination or improper receipt of information, any profit or loss made from any alleged disclosure, let alone a potential disclosure, is 'conjectural.'" *Id.*

*Google Privacy Policy Litig.* neither addressed the benefit of the bargain theory asserted by Svenson nor the appropriate legal construction of the term "share" as used in the Privacy Policies. However, the presiding court in that case likewise failed to perceive how a Buyer could suffer injury in fact simply because, for a particular window in time, the Seller could view the Buyer's personal information, when the Seller never actually did so.

In *In re Facebook*, the district court found that one of the named plaintiffs, Marfeo, had Article III standing based on her theory that she "did not receive the full benefit of her bargain because Facebook transmitted her personal information to advertisers." *In re Facebook Privacy Litig.*, 2016 WL 3523850, at *4. In ruling on a motion to dismiss, the court concluded that Marfeo's claim did not depend on advertisers' receipt or use of her personal information but rather that the mere transmission of the information was sufficient to establish Article III standing. *Id.* *In re Facebook* is distinguishable from the present case in that Marfeo's personal information actually was transmitted to outside advertisers and thus the possibility existed that the advertisers could receive and use the information. In the present case, Svenson's personal information was kept on Google's secure servers. While YCDroid had potential access to the information at one time, there is no evidence that YCDroid ever viewed the information when it had the opportunity, and no possibility that YCDroid could do so in the future given Google's change in policy regarding Sellers' access to Buyers' information.

The Court likewise finds distinguishable data breach cases in which courts have found Article III standing where hackers breached a company's security and thereby obtained the plaintiffs' personal information. *See, e.g., In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d at 994; *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1211 (N.D. Cal. 2014). In those cases, the injury in fact resulted from evidence or allegations that hackers *had obtained* the plaintiffs' data. *See In re Anthem*, 162 F. Supp. 3d at 994 (finding Article III injury under a

diminution in value theory where plaintiffs alleged that "cyberattackers extracted Plaintiffs' PII from the Anthem database over an extended time period" and "misused Plaintiffs' personal information"); *In re Adobe*, 66 F. Supp. 3d at 1214 ("[T]he risk that Plaintiffs' personal data will be misused by the hackers who breached Adobe's network is immediate and very real.").  In two cases cited by Svenson, *Remijas v. Neiman Marcus Group, LLC* and *Lewert v. P.F. Chang's China Bistro, Inc.*, the Seventh Circuit declined to find Article III standing based upon a theory similar to that alleged by Svenson here – that the plaintiffs would not have patronized the defendants' businesses had they known that the defendants did not adequately protect their personal information – and instead found Article III standing based on allegations that hackers actually had obtained the plaintiffs' personal information.  *See Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 967-68 (7th Cir. 2016) (finding that plaintiffs' allegations of "the increased risk of fraudulent charges and identity theft they face because their data has already been stolen . . . . are concrete enough to support a lawsuit"); *Remijas v. Neiman Marcus Group, LLC*, 794 F.3d 688, 693-96 (7th Cir. 2015) (finding standing because there was "no need to speculate as to whether the Neiman Marcus customers' information has been stolen and what information was taken") (internal quotation marks, citation, and brackets omitted).

Here, as noted above, YCDroid never viewed or used Svenson's personal information and there is no possibility that it could do so in the future.  Had there been evidence that YCDroid did view or use Svenson's personal information, the Court might well have concluded that the record contained sufficient evidence to show an injury in fact under Article III based on lost benefit of the bargain.  However, because Svenson's interest in that bargain was the protection of her personal information, and there is no evidence that anyone outside of Google viewed her information, the Court concludes as a matter of law that she cannot establish a concrete injury under this theory.

The Court finds upon a review of the record in the light most favorable to Svenson that Google has established that Svenson has not suffered an injury in fact.  Accordingly, Google's motion for summary judgment as to Svenson's individual claims for lack of Article III standing is GRANTED.

**D.      Merits of Svenson's Claims**

Google argues in the alternative that Svenson cannot prove required elements of her contract and UCL claims.  The Court need not reach Google's alternative arguments in light of its conclusion that Svenson lacks Article III standing.  However, the Court addresses the parties' merits arguments briefly for the sake of completeness.

**1.      Contract Claims**

Under California law, a plaintiff must plead and prove four elements to succeed on a claim for breach of contract:  (1) a contract, (2) the plaintiff's performance or excuse for non-performance, (3) the defendant's breach, and (4) damages to the plaintiff resulting from the defendant's breach.  *Walsh v. W. Valley Mission Cmty. Coll. Dist.*, 66 Cal. App. 4th 1532, 1545 (1998).  Google argues that Svenson cannot show breach of the Wallet TOS or Google's Privacy Policies because Google did not "share" her personal information, and that even if Google did share her information Svenson cannot prove that such sharing was for reasons not permitted under the Privacy Policies.  Google also argues that Svenson cannot show damages resulting from Google's alleged breach of contract for the same reasons that she cannot show Article III injury.

As discussed above, Google has failed to provide the Court with a sufficient basis to adopt its definition of sharing under the Privacy Policies.  Under Svenson's definition, her personal information was shared with YCDroid immediately after her App purchase, and the record reflects that YCDroid's ability to access Svenson's personal information was not limited to circumstances under which sharing was permissible under the Privacy Policies.  Thus, it is disputed whether Google shared Svenson's personal information in violation of the Privacy Policies.  However, even if Google did breach its Privacy Policies, Svenson has presented no evidence of resulting damages.  Consequently, for the same reasons that Google is entitled to summary judgment on the contract claims for lack of Article III standing, Google also is entitled to summary judgment on the merits of those claims.

**2.      UCL Claim**

In order to prevail on a claim for unfair competition under California Business & Professions Code § 17200, a plaintiff must plead and prove that the defendant engaged in an

28

"unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.

"Because the statute is written in the disjunctive, it is violated where a defendant's act or practice

violates any of the foregoing prongs."  *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168

(9th Cir. 2012).

Svenson asserts claims under the unlawful and unfair prongs.  With respect to the unlawful

prong, "[b]y proscribing any unlawful business practice, section 17200 borrows violations of other

laws and treats them as unlawful practices that the unfair competition law makes independently

actionable."  *Chabner v. United of Omaha Life Ins. Co.,* 225 F.3d 1042, 1048 (9th Cir. 2000)

(internal quotation marks and citation omitted).  Svenson relies upon Google's alleged violations

of California Business and Professions Code § 22576, which prohibits an operator of a

commercial website or online service from failing to comply with its own privacy policies.  With

respect to the unfair prong, "the UCL does not define the term 'unfair' as used in Business and

Professions Code section 17200."  *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1364

(2010).  "[A] breach of contract may . . . form the predicate for Section 17200 claims, provided it

also constitutes conduct that is unlawful, or unfair, or fraudulent."  *Puentes v. Wells Fargo Home

Mortg., Inc.*, 160 Cal. App. 4th 638, 645 (2008) (internal quotation marks and citation omitted)

(alterations in original).  Svenson claims that Google breached its contractual obligations by

sharing her personal information with YCDroid immediately after the App transaction for reasons

other than those permitted under the Privacy Policies.  She also claims that Google did so pursuant

to a practice of granting Sellers the unrestricted ability to access Buyers' information, which

practice frustrated the protections ostensibly offered by the Privacy Policies.

As discussed above, Svenson has failed to establish that Google's practice of granting

Sellers unrestricted potential access caused her injury in fact as required under Article III.

However, even if she had been able to clear that hurdle, she would have to take on the more

difficult task of establishing statutory standing under the UCL.  Under the UCL, "claims may only

be brought by a person who has suffered injury in fact *and* has lost money or property as a result

of a violation."  *Von Koenig v. Snapple Beverage Corp.*, 713 F. Supp. 2d 1066, 1078 (E.D. Cal.

2010) (internal quotation marks and citation omitted); *see also Kwikset Corp. v. Sup. Ct.*, 51 Cal.

1   4th 310, 323 (2011) (same); Cal. Bus. & Prof. Code § 17204 (plaintiff must allege that he or she

2   "suffered injury in fact and has lost money or property as a result of the unfair competition").

3   Here, the Google services used by Svenson were free, and she has failed to show that she paid

4   Google any money. To the extent that Svenson entered into a bargain with Google to buy an App

5   on Google's platform in exchange for privacy protections, the asserted loss of those privacy

6   protections does not constitute a loss of *money or property*.

7       Consequently, Google has established an entitlement to summary judgment on Svenson's

8   UCL claim for lack of statutory standing as well as lack of Article III standing.

9   **V.    SVENSON'S MOTION FOR CLASS CERTIFICATION**

10      Svenson's motion for class certification must be DENIED in light of the Court's

11  determination that Svenson lacks Article III standing. However, even if the Court were to

12  conclude that Svenson has Article III standing, the Court would deny class certification on the

13  basis that she does not satisfy the typicality and adequacy requirements of Federal Rule of Civil

14  Procedure 23(a).

15      Class certification requires that the class representative satisfy the numerosity,

16  commonality, typicality, and adequacy requirements of Rule 23(a) and at least one of the

17  provisions of Rule 23(b). *See Mazza v. Am. Honda Motor Co., Inc.*, 666 F. 3d 581, 588 (9th Cir.

18  2012). To satisfy the typicality requirement, Svenson's claims must be typical of those advanced

19  by the class. *See* Fed. R. Civ. P. 23(a)(3). Typicality is "directed to ensuring that plaintiffs are

20  proper parties to proceed with the suit." *Reis v. Arizona Beverages USA*, 287 F.R.D. 523, 539

21  (N.D. Cal. 2012). "The test of typicality is whether other members have the same or similar

22  injury, whether the action is based on conduct which is not unique to the named plaintiffs, and

23  whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar

24  Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation and internal quotation

25  marks omitted). The standard is permissive, requiring only that the claims of the class

26  representatives are "reasonably co-extensive with those of absent class members; they need not be

27  substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

28      Adequacy, meanwhile, requires the plaintiff to "fairly and adequately protect the interests

of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (internal quotation marks and citation omitted). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Id.* (citation omitted).

The Court has no reservations regarding the adequacy of class counsel or their zeal in respresenting the class. However, even assuming that Svenson had demonstrated Article III standing under a benefit of the bargain theory, at most she would be able to pursue contract claims on behalf of the class – the UCL claim is precluded given that Buyers do not pay Google money for the privacy protections at issue. The Court therefore must pay particular attention to the fact that Svenson is subject to a unique defense to the contract claims, in that she asserts injury resulting from her lost expectation of privacy protection, but she purchased the "SMS MMS to Email" App for a second time on Google Play *after* discovering Google's practice of granting Sellers potential access to Buyers' information and *after* filing this suit. *See* Pl.'s Tr. at 24:8-25, Exh. 30 to Sipos Decl., ECF 163-26. Under these circumstances, the Court would deny Svenson's motion for class certification for failure to establish typicality and adequacy, even if it were to determine that she has Article III standing.

## VI.   CONCLUSION

For the reasons discussed above, the Court concludes that although Svenson has established the existence of a triable issue of material fact as to whether Google's "sharing" of her personal information with YCDroid constituted a breach of contract, she cannot establish that she incurred injury in fact as a result of that breach as required under Article III. This is a narrow ruling based on the particular facts of this case. The Court does not intend to suggest, and certainly has not concluded, that Google may violate its Privacy Policies because they are provided in connection with free services.

**VII. ORDER**

    (1)    Plaintiff's motion for class certification is DENIED;

    (2)    Defendants' motion for summary judgment as to Plaintiff's individual claims is GRANTED; and

    (3)    Defendants' motion to exclude the testimony of Plaintiffs' damages expert, Dr. Henry Fishkind, is GRANTED IN PART AND DENIED IN PART.

Dated: December 21, 2016

BETH LABSON FREEMAN
United States District Judge